UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| ALAN WILLIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BIG LOTS, INC., STEVEN S. FISHMAN, JOE R. COOPER, CHARLES W. HAUBIEL II and TIMOTHY A. JOHNSON,<br><br>Defendants. | No. 2:12-cv-00604-MHW-NMK<br><br><u>CLASS ACTION</u> |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
BRIAN K. MURPHY (0070654)
1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DAVID W. MITCHELL
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

1. This securities fraud class action is brought on behalf of persons who purchased the common stock of Big Lots, Inc. ("Big Lots" or the "Company") between February 2, 2012 and August 23, 2012 (the "Class Period"), against Big Lots and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. This Action arises out of a fraudulent scheme and wrongful course of business whereby defendants issued false and misleading statements regarding the Company's business and financial results in order to artificially inflate the price of Big Lots stock and then dump tens of millions of dollars worth of their Big Lots shares at artificially inflated levels. As the truth about Big Lots' operations and prospects were disclosed to the market, the price of Big Lots' shares collapsed to less than $27 per share, 43% below the Class Period high of nearly $47, inflicting substantial economic harm on lead plaintiff and other members of the Class.

## INTRODUCTION

3. Big Lots operates as the largest broadline closeout retailer in North America. Headquartered in Columbus, Ohio, the Company specializes in products that have been overproduced, discontinued or rejected by other retailers. Big Lots operates in both the United States and Canada, but derives the vast majority of its sales and operating profits from U.S. sales.

4. Unlike other discount retailers, Big Lots sources the majority of its merchandise from vendors trying to quickly dispose of unwanted inventory. This unique business model allows Big Lots to offer merchandise at a substantial discount, and often for far less than its competitors. Big Lots' merchandise regularly changes to reflect products sourced through the Company's closeout pipeline, offering Big Lots' customers a distinct "treasure hunt" experience. The success of Big Lots' business model depends largely on the Company's ability to consistently secure high-quality closeout merchandise compatible with consumer demand. As a result, the Company relies heavily on its merchandising personnel to: (i) develop relationships with a broad array of vendors; (ii)

negotiate and secure closeout deals which form the core of the Company's sourcing operations; and (iii) monitor and adapt Big Lots' product offerings to match shifting consumer tastes and preferences.

5. Big Lots' merchandising operations are divided into six "categories" or "divisions": consumables, furniture, home, seasonal, play n' wear, and hardlines and other. Consumables – which consists of replenishable items such as food, hygiene, plastics, paper, chemical and pet products – is Big Lots' largest and most important merchandise category, accounting for over 30% of sales in fiscal years ("FYs") 2011 and 2012 and serving as a primary driver of customer traffic.[1] Big Lots' Chairman, Chief Executive Officer ("CEO") and President, Steven S. Fishman ("Fishman"), has described consumables as so important that he "lose[s] sleep every night" over the category's performance. The other "key categories" emphasized by Big Lots' management are: (i) seasonal; (ii) electronics (a department within the play n' wear division); (iii) furniture; and (iv) domestics (a department within the home division). During the Class Period, investment analysts closely followed Big Lots' performance in these key merchandise categories, as well as the Company's overall same store sales ("SSS") growth, in evaluating Big Lots' performance and business prospects.[2]

6. In FY 2011, following several quarters of disappointing and inconsistent sales results and a botched leveraged buyout attempt, defendants implemented a number of new merchandising initiatives designed to turn around Big Lots' business. For example, defendants shifted Big Lots'

---

1 Big Lots' FY ends on the last Saturday in January, or January 28, 2012 for FY 2011 and January 26, 2013 for FY 2012. As a result, FY 2012 had one extra calendar week. All emphasis throughout this Complaint is added, unless noted otherwise.

2 SSS, also known as "comparable store sales" or "comps," compare the amount of sales at a store with sales at the same store during a prior financial period.

merchandising mix away from toys and towards a greater focus on electronics, seasonal, domestics, furniture and the all-important consumables category. In addition, defendants increased the number of product offerings manufactured specifically for Big Lots, such as Big Lots' private label Fresh Finds food program. Finally, defendants hired Doug Wurl ("Wurl"), a former senior merchandising executive at Sears Holding Corporation ("Sears"), to serve as Big Lots' new Executive Vice President ("EVP") of Merchandising. Defendants touted Wurl's "broad based experience" and contacts as enabling Big Lots to strengthen its critical relationship with sourcing partners in its closeout network and improve Big Lots' overall merchandising operations.

7. Defendants' strategy appeared to pay off. After three consecutive quarters of negative or flat SSS growth, in 3Q11 Big Lots reported a SSS increase. On a December 2, 2011 earnings conference call with investors, Fishman assured the market that the Company's merchandising initiatives had been "***well received***" by customers and that the Company's merchandising personnel "***look and are executing as good as [they've] ever done before***." Senior Vice President ("SVP") of Finance, Timothy A. Johnson ("Johnson") added that the closeout opportunities had been "***terrific***" and that a number of "***great deals***" had propelled accelerating trends in Big Lots' key consumables category.

8. On the call, defendants made clear that improving sales trends would continue through 4Q11 and into FY 2012. Fishman and other senior executives stressed that sales trends were "***accelerat[ing]***" heading into the new year. Fishman explained that Big Lots' merchandise assortment continued to "***get stronger and more focused on value, brands and excitement***," and that in-store execution was "***better . . . than any [time he] can remember***." Fishman stated that the Company's electronics business was performing "***better than ever before***" and that "[w]e're really going after seasonal, really going after furniture, really going after consumables. Every one of those businesses are seeing lifts and have seen consistent lifts quarter to quarter to quarter." Fishman

further credited Wurl's experience and network of vendor contacts with enabling Big Lots to secure closeout deals "on a consistent basis, better quality deals, better vendor deals, upscale vendors that [Big Lots] really wanted to do business with."

9. Defendants' public statements, however, did not match reality. Changes within the Company's merchandising operations prevented Big Lots from being able to meet sales targets. As the new head of merchandising, Wurl moved away from Big Lots' unique closeout-focused business model to a more conventional retail model like the one he previously oversaw at Sears. By late 2011, Wurl began laying off merchandising personnel in order to implement this vision, a purge so severe that it earned him the nickname "Attila the Hun." Wurl's strategies also ran at odds with the Company's opportunistic deal culture, placing Wurl at loggerheads with other Company leaders, in particular Fishman, who wanted to maintain the integrity of the Company's distinctive business model. Big Lots' merchandising teams – critical to the success of Big Lots' business – struggled to execute inconsistent, and often conflicting, directives from senior management. In early 2012, Big Lots employees left en masse. The loss in talent exacerbated execution problems within the Company's merchandising operations. Remaining merchandising teams found it more difficult to secure the high-quality closeout deals that formed the foundation of Big Lots' business model, and instead resorted to sourcing low-quality, inferior products which were poorly received by customers. Finally, the new merchandising initiatives implemented by defendants in mid-FY 2011 failed to address increasingly problematic structural weaknesses in Big Lots' business model. As a result, sales slowed by February 2012, particularly in the Company's key sales categories.

10. Despite the severity of these internal problems and defendants' awareness of Big Lots' deteriorating sales trends, in a February 2012 release defendants revised Big Lots' 4Q11 earnings-per-share ("EPS") numbers up to $1.71-$1.74. The release also reported that SSS growth

in 4Q11 increased 3.4%, which "exceeded [prior] guidance" of 1%-2%, on the strength of favorable trends in the Company's key sales categories. The release quoted Fishman as stating:

> "I'm pleased with our fourth quarter sales results and the improving trends we have experienced throughout the year. For the all-important holiday selling season, we believe our strategy was very well executed and our decision to be aggressive in certain key categories was successful. From a merchandising perspective, seasonal and furniture each comped up low double digits and consumables comped up mid single digits. Additionally, our planned shift to more electronics merchandise while downsizing toys was well received by our customers."

11. The February 2012 release was the first of a series of false and misleading statements intended to artificially inflate the price of Big Lots stock. Crucially omitted from this statement was the fact that several of the Company's key sales categories, including consumables and electronics, and the "improving trends" coming out of FY 2011 had eroded. Contrary to Fishman's earlier representations, in-store execution in the first part of FY 2012 was far from being "better than any [Fishman] can remember." It was an unmitigated disaster. Sales trends were not "accelerating," as claimed, but rather declining. And, the "consistent lifts quarter to quarter to quarter" in key sales categories had evaporated. Moreover, the highly touted merchandising-guru, Wurl, had failed to live up to expectations. Instead of offering increased consistency in the quality and number of closeout deals, under his leadership the number of closeout deals had dried up and many of the Company's top merchandising talent had left. Big Lots' shelves were stocked with stale electronics merchandise and a far narrower selection of consumables, which defendants knew was decimating 1Q12 top-line sales results.

12. Despite this adverse turn of events, over the next six months defendants repeatedly made the false proclamation – in releases, U.S. Securities and Exchange Commission ("SEC") filings, and investor conference calls – that the favorable trends closing out FY 2011 had carried into FY 2012. Not so. Moreover, defendants concealed critical information about the decline in key sales categories – and the implications of this downturn for SSS and the soundness of Big Lots'

business model – in representations to the investing public rendering these representations false and misleading.

13. For example, in a March 2, 2012 earnings conference call with investors, Fishman stated that Big Lots was experiencing "***improving trends coming out of 2011***" and that 1Q12 sales trends were "***consistent***" with the "***Record Results***" achieved in 4Q11. Defendant Joe R. Cooper ("Cooper"), the Company's Chief Financial Officer ("CFO"), stated that in 1Q12, SSS would increase "2% to 4%," U.S. sales would increase "6% to 8%," and EPS would increase "7% to 16%." Likewise, at an investor conference on March 27, 2012, Fishman stated: "***We are growing organically, and merchandise is key***." "***For fiscal 2012 we are expecting another solid year – a US comp store sales increase [of] 2% to 3%, EPS of $3.40 to $3.50, a 14% to 17% increase over 2011, and $200 million of cash flow***."

14. Defendants' representations about FY 2012 prospects were false and misleading when made. Indeed, momentum from the end of FY 2011 failed to carry into FY 2012, critical closeout opportunities had dried up, and the Company's merchandising operations had fallen into increasing disarray, with execution problems decimating sales results in the Company's key merchandising categories. Defendants purposefully concealed Big Lots' actual operating performance in order to: (i) hide the fact that the merchandising initiatives implemented in mid-FY 2011 had failed to cure structural deficiencies in Big Lots' closeout business model; (ii) conceal that mass defections and internal disagreements had substantially impaired Big Lots' critical merchandising operations; and (iii) allow certain of the Company's directors and/or officers (the "Individual Defendants") to dump en masse their own Big Lots shares before the truth about Big Lots' operating condition became known to the market, thereby securing tens of millions of dollars in ill-gotten proceeds for themselves.

15. As a result of defendants' false and misleading statements, Big Lots stock reached a high of nearly $47 per share on March 27, 2012, the same day that: (i) Fishman falsely declared Big Lots' "***solid***" FY 2012 prospects at an investor conference; and (ii) Company insiders dumped ***92,000 shares*** of Big Lots stock while in possession of the adverse material, non-public information detailed herein.

16. Indeed, during the Class Period, the Individual Defendants and 13 other Company insiders sold a combined total of more than ***809,000 shares*** for total proceeds of more than ***$36 million*** as detailed in the chart below.

**BIG LOTS' MASSIVE INSIDER TRADING SCHEME DURING THE CLASS PERIOD**

| Defendant | Shares Sold | Proceeds | Percent Sold |
|---|---|---|---|
| Cooper | 86,875 | $3,934,521 | 42% |
| Fishman | 227,500 | $10,289,825 | 19% |
| Haubiel | 75,000 | $3,399,188 | 40% |
| Johnson | 5,625 | $255,769 | 15% |
| Additional Insiders[3] | 414,773 | $18,568,371 | 46% |
| ***TOTAL*** | ***809,773*** | ***$36,447,673*** | ***32%*** |

On average, Company insiders dumped more than 32% of their holdings in Big Lots during this time. On March 20, 2012, defendant Fishman dumped 227,500 shares for more than $10 million in proceeds – nearly ***double*** the next highest single-day trade by a Company insider in Big Lots' history. By selling their Big Lots stock before the truth of Big Lots' sales performance and business prospects became known to the market, ***Company insiders avoided nearly $12 million in losses***.

17. Defendant's stock sales were highly suspicious in both timing and amount. In fact, March 2012 represented the largest single month of insider trading activity in terms of the amount of

---

3 As more fully described in ¶¶155-160, the following Company insiders also dumped Big Lots stock during the Class Period: Lisa Bachmann, Jeffrey Berger, Robert Claxton, David Kollat, Brenda Lauderback, Philip Mallot, John Martin, Norman Rankin, Paul Schroeder, Robert Segal, Steven Smart, Russel Solt and Dennis Tishkoff.

proceeds generated in at least ten years. Moreover, these trades did not conform with the Individual Defendants' prior trading practice and a vast majority occurred outside any 10b5-1 trading plans.[4] Finally, the sheer number of officers and directors who concurrently engaged in unusual trading activity – 17 individuals, the most Big Lots insiders to trade during the same month in at least a decade – further suggests in at least a decade that the Individual Defendants made their trades on the basis of a shared knowledge of material, non-public information adverse to Big Lots' stock price.

18. At the same time the Individual Defendants were dumping their own stock in Big Lots, they were causing the Company to purchase $99 million of Big Lots stock on the open market and in private transactions throughout 1Q12 in order to: (i) maintain the Company's inflated stock value; (ii) further support the appearance that the Company was doing well; (iii) and deflect attention away from the insiders' profiteering.

19. On April 23, 2012, after the markets closed and after the massive sell-off by Individual Defendants had been completed, Big Lots issued a release partially disclosing the true state of its operating performance. The release slashed guidance of SSS from 2%-4% ***growth*** to a predicted ***decline***. As a result, Big Lots would miss its easiest quarterly comparison in at least ten years. In addition, defendants shocked the market by disclosing that the performance of Big Lots' core consumables and electronics categories was sharply divergent from defendants' assurances less than a month before.

---

[4] Sales under 10b5-1 trading plans are ostensibly pre-planned trades designed to comply with SEC Rule 10b5-1(c), which allows an affirmative defense to any charge of insider trading, "designed to cover situations in which a person can demonstrate that the material non-public information was not a factor in the trading decision." Trades made under 10b5-1 plans do ***not*** shield an individual from insider trading liability, however, in instances where the 10b5-1 plan is established after an insider comes into possession of material, non-public information. *See, e.g., United States v. Nacchio*, 519 F.3d 1140, 1169 (10th Cir. 2008), *overruled on other grounds by* 555 F.3d 1234 (10th Cir. 2010) (holding termination and adoption of several 10b5-1 plans in rapid succession could lead a reasonable jury to find scienter for criminal securities fraud).

20. Investment analysts described the announcement as a "***doozy***" and "***hard to swallow***" and downgraded their earnings guidance and price targets for Big Lots stock across the board. On this news, Big Lots stock collapsed $11 per share to close below $35 per share on April 24, 2012, a one-day decline of 24% on heavy trading volume.

