UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALAN WILLIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BIG LOTS, INC., STEVEN S. FISHMAN, JOE R. COOPER, CHARLES W. HAUBIEL II and TIMOTHY A. JOHNSON,<br><br>Defendants. | Case No. 2:12-cv-00604-MHW-NMK<br><br>District Judge Michael H. Watson<br><br>Magistrate Judge Norah McCann King<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, defendants Joe R. Cooper, Steven S. Fishman, Charles W. Haubiel II, Timothy A. Johnson, and Big Lots, Inc. ("Defendants") move the Court to dismiss with prejudice the Amended Complaint For Violations Of The Federal Securities Laws, filed April 4, 2013 (Dkt. No. 18).

Pursuant to S.D. Ohio Civ. R. 7.1(b) and Section E(2) of this Court's Case Management Procedures, Defendants respectfully request oral argument because of the acute importance of the issues raised by this motion, namely the significance of the statutory safe harbor of the Private Securities Litigation Reform Act of 1995, which provides that claims premised on allegedly fraudulent forward-looking statements and predictions of future results are categorically protected from liability.

In support of their motion, Defendants respectfully submit the following memorandum, the Declaration of Brendon DeMay and the exhibits attached thereto, and all prior proceedings herein.

VORYS, SATER, SEYMOUR AND PEASE LLP

/s/ William D. Kloss, Jr., Trial Attorney
William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

CRAVATH, SWAINE & MOORE LLP
Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALAN WILLIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BIG LOTS, INC., STEVEN S. FISHMAN, JOE R. COOPER, CHARLES W. HAUBIEL II and TIMOTHY A. JOHNSON,<br><br>Defendants. | Case No. 2:12-cv-00604-MHW-NMK<br><br>District Judge Michael H. Watson<br><br>Magistrate Judge Norah McCann King<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**


William D. Kloss, Jr., Trial Attorney (0040854)
John J. Kulewicz (0008376)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ..... v

SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO C.M.P. E(1) AND L.R. 7.2 .. viii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

APPLICABLE STANDARD ON THIS MOTION ..... 8

ARGUMENT ..... 9

I. THE CHALLENGED STATEMENTS ARE FORWARD-LOOKING STATEMENTS ACCOMPANIED BY MEANINGFUL CAUTIONARY LANGUAGE AND ARE THEREFORE IMMUNE FROM LIABILITY UNDER THE PSLRA SAFE HARBOR. ..... 9

A. The Challenged Statements Are Forward-Looking Statements. ..... 10

B. The Challenged Statements Were Identified as Forward-Looking Statements and Accompanied By Meaningful Cautionary Language. ..... 12

II. THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT ITS FACTUAL ALLEGATIONS LACK THE REQUISITE PARTICULARITY TO STATE A CLAIM FOR SECURITIES FRAUD. ..... 14

A. Lead Plaintiff Fails to Satisfy the Heightened Standard to Plead a Strong Inference of Scienter as Required by the PSLRA and Tellabs. ..... 15

1. The Complaint fails to allege specific facts to undermine the nonculpable inference that the Individual Defendants believed in good faith that the challenged statements were true. ..... 15

2. Lead Plaintiff's insider trading allegations are out of context and misleading and do not support a strong inference of scienter. ..... 18

3. Lead Plaintiff's other allegations also fail to support a strong inference of scienter. ..... 23

B. Lead Plaintiff Fails to Plead With Particularity That Any Challenged Statement Was Materially False Or Misleading. ..... 24

III. LEAD PLAINTIFF FAILS TO PLEAD LOSS CAUSATION. ..... 26

IV. LEAD PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY AND INSIDER TRADING. ..... 30

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


Ashland, Inc. v. Oppenheimer & Co., 648 F.3d 461 (6th Cir. 2011) ........................................8, 15

Bach v. Amedisys, Inc., No. 10-395-BAJ-CN, 2012 WL 6947008 (M.D. La. June 28, 2012) ........................................29

D.E.& J. Ltd. Partnership v. Conaway, 133 F. App'x 994 (6th Cir. 2005) ........................................28

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005)........................................27, 28

Frazier v. Vital Works, Inc., 341 F. Supp. 2d 142 (D. Conn. 2004)........................................19

Gruhn v. Tween Brands, Inc., No. 2:07-cv-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009) ........................................17, 23

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003)........................................20

Harris v. Ivax Corp., 182 F.3d 799 (11th Cir. 1999) ........................................9

Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001) (en banc)........................................10, 11, 12, 14

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)........................................22

In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171 (S.D.N.Y. 2003)........................................13

In re Almost Family, Inc. Sec. Litig., No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ........................................27, 30

In re Cutera Sec. Litig., 610 F.3d 1103 (9th Cir. 2010)........................................10, 26

In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)........................................12

In re Enron Sec., Derivative & ERISA Litig., 258 F. Supp. 2d 576 (S.D. Tex. 2003)........................................19

In re Goodyear Tire & Rubber Co. Deriv. Litig., No. 5:03CV2180, 2007 WL 43557 (N.D. Ohio Jan. 5, 2007)........................................22

In re Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968 (S.D. Ohio 2008)........................................18

In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951 (S.D. Ohio 2009) (Watson, J.) ........................................ passim

In re Juniper Networks, Inc., 158 F. App'x 899 (9th Cir. 2005) ........................................17

In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425 (D.N.J. 2000)....................................22

In re Oracle Corp. Deriv. Litig., 867 A.2d 904 (Del. Ch. 2004)..................................................21

In re Skechers U.S.A., Inc. Sec. Litig., No. CV 03-02094 PA, 2004 WL 1080174 (C.D. Cal. May 7, 2004) ..........................................................................................23

In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086 (N.D. Cal. 1994), aff'd, 95 F.3d 922 (9th Cir. 1996)..............................................................................................26

In re Tibco Software, Inc. Sec. Litig., No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ........................................................................................10

In re Vantive Corp. Sec. Litig., 283 F.3d 1079 (9th Cir. 2002)....................................................23

Ind. State Dist. Council of Laborers & Hod Carriers & Welfare Fund v. Omnicare, Inc., 583 F.3d 935 (6th Cir. 2009) .................................................................... passim

Int’l Investors Grp. v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009) .................................................14

Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697 (2d Cir. 1994)..........................30

Johnson v. Hui, 811 F. Supp. 479 (N.D. Cal. 1991) ......................................................................20

Konkol v. Diebold, Inc., 590 F.3d 390 (6th Cir. 2009) ....................................................18, 20, 21

Local 295/Local 851 IBT Emp’r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp., 731 F. Supp. 2d 689 (S.D. Ohio 2010)......................................................17, 18, 19

Louisiana School Employees’ Retirement System v. Ernst & Young LLP, 622 F.3d 471 (6th Cir. 2009)...........................................................................................18, 24

Magyery v. Transamerica Fin. Advisors, Inc., 315 F. Supp. 2d 954 (N.D. Ind. 2004) ................10

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011) .............................................17, 18

Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049 (9th Cir. 2008)............................29

Meyer v. Greene, 710 F.3d 1189 (11th Cir. 2013) .........................................................................29

Miller v. Champion Enters. Inc., 346 F.3d 660 (6th Cir. 2003) .............................................12, 15

Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226 (9th Cir. 2004) ...............................................................................................................................23

Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210 (S.D.N.Y. 2009) ...............................................................................................................................29

PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004) ....................................................17

Ricker v. Zoo Entm't, Inc., No. 1:11-cv-00490, 2011 WL 3070717 (S.D. Ohio July 30, 2012) ....................15

Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)....................21

Sawant v. Ramsey, 742 F. Supp. 2d 219 (D. Conn. 2010) ....................19

Slayton v. Am. Express Co., 604 F.3d 758 (2d Cir. 2010) ....................14

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) .................... passim

In re VeriFone Sec. Litig., 784 F. Supp. 1471 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993)....................25

**Statutes & Rules**

15 U.S.C. § 78u-4 .................... passim

15 U.S.C. § 78u-4(b)(1) ....................8, 25

15 U.S.C. § 78u-4(b)(2) ....................8, 15

15 U.S.C. § 78u-4(b)(4) ....................27

15 U.S.C. § 78u-5(c)(1) ....................9, 12

15 U.S.C. § 78u-5(c)(1)(B) ....................14

15 U.S.C. § 78u-5(i)(1)(A) ....................10

15 U.S.C. § 78u-5(i)(1)(D) ....................10

Fed. R. Civ. P. 9(b) ....................1, 2, 8

Fed. R. Civ. P. 12(b)(6)....................1, 8

**Other**

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 741–42 ....................9–10

## SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO C.M.P. E(1) AND L.R. 7.2

The Amended Complaint spins a tale of a tumultuous period at Big Lots. Following what is described as a period of "abysmal" performance during the early part of 2011, Big Lots made significant changes within its management ranks and in its merchandising strategies in an effort to improve upon its performance. Lead Plaintiff contends that, for a period of time, those strategies were successful, leading to improved financial results in the second half of fiscal 2011 (which ended on January 28, 2012) that exceeded the Company's previously announced guidance and drove the stock price higher, to the satisfaction of its investors.

