UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| ALAN WILLIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BIG LOTS, INC., et al.,<br><br>Defendants. | No. 2:12-cv-00604-MHW-NMK<br><br><u>CLASS ACTION</u> |

# OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
BRIAN K. MURPHY (0070654)
1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DAVID W. MITCHELL
BRIAN COCHRAN
AUSTIN P. BRANE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ....................................................................................1

II. STATEMENT OF FACTS ..........................................................................1

A. Defendants Condition the Market to Expect "Accelerating" Sales Trends in FY 2012, While Big Lots' Business Deteriorates..........................................2

B. Despite a Dramatic Deterioration in Big Lots' Business, Defendants Continue to Report "Improving" Sales Trends While Insiders Dump Stock at Inflated Prices ..........................................................................3

C. The Truth Begins to Emerge, Inflicting Millions of Dollars in Damages on the Investing Public..........................................................................6

D. Defendants Become the Target of Multiple Governmental Investigations as Big Lots' Business Continues to Deteriorate ...........................................7

III. LEGAL STANDARD..................................................................................7

IV. ARGUMENT.............................................................................................8

A. The Complaint Alleges Actionable Material Misrepresentations and Omissions with Particularity...........................................................................8

1. Defendants' Misrepresentations and Omissions Were False and Misleading When Made.............................................................8

2. Defendants' False Statements and Omissions Were Material ..................10

3. Defendants' Materially False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor...................................................12

B. The Complaint Satisfies the PSLRA's Standard for Pleading Scienter With Particularity......................................................................................16

1. Defendants' Highly Unusual and Suspicious Insider Trading Presents a Compelling Inference of Scienter ........................................17

2. Plaintiff's Particularized Allegations Regarding Defendants' Use of Big Lots' Information Systems Confirms Scienter .............................22

3. Plaintiff's Other Allegations Bolster an Already Strong Inference of Scienter ......................................................................................25

C. Plaintiff Has Adequately Pled Loss Causation ..............................................27

V. CONCLUSION........................................................................................30

## TABLE OF AUTHORITIES

Page

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8

*Ashland, Inc. v. Oppenheimer & Co., Inc.*,
648 F.3d 470 (6th Cir. 2011)....................17

*Bach v. Amedisys, Inc.*,
No. 10-395-BAJ-CN, 2012 WL 6947008
(M.D. La. June 28, 2012)....................28

*Basic v. Levinson*,
485 U.S. 224 (1988)....................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*Bensley v. FalconStor Software, Inc.*,
277 F.R.D. 231 (E.D.N.Y. 2011)....................27

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)....................10, 28, 29

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755
(S.D.N.Y. Mar. 25, 2013)....................13

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005).................... *passim*

*D.E.&J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005)....................29

*Dobina v. Weatherford Int'l Ltd.*,
No. 11 Civ. 1646 (LAK), 2012 WL 5458148
(S.D.N.Y. Nov. 7, 2012)....................23

*Fidel v. AK Steel Holdings Corp.*,
No. C-1-00-320, 2002 WL 31545952
(S.D. Ohio Sept. 19, 2002).................... *passim*

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008)....................8, 16

*Frank v. Dana Corp*,
646 F.3d at 958 (6th Cir. 2011) ........................................................................... *passim*

*Frazier v. VitalWorks*,
341 F. Supp. 2d 142 (D. Conn. 2004)...........................................................................18

*Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*,
No. 3:09-00882, 2011 WL 1335803
(M.D. Tenn. Mar. 31, 2011)...........................................................................................11

*Gruhn v. Tween Brands, Inc.*,
No. 2:07-cv-852, 2009 WL 1542795
(S.D. Ohio June 2, 2009) .........................................................................................22, 24

*Guttman v. Huang*,
823 A.2d 492 (Del. Ch. 2003).........................................................................................19

*Halford v. AtriCure, Inc.*,
No. 1:08cv867, 2010 WL 8973625
(S.D. Ohio Mar. 29, 2010) ..............................................................................................26

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ........................................................................................13

*Hawaii Ironworkers Annuity Trust Fund v. Cole*,
No. 3:10CV371, 2011 WL 1257756
(N.D. Ohio Mar. 31, 2011) .............................................................................................27

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ........................................................................... *passim*

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)............................................................................................21

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003)............................................................................15

*In re Almost Family, Inc. Sec. Litig.*,
No. 3:10-CV-00520-H, 2012 WL 443461
(W.D. Ky. Feb. 10, 2012) ...............................................................................................29

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F. Supp. 2d 688
(S.D. Ohio 2005) ........................................................................................... *passim*

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004)..........................................................................14



844913_1

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................22

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ....................................................................11, 12

*In re Duane Read Inc. Sec. Litig.*,
No. 02 Civ. 6478(NRB), 2003 WL 22801416
(S.D.N.Y. Nov. 25, 2003) ....................................................................13

*In re Dura Pharm. Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006) ....................................................................29

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ....................................................................18

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004) ....................................................................10, 14, 18

*In re Gen. Elec. Sec. Litig.*,
No. 09 Civ. 1951 (DC), 2009 WL 2259502
(S.D.N.Y. July 29, 2009) ....................................................................27

*In re Goodyear Tire & Rubber Co. Deriv. Litig.*,
No. 5:03CV2180, 2007 WL 43557
(N.D. Ohio Jan. 7, 2007) ....................................................................20, 21

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ....................................................................9, 11, 12

*In re Huntington Bancshares Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ....................................................................9, 17, 24

*In re Lason, Inc. Sec. Litig.*,
143 F. Supp. 2d 855 (E.D. Mich. 2001) ....................................................................13

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................20

*In re Milestone Sci. Sec. Litig.*,
103 F. Supp. 2d 425 (D.N.J. 2000) ....................................................................21

*In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*,
541 F. Supp. 2d 986 (S.D. Ohio 2007) ....................................................................24

*In re Oracle Corp. Deriv. Litig.*,
867 A.2d 904 (Del. Ch. 2004) ....................................................................19

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000) ....................................................................26

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)....................18, 25

*In re Skechers U.S.A., Inc. Sec. Litig.*,
No. CV03-02094PA, 2004 WL 1080174
(C.D. Cal. May 7, 2004)....................22

*In re Smartalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d at 543 (S.D. Ohio 2000).................... *passim*

*In re Syntex Corp. Sec. Litig.*,
855 F. Supp. 1086 (N.D. Cal. 1994)....................12

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................29

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000)....................25

*In re Tibco Software Sec. Litig.*,
No. C05-2146 SBA, 2006 WL 1469654
(N.D. Cal. May 25, 2006)....................13

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002)....................22

*In re VeriFone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992)....................11

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
No. 12-5281, 2013 WL 2248970 (6th Cir. May 23, 2013)....................7, 12

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009)....................11, 12, 29

*Institutional Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....................22

*Johnson v. Hui*,
811 F. Supp. 479 (N.D. Cal. 1991)....................19

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009)....................16, 20, 24

*La. School Emps. Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2009)....................9, 25

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008)....................16

*Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ....................24

*Magyery v. Transamerica Fin. Advisors, Inc.*,
315 F. Supp. 2d 954 (N.D. Ind. 2004) ....................13

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
No. 12-1900, 2013 WL 2278599
(1st Cir. May 24, 2013)....................29

*Matrix Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)....................10, 16

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................29

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ....................29

*Miller v. Champion Enters., Inc.*,
346 F.3d 660 (6th Cir. 2003) ....................12

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
No. 3:11-cv-00595, 2013 WL 866943
(M.D. Tenn. Mar. 7, 2013)....................26

*New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*,
No. Civ. A 1:98-CV-99-M, 1999 WL 33295037
(W.D. Ken. Aug. 16, 1999)....................9, 18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ....................19

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009)....................28

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ....................16

*Ricker v. Zoo Entm't Inc.*,
No. 1:11-CV-00490, 2011 WL 3070717
(S.D. Ohio July 30, 2012)....................24

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Ohio 2007) .................... *passim*

*Sawant v. Ramsey*,
742 F. Supp. 2d 219 (D. Conn. 2010)....................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................16, 17

**STATUTES, RULES AND REGULATIONS**

15 U. S.C.
§78u-4(b)(1)(B)........................................8
§78u-4(b)(2)........................................16
§78u-5........................................13
§78u-5(c)(1)(A)........................................13, 14
§78u-5(c)(1)(B)........................................15
§78u-5(c)(2)(B)(i)........................................15

Federal Rules of Civil Procedure
Rule 9(b)........................................*passim*
Rule 12(b)(6)........................................7

17 C.F.R.,
§240.10b-5(b)........................................9
§240.10b5-1(c)........................................22

## SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO C.M.P. E(1) AND L.R. 7.2

During 2012, Big Lots Inc. ("Big Lots" or the "Company") and its senior executives made a series of false and misleading statements, reporting that Big Lots was experiencing "record breaking" sales growth on the strength of unprecedented operational effectiveness during a period of rapid sales decline and profound deterioration in Big Lots' merchandising capabilities. Defendants'[1] false statements were designed to and did push Big Lots' stock price to its highest levels ever, allowing the Company's directors and top executives to unload more than ***$36 million*** worth of Big Lots shares at peak prices just before they were forced to reveal the truth that Big Lots' sales and earnings were in fact declining, causing Big Lots' stock price to collapse and inflicting damage on the investing public. Defendants' brazen insider trading has drawn the scrutiny of a host of government agencies, news organizations and shareholder lawsuits, and led to the sudden and premature retirement of Big Lots' CEO. Meanwhile, more than a year after Defendants pocketed millions of dollars in insider trading proceeds, Big Lots' business has continued its downward spiral.

The Complaint[2] satisfies the requirements for pleading a securities fraud claim as set forth by the Securities Exchange Act of 1934 (the "Exchange Act"), Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Defendants mischaracterize the Complaint to argue it "makes no sense" and should be dismissed. MTD at 1.[3] Instead, Defendants

---

[1] "Individual Defendants" refers collectively to Steven S. Fishman ("Fishman"), Joe R. Cooper ("Cooper"), Timothy A. Johnson ("Johnson"), and Charles W. Haubiel II ("Haubiel") (collectively, with Big Lots, "Defendants").

[2] Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 18) ("Complaint"). All "¶__" and "¶¶__" are to the Complaint, unless otherwise noted. All emphasis has been added and citations omitted, unless noted otherwise.

