UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ALAN WILLIS, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BIG LOTS, INC., STEVEN S. FISHMAN, JOE R. COOPER, CHARLES W. HAUBIEL II and TIMOTHY A. JOHNSON,

Defendants.

Case No. 2:12-cv-00604-MHW-NMK

District Judge Michael H. Watson

Magistrate Judge Norah McCann King

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

William D. Kloss, Jr., Trial Attorney (0040854)
John J. Kulewicz (0008376)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

EXPLANATION OF CITATION FORMS ..... vi

I. THE CHALLENGED STATEMENTS ARE ALL PROTECTED UNDER THE PSLRA SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS. ..... 1

A. The Challenged Statements Were Forward-Looking. ..... 1

B. The Cautionary Language Was Meaningful. ..... 6

II. THE AMENDED COMPLAINT'S CONCLUSORY AND MISLEADING ALLEGATIONS FAIL TO STATE A CLAIM. ..... 9

A. Lead Plaintiff's "Particularized Allegations Regarding Defendants' Use of Big Lots' Information Systems" Fail to Specify How Such Information Was Contrary to Defendants' Public Statements, Let Alone Knowingly So ..... 9

B. Lead Plaintiff's Other Scienter Allegations Also Fail. ..... 15

III. THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION. ..... 18

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ashland, Inc. v. Oppenheimer & Co., 648 F. 3d 461 (6th Cir. 2011) ....................................9, 10

Beaver Cnty. Ret. Bd. v. LCA-Vision Inc., No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009)........................................................................................ passim

Bensley v. FalconStor Software, Inc., 277 F.R.D. 231 (E.D.N.Y. 2011)...............................19, 20

Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004) ..................................11

Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683 (E.D. Mich. 2010).........13, 18, 20

City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651 (6th Cir. 2005)...........12, 13

City of Providence v. Aeropostale, Inc., No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................................5, 6

Dobina v. Weatherford Int'l Ltd., No. 11 CIV. 1646 LAK, 2012 WL 5458148 (S.D.N.Y. Nov. 7, 2012) ..................................................................................................................10

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ......................................................................19

Fidel v. AK Steel Holding Corp., No. C-1-00-320, 2002 WL 31545952 (S.D. Ohio Sept. 19, 2002) ......................................................................................................................4

Frank v. Dana Corp., 646 F.3d 954 (6th Cir. 2011)..........................................................9, 12, 18

Garden City Emps. Ret. Sys. v. Psychiatric Solutions, Inc., No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)................................................................................14, 15

Halford v. AtriCure, Inc., No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ..........18

Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)..........................................................3, 8, 9

I.B.E.W. v. Ltd. Brands, Inc., 788 F. Supp. 2d 609 (S.D. Ohio 2011)..........................................14

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)..................................................4, 13

In re Almost Family, Inc. Sec. Litig., No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ..................................................................................................................19

In re Cardinal Health Inc. Sec. Litigs. 426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................16, 17, 19

In re Compuware Sec. Litig., 301 F. Supp. 2d 672 (E.D. Mich. 2004)..........................................8

In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 NRB, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ....................13

In re Enron Corp. Sec., Deriv. & ERISA Litig., 258 F. Supp. 2d 576 (S.D. Tex. 2003)...............17

In re Fed.-Mogul Corp. Sec. Litig., 166 F. Supp. 2d 559 (E.D. Mich. 2001)...............................14

In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581 (N.D. Ohio 2004)..................................8

In re Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968 (S.D. Ohio 2008)..................................3, 4, 15

In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951 (S.D. Ohio 2009)..................12

In re Keithley Instruments Inc. Sec. Litig., 268 F. Supp. 2d 887 (N.D. Ohio 2002).....................15

In re Lason, Inc. Sec. Litig., 143 F. Supp. 2d 855 (E.D. Mich. 2001)............................................4

In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 541 F. Supp. 2d 986 (S.D. Ohio 2007) ............12

In re Nice Sys. Ltd. Sec. Litig., 135 F. Supp. 2d 551 (D.N.J. 2001) ......................................2, 4, 5

In re Odyssey Healthcare, Inc. Sec. Litig., 424 F. Supp. 2d 880 (N.D. Tex. 2005) ........................6

In re PetSmart, Inc. Sec. Litig., 61 F. Supp. 2d 982 (D. Ariz. 1999)............................................16

In re Proquest Sec. Litig., 527 F. Supp. 2d 728 (E.D. Mich. 2007).............................................17

In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527 (S.D. Ohio 2000) ...........13, 15

In re Tibco Software, Inc., No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ....................3

In re Tyco Int'l, Ltd., Sec. Litig., 185 F. Supp. 2d 102 (D.N.H. 2002) .................................15, 16

Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935 (6th Cir. 2009)..........................................................3, 5, 14, 19

Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., No. 12-5287, 2013 WL 2248970 (6th Cir. May 23, 2013) ............................14

Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009).................................4, 10

Konkol v. Diebold, Inc., 590 F.3d 390 (6th Cir. 2009) ........................................................11, 17

La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471 (6th Cir. 2010).................11, 18

Ley v. Visteon Corp., 543 F.3d 801 (6th Cir. 2008)....................................................................11

Local 295/Local 851 IBT Emp'r. Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp, 731 F. Supp. 2d 689 (S.D. Ohio 2010)....................5

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011) ....................20

Miller v. Champion Enters. Inc., 346 F.3d 660 (6th Cir. 2003) .................... passim

Nadoff v. Duane Reade, Inc., 107 F. App'x 250 (2d Cir. 2004) ....................13

Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517 (D.N.J. 2010) ....................16

New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc., No. Civ.A. 1:98-CV-99-M, 1999 WL 33295037 (W.D. Ky. Aug. 16, 1999)....................17

Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226 (9th Cir. 2004)....................17

Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299 (6th Cir. 2000)....................20

PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004) ....................20

Ricker v. Zoo Entm't, Inc., No. 1:11-CV-00490, 2012 WL 3070717 (S.D. Ohio July 30, 2012) ....................9

Ross v. Abercrombie & Fitch Co., 501 F. Supp. 2d 1102 (S.D. Ohio 2007) ....................11, 12, 16, 19

Ross v. Abercrombie & Fitch Co., No. 2:05-cv-0819, 2006 WL 2869588 (S.D. Ohio Oct. 5, 2006) ....................11, 12

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ....................3, 15

**Statutes & Rules**

15 U.S.C. § 78u–4(b)(1) ....................11, 20

15 U.S.C. § 78u–5(i)(1)(D)....................3

15 U.S.C. § 78u–5(c) ....................1, 5, 8, 9

15 U.S.C. § 78u–5(f)....................5

**Other Authorities**

Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/net. ....................16

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

- "Defs. Mem." for references to the May 6, 2013 Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint.