21. The true facts, which were known by or available to defendants but concealed from the investing public were:

(a) that, by February 2012, sales in the Company's key merchandising categories had slowed;

(b) that 1Q12 sales in Big Lots' consumables category, which represented a third of its business and served as a key driver of customer traffic, were declining as a result of poor brand selection and limited product array;

(c) that 1Q12 sales in the Company's video game, DVD and tablet classifications were declining as a result of outdated offerings and poor product selection;

(d) that mass defections and layoffs of key personnel and Wurl's failure to successfully integrate as head of Big Lots' merchandising operations had critically impaired Big Lots' merchandising operations and the Company's ability to secure appropriate closeout inventory and effectively execute its merchandising strategies;

(e) that the Company could not meet its 1Q12 sales and earnings numbers as SSS were not on track to increase 2%-4% but were in fact decreasing and Big Lots could not possibly achieve EPS of $0.75-$0.81 as claimed by defendants;

(f) that the Company could not meet its FY 2012 sales numbers or EPS of $3.40-$3.50, as SSS were not on track to increase 2%-3% but were in fact declining; and

(g) that as a result of (a)-(f) above, defendants had no reasonable basis to expect, and did not, in fact, expect Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81, or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

22. Despite the data disclosed in the Company's April 23, 2012 release, defendants continued to conceal the true cause of the sales and earnings miss. For example, on a May 23, 2012 earnings call with investors, Fishman and other senior executives presented 1Q12 as a one-off, readily-rectifiable slowdown limited to consumables and electronics. Fishman chalked up 1Q12 results to poor execution and stated that defendants had "***identified [Big Lots'] misses and have a plan to correct them***." Defendants not only omitted the loss of key personnel, but Fishman actually represented that Big Lots was ***expanding*** its merchandising staff. Instead of disclosing the Company's diminished capacity to secure valuable closeout inventory, Fishman falsely represented that there was "***good [closeout] flow in every one of the [Company's] businesses***" and that the deals were "***better quality from better name-brand manufacturers than ever before***." And, Fishman continued to tout Wurl's stewardship of Big Lots' merchandising operations as a success despite his knowledge to the contrary, praising Wurl for doing "a job that we have never really done before."

23. As a result, defendants continued to conceal the truth about the Company's impaired merchandising capabilities, the structural weaknesses in Big Lots' business model, and the Company's FY 2012 prospects, and Big Lots stock continued to trade at artificially inflated levels. Defendants also attempted to obscure their fraudulent conduct by falsely representing that the slowdown in sales only began in April 2012 – immediately after the massive March insider-trading spree by the Individual Defendants had concluded.

24. On August 23, 2012, Big Lots once again shocked the markets by reporting it had failed to meet its performance numbers for the second consecutive quarter. In a release, the Company reported a 2Q12 2% SSS decline and EPS of only $0.36, revising downward Big Lots'

numbers for FY 2012. That same day, Big Lots announced numerous changes to its top executive personnel, including the "resignation" of Wurl and the return of Wurl's predecessor to head Big Lots' merchandising operations. As the market absorbed the truth of Big Lots' merchandising and sales problems, Big Lots stock plummeted $8 per share to close at $30.76 per share on August 23, 2012, a one-day decline of 21% on heavy trading volume.

25. Thereafter, *The Wall Street Journal* ran a series of articles focused on the insider trading by Fishman and the rest of the Individual Defendants during the Class Period. Big Lots admitted that it had received a subpoena from the United States Department of Justice ("DOJ") on November 29, 2012, requesting information regarding trades made by Fishman. The SEC had also opened an investigation into trading by the Company's executives.

26. On December 4, 2012, less than a week after the Company received the DOJ subpoena, Fishman abruptly announced his "retirement" from the Company. Fishman provided no explanation for his decision other than a sudden "desire to shift his focus and put his family first." The resignation was a surprise to many not only because of its unusual timing and the ignominy of the surrounding circumstances, but also because of previous public comments by the defendants regarding their intention to ensure a stable and smooth transition in placing Fishman's successor.

27. Defendant's scheme and wrongful course of business was designed to, and did, have the effect of diving up the price of Big Lots stock and allowing Big Lots insiders to dump tens of millions of dollars worth of their own shares at artificially inflated levels. As the truth about Big Lots and its operations reached the market, the trading price of Big Lots shares collapsed, inflicting substantial economic harm on lead plaintiff and other Class members as depicted below:




## JURISDICTION AND VENUE

28. The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

29. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

30. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions giving rise to the violations of the law complained of herein, including the preparation and dissemination of materially false and misleading statements and the acquisition of material non-public information by Company insiders and subsequent trading thereon, occurred in, substantial part, in this District. In addition, Big Lots' principal executive

offices are in Columbus, Ohio, and the Individual Defendants conducted Big Lots' day-to-day operations in this District.

31. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiff

32. The City of Pontiac General Employees' Retirement System ("Pontiac") was appointed as lead plaintiff in this Action. Pontiac bought 16,800 shares of Big Lots stock at inflated prices, including purchases contemporaneous with insider sales by the Individual Defendants, during the Class Period.

### Defendants

33. Defendant Big Lots, a Fortune 500 corporation based in Columbus, Ohio, describes itself as the "nation's largest broadline closeout retailer." The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BIG."

34. Defendant Fishman serves as Chairman of the Board, CEO and President of Big Lots. During the Class Period, Fishman was responsible for directing Big Lots' finances and business affairs. On December 4, 2012, soon after Big Lots was notified that both the SEC and DOJ were investigating Fishman's suspicious insider trading activity, Fishman abruptly announced his "retirement." Because no succession plans had been put in place, Fishman agreed to retain his positions until a successor is appointed.

35. Defendant Cooper serves as President of Big Lots Canada. During the Class Period, Cooper also served as CFO of Big Lots and the EVP of Loss Prevention and Risk Management, and

in these positions was responsible for the Company's treasury, tax, investor relations, loss prevention and risk management, as well as the reporting, planning, and control functions of the business.

36. Defendant Charles W. Haubiel II ("Haubiel") serves as Big Lots' General Counsel, Corporate Secretary and EVP of Legal and Real Estate. In August 2012, Haubiel also became the Company's Chief Administrative Officer. During the Class Period, Haubiel was responsible for overseeing the Company's compliance with applicable laws and regulations, and for the mitigation of risk, including with regards to representations made to the investing public.

37. Defendant Johnson serves as CFO of Big Lots. In this role, Johnson oversees all of the financial activities of the Company. During the Class Period, Johnson served as SVP of Finance and as a member of the Company's Executive Committee, which gave him responsibility for the accounting and financial control, tax, internal audit, financial planning and analysis, and investor relations of the Company.

38. Defendants Cooper, Fishman, Haubiel and Johnson are collectively referred to herein as the "Individual Defendants."

39. By reason of their direct and substantial management positions and responsibilities during the Class Period, the Individual Defendants were "control persons" of Big Lots within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78, and had the power and influence to control Big Lots and exercised that control to cause the Company to engage in the violations and improper practices complained of herein. Each of the Individual Defendants was directly involved in the day-to-day operations of Big Lots, including the improper dissemination of materially false and misleading information regarding Big Lots' sales, financial performance and business prospects.

40. As senior officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants had a

duty to promptly disseminate, accurate and truthful information with respect to Big Lots' business operations, sales performance, financial status, outlook, and material facts that could affect valuation, growth and earnings, as well as to correct or amend any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and wrongful course of business that operated as a fraud or deceit on purchasers of Big Lots common stock by disseminating materially false and misleading statements and concealing material adverse facts and/or engaging in illegal insider trading of Big Lots common stock based on material, non-public information. The scheme: (i) deceived the investing public regarding Big Lots' business operations, financial status, outlook, and the intrinsic value of Big Lots common stock; (ii) enabled Big Lots' senior executives and Company directors to sell their Big Lots stock at artificially inflated levels thereby generating more than $36 million in insider trading proceeds; and (iii) caused lead plaintiff and other members of the Class to suffer substantial economic harm.

## BACKGROUND TO THE FRAUD

### The Central Importance of Big Lots' Merchandising Operations to Its Business

42. Big Lots was founded in 1967 in Columbus, Ohio as Consolidated Stores Corporation, which opened its first closeout retail chain in 1982. Since then, Big Lots has grown into North America's largest broadline closeout retailer by offering customers a wide variety of merchandise at cut-rate prices.

43. Big Lots operates a unique business model. Unlike other discount retailers, Big Lots sources a substantial percentage – up to 80% in some sales categories – of its merchandise through

closeout deals. Vendors may have closeout merchandise available where merchandise has been overproduced, discontinued or rejected by other retailers. In these situations, Big Lots is often able to source branded products at a substantial discount to retail, and can pass these savings on to customers. As a result of the opportunistic deal nature of Big Lots' sourcing operations, a significant percentage of its merchandise may change from week to week as new deals arise and old opportunities are fully exploited. This sourcing model provides a "treasure hunt" environment that appeals to the particular type of bargain hunters who make up Big Lots' customer base.

44. Given the closeout-focus of Big Lots' business model, the Company relies heavily on the success of its merchandising operations. As described in the Company's FY 2011 Form 10-K:

> An integral part of our business is the sourcing and purchasing of quality brand-name merchandise directly from manufacturers and other vendors typically at prices below those paid by traditional retailers. . . . We have a merchandising team with extensive closeout purchasing experience, which we believe has enabled us to develop successful long-term relationships with many of the largest and most recognized vendors in North America.

**Big Lot's Corporate Structures and Reporting Systems**

45. Big Lots' merchandising operations are divided into six "categories" or "divisions": consumables, furniture, home, seasonal, play 'n wear, and hardlines and other. Each merchandising division is subdivided into "departments," which are further subdivided into "classifications" made up of a discrete set of merchandising items. For example, hygiene is a classification within the health and beauty department, which in turn is organized as part of the consumables division. Consumables is Big Lots' largest and most important category, accounting for more than 30% of sales in FYs 2011 and 2012. Consumables is also a major driver of customer traffic, and, therefore, important to Big Lots' overall sales results. Fishman has described consumables as so important that he "lose[s] sleep every night" over the category's performance. The other "key categories" singled out by Big Lots' management include seasonal, electronics (a department within the play n' wear division), furniture, and domestics (a department within the home division). During the Class

Period, investment analysts closely followed Big Lots' performance in these key sales categories, as well as the Company's overall SSS growth, in evaluating Big Lots' performance and business prospects.

46. During the Class Period, Big Lots relied on an extensive network of merchandising personnel integral to the successful execution of its closeout-focused business model. At the lowest level, specialized "merchant teams" were focused on one or more product classifications and included "Buyers," responsible for developing vendor relationships and purchasing inventory, "Planners," responsible for monitoring and quickly reacting to sales trends, and "Allocators," responsible for properly timing shipments from distribution centers to individual stores. Merchant teams received detailed sales reports on a daily basis via the Company's internal narrowcast messaging system which broke down Big Lots' sales by division, department and classification. Merchant teams also convened weekly "BPA meetings," during which Buyers, Planners and Allocators performed in-depth analyses of current sales issues for their specific classifications. Sales performance was further discussed at weekly "Divisional meetings" attended by all merchant teams within a division and led by the divisional merchandising manager. Negative sales trends were highlighted during these meetings, and attendees pored over potential reasons for the downturn and proposed solutions.

47. Divisional managers reported to one of Big Lots' two General Merchandising Managers who reported to Chief Merchandising Officer Wurl. Wurl, in turn, reported to CEO Fishman. In addition, each of the Individual Defendants received daily "Flash Reports" of the Company's sales performance and a "Weekly Summary" of sales results. These reports included sales by region, sales to plan, and comparable store sales for each of the Company's merchandising divisions. Each of the Individual Defendants also attended weekly "Executive meetings" wherein they discussed the content of the weekly divisional merchandising meetings and the Company's

sales performance, with special attention paid to any negative sales trends. In this way, defendants were continuously apprised of sales developments and relied heavily on a broad network of highly specialized merchandising personnel to: (i) locate and secure high-quality closeout inventory; (ii) continuously monitor the sales performance of specific merchandise items; (iii) quickly adjust inventory to match consumer demand; and (iv) effectively implement merchandising directives from Big Lots' senior management.

**Defendants Condition the Market to Expect Positive Sales Trends to Continue into FY 2012**

48. By mid-FY 2011, Big Lots had experienced three consecutive quarters of flat or negative SSS growth. The Company's poor sales performance took a major toll on Big Lots' share price, causing Big Lots stock to trade at the lowest price-to-earnings ("P/E") ratio among any of the Company's peers.[5] By mid-FY 2011, Big Lots stock was trading in the 10-14 P/E multiple range while the stocks of other discount retailers were trading at a 15-25 P/E multiple. In fact, Big Lots stock became so cheap that the Company became a serious takeover target. Frustrated with the underperformance of Big Lots stock, outside investors increasingly pressured management to implement changes to Big Lots' business model which had already been successfully adopted by many of Big Lots' competitors. Specifically, investors wanted Big Lots to add coolers and freezers to stores to increase consumables sales and for Big Lots to move into online sales. Fishman would later acknowledge that he was "challenged more than any probably CEO" on his refusal to adopt such changes.

---

[5] A P/E ratio compares a company's current share price to its EPS. The P/E ratio is most useful for comparing the earnings potential of peer companies within an industry. The lower a company's P/E ratio, the more heavily discounted the company's stock is perceived to be.

49. With Big Lots stock substantially undervalued and sales results abysmal, defendants knew they needed to improve reported sales performance in order to increase the price of Big Lots stock and bring investors off the sidelines. In an effort to report improving performance, defendants implemented a number of new strategies, particularly within the Company's key merchandising categories. For example, in a March 3, 2011 conference call with investors, Fishman described several initiatives that defendants were "working really aggressively on in Consumables to get that business going," such as increasing the number of international food offerings and expanding the Company's private label Fresh Foods program. Defendants also shifted the Company's merchandising mix away from down-trending categories such as toys and towards the key sales categories of consumables, electronics, furniture, seasonal and domestics. Finally, in an April 15, 2011 release, with significant fanfare, defendants announced the hiring of Wurl, a former merchandising executive at Sears, to head the Company's critical merchandising operations. In an August 25, 2011 conference call with investors, Fishman stressed Wurl's ability to open up new closeout opportunities: "Doug, since he has been here . . . is reaching out to a lot of vendors he had relationships with," and as a result, "the quality and the content of the vendor base continues to get better and better" and the Company was "aggressively pursuing" deals with "all" of its vendor base.

50. At first, it appeared that Big Lots' merchandising initiatives paid off. After three consecutive quarters of negative or flat SSS growth, in 3Q11 Big Lots reported SSS increases of 1.7% driven in substantial part by improvements in the consumables, furniture, home and electronics categories. The Company also increased FY 2011 EPS guidance to $2.85-$2.92.

51. On December 2, 2011, defendants Cooper, Fishman, Haubiel and Johnson explained the upswing in a conference call with investors. Fishman stated that the Company's merchandising initiatives had been "well received" by customers and that the Company's merchandising personnel "***look and are executing as good as [they've] ever done before***." Fishman further reported that Big

Lots had done a "terrific job" implementing the merchandising mix shift away from toys, and that the Company was "***very well positioned***" in the "have to win" merchandising categories of seasonal, electronics, furniture, domestics and consumables. Johnson added that the Company's merchant teams had capitalized on "terrific" closeout opportunities, particularly in the critical consumables category, where "great deals" had enabled the Company to offer a broad array of branded merchandise to consumers.