Unfortunately, however, Big Lots' fortunes took a turn for the worse in 2012, as the Company's results fell short of its guidance in each of the first two fiscal quarters. After crediting the Company's new head merchant for the improvements in the business during 2011, Lead Plaintiff pivots to blame him for alleged strategic and operational missteps that it contends were responsible for the underperformance that immediately followed.

Lead Plaintiff claims that various of the Defendants' public statements—some of which contained the Company's financial guidance for the first and second fiscal quarters and fiscal year 2012 and others of which were generally optimistic statements about trends in Big Lots' business—amounted to securities fraud. But the theory of Lead Plaintiff's case makes no sense; in essence, the Complaint alleges that within only a few days following the strong results at the end of 2011 (which Lead Plaintiff does not challenge as fraudulent or misstated in any way), Defendants somehow knew that sales were slumping and that the Company's merchandising strategies (which Lead Plaintiff says were successful in 2011) would be a failure in 2012. While Lead Plaintiff contends that contemporaneous sales reports and other sources of information put the lie to Defendants' public statements by detailing the supposedly declining sales, no such details can be found in the Complaint—its allegations are entirely conclusory.

At bottom, Lead Plaintiff's allegations amount to nothing more than "fraud by hindsight", and the Complaint should be dismissed for multiple independent reasons. First, Lead Plaintiff's claims present a classic case for applying the PSLRA's safe harbor for forward-looking statements. See Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c)(1)(A)(i) ("PSLRA"). The challenged statements here are all forward-looking statements that were accompanied by meaningful cautionary language disclosing the very risks that Lead Plaintiff claims were concealed, and the PSLRA safe harbor thus immunizes the statements from liability for securities fraud. See Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc). Even if Lead Plaintiff did adequately allege that the statements at issue were known by the Defendants to be false—and Lead Plaintiff has not come close to making that showing—dismissal with prejudice would still be required by the statute. (See infra Section I.)

Second, the Complaint does not allege particularized facts sufficient under the PSLRA and Rule 9(b) to plead either a strong inference of scienter or that any of the challenged statements was false or misleading when made. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007). To begin, Lead Plaintiff's failure to support its conclusory accusations with any specifics detailing the internal information that purportedly contradicted Defendants' public statements is fatal. See In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951, 964–66 (S.D. Ohio 2009) (Watson, J.). Lead Plaintiff simply lists dozens of allegedly fraudulent statements and then alleges conclusorily that the opposite of those statements was true. Although Lead Plaintiff alleges the Individual Defendants received periodic sales reports, Lead Plaintiff only speculates regarding the content of those reports, and therefore Lead Plaintiff fails to show that any Defendant knew or was reckless in not knowing that the challenged statements were false or misleading. See Ricker v. Zoo Entm't, Inc., No. 1:11-cv-

00490, 2012 WL 3070717, at *5 (S.D. Ohio July 30, 2012); Gruhn v. Tween Brands, Inc., No. 2:07-cv-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009). Additionally, the alleged massive insider trading scheme that Lead Plaintiff contends is evidence of scienter is premised on misleading calculations and takes the Individual Defendants' trades entirely out of context; in fact, the Individual Defendants all saw their total holdings of Big Lots stock increase or remain flat during the alleged class period. See Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009). (See infra Section II.)

Third, the Complaint also fails to demonstrate that the alleged fraud caused any losses. See 15 U.S.C. § 78u–4(b)(4); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342–44 (2005). Lead Plaintiff alleges only that Big Lots' share price fell when the Company disclosed that it would miss its earnings projections, but an eventual earnings miss conveys to the market nothing more than the company's failure to perform as anticipated—it does not convey to the market that the projections were knowingly false when made. D.E.& J. Ltd. P'ship v. Conaway, 133 F. App'x 994, 999-1001 (6th Cir. 2005).

Defendants Big Lots, Inc. ("Big Lots" or the "Company"), and Steven S. Fishman, Joe R. Cooper, Charles W. Haubiel II and Timothy A. Johnson (the "Individual Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws ("AC" or "Complaint"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").

## PRELIMINARY STATEMENT

The Amended Complaint spins a tale of a tumultuous period at Big Lots. Following what is described as a period of "abysmal" performance during the early part of 2011, Big Lots made significant changes within its management ranks and in its merchandising strategies in an effort to improve upon its performance. For a period of time, Lead Plaintiff contends those strategies were successful, leading to improved financial results in the second half of fiscal 2011 (which ended on January 28, 2012) that exceeded the Company's previously announced guidance and drove the stock price higher, to the satisfaction of its investors.

Unfortunately, however, Big Lots' fortunes took a turn for the worse in 2012, as the Company's results fell short of its guidance in each of the first two fiscal quarters. After crediting the Company's new head merchant for the improvements in the business during 2011, Lead Plaintiff pivots to blame him for alleged strategic and operational missteps that it contends were responsible for the underperformance that immediately followed.

Lead Plaintiff claims that various of the Defendants' public statements—some of which contained the Company's financial guidance for the first and second fiscal quarters and fiscal year 2012 and others of which were generally optimistic statements about trends in Big Lots' business—amounted to securities fraud. But the theory of Lead Plaintiff's case makes no sense; in essence, the Complaint alleges that within only a few days following the strong results

at the end of 2011 (which Lead Plaintiff does not challenge as fraudulent or misstated in any way), Defendants somehow knew that sales were slumping and that the Company's merchandising strategies (which Lead Plaintiff says were successful in 2011) would be a failure in 2012. While Lead Plaintiff contends that contemporaneous sales reports and other sources of information put the lie to Defendants' public statements by detailing the supposedly declining sales, no such details can be found in the Complaint—its allegations are entirely conclusory.

At bottom, Lead Plaintiff's allegations amount to nothing more than "fraud by hindsight", and the Complaint should be dismissed for multiple independent reasons. First, Lead Plaintiff's claims present a classic case for application of the PSLRA's safe harbor for forward-looking statements. The challenged statements here are all forward-looking statements that were accompanied by meaningful cautionary language, and the PSLRA safe harbor thus immunizes them from liability for securities fraud. Indeed, even if Lead Plaintiff did adequately allege that the statements at issue were known by the Defendants to be false—and the Complaint is woefully inadequate in that regard—dismissal with prejudice would still be required by the statute. (See infra Section I.)

Second, the Complaint does not allege particularized facts sufficient under the PSLRA and Rule 9(b) to plead either a strong inference of scienter or that any of the challenged statements was false or misleading when made. With respect to both of those required elements of a securities fraud claim, Lead Plaintiff's failure to support its conclusory accusations with any specifics detailing the internal information that purportedly contradicted Defendants' public statements is fatal. Additionally, the alleged massive insider trading scheme that Lead Plaintiff contends is evidence of scienter is premised on misleading calculations and takes the Individual Defendants' trades entirely out of context; in fact, the Individual Defendants all saw their total

holdings of Big Lots stock increase or remain flat during the alleged class period. (See infra Section II.)

Third, the Complaint also fails to plead loss causation because while the alleged corrective disclosures reported Big Lots' disappointing results, they said nothing at all to suggest that Defendants' prior statements were knowingly false when made. (See infra Section III.)

**STATEMENT OF FACTS**

Big Lots is the nation's largest broadline closeout retailer, with headquarters in Columbus, Ohio. (AC ¶ 3.) The Individual Defendants and their titles during the relevant period are: Chairman, CEO and President Fishman; CFO and EVP of Loss Prevention and Risk Management Cooper; General Counsel, Corporate Secretary and EVP of Legal and Real Estate Haubiel; and SVP of Finance Johnson. (Id. ¶¶ 34–37.) Lead Plaintiff is City of Pontiac General Employees' Retirement System. (Id. ¶ 32.)