[3] For example, Defendants falsely and repeatedly contend that the Complaint "does not challenge as fraudulent or misstated in any way" statements about Big Lots' FY 2011 performance (Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 28) ("MTD" or "Motion"), at viii, 1-2, 4, 6-7, 17), when the Complaint in fact alleges such statements were false and misleading when made as a result of problems in Big Lots' business that began at the end of calendar 2011. ¶¶10-11, 61-62.

contend that Big Lots' sales results went from record breaking growth to the worst quarterly sales decline in more than a decade – in a matter of days – and did so coincidentally ***immediately after*** the Individual Defendants and other Company insiders had completed a historic rash of insider trading. MTD at 7. It is Defendants' alternative reality which is "difficult to grasp." *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954, 962 (6th Cir. 2011). Far from a "strike suit" (MTD at 10), the Complaint alleges in detail a troubling series of misrepresentations combined with a pattern of insider trading unprecedented in Big Lots' history. "[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Indeed, Defendants concede that the case at bar ***closely resembles*** *Ross v. Abercrombie & Fitch Co.*,"[4] in which this Court denied the defendants' motion to dismiss in its entirety. *See* 501 F. Supp. 2d 1102, 1114 (S.D. Ohio 2007). As in *Ross*, Defendants' Motion should be denied.

***First***, Defendants seek refuge for their fraud in the PSLRA's Safe Harbor. MTD at 9-14. However, the Complaint is centered around misrepresentations of present and historical fact and material omissions which by definition fall outside the Safe Harbor's purview. *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008). Furthermore, for any statements deemed forward-looking, Defendants' boilerplate risk disclosures fall far short of the "meaningful cautionary language" required for Safe Harbor protection. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001), *overruled on other grounds*, *Tellabs*, 551 U.S. at 308 (2007). Finally, the Complaint adequately alleges that Defendants acted with actual knowledge of their fraud and thus

---

[4] Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Partially Lift the Discovery Stay (Dkt. No. 31) ("Defs. Opp.") at 9.

the Safe Harbor is inapplicable. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005). *See* §IV.A.3., *infra*.

***Second***, Defendants argue that the Complaint fails to plead scienter or falsity with the requisite particularity. MTD at 14-26. Defendants' argument ignores much of the Complaint, mischaracterizes the rest, and relies on non-existent, overturned or inapposite legal standards. Specifically, Defendants ask this Court to "parse out" each of Plaintiff's[5] allegations separately for "individual analysis," an approach to analyzing scienter expressly rejected by the Sixth Circuit. *See Dana II*, 646 F.3d at 961. In fact, Plaintiff particularizes numerous allegations related to each Defendant that this Court and others have found highly probative of scienter. *See, e.g.*, *Ross*, 501 F. Supp. 2d at 1117. Viewed holistically, as they must be, these well-pled allegations create a strong inference of scienter that dwarfs any inference of Defendants' innocence. *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000). Likewise, Plaintiff has specified every allegedly misleading statement and omission, identified the speaker, stated where and when each statement was made, and detailed the reasons why each statement was materially misleading – all that is required to plead falsity. *See Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564, 570 (6th Cir. 2008). *See* §IV.A.1.&2., B., *infra*.

***Third***, Defendants contend that Plaintiff has failed to adequately plead loss causation because the revelation of Big Lots' true operating performance did not amount to an admission of fraud. MTD at 26-29. This argument has already been rejected by this Court and by courts around the country. *See, e.g., In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006); *Mass. Ret. Sys. v. CVS Caremark Corp.*, No. 12-1900, 2013 WL 2278599, at *9-*11 (1st Cir. May 24, 2013). Instead, a plaintiff alleging securities fraud need only provide a defendant "with

---

[5] "Plaintiff" is the City of Pontiac General Employees' Retirement System.

some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 337 (2005). Plaintiff has done far more than that, specifically pleading that class members purchased Big Lots' stock at artificially inflated prices as a result of Defendants' false statements and deceptive conduct and were damaged when the truth about Defendants' actions began to be revealed on April 23, 2012, resulting in double-digit stock price declines as the artificial inflation left the stock. *See* §IV.C., *infra*.

Plaintiff's Complaint satisfies the pleading requirements of the Exchange Act, the PSLRA and Rule 9(b) in every respect. Defendants' Motion should be denied.

## I. INTRODUCTION

During 2012, the directors and top executives of Big Lots unloaded more than ***800,000 Big Lots shares*** at artificially inflated levels for more than ***$36 million*** in proceeds while concealing the Company's true financial condition, including falsely reporting that Big Lots' "record breaking" results had continued into FY 2012, when in fact, Big Lots was experiencing a historic sales decline. ¶¶61-101. The Individual Defendants' massive insider trading continued right up until just before the stock collapsed. ¶157. Defendants' fraud has been the subject of a series of exposés by the *Wall Street Journal* and *Forbes*. ¶¶25, 133-134, 140-142. It is also the focus of Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") investigations. ¶¶67, 69. As the truth of Big Lots' financial condition and the Individual Defendants' insider trading was revealed, financial analysts reacted with shock, calling the disclosures a "***doozy***" which "***[e]xacerbat[ed]***" Defendants' "***credibility issues***." ¶¶104-105.

Defendants' Motion ignores these damning facts, instead recasting this action as a fraud by hindsight "strike suit" which should be dismissed at the pleadings stage. MTD at 2, 9-10. Plaintiff's Complaint, however, details all of the facts underlying Defendants' fraud consistent with Sixth Circuit law, and satisfies the pleading requirements of the PSLRA and Rule 9(b). Indeed, Defendants concede the "the case at bar ***closely resembles*** *Ross v. Abercrombie & Fitch Co.*," (Defs. Opp. at 9), in which this Court ***denied*** the defendants' motion to dismiss in its entirety. *See* 501 F. Supp. 2d at 1114. Defendants' Motion should similarly be denied.

## II. STATEMENT OF FACTS

Big Lots is a discount retailer that specializes in sourcing cheap closeout inventory. ¶¶3, 43. In order to obtain products at a substantial discount, Big Lots relies heavily on an extensive network of highly specialized merchandising personnel who develop vendor relationships and negotiate and secure valuable closeout deals. ¶¶4, 44, 46-47. Consumables is Big Lots' largest and most

important merchandising category, consisting of over 30% of sales. ¶¶5, 45. Analysts and investors closely followed Big Lots' sales results in each of its key categories – in particular consumables – and focused on same store sales ("SSS") results as an important measure of Big Lots' success. *Id.*

### A. Defendants Condition the Market to Expect "Accelerating" Sales Trends in FY 2012, While Big Lots' Business Deteriorates

In FY 2011, Defendants announced a number of new strategies and operational changes. ¶¶6, 48-49. These changes included: (i) the hiring of a senior merchandising executive, Doug Wurl ("Wurl"), from Sears to head the Company's merchandising operations; (ii) a shift in focus to consumables, electronics and other key categories; and (iii) an increase in private label offerings. *Id.*

Thereafter, Defendants began to report a major turnaround in Big Lots' business. ¶¶7-8, 50-55. After consecutive quarters of negative or flat SSS growth, Big Lots reported SSS ***increases*** driven largely by sales in consumables and electronics. ¶¶7, 50. In November and December 2011, Defendants represented that: (i) sales increases were the result of merchandising enhancements and extraordinary closeout availability; (ii) under Wurl, Big Lots had substantially improved its sourcing operations; (iii) positive sales trends were "accelerating," particularly in consumables and electronics; and (iv) these increases would continue into FY 2012. ¶¶7-8, 51-55.

However, the truth was that behind the scenes Big Lots' operations had fallen into disarray. ¶¶9, 56. Wurl had moved Big Lots towards a more conventional retail model like the one he oversaw at Sears, which placed him at loggerheads with Company leaders, in particular Fishman, who wanted to maintain Big Lots' unique closeout-focused business model. ¶¶9, 57-58. Merchandising personnel struggled to implement unfamiliar and inconsistent directives from senior management. *Id.* Beginning at the end of 2011, mass layoffs and defections from dissatisfied employees exacerbated execution problems. *Id.* Remaining personnel found it more difficult to secure high-quality closeout inventory and instead sourced inferior products which were poorly

received by customers. *Id.* As a result, Big Lots experienced a dramatic downturn in its business and sales slowed by February 2012, particularly in Big Lots' key sales categories. *Id.*

### B. Despite a Dramatic Deterioration in Big Lots' Business, Defendants Continue to Report "Improving" Sales Trends While Insiders Dump Stock at Inflated Prices

Defendants' February 2012 release began a series of false and misleading statements which artificially inflated the trading price of Big Lots stock and allowed the Individual Defendants to dispose of millions of dollars' worth of their own shares in less than a month. ¶¶11, 62.[6] Despite knowing the severity of Big Lots' merchandising problems and deteriorating sales trends, Defendants publicly revised Big Lots' FY 2011 earnings-per-share ("EPS") numbers upward and reported that SSS "exceeded our guidance" on "improving trends" in Big Lots' key sales categories. ¶¶10, 61. Fishman stated that Big Lots' new initiatives had been "very well executed" and the "decision to be aggressive in certain key categories was successful." *Id.*

However, Defendants' statements concealed the fact that the "improving trends" in key sales categories had eroded by the time of the February release. ¶¶11, 62. Contrary to Fishman's earlier representations, sales trends were not "accelerating," as claimed, but rather declining. *Id.* And, the "consistent lifts quarter to quarter to quarter" in key sales categories had evaporated. *Id.* Moreover, under Wurl's reign, closeout opportunities had dried up and many of Big Lots' top merchandising talent had left. *Id.* This left shelves stocked with stale electronics and a narrow selection of consumables, which Defendants knew was decimating 1Q12 sales results. *Id.*

In order to pocket tens of millions of dollars from the sale of their Big Lots' shares, over the next six months, Defendants continued to falsely represent in SEC filings and investor conference

---

[6] Throughout their Motion, Defendants falsely claim that the Complaint "acknowledges" the veracity of FY 2011 results. *See* MTD at viii, 1-2, 4, 6,-7, 17. To the contrary, the Complaint merely describes ***Defendants' own statements*** about Big Lots' performance and pointing to problems that ***began at the end of calendar 2011***, alleges that statements about FY2011 were false and misleading when made due to the omission of material information. *See* ¶¶10-11, 61-62.

calls that "accelerating" sales trends had carried into FY 2012. ¶12. Furthermore, Defendants concealed and misrepresented critical information about the decline in key sales categories and the deterioration in merchandising operations in statements to the investing public, rendering these statements materially false and misleading when made. *Id.*

For example, on a March 2, 2012 earnings call, despite the dramatic slowdown in sales, Fishman stated that Big Lots was experiencing "improving trends coming out of 2011" and that 1Q12 sales were "consistent" with the "record results" reported in 4Q11. ¶¶13, 71-72. Aware of their importance to investors, Fishman drew particular attention to the "key categories" of consumables and electronics – stating that "significant improvements" in consumables had "translated into meaningful sales growth" and that electronics "continues to be good." ¶¶69-70. In reality, the slowdown in each of these categories was at the heart of Big Lots' sales problems. ¶113. To support this illusion of growth, Cooper issued robust sales and earnings numbers for 1Q12 and FY 2012 at odds with internal data showing that sales and earnings were in fact deteriorating, and Johnson stated that "February [2012] was on plan" to achieve these unobtainable numbers. ¶70.