- "Opp." for references to the June 5, 2013 Opposition to Defendants' Motion to Dismiss the Amended Complaint.

- "Ex. __" for references to the exhibits to the May 6, 2013 Declaration of Brendon DeMay in Support of Defendants' Motion to Dismiss the Amended Complaint.

- "Murphy Decl. Ex. __" for references to the exhibits to the June 5, 2013 Declaration of Brian K. Murphy in Support of Opposition to Defendants' Motion to Dismiss the Amended Complaint.

- "Jackson Decl. Ex. __" for references to the June 20, 2013 Declaration of Nicholas A. Jackson in Support of Defendants' Reply in Support of Their Motion to Dismiss the Amended Complaint.

## I. THE CHALLENGED STATEMENTS ARE ALL PROTECTED UNDER THE PSLRA SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS.

Lead Plaintiff devotes scarcely four pages (Opp. at 12-15) to Defendants' arguments that the challenged statements are all immune from liability pursuant to the PSLRA safe harbor, 15 U.S.C. § 78u–5(c). Lead Plaintiff mischaracterizes the law in ways that essentially would render it meaningless and examines the challenged statements and accompanying cautionary language out of context. The Court should reject Lead Plaintiff's arguments and dismiss the Complaint in its entirety, and the Court need not consider Defendants' additional arguments (which independently require dismissal, see infra Sections II and III).

### A. The Challenged Statements Were Forward-Looking.

While Lead Plaintiff does not dispute that Big Lots' announcements of financial guidance qualify under the safe harbor, it contends the more contextual statements about Big Lots' business are not forward-looking because they relate to past or current events or express "current belief". (Opp. at 12.) Lead Plaintiff's arguments are without merit.

First, Lead Plaintiff is wrong that a statement of "current belief" regarding future business trends or performance is not forward-looking. See Beaver Cnty. Ret. Bd. v. LCA-Vision Inc., No. 1:07-CV-750, 2009 WL 806714, at *11 (S.D. Ohio Mar. 25, 2009) (forward-looking statements include "future projections, estimates, or opinions" (emphasis added)). It is hard to imagine how any statement could express a speaker's belief that exists in any time other than the present. Under Lead Plaintiff's formulation, the only sort of statement subject to safe harbor protection would be something to the effect of: "I have no current view how our business will perform, but in the future I will believe that sales will grow five percent." That is an absurd result.

Second, the statements to which Lead Plaintiff points (see Opp. at 12 (quoting AC ¶¶ 69, 70, 122)) are taken out of context; properly understood they could only conceivably have misled investors regarding Big Lots' future prospects. Specifically, Lead Plaintiff points to:

- Statements on the March 2, 2012 earnings call about the fiscal 2011 results that "significant improvements . . . have translated into meaningful sales growth" and "consumables . . . has picked up". (Opp. at 12 (quoting AC ¶¶ 69-70).) Because it is undisputed that the 2011 results were accurately reported, those statements could not have misled investors regarding Big Lots' historical performance. Rather, Lead Plaintiff's essential theory is that, notwithstanding use of the past tense, those statements conditioned the market to expect strong results in the future. (Id. ("[D]efendants repeatedly represented . . . that these positive sales trends had carried into 1Q12 and would propel growth throughout FY 2012.").)[1]

- Johnson's statement on March 2 that "February [i.e., the first month of fiscal 2012] was on plan". (Opp. at 12 (quoting AC ¶ 70).) However, that statement was in response to a question about anticipated 1Q12 performance "relative to . . . the fourth quarter". (Ex. C at 10.) The response goes on to make clear that it is about expectations for the full quarter: "February was on plan, and . . . the key categories that were good for us in fourth quarter we think have legs here into 2012". (Id.) Moreover, Big Lots did not report monthly sales results, which makes it even more obvious that the comment provided context and assumptions relating to the full 1Q12 guidance.[2]

- Johnson's statement on the June 5, 2012 conference call that "[the] misstep in electronics [in 1Q12] was really isolated". (Opp. at 12 (quoting AC ¶ 122).) But as with the 2011 results, Lead Plaintiff does not challenge the accuracy of Big Lots' reported 1Q12 results, and Johnson's statement was in response to a question regarding how problems in consumables and electronics would be

[1] Indeed, because Lead Plaintiff does not challenge the accuracy of Big Lots' reported financial results, to the extent statements characterizing the 2011 results are viewed as statements of historical fact, they are immaterial. Given that investors had the actual results, they could decide for themselves whether the undisputed sales growth reflected in those results was "meaningful". See, e.g., In re Nice Sys. Ltd. Sec. Litig., 135 F. Supp. 2d 551, 580 (D.N.J. 2001) (dismissing complaint that did "not allege that the published earnings figures were false" but only challenged accompanying contextual statements). Moreover, Defendants do not "concede" certain challenged statements are not forward-looking (Opp. at 12 (citing Defs. Mem. at 11)). Because the actual reported results are unchallenged, Lead Plaintiff's theory of the case is necessarily that the contextual statements misled investors about Big Lots' future prospects. If that is not Lead Plaintiff's theory it would be a change from how the Complaint casts its allegations, and the statements would be immaterial in view of the undisputedly true reported results.

[2] In addition, Lead Plaintiff alleges no details to explain why the statement was false apart from the fact that results for the first quarter fell short of expectations. (See infra Section II.A.) That is not inconsistent with the notion that "February was on plan", particularly given that the Company later attributed the first quarter shortfall to a downturn during the latter part of the period—i.e., not February. (Ex. I at 3.)

addressed in the second half of the year, and he explained that those issues were "baked into our guidance for second quarter". (Ex. L at 3 (emphasis added).)[3]

The characterization of those statements as "misstatements . . . of historical and present fact made independently of any projection" (Opp. at 12 n.13) is simply not true. In this Circuit, such contextual statements are forward-looking because they concern "'assumptions underlying or relating to' economic predictions". Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc) (quoting 15 U.S.C. § 78u–5(i)(1)(D)) (statements about impact of already-enacted legislation "concerned 'assumptions underlying or relating to' economic predictions", even if they relate to "existing condition"), abrogated in part on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); Miller v. Champion Enters. Inc., 346 F.3d 660, 676-77 (6th Cir. 2003) ("continuation of outstanding earnings growth and the successful implementation of our retail strategy" was "classically forward-looking"; while statements may "imply[] some present circumstances, [they are] also [] the basis for the later 'forward-looking statements'"); Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009) ("growth outlook remains positive" forward-looking despite reference to present circumstances); accord In re Tibco Software, Inc., No. C 05-2146 SBA, 2006 WL 1469654, at *26 (N.D. Cal. May 25, 2006) ("[A] present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made.").[4]

[3] While Lead Plaintiff cites other paragraphs in the Complaint without any quotes or explanation (Opp. at 12), the statements referenced are also plainly forward-looking when viewed in context. (See, e.g., AC ¶ 72 ("We have improving trends coming out of 2011 and a focused strategy to execute in 2012."); id. ¶ 85 ("the same successful initiatives that benefited results over the last few years [would] continue to grow the basket" in FY 2012); id. ¶ 89 ("As we begin 2012, we expect positive trends in growth and shareholder returns."); id. ¶ 115 ("Fishman . . . estimated that 'comps [would] move back into positive territory' in FY 2012").)