52. On the call, defendants made clear that improving sales trends would continue through 4Q11 and into FY 2012. For example, Fishman and other senior executives repeatedly stressed that sales trends were "accelerating" heading into the new year. Fishman explained that Big Lots' merchandise assortment continued to "get stronger," that in-store execution was "better . . . than any [time he] can remember," and that he "look[ed] forward to seeing the same impact and excitement as [Big Lots] transition[ed] from Holiday into 2012."

53. When asked, "[d]o you see any reason that the business would not continue to see gains as we go into next year, based on the momentum in consumables and some of the other merchandising initiatives that you have?" Fishman responded that the Company's electronics business was performing "better than ever before." "We're really going after seasonal, really going after furniture, really going after consumables. Every one of those businesses are seeing lifts and have seen consistent lifts quarter to quarter to quarter." Fishman further credited Wurl's experience and network of vendor contacts with enabling Big Lots to secure closeout deals "on a consistent basis, better quality deals, better vendor deals, upscale vendors that [Big Lots] really wanted to do business with." Johnson added that investors would "continue to see [terrific closeout deals] as they transition between now and Christmas time and into January, because the flow's pretty good right now."

54. Big Lots' Form 10-Q for the quarter ending October 29, 2011, filed on December 7, 2011, reiterated the improving sales trends and the success of the Company's recent merchandising initiatives: "The Consumables category experienced increases in all departments." In addition to consumables, the Form 10-Q singled out electronics, furniture and domestics as strong growth categories, as the Company shifted its merchandising mix away from down-trending categories like toys.

55. In November and December 2011, defendants made several key representations about Big Lots' sales performance and merchandising operations, including: (i) Big Lots' merchandising initiatives had been well-received by customers and had successfully improved sales performance in the Company's key merchandising categories, in particular the "business driving" consumables category; (ii) positive sales trends were accelerating; (iii) Big Lots was aggressively capitalizing on an extraordinary level of closeout availability; (iv) as the merchandising mix shifted away from toys and towards consumables, electronics, domestics, furniture and seasonal, Big Lots was "well positioned" and stocked with a broad array of high-quality merchandise; (v) Wurl had brought his significant experience and vendor contacts to bear in improving the Company's merchandising operations and expanding its global sourcing network; (vi) Big Lots' merchant teams were successfully executing the Company's sales strategies in unprecedented fashion; and (vii) these positive trends and operational enhancements would continue through 4Q11 and into FY 2012. On the basis of these representations, investment analysts offered substantially improved assessments of the Company's prospects.

**Behind the Scenes, Big Lots' Sales Trends Deteriorated Amid Execution Problems and a Mass Employee Exodus**

56. Despite the representations made by defendants at the end of FY 2011, changes within the Company's merchandising operations had exacerbated weaknesses in the Company's business model and substantially impaired the Company's ability to meet sales targets.

57. As the new head of merchandising, Wurl sought to move away from Big Lots' unique closeout-focused business model to a more conventional retail model like the one he previously oversaw at Sears. Towards that end, Wurl focused on improving and expanding Big Lots' private label offerings at the expense of securing closeout merchandise. Wurl also sought to improve store appearance with an eye towards making Big Lots stores look more like department stores. For example, Wurl wanted the presentation of store merchandise planned out months in advance, so that items would appear coherent and attractive. Because the acquisition and sale of closeout merchandise could not be planned far in advance, Wurl's priorities conflicted with overall Company strategy and ultimately weakened the Company's sales performance.

58. Wurl's initiatives also ran at odds with the Company's opportunistic deal culture, placing Wurl at loggerheads with other Company leaders, in particular Fishman, who wanted to maintain the integrity of the Company's distinctive business model. As a result, Big Lots' merchandising teams – critical to the success of Big Lots' overall business – struggled to implement inconsistent, and often conflicting, directives from senior management. Employees were frequently required to change strategies at the last minute and to redo work they had already completed. Sales performance deteriorated amid growing execution problems. Adding to the uncertainty, Wurl began to layoff a number of employees in late 2011. The severity of the purge earned Wurl the nickname "Attila the Hun" among the Company's merchandising personnel.

59. Beginning in early 2012, dissatisfied with the direction of the Company, many of the Company's key personnel left en masse. As a result, Big Lots lost some of its most seasoned Buyers, Planners and Allocators. During this period, the Company's SVP of Store Operations and a large portion of Big Lots' Human Resources Department also quit or were let go.

60. The loss in expertise seriously impaired the capabilities of Big Lots' specialized merchandising teams and irreparably damaged Big Lots' critical vendor network. Remaining

personnel were unable to secure the high-quality closeout deals that formed the foundation of Big Lots' business, and instead resorted to sourcing low-quality, inferior products which were poorly received by customers. The deterioration of Big Lots' core merchandising capabilities diminished its ability to consistently meet sales targets across merchandise categories and exacerbated structural weaknesses in Big Lots' opportunistic, deal-centered business model. Sales slowed by February 2012, particularly in the Company's key sales categories.

## DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

61. The Class Period commences on February 2, 2012. On that date, defendants issued a release which reported the Company's financial results for the quarter ending January 28, 2012. The release stated that Big Lots had "***exceeded our guidance***" on "***improving trends***." The release reported that 4Q11 SSS grew 3.4% and U.S. sales grew 7.7%. The release revised up EPS numbers for FY 2011 to $2.94-$2.97, a 4%-5% improvement over FY 2010. Commenting on the overall operating results, Fishman was quoted:

> "I'm pleased with our fourth quarter sales results and the improving trends we have experienced throughout the year. For the all-important holiday selling season, we believe our strategy was very well executed and our decision to be aggressive in certain key categories was successful. From a merchandise perspective, seasonal and furniture each comped up low double digits and consumables comped up mid single digits. Additionally, our planned shift to more electronics merchandise while downsizing toys was well received by our customers."

62. Defendants' February 2, 2012 statements regarding the Company's 4Q11 financial results were each materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants were that mass layoffs of key personnel and Wurl's failure to successfully integrate as head of Big Lots' merchandising operations had critically impaired Big Lots' merchandising operations and the Company's ability to secure appropriate closeout inventory and effectively execute its merchandising strategies. Moreover, as a result of these layoffs, integration issues and merchandising problems, the robust sales trends experienced by

Big Lots at the end of the FY 2011, including robust growth in consumables and electronics, could not be sustained in 1Q12.

63. Defendants' false February 2, 2012 statements had a direct effect on Big Lots' stock price driving it up to $42.82 per share, a one-day increase of nearly 8%.

64. Following the release of the 4Q11 results, securities analysts issued upbeat reports about the Company's sales prospects heading into 1Q12, reiterating and disseminating defendants' comments. The reports highlighted Big Lots' reported positive SSS growth of 3.4% for 4Q11 after two consecutive quarters of negative comparisons. In particular, analysts focused on the improvements in consumables and the merchandising-mix shift towards the Company's key sales categories as a sign that Big Lots would achieve greater top-line consistency in FY 2012. For example, on February 2, 2012, an analyst at Deutsche Bank wrote, "***SSS Rise 3.4% … Game Plan Working Well***," and continued:

> ***Strong Results + Favorable Set-Up = Remain Bullish***
>
> Big Lots took a BIG step forward in 4Q as continued execution and improved assortment throughout the store led to a strong 3.4% comp earlier today, well ahead of our 1.8% estimate and the Street (+1.1%). ***To this point, Biggie's game plan to be aggressive in certain key categories paid off handsomely, (i.e. seasonal, furniture segments comped up low "double digits," consumables up "mid-single digits") as BIG reported its best overall comp since 2Q10 (+3.8%)***. All told, these impressive top-line results (+ increased 4Q11 guidance) despite mixed sentiment heading into this print, combined with the potential for an improvement in housing (BIG well positioned with 33% of its mix housing related in furniture and home), and the fact that SSS comparisons remain easy over the next two quarters (-2.6% avg.) keep us bullish on the shares.

65. Taking advantage of the fact that Big Lots stock was trading at artificially inflated levels, defendants Cooper and Haubiel dumped large quantities of Big Lots stock. On February 29, 2012, Haubiel dumped 18,750 shares of Big Lots stock for more than $833,000 in proceeds. On February 29 and March 1, 2012, Cooper dumped a total of 17,000 of Big Lots stock for combined proceeds of more than $760,000.

66. On March 1, 2012, the Board met and discussed Big Lots' financial performance and sales results in detail, including Big Lots' actual sales trends and business prospects.

67. On March 2, 2012, Big Lots issued a release announcing the Company's financial "***Record Results***" for its fourth quarter and fiscal year ending January 28, 2012. The release highlighted "***record total sales***," "***record net income***" and "***record operating profit***," as well as SSS increases of 3.4% for U.S. Big Lots' stores. Commenting on the results, Fishman stated: "We were aggressive this year in certain key merchandise initiatives and our strategies accelerated sales trends as the year progressed."

68. Defendants also advised investors that FY 2012 EPS would "be in the range of $3.40 to $3.50," SSS would increase "2% to 3%," U.S. sales would increase "8% to 9%," and that Big Lots' financial performance would "result in cash flow of approximately $200 million." The release also noted that 1Q12 EPS would be "$0.75 to $0.81, a 7% to 16% increase" over 1Q11, while SSS would increase "2% to 4%" in 1Q12, with an increase in U.S. sales of "6% to 8%."

69. Also on March 2, 2012, defendants hosted an earnings call with investors. Defendants Cooper, Fishman, Haubiel and Johnson participated on the call and repeated the information in the March 2, 2012 release and addressed analysts and investors' questions. During the call, Fishman credited Big Lots' 4Q11 "strong financial results" to the fact that the Company was "***execut[ing] our strategies extremely well . . . maybe better than we ever have before***." Fishman highlighted strong sales growth in the seasonal, furniture, consumables and electronics categories and stated that "***customers responded in a big way***" to the merchandising mix-shift away from toys and towards other key sales categories, as well as Big Lots' improved product offerings. He added that "***significant improvements . . . with our merchandise, with planned events, and our team . . . have translated into meaningful sales growth***" in consumables and that "marketing, product presentation, and in-store execution" for the category had "***steadily improved***." Fishman singled out

electronics as "the other big winner" and stated that the "most exciting" aspect of the category's performance was that "electronics is not just a fourth quarter business."

70. Throughout the call, defendants repeatedly represented to the investing public that these positive sales trends had carried into 1Q12 and would propel growth throughout FY 2012. For example, Cooper reiterated that FY 2012 EPS would be "$3.40 to $3.50," cash flow would be "$200 million," and U.S. sales would increase "8% to 9%," with SSS growth of "2% to 3%." Cooper also stated that for 1Q12, EPS would be "$0.75 to $0.81" and U.S. sales would increase "6% to 8%," with SSS growth of "2% to 4%." Johnson stated that "***February was on plan***" and that the "key categories that were good" in 4Q11 "have legs here into 2012." Fishman specified: "Electronics continues to be good," and "Consumables . . . has picked up." Later, Fishman elaborated on key initiatives in consumables: "Fresh Finds and international foods is doing quite well." "[W]e will probably do in the range of double the business in both those programs this year. ***There is not much yet that is not working***."

71. When asked directly by an investment analyst to describe how the Company's key merchandising categories would perform relative to 4Q11, Fishman answered that 1Q12 sales performance was "***consistent***" with 4Q11 results – results which defendants had repeatedly and emphatically touted as "***record breaking***." In addition, Fishman repeatedly stated that in FY 2012: "We will grow organically. We will grow our U.S. store footprint. We will turn around Canada, and we will grow our organization capabilities." Later, another investment analyst followed-up: "[Y]ou sound very upbeat on this broad-based sales recovery in a number of categories. Sounds like you expect that to continue in FY '12." Fishman doubled-down on defendants' upbeat assessment: "We feel real good about the guidance that we have given."

72. Fishman further represented that the merchandising initiatives which had purportedly proven effective in the latter half of FY 2011 would continue to drive growth in FY 2012, stating:

"***We have improving trends coming out of 2011 and a focused strategy to execute in 2012***." In response to an investment analyst question about comparable store sales consistency, Fishman assured the analyst that Big Lots "ha[d] stronger, more aggressive plans" in place "to address some of the quarter-to-quarter issues." Fishman later added, in response to yet another question about improving quarterly sales consistency: "We feel very, very good that we have very specific merchandising plans for our execution on a quarter-by-quarter . . . basis."

73. Fishman also represented that the unprecedented quality and availability of closeout deals which occurred at the end of FY 2011 had continued into 1Q12:

> ***I will tell you that [closeout availability] for some reason seems to have picked up to a more aggressive posture in the last two to three weeks in particular***. It tends to be in the Consumables area, which to us is good because . . . the Consumables business is the largest closeout piece of our business as a percent to total. . . . So it's been pretty aggressive and pretty active. We continue to work on relationships with the people who we do business with, the branded ones in particular.
>
> I can't speak to why it has picked up. I can only assume that they either have a lot of inventory or somebody is pushing back. That is the same thing that happens all the time, but that is really where it is happening in a pretty aggressive posture, particularly in food and in HBC.

Later, Fishman continued, "we are really aggressively approaching [close out opportunities], and ***are out there in the market probably stronger than we have even been before*** in addressing those opportunities and making sure those opportunities aren't getting by us."

74. Fishman concealed the major employee defections and layoffs, and, in fact, stated that Big Lots "has created meaningful employment opportunities and new jobs" in recent years. He continued: "Organizationally, we will continue to invest in our people to train and develop them, to provide meaningful employment opportunities to support our future growth" in 2012. Fishman specifically highlighted the positive contributions of Wurl to the Company's merchandising operations, stating: "Doug and his team have some different strategies to hopefully drive business," and adding, "what Doug has done . . . I really support."

75. On March 7, 2012, defendants filed a Form 8-K which summarized the contents of the March 2, 2012 release and earnings conference call and provided defendants' FY 2011 condensed consolidated balance sheets and guidance for 1Q12 and FY 2012. Furthermore, the Form 8-K attached as exhibits a copy of the release and a transcript of the conference call, thereby restating and disseminating the false and misleading statements contained therein, and detailed in ¶¶67-74.

76. Haubiel signed the Form 8-K on behalf of Big Lots. In order to comply with the requirements of the Exchange Act, Haubiel was required to familiarize himself with the contents of the Form 8-K and verify that the information contained therein was not false or materially misleading.