**Lead Plaintiff's Allegations of Fraud**

Lead Plaintiff alleges that between February 2, 2012 and August 23, 2012 (the putative class period), Defendants made a series of false and misleading public statements about Big Lots' business prospects in order to inflate the price of Big Lots stock before selling their shares. (Id. ¶¶ 1–2.) The challenged statements, which were made in press releases and SEC filings and during oral communications with investors, fall into two basic categories.

First, Lead Plaintiff alleges that Big Lots announced quantitative sales and earnings guidance for the first two fiscal quarters of 2012 that Defendants knew the Company could not meet. (Id. ¶ 77(*l*).) In particular, Lead Plaintiff alleges that Big Lots (1) issued financial guidance for the first fiscal quarter on March 2, 2012, which it later revised downward on April 23, 2012, and confirmed on May 23, 2012, that it had not met (id. ¶¶ 67–68, 102–03, 110–11); and (2) issued financial guidance for the second fiscal quarter on May 23, 2012, which

it announced on August 23, 2012, that it had not met (id. ¶¶ 110–12, 128). Lead Plaintiff does not allege any accounting improprieties, nor does Lead Plaintiff allege that any historical financial data was manipulated or falsely reported.

Second, Lead Plaintiff claims that Big Lots and certain Individual Defendants made qualitative statements about trends in the Company's business that formed the basis for the financial guidance and purportedly misled investors about the Company's prospects for 2012. For instance, Lead Plaintiff refers to the statement in Big Lots' February 2, 2012, announcement of its fiscal 2011 results that its strong performance reflected "improving trends" in the business. (AC ¶ 61.) Similarly, Lead Plaintiff quotes Johnson as stating on March 2, 2012, that the "'key categories that were good' in 4Q11 'have legs here into 2012'". (Id. ¶ 70.) Lead Plaintiff does not challenge that in 2011 the "key categories" in fact "were good" or that business trends did in fact "improve"—indeed, the Complaint concedes that after a period of disappointing performance in the first part of 2011, the Company's performance in the third and fourth fiscal quarters was strong. (Id. ¶¶ 49–51, 61.) Nevertheless, Lead Plaintiff contends that the strong 2011 performance (with which they take no issue) and Defendants' optimistic comments about it somehow misled investors because, Lead Plaintiff alleges, those concededly "robust sales trends . . . could not be sustained in 1Q12". (Id. ¶ 62.)

While the Complaint fails to mention it, the challenged statements were all accompanied by extensive, meaningful cautionary language warning investors that Big Lots might not meet its financial projections and that its business strategies might not succeed. For example, the March 2, 2012, press release at the heart of Lead Plaintiff's case states:

> "Forward-looking statements relate to the expectations of management as to future occurrences and trends, including statements expressing optimism or pessimism about future operating results or events and projected sales, earnings, capital expenditures and business strategy.

> Forward-looking statements are based upon a number of assumptions concerning future conditions that may ultimately prove to be inaccurate. . . . [A]ctual results may differ materially from those discussed in such forward-looking statements as a result of various factors, including, but not limited to, . . . our inability to successfully execute strategic initiatives, . . . the availability of brand name closeout merchandise, . . . and other factors . . . in our other filings with the SEC".[1]

Lead Plaintiff alleges the Defendants concealed that sales were in fact poor at the time of the challenged statements, rendering the optimistic statements regarding future prospects misleading because they were allegedly contradicted by weekly and daily sales reports that were available to the Individual Defendants and other Company executives. (AC ¶¶ 151, 161.) However, while the Complaint undeniably alleges details regarding the sort of information that was available in the ordinary course of business, it fails to provide any details regarding what any particular report said on any particular date or how such information was contrary to Defendants' public statements. In that regard, the Complaint's allegations are entirely conclusory: "Sales slowed by February 2012, particularly in the Company's key sales categories." (Id. ¶ 60.) Lead Plaintiff plainly wants the Court to believe the sales reports it cites are chock full of data to support such conclusory allegations, but the failure to specify what the data are speaks volumes.

Lead Plaintiff further alleges that Big Lots was destined to fall short of its 2012 guidance because of the alleged failure of the new product-sourcing strategies of the Company's

[1] March 2, 2012 press release at 4, attached as Exhibit A to the Declaration of Brendon DeMay dated May 6, 2013 ("DeMay Decl."); see also Feb. 2, 2012 press release at 1–2 (DeMay Decl. Ex. B); March 2, 2012 conference call transcript at 2, 23 (DeMay Decl. Ex. C); Form 8-K dated March 7, 2012 at Item 2.02 (attaching March 2 press release and transcript) (DeMay Decl. Ex. D); Form 10-K dated March 26, 2012, at 7–13 (DeMay Decl. Ex. E); Telsey Advisory Group's 4th Annual Consumer Conference transcript dated March 27, 2012, at 9 (DeMay Decl. Ex. F); Annual Report dated April 10, 2012 (attaching 10-K) (DeMay Decl. Ex. G); April 23, 2012 press release at 1 (DeMay Decl. Ex. H); May 23, 2012 press release at 3–4 (DeMay Decl. Ex. I); May 23, 2012 conference call transcript at 2, 14 (DeMay Decl. Ex. J); Form 8-K dated May 29, 2012 at Item 2.02 (attaching May 23 press release and transcript) (DeMay Decl. Ex. K); Piper Jaffray Consumer Conference transcript dated June 5, 2012, at 10 (DeMay Decl. Ex. L); Form 10-Q dated June 6, 2012, at 15 (DeMay Decl. Ex. M).

new head merchant Douglas Wurl, who was hired in April 2011 in an effort to improve on prior sales results. In that regard, the story Lead Plaintiff weaves in the Complaint is nothing short of schizophrenic. On the one hand, Lead Plaintiff alleges that Big Lots' performance in early 2011 was "abysmal" (AC ¶ 49) and that new "merchandising initiatives" under Wurl led to increases in same-store sales that exceeded the Company's guidance for the third and fourth fiscal quarters of 2011, which Lead Plaintiff concedes was "driven in substantial part by improvements in the consumables, furniture, home and electronics categories". (Id. ¶ 50; see also id. ¶ 61.) Yet when sales turned down in the first and second quarters of fiscal 2012 based on sales weakness in some of those same product categories, Lead Plaintiff says the shortfall was caused by "[t]he deterioration of Big Lots' core merchandising capabilities". (Id. ¶ 60.) On top of that, Lead Plaintiff contends that by February 2, 2012, only five days into the 2012 fiscal year and following two quarters of outstanding business performance, Defendants already knew that 2012 "[s]ales [had] slowed" and that, despite his very recent success, "Wurl's failure to successfully integrate as head of Big Lots' merchandising operations had critically impaired Big Lots' merchandising operations and the Company's ability to secure appropriate closeout inventory and effectively execute its merchandising strategies." (Id. ¶¶ 60, 62.)

With 20/20 hindsight, it is clear that Big Lots' business did not perform to expectations in the first and second quarters of 2012. And with perfect hindsight, one might (or might not) attribute some or all of that underperformance to Wurl, who resigned from the Company in August 2012. (Id. ¶ 128.) But the Complaint alleges no details that, if proven true, would show either that Big Lots' announced financial guidance or any of the Defendants' other optimistic public statements about positive business trends was false or misleading when made or what information was available to show that any of the Individual Defendants did not believe

any of the challenged statements was true. Lacking such details and stripped of its conclusory allegations, the Complaint alleges nothing more than that, following an undeniably successful 2011, the Defendants believed, and informed the market of their belief, that the Company's success would continue into 2012, but as it turned out the Company's actual performance fell short of those expectations.

**Alleged Corrective Disclosures**

Lead Plaintiff alleges that the market learned the truth about Defendants' purported fraud through two public disclosures. First, Big Lots announced on April 23, 2012, that, due to softening sales that occurred primarily in April, it would not meet the financial projections that it had announced to the market in early March. (AC ¶¶ 102–07.) Lead Plaintiff alleges, however, that the April 23 disclosure did not reveal the full extent of the alleged fraud because the disclosures characterized the shortfall as a one-off event rather than as a trend that would continue, and also because Lead Plaintiff contends that the first quarter miss had happened earlier than April as a result of purportedly undisclosed structural problems with Big Lots' business. (Id. ¶ 107.) Again, however, Lead Plaintiff does not point to any specific information or data—despite its purported familiarity with the sort of reports in which such information would be expected to be found—demonstrating either that the first quarter shortfall was not in fact primarily the result of a decline in April sales as the Company stated or that the projections provided for the second quarter were not made in good faith based on the information that Defendants had at the time.