Defendants credited the façade of success to a newfound operational effectiveness completely divorced from Big Lots' true operating condition. Despite the fact that topline results were being decimated by execution problems, Fishman stated that Big Lots was "execut[ing] our strategies extremely well . . . maybe better than we ever have before" and falsely stated "[t]here is not much yet that is not working" in consumables. ¶¶69-70. Fishman also stated that closeout deals had "picked up to a more aggressive posture in the last two or three weeks," "particularly" in consumables, and that Big Lots was positioned to secure this inventory "probably stronger than we have ever been before." ¶73. In fact, a paucity of closeout deals had left shelves stacked with outdated inventory that was being rejected by customers. ¶77.

Throughout March and April 2012, Defendants continued to falsely represent that Big Lots was experiencing robust sales and earnings growth. ¶¶83-99. For example, while concealing the downturn in business, Defendants continued to stress that Big Lots was "in growth mode" and on track for "another solid year" in 2012 (¶¶89, 92); "successful initiatives . . . continue to grow the basket" (¶85); "consumers continue to respond to our new assortments and product offerings" (*id.*); Big Lots "continue[d] to grow" closeout vendors "every day" (¶89); "job creation" efforts had left Big Lots "ideally positioned for the future" (¶97); and Big Lots' "merchandising team with extensive closeout purchasing experience" gave it a competitive advantage (¶86).

As a result of Defendants' false statements, Big Lots' stock price rose to its highest levels ever. ¶¶15, 63-64, 78-80, 94, 100-101. Taking advantage of this artificial inflation, the Individual Defendants and 13 other Company insiders embarked on a massive insider trading spree. ¶¶15-17, 65, 81-82, 95, 155-160. In less than a month, these insiders captured peak prices to dump more than ***800,000*** Big Lots shares for over ***$36 million*** in proceeds. ¶16. March 2012 represented the single largest month of insider trading in terms of the number of insiders involved and proceeds generated ***in at least a decade***. ¶¶81, 159. In a single day – March 20, 2012 – Fishman dumped 227,500 shares for more than ***$10 million*** – nearly doubling the previous record of same-day insider sale proceeds. ¶¶16, 81, 159. Haubiel and Cooper each dumped more than 40% of their holdings, with Haubiel dumping more Big Lots shares in March than he ever had in a single month. ¶¶16, 159. This massive, coordinated sell-off was a dramatic break from precedent, as ***none*** of the Individual Defendants had sold ***any*** Big Lots stock in the preceding ***17 months***, and most had not sold any for the previous ***22 months***. ¶159; MTD, Exs. N, O, P, Q. Concurrent with their own selling, the Individual Defendants caused Big Lots to repurchase $99 million worth of stock to buoy Big Lots' stock price and deflect attention away from their profiteering. ¶¶18, 107.

### C. The Truth Begins to Emerge, Inflicting Millions of Dollars in Damages on the Investing Public

On April 23, 2012 – less than a month after the massive insider selloff and Defendants' most recent false statements – Big Lots issued a release partially disclosing the truth of its operating performance, slashing SSS ***growth*** for 1Q12 to a predicted ***decline***. ¶¶19, 102-103. As a result, Big Lots would miss its easiest quarterly sales comparison in ***at least ten years***. ¶¶19, 103. Also, Big Lots disclosed that consumables and electronics – ***the very categories*** Defendants had repeatedly touted as driving positive sales – caused the "large majority" of the miss. ¶¶19, 102-103. Analysts described this announcement as a "***doozy***" and "***hard to swallow***." ¶¶20, 104-105. On this news, Big Lots stock plummeted 24% to close at $35 per. ¶¶20, 106.

Defendants continued to conceal the truth about Big Lots' impaired merchandising capabilities, structural weaknesses in its business model, and deteriorating sales and earnings trends. ¶¶22, 102-103, 107, 113-123. In a May 23, 2012 conference call with investors, Fishman stated that the 1Q12 miss was nothing more than a "straightforward execution issue" (¶114) and the "misstep in electronics was really isolated" (¶122), and told investors that the Company had "identified [its] misses and have a plan to correct them" (¶22). Instead of disclosing the problems in Big Lots' merchandising operations, Fishman stated that Big Lots was ***expanding*** its merchandising staff, and that growth was coming from "better quality . . . better name-brand manufacturers than ever before." ¶¶22, 116. Cooper knowingly issued false guidance for 2Q12 and FY 2012, while Fishman stated that SSS would soon "move back into positive territory." ¶¶115, 118.

On August 23, 2012, Big Lots reported that, notwithstanding its representations to the contrary, sales trends had not only failed to improve but accelerated downward, demonstrating that Big Lots' "execution issues" were much deeper than originally disclosed and symptomatic of widespread problems in merchandising. ¶¶24, 128-130. That same day, Big Lots reported a massive organizational shakeup, which included the resignation of Wurl, "effective immediately." *Id.*

Analysts slashed estimates and price targets across the board, describing the results as "a surprise and very disappointing" and "far worse than expected." ¶132. On this news, Big Lots' stock price dropped 21% to close at $30.76 on heavy trading volume. ¶¶24, 131.

### D. Defendants Become the Target of Multiple Governmental Investigations as Big Lots' Business Continues to Deteriorate

Beginning November 27, 2012, *The Wall Street Journal* ran a series of articles on the Individual Defendants' insider trading. ¶¶25, 133-134, 140-142. The articles, with titles like "Big Sales by Big Lots Brass" and "Executives' Good Luck in Trading Own Stock," focused on the unusual and suspicious nature of the Individual Defendants' insider trades. ¶¶134, 142. On December 4, 2012, Big Lots disclosed that the DOJ and the SEC had formally opened criminal and civil inquiries into the matter. ¶¶25, 135. That same day, Fishman abruptly announced his "retirement," although the search for a successor had not even begun.[7] ¶¶26, 136. This announcement came as a surprise given the ignominy of the surrounding circumstances and Fishman's earlier representation that Big Lots had in place a "defined" succession plan. ¶¶26, 130, 136. On this news, Big Lots' stock price dropped 13% to less than $28 per share, down more than 40% from its Class Period high. ¶143.

## III. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to the plaintiff and accept all factual allegations as true." *Ind. State Dist. Council of Laborers v. Omnicare, Inc.* ("*Omincare II*"), No. 12-5281, 2013 WL 2248970, at *3 (6th Cir. May 23, 2013). To survive a Rule 12(b)(6) motion, a complaint must simply allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

[7] Not until May 3, 2013, did Big Lots disclose that instead of retiring, Fishman will actually maintain a lucrative consulting role going forward. *See* Declaration of Brian K. Murphy in Support of Plaintiff's Opposition to Defendants' Motion ("Murphy Decl."), Ex. A, filed concurrently herewith.

U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint alleging securities fraud must also satisfy Rule 9(b) and the PSLRA. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Likewise, the PSLRA requires a plaintiff to "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U. S.C. §78u-4(b)(1)(B); *Dana I*, 547 F.3d at 570 (a complaint must simply: "'(1) specify the statements that . . . were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent'"). The Complaint meets all pleading requirements and adequately alleges each element of Plaintiff's claims. Defendants' Motion should be denied.

## IV. ARGUMENT

### A. The Complaint Alleges Actionable Material Misrepresentations and Omissions with Particularity

Defendants' argument that Plaintiff has failed to plead any material misrepresentations or omissions "is simply an inaccurate characterization of the Class Complaint." *SmarTalk*, 124 F. Supp. 2d at 543; MTD at 24-25. The Complaint details each of Defendants' false statements and omissions. Defendants' willful blindness to these allegations is neither a defense to their underlying misconduct nor a basis for dismissal.

#### 1. Defendants' Misrepresentations and Omissions Were False and Misleading When Made

Defendants' argument that Plaintiff "fail[s] to plead adequately that [any] statements were false and misleading" is without merit. MTD at 25. Defendants repeatedly made public statements regarding Big Lots' business operations, sales and ongoing success. ¶¶61-64, 67-76, 83-92, 96-98, 110-124. For each statement, the Complaint identifies which Defendant spoke (or omitted material

information) and precisely when and where the statement was made. *Id*. Most importantly, the Complaint sets forth why each statement was false and misleading, or what material information was omitted. *See, e.g.*, ¶¶77(a)-(l), 93(a)-(k), 99(a)-(i), 125(a)-(f).