[4] The cases cited by Lead Plaintiff (Opp. at 12-13) scrutinize specific representations relating to present or historical performance and are thus distinguishable. See In re Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968, 1013-14 (S.D. Ohio 2008) (court analyzed statements relating to performance in the first fiscal quarter of 2002 made in connection with announcement of actual results at the end of that quarter, which plaintiff (unlike Lead Plaintiff here)

Third, Lead Plaintiff contends statements "about Big Lots' FY 2011 performance . . . were false and misleading when made as a result of problems in Big Lots' business that began at the end of calendar 2011." (Opp. at viii n.3, 3 n.6, 12.) However, Lead Plaintiff acknowledges the reported results were accurately stated and represented a significant improvement in the business over the first part of 2011, based on strength in the very same lines of business that later suffered setbacks. (AC ¶¶ 7, 50.) Lead Plaintiff thus cannot dispute that those lines of business did perform well in 2011, and cannot claim securities fraud in connection with statements about 2011 performance outside the context of the impact of such business performance in the future. (See, e.g., AC ¶ 62 ("statements regarding the Company's 4Q11 financial results were each materially false and misleading . . . [because] the robust sales trends experienced by Big Lots at the end of FY 2011, including robust growth in consumables and electronics, could not be sustained in 1Q12"); id. ¶ 11 ("'improving trends' coming out of FY 2011 had eroded"); id. ¶ 125 ("May and June 2012 statements regarding the Company's 1Q12 performance . . . were . . . false and misleading" because Big Lots "could not meet" its 2Q12 and revised FY 2012 "sales and earnings numbers") (emphases added).) Nor could it. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) ("[F]actual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)."), abrogated on other grounds as recognized in Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009); In re Nice, 135 F. Supp. 2d at 580 (dismissing claims where plaintiffs "do not allege that

had challenged as false; court also found statement that the company "was experiencing 'solid growth' in a number of product lines" was a non-actionable, "non-specific statement[] of corporate optimism"); Fidel v. AK Steel Holding Corp., No. C-1-00-320, 2002 WL 31545952, at *19-20 (S.D. Ohio Sept. 19, 2002) (noting "[p]laintiffs have advanced no reasons why [most of the] false statements alleged in their complaint should not be considered 'forward-looking' statements", and thus evaluating only a small subset of specific and factually disputed statements concerning the state of the company in the preceding quarter); In re Lason, Inc. Sec. Litig., 143 F. Supp. 2d 855, 858, 860 (E.D. Mich. 2001) ("actionable statements were based on fraudulent historical and current facts" relating to promotion over a two-year period of a "non-existent corporate strategy").

the published earnings figures were false" but instead challenged statements accompanying the announcement—such as "I trust that in 1998 we will enjoy another year of continuous growth" and that company "continues to benefit from its technological leadership and strong competitive position"—because "soft statements of belief or past financial success [] are not the type of statements that have been found capable of 'duping' the market").

Fourth, Lead Plaintiff is wrong that the safe harbor "does not apply to omission of present facts" (Opp. at 13)—to the contrary, it expressly applies to "any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading". 15 U.S.C. § 78u–5(c)(1) (emphasis added); see also id. § 78u–5(f) ("court shall stay discovery . . . during the pendency of any motion by a defendant for summary judgment [] based on the ground[] that . . . the statement or omission upon which the complaint is based is a forward-looking statement" (emphasis added)).

The rule advocated by Lead Plaintiff would eviscerate the safe harbor, since no forward-looking statement could ever be false absent some undisclosed adverse fact. Lead Plaintiff's approach has thus been rejected repeatedly by the Sixth Circuit and courts in this District. See, e.g., Omnicare, 583 F.3d at 940, 943 (applying safe harbor and rejecting argument that "positive earnings growth predictions were misleading in light of an undisclosed contract dispute"); Miller, 346 F.3d at 676 (projections were forward-looking notwithstanding alleged omission regarding "poor financial condition" and probable bankruptcy of company's largest independent retailer); Local 295/Local 851 IBT Emp'r. Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp, 731 F. Supp. 2d 689, 708 (S.D. Ohio 2010) ("several of the alleged misstatements and omissions set forth in the complaint concerning Fifth Third's reserves and capitalization are forward-looking"). The sole case relied upon by Lead Plaintiff, City of

Providence v. Aeropostale, Inc., No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755, at *12-13 (S.D.N.Y. Mar. 25, 2013), is inconsistent with that approach. Moreover, in Aeropostale, plaintiff alleged extensive details relating to defendants' knowledge of adverse facts at the time the challenged statements were made, including sales figures, statements by former employees relating to the timing and substance of insiders' knowledge, and the content of internal meetings. Id. at *2-3. No such details are alleged in the Complaint. (See infra Section II.A; Defs. Mem. at 15-18); see also In re Odyssey Healthcare, Inc. Sec. Litig., 424 F. Supp. 2d 880, 887 n.3 (N.D. Tex. 2005) ("declin[ing] to judicially graft such an exception onto the statutory safe harbor", and rejecting authority relied upon by the court in Aeropostale).

**B. The Cautionary Language Was Meaningful.**

Lead Plaintiff concedes that nearly all the challenged statements were identified as forward-looking and accompanied by cautionary language, but argues the cautionary language was "neither meaningful nor adequate". (Opp. at 13-15.) Lead Plaintiff is wrong.