77. Defendants' March 2 and March 7, 2012 statements regarding the Company' sales performance and EPS numbers for 1Q12 and FY 2012 were each materially false and misleading when made. The true facts, which were known to or recklessly disregarded by defendants, were:

(a) that, by February 2012, sales in the Company's key merchandising categories did not "have legs" and would not "grow organically" in FY 2012, but in fact had slowed;

(b) that 1Q12 sales in Big Lots' consumables category, which represented a third of its business and served as a key driver of customer traffic, had not "picked up" but in fact had declined as a result of poor brand selection and limited product array;

(c) that 1Q12 sales in the Company's video game, DVD and tablet classifications did not "continue to be good," but in fact had deteriorated as a result of outdated offerings and poor product selection;

(d) that because of softening sales figures, the robust sales trends experienced by Big Lots at the end of FY 2011 had reversed, and thus the Company did not have "improving trends coming out of FY 2011" and its sales performance was not "consistent" with the "record results" of

FY 2011 – indeed, Big Lots was on target to miss its easiest quarterly sales comparison in at least ten years;

(e) that Big Lots had experienced mass defections and layoffs of key personnel which materially impaired the Company's future growth prospects and precluded Big Lots from posting the numbers disseminated by defendants;

(f) that Wurl's merchandising strategies did not "drive business" on the back of Fishman's "real[] support," as Wurl's more conventional retail strategies in fact ran against Big Lots' unique closeout-focused business model and diminished its sales performance, and Fishman was privately acting to prevent the changes endorsed by Wurl;

(g) that the Company could not provide "more consistent and predictable results" in FY 2012, as the loss of key personnel and a lack of focused leadership had critically impaired Big Lots' merchandising operations and its ability to meet sales targets, particularly within the Company's key sales categories;

(h) that the execution of merchandising sales strategies was neither focused nor better than ever before – to the contrary, the Company's merchandising operations had fallen into disarray, many senior personnel had left, and customers were not responding positively to many of the Company's sales initiatives;

(i) that the Company was not "aggressively approaching" an unprecedented level of closeout activity, nor had closeouts in consumables been extraordinarily "aggressive" or "active," as impaired merchandising teams failed to secure available closeout inventory and the consumables product pipeline had dried up;

(j) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to

increase 6%-8%, and the Company could not possibly achieve EPS of $0.75-$0.81 as claimed by defendants;

(k) that the Company could not meet its FY 2012 sales and earnings numbers as SSS were not on track to increase 2%-3%, but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(l) that as a result of (a)-(k) above, defendants had no reasonable basis to expect, and, in fact, did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81, or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

78. Defendants' false March 2, 2012 statements had a direct effect on Big Lots' stock price, driving it up 3% to $44.15 per share by the next trading day. Likewise, after defendants' false March 7, 2012 statements, Big Lots' stock price again increased 3% to $45.43 on March 9, 2012.

79. Following the March 2, 2012 release and investor conference call, and the release of the March 7, 2012 Form 8-K, approximately one dozen analysts issued reports further disseminating defendants' upbeat sales outlook for 1Q12 and FY 2012, with analysts revising their sales and EPS numbers upwards as directed by defendants. Analysts emphasized the reported continuity of positive trends in key merchandising categories marked by a more "aggressive" sales approach, a favorable product pipeline, and the improved execution of successful merchandising strategies.

80. On March 2, 2012, WedBush Securities ("WedBush") issued a report on Big Lots stating that "the company sounded very upbeat regarding its expectations for 2012." "New merchandising strategies are resonating with customers [and] Management has committed to providing more consistent and predictable quarterly results." That same day, another analyst from BB&T Capital Markets ("BB&T") echoed this sentiment: "[W]e see no reason to expect the company's momentum to slow in FY'12." "[B]etter merchandising will help Big Lots achieve management's goal of posting more consistent quarterly comparable-store sales growth and overall

financial performance – which we think would ultimately lead to [P/E] valuation multiple expansion."

81. Defendants' false and misleading statements artificially inflated the price of Big Lots stock and allowed Company insiders to take advantage of this inflated stock value by embarking on a rash of insider trading. ***This insider trading was highly unusual in terms of its timing, size, nature and the number of insiders involved***. During the month of March, ***17 Company insiders*** – including all of the Individual Defendants – sold a stunning ***730,000 shares*** of Big Lots stock for proceeds of more than ***$33 million***. This represented the single largest month of insider trading activity by Big Lots insiders in terms of proceeds generated in at least ten years. Fishman's sales of Big Lots stock on March 20, 2012 alone netted him ***$10.3 million***, an amount nearly ***double*** the next largest same-day transactions by an insider in at least a decade. And the vast majority of trades by the Individual Defendants, approximately ***85%***, occurred off any 10b5-1 trading plan despite the fact that Company insiders ordinarily made use of such plans.

82. In filings with this Court, each of the Individual Defendants would later admit that they chose to sell their Big Lots shares in March 2012 ***because they knew Big Lots shares were trading at all-time highs***. In the words of defendants, "on March 6, when [the Individual Defendants] began selling their shares, Big Lots shares closed at a 14-year high, making [the Individual Defendants'] decisions to sell some of their holdings shortly thereafter both prudent and entirely understandable." *Lamb v. Berger*, No. 2:12-cv-00445-MHW-NMK, Dkt. No. 33-1 at 22 (S.D. Ohio Sept. 10, 2012). Defendants' massive insider trading while in possession of material, adverse non-public information was neither prudent nor understandable – most importantly, it was not lawful.

83. On March 26, 2012, defendants filed Big Lots' annual report with the SEC on Form 10-K for the fiscal year ending January 28, 2012. The Company's Form 10-K was signed by

defendants Fishman, Cooper and Haubiel and affirmed the previously announced FY 2011 sales and earnings numbers, including EPS of "$3.35 to $3.45" and SSS increase of "2% to 3%."

84. The Form 10-K also stated that the Company's employee programs were "key to [Big Lots'] store growth strategy," and that "three significant training and development programs . . . designed to identify and develop the management ranks within [Big Lots'] store operations at all levels" were being rolled out in 2012. The significant employee defections and layoffs that had already occurred were concealed from investors. Instead, defendants represented that the Company's employee retention and training initiatives had "improved the performance of [Big Lots'] new stores" and that "[Big Lots] benefit[s] substantially from the leadership and experience of [its] senior executives."

85. In the Form 10-K, defendants represented that the positive sales results in FY 2011 in the Company's key merchandising categories – in particular, consumables, furniture, seasonal, domestics, and electronics – had been achieved "as customers continue to respond to our new assortments and specialty offerings" and "merchandising initiatives positively impacted sales." Defendants further stated that "the same successful initiatives that benefited results over the last few years" would "continue to grow the basket [*i.e.*, increase transaction value]" in FY 2012.

86. The Form 10-K further stated that Big Lots' merchandising teams had solid relationships with "a broad and growing vendor base" which would "continue to support [Big Lots'] ability to source quality closeout merchandise at competitive prices":

> An integral part of our business is the sourcing and purchasing of quality brand-name merchandise directly from manufacturers and other vendors typically at prices below those paid by traditional retailers. . . .
>
> ***We have a merchandising team with extensive closeout purchasing experience, which we believe has enabled us to develop successful long-term relationships with many of the largest and most recognized vendors in North America***. As a result of our relationships and our experience and reputation in the closeout industry, we believe many vendors offer buying opportunities to us prior to attempting to dispose of their merchandise through other channels.

87. The Form 10-K contained signed certifications by Fishman and Cooper submitted pursuant to §§302 and 906 of the Sarbanes-Oxley Act, which purported to confirm the veracity of the Company' financial statements, operating results and financial guidance, as follows:

> 1. I have reviewed this annual report on Form 10-K of Big Lots, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

88. On March 27, 2012, Fishman and Johnson participated in Telsey Advisory Group's 4th Annual Spring Consumer Conference. The call repeated and addressed information previously made public in defendants' February and March 2012 statements. Defendants Fishman and Johnson participated on the call and had an opportunity to address analysts and investors' questions and concerns.

89. In his prepared remarks, Fishman repeatedly stressed that Big Lots was in "growth mode" and "continue[d] to grow" its vendor base "every day." He stated that successful execution in merchandising strategies was "key" to this "organic growth," and that defendants "expected positive trends in growth and shareholder returns" for the first part of FY 2012 and that the positive sales trends which had led to "record earnings" in FY 2011 would continue:

> ***As we begin 2012, we expect positive trends in growth and shareholder returns. First is growth***. ***We are in a growth mode***, and I will spend a few minutes telling you about our plans for the upcoming year.
>
> And second, shareholder returns. We've been a good steward of our cash and our shareholders' capital, making strategic investments for the future. ***I will briefly discuss our initial guidance for fiscal 2012, which we're expecting to be another solid performance***.

> Let me start with growth. After recent success and refocusing our strategies, we find ourselves deeply entrenched and committed to growing our business. And yes, we are in a growth mode. ***We are growing organically, and merchandise is the key***. We are expanding geographically in both the United States and Canada. And we are growing our organizational capabilities with investments in associate training and development and in information technology.
>
> ***For us, organic growth starts with merchandise***. We offer a unique product assortment with extreme value on branded merchandise and a high penetration of discretionary items, another element of distinction or differentiation.

90. Fishman specifically singled out electronics as a category that was key to Big Lots' continued growth and an example of Big Lots' ability to quickly move merchandise to respond to shifts in consumer demand. He noted that the most exciting aspect of electronics was the category's "year-round appeal":

> We focus our merchandise on consumer buyer trends and strategically shift assortments and space towards hot categories as customer demands.
>
> Here is a good example. A year ago, we decided to strategically shift our business away from traditional toys, a declining category. Instead, we moved toward a hot consumer buying trend, electronics. We allocated more floor space and inventory to tablets, MP3 players, camcorders and accessories, the toys of a new age. These toys have screens and memory cards and appeal to a broad customer base. The results were great. Q4 comps were up nearly 20%. ***Maybe the most exciting aspect of this strategy is the year-round appeal of these items***.

Later, Fishman reiterated that investors would continue to see a "major shift" in electronics in FY 2012 after it had "expanded this past fourth quarter."

91. Fishman emphasized the efficacy of the Company's employee retention and training initiatives: "To support growth, we have also made and will continue to make investments in our organizational capabilities. Associate training and development is a major initiative." Towards that end, Fishman highlighted four employee programs "to ensure that [Big Lots] ha[s] the next generation of leaders throughout the entire infrastructure of the organization," omitting entirely the mass defections of key Company personnel and the extensive impairment to the Company's merchandising operations.

92. Finally, Fishman reiterated defendants' prior FY 2012 numbers, telling investors that Big Lots would post an increase in SSS and EPS above the "record results" obtained in FY 2011 because Big Lots had the "strategies, teams and capital for continued success":

> ***For fiscal 2012 we are expecting another solid year – a US comp store sales increase in the range of 2% to 3%, EPS of $3.40 to $3.50 per share, a 14% to 17% increase over 2011, and $200 million of cash flow***.
>
> As I wrap up, we have a positive track record of success. Our prospects for the future are encouraging. We've delivered record EPS for a half a decade. We've generated strong returns for our shareholders. We've created meaningful employment opportunities for our associates. And we have strategies, teams and capital for continued success in the future.

93. Defendants' March 26 and March 27, 2012 statements regarding the Company's sales and business operations and financial prospects were each materially false and misleading when made. The true facts, which were known to or recklessly disregarded by defendants, were:

(a) that, by February 2012, sales in the Company's key merchandising categories had slowed as major merchandising initiatives implemented in FY 2011 no longer "positively impacted sales" and failed to increase transaction values;

(b) that 1Q12 sales in Big Lots' consumables category, which represented a third of its business and served as a key driver of customer traffic, were declining as a result of poor brand selection and limited product array;

(c) that 1Q12 sales in the Company's video game, DVD and tablet classifications had slowed as a result of outdated offerings and poor product selection, and thus the "major shift" experienced in 4Q11 in electronics had reversed;

(d) that because of softening sales figures, the robust sales trends experienced by Big Lots at the end of FY 2011 had not been maintained, and thus defendants did not "expect positive trends in growth and shareholder returns" in 1Q12;

(e) that defendants did not expect "another solid year" for FY 2012, as Big Lots was on target to miss its easiest quarterly sales comparison in at least ten years;

(f) that Big Lots was not "growing organically" as a result of its merchandise offerings," as Big Lots' was offering an increasingly outdated and narrow selection of merchandise in several of its key sales categories, including consumables and electronics;

(g) that the Company was not "growing [its] organizational capabilities" but rather had experienced mass defections and layoffs of key personnel – which materially impaired the Company's future growth prospects and precluded Big Lots from posting the numbers disseminated by defendants;

(h) that Big Lots was not "benefit[ing] substantially from the leadership and experience of [its] senior executives," as infighting among the Company's senior leadership and failed strategic initiatives had substantially impaired the Company's merchandising operations;

(i) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to increase 6%-8%, and the Company could not possibly achieve the $0.75-$0.81 EPS defendants had claimed;

(j) that the Company could not meet its FY 2012 sales and earnings numbers, as SSS were not on track to increase 2%-3%, but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(k) that as a result of (a)-(j) above, defendants had no reasonable basis to expect, and, in fact, did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81 or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

94. Defendants' false March 26 and March 27, 2012 statements had a direct effect on Big Lots' stock price driving it up to its Class Period high of $46.81 on March 27, 2012.

95. On March 27, 2012, the same day Fishman and Johnson's public statements pushed Big Lots' stock price to its highest levels ever, Cooper dumped 25,000 shares for more than $1 million on proceeds. Also on the same day, 250,000 shares of Fishman's incentive-based restricted stock vested. At the closing trading price on March 27, 2012, this stock was worth ***$11,234,400*** **–** nearly ***ten times*** more valuable than Fishman's entire FY 2011 salary of $1,400,000.

96. On April 9, 2012, defendants released 2011 Big Lots Annual Report. Fishman directly addressed shareholders in a letter to open the report. Fishman's letter represented that Big Lots was in "growth mode": "Not many companies can say it these days, but ***WE ARE IN A GROWTH MODE***. We're growing organically . . . we're growing geographically . . . we're growing organizationally . . . and often growth in one area leads to growth in another." (Emphasis and alterations in original.) Fishman stated that "significant improvements" in consumables which "resonated with consumers and generated shopping excitement" had "translated into meaningful sales growth" at the end of FY 2011. Fishman also stated that Big Lots had "correctly anticipated a shift in consumer buying trends towards electronics" and that "accelerated" sales trends had been experienced across "all major categories." Tying these trends to the present, Fishman stated that Big Lots' merchandise assortment "continues to get stronger and more focused on value and brands," special initiatives had "been successful in introducing new consumers to Big Lots," and that the strategic shifts in merchandise "should have a lasting appeal with shoppers." Fishman went on to state that the Company's success was made possible by "executing a consistent, focused strategy."

97. Throughout his letter, Fishman repeatedly emphasized Big Lots' "job creation" efforts. "At a time when many retailers are eliminating jobs . . . we continue to grow, open new stores, and create meaningful employment opportunities." As a result, Fishman stated that Big Lots was "ideally positioned for the future."

98. The 2011 Big Lots Annual Report also attached as an exhibit a copy of Big Lots' 2011 Form 10-K, thereby restating and disseminating the false and misleading statements contained therein, and detailed in ¶¶83-86.

99. Defendants' April 10, 2012 statements regarding Big Lots' sales and business operations and financial prospects were materially false and misleading when made. The true facts, which were known to or recklessly disregarded by defendants, were:

(a) that by February 2012, Big Lots was not in "growth mode," as sales trends in the Company's key merchandising categories had not continued to accelerate after FY 2011, but in fact had slowed;

(b) that in 1Q12 sales in the Company's electronics and consumables categories had slowed as a result of poor merchandise selection and poorly executed merchandising initiatives;

(c) that the merchandise assortment did not "continue to get stronger and more focused on value and brands," as Big Lots was offering an increasingly outdated and narrow selection of merchandise in several of its key sales categories, including consumables and electronics;

(d) that Big Lots had not "creat[ed] meaningful employment opportunities," as heightened employee dissatisfaction had led to mass defections and layoffs of key personnel, which materially impaired the Company's future growth prospects and precluded the Company from posting the numbers disseminated by defendants;

(e) that Big Lots was not executing a consistent, focused strategy – to the contrary, Big Lots' merchandising operations had fallen into disarray, key personnel had left, and the Company's sales initiatives were being poorly received by consumers;

(f) that the Company was not "ideally positioned for the future," as impaired merchandising teams failed to successfully execute sales strategies or secure appropriate closeout inventory and the consumables product pipeline had dried up;

(g) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to increase 6%-8%, and the Company could not possibly achieve EPS of $0.75-$0.81 as claimed by defendants;

(h) that the Company could not meet its FY2012 sales and earnings numbers, as SSS were not on track to increase 2%-3% but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(i) that as a result of (a)-(h) above, defendants had no reasonable basis to expect, and in fact did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81, or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

100. Defendants' false April 10, 2012 statements had a direct effect on Big Lots' stock price, driving it up nearly 6% to $45.32 by April 17, 2013.