Second, Lead Plaintiff alleges that the full extent of the purported fraud was revealed in Big Lots' announcement on August 23, 2012 that it had failed to meet its guidance for the second fiscal quarter of 2012 and that Wurl had resigned from the Company. (Id. ¶¶ 128–

30.) Lead Plaintiff concedes that neither the April 23, 2012 nor the August 23, 2012 announcement revealed "the particulars of [Defendants' alleged] fraud" but nonetheless asserts that "the full truth had been revealed". (Id. ¶ 182.)

**APPLICABLE STANDARD ON THIS MOTION**

"To state a securities fraud claim under Section 10(b), a plaintiff must allege in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." Ashland, Inc. v. Oppenheimer & Co., 648 F.3d 461, 468 (6th Cir. 2011).

When assessing the strength of a complaint under Rule 12(b)(6), courts must accept all well-pled allegations as true, yet the complaint must allege facts that plausibly state a claim, as opposed to facts that are merely consistent with liability. Id. at 467–68. Claims for securities fraud under Section 10(b) must satisfy the heightened pleading standard of Rule 9(b), which requires that "the circumstances constituting fraud" must be "state[d] with particularity". Fed. R. Civ. P. 9(b). In addition, under the PSLRA, "plaintiff[] 'shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' Additionally, plaintiff[] 'shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Ashland, 648 F.3d at 469 (quoting 15 U.S.C. § 78u-4(b)(1)–(2)) (internal citations omitted); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 324 (2007) (holding that a proper scienter analysis "must consider plausible nonculpable explanations for the defendant's conduct", and the plaintiff's allegations of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent").

## ARGUMENT

### I. THE CHALLENGED STATEMENTS ARE FORWARD-LOOKING STATEMENTS ACCOMPANIED BY MEANINGFUL CAUTIONARY LANGUAGE AND ARE THEREFORE IMMUNE FROM LIABILITY UNDER THE PSLRA SAFE HARBOR.

Fundamentally, this case arises out of a public company's statements about its business trends and expected future performance. As a result, it is a classic case for application of the PSLRA safe harbor for forward-looking statements, which provides, inter alia, that a defendant "shall not be liable with respect to any forward-looking statement" that is "[i]dentified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." 15 U.S.C. 78u-5(c)(1). The allegedly fraudulent statements at issue here are canonical forward-looking statements, and they were identified as such and accompanied by meaningful cautionary language. Accordingly, those statements are absolutely protected from liability, and no allegations can save Lead Plaintiff's claims. The action should be dismissed with prejudice, and no further inquiry or analysis is required.

That result is exactly what Congress intended. Prior to the enactment of the PSLRA, Congress was concerned that "[a]busive litigation" and "[f]ear that inaccurate projections w[ould] trigger the filing of securities class action lawsuit[s]" had effectively "muzzled corporate management" by "severely affect[ing their] willingness . . . to disclose information to the marketplace". H.R. Conf. Rep. No. 104-369 (1995) ("House Report"), reprinted in 1995 U.S.C.C.A.N. 730, 741–42. The PSLRA safe harbor was designed to address that concern and "enhance market efficiency by encouraging companies to disclose" "more information about a company's future plans [] to investors and the public" "without fear of open-ended liability". Id. at 731, 742, 744; see Harris v. Ivax Corp., 182 F.3d 799, 806 (11th Cir.

1999) ("Congress enacted the [PSLRA] safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." (quoting House Report at 730, 741)); In re Tibco Software, Inc. Sec. Litig., No. C 05-2146 SBA, 2006 WL 1469654, at *25 (N.D. Cal. May 25, 2006) ("The purpose behind this safe harbor is to encourage the disclosure of forward-looking information."); Magyery v. Transamerica Fin. Advisors, Inc., 315 F. Supp. 2d 954, 957 (N.D. Ind. 2004) ("To accomplish its purpose of limiting meritless strike suits, the PSLRA contains . . . a safe harbor for certain forward looking statements." (internal quotation marks omitted)). Accordingly, Congress intended that the safe harbor "provide certainty that forward-looking statements will not be actionable". House Report at 743 (emphasis added).

**A. The Challenged Statements Are Forward-Looking Statements.**

A "forward-looking statement" is defined as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A); see Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc), abrogated in part on other grounds by Tellabs, 551 U.S. 308 (noting that "predictions about earnings, revenue, and future economic performance" are "forward-looking" within the meaning of the PSLRA). Even statements of existing condition are "forward-looking" insofar as they concern "'assumptions underlying or relating to' economic predictions". Helwig, 251 F.3d at 554 (quoting 15 U.S.C. § 78u-5(i)(1)(D)).

All the statements Lead Plaintiff alleges to be fraudulent—i.e., the sales and earnings projections for the first and second fiscal quarters and full fiscal year 2012, as well as the more contextual statements regarding Big Lots' business trends—are classic forward-looking statements that are insulated under the safe harbor. See id.; In re Cutera Sec. Litig., 610 F.3d

1103, 1111–13 (9th Cir. 2010); Ind. State Dist. Council of Laborers & Hod Carriers & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009) (the PSLRA "safe harbor 'excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance'" (quoting Helwig, 251 F.3d at 547–48)).

Nevertheless, Lead Plaintiff—all too aware that its claims are doomed if the Court reaches that obvious conclusion—might attempt to characterize some of Defendants' statements as relating to the Company's historical performance and present condition rather than its prospects for the future. For example, with respect to the February 2, 2012 release that starts the alleged class period (one month before the March 2 release in which the Company first quantified its financial guidance for 2012), Lead Plaintiff describes the allegedly fraudulent statements as "regarding the Company's 4Q11 financial results". (AC ¶ 62.) But Lead Plaintiff does not even remotely suggest that the financial results reported on that date were anything other than entirely accurate; there is no allegation of accounting irregularities or that reported sales or earnings were artificially inflated. Lead Plaintiff does not and cannot dispute that "the robust sales trends experienced by Big Lots at the end of FY2011" (id.) are what the business truly experienced. Instead, what Lead Plaintiff contends was fraudulent about the release's reference to the "improving trends" during 2011 is that such performance "could not be sustained in 1Q12"—i.e., in the future. (Id. ¶¶ 61–62.) Accordingly, while there are obviously certain respects in which the February 2, 2012 release does recount historical facts, the aspect of the release that Lead Plaintiff contends was fraudulent was forward-looking and subject to the PSLRA safe harbor. See Helwig, 251 F.3d at 554 ("Plaintiffs urge that Vencor's professed inability to assess the impact of the Budget Act was a statement of then-present fact. Even as a statement of existing condition, however, these statements were forward-looking in that they

concerned assumptions underlying or relating to economic predictions." (internal quotation marks omitted)); Miller v. Champion Enters. Inc., 346 F.3d 660, 676–77 (6th Cir. 2003) (finding that the use of the word "continuation" in the phrase "continuation of outstanding earnings growth" did not transform an otherwise forward-looking prediction into a statement of present condition); see also In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478(NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (stating that accurate historical data "does not become misleading even if less favorable results might be predictable by the company in the future").

### B. The Challenged Statements Were Identified as Forward-Looking Statements and Accompanied By Meaningful Cautionary Language.

Under the PSLRA safe harbor, if forward-looking statements are identified as forward-looking and are accompanied by meaningful cautionary language, then they are absolutely non-actionable. See Helwig, 251 F.3d at 554–55 (citing 15 U.S.C. § 78u-5(c)(1)). The statements that Lead Plaintiff contends were fraudulent all satisfy the PSLRA standard. First, the statements were all identified at the time as forward-looking. (See supra pp. 4–5 & n.1.) And second, the forward-looking statements at issue were accompanied by meaningful cautionary language—i.e., the "cautionary statements [were] substantive and tailored to the specific future projections, estimates, or opinions. . . . which [Lead Plaintiff] challenge[s]". Helwig, 251 F.3d at 559. For example, the March 2, 2012 press release announcing Big Lots' financial guidance for the first quarter and fiscal year 2012 included a "Cautionary Statement Concerning Forward-Looking Statements" that expressly warned that certain statements therein were forward-looking with the meaning of the PSLRA and specifically identified as forward-looking those statements that included the words: "'anticipate,' 'estimate,' 'expect,' 'objective,' 'goal,' 'project,' 'intend,' 'plan,' 'believe,' 'will,' 'should,' 'may,' 'target,' 'forecast,' 'guidance,' 'outlook' and similar expressions." (DeMay Decl. Ex. A at 4.) The release further

explained that the forward-looking statements related to the exact issues about which Lead Plaintiff now complains: "projected sales, earnings, . . . and business strategy" that "may ultimately prove to be inaccurate . . as a result of various factors, including, but not limited to, . . . our inability to successfully execute strategic initiatives, . . . the availability of brand name closeout merchandise, . . . and other factors". (Id.)