As detailed above, the Complaint alleges that Defendants misrepresented and concealed: (1) deteriorating sales and earnings results; (2) massive layoffs and employee defections; (3) an inability to secure crucial closeout inventory; (4) the failure of recent merchandising strategies; and (5) a failed attempt to shift away from Big Lots' traditional business model. ¶¶77(a)-(l), 93(a)-(k), 99(a)-(i), 125(a)-(f). Such facts seriously undermined Big Lots' business and prospects and were therefore required to be disclosed. *See Bridgestone*, 399 F.3d at 675. Defendants' statements were false and misleading because they concealed these facts. *See Huffy*, 577 F. Supp. 2d at 1003 ("'A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it.'").[8]

These false statements are all actionable. Precisely as alleged here, "[c]ourts have recognized a securities fraud claim where the plaintiff alleges that the defendant made certain statements despite knowing that existing mismanagement made those statements false or misleading." *Fidel v. AK Steel Holdings Corp.*, No. C-1-00-320, 2002 WL 31545952, at *5 (S.D. Ohio Sept. 19, 2002); *see also New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*, No. Civ. A 1:98-CV-99-M, 1999 WL 33295037, at *4-*6 (W.D. Ken. Aug. 16, 1999). Plaintiff also alleges that Defendants repeatedly omitted "material fact[s] necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b); ¶¶9, 11, 56-60, 62, 77, 93, 99, 125. "Our securities laws . . . 'require an actor to "provide complete

---

[8] Defendants' authority on falsity is unavailing. MTD at 24, 26. In *In re Huntington Bancshares Sec. Litig.*, 674 F. Supp. 2d 951, 963 (S.D. Ohio 2009) plaintiffs failed to allege any "reasons why the subject statements are misleading" or provide any explanation "why the statements were fraudulent." The Complaint here explains exactly why each statement was fraudulent. ¶¶77(a)-(l), 93(a)-(k), 99(a)-(i), 125(a)-(f). In *La. School Emps. Ret. Sys. v. Ernst & Young*, LLP, 622 F.3d 471 (6th Cir. 2009), the only issues on appeal were scienter and leave to amend.

and non-misleading information with respect to the subjects on which he undertakes to speak.'"" *Bridgestone*, 399 F.3d at 670; *see also Fidel*, 2002 WL 31545952, at *18; *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("[A] company that chooses to speak on an issue must provide complete and non-misleading information.").

In addition, in cases such as this, a duty to affirmatively disclose nonpublic material information arises "'when there is insider trading'" or "'an inaccurate, incomplete or misleading prior disclosure.'" *Bridgestone*, 399 F.3d at 669. Thus, ***each instance*** of the Individual Defendants' numerous insider trades during the Class Period gave rise to a duty to affirmatively disclose the concealed adverse facts. *See SmarTalk*, 124 F. Supp. 2d at 546-47. Also, because the development of the adverse facts rendered prior statements misleading, Defendants were required to disclose them. *See Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010). Defendants failed on each count.

**2. Defendants' False Statements and Omissions Were Material**

Although Defendants concede their financial guidance was material, they contend that every other misstatement and omission is immaterial as a matter of law. MTD at 25-26. Defendants are wrong. Materiality is satisfied where a "***reasonable*** investor would have viewed the nondisclosed information 'as having significantly altered the "total mix" of information made available.'" *Matrix Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1312 (2011) (emphasis in original); *see also Basic v. Levinson*, 485 U.S. 224 (1988). A complaint may only be dismissed on materiality grounds if the alleged false statements "'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Bridgestone*, 399 F.3d at 681.

Here, the alleged false statements and omissions all concerned Big Lots' core operations and the key metrics used to measure the Company's success. *See* §IV.A.1., *supra*. Such specific misstatements regarding historical and present financial and sales results, near-term prospects and

the reasons for past and present financial success, are material. *See Huffy*, 577 F. Supp. 2d at 1007 (finding material statements such as defendants were "excited about Huffy's prospects for Fiscal Year 2003" as well as those incorrectly attributing primary reasons for sales growth).[9]

In addition, Defendants concealed adverse facts about Big Lots' true sales and operating performance, *see* §IV.A.1., *supra*, which no doubt "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Helwig*, 251 F.3d at 556; *see also SmarTalk*, 124 F. Supp. 2d at 543; *Psychiatric Solutions*, 2011 WL 1335803, at *44-*45.[10] For example, at the time Defendants stated sales and earnings performance "exceeded guidance" on "improving trends" in February 2012, Big Lots' then ***actual*** operating performance would have been considered important to a reasonable investor. ¶61. *See Huffy*, 577 F. Supp. 2d at 1007. Defendants' repeated emphasis on these topics (¶¶61-64, 67-76, 83-92, 96-98, 110-124, 152), the attention paid to such representations by analysts (¶¶5, 20, 45, 55, 64, 79-80, 101, 104-105, 127, 132), and the precipitous decline in Big Lots' stock price upon disclosure of the truth (¶¶20, 24, 106, 131, 143, 178-183) further support the materiality of the misrepresentations. *See Psychiatric Solutions*, 2011 WL 1335803, at *45.

The subject of Defendants' misstatements and omissions were the core fundamentals and key metrics of Big Lots' business and clearly important to reasonable Big Lots investors. Plaintiff has properly pled their materiality.[11]

---

[9] *See also Cardinal*, 426 F. Supp. 2d at 747; *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 3:09-00882, 2011 WL 1335803, at *45 (M.D. Tenn. Mar. 31, 2011) (finding material statements attributing "strong growth" to a "'successful strategy and a highly experienced management team" and that defendants were "on track to achieve . . . earnings guidance").

[10] Defendants' reliance on *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 (9th Cir. 2010), is misguided. MTD at 26. There, the court did not find that the omission of personnel changes are per se immaterial, as Defendants' suggest, but that the difference between the allegedly misleading statement and corrective disclosure was immaterial.

[11] Defendants' purported authority on materiality is incongruous. MTD at 25-26. The claims in *Ind. State Dist. Council of Laborers v. Omnicare, Inc.* ("*Omnicare I*"), 583 F.3d 935, 944 (6th Cir. 2009); *In re VeriFone Sec. Litig.*, 784

### 3. Defendants' Materially False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor

None of Defendants' alleged misstatements and omissions fall within the PSLRA's Safe Harbor provision, as: (1) Defendants' statements were not forward-looking; (2) Defendants failed to provide meaningful cautionary language; and (3) Defendants had actual knowledge that those statements were false and misleading when made. *See Helwig*, 251 F.3d at 554-65; MTD 9-14.

#### a. Defendants' Statements Were Not Forward Looking

Statements about "events that were currently occurring" or expressing "the speaker's current belief" are not forward-looking. *Huffy*, 577 F. Supp. 2d at 1014-15. Although Defendants concede this much (MTD at 11), they ignore numerous such statements alleged in the Complaint.[12] For example, Defendants stated: "***February was*** on plan" (¶70); "significant improvements . . . ***have translated*** into meaningful sales growth" (¶69); "consumables . . . ***has picked*** up" (¶70); and the "misstep in electronics ***was*** really isolated" (¶122). "Because the statement[s]" – among others (*see, e.g.*, ¶¶61-64, 67-76, 83-92, 96-98, 110-124) – "plainly relate[] to past or current, rather than future, performance, the statement[s] cannot be considered forward-looking."[13] *Fidel*, 2002 WL 31545952, at *20.[14]

---

F. Supp. 1471 (N.D. Cal. 1992), and *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) involved alleged failures to disclose forecasts of ***future*** sales or revenues. By contrast, the Complaint centers on misrepresentations and omissions of both historical and present fact. *See* §IV.A.3.a., *infra*. The Sixth Circuit has also recently invited the district court to reconsider dismissal of the Exchange Act claims at issue in *Omnicare I*. *See Omnicare II*, 2013 WL 2248970, at *11-*12 (Gwin, J. concurrence) (reversing, in part, the district court's dismissal of securities fraud claims). And, as to the alleged false and misleading forecasts – which also represented material omissions of then-existing fact – Defendants concede they are material. MTD at 25.

[12] Defendants cite *Cutera*, 610 F.3d 1103, for the proposition that projections are forward-looking. MTD at 10-11. However, representation and omissions of ***then-existing material facts*** do not fall within the Safe Harbor, as discussed herein at §IV.A.3.a.

[13] This fact alone – that Plaintiff alleges numerous misstatements and omissions of historical and present fact made ***independently*** of any projection, distinguishes this action from those cited by Defendants. MTD at 10-12; *see Helwig*, 251 F.3d at 554 (statements concerning an inability to ***predict*** the ***future*** impact of ***pending*** legislation on stated projections); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 676-77 (6th Cir. 2003) (statements concerning "***projections and objectives***" provided as the basis for defendants' financial projections); *Omnicare I*, 583 F.3d at 943 (statement that

In addition, the Safe Harbor, by definition, does not apply to omission of present facts. 15 U.S.C. §78u-5; *City of Providence v. Aeropostale, Inc*., No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (collecting cases). Defendants' statements regarding Big Lots' sales results, merchandising success and overall strength omitted then-existing material adverse facts known to or recklessly disregarded by Defendants. *See* §IV.A.1., *supra*. Also, for each affirmative misstatement, including Defendants' 1Q12, 2Q12, and FY 2012 financial projections, there was a coinciding material omission. *Id.* Lastly, as discussed herein, each instance of insider trading gave rise to a duty to disclose material nonpublic information. *Id.* Defendants' omissions of then-existing material adverse facts are not within the Safe Harbor. *Aeropostale*, 2013 WL 1197755, at *12 (finding defendants' "failure to disclose" adverse facts is "unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were forward-looking").

### b. Defendants' Boilerplate Cautionary Language Was Neither Meaningful Nor Adequate

Defendants' use of boilerplate risk disclosures failed to provide the "meaningful cautionary language" necessary to "convey substantive information about factors that realistically could cause results to differ materially from those projected." 15 U.S.C. §78u-5(c)(1)(A); *Helwig*, 251 F.3d at

---

"'revenue and earnings ***growth outlook*** remains positive'"); *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) (all statements were economic projections or factors underlying those projections); and *In re Duane Read Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) (did not discuss whether statements were forward-looking). Further, *In re Tibco Software Sec. Litig.*, No. C05-2146 SBA, 2006 WL 1469654, at *25 (N.D. Cal. May 25, 2006), plaintiffs "fail[ed] to identify any" facts demonstrating falsity and defendant's cautionary language was "complete and thorough," unlike here. In *Magyery v. Transamerica Fin. Advisors, Inc.*, 315 F. Supp. 2d 954, 957 (N.D. Ind. 2004), the court evaluated federal preemption issues, with no substantive Safe Harbor analysis.