First, Lead Plaintiff barely engages in any review or analysis of the relevant cautionary language, and where it purports to do so, it omits the portions that do "convey substantive information". (Id. at 13-14.) Specifically, the Complaint alleges Defendants' statements were misleading because of slowing sales in key categories due to limited or outdated product selection and strategic missteps concerning "Big Lots' merchandising operations and [] ability to secure appropriate closeout inventory and effectively execute its merchandising strategies". (See, e.g., AC ¶ 21.) The cautionary language expressly addresses such risks. (See Defs. Mem. at 12-13.) For instance, the March 2, 2012 press release cautioned investors that "results may differ materially . . . as a result of various factors, including, but not limited to . . . our inability to successfully execute strategic initiatives, . . . [and] the availability of brand name closeout merchandise". (Ex. A at 4 (emphases added).) Other statements included substantially

the same warnings. (See Defs. Mem. at 5 n.1 (compiling warnings).)

Moreover, each of the challenged statements specifically directed investors to the risk disclosures in Big Lots' SEC filings, notably its Form 10-K, which provided extensive warnings tailored to the allegedly false statements. (See Ex. A at 4; Ex. B at 1-2; Ex. C at 2; Ex. D at 8; Ex. F at 9; Ex. G (attaching 10-K); Ex. H at 1; Ex. I at 3-4; Ex. J at 2, 14; Ex. K at 11; Ex. L at 10; Ex. M at 15.) Big Lots' Form 10-K dated March 26, 2012, warned that "[o]ur ability to meet or exceed our operating performance targets . . . depends upon the sufficient availability of closeout merchandise that we can acquire and offer at prices that represent a value to our customers", "[o]ur ability to establish effective advertising, marketing, and promotional programs" may "materially or adversely affect our business", and "[c]hanges by vendors related to the management of their inventories may reduce the quantity and quality of brand-name closeout merchandise available to us or may increase our cost to acquire brand-name closeout merchandise, either of which may materially adversely affect our revenues and gross margin". (Ex. E at 7-13 (also warning: "Our inability to properly manage our inventory levels and offer merchandise that our customers want may materially adversely impact our business and financial performance"; "If we are unable to attract, train and retain highly qualified associates while also controlling our labor costs, our financial performance may be negatively affected"; and "If we lose key personnel, it may have a material adverse impact on our future results of operations"); see also Form 10-K dated March 30, 2011, at 6-12 (Jackson Decl. Ex. A).) Such cautionary statements clearly satisfy the PSLRA's requirements. Miller, 346 F.3d at 677-78 (reference to risk disclosures in 10-K held meaningful cautionary language under safe harbor).[5]

---

[5] Defendants' March 27 and June 5, 2012 oral statements warrant safe harbor protection as well, as the official transcripts published on the same days the statements were made specifically identify the statements as forward-looking and direct investors to the risk factors identified in Big Lots' SEC filings. (See Ex. F at 9, Ex. L at 10.) Lead Plaintiff cites no case for its overly-restrictive interpretation that the PSLRA did not permit Defendants to

Further, Lead Plaintiff's argument that the cautionary language is not meaningful because Big Lots "had already experienced . . . an inability to secure crucial closeout inventory" (Opp. at 14) is circular. If that were so, the statute would never apply where a forward-looking statement is knowingly false, but that is exactly the immunity provided by the safe harbor—i.e., it protects forward-looking statements from liability when they are accompanied by meaningful cautionary language, even if they were knowingly false when made. 15 U.S.C. § 78u–5(c)(1); Miller, 346 F.3d at 672 ("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind.").[6]

Second, that the cautionary statements remained similar over time (see Opp. at 14-15) did not render them inadequate. Lead Plaintiff's cases involve "general", "vague and insipid cautionary language" and do not analyze detailed cautionary language corresponding to the exact business risks complained about. See, e.g., In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004). While Lead Plaintiff argues Defendants' disclosures should have changed due to "material changes in risk" (Opp. at 14), to the extent in 2012 those risks materialized and sales slumped does not mean the nature of the risks changed. Rather, that Big Lots' later problems related so closely to the risks identified demonstrates that the disclosures did "convey substantive information about factors that realistically could cause results to differ materially from those projected". Helwig, 251 F.3d at 558-59; 15 U.S.C.

---

invoke the safe harbor and point to written cautionary language on the transcripts as opposed to doing so orally. (Opp. at 15.)

[6] Although the court in In re Compuware Securities Litigation (cited in Opp. at 14) correctly recognized that "[m]ixed statements of present fact and future prediction must be treated as forward-looking", it failed properly to follow Miller by considering allegations of knowledge in analyzing whether cautionary language is meaningful. 301 F. Supp. 2d 672, 685-86 (E.D. Mich. 2004). Further, the vast majority of statements at issue in that case contained "no language warning investors of any risk at all". Id. at 685-88.

§ 78u–5(c)(1)(A)(i).[7]

Finally, if the Court concludes that any of Defendants' statements is not entitled to absolute immunity based on the existence of meaningful cautionary language, the safe harbor still precludes liability unless Lead Plaintiff pleads and proves the forward-looking statements were made with "actual knowledge . . . [they were] false or misleading". 15 U.S.C. § 78u–5(c)(1)(B); (Defs. Mem. at 14 n.2.) As with the failure to plead scienter (see infra Section II.A), because the Complaint does not allege Defendants had actual knowledge of specific adverse facts when the statements were made, the safe harbor still mandates dismissal.

## II. THE AMENDED COMPLAINT'S CONCLUSORY AND MISLEADING ALLEGATIONS FAIL TO STATE A CLAIM.

### A. Lead Plaintiff's "Particularized Allegations Regarding Defendants' Use of Big Lots' Information Systems" Fail to Specify How Such Information Was Contrary to Defendants' Public Statements, Let Alone Knowingly So.

The only particularized "facts" alleged in support of the contention that the challenged statements were knowingly false relate to Defendants' access to information—i.e., "Defendants' use of Big Lots' information systems" and that "they were intimately familiar with and personally involved in Big Lots' merchandising operations and financial reporting". (Opp. at 22.)[8] That is beside the point—of course Defendants had access to detailed information about

[7] It is Lead Plaintiff, not Defendants, whose reliance on Helwig is misplaced. (Opp. at 14 n.15, 15). In Helwig, nearly all of defendants' statements were not designated as forward-looking at all. 251 F.3d at 558. The court did not criticize the use of "[s]ubstantially similar language" over time, but rather the fact that the warnings "grew more cursory and abstract" such that they became "generic". Id. at 558-59. Here, by contrast, Big Lots consistently "warned [investors] of risks of a significance similar to that actually realized". Id.