101. As a result of defendants' false and misleading statements, analysts following Big Lots stock continued to issue glowing assessments of Big Lots' sales performance, business operations and financial prospects. For example, on April 17, 2012, Canaccord Genuity ("Canaccord") issued a report emphasizing defendants' representations that merchandising initiatives had successfully turned around the business and would support sustained growth in FY 2012. The report also highlighted the "impact" Wurl was having on merchandising operations and Big Lots' purportedly "aggressive" approach to securing closeout inventory:

> Wurl's impact on the company's merchandising strategies and product assortment can already be seen in his short time as GMM. Since his arrival, BIG has taken a more aggressive approach to its closeout strategy, which has enabled it to broaden its product assortment, specifically in consumables. ***According to management, Wurl***

> ***has been able to garner better deals from vendors on a more consistent basis than the company had in the past. BIG has also added more upscale vendors to its roster and has expanded the breadth of its global sourcing***.

Based on defendants' reported "double-digit EPS growth," "gross margin recovery," and "improved SSS growth in 2012," the report recommended that investors "Buy" Big Lots stock.

**THE TRUTH ABOUT DEFENDANTS' FRAUD BEGINS TO EMERGE**

102. After the markets closed on April 23, 2012, and less than a month after defendants' last spate of insider trading, Big Lots for the first time disclosed that its sales operations were not as represented during 1Q12:

> Based on retail sales results quarter-to-date and assumptions for the balance of the first quarter of fiscal 2012, we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%. . . . From a merchandising perspective, furniture, hardlines, and seasonal, particularly lawn and garden, have been our best performing businesses; whereas, consumables and play n' wear, particularly electronics, are currently below expectations for the quarter.

103. Instead of the 2%-4% ***increase*** in SSS represented by defendants, SSS were now slated to ***decline*** for the quarter. What made this result particularly shocking was that the projected decrease in SSS was to occur during Big Lots' ***easiest quarterly comparison in more than ten years***. In other words, negative SSS indicated that 1Q12 sales were so bad that they would not even match 1Q11, ***a quarter in which Big Lots' SSS had fallen 3.6%***. Moreover, other discount retailers had experienced a noticeable uptick in sales during the same period due to favorable weather. For example, SSS increased 4.1% for Family Dollar Stores, Inc., 5.6% for Dollar Tree, Inc., and 6.7% for Dollar General Corp. – Big Lots' primary three competitors – during each company's comparative financial quarter. Adding insult to injury was the fact that consumables and electronics – ***the very same sales categories*** repeatedly touted by defendants – were the primary contributors to Big Lots' monumental miss.

104. Investment analysts were shocked at the announcement, characterizing it as a "***doozy***" and "***hard to swallow***" and one "***investors [would] have trouble digesting***," particularly in light of the upswing in consumables and electronics defendants had claimed only a few weeks before as a result of favorable closeout opportunities, successful sales initiatives, and improved merchandising operations. In the words of one analyst at Northcoast Research ("Northcoast"): "***What surprised us most about yesterday's news is the positive comments we heard in the Q4 call relating to a favorable product supply pipeline in consumables***." The market was shocked to discover that this "favorable product pipeline" did not exist. Buckingham Research Group, Inc. ("Buckingham") issued an April 24, 2012 report characterizing the miss as "pretty bad" given the easy quarterly comparison and improved sales trends posted by other discount retailers and "advise[d] investors to exit the stock and reinvest funds elsewhere." The report further noted that "***[r]ecent, meaningful insider selling is a concern***." Likewise, a May 18, 2012 Deutsche Bank Research ("Deutsche Bank") report described Big Lots management as a "***team searching for credibility and more consistent results***." In reaction to the news, analysts slashed earnings forecasts and price targets, and several analysts, such as those at Deutsche Bank, MKM Partners ("MKM") and Buckingham, downgraded their recommendations from Buy to Neutral or Hold.

105. Defendants quickly canceled an investor conference call which had been scheduled for April 27, 2012. This move allowed defendants to avoid answering questions about the slowdown. Deutsche Bank characterized the move as "***[e]xacerbating the company's credibility issues***" and noted that the failure to attend the competitor conference "***only deepens our concerns***."

106. As it was finally revealed to the market that the "continuing trends" in consumables, electronics and overall SSS growth repeatedly touted by defendants throughout the Class Period – in releases, investor conference calls, and SEC filings – was completely illusory, Big Lots' stock price plummeted. On April 24, 2012, the next trading day, Big Lots' stock price dropped from $45.71 to

$34.71, a one-day decline of $11, or 24%, on volume of more than 13 million shares – ten times larger than the average trading volume of Big Lots stock during the Class Period, but continued to trade at artificially inflated levels throughout the remainder of the Class Period as defendants continued to conceal the true facts about Big Lots' operations and prospects.

107. Defendants attempted to conceal their fraud by claiming that the softening in sales had occurred almost entirely in April 2012 – immediately ***after*** the Individual Defendants had completed their unprecedented insider selling spree – when in reality the slowdown and impairment in Big Lots' merchandising operations had begun much earlier and was known to the Individual Defendants when making their February and March sales. Defendants also caused the Company to repurchase ***$99 million worth*** of its own shares during 1Q12 at artificially inflated prices while each of the Individual Defendants were simultaneously dumping their Big Lots stock. Causing the Company to buy while insiders sold served to maintain the Company's inflated stock value, further support the appearance that the Company was doing well, and deflect attention away from the insiders' profiteering. Finally, in the April 23, 2012 release and subsequent Class Period statements, defendants failed to disclose the full truth of the earnings and sales miss or the extent to which Big Lots' merchandising operations had been impaired.

108. Despite defendants' efforts, major media outlets soon began to raise questions about the Individual Defendants' insider trading during the Class Period. As reported in April 24, 2012, in a Forbes article:

> In March, following the fourth quarter 8-K issuance on March 7, Big Lots executives dumped about 800,174 shares of stock. CEO Steve Fishman unloaded a cool $14.9 million of his Big Lots holdings, $10 million on March 20 and $4.9 million on March 27. Note that on the fourth quarter earnings call, Mr. Fishman was quoted as stating: "We have improving trends coming out of 2011 and a focused strategy to execute in 2012."
>
> ***So, trends were improving in the first week of March, then significantly nosedived to the extent that sparked meaningful insider stock sales by the CEO on March 20 and March 27? Or, was the earnings call statement misleading to begin***

> ***with seeing as executives began to unload Big Lots shares as soon as the calendar turned to March***?
>
> Keep in mind that retail has been delivering stronger than expected sales for the better part of 2012, suggesting Big Lots' initiatives to drive more consumables goods sales is not working as management has hinted and overall, there is market share loss occurring.
>
> Big Lots spent $46 million to repurchase 1.3 million shares in the fourth quarter at $36.79 per. In 2011, the company repurchased 15% of its outstanding shares. ***This is poorly allocated capital, in my view, especially strange in light of the CEO and other executives selling while the company is buying***.

The article went on to note that the sales results were indications of "clear fundamental deterioration in the business" and that Big Lots' management seemed "to be overpromising and under-delivering in making the chain a destination for consumables."

109. Concerns about insider selling surfaced among the investment community as well. One May 22, 2012 Buckingham report asked, "***[h]ow are insiders so good at selling their shares in [Big Lots]***? A group of 17 executives and directors including the CEO and CFO sold 900,000 shares YTD at an average price of $45. With the stock at $35 today smart selling saved $9M for this group. Must be nice."

110. On May 23, 2012, defendants reported Big Lots' results for 1Q12. The release revealed that, instead of growing 7%-16% as stated, the Company's EPS in fact ***fell*** 3% – a result even worse than the numbers suggested as defendants' representations made "no assumption for share repurchase activity," yet defendants had caused the Company to repurchase 2.5 million Big Lots shares in 1Q12 in an effort to bolster Big Lots' share price and EPS numbers. Adjusting for this massive repurchase, Big Lots' EPS was only $0.65, or more than ***15%*** below the bottom-end of defendants' prior range.

111. The release also disclosed that the robust sales figures repeatedly touted by defendants throughout the Class Period were fabricated. For example, instead of increasing up to

4% during the quarter as represented, SSS actually ***declined*** 1%. U.S. sales increased by less than 3%, largely due to new stores openings, well-below defendants' stated 6% to 8% increase.

112. The release also revised down FY 2012 EPS to "$3.25 to $3.40," revised down SSS to "be in a range of flat to 1%," and revised down U.S. sales to "5.5% to 6.5%." For 2Q12, the release stated that EPS would be "$0.37 to $0.42," U.S. sales would increase "3% to 4%," and SSS would "be in the range of slightly positive to slightly negative."

113. Also on May 23, 2012, defendants Cooper, Fishman and Johnson hosted an earnings call with investors and analysts. After summarizing sales results for 1Q12, Johnson described consumables and electronics as the "two most challenging areas in merchandising." He stated that slowdowns in the two categories had constituted the "large majority of [the] miss."

114. Fishman sought to reassure investors that the sales miss was nothing more than a "straightforward execution issue." He stated that the "challenges [in consumables] were isolated to [the] business, which were more closeout in nature. . . . Our shortfall was either we bought the wrong item, or we weren't broad enough in our selections, particularly in Food." Turning to electronics, Fishman stated he "believe[d] execution came up short here as well. . . . [T]he slowdown from Q4 2011 into Q1 2012 was the result of not keeping pace with technology." Fishman singled out tablets, video games and DVDs as three classifications where Big Lots had offered stale and out-of-date merchandise poorly received by customers.

115. Throughout the call, defendants presented 1Q12 as a one-off, readily-rectifiable miss limited to consumables and electronics. For example, Fishman stated defendants had "a plan" to correct Big Lots' misses and estimated that "***comps [would] move back into positive territory***" in FY 2012 as "the content changes coming from Consumables and Electronics will improve those businesses." Fishman repeatedly denied the existence of any larger issues which could call into question the viability of Big Lots' business model or the integrity of its merchandising operations:

> [W]e looked at all aspects of what can impact sales and in the final analysis, we believe our execution was off. We do not believe competition was an issue. We do not believe we were beat on price or see any issues with our value proposition. We don't believe placement in the store or a marketing changed from Q4 to any significant degree that would explain a slowdown in sales, and I won't allow or acknowledge macro excuses for what I believe is a straightforward execution issue.

116. Indeed, at every turn, defendants tried to mitigate the fallout from the April 23 and May 23, 2012 revelations. Defendants not only failed to mention the loss of any key personnel, but Fishman actually represented that Big Lots was ***expanding*** its merchandising staff by hiring specialized personnel in each of the Company's main merchandising categories known as "Finders." Instead of disclosing the Company's diminished capabilities to secure closeout inventory, Fishman stated that there was "***good [closeout] flow in every one of the [Company's] businesses***" that the deals were "better quality from better name-brand manufacturers than ever before." In his efforts to avoid a complete collapse in the price of Big Lots' shares, Fishman stated that he felt "particularly good" about the consumables, home and hardlines categories. And, despite his knowledge of the turmoil in the Company's merchandising operations brought on by Wurl, Fishman continued to advocate the idea that Wurl had successfully led a restructuring of the business and broadened the Company's closeout opportunities:

> ***I think the relationship-building that Doug has really initiated with his team and with some of the major manufacturers, the best manufacturers in the country, that we probably didn't have as close a relationship with in the past few years is only going to continue to grow***.
>
> He is not only structuring the business or restructuring it around giving him some more talent in those businesses, but also infusing some relationship people that we have really never had before to continue to grow those things.

117. In an effort to avoid a complete collapse in Big Lots' share price and reinflate Big Lot shares Fishman expressly rejected the suggestion raised by two different analysts (from Raymond James and Deutsche Bank) that the slowdown in electronics and consumables spoke to larger

"cyclical" or "structural" problems, in Big Lots' business model. Fishman reiterated that nothing beyond poor "execution" was to blame for the miss.

118. Defendants provided 2Q12 and FY 2012 estimates which failed to acknowledge the true state of Big Lots' sales capabilities and earnings potential. Cooper stated Big Lots was on track to post 2Q12 EPS from U.S. operations of "$0.44 to $0.49," while U.S. sales would increase "3% to 4%" and gross margin would increase over 2Q11. For FY 2012, Cooper noted EPS would be "$3.25 to $3.40," while U.S. sales would increase "5.5% to 6.5%" and SSS would "be in the range of flat to up 1%." Fishman stated "positive" "comps" would be achieved in the back half of FY 2012 as a result of successful execution, improvements in electronics and consumables, and a "recently completed Home expansion [which] will provide an incremental sales opportunity."

119. Defendants' statements were intended to mitigate, and did in fact mitigate, fallout from Big Lots' first quarter results and to prevent the full truth of the impairment to Big Lots' merchandising operations from becoming known to the investing public. As a result, the sharp drop in Big Lots' stock price stabilized and remained at inflated levels.

120. On May 29, 2012, defendants filed a Form 8-K which summarized the contents of the May 23, 2012 release and earnings conference call and provided defendants' balance sheets for 1Q12 and estimates for 2Q12 and FY 2012. Furthermore, the Form 8-K attached as exhibits a copy of the release and a transcript of the conference call, thereby restating and disseminating the false and misleading statements contained therein, as detailed in ¶¶110-117.

121. Haubiel signed the Form 8-K on behalf of Big Lots. In order to comply with the requirements of the Exchange Act, Haubiel was required to familiarize himself with the contents of the Form 8-K and verify that the information contained therein was not false or materially misleading.

122. On June 5, 2012, defendants Haubiel and Johnson represented Big Lots at the 32nd Piper Jaffray Consumer Conference. An analyst expressed the pervasive puzzlement at the earnings miss in 1Q12: "I guess one thing that I'm getting questions from investors on is sort of we understand consumables and electronics were weak, but I guess people still don't understand exactly what happened with the merchandise offering and where you maybe got it wrong . . . ." In response, Johnson continued to downplay the significance of the earnings miss to Big Lots' overall operating performance, stating "[o]ur misstep in electronics was really isolated to a couple select areas." When discussing consumables, Johnson admitted that the Individual Defendants "might not have been aggressive enough" in trying to secure closeout deals, which represent the vast majority – 70% to 80% – of the consumables business, and that there "were certain instances where [Big Lots] had deals last year that [it] did not have deals this year."

123. On June 6, 2012, Big Lots filed its Form 10-Q for the quarter ending April 28, 2012. The Form 10-Q stated that "[b]ased on the sales trends exiting the first quarter of 2012 and the beginning weeks of May, we expect comparable store sales to be slightly positive to slightly negative during the second quarter of 2012." The Form 10-Q further stated that "[i]n the second quarter of 2012, we expect our gross margin rate will be higher than the second quarter of 2011, as we expect a lower markdown rate in 2012 as compared to 2011."