Similarly, for the February 2, 2012 press release that Lead Plaintiff contends misrepresented the degree to which Big Lots' unchallenged 2011 results reflected "improving trends" that the market then believed would continue into 2012 (AC ¶¶ 61–62), the accompanying cautionary language expressly invoked the protections of the PSLRA safe harbor with respect to statements that "relate to the expectations of management as to future occurrences and trends . . . ." (See DeMay Decl. Ex. B at 1 (emphasis added).) In the face of that disclaimer, as a matter of law no reasonable investor could have viewed the reference to "improving trends" in 2011 as providing any commentary as to whether such trends could or "could not be sustained in 1Q12". (AC ¶ 62); see In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) ("[A] misstatement or omission related to a forward-looking statement will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." (internal alterations omitted)). The other releases and SEC filings challenged by Lead Plaintiff contained similar meaningful cautionary statements. (See DeMay Decl. Exs. A, B, D, E, G–I, K.)

In addition to the Company's written releases, the oral statements made by the Individual Defendants on conference calls that Lead Plaintiff contends were false and misleading were also accompanied by meaningful cautionary language. For example, following the March 2, 2012 release, the Company held an earnings call with investors (see AC ¶ 69) that included an

oral cautionary statement indicating that the statements on the call would include forward-looking statements that "involve risks and uncertainties and are subject to [the] Safe Harbor provisions, as stated in [Big Lots'] press release and SEC filings" and "that actual results can differ materially from those described in [the] forward-looking statements". (DeMay Decl. Ex. C at 2, 23; see also DeMay Decl. Exs. F, J, L.)

Because the statements that Lead Plaintiff claims were fraudulent were all forward-looking statements accompanied by meaningful cautionary language, they are absolutely immune from liability under the PSLRA safe harbor. Accordingly, the Court should dismiss the case in its entirety and with prejudice and need not consider Lead Plaintiff's "substantive" allegations or Defendants' arguments in the following sections regarding the failure of those allegations to state a claim. Helwig, 251 F.3d at 554.[2]

## II. THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT ITS FACTUAL ALLEGATIONS LACK THE REQUISITE PARTICULARITY TO STATE A CLAIM FOR SECURITIES FRAUD.

As discussed above, because all of Lead Plaintiff's challenged statements are forward-looking statements protected by the statutory safe harbor, no further inquiry is required. Nevertheless, even when analyzed outside the PSLRA safe harbor, the Complaint still fails to state a claim because Lead Plaintiff has not pled with particularity that the challenged statements

[2] Even if the Court were to conclude that the cautionary language accompanying the forward-looking statements was not "meaningful"—and Defendants respectfully submit such a conclusion would be contrary to applicable law—Lead Plaintiff's claims would still fail under a separate prong of the PSLRA safe harbor provision. To the extent any forward-looking statement is not accompanied by meaningful cautionary language, it is still protected unless Lead Plaintiff pleads and proves, inter alia, that the statement was made with "actual knowledge . . . that the statement was false or misleading". 15 U.S.C. 78u-5(c)(1)(B); see Helwig, 251 F.3d at 554–55. As explained below, Lead Plaintiff fails to plead facts giving rise to a strong inference of scienter, which is a required element of a securities fraud claim. (See infra Section II.A.) For the same reasons, the Complaint fails to plead "actual knowledge" to overcome the protections of the PSLRA safe harbor: "[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.'" Slayton v. Am. Express Co., 604 F.3d 758, 773 (2d Cir. 2010) (quoting Int'l Investors Grp. v. Avaya, Inc., 564 F.3d 242, 274 (3d Cir. 2009)).

were made with scienter or were materially false or misleading in the first place. See In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951, 970–76 (S.D. Ohio 2009) (Watson, J.).

### A. Lead Plaintiff Fails to Satisfy the Heightened Standard to Plead a Strong Inference of Scienter as Required by the PSLRA and Tellabs.

The PSLRA requires that the Complaint, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind". Ashland, 648 F.3d at 469 (quoting 15 U.S.C. § 78u-4(b)(2)) (ellipses in opinion). To meet the "[e]xacting pleading requirements for pleading scienter", Ashland, 648 F.3d at 469, Lead Plaintiff must plead specific facts creating a strong inference that, for each statement that is supposedly false or misleading, the speaker had actual knowledge that the statement was false or spoke in reckless disregard of the truth. Miller, 346 F.3d at 672. Any such inference of a defendant's state of mind for each challenged statement "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. In determining whether these requirements are met, all of the facts alleged in the Complaint must be assessed collectively, rather than individually. Ashland, 648 F.3d at 469. "This does not mean, however, that the Court cannot critically examine Plaintiff's allegations." Ricker v. Zoo Entm't, Inc., No. 1:11-cv-00490, 2011 WL 3070717, at *4 (S.D. Ohio July 30, 2012).

#### 1. The Complaint fails to allege specific facts to undermine the nonculpable inference that the Individual Defendants believed in good faith that the challenged statements were true.

Lead Plaintiff fails to plead specific facts showing that, at the time the statements were made, Defendants had specific information establishing that their forecasts of future performance and general statements of optimism were lies. As this Court has held, a securities

fraud plaintiff must allege "specific facts that [Defendants'] disclosures were incompatible with any reports, data" or other signs. See In re Huntington, 674 F. Supp. 2d at 958, 964–66. The Complaint, however, does not contain a single allegation regarding any specific sales figures or other specific content revealed by any particular report or sales meeting on any particular date. (See AC ¶¶ 62, 77(a)–(d), (j)–(l), 93(a)–(e), (i)–(k), 99(a)–(b), (g)–(i), 125(a)–(f).) Without those kinds of "specific facts" establishing that Defendants "knew the statements were false at the time they were made", Lead Plaintiff cannot plead scienter. In re Huntington, 674 F. Supp. 2d at 966 (emphasis in original).

Instead of providing details to explain how actual sales data contradicted Defendants' statements at the time they were made, the Complaint rests heavily on allegations that the Individual Defendants had access to regular internal sales reports and monitored sales closely, coupled with conclusory and speculative assertions of what the sales reports contained. (See, e.g., AC ¶¶ 47, 144–51, 161–63.) While the Complaint includes a section bearing the heading "Internal Reports and Meetings Differed Drastically from Defendants' Public Statements" (id. ¶¶ 161–63), it contains only conclusory assertions and colorful language; despite the promise of the heading, Lead Plaintiff offers no details whatsoever about the sales in the alleged "internal reports" or what was said in the alleged "meetings". The section of the Complaint bearing the heading "Defendants' Knowledge of the Fraud" (id. ¶¶ 144–53) similarly fails to deliver, detailing at length the Individual Defendants' job responsibilities and access to information about Big Lots' business while remaining silent with regard to what specific information they had that would contradict the innocent inference that they reasonably believed the challenged statements to be true. "[T]hat Defendants 'could regularly track' sales data contradicting the [targeted earnings] forecast[s], accompanied by 'a general assertion about what

[plaintiffs] think the data showed,' is insufficient to plead scienter without 'hard numbers or other specific information.'" Gruhn v. Tween Brands, Inc., No. 2:07-cv-852, 2009 WL 1542795, at *8 (S.D. Ohio June 2, 2009) (quoting In re Juniper Networks, Inc., 158 F. App'x 899, 900 (9th Cir. 2005)); see also Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp., 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010) (stating that scienter "cannot be inferred merely because of the defendants' positions in the company or the fact that they had access to the company's financial information. . . . [and] participated in committee meetings to discuss the company's financial information" (citing PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 688 (6th Cir. 2004), abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011)).