[14] *See also Huffy*, 577 F. Supp. 2d at 1013-14 (finding statements that "'sales . . . have improved substantially,'" "[w]e are beginning to see our margins improve," "[w]e anticipate continued expansion," "'[e]arnings . . . are currently tracking to the higher end of . . . estimates,'" and regarding defendants' "continued optimism" not forward-looking); *SmarTalk*, 124 F. Supp. 2d at 544; *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 861 (E.D. Mich. 2001) ("misrepresentations about . . . current and historical corporate strategy . . . ability to effectuate that strategy, and the success of the company up to that point" not forward-looking).

558-59.[15] Defendants' claim that they "expressly invoked" Safe Harbor protection for some of their false statements does not render such language meaningful. MTD at 13; *see* 15 U.S.C. §78u-5(c)(1)(A).

Defendants citation to a March 2, 2012 release that stated projections "may ultimately prove to be inaccurate . . . as a result of various factors" is an example of "a boilerplate litany of generally applicable risk factors" that cannot invoke Safe Harbor protection. *Cardinal*, 426 F. Supp. at 749; MTD 13-14. Further, Defendants' boilerplate list ignores that as of the date of the disclosure, Big Lots had ***already*** experienced softening sales and an inability to secure crucial closeout inventory, among other problems. Disclosing a mere "possibility as opposed to an actuality . . . does not qualify as ***meaningful*** cautionary language." *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004) (emphasis in original). Defendants simply told investors what investors already knew – results may differ based on a litany of general factors – while concealing what investors did not – results in fact ***would*** differ due to an already occurring slowdown in sales and systemic operational problems. "[C]autionary language [that] is general and fails to disclose the 'actual risks' known" does not trigger Safe Harbor protection. *FirstEnergy*, 316 F. Supp. 2d at 596 & n.9; *Cardinal*, 426 F. Supp. 2d at 750.

Underscoring the unacceptable and generic nature of Defendants' warnings is their cut-and-paste nature. For example, each of Defendants' misleading releases include ***identical*** "disclosures" about forward-looking statements and remained ***unchanged*** from their pre-Class Period "disclosures" despite material changes in risk. *See* Declaration of Brendon DeMay in Support of Motion to Dismiss (Dkt. No. 28-1) ("DeMay Decl."), Exs. A, B, H, I; Murphy Decl., Exs. B-D. The

---

[15] Defendants' reliance on *Helwig* to argue their cautionary language was adequate is misplaced. MTD at 12. In *Helwig*, as here, defendants "statements were not meaningful and were hardly even cautionary." 251 F.3d at 559.

Sixth Circuit has recognized that, as here, "[s]ubstantially similar language" appearing in multiple SEC filings may in and of itself render cautionary language inadequate for Safe Harbor purposes. *Helwig*, 251 F.3d at 559. Such "blanket statements" do not trigger immunity as they are not "'tailored to the specific future projections, estimates, or opinions'" which they purport to insulate. *Id.*

Furthermore, Defendants' March 27 and June 5, 2012 oral misstatements (¶¶88-92, 122) fail to warrant Safe Harbor protection because oral statements must be "accompanied by an ***oral*** statement that additional . . . factors that could cause actual results to materially differ . . . is contained in a readily available written document." 15 U.S.C. §78u-5(c)(2)(B)(i). However, in both instances, Defendants failed to make any such oral statement at the time, and instead attempt to immunize themselves by appending a disclaimer after the fact to the conference call transcript. DeMay Decl., Exs. F, M. Defendants' inadequate disclosures are insufficient to invoke the Safe Harbor.[16]

**c. Defendants Made Statements With Actual Knowledge that They Were False and Misleading**

Plaintiff alleges more than sufficient facts to demonstrate Defendants made 1Q12, 2Q12, and FY 2012 projections – and any other statements deemed forward-looking, which Plaintiff asserts there are none – "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B); *see* §IV.B., *supra*. Opinions, predictions and other forward-looking statements are actionable if the speaker does not genuinely and reasonably believe them when made or is "'aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'" *Helwig*, 251 F.3d at 557, 561 ("With regard to future events [and] uncertain figures, . . . a company may

---

16 *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) (MTD at 13), does not support dismissal. There, in evaluating a summary judgment motion, the court found "no evidence" that statements were false or misleading when made. By contrast, Plaintiff adequately alleges falsity. *See* §IV.A.1., *supra*.

choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths."); *see also Bridgestone*, 399 F.3d at 675.[17]

**B. The Complaint Satisfies the PSLRA's Standard for Pleading Scienter With Particularity**

A plaintiff pleads the requisite "strong inference" of scienter where the "facts argued collectively . . . give rise to a strong inference of at least recklessness." 15 U.S.C. §78u-4(b)(2); *Dana II*, 646 F.3d at 959. Though higher than negligence, "reckless behavior is not intentional or knowing behavior because the danger need not have been actually known." *SmarTalk*, 124 F. Supp. 2d at 539. In evaluating scienter, courts must: (1) treat plaintiff's factual allegations as true; (2) consider the allegations collectively, "not whether any individual allegation, scrutinized in isolation" meets the requisite standard; and (3) take into account "plausible" opposing inferences. *Dana II*, 646 F.3d at 959 (citing *Tellabs*, 551 U.S. at 322-23). Thus, in a tie, "*Tellabs* instructs that the complaint should be permitted to move forward." *Dana I*, 547 F.3d at 571.

Citing the Supreme Court's directive in *Matrixx*, 131 S. Ct. at 1324, to review scienter pleadings "holistically," the Sixth Circuit recently held that district courts can no longer "sort[] through each allegation individually before concluding with a collective approach," as such a method "risks losing the forest for the trees." *Dana II*, 646 F.3d at 961 (reversing the district court's dismissal of an action alleging securities fraud for the second time). Instead, the "***only*** appropriate approach" is to "address[] the allegations collectively, [to do] so quickly, and, importantly . . . not parse out the allegations for individual analysis." *Id.*[18] Tellingly, Defendants fail to even cite "this

---

[17] *See also Cardinal*, 426 F. Supp. 2d at 756 ("[B]ecause . . . Plaintiffs adequately pled scienter . . . Plaintiffs' allegations are, for pleading purposes, sufficient to show scienter as to . . . forward-looking statements"); *SmartTalk*, 124 F. Supp. 2d at 544; *Fidel*, 2002 WL 31545952 , at *21 (denying motion to dismiss as to forward-looking statements based on facts "support[ing] an inference that Defendants knew statements . . . would convey a false impression").

[18] Thus, *Dana II*, 646 F.3d at 961 overruled the piecemeal approach to analyzing scienter pleadings used in *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396-97 (6th Cir. 2009); *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008); and *PR*

new precedent," *Ashland*, 648 F.3d at 470, and rely primarily on opinions which applied the 'divide and dismiss' approach expressly rejected by the Sixth Circuit.

The Complaint adequately pleads that Defendants knew of, or were reckless in disregarding, the falsity of their Class Period statements. Specifically: (1) Defendants participated in a massive insider trading spree which was highly unusual – indeed unprecedented – by almost any metric; (2) Defendants reviewed, analyzed and discussed internal information regarding Big Lots' deteriorating sales results and merchandising operations in real time; and (3) numerous other specifically pled facts remove any lingering doubt about scienter. *See Dana* II, 646 F.3d at 959-61; *Bridgestone*, 399 F.3d at 689. Indeed, in *Ross*, a case which Defendants admit "***closely resembles***" the case at bar (Defs. Opp. at 9), this Court found that plaintiffs had adequately pled scienter. 501 F. Supp. 2d at 1117 (allegations that sales results differed from class period statements, especially in key sales categories and that defendants received internal sales reports and engaged in unusual insider trading activity gave rise to a strong inference of scienter); *see also Cardinal*, 426 F. Supp. 2d at 741.

### 1. Defendants' Highly Unusual and Suspicious Insider Trading Presents a Compelling Inference of Scienter

"'[P]ersonal financial gain may weigh heavily in favor of a scienter inference.'" *Huntington*, 674 F. Supp. 2d at 969 (quoting *Tellabs*, 551 U.S. at 325). Here, the Individual Defendants and 13 other Company insiders collectively reaped more than ***$36 million*** in insider trading proceeds during the Class Period. ¶¶15-18, 65, 81-82, 155-160. In a single month, the Individual Defendants reaped ***$17 million*** while making false statements that inflated Big Lots' stock price to historic highs just before corrective disclosures that crashed its value. ¶16.

---

*Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004). And, although the Sixth Circuit upheld dismissal of a securities fraud complaint in *Ashland, Inc. v. Oppenheimer & Co., Inc.*, the facts were clearly distinguishable from the facts of this action, as plaintiffs there "fail[ed] to provide ***any*** facts" indicative of scienter. 648 F.3d at 461, 470 (6th Cir. 2011) (emphasis in original). As detailed herein, the complaint alleges numerous such facts. *See* §IV.B., *supra*.

The Individual Defendants' insider sales were: (1) highly unusual in timing; (2) highly unusual in amount; and (3) when viewed in context, highly indicative of scienter. *See Cardinal*, 426 F. Supp. 2d at 727 ("'[I]nsider trading at a suspicious time or in an unusual amount comprises one of the "fixed constellations of facts" that courts have found probative of securities fraud.'").

The timing of the Individual Defendants' insider trading was highly unusual. All sales came soon after, and sometimes on the ***same day***, that Defendants issued false and misleading statements which pushed Big Lots' stock price to its highest levels ever. ¶¶65, 81-82, 156-158. "Insider sales made when a company's stock price is near an all-time high are probative of scienter." *FirstEnergy*, 316 F. Supp. 2d at 599; *see also Ross*, 501 F. Supp. 2d at 1117 (stock sales soon after defendants issued allegedly false positive news which inflated their stock price indicative of scienter). The Individual Defendants also cashed out at ***exactly*** the right time – less than a month before the truth about Big Lots' negative sales results and merchandising problems eviscerated the Company's stock price. ¶157; *see In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (finding that "the timing of stock sales" led to a "quite compelling" inference of scienter where the sales came soon before negative company news); *Fruit of the Loom*, 1999 WL 33295037, at *9.