[8] Defendants address Lead Plaintiff's allegations of insider trading and other "indicia of scienter" in Section II.B, infra. Contrary to Lead Plaintiff's characterization (Opp. at 16), Defendants do not ask the Court to "parse out" scienter allegations. (See Defs. Mem. at 15 ("all of the facts alleged in the Complaint must be assessed collectively") (citing Ashland, Inc. v. Oppenheimer & Co., 648 F. 3d 461, 469 (6th Cir. 2011)).) Defendants merely discuss scienter following the topical organization in the Complaint. (See AC ¶¶ 144-171.) Moreover, while the Sixth Circuit requires "a 'collective view of the facts'[,] . . . [t]his does not mean . . . that the Court cannot critically examine Plaintiff's allegations. It simply means that scienter is not a question to be answered on the basis of each allegation in a vacuum but, instead, the Court must answer whether, given the allegations as a whole, the Complaint allows the Court to draw a strong inference of scienter." Ricker v. Zoo Entm't, Inc., No. 1:11-CV-00490, 2012 WL 3070717, at *4 (S.D. Ohio July 30, 2012) (citing Frank v. Dana Corp., 646 F.3d 954, 961 (6th Cir. 2011)).

Big Lots' business, including daily sales figures. The same could be said of any senior executive at any large retailer in the United States. To state a claim with the particularity required by the PSLRA, however, the details alleged must explain how and why Defendants' public statements were contradicted by the information inside the Company, and on that count the Complaint fails to allege any details. (See Defs. Mem. at 15-18.) As the Sixth Circuit explained in Ashland: "[A]part from conclusory allegations, [Lead Plaintiff] fails to provide any facts explaining why or how [Defendants] possessed advance, non-public knowledge . . . exposing [their] deliberate intent to manipulate, deceive, or defraud". 648 F.3d at 470 (internal quotation marks omitted).[9]

Lead Plaintiff's opposition does not cure that essential pleading failure—rather, it presses the conclusory assertion that internal information "directly contradicted [Defendants'] Class Period statements". (Opp. at 24 n.27.) While Lead Plaintiff says the Complaint describes "how and when the information in the reports reflected the downturn in sales" and "how and when [Defendants] tracked Big Lots' deterioration" during meetings (Opp. at 23), the paragraphs it cites provide no such details to plausibly indicate Defendants knew the Company would not perform in line with estimates. (See AC ¶¶ 9, 46-47, 58, 60, 151.)

If anything, Lead Plaintiff's opposition reinforces its self-contradictory theory that strategies initiated in fiscal 2011 caused "merchandising problems" and "deteriorating sales trends" at Big Lots that, despite leading to 2011 results that were accurately stated and exceeded the Company's guidance, Defendants knew had already caused "key sales categories [to]

---

[9] Lead Plaintiff also argues that Defendants' statements that they "challenge[d] [themselves] every day about [sales growth]" and "work[ed] really, really hard . . . to understand how to grow the business", are probative of scienter, but its cases again are inapposite. See Avaya, 564 F.3d at 269-70 (holding repeated denial of a specific business practice may be probative of scienter where plaintiff adequately pleads that the company engaged in that practice); Dobina v. Weatherford Int'l Ltd., No. 11 CIV. 1646 LAK, 2012 WL 5458148, at *1-*2, *6-*7 (S.D.N.Y. Nov. 7, 2012) (scienter based in part on allegations that CFO was personally responsible for internal financial controls over tax preparation, where plaintiff sufficiently alleged company engaged in "simple and crude tax accounting fraud" and subsequently restated earnings and admitted "material weakness in internal control over financial reporting for income taxes").

erode[]" "by the time of the February release"—i.e., the fifth day of fiscal 2012. (Opp. at 3.) Lead Plaintiff provides no details to permit such a conclusion. Even worse, in arguing that on the March 2, 2012 earnings call (still scarcely one month into the quarter) Defendants knew that "[i]n reality, the slowdown in [the consumables and electronics] categories was at the heart of Big Lots' sales problems", Lead Plaintiff cites to allegations about the disclosure on May 23, 2012—after the end of the first fiscal quarter and 82 days after the March 2 earnings call—that the shortfall for the entire quarter was largely attributable to those product categories. (Id. at 4 (citing AC ¶ 113).)[10] That is classic "fraud by hindsight". La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 484 (6th Cir. 2010).[11]

Lead Plaintiff also relies extensively on Judge Sargus's denial of a motion to dismiss in Ross v. Abercrombie & Fitch Co., 501 F. Supp. 2d 1102 (S.D. Ohio 2007)—repeating three times that "Defendants concede the case at bar closely resembles" that case. (Opp. at ix, 1, 17.) However, the decision Defendants previously cited in Ross is Magistrate Judge Kemp's denial of plaintiff's motion to lift the PSLRA discovery stay, which involved entirely different legal issues and analysis. (See Dkt. No. 31 at 9-10 (citing Ross v. Abercrombie & Fitch Co., No.

---

[10] Defendants' May 23, 2012 statements that the "miss to plan was rather abrupt" and "April alone accounted for nearly 75% of the sales shortfall for the quarter" (Ex. J at 3), obviously mean those facts could not have been known in February or March, and Lead Plaintiff alleges no specifics to contradict Defendants' explanation.

[11] Given the specificity with which the Complaint alleges innocent details regarding the inner workings of Big Lots' business—such as when certain reports would be circulated and where certain meetings were held (see, e.g., AC ¶¶ 46-47, 144-51, 161-63)—the lack of details about the content of any of those internal communications is particularly telling. Those innocent details presumably come from current and/or former employees who provided information to Lead Plaintiff or its counsel, but the Complaint identifies no such sources, despite the PSLRA mandate to allege "with particularity all facts on which [the] belief [that a statement is false or misleading] is formed". 15 U.S.C. § 78u–4(b)(1) (emphasis added). As stated in Konkol v. Diebold, Inc., "because the investors had confidential witnesses who provided generalized statements about the reports, one would reasonably expect those witnesses to be able to provide more details about the reports". 590 F.3d 390, 398 (6th Cir. 2009); see also id. at 399 ("Anonymity conceals information that is essential to the sort of comparative evaluation required by Tellabs"); Ley v. Visteon Corp., 543 F.3d 801, 811 (6th Cir. 2008) (allegations based on anonymous inside source did not support scienter absent details as to "who [knew] . . . and what, when, where, and how they knew"). Otherwise, the Court is "left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 148 (3d Cir. 2004).