124. The Form 10-Q contained signed certifications by Fishman and Cooper submitted pursuant to §§302 and 906 of the Sarbanes-Oxley Act, which purported to confirm the veracity of the Company' financial statements, operating results and financial guidance. The certifications stated:

> 1. I have reviewed this quarterly report on Form 10-Q of Big Lots, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

125. Defendants' May and June 2012 statements regarding the Company's 1Q12 performance, sales and business operations and financial prospects were each materially false and misleading when made. The true facts, which were known to or recklessly disregarded by defendants, were:

(a) that as a result of mass defections, layoffs of key personnel and Wurl's failure to successfully integrate into Big Lot's merchandising operations, the volatility underlying the Company's closeout-focused business model had in fact been exacerbated and downward sales trends had accelerated;

(b) that sales in several of the Company's key merchandising categories – including furniture, home and seasonal – had softened in the first weeks of 2Q12 as a result of ongoing "execution" failures within Big Lots' merchandising operations;

(c) that Big Lots' gross margin rate was not increasing but in fact declining as a result of an unfavorable merchandising mix and elevated markdown levels;

(d) that the Company could not meet its 2Q12 sales and earnings numbers, as U.S. sales were not on track to increase 3%-4% and the Company could not possible achieve EPS of $0.37-$0.42;

(e) that the Company could not meet its revised FY 2012 sales and earnings numbers, as U.S. sales were not on track to increase 5.5%-6.5% and the Company could not possibly achieve EPS of $3.25-$3.40; and

(f) that as a result of (a)-(e) above, defendants had no reasonable basis to expect, and in fact did not expect, Big Lots to post 2Q12 U.S. sales growth of 3%-4% or EPS of $0.37-$0.42, or FY 2012 U.S. sales growth of 5.5%-6.5% or EPS of $3.25-$3.40.

126. Defendants' false May and June 2012 statements had a direct effect on Big Lots' stock price, preventing further reductions in the stock price. Indeed, after the market received defendants' assurances that 1Q12 sales results were the product of a one-off, readily-rectifiable miss Big Lots' stock price increased 4% in a day to end at $36.31 on May 23, 2012, and increased 3% over two days to end at $38.18 on June 6, 2012.

127. Following defendants' May and June 2012 statements, several analysts issued reports reiterating defendants' assurances that they had corrected downward sales trends in 1Q12 and that SSS would return to positive growth. Illustrative of market sentiment, on June 1, 2012, J.P. Morgan wrote "[w]e believe the [Big Lots] team has stabilized the ship" as "CEO Fishman clarified BIG's 1Q top-line weakness . . . as more execution related . . . rather than structural in nature and firmly believes BIG can hit or exceed Company guidance . . . ."

128. On August 23, 2012, defendants once again shocked the markets with disappointing sales and earnings performance. In a release, Big Lots announced that 2Q12 sales and earnings results fell short of guidance for the second consecutive quarter. Downward sales trends had not only failed to improve but accelerated downward, demonstrating that the Company's "execution issues" were much deeper than originally disclosed and symptomatic of underlying structural problems in Big Lots' business model. The release reported that sales, EPS and SSS for the quarter had all fallen short of defendants' earlier representations. For FY 2012, the release confirmed that defendants' assurances about EPS being $3.25-$3.40 had been substantially overstated and that SSS would in fact ***decline***. That same day, Big Lots revealed that Wurl had "resigned" from the Company "effective immediately."

129. Also on August 23, 2012, defendants Cooper, Fishman and Johnson convened an earnings call with investors to discuss 2Q12 results. On the call, Johnson revealed that, contrary to

defendants' prior representations, Big Lots' gross margin profit rate had ***declined*** 20 basis points instead of increasing.

130. Once again, defendants blamed "self-inflicted" "execution" issues, but continued to conceal the true causes of the execution problems. For example, Fishman briefly touched on the organizational changes in merchandise management, claiming the changes were part of "a well-defined succession plan for the future," and said that he had personally asked John Martin (the Chief Merchandising Officer prior to Wurl) to step back in to lead Big Lots' merchandising efforts. When an investor dissatisfied by this response pressed further, Fishman responded that he was "not trying to be elusive." Fishman stated that Big Lots wanted to look internally for someone to lead its critical merchandising operations, as in his experience Big Lots had only been successful bringing in lower-level employees from outside. Even though the clear implication of this statement was that Wurl's tenure had been unsuccessful, Fishman failed to provide any explanation for Wurl's departure.

131. Once the market learned of the massive organizational shakeup, Big Lots' disappointing 2Q12 results, and the fact that the Company's execution problems and sales volatility remained unaddressed, the Company's stock price plummeted. Big Lots' stock price dropped from $38.84 per share at the close of the markets on August 22, 2012, to close at $30.76 per share by the end of trading on August 23, 2012 – a one-day decline of more than $8, or 21%, on volume of more than 16 million shares, an amount 12 times larger than the average trading volume of Big Lots stock during the Class Period.

132. Analysts slashed estimates and price targets for Big Lots, describing the results as "***a surprise and very disappointing***" and "***far worse than expected***." Analysts, like those at J.P. Morgan and Canaccord, highlighted their concerns about the leadership shakeup, characterizing defendants' revelations as a "***surprise***" which "***illustrate[s] serious problems in merchandising***."

## POST CLASS PERIOD EVENTS

133. Following the August 23, 2012 disclosures, an increasing host of outside observers and governmental authorities began to probe deeper into the Individual Defendants' unusual insider trading during the Class Period.

134. On November 27, 2012, *The Wall Street Journal* ran an article entitled "Executives' Good Luck in Trading Own Stock." The article highlighted how several executives of major corporations had managed to sell large quantities of company stock shortly before the stock price declined as a result of adverse news. In particular, the article focused on defendant Fishman and the beneficial trades he made in Big Lots shares in March, shortly before Big Lots revised down its sales guidance – trades which were unusual not only in timing and amount, but also because Fishman made these huge trades outside of his ordinary 10b5-1 plan:

> The CEO, Steven Fishman, exercised stock options and sold a little over $10 million of Big Lots stock on March 20. On April 23, Big Lots surprised investors by disclosing that first-quarter sales had slowed.
>
> The stock plunged 24% in a single day. ***That meant shares worth $10 million in late March, when Mr. Fishman sold, suddenly would have been worth $2.4 million less***.
>
> ***Mr. Fishman had a 10b5-1 plan calling for periodic stock trades, but he made this trade outside of the plan***. . . .
>
> Neither Mr. Fishman nor the company would comment on whether he knew of the sales slowdown when he sold the shares.
>
> His trade displeased some shareholders, who had been primed for good news. Big Lots' guidance to investors in early March was for a 2% to 4% increase in sales. When the company on April 23 instead said to expect a decline, the stock fell by nearly a quarter in a single day, to $34. Mr. Fishman had sold at a little over $45.

135. Shortly thereafter, on November 29, 2012, the Company received a grand jury subpoena from the U.S. Attorney for the Southern District of New York requesting documents relating to Fishman's March 2012 insider trading.

136. On December 4, 2012, less than a week after receiving a criminal subpoena related to Fishman's trades, Big Lots abruptly announced that Fishman would retire from his positions as Chairman, CEO and President of the Company due to his "desire to shift his focus and put his family first." It was further announced that no successor had been named and that, instead, an outside talent company had been hired to conduct a search for one. The lack of a successor or a clear transition plan was particularly striking given Fishman's comments only a few months previously that Big Lots had in place a "defined succession plan for the future."

137. Also on December 4, 2012, the Company announced that Big Lots had posted negative EPS, SSS and U.S. sales for 3Q12. Defendants Cooper, Haubiel, Fishman and Johnson participated in a conference call with investment analysts to discuss the Company's 3Q12 earnings and sales results. On the call, Johnson revealed that the decline in earnings would have been even more pronounced, except for defendants' decision to make certain one-time "adjustments" to equity compensation expenses. Fishman also briefly discussed his plans to retire.

138. When asked by an analyst to explain the Individual Defendants' insider trades and whether the Company's use of 10b5-1 plans was "appropriate," Haubiel responded meekly: "We certainly understand the rules, follow the rules and there's probably not a whole lot more to add."

139. After the call, analysts expressed surprise at Fishman's retirement and several tied the departure to questions about his insider trading activity. In the words of one analyst from Wedbush: "***After eight years as the company's CEO, we were surprised that Fishman did not have a management succession plan in place***." And, as one Buckingham investment analyst commented: "***Curiously, the announcement of [Fishman's] retirement closely follows last week's WSJ exposé on his stock sales ahead of bad news earlier this year***. Of course he was only one of the many members of management who sold stock at the same time."

140. Also on December 4, 2012, *The Wall Street Journal* revealed that Fishman was being investigated by the SEC in an article entitled "***Big Lots Chief Probed by SEC***." The article stated that the March 2012 insider sales followed an unsettling pattern by Fishman of dumping shares before bad news about the Company hit markets:

> The sale this year hit a nerve with investors and analysts who recalled 2010 trading activity, when Mr. Fishman, under his 10b5-1 plan, sold $8 million of Big Lots stock between April 23 and April 26 at an average price of $40.72. By May 7, the stock had fallen to $35, where it lingered as the company's business faltered in the second half of the year.

141. On December 5, 2012, Big Lots filed the Company's Form 10-Q for the quarterly period ending October 27, 2012. The Form 10-Q for the first time confirmed that Big Lots had received a grand jury subpoena on November 29, 2012 from the DOJ and also that the Company was being investigated by the SEC related to insider sales by the Individual Defendants during the Class Period. Then on December 8, 2012, *The Wall Street Journal* continued its inquiry into Fishman's conduct in an article entitled "***FBI Probes Big Lots Chief***." The article confirmed that: "The Federal Bureau of Investigation and federal prosecutors are examining whether Mr. Fishman sold the Big Lots stock based on his knowledge of a coming negative corporate announcement."

142. On December 11, 2012, *The Wall Street Journal* published two more articles highlighting Fishman's insider trading activity. The first article, entitled "Insider-Trading Probe Widens," once again placed Fishman at the center of a broad government crackdown on insider trading by corporate executives. The second article, entitled "***Big Sales by Big Lots Brass***," focused on the unusual timing, scope and nature of trades by all Individual Defendants and six other insiders. The article stated:

> Ten Big Lots Inc. executives sold a total of more than $23 million in the discount retailer's stock in March before the company announced news that sank its stock, according to a Wall Street Journal analysis.

> ***These sales – which were made outside of prearranged trading plans – represent the largest bulk of unplanned trading reported by Big Lots executives in a single month in the past eight years, according to regulatory filings*.**
>
> Federal criminal and civil investigators are examining one of those trades: a $10 million sale of Big Lots stock by Chief Executive Steven Fishman. That trade is part of a broader probe into whether executives improperly bought and sold their company shares ahead of important, non-public information, which was triggered by a Wall Street Journal page one article on Nov. 28.
>
> Mr. Fishman announced his retirement last week in a move the company has said is unrelated to the trading or probes.
>
> The trading by nine other senior Big Lots executives hasn't previously been reported. Big Lots General Counsel Charles W. Haubiel II said all of these March 2012 Big Lots sales – including his own – were made at a time when trading was allowed by the company.
>
> *　　*　　*
>
> ***In the Big Lots matter, regulatory filings show the 10 executives converted options and sold company stock outside their 10b5-1 plans, though each of them previously had reported using a 10b5-1 plan*.**
>
> These executives sold a total of about $23.1 million in Big Lots shares outside of trading plans, compared with $4.7 million sold in plans, according to regulatory filings.

143. Big Lots' stock price plummeted on news of the FBI and SEC probes. On December 4, 2012, the day before news of the governmental investigations broke, Big Lots stock traded at $31.27. By December 14, 2012, as news of the multiple investigations and defendants' underlying fraudulent activity was absorbed by the marketplace, Big Lots' stock price sank to less than $28 per share, a decline of more than $4 or 13%. This drop represented an overall decline of more than 40% from the Class Period high of almost $47, as the full truth of defendants fraudulent activity was finally revealed and shareholders felt the full extent of the damage caused by defendants' fraud.

## DEFENDANTS' SCIENTER

### Defendants' Knowledge of the Fraud

144. Throughout the Class Period, defendants Cooper, Fishman, Haubiel and Johnson held themselves out to investors and the market as the persons most knowledgeable about Big Lots'

merchandising and sales operations, financial statements and business operations. As described more fully in ¶¶147-150 each of the Individual Defendants held a senior position at Big Lots with responsibility for directing and managing the Company's business, merchandising operations and financial reporting.

145. Defendants Cooper, Fishman, Haubiel and Johnson also routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Big Lots' business and finances, including the Company's key merchandising categories, sales prospects, and overall business operations. As described in ¶¶49, 51-53, 69-74, 88-92, 113-118, 122, 129-130 each of these defendants participated in Big Lots' periodic conference calls with analysts and investors. In the course of these calls, defendants presented information regarding Big Lots' sales trends, business performance and prospects. In addition, defendants represented that they had intimate knowledge of these areas and responded to questions about them.

146. Concurrent with their representations on conference calls, defendants Cooper, Fishman and Haubiel signed and certified, based on their knowledge and positions as executive officers, Big Lots' SEC filings during the Class Period. Specifically, defendants Fishman and Cooper signed all of the Company's Form 10-Q and Form 10-K filings as described in ¶¶83, 87, 124, and defendant Haubiel signed the Company's Form 10-K and Form 8-K filings as described in ¶¶76, 83, 121, attesting to their personal knowledge of the factual basis for the reported information and purported accuracy of the information.

147. During the Class Period, defendant Fishman served as Chairman of the Board, CEO and President of Big Lots. In these roles, Fishman was responsible for directing the Company's finances and business affairs and confirmed to investors and the market that he was "***consumed***" with managing Big Lots' business and "***relentless[ly]***" followed its performance. As part of the duties of his senior positions at Big Lots, Fishman was intimately familiar with Big Lots' store

operations and sales results, including the Company's key merchandising categories. Fishman has stated that he would "***constantly monitor***" the Company's sales results. As the Chairman and the only senior executive on Big Lots' Board of Directors, Fishman was required to not only keep himself informed of the Company's day-to-day business and finances, but also to keep Big Lots' non-management directors appraised of the state of Big Lots' business and finances, including the sales and growth figures and the outlook for the Company's key merchandising categories. Furthermore, and as detailed in ¶¶49, 51-53, 61, 67, 69-74, 83, 87-92, 96-97, 113-118, 124, 129-130, Fishman prepared and signed the Company's SEC filings, issued statements in releases and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Big Lots' business operations, sales performance, financial status, and outlook. As detailed in ¶¶87, 124, Fishman also signed a certificate pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "***report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***." To assure that the certification was not simply a hollow gesture, Fishman was required to and did further confirm that he, along with defendant Cooper: (i) was responsible for establishing and maintaining Big Lots' disclosure controls and procedures; (ii) had designed such controls to assure that material information relating to Big Lots' business was promptly made known to Fishman; and (iii) the Company's senior executives and he had routinely evaluated the effectiveness of the Company's policies with regard to assuring that Fishman and other executives were made aware of material information.