Lead Plaintiff's failure to support its conclusions with specific allegations of fact is fatal under the Supreme Court's decision in Tellabs, which held that a proper scienter analysis "must consider plausible, nonculpable explanations for the defendant's conduct", and a plaintiff's allegations of scienter must be "at least as compelling as any opposing", innocent explanation. 551 U.S. at 324. Without particularized allegations detailing precisely what the Individual Defendants knew and when they knew it, Lead Plaintiff's conclusory inference that Defendants were in possession of information contrary to their public statements is not even remotely as compelling as the innocent inference that Defendants made good-faith earnings projections that did not pan out. Indeed, the Complaint tends to support that nonfraudulent inference because it acknowledges that Big Lots' business performance showed marked improvement during the second half of fiscal 2011 and does not criticize the veracity of those results. (AC ¶¶ 49–50, 61.) It is thus only reasonable to infer that as Big Lots' fiscal calendar turned to 2012 the Individual Defendants continued to believe the Company would perform well.

Accordingly, because the Complaint "offers no allegations regarding the content of [the alleged] reports" or sales meetings—beyond mere speculation—they "cannot possibly lend support to an inference of scienter". Ricker, 2012 WL 3070717, at *5. As the Sixth Circuit held in Louisiana School Employees' Retirement System v. Ernst & Young LLP, 622 F.3d 471 (6th Cir. 2009), "[f]inding scienter based on such allegations would be equivalent to the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." 622 F.3d at 484–85 (internal quotation marks omitted).

**2. Lead Plaintiff's insider trading allegations are out of context and misleading and do not support a strong inference of scienter.**

The Complaint contends that the Individual Defendants engaged in a "massive insider trading spree in February and March 2012" and that those trades support an inference of scienter. (See AC ¶¶ 16–17, 155–60.)[3] Those allegations are misleading and, in any event, insufficient to support a strong inference of scienter because, despite Lead Plaintiff's assertion to the contrary, the trades were not unusual in timing or amount. See Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009), abrogated in part on other grounds by Matrixx Initiatives, 131 S. Ct. 1309.[4]

---

[3] Lead Plaintiff's allegations of insider sales apply only to statements made on or before March 27, 2012, because it alleges no insider sales after that date. (See AC ¶ 160.)

[4] Moreover, the Complaint relies on impermissible group pleading. Local 295, 731 F. Supp. 2d at 719 (holding that "group pleading, if it properly existed in the Sixth Circuit before, does not survive the PSLRA"). Specifically, the Complaint alleges that trades by a group of 17 insiders (only four of whom are Defendants here) were unusual in coordinated timing and aggregate amount and allegedly made "on the basis of a shared knowledge of material, non-public information adverse to Big Lots' stock price". (AC ¶¶ 16–17, 159–60 & n.7.) However, the PSLRA requires the complaint [to] plead scienter with particularity as to each defendant in [a multiple-defendant] case". Local 295, 731 F. Supp. 2d at 719–20. Indeed, courts in this District have repeatedly rejected such group pleading because it "is antithetical to the PSLRA's requirement that the complaint state with particularity facts giving rise to a strong inference of scienter". Id. at 719–20 (internal quotation marks omitted); see also In re Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968, 984–87 (S.D. Ohio 2008). Thus, Lead Plaintiff's "reliance on group pleading undercuts an inference that the Individual Defendants acted with scienter" because it implies that Defendants are liable based only

First, the timing of the stock trades at issue was not unusual. There is nothing suspicious about selling shares when a stock is trading at or near an historical peak in price. See, e.g., Sawant v. Ramsey, 742 F. Supp. 2d 219, 232 (D. Conn. 2010) (finding no insider trading because, among other reasons, the defendant "sold at a time when Host's stock had reached unprecedented levels in both price and trading volume, thus enabling him to secure a substantial return on his initial investment", and accordingly "[t]here was nothing uncharacteristic or risky concerning his sale under these circumstances").[5] To the contrary, it only makes sense that an insider, just like any other investor, would prefer to sell stock at a high price rather than a low price. Lead Plaintiff's contention that the Individual Defendants' sales at historically high prices would be prudent only if they "knew, on the basis of non-public information about the Company's poor performance, that Big Lots' share price had peaked and would lose value in the near future" (AC ¶ 156) makes no sense and is contrary to law. Under the analysis required by Tellabs, there is a more compelling and perfectly innocent inference that is easily drawn—i.e., that the Individual Defendants decided to monetize portions of their equity-based compensation at a time when trading was permitted by the Company and when that equity was more valuable than it had been in recent memory. 551 U.S. at 324.

The allegation that the insider sales occurred alongside the challenged statements also fails to support a strong inference of scienter. Stock sales following announcements of earnings guidance are not suspicious in the least: "No inference can be drawn from [such sales]

---

on the collective knowledge acquired by all 17 insiders alleged to have traded during the class period. See Local 295, 731 F. Supp. 2d at 727.

[5] See also, e.g., Frazier v. Vital Works, Inc., 341 F. Supp. 2d 142, 162–63 (D. Conn. 2004) (timing of insider sales near "historically high prices" was not suspicious); In re Enron Sec., Derivative & ERISA Litig., 258 F. Supp. 2d 576, 616, 636–38 (S.D. Tex. 2003) (Lead Plaintiff's claim that a defendant's "single sale of 21,200 shares, or 46% of his holdings, from stock options at ['a high price' of] $80.44 per share on October 31, 2000 was suspiciously timed" was presented "out of context" and failed to raise a strong inference of scienter (internal quotation marks omitted)).

because [they are] more obviously consistent with the idea that [the Company] permitted stock sales in such periods because it diminished the possibility that insiders could exploit outside market buyers." Guttman v. Huang, 823 A.2d 492, 503–04 (Del. Ch. 2003). In fact, public companies typically require insiders to conduct any trading during "window periods" following releases of quarterly earnings and announcements of financial guidance. See Johnson v. Hui, 811 F. Supp. 479, 487 (N.D. Cal. 1991) (holding that a special litigation committee reasonably concluded that the defendants' trading patterns were inconsistent with an alleged insider trading scheme where "[m]ost stock sales were made during 'window periods' established by [corporate defendant] for the sale of stock by directors", which "began a few days after the release of a quarterly financial reports and continued for ten days"). Lead Plaintiff has alleged no facts to cast doubt on the innocent inference that the timing of the trades had nothing to do with any purported fraudulent intent. See Tellabs, 551 U.S. at 324.[6]

Second, the Individual Defendants' stock trades were not "highly unusual in amount". (AC ¶ 159.) The Complaint's assertions that "a single trade by Fishman on March 20, 2012 netted him more than $10 million" and "Cooper and Haubiel each dump[ed] more than 40%" of their shares are out of context and misleading. (Id.) Lead Plaintiff cannot show that the trades are unusual without pleading a meaningful trade history for each defendant, which Lead Plaintiff has failed to do. See Konkol, 590 F.3d at 399. As the Sixth Circuit stated in Konkol, a "'meaningful trading history' requires information on non-Class Period sales, the amount of stock retained by the Defendants, or, as the Defendants allege, whether the amount of stock

[6] Lead Plaintiff's failure to allege whether the trades were made during such a "window period" also renders nonsensical the contention that the Individual Defendants' stock sales were suspicious because some occurred "outside a 10b5-1 plan". (AC ¶ 160.) The point of such a plan is to permit a trade to occur outside of a "window period" based on a decision made during a permissible period committing to the circumstances under which the trade would take place. Thus, to the extent the questioned trades were made during a "window period" (and Lead Plaintiff does not allege otherwise), there would be no reason to do so pursuant to a 10b5-1 plan.

owned by the Defendants actually increased during the Class Period." Id. at 399–400. Although Lead Plaintiff omitted that information from its Complaint, those trading histories—listed in Forms 4 filed with the SEC and publicly available[7]—supply the appropriate context and easily lead to the inference that the trades were not part of any fraudulent scheme. See Tellabs, 551 U.S. at 324; cf. In re Oracle Corp. Deriv. Litig., 867 A.2d 904, 934, 954 (Del. Ch. 2004) (holding that neither timing nor amount of trades "create[d] any rational inference of scienter" because they could be explained by "proper, non-suspicious financial considerations").