Defendants' illogical contention that "[t]here is nothing suspicious about selling shares when a stock is trading at or near a historical peak in price" (MTD at 19), finds no refuge in law. *See, e.g.*, *FirstEnergy*, 316 F. Supp. 2d at 599. Defendants' authority shares one critical fact notably absent here: no one could be accused of capturing peak prices because the stock ***continued to rise*** after insider sales were completed.[19] Defendants' other excuse that "[s]tock sales following

---

[19] *See Frazier v. VitalWorks*, Inc., 341 F. Supp. 2d 142, 162 (D. Conn. 2004) (stock price "continued to rise" after insider sales were completed and sales did "not seem to correlate at all with any particular announcements that plaintiffs claim were fraudulent"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 617 (S.D. Tex. 2003) (defendants sold stock "well below peak prices"). Likewise, *Sawant v. Ramsey*, 742 F. Supp. 2d 219 (D. Conn. 2010) is inapplicable as the defendants there were not corporate insiders and did not possess material, non-public information.

announcements of earnings guidance are not suspicious in the least," (MTD at 19), ignores numerous cases that hold otherwise. *See, e.g., Ross*, 501 F. Supp. 2d at 1117. Tellingly, Defendants cite opinions in shareholder ***derivative lawsuits*** which simply have no bearing on the present dispute.[20] *Compare In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 955 (Del. Ch. 2004) (finding insider trading allegations did not amount to fiduciary breach in shareholder derivative action) *with Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) (finding ***same*** insider trading allegations indicative of scienter in a PSLRA shareholder class action).

The Individual Defendants' insider trades were also highly unusual in amount. The Individual Defendants dumped 315,000 shares of Big Lots stock for more than $17 million in less than a month. ¶16. March 2012 represented the single largest month of insider trading at Big Lots in terms of the number of insiders involved (17 directors and executives) and proceeds generated ($33 million) in at least ten years. ¶159. A single trade by Fishman generated more than $10 million – nearly ***double*** the next highest same-day proceeds by a Company insider. *Id.* Haubiel and Cooper both shed more than 40% of their holdings, with March 2012 representing the largest month of insider sales by Haubiel in at least a decade. *Id.* Such facts are clearly indicative of scienter. *See, e.g., Ross*, 501 F. Supp. 2d at 1115 (finding defendant's $128,000 insider sale proceeds gave rise to a strong inference of scienter).[21] Even if Johnson's sales – for which he received more than $250,000 in proceeds – as a percentage of his total holdings may "superficially appear unimpressive, they take on greater weight when the timing of the sales," and other indicia of scienter, "[are] taken into

---

[20] *See Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003); *Johnson v. Hui*, 811 F. Supp. 479 (N.D. Cal. 1991). The defendants in *Guttman* were outside directors who did not possess material, nonpublic information and sold stock at "disparate" times. 823 A.2d at 504. This directly contrasts with the Individual Defendants' coordinated selling. ¶17. In *Johnson*, unlike here, the defendants ***failed*** to capture peak trading prices and, in fact, made most sales at a price even lower than the stock's price following the corrective disclosure. 811 F. Supp. at 487-88.

[21] *See also Cardinal*, 426 F. Supp. 2d at 734 ($740,00 insider sales proceeds over a nearly four year class period gave rise to a strong inference of scienter); *SmarTalk*, 124 F. Supp. 2d at 542 (sale of 11% of holdings indicative of scienter).

consideration." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000); *see also Cardinal*, 426 F. Supp. 2d at 728 ("There is no bright line test, however, as to the amount or percentage of stock that must be sold to constitute a 'suspicious amount . . . .'"). Also, ***no*** Defendant made ***any*** insider sales in the previous ***17 months*** leading up to the Class Period – in fact Haubiel, Cooper and Johnson made no sales for the previous ***22 months*** – rendering their massive insider sales in such a short time all the more suspicious. *See* ¶159; MTD, Exs. N, O, P, Q.[22] Finally, the fact that ***17 top-level insiders*** concurrently sold ***32% of their holdings*** on average, is highly indicative of scienter.[23] *See Cardinal*, 426 F. Supp. 2d at 728.

Defendants attempt to defuse the explosiveness of their insider selling spree by pointing to equity compensation they passively received for their ***pre-Class Period*** performance. MTD at 22. That Defendants rely on a case involving affirmative stock ***purchases*** is fatal to their argument. *See In re Goodyear Tire & Rubber Co. Deriv. Litig.*, No. 5:03CV2180, 2007 WL 43557 (N.D. Ohio Jan. 7, 2007). By contrast, ***the Individual Defendants received this equity compensation for their FY 2011 performance***, and thus, its acquisition had already been determined by the start of the Class Period and had ***nothing to do*** with their mental state to commit fraud during the Class Period, other than providing an additional motive to increase Big Lots' stock price. *See* Murphy Decl., Ex. E; ¶169. Moreover, the Individual Defendants ***could not sell*** most, if not all, of the equity awards

---

[22] Defendants cite *Konkol* for the meritless argument that Plaintiff fails to plead a "meaningful trading history for each defendant." MTD at 20. However, the Complaint cites both "information on non-Class Period sales" ***and*** "the amount of stock retained by Defendants." *Konkol*, 590 F.3d at 399; *see* ¶¶16-17, 81, 159. Furthermore, the Complaint compares Class Period sales for each Individual Defendant to their trading history and that of other Big Lots insiders during the ***previous ten years*** – a period far longer than necessary given the seven month Class Period. *See, e.g., Cardinal*, 426 F. Supp. 2d at 732. In any event, Plaintiff agrees that judicial notice should be taken of each Individual Defendants' Form 4s, which renders the point moot. *See Huntington*, 674 F. Supp. 2d at 969.

[23] Defendants suggest, in a footnote, that the "Complaint relies on impermissible group pleading" because it details the abnormally large number of insiders who dumped Big Lots stock during the Class Period. MTD at 18 n.4. In actuality, the Complaint in no way seeks to rely on the group pleading doctrine. Rather, it cites the number of insiders who traded concurrently in Big Lots stock for the obvious reason that it is a specifically pled fact that this Court has considered indicative of scienter. *See, e.g., Cardinal*, 426 F. Supp. 2d at 728.

received during the Class Period ***even if they wanted to*** because it was subject to various restrictions or vesting requirements. *Id.* Further, "Defendants mistakenly assume that the only motive probative of scienter is the Individual Defendants' motive to 'cash out' fully." *Cardinal*, 426 F. Supp. 2d at 731. However, "'the calculus is clearly more complicated [because] "an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC.'"" *Id.* (finding a defendant's class period sales probative of scienter despite the fact that he purchased 40,000 shares during the class period); *see also Ross*, 501 F. Supp. 2d at 1117 (finding inference of scienter at least as compelling as non-culpable inference, despite the fact that defendants "retained the majority of their holdings").[24]

The charge that Plaintiff "inflates" the amount of insider trading proceeds is false. MTD at 22-23. Defendants play word games, miraculously transforming "netted" into "net proceeds" (MTD at 22), while ignoring the clear context of Plaintiff's allegation (*i.e.*, that amounts are calculated "in terms of proceeds generated") (¶¶81, 159). Nowhere do Defendants claim that Plaintiff misstates the amount of ***proceeds*** generated. In truth, the Complaint neither inflates nor misleads – not once does it refer to "net proceeds." Finally, the very notion that "net proceeds" are relevant to scienter has already been rejected by this Court. *See Cardinal*, 426 F. Supp. 2d at 730 (finding "no authority" for

---

[24] Defendants cite no authority for the argument that the grant of equity awards defeats an otherwise strong inference of scienter. MTD at 22. *Goodyear Tire*, 2007 WL 43557, and *Oracle*, 867 A.2d 904, both involved shareholder derivative causes of action, and thus did not analyze scienter under the PSLRA. Notably, in *Oracle's* parallel securities fraud case, the Ninth Circuit found that the defendants' insider sales ***did*** create a strong inference of scienter. *Oracle*, 380 F.3d at 1235. Similarly, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) and *In re Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425 (D.N.J. 2000) both turned on numerous facts not present here, such as the fact that numerous defendants sold no stock during the class period and that the complaint failed to allege any prior trading history or stock sales as a percentage of defendants' holdings. Neither case involved the class period acquisition of stock.

the proposition that proceeds from insider sales should be limited to "net proceeds" or offset by "open-market purchases, 'option exercises, and relevant payroll taxes'").[25]

Viewed collectively, the timing, amount, nature and coordination of the Individual Defendants' insider trading support a strong inference of scienter.[26] The fact that the Individual Defendants directed Big Lots to repurchase $99 million worth of stock while they cashed out their own holdings merely adds icing to the cake. ¶107; *see In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188 & n.68 (C.D. Cal. 2008) (the fact that "as insiders were selling, [the company] was buying" "contribute[s] to a strong inference of scienter").

### 2. Plaintiff's Particularized Allegations Regarding Defendants' Use of Big Lots' Information Systems Confirms Scienter

Defendants repeatedly asserted that they were intimately familiar with and personally involved in Big Lots' merchandising operations and financial reporting. Defendants told analysts they would "***constantly monitor***" sales and were "***always concerned***" with key sales categories. ¶152; *see Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (fact that misstatements regarded areas of analysts' focus supports scienter). Defendants assured investors that they "***challenge[d] [themselves] every day about [sales growth]***" and "***work[ed] really, really hard***

---

[25] Defendants seek amnesty by claiming some sales were made pursuant to a 10b5-1 plan and that other sales occurred during a "window period." *See* MTD at 20 n.6. ***No such immunity exists***. *See Cardinal*, 426 F. Supp. 2d at 731-32 (finding insider trades unusual and suspicious despite the fact that they largely occurred during a "window" period). Defendants also misconstrue the purpose of 10b5-1 plans. Their "point" is not to "permit a trade to occur outside a 'window' period" (MTD at 20), but rather to provide an affirmative defense to charges of insider trading where established at a time when the plan-holder does not possess material, nonpublic information. *See* 17 C.F.R. §240.10b5-1(c). "As it is typically premature to raise affirmative defenses in a motion to dismiss, this Court [does] not consider the impact of [a] purported 10b5-1 trading plan at this stage of the pleadings." *See Cardinal*, 426 F. Supp. 2d at 734.