2:05-cv-0819, 2006 WL 2869588 (S.D. Ohio Oct. 5, 2006)).) It is difficult to view Lead Plaintiff's suggestion that Defendants somehow "concede" the allegations here "closely resemble" those in Ross as anything other than a blatant attempt at deception. In fact, the substantive allegations were dramatically different and the motion to dismiss decision in Ross is easily distinguishable. In Ross, the plaintiff claimed defendants misrepresented Abercrombie & Fitch's financial performance by reporting strong monthly sales while concealing a decline in its gross margin and falsely assuring that denim sales were strong when the company was in fact accumulating excess inventories, forcing it to take drastic measures to sell that inventory and thereby reducing gross margins. 501 F. Supp. at 1104. The court found the complaint alleged specific facts contradicting the challenged statements, such as details of a meeting with the CEO about a plan to increase denim inventory, specific concerns expressed during that meeting, and detailed measures the company then took to reduce excess denim inventories. Id. at 1114.

Thus, the court in Ross did not rely on mere allegations of access to internal reports and sales data, but rather on the specific content of the adverse internal information—precisely what is missing from the Complaint here.[12] See, e.g., In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951, 965-66 (S.D. Ohio 2009) (Watson, J.) (without "specific facts" showing statements were "incompatible with [internal] reports" and other information, plaintiff failed to plead statements "were false at the time they were made"); Beaver Cnty., 2009 WL

[12] The other cases on which Lead Plaintiff relies are similarly distinguishable. See Frank, 646 F.3d at 961-62 (where company had restated financials and admitted material accounting weaknesses, court held it was "uncontested that [defendants] made false statements" and concluded based on other specific facts that "i[t] is difficult to grasp the thought that [defendants] really had no idea that [the company] was on the road to bankruptcy"); City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651 (6th Cir. 2005) (falsity of statements regarding Firestone's tire quality and financial impact of problem that resulted in cars rolling over and causing fatalities supported by specific allegations regarding manufacturing problems and production error rates dating back at least a decade, thousands of claims and dozens of lawsuits, the content of internal documents, a safety recall, and an internal investigation culminating in a publicly released report); In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 541 F. Supp. 2d 986, 1002-03 (S.D. Ohio 2007) ("mere access to information is not enough"; a plaintiff must allege "what information [defendants] would have learned from reviewing the documents", which, unlike here, specify what defendant "did review and know").

806714, at *21 (possession of reports regarding patient volume trends insufficient absent "specific factual information about . . . how information conveyed to investors differed from the internal reports"; "PSLRA requires that a plaintiff do more than make conclusory allegations about what an internal reporting system would have shown"); (Defs. Mem. at 24-26.)

Lead Plaintiff also argues there is a duty to disclose "when there is insider trading". (Opp. at 10.) But the cases it cites make only cursory reference to the notion that such a duty "may arise", with no analysis applicable here. Bridgestone, 399 F.3d at 669 (noting general proposition that duty "may arise when there is insider trading, a statute requiring disclosure, or . . . an inaccurate, incomplete or misleading prior disclosure" (internal quotation marks omitted)); see also In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 548 (S.D. Ohio 2000) (referencing "duty to disclose or abstain from trading" on inside information but providing no analysis because relevant defendants not insiders).

Similarly, the argument that Defendants were required to disclose adverse facts "because the development of [such] facts rendered prior statements misleading" (Opp. at 10) misstates the applicable law. The case cited by Lead Plaintiff merely stands for the general proposition that "where corporate officers choose to speak they are obligated to disclose the truth and to make any additional disclosures necessary to avoid making both present and prior statements misleading". Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010). However, there is no duty to update prior statements merely because changing circumstances proved them wrong. In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 NRB, 2003 WL 22801416, at *7 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom Nadoff v. Duane Reade, Inc., 107 F. App'x 250 (2d Cir. 2004); see also In re Advanta, 180 F.3d at 536 ("voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update").

Finally, Lead Plaintiff incorrectly characterizes all the challenged statements as "concern[ing] Big Lots' core operations and the key metrics used to measure the Company's success", and asserts that "[s]uch specific misstatements regarding historical and present financial and sales results, near-term prospects and the reasons for past and present financial success, are material". (Opp. at 10-11.) But the veracity of the reported financial and sales results themselves is not disputed. (See supra Section I.A.) Accordingly, if the more contextual statements describing those "key metrics" and "core operations" are not forward-looking statements protected by the PSLRA safe harbor (and they are, see supra Section I), but are considered statements of "present condition" about those accurately reported results, they are immaterial and non-actionable expressions of corporate optimism. See In re Fed.-Mogul Corp. Sec. Litig., 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (statements "[w]e continue to demonstrate the viability of our growth strategy", "[w]e continue to enhance our position as a leader in the automotive industry" and "the Company is on target to achieve projected 'synergies' and cost savings" "are the sort of vague statements predicting growth" dismissed as puffery); I.B.E.W. v. Ltd. Brands, Inc., 788 F. Supp. 2d 609, 619, 634 (S.D. Ohio 2011) (statements that company has "significant growth opportunities in . . . internet and catalog businesses" and is "drastically better planned for the holiday [season]" "represent [] subjective, rosy opinion about the company's future prospects and are thus puffery"); (Defs. Mem. at 25-26.)[13] The cases Lead Plaintiff cites to suggest otherwise are inapposite. See Garden City Emps. Ret. Sys. v. Psychiatric Solutions, Inc., No. 3:09-00882, 2011 WL 1335803, at *45 (M.D. Tenn.

[13] Regarding Omnicare, 583 F.3d 935 (6th Cir. 2009), Lead Plaintiff states that the "Sixth Circuit has [] recently invited the district court to reconsider dismissal of the Exchange Act claims" (Opp. at 11 n.11), implying the prior dismissal is not good law. However, what Lead Plaintiff cites is a concurrence, which merely noted that because the court had allowed plaintiff's Section 11 claim, "the district court could allow the [10(b)] claim to be revived" if "newly-found evidence" supported scienter. Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., No. 12-5287, 2013 WL 2248970, at *12 (6th Cir. May 23, 2013).

Mar. 31, 2011) (concluding without any analysis of specific allegations, much less the fragments quoted by Lead Plaintiff, there were sufficient details to plead material falsity of company's representations that its psychiatric care was "objectively better and of higher quality than the care provided by [its] competitors"); In re Huffy, 577 F. Supp. 2d at 1004, 1007 (Lead Plaintiff quoted fragment of a lengthy statement that the court evaluated, without any discussion of the specific excerpt, concerning primary drivers of growth and expected changes to projected earnings); In re SmarTalk, 124 F. Supp. 2d 527 (no discussion or analysis of materiality at all).