148. During the Class Period, defendant Cooper served as President of Big Lots Canada, EVP of Loss Prevention and Risk Management, and as the Company's CFO. In these roles, Cooper was responsible for the Company's treasury, tax, investor relations, loss prevention and risk

management, as well as the reporting, planning, and control functions of the business. As part of the duties of his senior positions at Big Lots, Cooper was intimately familiar with Big Lots' store operations and sales results, including the Company's key merchandising categories. Furthermore, and as detailed in ¶¶51-53, 69-74, 83, 87, 113-118, 124, 129-130, Cooper prepared and signed the Company's SEC filings and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Big Lots' business operations, sales performance, financial status, and outlook. As detailed in ¶¶87, 124, Cooper also signed a certificate pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "***report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***." To assure that the certification was not simply a hollow gesture, Cooper was required to and did further confirm that he, along with defendant Fishman: (i) was responsible for establishing and maintaining Big Lots' disclosure controls and procedures; (ii) had designed such controls to assure that material information relating to Big Lots' business was promptly made known to Cooper; and (iii) the Company's senior executives and he had routinely evaluated the effectiveness of the Company's policies with regard to assuring that Cooper and other executives were made aware of material information.

149. During the Class Period, defendant Haubiel served as Big Lots' EVP of Legal and Real Estate. In these roles, Haubiel was responsible for overseeing the Company's compliance with applicable laws and regulations, and for the mitigation of risk, including with regards to representations made to the investing public. As part of the duties of his senior position at Big Lots, Haubiel was intimately familiar with Big Lots' store operations and sales results, including the Company's key merchandising categories. Furthermore, and as detailed in ¶¶51-53, 69-74, 76, 83,

121-122, Haubiel prepared and signed the Company's SEC filings and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Big Lots' business operations, sales performance, financial status, and outlook. As detailed in ¶¶76, 121, Haubiel also signed the Company's Form 8-K current reports on behalf of Big Lots "[p]ursuant to the requirements of the Securities Exchange Act of 1934," thereby attesting that he could confirm that, in accordance with Rule 10b-5 promulgated under the Exchange Act, the report did not contain "any untrue statement of a material fact or . . . omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

150. During the Class Period, defendant Johnson served as SVP of Finance and on the Company's Executive Committee. As part of the duties of his senior positions at Big Lots, Johnson had responsibility for the accounting and financial control, tax, internal audit, financial planning and analysis, and investor relations of the Company, including with regards to representations made to the investing public. As part of the duties of his senior position at Big Lots, Johnson was intimately familiar with Big Lots' store operations and sales results, including the Company's key merchandising categories. Furthermore, and as detailed in ¶¶51-53, 69-74, 88-92, 113-118, 122, 129-130, Johnson led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Big Lots' business operations, sales performance, financial status, and outlook. In the words of Fishman, Johnson would "***constantly monitor***" the Company's sales results and business performance.

151. In addition to their individual job responsibilities, each of the Individual Defendants – Cooper, Fishman, Haubiel and Johnson – were continuously apprised of ongoing sales trends and the performance of the Company's critical merchandising operations through Big Lots' extensive reporting and information delivery systems. Each of the Individual Defendants received daily "Flash

Reports" via Big Lots' "Lotus Notes" narrowcast messaging system – an internal Company communication and information-sharing interface – at approximately 3 a.m. every morning. The Flash Reports broke down the Company's sales by region, sales to plan, and comparable store sales. In addition, the Individual Defendants received a "Weekly Summary" of sales results every Monday morning between 10:30 and 11:00 a.m. The sales data in the Weekly Summary came from a Company data warehouse known as "Donald" and was approved by defendant Johnson. The Weekly Summary showed the prior week's sales by state, by region, and by merchandise category and included comparable store sales. Every Monday, from noon to 2:30 p.m., the Individual Defendants attended an executive meeting in the Company's Executive Board Room during which managers relayed the content of weekly BPA divisional meetings, including sales trends and issues throughout the Company's merchandising operations. At these executive meetings, the Individual Defendants discussed Big Lots' business performance for the previous week and business prospects in detail, with top priority given to any downward sales trends or problems identified within the Company's merchandising operations. Moreover, certain senior executives, including Fishman, received special "micro-strategy reporting" which allowed these executives to view sales performance every hour, by region, by district, by store, and by merchandise category. Because of these extensive information delivery and reporting systems, during the Class Period the Individual Defendants knew of declines within the Company's key merchandising categories and problems within the Company's critical merchandising operations ***as they occurred***.

152. The Individual Defendants have admitted and repeatedly affirmed their intense, constant focus on the Company's merchandising operations and sales prospects, in particular on the Company's key merchandising categories. As senior executives overseeing the Company's merchandising operations, the Individual Defendants "***challenge[d] [themselves] every day about [sales growth]***" and "***work[ed] really, really hard*** . . . to understand how to grow the business and

have more consistency." Indeed, "[Big Lots'] [m]erchant terms [were] ***intensely focused*** on [sales consistency]," such that it was the "***top priority" in "everything [Big Lots would] do***." In addition, Fishman has stated that he and Johnson would "***constantly monitor***" store sales trends and discuss, on a "week to week basis," "where the action needs to be taken." Fishman has further stated that he was "***always concerned***" with the performance of the Company's key merchandising categories, and would even "***lose sleep***" over sales performance.

153. The Individual Defendants' job responsibilities, certifications, actions, statements and participation in Big Lots' extensive reporting and information distribution network in and around the Class Period confirm that each of the Individual Defendants knew or recklessly disregarded the impairment to the Company's merchandising operations and slowdown in the Company's sales performance and the surrounding circumstances set forth herein. The centrality of Big Lots' merchandising operations and sales performance, and the magnitude of the sales and earnings miss – SSS were not only not growing in 1Q12 but in fact ***declined*** during the Company's easiest quarterly comparison in more than ten years – further confirming that each of the Individuals Defendants knew or were aware that defendants' statements and/or omissions during the Class Period and complained of herein were materially false or misleading when made.

**Additional Indicia of Scienter**

154. As detailed herein, defendants acted with scienter during the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth, or acted with reckless disregard for the truth. Furthermore, the Individual Defendants traded on the basis of material non-public information. In addition to their orchestration of the fraudulent scheme, defendants' scienter is evidenced by: (i) defendants' unprecedented insider trading spree – unusual in its nature, timing, amount and coordination – which allowed the Individual Defendants to secure tens of millions of dollars in ill-gotten proceeds for themselves; (ii) the wide divergence between

internal sales reports and discussions and the Individual Defendants' representations to the public; (iii) the short proximity between the Individual Defendants' fraudulent statements and omissions, including their insider sales, and the disclosure of adverse information inconsistent with earlier representations; (iv) the multitude of governmental investigations and news reports concerning the impropriety of the Individual Defendants' conduct during the Class Period; (v) defendants' efforts to minimize investor scrutiny of quarterly sales volatility, which had significantly depressed Big Lots' stock price, and deflect criticism away from Company management; and (vi) the resignation of key Company personnel – including Fishman, the Company's Chairman, CEO and President – as a result of, or occurring within such close temporal proximity as to strongly suggest a correlation to, the illegal activity and surrounding circumstances alleged herein.

**With Big Lots' Stock Price Artificially Inflated, the Individual Defendants Engaged in Unprecedented Insider Sales**

155. The timing, amount, nature and coordination of the massive insider trading spree by the Individual Defendants in February and March 2012, ***highly unusual by almost any metric***, provides strong evidence of the Individual Defendants' scienter.

156. The timing of defendants' trades was highly suspicious as the Individual Defendants were remarkably successful at timing their sales to capture peak prices. The average trading price for Big Lots stock in the 90 days after defendants' fraud was revealed – August 23, 2012 through November 20, 2012 – was only $29.97 per share. In sharp contrast, the Individual Defendants unloaded their stock at prices ***as high as $46.60***. Indeed, defendants have admitted in court filings in related proceedings that they chose to sell their shares precisely because they ***knew*** Big Lots shares were trading at all-time highs: "[O]n March 6, when Defendants began selling their shares, Big Lots shares closed at a 14-year high, making Defendants' decisions to sell some of their holdings shortly thereafter both prudent and entirely understandable." *Lamb*, No. 2:12-cv-00445-MHW-NMK, Dkt.

No. 33-1 at 22. Of course, the decision to liquidate their investments in the Company would only be "prudent" (albeit illegal) if the Individual Defendants knew, on the basis of non-public information about the Company's poor performance, that Big Lots' share price had peaked and would lose value in the near future.

157. The timing of the insider trades is also highly unusual because all sales occurred either on the same day that defendants released materially misleading positive statements about the Company's sales results and business prospects, or shortly thereafter. For example, Haubiel sold nearly 19,000 Big Lots shares on February 29, 2012, shortly after the Company revised up its positive earnings numbers on February 2, 2012. Likewise, only four days after defendants made a variety of positive statements about the Company's business in a March 2, 2012 release and earnings conference call, all four Individual Defendants and 13 other Company insiders began a coordinated and massive selloff just as Big Lots' share price reached a 14-year trading high, dumping more than 730,000 shares of Big Lots stock for more than $33 million in proceeds over the next month. Similarly, defendant Cooper dumped 25,000 Big Lots shares on March 27, 2012, shortly after defendants' false and misleading statements at a March 27, 2012 consumer conference drove the price of Big Lots shares to their Class Period high. Finally, all of the Individual Defendants' sales during the Class Period occurred shortly before the Company shocked the markets by revising its sales guidance sharply downward for 1Q12, with the last of the sales occurring less than a month before the adverse news broke on April 23, 2012 and sent Big Lots' stock price into a tailspin. Big Lots stock would eventually drop as low as $26.86 on November 14, 2012, as the full extent of defendants' fraudulent scheme became known to the market.

158. Defendants' propitiously timed sales before the truth about Big Lots' business was disclosed to the market allowed the Individual Defendants and other Company insiders to save nearly ***$12 million***, or nearly half their proceeds from insider sales during the Class Period.

159. The insider sales were also highly unusual in amount and coordination. In March 2012 alone, ***17 Company insiders*** sold more than ***730,000 shares*** of Big Lots stock for more than ***$33 million*** in proceeds. Looking back a decade, never before had so many Company insiders dumped Big Lots stock or collectively reaped such a staggering sum within a single month. Among the Individual Defendants, Haubiel sold more Big Lots shares in March 2012 than he had in the past ten years in a single month. And a single trade by Fishman on March 20, 2012 netted him more than $10 million – nearly ***double*** the next highest single-day trade by a Company insider in at least a decade. On average, the 17 Company insiders sold 32% of their personal holdings in Big Lots stock, with defendants Cooper and Haubiel each dumping ***more than 40%***. The sheer number of insiders who sold massive amounts of Big Lots common stock during the Class Period suggests a common scheme to defraud outside investors in the Company.

160. Finally, the vast majority of the Individual Defendants' stock sales during the Class Period – ***nearly 85%*** – occurred outside a 10b5-1 plan, even though Company insiders ordinarily employed such plans to sell Big Lots stock. While 10b5-1 plans offer only an affirmative defense to insider trading allegations, and thus cannot shield a defendant at the pleadings stage, trades made off plan raise serious "red flags" about their legality. During the Class Period, defendants Cooper, Fishman, Haubiel and Johnson all made sizeable sales outside any 10b5-1 plan despite regularly using such plans in the past.[6] Indeed, the apparent impropriety of the Individual Defendants' stock sales during the Class Period has caused defendants to be the target of multiple governmental investigations as described in ¶¶141-143, 166.

---

[6] Specifically, during the Class Period, Cooper sold about 45,000 Big Lots shares off plan for proceeds of $2 million, Fishman sold 227,500 Big Lots shares off plan for proceeds over $10 million, Haubiel sold about 56,000 Big Lots shares off plan for proceeds of approximately $3 million, and Johnson sold more than 5,500 Big Lots shares off plan for proceeds of about $260,000.

## DEFENDANTS' INSIDER TRADING
## DURING THE CLASS PERIOD

| Individual Defendant | Date | Shares Sold | Price | Proceeds | % of Total Holdings Sold |
|---|---|---|---|---|---|
| Cooper | 29-Feb- 2012 | 16,600 | $44.76 | $743,016 | |
| Cooper | 1-Mar-2012 | 400 | $44.75 | $17,900 | |
| Cooper | 7-Mar-2012 | 44,875 | $44.76 | $2,008,605 | |
| Cooper | 27-Mar-2012 | 25,000 | $46.60 | $1,165,000 | |
| **Cooper** | **Total** | **86,875** | | **$3,934,521** | **42%** |
| Fishman | 20-Mar-2012 | 227,500 | $45.23 | $10,289,825 | |
| **Fishman** | **Total** | **227,500** | | **$10,289,825** | **19%** |
| Haubiel | 29-Feb-2012 | 18,750 | $44.46 | $833,625 | |
| Haubiel | 15-Mar-2012 | 56,250 | $45.61 | $2,565,563 | |
| **Haubiel** | **Total** | **75,000** | | **$3,399,188** | **40%** |
| Johnson | 14-Mar- 2012 | 5,625 | $45.47 | $255,769 | |
| **Johnson** | **Total** | **5,625** | | **$255,769** | **15%** |
| | | | | | |
| **Other Insiders[7]** | **Total** | **414,773** | | **$18,568,371** | **46%** |
| **TOTAL** | | **809,773** | | **$36,447,673** | **32%** |

### Internal Reports and Meetings Differed Drastically from Defendants' Public Statements

161. Defendants repeatedly offered public assessments of the Company's sales results, financial performance and future prospects that were materially different from the abundance of negative information that was being circulated internally in regular Company reports and meetings and known to each of the Individual Defendants.

162. During the Class Period, defendants stated that the Company's sales and earnings performance in 1Q12 was "consistent" with the "record results" obtained in FY 2011, that Big Lots

7 Other Big Lots insiders who sold Big Lots shares during the Class Period include: officer Lisa Bachmann (who sold about 70,000 shares for $3 million); director Jeffrey Berger (who sold 20,000 shares for $900,000); officer Robert Claxton (who sold about 50,000 shares for $2.4 million); director David Kollat (who sold 60,000 shares for $2.6 million); director Brenda Lauderback (who sold 30,000 shares for $1.3 million); director Philip Mallot (who sold 1,500 shares for $70,000); officer John Martin (who sold about 90,000 shares for $4 million); officer Norman Rankin (who sold about 20,000 shares for $1 million); officer Paul Schroeder (who sold about 10,000 shares for $500,000); officer Robert Segal (who sold about 30,000 shares for $1.5 million); officer Steven Smart (who sold 20,000 shares for $1 million); director Russel Solt (who sold about 6,500 shares for $300,000); and director Dennis Tishkoff (who sold 4,000 shares for $200,000).

was "growing organically" as a result of merchandise offerings, that the Company's merchandising operations were "focused" and "better than . . . ever . . . before," that the Company was "aggressively approaching" an unprecedented level of closeout availability, that customers "continue[d] to respond" to Big Lots' sales initiatives, that the Company was "benefit[ing] substantially from the leadership and experience of [its] senior executives," and that the Company had creat[ed] meaningful employment opportunities" for "associates who are proud to work and grow [there]," among numerous other misrepresentations.