Specifically, Fishman's sale of 227,500 shares came just two weeks after he was awarded 240,000 shares of Big Lots stock and one year after he was awarded 250,000 shares (after selling no shares in all of 2011 except to satisfy tax obligations from his equity award and after selling over one million shares in 2010). (See Fishman Forms 4, DeMay Decl. Ex. Q). Johnson sold 5,625 shares on March 14, 2012, but he was awarded 50,000 options and shares on March 6, meaning his holdings increased by over 44,000 shares during the time when Lead Plaintiff would have the Court infer that he was dumping his shares to cash out. (See Johnson Forms 4, DeMay Decl. Ex. P). Similarly, Haubiel sold 56,250 shares on March 15, 2012 after receiving awards of 70,000 options and shares on March 6, while Cooper sold 69,875 shares while also receiving 70,000 options and shares.[8] (See Haubiel and Cooper Forms 4, DeMay Decl. Exs. N, O). Whether viewed individually or as a group, it is clear that if anything the Individual Defendants were on balance increasing their ownership of company stock and

[7] It is well-established that Forms 4 are properly considered on a motion to dismiss, both because they are judicially noticeable and because they are "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit". E.g., Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); In re CNET Networks, Inc., 483 F. Supp. 2d 947, 953–54, 961– 62 (N.D. Cal. 2007).

[8] Lead Plaintiff alleges that Defendants Cooper and Haubiel also sold shares in late February (AC ¶ 160), but those sales were pursuant to 10b5-1 trading plans that were put into effect at an earlier time (see Forms 4, DeMay Decl. Exs. N, O), meaning Lead Plaintiff has not shown that the trades were entered into during the putative class period.

exposure to the risks associated with Big Lots' business performance. See In re Goodyear Tire & Rubber Co. Deriv. Litig., No. 5:03CV2180, 2007 WL 43557, at *8 (N.D. Ohio Jan. 5, 2007) (stating that claims of insider trading were implausible when the defendant's holdings increased during the relevant time period). Whatever shares were sold merely reflected the Individual Defendants' realization of a portion of their overall compensation package at a time their efforts had been recognized with new awards of stock and options. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) (rejecting an inference of scienter based on sales of options because options "were an intended part of [defendants'] overall compensation package"), abrogated in part on other grounds as recognized in Avaya, 564 F.3d 242; In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 471 (D.N.J. 2000).

The amounts of the alleged sales are also not "unusual". While Lead Plaintiff alleges the Individual Defendants "netted" certain proceeds from their sales (AC ¶ 159–60), those alleged amounts are inflated and misleading. Lead Plaintiff appears to have calculated the alleged "proceeds" by multiplying the number of shares sold by the sale price (id.), but the net proceeds after paying the strike price to exercise options are far lower. For example, Lead Plaintiff alleges that Johnson sold 5,625 shares at $45.47 for proceeds of $255,769 (AC ¶ 160), but those shares were options exercised that day at $17.47. (See Johnson Form 4 dated March 16, 2012, DeMay Decl. Ex. P.) Accordingly, Mr. Johnson's net proceeds were only $157,500, not $255,769, and he would then have to pay taxes associated with that net gain, further reducing the ultimate proceeds. Similarly, once the exercise price of the options is taken into account, Fishman's net proceeds from his sale of 227,500 shares would have been roughly $5 million, not $10 million, and after paying taxes it would be significantly lower. (See Fishman Form 4 dated March 21, 2012, DeMay Decl. Ex. Q.)

Still, even accepting Lead Plaintiff's misleading calculations and ignoring the historical context (contrary to the Sixth Circuit's direction in Konkol), the amount of the stock sales described in the Complaint do not support the required "strong inference" of scienter. See Gruhn, 2009 WL 1542795, at *2–3, 9–10. For example, in Gruhn the defendant insider allegedly sold 49% of his holdings for $8.7 million. Id. at *2–3. The court found those amounts did not support a strong inference of scienter, holding that the amount of stock sold "[did] not compare to other instances in which considerably greater percentages" of shares were sold. Id. at *9. The court also held that the $8.7 million in sale proceeds, "although not a pittance", "pales in comparison" to cases where sales of relatively small percentages of the defendants' holdings resulted in "truly astronomical" proceeds.[9] Id. (citing Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of 2.1% of holdings constituted nearly $900 million in proceeds)).

**3. Lead Plaintiff's other allegations also fail to support a strong inference of scienter.**

The Complaint also speculates that the Defendants committed fraud because Big Lots' "depressed stock price" in early 2011 made the company "a takeover target", "[p]laced [i]mmense [p]ressure on Defendants to [m]aintain [p]ositive FY 2011 Sales Trends" and "materially impacted the personal finances of the Individual Defendants, who receive a large portion . . . of their annual compensation in the form of incentive-based compensation which consisted primarily of equity awards." (AC ¶¶ 167–69.) Although certain allegations of motive can sometimes be relevant to scienter, the allegations here are of the exact sort that this Court rejected as a basis for scienter in In re Huntington: "[C]ourts distinguish motives common to

[9] See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092–93 (9th Cir. 2002) ($36 million in stock trades not suspicious), abrogated in part on other grounds by Tellabs, 551 U.S. 308; In re Skechers U.S.A., Inc. Sec. Litig., No. CV 03-02094 PA, 2004 WL 1080174, at *9–10 (C.D. Cal. May 7, 2004) (over $32.4 million not suspicious).

corporations and executives generally from motives to commit fraud. All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud." 674 F. Supp. 2d at 974. Nor does the allegation that the "Individual Defendants had a [pecuniary] interest" in their company's success demonstrate scienter, because"[s]uch motives are common to all executives". Id.

Moreover, temporal proximity between alleged fraudulent statements and later disclosures (see AC ¶¶ 164–65) supported only by "generalized allegations" are "nothing more than fraud by hindsight" and do not establish a strong inference of scienter, even when taken collectively with other allegations. See In re Huntington, 674 F. Supp. 2d at 972–73.

*  *  *

Accordingly, Lead Plaintiff fails to allege particularized facts giving rise to the necessary "strong inference" of scienter, requiring dismissal.

### B. Lead Plaintiff Fails to Plead With Particularity That Any Challenged Statement Was Materially False Or Misleading.

In order to plead fraud adequately, Lead Plaintiff must allege "specific facts" to show that the statements "were false at the time they were made". In re Huntington, 674 F. Supp. 2d at 966 (emphasis in original); see also id. (a plaintiff must "alleg[e] particularized facts . . . that plausibly demonstrate that Defendants made false and misleading statements"); La. Sch. Emps. Ret. Sys., 622 F.3d at 478 ("Securities fraud claims arising under Section 10(b) must satisfy the particularity requirements of [Rule] 9(b). A plaintiff's complaint must[, among other things,] specify the statements that the plaintiff contends were fraudulent [and] explain why the statements were fraudulent. . . . [P]laintiffs [must] state with particularity . . . the facts constituting the alleged violation . . . ." (internal citation omitted)).

As discussed above in connection with scienter, while Lead Plaintiff bases its case on the notion that there was contemporaneous internal information about Big Lots' business that contradicted Defendants' public statements, the Complaint fails to specify what those supposed contrary facts were. (See supra Section II.A.1.) That absence is particularly important because the PSLRA requires that allegations regarding statements that a plaintiff believes are false or misleading "shall state with particularity all facts on which that belief is formed". 15 USC 78u-4(b)(1) (emphasis added). For the same reasons that the Complaint's conclusory assertions fail to plead that the Defendants knew their public statements to be false, they also fail to plead adequately that the statements were false or misleading at all.

Additionally, certain of the challenged statements—all but those that specifically state the Company's 2012 financial guidance—are immaterial as a matter of law. Many of the allegedly misleading statements are mere generic expressions of corporate optimism, and it is well-settled that such statements are immaterial because "[p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives". See VeriFone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993); Omnicare, 583 F.3d at 944. For example, the Complaint alleges that on March 27, 2012, Defendant Fishman "falsely declared Big Lots' 'solid' FY 2012 prospects at an investor conference" and falsely stated that Big Lots "ha[s] strategies, teams and capital for continued success in the future". (AC ¶¶ 15, 92.)[10] "Courts have consistently found immaterial . . . [such] rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the

[10] Among many other examples, the Complaint quotes various Defendants as stating that "in-store execution was 'better . . . than any time I can remember" (AC ¶ 52); "customers responded in a big way" to Big Lots' product offerings (id. ¶ 69); "the 'key categories that were good' in 4Q11 'have legs here into 2012'" (id. ¶ 70); "Doug and his team have some different strategies to hopefully drive business" (id. ¶ 74); "[Big Lots] benefit[s] substantially from the leadership and experience of [its] senior executives" (id. ¶ 84); and "'significant improvements' in consumables . . . 'resonated with consumers and generated shopping excitement'" (id. ¶ 96).

marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." Omnicare, 583 F.3d at 944; accord In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), aff'd, 95 F.3d 922 (9th Cir. 1996) (holding non-actionable the phrases "'[w]e're doing well and I think we have a great future,' 'business will be good this year . . . [,] we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . . ,' '[e]verything is clicking [for the 1990s] . . . [,] new products are coming in a wave, not in a trickle . . . [,] old products are doing very well' and that 'I am optimistic about Syntex's performance during this decade'"). Such comments "do nothing more than vaguely predict positive future results" and therefore cannot serve as the basis for a securities fraud claim. Omnicare, 583 F.3d at 944.