[26] In citing *Gruhn v. Tween Brands, Inc.*, No. 2:07-cv-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009) (MTD at 23), Defendants fail to note that plaintiffs there failed to allege any insider trading history or other indicia of scienter and only one of three defendants engaged in any insider sales. Likewise, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), *overruled by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) defendants failed to capture peak prices and the trades occurred during an "unusually long" class period. In *In re Skechers U.S.A., Inc. Sec. Litig.*, No. CV03-02094PA, 2004 WL 1080174 (C.D. Cal. May 7, 2004), meanwhile, defendants sold as little as 7% of their holdings and their class period trades were almost identical to the previous year's.

***. . . to understand how to grow the business and have more consistency***." ¶152. Fishman went as far as to say he would "***lose sleep***" over sales performance. ¶152; *see Dobina v. Weatherford Int'l Ltd.*, No. 11 Civ. 1646 (LAK), 2012 WL 5458148, at *7 (S.D.N.Y. Nov. 7, 2012) ("Where a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter.").

Despite these admissions, Defendants argue they did not know, and could not have known, about the severe downturn in Big Lots' sales performance and merchandising operations. MTD at 15-24. Instead, Defendants assert that sales coincidentally went from "record breaking" to a decline so precipitous Big Lots missed its easiest quarterly comparison in at least a decade, ***just days*** after a record-setting insider stock dump. MTD at 7. Defendants' alternative reality is not even plausible, let alone ***more*** compelling than the inference of scienter. *Dana II*, 646 F.3d at 961-62 ("difficult to grasp" key executives "had no idea" of internal problems given sudden and substantial business downturn).

The Complaint further alleges that at the time Defendants made such assurances, they not only had ready access to, but in fact regularly reviewed, analyzed and discussed, information depicting a significant downturn in sales due to numerous merchandising failures. ¶¶47-48, 151, 161-163. Defendants cannot run from the real-time technology they relied upon to do their jobs. The Complaint describes the internal reports regularly reviewed by each Defendant in exacting detail, specifying what information the reports contained (¶¶47, 151); who oversaw their preparation (¶151); when they were delivered (*id.*); the delivery and storage systems used (*id.*); who received and regularly reviewed the reports (¶¶47, 151); and how and when the information in the reports reflected the downturn in sales (¶¶9, 47, 60, 151). Equally important, the Complaint details Defendants' private huddles: when they met (¶151); where they met (*id.*); what they talked about (¶¶47, 151); how and when they tracked Big Lots' deterioration (¶¶9, 46-47, 58, 151); and how this

valuable information was communicated up the chain of command (¶¶46-47, 151). The Complaint alleges that, as a result, Defendants were apprised of the deterioration in sales and merchandising "***as they occurred***." ¶151. These allegations allege scienter. *Dana II*, 646 F.3d at 959 (defendants' receipt of "internal reports and information showing that [the company] was under financial distress" indicative of scienter); *see also In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1003 (S.D. Ohio 2007) ("[Plaintiff] describe[s] exactly what documents [Defendants] had access to, why [Defendants] likely would have reviewed them, and what [Defendants] would have learned by reviewing them.").

Defendants contend that Plaintiff must plead specific sales figures on specific dates contained in particular reports in the sole possession of Defendants. MTD at 15-18. No such requirement exists. Indeed, "the exact amount of money reflected in [internal] reports is not relevant at [the pleadings] stage." *Konkol*, 590 F.3d at 398 (noting investors need not plead information only obtainable through discovery); *see also Huntington*, 674 F. Supp. 2d at 971 ("'The inference that defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre.'"). In fact, the allegations of internal reports and meetings here are far more detailed than those recently found by the Sixth Circuit to adequately plead scienter, which notably ***did not*** contain the type of "data" sought by Defendants. *See Dana II*, 646 F.3d at 959 (regular receipt of reports which contained information such as "sales, cost of materials, and inventory" and attendance at weekly meetings supported scienter).[27]

---

[27] Defendants' purported authority on this point is of no support. MTD at 15-19. *Huntington*, 674 F. Supp. 2d 951; *Ricker v. Zoo Entm't Inc.*, No. 1:11-CV-00490, 2011 WL 3070717 (S.D. Ohio July 30, 2012); *Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689 (S.D. Ohio 2010); and *Gruhn*, 2009 WL 1542795 do not require Plaintiff to plead internal sales "data." All of these cases involved pleadings which failed to allege ***any*** specific facts regarding internal reports and/or meetings, how the information contained therein contradicted defendants' public statements, or to tie that information to defendants' actual knowledge. *See, e.g.*, *Huntington*, 674 F. Supp. 2d at 971 ("The Complaint does not allege any specific facts.") By contrast, the Complaint details how each of the Defendants came to know sales and merchandising data which directly contradicted their Class

### 3. Plaintiff's Other Allegations Bolster an Already Strong Inference of Scienter

As top executives of a major discount retailer, Defendants were intimately familiar with the sales results and merchandising operations of their business – especially Big Lots' key merchandising categories – and indeed participated in conference calls and signed certifications throughout the Class Period attesting as much. ¶¶49, 51-53, 69-74, 76, 83, 87-92, 113-118, 121-122, 124, 129-130, 144-150; *see Dana II*, 626 F.3d at 961 (finding that "top executives" reporting "gangbuster earnings" when "the key product line[]" was rapidly deteriorating indicative of scienter); *Proquest*, 527 F. Supp. 2d at 743 ("SOX certifications give rise to an inference of [defendants'] scienter.").

On the heels of a failed leverage-buyout attempt and heightened investor scrutiny, Defendants also felt extreme pressure to prove their merchandising strategies would turn the business around. ¶¶6, 48-49, 167-169. Allegations that Defendants "were under substantial pressure to improve performance after several initial quarters of poor performance" and "made various public statements regarding their own management abilities and the wisdom of changes they implemented and, thus, were pressured to live up to those statements" all undergird scienter. *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D. Ohio 2000); *see also Cardinal*, 426 F. Supp. 2d at 726 (defendants' intense "pressure" to mislead about business aspects that "were analysts' and investors' primary area of focus" indicative of scienter); *Fidel*, 2002 WL 31545952, at *21.

Furthermore, Defendants received the vast majority (for Cooper, Haubiel and Fishman ***more than 80%***) of their 2011 annual compensation as incentive-based equity, mostly awarded in March 2012. ¶169; Murphy Decl., Ex. E. Defendants "only appear more culpable when considering . . . the

---

Period statements. *See, e.g.*, ¶¶45-47, 151. Likewise, *Ernst & Young*, 622 F.3d 471, is off point – because it involved allegations against an outside auditor, the court applied an even higher and inapposite standard of scienter, "approximat[ing] an actual intent to aid in the fraud." 622 F.3d at 479.

bonuses that [they] stood to earn." *Dana II*, 646 F.3d at 962; *see also Cardinal*, 426 F. Supp. 2d at 738; *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, No. 3:11-cv-00595, 2013 WL 866943, at *43 (M.D. Tenn. Mar. 7, 2013).

Also, multiple governmental investigations into the Individual Defendants' Class Period insider trading, coupled with Fishman's premature resignation, are indicative of scienter.[28] *See Dana II*, 646 F.3d at 961-62; *Ross*, 501 F. Supp. 2d at 1116 (noting governmental investigation into insider trading); *Chamberlain*, 757 F. Supp. 2d at 706 (finding governmental investigations and the related suspension of a key executive gave rise to a strong inference of scienter).[29]

Finally, ***less than two weeks*** after Defendants' most recent misleading statements, Defendants disclosed facts starkly inconsistent with earlier representations, including that Big Lots would miss its easiest quarterly comparison ***in over ten years*** (after Defendants had stated Big Lots would surpass FY 2011's "record results") and that the ***very categories*** – consumables and electronics – that Defendants had repeatedly touted as driving positive sales trends had caused the "large majority" of the miss. ¶¶19, 102-103. The short proximity between Defendants' statements and inconsistent disclosures combined with the wide divergence between internal reports and public statements further cements scienter. ¶¶164-169; *see Ross*, 501 F. Supp. 2d at 1117 (failure to disclose merchandising problems and gross margin trends in key sales categories while making misleading statements about those categories' performance indicative of scienter); *In re Prison*

---

[28] On April 29, 2013, Big Lots filed a Form 8-K that effectively confirmed that Fishman's "retirement," announced the same day as the SEC and DOJ investigations, was "in name only" and very much the result of his improper Class Period trades. *See* Murphy Decl., Ex A; ¶26.

[29] Defendants may erroneously argue that the conclusion of an SEC investigation weakens an inference of scienter. This misses the point. "It is the falsity of Defendants' statements which is critical, not whether the underlying activity is found to be illegal." *Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 WL 8973625, at *9 (S.D. Ohio Mar. 29, 2010). Furthermore, the SEC ***expressly stated*** that "[t]he attempted use of such a communication as a purported defense in any action brought against the party, either civilly or criminally, ***would be clearly inappropriate and improper.***" Declaration of Michael A. Paskin to Defendants' Opposition (Dkt. 31-1) at 8. Moreover, ***criminal*** and "various" other regulatory investigations remain ongoing. Defs. Opp. at 5.

*Realty Sec. Litig.*, 117 F. Supp. 2d 681, 687 (M.D. Tenn. 2000) (short proximity between alleged misrepresentations and disclosure indicative of scienter).

Viewed holistically, these well-pled allegations create a strong inference of scienter that dwarfs any inference of Defendants' innocence.

### C. Plaintiff Has Adequately Pled Loss Causation

To successfully plead loss causation, a plaintiff must simply allege a "'short and plain statement'" with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 337. This ordinary pleading rule is "not meant to impose a great burden upon a plaintiff." *Id.* A plaintiff must simply provide "fair notice" of the "relevant economic loss" and what the causal connection "might be between that loss and the misrepresentation." *Id.* The Complaint exceeds this standard.