**B. Lead Plaintiff's Other Scienter Allegations Also Fail.**

Lead Plaintiff attempts to bolster its scienter pleading with circumstantial allegations of insider stock sales and post-class period government investigations. (Opp. at 17-22, 25-26.) Considered collectively with the conclusory allegations of knowledge discussed above, the Complaint's allegations of scienter are not "cogent and at least as compelling as any opposing inference of nonfraudulent intent". Tellabs, 551 U.S. at 314.

Lead Plaintiff has not met its "burden at the pleading stage of explaining why the stock sales [by Defendants] were unusual or suspicious." Beaver Cnty., 2009 WL 806714, at *23 (quoting In re Keithley Instruments Inc. Sec. Litig., 268 F. Supp. 2d 887, 902 (N.D. Ohio 2002)). Their timing—following Big Lots' announcement of its 2011 results—is consistent with the fact that "most publicly traded companies have adopted policies which prevent insiders from trading except during narrow windows that are open for only brief periods following the release of accounting information." In re Tyco Int'l, Ltd., Sec. Litig., 185 F. Supp. 2d 102, 112 n.6 (D.N.H. 2002) ("insider trading following the release of accounting information is of limited value . . . in most cases because it is equally likely that the information is accurate and that the

timing of the trades is dictated by the company's insider trading policy").[14]

Nor were the trades unusual in their amount. While Lead Plaintiff portrays Defendants' class period sales as a "dramatic break from precedent" because they had not sold any stock during the preceding 17 months (Opp. at 5), it alleges elsewhere that Big Lots was involved in a "botched leveraged buyout attempt" (AC ¶ 6). Accepting that allegation as true for purposes of this motion to dismiss, it follows that insiders would have been prohibited from trading during an active effort to sell the Company.

And to the extent the ability to sell stock had been foreclosed during 2011, the "cogent" and "compelling" nonfraudulent inference is that insiders would then seek to sell shares during a period when trading was permitted in 2012. Tellabs, 551 U.S. at 314. Viewed against broader historical patterns, even Lead Plaintiff's misleading calculations of net proceeds[15] do not suggest that the March 2012 trades were suspicious.[16] For instance, Fishman's gross proceeds from stock sales in 2010 were over $38 million (over $14 million of which occurred in less than a month), several times his class period sales. (AC ¶ 16; Jackson Decl. Ex. B (also showing gross proceeds of nearly $3.8 million in 2008 and $5.6 million in 2007)); see Beaver Cnty., 2009

[14] The sole case Lead Plaintiff cites to dispute that proposition contains no discussion regarding the significance of post-announcement trading and merely mentions it as the last of a long series of scienter allegations that, viewed collectively, gave rise to a strong inference of scienter. See Ross, 501 F. Supp. 2d at 1117.

[15] Lead Plaintiff defends its allegation that Fishman's sale "on March 20, 2012 netted him more than $10 million" (AC ¶ 159 (emphasis added)) by accusing Defendants of "play[ing] word games". (Opp. at 21.) The plain meaning of the verb "net" as used in the Complaint, however, is "to receive by way of profit". Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/net. Consideration of the actual financial benefit resulting from insider sales is certainly relevant to determining whether those sales plausibly suggest scienter.

[16] Lead Plaintiff's assertion that March 2012 was "the single largest month of insider trading at Big Lots . . . in at least ten years" (Opp. at 19), continues improperly to rely on sales by non-defendant insiders (representing over half of the purported $36 million in trades). (See AC ¶¶ 16-17, 160); Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517, 550 (D.N.J. 2010) (that non-defendant executives sold stock "do[es] not establish scienter on the part of" the defendants); In re PetSmart, Inc. Sec. Litig., 61 F. Supp. 2d 982, 1001 (D. Ariz. 1999) ("reject[ing] plaintiffs['] efforts to bolster the perception of 'insider trading' by pleading the stock sales of unnamed defendants"). Lead Plaintiff's assertion that such allegations were "considered indicative of scienter" in In re Cardinal Health Inc. Securities Litigations is wrong—the court there analyzed only the individual defendants' trading histories, separately and in detail. 426 F. Supp. 2d 688, 728-36 (S.D. Ohio 2006).

WL 806714, at *24 (considering fact that stock sales during previous year were greater than during class period in concluding trades not suspicious).[17]

Lead Plaintiff's effort to discount the increase in overall holdings of Big Lots stock during the class period (Opp. at 20-21) misunderstands Defendants' argument. Defendants do not contend the receipt of equity compensation in 2012 based on Big Lots' strong 2011 performance (which was truly achieved and accurately reported) on its own is probative of state of mind, but rather that the receipt of such additional equity provides yet another nonfraudulent explanation for Defendants's decisions to sell some of their shares. (See Defs. Mem. at 21-22); In re Enron Corp. Sec., Deriv. & ERISA Litig., 258 F. Supp. 2d 576, 614-16, 634-37 (S.D. Tex. 2003) (considering whether overall holdings increased as part of scienter analysis). Lead Plaintiff's reliance on In re Cardinal to argue class period sales may be probative of scienter despite additional purchases is misplaced—in fact what the court rejected was an argument that the purchase of 40,000 shares "cuts against any unusual or suspicious trading" because that was "a trifling amount when compared with the 593,910 [shares] he sold". 426 F. Supp. 2d at 730-31.[18]

---

[17] The other Defendants' trading histories similarly confirm their class period sales were not unusual. Cooper, whose alleged gross proceeds during the class period were $3.9 million, sold stock for nearly $3.7 million in 2010, $1.4 million in 2008 and $2.2 million in 2007; Johnson, whose alleged gross proceeds during the class period were $255,769, sold stock for over $540,000 in 2010, $387,000 in 2008, $377,000 in 2007, and $347,000 in 2006; and Haubiel, whose alleged gross proceeds during the class period were $3.4 million, sold stock for over $4.5 million in 2010 and over $1 million in 2008. (AC ¶ 16; Jackson Decl. Exs. C, D, E.)

[18] The remaining cases cited by Lead Plaintiff in support of its insider trading allegations involve different factual circumstances or else only deem insider sales probative when coupled with other more substantive scienter allegations (which are absent here). See, e.g., In re Proquest Sec. Litig., 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (defendant sold 100% of stock in a 14-day period); New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc., No. Civ.A. 1:98-CV-99-M, 1999 WL 33295037, at *9 (W.D. Ky. Aug. 16, 1999) (defendants sold 80-100% of holdings after no significant sales in previous three years); Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004) (defendant sold $900 million in stock and had not sold any in preceding five years). In addition, Lead Plaintiff's reliance on ProQuest to suggest Sarbanes-Oxley certifications indicate scienter (Opp. at 25) has been rejected by the Sixth Circuit. See Konkol, 590 F.3d at 402 (SOX certifications "only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements" and must be supported by "contemporaneous facts showing that the Defendants knew or should have been aware that [the] statements were false").