163. These statements were diametrically opposed to reality. Instead of being on track to obtain "record results" in 1Q12, Big Lots was on track to post a record sales ***miss***, failing to achieve its easiest quarterly comparison in at least ten years. Instead of growing, Big Lots' SSS were actually ***declining*** as a result of poor merchandise offerings. The Company's merchandising operations were not only not "better than ever," but had fallen into disarray – the result of a mass exodus by ***dissatisfied*** employees, a growing leadership ***crisis*** among the Company's senior executives, and a ***lack*** of available high-quality closeout merchandise. This increasing dysfunction left the Company's merchandising personnel incapable of consistently executing sales strategies across the Company's key merchandising categories and, consequently, customers were increasingly ***rejecting*** Big Lots' merchandising initiatives. Likewise, defendants' numbers for 1Q12, 2Q12 and FY 2012 had no basis in the Company's internal reporting, and, in fact, were contradicted by such reporting. Ultimately Big Lots would post FY 2012 EPS of only $2.99 – or a mere $2.62 when adjusted to account for share repurchase activity, ***23% below the bottom end of defendants' initial representations***. The Company also posted FY 2012 cash flow of only $151 million, ***25% below defendants' initial statements***. And, instead of posting FY 2012 SSS growth of 2% to 3%, Big Lots experienced its ***first annual comp decline in more than 13 years***.

**Defendants' Misleading Representations Occurred Shortly Before the Release of Starkly Inconsistent Information**

164. As late as April 9, 2012, in the 2011 Big Lots Annual Report, defendants claimed that Big Lots was "***in a growth mode***" and that "***improvements***" implemented in FY 2011 had "***resonated with customers and generated shopping excitement***." The report further stated that Big Lots was "expand[ing] its vendor base" and offering "new, high-quality brands" as a result of "sharpened . . . product offerings" and "improved in-store marketing and presentation." The report further claimed that Big Lots' merchandise "continue[d] to get stronger and more focused on value and brands." The report touted the shift to electronics as being successful and claimed that this category would "continue to have a lasting appeal with [Big Lots'] shoppers."

165. ***Less than two weeks later***, on April 23, 2012, defendants disclosed that, instead of posting a record-breaking sales increase, SSS were actually on track to post a historic sales ***decline***. One month later, on May 23, 2012, defendants revealed that the ***very categories*** which defendants had recently stated would continue to drive business – consumables and electronics – had caused nearly all of the miss, and that poor product offerings and failures in the Company's merchandising operations had in fact been to blame.

**A Multitude of Governmental Agencies and Other Parties Have Challenged Defendants' Conduct**

166. The DOJ has formally opened a criminal investigation and the SEC has opened a civil investigation into suspicious insider trades by Fishman, and possibly other Individual Defendants, during the Class Period. *The Wall Street Journal* and Forbes have also written extensive exposés questioning the unusual trading activity and suspect statements by the Individual Defendants during the Class Period.

**Big Lots' Depressed Stock Price Placed Immense Pressure on Defendants to Maintain Positive FY 2011 Sales Trends**

167. As alleged herein, the Individual Defendants and the Board of Directors were under intense pressure to change their merchandising strategies after SSS floundered in the latter half of FY 2010 and the beginning of FY 2011. SSS growth flat-lined in 4Q10, then dipped sharply negative in 1Q11 (down 3.6%) and in 2Q11 (down 1.4%). These disappointing sales results caused Big Lots' stock price to trade at a substantially lower P/E multiple than other discount retailers. For example, a June 14, 2011 MKM analyst report targeted Big Lots' P/E multiple at a "20% discount to the peer group average to reflect Big Lots' weaker recent results and more challenging outlook." Indeed, the Company's stock price became so cheap that it became a takeover target in early FY 2011, and it even hired the Goldman Sachs Group Inc. to represent it in discussions with private equity firms Bain Capital LLC and Thomas H. Lee Partners LP.

168. Displeased with Big Lots' languid stock performance, investors and analysts ratcheted up pressure on the Company's senior executives to implement major reforms, in particular to add freezers and coolers to the Company's stores to improve consumables traffic and to provide an online sales platform. In several conference calls leading up to and including the Class Period, investment analysts hounded Fishman about Big Lots' lack of freezers and coolers and/or lack of an online sales presence – initiatives which had already been successfully adopted by many of Big Lots' competitors. For example, a Raymond James analyst posed a typical question to Fishman in a May 23, 2012 conference call: "Steve, I have become concerned that Big Lots' philosophy on not adding coolers and freezers is placing the Company at a competitive disadvantage. . . . So again, I understand your view about the economics of coolers not being favorable, but I am not sure that the customer really cares about the economics." And regarding ecommerce, a MKM analyst pressed Fishman in a December 2, 2011 conference call: "Some of your competitors . . . [are] selling merchandise online. I'm just wondering if you think that there's a competitive issue [there]."

169. The Company's senior executives resisted enacting such changes out of concern they would conflict with Big Lots' unique closeout-focused business model. Nevertheless, in the face of sporadic and often disappointing sales results, the Individual Defendants faced mounting pressure to demonstrate the continued viability of the Company's business model. Fishman would later admit he was "challenged more than any probably CEO in the Hardlines business in the United States about why [Big Lots] ha[dn't] done coolers and freezers" and that defendants felt the need to "constantly try to figure out what the right model is for [Big Lots] to go online." Adding to the pressure to perform, Big Lots' depressed stock price materially impacted the personal finances of the Individual Defendants, who receive a large portion – for Fishman, Cooper and Haubiel ***more than 80%*** for FY 2011 – of their annual compensation in the form of incentive-based compensation which consisted primarily of equity awards.

**The Suspect Timing and Circumstances of Wurl's and Fishman's Departures**

170. Wurl's resignation was announced on August 23, 2012, the same day as it was disclosed to the markets that Big Lots' 2Q12 sales figures would miss guidance for the second consecutive quarter, and only three months after Fishman claimed that Wurl was positively impacting the Company's merchandising operations and would "continue to grow" relationships with "the best manufacturers in the country." Likewise, Fishman, who had led the Company for more than eight years, suddenly and unexpectedly announced his retirement on December 4, 2012, less than a week after the Company had received a subpoena from the DOJ seeking information about his trading activity and been notified that the SEC had opened a related investigation. As of March 25, 2013, defendants had yet to announce a replacement for Fishman, a surprising outcome in light of Fishman's comments only a few months prior to announcing his retirement that Big Lots had in place a "defined succession plan for the future."

171. The unusual timing and the ignominy of the surrounding circumstances of the departures of Fishman and Wurl strongly suggest that the departures were closely related to the fraudulent conduct alleged herein, and provide additional indicia that defendants acted with scienter.

**LOSS CAUSATION / ECONOMIC LOSS**

172. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market through a course of conduct that artificially inflated the value of Big Lots common stock throughout the Class Period. Defendants' false and misleading statements operated as a fraud or deceit on Class Period purchasers of Big Lots common stock by misrepresenting sales and earnings results and growth, as well as the performance of the Company's merchandising operations. Defendants also concealed that Big Lots' reported financial outlook for 1Q12, 2Q12 and FY 2012 lacked a reasonable basis when made, further serving to artificially inflate the price of Big Lots stock throughout the Class Period.

173. Defendants' false and misleading statements had their intended effect and directly and proximately caused Big Lots common stock to trade at artificially inflated levels, reaching a Class Period high of $46.81 per share.

174. As a result of defendants' fraudulent conduct as alleged herein, the price at which Big Lots common stock traded was artificially inflated throughout the Class Period. When lead plaintiff and other members of the Class purchased their Big Lots common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Big Lots stock during the Class Period at artificially inflated prices, lead plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

175. In addition, defendants affirmatively assured investors that Big Lots' 1Q12 sales and earnings miss was isolated and that Big Lots had already enacted a plan to put Big Lots back on

track for its sales. Defendants' efforts were nothing more than further attempts to mislead the market's expectations for the Company. To that end, defendants' false and misleading statements maintained and increased the artificial inflation in the price of Big Lots common stock.

176. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by lead plaintiff and other members of the Class, and maintained the artificial inflation in the price of Big Lots common stock throughout the Class Period, until the truth leaked into, and was partially revealed to, the market, at which time the prior inflation came out.

177. As a result of defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to the defendants, lead plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Big Lots common stock at artificially inflated prices during the Class Period. Had lead plaintiff and other members of the Class known the truth, they would not have taken such actions.

178. The first partial disclosure of truth came after the market closed on April 23, 2012, when defendants revealed that Big Lots was revising down its recently issued guidance and that instead of achieving "record breaking" sales growth as defendants represented, Big Lots would in fact be achieving a record breaking sales decline. At the time of the April 23, 2012 disclosure and in subsequent Class Period statements, defendants continued to make false and misleading statements, including representing 1Q12 as a one-off, readily-rectifiable miss and providing 2Q12 and FY 2012 guidance that lacked a reasonable basis in fact. As a result, despite the 24% decline in the price of Big Lots stock on April 24, 2012, the stock remained artificially inflated.

179. The next disclosure of Big Lots' true financial condition marks the end of the Class Period, when, on August 23, 2012, Big Lots issued a press release disclosing that Big Lots would

miss its sales and earnings guidance for a second consecutive quarter and that the head of the Company's critical merchandising operations had resigned. For the first time, the market learned that 1Q12 had not been an isolated incident, but indicative of serious problems within the Company's merchandising operations and business model. The press release further revealed that the Company's sales trends remained soft and would continue impacting the Company during 2012.

180. As a result of the August 23, 2012 disclosure, Big Lots' stock price fell $8 per share, to close at $30.76 per share on August 23, 2012, the next trading day – a one-day decline of 21% – on volume of more than 16 million shares.

181. Likewise, Big Lots' stock price sank 13%, from $31.27 per share on December 4, 2012, to $27.22 per share on December 14, 2012, as the disclosure of multiple governmental investigations into conduct during the Class Period exposed the extent of defendants' fraud.

182. These disclosures were a direct and foreseeable consequence of defendants' fraud unraveling. Although defendants did not affirmatively admit to the particulars of their fraud, they did not have to. The market, which reacted by punishing the Company's stock price by more than 40% after the full truth had been revealed, clearly understood that there had been new revelations – that Big Lots' financial condition was not as previously (and misleadingly) presented to the market.

183. The timing and magnitude of the decline in Big Lots common stock negates any inference that the loss suffered by lead plaintiff and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which Big Lots' stock price fell 40% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index rose 1.5% and the Standard & Poor's 500 Retail Index (without Big Lots), comprised of public corporations in Big Lots' industry peer group, rose 7.5%. As a result of their purchases of Big Lots common stock during the Class Period, lead plaintiff and other members of the Class suffered economic loss, *i.e.*,

damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

184. At all relevant times, the market for Big Lots common stock was an efficient market for the following reasons, among others:

(a) Big Lots stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, Big Lots filed periodic public reports with the SEC and the NYSE;

(c) Big Lots regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Big Lots was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

185. As a result of the foregoing, the market for Big Lots common stock promptly digested current information regarding Big Lots from all publicly available sources and reflected such information in Big Lots' stock price. Under these circumstances, all purchasers of Big Lots common stock during the Class Period suffered similar injury through their purchase of Big Lots common stock at artificially inflated prices and a presumption of reliance applies.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

186. Lead plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of purchasers of Big Lots' common stock during the Class Period who were damaged by defendants' fraud (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

187. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Big Lots' common stock was actively traded on the NYSE. While the exact number of Class members is unknown to lead plaintiff at this time and can only be ascertained through appropriate discovery, lead plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Big Lots or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188. Lead plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

189. Lead plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

190. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and financial results of Big Lots; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

191. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

192. Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

193. During the Class Period, defendants, and each of them, carried out an unlawful scheme and wrongful course of business which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including lead plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Big Lot's common stock; and (c) cause lead plaintiff and other members of the Class to purchase Big Lots common stock at artificially inflated prices and, as a result, suffer economic losses when the truth about defendants' fraud was revealed. In furtherance of this unlawful scheme and wrongful course of business, defendants, and each of them, took the actions set forth herein.

194. Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Big Lots common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

195. In addition to the duties of full disclosure imposed on defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.01, *et. seq.*, and Regulation S-K, 17 C.F.R. §§229.10, *et. seq.*, and other SEC regulations, including accurate and truthful information with respect to the Company's operations, business and finances so that the market price of the Company's securities would be based on truthful, complete and accurate information.

196. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Big Lots as specified herein.

197. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

198. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing Big Lots' financial results, operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements and omissions regarding the Company's financial results and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

199. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Big Lots common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Big Lots' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, lead plaintiff and the other members of the Class acquired Big Lots common stock during the Class Period at artificially inflated prices and were damaged thereby.

200. At the time of said misrepresentations and omissions, lead plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had lead plaintiff

and the other members of the Class and the marketplace known of the true financial condition and business prospects of Big Lots, which were not disclosed by defendants, lead plaintiff and other members of the Class would not have purchased or otherwise acquired their stock at the artificially inflated prices which they paid, or at all.

201. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

202. As a direct and proximate result of defendants' wrongful conduct, lead plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**Violation of §20(a) of the Exchange Act**
**Against All Individual Defendants**

203. Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204. The Individual Defendants acted as controlling persons of Big Lots within the meaning of §20(a) of the Exchange Act as alleged herein. Big Lots controlled all of its employees and each of the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which lead plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, releases, public filings and other statements alleged by lead plaintiff to be misleading prior

to and/or shortly after these statements were issued and had the ability to prevent the issuance of, or cause to be corrected, the statements.

205. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

206. As set forth above, Big Lots and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, lead plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT III**

**For Violations of §20A of the Exchange Act**
**Against All Individual Defendants**

207. Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208. During the Class Period, the Individual Defendants were in possession of material, non-public information concerning Big Lots. These defendants took advantage of their possession of material, non-public information regarding Big Lots to obtain millions of dollars in insider trading profits during the Class Period.

209. On the basis of material, non-public information, defendant Cooper sold approximately 87,000 Big Lots shares, defendant Fishman sold 227,500 Big Lots shares, defendant Haubiel sold 75,000 Big Lots shares and defendant Johnson solder more than 5,000 Big Lots shares during the Class Period.

210. The Individual Defendants' sales of Big Lots stock were made contemporaneously with lead plaintiff's purchases in February and March 2012 and other class members' purchases of Big Lots stock during the Class Period.

211. Lead plaintiff, along with other class members who purchased shares of Big Lots common stock contemporaneously with sales by the Individual Defendants, suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the stock at the prices paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, lead plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating lead plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and lead plaintiff's counsel as lead counsel;

B. Awarding compensatory damages in favor of lead plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest;

C. Awarding to lead plaintiff and the other Class members against all defendants disgorgement of all profits made and losses avoided as a result of defendants' illegal insider trading, in an amount to be proven at trial, including interest;

D. Awarding lead plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead plaintiff demands a trial by jury.

DATED: April 4, 2013

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
BRIAN K. MURPHY (0070654)

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY

1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)
E-mail: murray@mmmb.com
E-mail: murphy@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DAVID W. MITCHELL
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: drobbins@rgrdlaw.com
E-mail: davidm@rgrdlaw.com
E-mail: bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)
E-mail: cbillings@swappc.com

BOTTINI & BOTTINI, INC.
FRANCIS A. BOTTINI
YURY A. KOLESNIKOV
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: 858/914-2001
858/914-2002 (fax)
E-mail: fbottini@bottinilaw.com
E-mail: ykolesnikov@bottinilaw.com

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 4, 2013.

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

E-mail: murray@mmmb.com

# Mailing Information for a Case 2:12-cv-00604-MHW-NMK

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E Cochran**
  bcochran@rgrdlaw.com
- **John Joseph Kulewicz**
  jjkulewicz@vssp.com
- **David W Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com
- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)