The alleged omissions are immaterial as well. Lead Plaintiff repeatedly accuses Big Lots of concealing "mass defections and layoffs" of "seasoned Buyers, Planners and Allocators" (AC ¶ 77(e), 59), but personnel changes at the operational level are not material: "To the extent the investors allege that an earlier disclosure of the details of the sales force reorganization would have made a material difference in their investment choices, we agree with the district court that the investors have not raised a plausible claim that stock prices fluctuated with disclosures about the sales staff". See In re Cutera Sec. Litig., 610 F.3d at 1110.

Accordingly, Lead Plaintiff fails to plead adequately the existence of any materially false statement or omission, which is an independent basis for dismissing the Complaint in its entirety and with prejudice. In re Huntington, 674 F. Supp. 2d at 966.

## III. LEAD PLAINTIFF FAILS TO PLEAD LOSS CAUSATION.

The PSLRA requires plaintiffs to plead facts showing "that the act or omission . . . caused the loss for which the plaintiff seeks to recover damages". 15 U.S.C. § 78u–4(b)(4); see

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342–46 (2005). If a complaint does not show that a corrective disclosure revealed that the challenged statements were lies, it must be dismissed. Omnicare, 583 F.3d at 944. The connection between the alleged fraud and the corrective disclosure must be direct. See id. at 945; In re Almost Family, Inc. Sec. Litig., No. 3:10-CV-00520-H, 2012 WL 443461, at *10, *12 (W.D. Ky. Feb. 10, 2012) ("Although the Court agrees that disclosures, and more particularly, partial disclosures, may suffice in some cases to establish loss causation, the requirement of revealing fraud is not lost. . . . If the disclosure of a mere risk of fraud was enough to trigger loss causation, a private cause of action for securities fraud would accrue every time an allegation or rumor of wrongdoing circulated.").

Lead Plaintiff alleges that Big Lots' statements on April 23, 2012 (which published revised guidance for the first fiscal quarter of 2012) and August 23, 2012 (which published results for the following quarter and announced Wurl's departure) constitute corrective disclosures that revealed the alleged fraud and caused the alleged losses. (AC ¶¶ 178–80.) Although Lead Plaintiff alleges conclusorily that the press releases "disclosed that the robust sales figures repeatedly touted by defendants throughout the Class Period were fabricated" (id. ¶ 111 (emphasis added)), no factual allegations in the Complaint support that bald assertion. All the April 23 and August 23 releases disclosed was that, as of the end of the respective fiscal quarters, Big Lots had failed to meet its prior projections.

Lead Plaintiff does not and cannot plead that anything in the press releases suggests the initial guidance (issued months earlier) was fraudulent or that Big Lots lacked a good-faith belief that it would perform as predicted. The Sixth Circuit held that the lack of such allegations required dismissal for failure to plead loss causation in D.E.& J. Ltd. Partnership v. Conaway, 133 F. App'x 994, 999–1001 (6th Cir. 2005). There, the plaintiff claimed the

defendant had "conceal[ed] the extent of [its] financial difficulties" and that the fraud was disclosed when the defendant filed for bankruptcy. Id. at 996, 1000. The Sixth Circuit held that the bankruptcy petition was not a corrective disclosure—even though it revealed to the market that the company's stock was not as valuable as previously presented—because plaintiffs did not allege that the bankruptcy "disclosed any prior misrepresentations to the market". Id. at 1000. Similarly, because the earnings shortfalls did not convey to the market that Big Lots' earlier projections were misrepresented (as opposed to just turning out to be wrong), Lead Plaintiff cannot show that the alleged fraud, as opposed to ordinary underperformance, caused any loss.[11]

In fact, Lead Plaintiff admits the alleged fraud was never disclosed, instead asserting that investors somehow divined that the prior statements were misrepresentations: "Although defendants did not affirmatively admit to the particulars of their fraud, they did not have to. The market, which reacted by punishing the Company's stock price by more than 40% after the full truth had been revealed, clearly understood that there had been new revelations – that Big Lots' financial condition was not as previously (and misleadingly) presented to the market." (AC ¶ 182.) The allegation that the fraud was "implicitly disclosed", however, "rests entirely on speculation" and is not sufficient to plead loss causation. See Omnicare, 583 F.3d at 945; Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1063 (9th Cir. 2008) ("So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.

[11] Not only has Lead Plaintiff failed to allege that the alleged fraud caused its losses, but as to the alleged corrective disclosure on August 23, 2012, Lead Plaintiff also fails to allege a cognizable economic loss in the first place. In Dura, the Supreme Court held that a securities fraud plaintiff cannot show economic loss by alleging merely that he purchased shares at an artificially inflated price: "[An] 'artificially inflated purchase price' is not itself a relevant economic loss." Dura, 544 U.S. at 342–47. At a minimum, the purchaser must hold its shares until after the truth is disclosed to the marketplace. See id. at 342. Here, Lead Plaintiff already stated in a sworn affidavit that it sold its entire position in Big Lots shares on April 24 and May 15, 2012. (See Dkt. No. 13, Murray Decl. Ex. B.) Accordingly, Lead Plaintiff cannot plead loss causation with respect to the second corrective disclosure.

Enabling a plaintiff to proceed on such a theory would effectively resurrect what Dura discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price.").

Lead Plaintiff further alleges that the disclosure of Wurl's resignation in the August 23 press release also revealed the alleged fraud. (AC ¶¶ 128, 130.) The law is clear that the resignation of senior officers or directors is not a corrective disclosure unless the resignation specifically refers to actual evidence of fraud, which plainly was not the case here. See, e.g., Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation."); Bach v. Amedisys, Inc., No. 10-395-BAJ-CN, 2012 WL 6947008, at *10 (M.D. La. June 28, 2012) ("Though . . . fraud may be revealed in the course of an officer's resignation, the resignation must somehow reveal actual evidence of fraud for a corrective disclosure to occur."). And Lead Plaintiff does not allege that the departure of any other employees was ever disclosed.

Finally, Lead Plaintiff points to a December 2012 disclosure of governmental investigations into trading by Big Lots officials (AC ¶ 181), but "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." See Meyer v. Greene, 710 F.3d 1189, 1201 (11th Cir. 2013) ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b).") (citing In re Almost Family, 2012 WL 443461, at *13)). Moreover, that announcement post-dates the end of the class period by several months and thus could not have caused losses during the class period. See In re Almost Family, 2012 WL 443461, at *11.

## IV. LEAD PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY AND INSIDER TRADING.

Lead Plaintiff also asserts claims against the Individual Defendants as "controlling persons" under Section 20(a) of the Exchange Act and for insider trading under Section 20A. (AC ¶¶ 203–11.) In order to state a claim under either Section 20(a) or Section 20A, Lead Plaintiff must plead a predicate violation of the Exchange Act. In re Huntington, 674 F. Supp. 2d at 975–76; Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 704 (2d Cir. 1994). Because Lead Plaintiff fails to state a predicate violation for the reasons discussed above, the secondary liability claims must be dismissed as well. In re Huntington, 674 F. Supp. 2d at 975–76; Jackson, 32 F.3d at 703–04.

## CONCLUSION

For all the foregoing reasons, the Amended Complaint should be dismissed in its entirety and with prejudice.

Respectfully submitted,

**VORYS, SATER, SEYMOUR AND PEASE LLP**

/s/ William D. Kloss, Jr. , Trial Attorney
William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

**CRAVATH, SWAINE & MOORE LLP**
Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was filed electronically through the Court's CM/ECF System this 6th day of May, 2013. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.96/+

/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854)