Plaintiff has clearly satisfied *Dura*'s causal requirement by pleading that Big Lots' stock price was artificially inflated during the Class Period and then dropped because of Defendants' fraud. ¶¶61-143, 172-183. Specifically, the Complaint pleads that: (1) Defendants falsely reported positive sales and earnings growth and that Big Lots' critical merchandising operations were successfully executing sales strategies (¶¶61-101, 110-125); (2) Defendants' false statements caused Big Lots stock to trade at artificially inflated levels (¶¶63, 78, 94, 100, 126, 172-175); (3) Plaintiff and the Class purchased Big Lots stock at these inflated prices (¶¶1, 32, 174-177);[30] (4) on April 23,

---

[30] Defendants contention that Plaintiff "fails to allege a cognizable economic loss" with regards to the August 23 and December 4, 2012 disclosures because Plaintiff sold its position beforehand is without merit. MTD at 28 n.11. "Loss causation 'does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline.'" *In re Gen. Elec. Sec. Litig.*, No. 09 Civ. 1951 (DC), 2009 WL 2259502, at *4 (S.D.N.Y. July 29, 2009). The fact that a class representative may not be able to recover for every corrective disclosure is irrelevant on a motion to dismiss. "Thus, courts have 'routinely' appointed investors as lead plaintiff 'when they sell their shares of stock after a partial disclosure and are not holding any shares at the time of a later disclosure.'" *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 238-39 (E.D.N.Y. 2011); *see also Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 1257756, at *12 n.11 (N.D. Ohio Mar. 31, 2011) (finding loss causation adequately pled despite fact that lead plaintiff sold all of its shares before last corrective disclosure). Moreover, named plaintiff

2012, when Big Lots revised down sales and earnings for 1Q12 and disclosed that key sales categories had caused the miss, Big Lots' stock dropped 24% on high trading volume (¶¶20, 106, 178); (5) on August 23, 2012, when Big Lots announced that its sales and earnings performance had deteriorated to a much greater extent than previously disclosed and that it had radically reorganized its senior leadership, Big Lots' stock dropped 21% on high trading volume (¶¶24, 131, 179-180);[31] (6) on December 4, 2012, when Big Lots announced that it was the subject of multiple criminal and civil investigations into insider trading by its top executives and that its CEO would abruptly and unexpectedly "retire," Big Lots' stock dropped another 13% (¶¶143, 181); and (7) as a direct result, Plaintiff and the Class suffered damages (¶¶2, 27, 41, 143, 174, 181, 202). *Dura* requires nothing more. 544 at U.S. 337; *Ross,* 501 F. Supp. 2d at 1119; *Cardinal*, 426 F. Supp. 2d at 760.

Defendants challenge loss causation by arguing "the alleged fraud was never disclosed." MTD at 27-28. This Court, along with courts around the country, has repeatedly rejected this very argument, as a corrective disclosure need not admit fraud or detail a fraud's particulars. *See, e.g.*, *Ross*, 501 F. Supp. 2d at 1119 (where "Plaintiffs makes specific claims as to Defendants' alleged misrepresentations and a purported link to Plaintiffs' claimed loss" there is no need to allege the drop "was caused by a correction, admission, disclosure of misrepresentation or restatement by Defendants."); *Cardinal*, 426 F. Supp. 2d at 760 ("where the Plaintiffs allege that the subject of the

---

Alan Willis has only pled stock purchases at inflated prices and no sales – thus, loss causation is met even under Defendants' erroneous test. *See* Complaint for Violation of the Federal Securities Laws (Dkt. No. 1), Ex. 1.

[31] Defendants falsely characterize the August 23, 2012 disclosure as limited to Wurl's resignation. MTD at 29. However, the Complaint makes clear that the disclosure's import was that it revealed that deterioration in Big Lots' business was much greater than previously disclosed. ¶¶24, 131, 179. Moreover, courts are clear that where an executive departure results from the same factual predicate as the fraud, it can amount to a disclosure. *See, e.g.*, *Chamberlain*, 757 F. Supp. 2d at 718 (announcement that key executive would be suspended for reasons related to alleged fraud a corrective disclosure for loss causation purposes). Further, because Wurl's resignation was not "standing alone" but "tied to" the fraud, both *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc*., 645 F. Supp. 2d 210 (S.D.N.Y. 2009) and *Bach v. Amedisys, Inc*., No. 10-395-BAJ-CN, 2012 WL 6947008 (M.D. La. June 28, 2012), *see* MTD at 29, ***support*** finding loss causation here.

misrepresentations and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value"); *Mass. Ret. Sys.*, 2013 WL 2278599, at *9-*11.

The Complaint specifically pleads the falsity of Defendants' statements, and describes how revelations about this falsity caused the stock price to drop.[32] The disappointing sales and earnings data and merchandising problems disclosed on April 23 and August 23, 2012, damaged the Class ***precisely because*** they had been concealed by and directly contradicted Defendants' earlier misstatements. ¶¶18-21, 24, 102-106, 131-132, 178-180, 182. Likewise, the announcement of DOJ and SEC investigations and Fishman's retirement on December 4, 2012, ***directly relate to*** Defendants' fraudulent insider trading.[33] ¶¶135-43, 181-82. "Perhaps the market did not perceive every detail of [Big Lots'] struggles, but it knew enough to drive down [its price] by 20%."[34] *Mass.*

---

[32] This fact distinguishes this case from *Omnicare I* and *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994 (6th Cir. 2005). Plaintiffs in *Omnicare I* predicated loss causation on a fragment of a sentence buried in a release authored by someone other than the defendant that did not even address the allegedly misrepresented facts. 583 F.3d at 945; *see also Chamberlain*, 757 F. Supp. 2d at 717-18. The *Omnicare I* plaintiffs also failed to plead ***any*** disclosure causing a stock drop related to their other allegations. 583 F.3d at 945. *D.E.&J.* is also readily distinguishable because the plaintiff did not allege ***any*** price drops connected to the defendants' earlier misstatements but instead sought to establish loss causation on allegations of price inflation alone. 133 Fed. App'x at 1001; *see also Cole*, 2011 WL 1257756, at *13.

[33] Contrary to Defendants' argument, there is no requirement that losses must occur during the class period. *See* MTD at 29. Indeed, *Dura* itself involved losses which accrued months after the class period ended. As the district court noted following remand, "When presented with this case, the Supreme Court could have held that as a matter of law Plaintiffs cannot establish loss causation because the corrective disclosures … were made several months after the Class Period ended. The Supreme Court did not so hold." *In re Dura Pharm. Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (citing *Dura*, 544 U.S. at 346-47); *see also Cardinal*, 426 F. Supp. at 761 ("[T]his issue of [post-class period revelations] alone is not enough to defeat Plaintiffs' allegations of loss causation where they have clearly specified causal connections between Defendants' misstatements . . . and their resulting damages."). Accordingly, the Complaint does not allege that August 23, 2012 revealed the "full extent" of Defendants' fraud (MTD at 7), but alleges material revelations about the fraud continued long thereafter, including on December 4, 2012. ¶¶135-143, 181-182.

[34] Defendants' purported authority on loss causation lend no support. *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) goes against *Dura*'s causal analysis and the great weight of authority to the extent it suggests that a government investigation "standing alone" cannot cause losses. *See, e.g.*, *Chamberlain*, 757 F. Supp. 2d at 717-18; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (collecting cases). *Meyer* is also distinguishable because it involved ***no*** other cognizable revelations or facts indicative of fraud, unlike the numerous facts alleged here. 710 F.3d at 1200-02. Further, even *Meyer* made clear, "[t]hat is not to say that an SEC investigation could never form the basis for a corrective disclosure." 710 F. 3d at 1201 n.13. Similarly, the investigation in *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012), followed the publication of an article which alleged no fraud, barely mentioned the defendants and was followed by a stock price ***increase*** **–** all facts which distinguish that case. *Id.*, at *13. Likewise, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008), found that the disclosure of an investigation related to a ***singl***e campus of an 88 campus college-system was

*Ret. Sys.*, 2103 WL 2278599, at *11; *see also Ross*, 501 F. Supp. 2d at 1119 ("Plaintiffs make specific claims as to Defendants' alleged misrepresentations and a purported link to Plaintiffs' claimed loss"); *Cardinal*, 426 F. Supp. 2d at 760-61 (collecting cases). Thus, loss causation is met.

## V. CONCLUSION

Because Plaintiff has adequately pled securities fraud under the Exchange Act, the PSLRA and Rule 9(b), Defendants' Motion should be denied in its entirety.[35] Should the Court find the Complaint deficient in any respect, Plaintiff respectfully requests leave to amend.

DATED: June 5, 2013

Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
BRIAN K. MURPHY (0070654)

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY (0063373)

1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)
E-mail: murray@mmmb.com
E-mail: murphy@mmmb.com

Liaison Counsel

insufficient to reveal the system-wide fraud alleged, without any other facts that "***even suggested***" fraud. Here, the governmental investigations relate directly to Defendants' fraudulent acts and come in the context of facts highly suggestive of fraud. ¶¶25-26, 135-143, 181-182.

[35] Defendants' sole argument for dismissal of Plaintiff's §§20(a) and 20A claims is that Plaintiff has failed to allege a primary violation. MTD at 30. As demonstrated above, however, Plaintiff has adequately alleged violations of §10(b) by Defendants. Accordingly, Plaintiff's §§20(a) and 20A claims should be sustained.

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID W. MITCHELL
BRIAN COCHRAN
AUSTIN P. BRANE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: davidm@rgrdlaw.com
E-mail: bcochran@rgrdlaw.com

Lead Counsel for Plaintiff

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)
E-mail: cbillings@swappc.com

BOTTINI & BOTTINI, INC.
FRANCIS A. BOTTINI
YURY A. KOLESNIKOV
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: 858/914-2001
858/914-2002 (fax)
E-mail: fbottini@bottinilaw.com
E-mail: ykolesnikov@bottinilaw.com

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 5, 2013.

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY (0063373)

MURRAY MURPHY MOUL + BASIL LLP
1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

E-mail: murray@mmmb.com

# Mailing Information for a Case 2:12-cv-00604-MHW-NMK

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Austin P Brane**
  abrane@rgrdlaw.com
- **Timothy G Cameron**
  tcameron@cravath.com,mao@cravath.com,dlisner@cravath.com
- **Brian E Cochran**
  bcochran@rgrdlaw.com
- **William Darrell Kloss , Jr**
  wdklossjr@vorys.com,lmhilty@vorys.com
- **John Joseph Kulewicz**
  jjkulewicz@vssp.com
- **David W Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com
- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com
- **Michael Paskin**
  mpaskin@cravath.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)