Finally, Lead Plaintiff is wrong that "governmental investigations into the Individual Defendants' Class Period insider trading, coupled with Fishman's premature resignation, are indicative of scienter."[19] (Opp. at 26.) Reliance on post-class period events "to help bolster a strong scienter inference" is improper and "would be equivalent to the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." Ernst & Young, 622 F.3d at 484 (internal quotation marks omitted). Indeed, Halford v. AtriCure, Inc., No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) (cited in Opp. at 26 n.29), rejects the argument that the existence of a governmental investigation is probative of scienter. Id. at *15 ("Defendants first argue that the DOJ investigation cannot support an inference of scienter. The Court agrees.").[20] While Lead Plaintiff cites the case to argue that the Court should disregard that the SEC recently informed Big Lots it concluded its investigation and did "not intend to recommend any enforcement action" (Jackson Decl. Ex. F), it continues to point to that inquiry as a centerpiece of its scienter argument. (Opp. at 26 & n.29.) Lead Plaintiff cannot have it both ways.[21]

## III. THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION.

None of the statements identified by Lead Plaintiff (see Opp. at 29) contains any information suggesting Defendants' guidance for the first two fiscal quarters of 2012 was

---

[19] The text of Big Lots' April 29, 2013 Form 8-K does not support Lead Plaintiff's characterization that it "effectively confirmed that Fishman's 'retirement' . . . [was] very much the result of his improper Class Period trades". (Opp. at 26 n.28; see Murphy Decl. Ex. A.)

[20] Lead Plaintiff's other authorities on this issue are distinguishable. See Chamberlain, 757 F. Supp. 2d at 689, 696, 713-14 (scienter based on, among other things, DOJ investigation followed by FBI raid and suspension of executive based on finding he likely violated company antitrust policies); Frank, 646 F.3d at 961-62 (extensive allegations, in a case where it was "uncontested that [defendants] made false statements", supported scienter when viewed collectively, and merely listing governmental investigation as one of plaintiff's arguments).

[21] Lead Plaintiff provides no support for its assertion that "criminal and 'various' other regulatory investigations remain ongoing"—going so far as to emphasize the word "criminal" with bold type (Opp. at 26 n.29)—particularly in the face of the Company's disclosure that after providing some information in response to a subpoena issued in November 2012 it has received no further requests in connection with the U.S. Attorney's "criminal" inquiry. (Jackson Decl. Ex. F.)

fraudulent or that Defendants lacked a good-faith belief in their estimates or statements about Big Lots' business performance and trends at the time. (Defs. Mem. at 27.) The Complaint thus does not "explain how the statements were revealed to be false" and "thereby caused a drop in the stock price". Omnicare, 583 F.3d at 944. Were it otherwise, an announcement of lower-than-expected earnings followed by a drop in stock price would be per se sufficient to plead loss causation, enabling the kinds of baseless lawsuits the Supreme Court has sought to foreclose. See In re Almost Family, Inc. Sec. Litig., No. 3:10-CV-00520-H, 2012 WL 443461, at *10 (W.D. Ky. Feb. 10, 2012) (lawsuits that do not require "misrepresentation or omission [to] become[] generally known to the market . . . serve as no more than 'broad insurance against market losses'" (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005))).[22]

Lead Plaintiff also disputes that it cannot plead loss causation relating to alleged corrective disclosures after it sold its Big Lots holdings, arguing "courts have routinely appointed investors as lead plaintiff" in such circumstances. (Opp. at 27 (quoting Bensley v. FalconStor Software, Inc., 277 F.R.D. 231, 238-39 (E.D.N.Y. 2011)).) The language it quoted from Bensley, however, was merely a recitation an argument that the court rejected. 277 F.R.D. at 240. The court rejected the substance of plaintiff's causation argument as well: "[Plaintiff] has not alleged sufficient facts from which this Court can confidently infer that the [disclosure] actually revealed fraud or misconduct". Id. at 240 (requiring "more than just a decline in price as a result of a disclosure . . . that the company is doing poorly", but "some identification of a

[22] The pre-Omnicare cases Lead Plaintiff cites are distinguishable in light of the clear linkage between the alleged misrepresentations and subsequent revelations, which is absent here. See Ross, 501 F. Supp. 2d at 1118-19 (allegedly concealed inventory and gross margin figures were subsequently disclosed); In re Cardinal, 426 F. Supp. 2d at 758-61 (misrepresentations concerning revenue and earnings later revealed by restatements of financial results and admissions by company of accounting errors).

disclosure of the fraud that causes a drop in the stock price").[23]

Finally, Lead Plaintiff's own authority makes clear that the existence of governmental investigations and the announcement of Wurl's departure are insufficient absent additional evidence of wrongdoing. See, e.g., Chamberlain, 757 F. Supp. 2d at 717 (distinguishing cases relying solely on existence of investigations and explaining the complaint pled "much more", including disclosed suspension of executive for "likely violating company policy and being associated with matters under investigation by the antitrust division of the DOJ"). And the assertion that Wurl's resignation was "tied to" the fraud (Opp. at 28 n.31) is inconsistent with the disclosure itself, which provides no reason for his departure. (See Jackson Decl. Ex. G at Item 5.02.)

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.[24]

[23] Lead Plaintiff's attempt to rely on named plaintiff Willis's earlier-filed complaint (Opp. at 27 n.30) is unavailing, because an amended complaint "supersedes all previous complaints and controls [the] case from that point forward", Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 306 (6th Cir. 2000), and the now-operative Complaint contains no allegations of Willis's stock purchases or sales.

[24] While Lead Plaintiff summarily requests leave to amend if the Complaint is dismissed, it points to no facts that remedy the deficiencies in its Complaint. See Beaver Cnty., 2009 WL 806714, at *26 ("[I]n cases involving the PSLRA, leave to amend is not as readily granted. . . . '[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA.'" (quoting Miller, 346 F.3d at 692)); 15 U.S.C. § 78u–4(b)(1) (pleading must "state with particularity all facts on which that belief is formed" (emphasis added)); see also PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 699 (6th Cir. 2004) ("a bare request [to amend] in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)"), abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011).

Respectfully submitted,

**VORYS, SATER, SEYMOUR AND PEASE LLP**

/s/ William D. Kloss, Jr., Trial Attorney
William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

**CRAVATH, SWAINE & MOORE LLP**
Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was filed electronically through the Court's CM/ECF System this 20th day of June, 2013. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.

/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854)