# EXHIBIT G

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **August 22, 2012**

# BIG LOTS, INC.

(Exact name of registrant as specified in its charter)

| Ohio | 1-8897 | 06-1119097 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

300 Phillipi Road, Columbus, Ohio 43228
(Address of principal executive offices) (Zip Code)

(614) 278-6800
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: BIG LOTS INC, 8-K, 8/28/2012 | Powered by Intelligize

**Item 2.02 Results of Operations and Financial Condition.**

On August 23, 2012, Big Lots, Inc. ("we," "us" or "our") issued a press release and conducted a conference call, both of which reported our second quarter fiscal 2012 unaudited results, provided an update on the status of our previously announced $200 million share repurchase program, and updated guidance for fiscal 2012.

The press release and conference call both included "non-GAAP financial measures," as that term is defined by Rule 101 of Regulation G (17 CFR Part 244) and Item 10 of Regulation S-K (17 CFR Part 229). Specifically, segment-level diluted earnings (loss) per share from continuing operations, a non-GAAP financial measure, was included. This non-GAAP financial measure reflects the portion of our consolidated diluted earnings per share that is attributable to the performance of each of our U.S. and Canadian segments. Additionally, the following non-GAAP financial measures were included: (i) adjusted gross margin; (ii) adjusted gross margin rate; (iii) adjusted operating profit; (iv) adjusted operating profit rate; (v) adjusted income tax expense; (vi) adjusted effective income tax rate; (vii) adjusted income from continuing operations; (viii) adjusted net income; (ix) adjusted diluted earnings per common share from continuing operations; and (x) adjusted diluted earnings per common share. These non-GAAP financial measures exclude from the most directly comparable financial measure calculated and presented in accordance with accounting principles generally accepted in the United States of America ("GAAP"), a non-cash, after-tax charge of approximately $3.4 million, or $0.05 per diluted share, incurred during the first quarter of fiscal 2012 in connection with an inventory accounting change associated with the implementation of new retail inventory systems. As required by Rule 100 of Regulation G and Item 10 of Regulation S-K, the press release, which was posted in the Investor Relations section of our website and referred to during the conference call, contained a presentation of the most directly comparable financial measure calculated and presented in accordance with GAAP and a reconciliation of the difference between the non-GAAP financial measure and the most directly comparable financial measure calculated and presented in accordance with GAAP.

Our management believes that disclosure of the segment-level non-GAAP financial measure provides useful information to investors because it separately reflects the portion of our consolidated diluted earnings per share that is attributable to the performance of each of our U.S. and Canadian segments. Our management also believes that disclosure of the non-GAAP financial measure that excludes the inventory charge provides useful information to investors because it presents an alternative and more relevant method for measuring our operating performance, excluding a special item included in the most directly comparable GAAP financial measure, that our management believes is more indicative of our ongoing operating results and financial condition. These non-GAAP financial measures, along with the most directly comparable GAAP financial measures, are used by our management in evaluating our operating performance.

Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in accordance with GAAP. Non-GAAP financial measures as reported by us may not be comparable to similarly titled items reported by other companies.

Attached as exhibits to this Form 8-K are copies of our August 23, 2012 press release on operating results and guidance (Exhibit 99.1) and the transcript of our August 23, 2012 conference call (Exhibit 99.2), including information concerning forward-looking statements and factors that may affect our future results. The information in Exhibits 99.1 and 99.2 is being furnished, not filed, pursuant to Item 2.02 of this Form 8-K. By furnishing the information in this Form 8-K and the attached exhibits, we are making no admission as to the materiality of any information in this Form 8-K or the exhibits.

Source: BIG LOTS INC, 8-K, 8/28/2012 | Powered by Intelligize

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(b) On August 22, 2012, Douglas N. Wurl, Executive Vice President, Merchandising, resigned his position with us. Additionally, effective on August 23, 2012, Joe R. Cooper transitioned his role as our Chief Financial Officer to Timothy A. Johnson, so that Mr. Cooper may focus his attention on his role as President of Big Lots Canada, Inc.

(c) On August 23, 2012, we made several organizational changes. John C. Martin, 62, was promoted to Executive Vice President, Chief Merchandising Officer, and Mr. Johnson, 45, was promoted to Senior Vice President, Chief Financial Officer. In addition, Lisa M. Bachmann, 51, was promoted to Executive Vice President, Chief Operating Officer, and Charles W. Haubiel II, 47, was promoted to Executive Vice President, Chief Administrative Officer. Further biographical information about Mr. Martin, Mr. Johnson, Mrs. Bachmann and Mr. Haubiel is included in the supplemental item of our Annual Report on Form 10-K for the fiscal year ended January 28, 2012. Attached as an exhibit to this Form 8-K is a copy of our August 23, 2012 press release on organizational changes (Exhibit 99.3).

(e) In connection with their promotions, Mrs. Bachmann, Mr. Haubiel and Mr. Johnson received increases in their annualized base salaries to $595,000, $500,000 and $400,000, respectively. Mr. Johnson also received 15,000 common shares underlying a restricted stock award and 5,000 common shares underlying a stock option award. The equity compensation for Mr. Johnson was granted pursuant to the Big Lots 2012 Long-Term Incentive Plan, the Big Lots 2012 Long-Term Incentive Plan Restricted Stock Award Agreement and the Big Lots 2012 Long-Term Incentive Plan Non-Qualified Stock Option Award Agreement.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

Exhibits marked with an asterisk (*) are furnished herewith.

| Exhibit No. | Description |
|---|---|
| 10.1 | Big Lots 2012 Long-Term Incentive Plan (incorporated herein by reference to Exhibit 4.4 to our Form S-8 dated May 23, 2012) |
| 10.2 | Form of Big Lots 2012 Long-Term Incentive Plan Restricted Stock Award Agreement (incorporated herein by reference to Exhibit 10.3 to our Form 8-K dated May 23, 2012) |
| 10.3 | Form of Big Lots 2012 Long-Term Incentive Plan Non-Qualified Stock Option Award Agreement (incorporated herein by reference to Exhibit 10.2 to our Form 8-K dated May 23, 2012) |
| 99.1* | Big Lots, Inc. press release on operating results and guidance dated August 23, 2012 |
| 99.2* | Big Lots, Inc. conference call transcript dated August 23, 2012 |
| 99.3* | Big Lots, Inc. press release on organizational changes dated August 23, 2012 |

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**BIG LOTS, INC.**

Date: August 28, 2012

By: /s/ Charles W. Haubiel II

Charles W. Haubiel II

*Executive Vice President, Chief Administrative Officer*

**Exhibit 99.1**

**PRESS RELEASE**

**FOR IMMEDIATE RELEASE**

Contact: Andrew D. Regrut
Director, Investor Relations
614-278-6622

# BIG LOTS REPORTS SECOND QUARTER EPS FROM CONTINUING OPERATIONS OF $0.36 PER DILUTED SHARE

## COMPANY PROVIDES UPDATED EPS AND CASH FLOW GUIDANCE

Columbus, Ohio - August 23, 2012 - Big Lots, Inc. (NYSE: BIG) today reported income from continuing operations of $22.1 million, or $0.36 per diluted share, for the second quarter of fiscal 2012 ended July 28, 2012. This compares to income from continuing operations of $35.7 million, or $0.50 per diluted share, for the second quarter of fiscal 2011.

For the year-to-date period ended July 28, 2012, income from continuing operations totaled $62.9 million, or $1.00 per diluted share. As previously disclosed in our March 2, 2012, press release, we incurred an after-tax charge of $3.4 million, or $0.05 per diluted share, during the first quarter of fiscal 2012 related to an inventory accounting change associated with the successful implementation of new retail inventory systems. Excluding this non-recurring, non-cash charge, adjusted income from continuing operations for the year-to-date period ending July 28, 2012 totaled $66.3 million, or $1.05 per diluted share (non-GAAP), compared to income from continuing operations of $88.2 million, or $1.21 per diluted share, for the same period in fiscal 2011. Discontinued operations activity was minimal for the second quarter and year-to-date period of fiscal 2012 and the corresponding periods in fiscal 2011.

## SECOND QUARTER HIGHLIGHTS

- **Income from continuing operations of $0.36 per diluted share versus income from continuing operations of $0.50 per diluted share last year**
- **Opened 18 new stores**
- **Invested $149 million to repurchase 4 million shares, or 6% of our outstanding shares, as part of our $200 million share repurchase program announced in May 2012**

| | EPS from Continuing Operations [1] | | | |
|---|---|---|---|---|
| | Q2 '12 | Q2 '11 | YTD '12 | YTD '11 |
| U.S. Operations | $ 0.42 | $ 0.52 | $ 1.15 | $ 1.22 |
| Add back: Inventory charge | $ - | $ - | $ 0.05 | $ - |
| U.S. Operations - adjusted basis | $ 0.42 | $ 0.52 | $ 1.20 | $ 1.22 |
| Canadian Operations [2] | $ (0.05) | $ (0.02) | $ (0.15) | $ (0.02) |
| Consolidated - adjusted basis | $ 0.36 | $ 0.50 | $ 1.05 | $ 1.21 |

(1) Non-GAAP

(2) Canadian operations were acquired on July 18, 2011; therefore, Q2 '11 and YTD '11 results include 12 days of ownership and financial results. Based on materiality, we have not provided pro forma financial results.

Note: See detailed segment reporting attached.

Shareholder Relations Department
300 Phillipi Road
Columbus, OH 43228-5311
Phone: (614) 278-6622 Fax: (614) 278-6666
E-mail: aschmidt@biglots.com

Second Quarter Results

*U.S. Operations*

Net sales for U.S. operations for the second quarter of fiscal 2012 increased 1.7% to $1,183.0 million, compared to $1,163.2 million for the same period of fiscal 2011. Comparable store sales for U.S. stores open at least fifteen months decreased 1.9% for the quarter. Income from continuing U.S. operations totaled $0.42 per diluted share (non-GAAP) compared to income from continuing U.S. operations of $0.52 per diluted share (non-GAAP) for the same period of fiscal 2011.

*Canadian Operations*

Net sales for Canadian operations for the second quarter of fiscal 2012 totaled $35.0 million, while incurring a net loss of $3.3 million, or $0.05 per diluted share (non-GAAP), compared to net sales of $3.9 million and a net loss of $1.2 million, or $0.02 per diluted share (non-GAAP) for the same period of fiscal 2011. As a reminder, we acquired our Canadian operations on July 18, 2011; therefore, prior year results include only our 12 days of ownership in the second quarter of fiscal 2011. Based on materiality to our total operations, we are not required to and have not provided pro-forma information for Canadian operations.

Inventory and Cash Management

On a consolidated basis, Inventory ended the second quarter of fiscal 2012 at $881 million compared to $780 million the second quarter of fiscal 2011. The increase represents growth in the number of U.S. stores, per store growth of inventory in our U.S. stores, and growth and improvement of inventory content related to our Canadian operations.

We ended the second quarter of fiscal 2012 with $62 million of Cash and Cash Equivalents and $243 million of borrowings under our credit facility compared to $58 million of Cash and Cash Equivalents and $60 million of borrowings under our credit facility as of the end of the second quarter of fiscal 2011. Our net use of cash and debt during the last twelve months was focused on share repurchase activity, acquiring and funding our Canadian operations, partially offset by positive cash flow (defined as operating activities less investing activities) generated by our U.S. operations.

Share Repurchase Activity

During the second quarter of fiscal 2012, we invested $149 million to repurchase 4.0 million of our shares. On a year-to-date basis through August 22, 2012, we have invested $254 million to repurchase 6.7 million of our common shares, or 10% of our outstanding share base as of the beginning of fiscal 2012. As of close of the market on August 22, 2012, we had $45 million available under our $200 million share repurchase program announced in May 2012. The remaining authorization is expected to be utilized to repurchase shares in the open market and/or in privately negotiated transactions at our discretion, subject to market conditions and other factors. Common shares acquired through the repurchase program will be available to meet obligations under equity compensation plans and for general corporate purposes. The 2012 share repurchase program will continue until exhausted.

Shareholder Relations Department
300 Phillipi Road
Columbus, OH 43228-5311
Phone: (614) 278-6622 Fax: (614) 278-6666
E-mail: aschmidt@biglots.com

**2012 OUTLOOK**

- **Updates fiscal 2012 annual guidance for adjusted consolidated income from continuing operations to $2.80 to $2.95 per diluted share (non-GAAP) versus income from continuing operations of $2.99 per diluted share for fiscal 2011**
- **Updates Cash Flow guidance to $125 million**

Based on operating results for the first two quarters and our revised expectations for the third and fourth quarters of fiscal 2012, we now estimate our fiscal 2012 consolidated adjusted income from continuing operations to be in the range of $2.80 to $2.95 per diluted share (non-GAAP), compared to our prior guidance of $3.25 to $3.40 per diluted share (non-GAAP). As a reminder, this guidance excludes the previously mentioned non-recurring, non-cash inventory charge. We have revised our Cash Flow guidance to approximately $125 million compared to our prior guidance of $190 million.

We now estimate adjusted income from U.S. operations will be in the range of $3.05 to $3.15 per diluted share (non-GAAP), compared to our prior guidance of $3.50 to $3.60 per diluted share (non-GAAP). This guidance assumes U.S. comparable store sales decline in the low single digit range and a total U.S. sales increase in the range of 3% to 4%.

For our Canadian operations, sales are expected to be in the range of $152 to $158 million for fiscal 2012 resulting in an operating loss in the range of $13 to $15 million, or $0.22 to $0.26 per diluted share (non-GAAP). This compares to our prior guidance of sales in the range of $142 to $152 million for fiscal 2012 resulting in an operating loss in the range of $14 to $16 million, or $0.23 to $0.26 per diluted share (non-GAAP).

| *EPS from Continuing Operations (non-GAAP)* | Full Year | |
|---|---|---|
| | 2012 Guidance | 2011 |
| U.S. Operations | $3.00 - $3.10 | $3.18 |
| Add back: Inventory charge | $0.05 | - |
| U.S. Operations - adjusted basis | $3.05 - $3.15 | $3.18 |
| Canadian Operations [1] | ($0.22) - ($0.26) | ($0.19) |
| Consolidated - adjusted basis | $2.80 - $2.95 | $2.99 |

(1) Canadian operations were acquired on July 18, 2011 and full year fiscal 2011 results reflect performance from acquisition date through the end of our fiscal year (January 28, 2012). Based on materiality to our total operations, we are not required and have not provided pro forma fiscal 2011 results.

Shareholder Relations Department
300 Phillipi Road
Columbus, OH 43228-5311
Phone: (614) 278-6622 Fax: (614) 278-6666
E-mail: aschmidt@biglots.com

Source: BIG LOTS INC, EX-99.1, 8/28/2012 | Powered by Intelligize

**Conference Call/Webcast**

We will host a conference call today at 8:00 a.m. to discuss our financial results for the second quarter and provide commentary on our outlook for fiscal 2012. We invite you to listen to the webcast of the conference call through the Investor Relations section of our website (www.biglots.com).

If you are unable to join the live webcast, an archive of the call will be available through the Investor Relations section of our website (www.biglots.com) beginning two hours after the call ends and will remain available through midnight on Thursday, September 6. A replay of the call will be available beginning today at 12:00 noon through September 6 at midnight by dialing: 1.888.203.1112 (United States and Canada) or 1.719.457.0820 (International). The Replay Confirmation Code is 9878343. All times are Eastern Time.

Big Lots is North America's largest broadline closeout retailer. As of the end of the second quarter of fiscal 2012, we operated 1,463 **BIG LOTS** stores in the 48 contiguous United States and 81 **LIQUIDATION WORLD** and **LW** stores in Canada. Wholesale operations are conducted through **BIG LOTS WHOLESALE, CONSOLIDATED INTERNATIONAL,** and **WISCONSIN TOY** and with online sales at www.biglotswholesale.com.

**Cautionary Statement Concerning Forward-Looking Statements**

Certain statements in this release are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, and such statements are intended to qualify for the protection of the safe harbor provided by the Act. The words “anticipate,” “estimate,” “expect,” “objective,” “goal,” “project,” “intend,” “plan,” “believe,” “will,” “should,” “may,” “target,” “forecast,” “guidance,” “outlook” and similar expressions generally identify forward-looking statements. Similarly, descriptions of our objectives, strategies, plans, goals or targets are also forward-looking statements. Forward-looking statements relate to the expectations of management as to future occurrences and trends, including statements expressing optimism or pessimism about future operating results or events and projected sales, earnings, capital expenditures and business strategy. Forward-looking statements are based upon a number of assumptions concerning future conditions that may ultimately prove to be inaccurate. Forward-looking statements are and will be based upon management's then-current views and assumptions regarding future events and operating performance, and are applicable only as of the dates of such statements. Although we believe the expectations expressed in forward-looking statements are based on reasonable assumptions within the bounds of our knowledge, forward-looking statements, by their nature, involve risks, uncertainties and other factors, any one or a combination of which could materially affect our business, financial condition, results of operations or liquidity.

Forward-looking statements that we make herein and in other reports and releases are not guarantees of future performance and actual results may differ materially from those discussed in such forward-looking statements as a result of various factors, including, but not limited to, the current economic and credit crisis, the cost of goods, our inability to successfully execute strategic initiatives, competitive pressures, economic pressures on our customers and us, the availability of brand name closeout merchandise, trade restrictions, freight costs, the risks discussed in the Risk Factors section of our most recent Annual Report on Form 10-K, and other factors discussed from time to time in our other filings with the SEC, including Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. This release should be read in conjunction with such filings, and you should consider all of these risks, uncertainties and other factors carefully in evaluating forward-looking statements.

You are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. We undertake no obligation to publicly update forward-looking statements, whether as a result of new information, future events or otherwise. You are advised, however, to consult any further disclosures we make on related subjects in our public announcements and SEC filings.

Shareholder Relations Department
300 Phillipi Road
Columbus, OH 43228-5311
Phone: (614) 278-6622 Fax: (614) 278-6666
E-mail: aschmidt@biglots.com

**BIG LOTS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands)**

| | JULY 28 2012 (Unaudited) | JULY 30 2011 (Unaudited) |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 61,679 | $ 57,829 |
| Inventories | 881,090 | 780,070 |
| Deferred income taxes | 42,840 | 47,086 |
| Other current assets | 91,167 | 99,026 |
| Total current assets | 1,076,776 | 984,011 |
| Property and equipment - net | 587,515 | 542,462 |
| Deferred income taxes | 6,146 | 12,404 |
| Goodwill | 13,428 | 21,507 |
| Other assets | 41,780 | 40,034 |
| | $ 1,725,645 | $ 1,600,418 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 409,578 | $ 367,542 |
| Property, payroll and other taxes | 79,520 | 77,653 |
| Accrued operating expenses | 70,239 | 61,846 |
| Insurance reserves | 36,297 | 37,668 |
| KB bankruptcy lease obligation | 3,069 | 3,342 |
| Accrued salaries and wages | 23,262 | 21,353 |
| Income taxes payable | 670 | 1,395 |
| Total current liabilities | 622,635 | 570,799 |
| Long-term obligations under bank credit facility | 242,800 | 60,400 |
| Deferred rent | 65,078 | 50,966 |
| Insurance reserves | 50,400 | 46,898 |
| Unrecognized tax benefits | 16,159 | 18,857 |
| Other liabilities | 38,565 | 35,951 |
| Shareholders' equity | 690,008 | 816,547 |
| | $ 1,725,645 | $ 1,600,418 |

**BIG LOTS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share data)**

| | 13 WEEKS ENDED JULY 28, 2012 | | | 13 WEEKS ENDED JULY 30, 2011 | | |
|---|---|---|---|---|---|---|
| | | | % | | | % |
| | (Unaudited) | | | (Unaudited) | | |
| **Net sales** | $ | 1,218,037 | 100.0 | $ | 1,167,135 | 100.0 |
| **Gross margin** | | 477,835 | 39.2 | | 460,536 | 39.5 |
| **Selling and administrative expenses** | | 412,220 | 33.8 | | 379,347 | 32.5 |
| **Depreciation expense** | | 26,271 | 2.2 | | 21,428 | 1.8 |
| **Operating profit** | | 39,344 | 3.2 | | 59,761 | 5.1 |
| **Interest expense** | | (895) | (0.1) | | (1,334) | (0.1) |
| **Other income (expense)** | | (38) | (0.0) | | 54 | 0.0 |
| **Income from continuing operations before income taxes** | | 38,411 | 3.2 | | 58,481 | 5.0 |
| **Income tax expense** | | 16,321 | 1.3 | | 22,767 | 2.0 |
| **Income from continuing operations** | | 22,090 | 1.8 | | 35,714 | 3.1 |
| **Loss from discontinued operations, net of tax benefit of $10 and $20, respectively** | | (15) | (0.0) | | (31) | (0.0) |
| **Net income** | $ | 22,075 | 1.8 | $ | 35,683 | 3.1 |
| | | | | | | |
| **Earnings per common share - basic (a)** | | | | | | |
| **Continuing operations** | $ | 0.37 | | $ | 0.51 | |
| **Discontinued operations** | | 0.00 | | | 0.00 | |
| **Net income** | $ | 0.37 | | $ | 0.51 | |
| | | | | | | |
| **Earnings per common share - diluted (a)** | | | | | | |
| **Continuing operations** | $ | 0.36 | | $ | 0.50 | |
| **Discontinued operations** | | 0.00 | | | 0.00 | |
| **Net income** | $ | 0.36 | | $ | 0.50 | |
| | | | | | | |
| **Weighted average common shares outstanding** | | | | | | |
| **Basic** | | 60,466 | | | 70,130 | |
| **Dilutive effect of share-based awards** | | 531 | | | 919 | |
| **Diluted** | | 60,997 | | | 71,049 | |

**(a) The earnings per share for Continuing Operations, Discontinued Operations and Net Income are separately calculated in accordance with accounting pronouncements; therefore, the sum of earnings per share for Continuing Operations and Discontinued Operations may differ, due to rounding, from the calculated earnings per share of Net Income.**

**BIG LOTS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share data)**

| | 26 WEEKS ENDED JULY 28, 2012 | | | 26 WEEKS ENDED JULY 30, 2011 | | |
|---|---|---|---|---|---|---|
| | | | % | | | % |
| | (Unaudited) | | | (Unaudited) | | |
| **Net sales** | $ | 2,512,518 | 100.0 | $ | 2,394,409 | 100.0 |
| **Gross margin** | | 990,283 | 39.4 | | 954,665 | 39.9 |
| **Selling and administrative expenses** | | 830,538 | 33.1 | | 766,514 | 32.0 |
| **Depreciation expense** | | 51,559 | 2.1 | | 42,092 | 1.8 |
| **Operating profit** | | 108,186 | 4.3 | | 146,059 | 6.1 |
| **Interest expense** | | (1,231) | (0.0) | | (1,835) | (0.1) |
| **Other income (expense)** | | (1) | (0.0) | | 166 | 0.0 |
| **Income from continuing operations before income taxes** | | 106,954 | 4.3 | | 144,390 | 6.0 |
| **Income tax expense** | | 44,084 | 1.8 | | 56,145 | 2.3 |
| **Income from continuing operations** | | 62,870 | 2.5 | | 88,245 | 3.7 |
| **Loss from discontinued operations, net of tax benefit of $32 and $60, respectively** | | (49) | (0.0) | | (91) | (0.0) |
| **Net income** | $ | 62,821 | 2.5 | $ | 88,154 | 3.7 |
| | | | | | | |
| **Earnings per common share - basic (a)** | | | | | | |
| **Continuing operations** | $ | 1.01 | | $ | 1.22 | |
| **Discontinued operations** | | 0.00 | | | 0.00 | |
| **Net income** | $ | 1.01 | | $ | 1.22 | |
| | | | | | | |
| **Earnings per common share - diluted (a)** | | | | | | |
| **Continuing operations** | $ | 1.00 | | $ | 1.21 | |
| **Discontinued operations** | | 0.00 | | | 0.00 | |
| **Net income** | $ | 1.00 | | $ | 1.20 | |
| | | | | | | |
| **Weighted average common shares outstanding** | | | | | | |
| **Basic** | | 62,292 | | | 72,088 | |
| **Dilutive effect of share-based awards** | | 779 | | | 1,089 | |
| **Diluted** | | 63,071 | | | 73,177 | |

**(a) The earnings per share for Continuing Operations, Discontinued Operations and Net Income are separately calculated in accordance with accounting pronouncements; therefore, the sum of earnings per share for Continuing Operations and Discontinued Operations may differ, due to rounding, from the calculated earnings per share of Net Income.**

**BIG LOTS, INC. AND SUBSIDIARIES**
**SEGMENT OPERATING PERFORMANCE**
**(In thousands, except per share data)**

| | 13 WEEKS ENDED | | | |
|---|---|---|---|---|
| | **JULY 28, 2012 U.S.** | **JULY 30, 2011 U.S.** | **JULY 28, 2012 Canada** | **JULY 30, 2011 (a) Canada** |
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| **Net sales** | $ 1,183,023 | $ 1,163,201 | $ 35,014 | $ 3,934 |
| **Gross margin** | 465,422 | 459,045 | 12,413 | 1,491 |
| **Selling and administrative expenses** | 397,327 | 377,548 | 14,893 | 1,799 |
| **Depreciation expense** | 25,468 | 21,349 | 803 | 79 |
| **Operating profit (loss)** | 42,627 | 60,148 | (3,283) | (387) |
| **Interest expense** | (895) | (544) | - | (790) |
| **Other income (expense)** | - | 42 | (38) | 12 |
| **Income (loss) from continuing operations before income taxes** | 41,732 | 59,646 | (3,321) | (1,165) |
| **Income tax expense** | 16,321 | 22,767 | - | - |
| **Income (loss) from continuing operations** | $ 25,411 | $ 36,879 | $ (3,321) | $ (1,165) |
| **Diluted earnings (loss) per common share from continuing operations (b)** | $ 0.42 | $ 0.52 | $ (0.05) | $ (0.02) |

| | 26 WEEKS ENDED | | | |
|---|---|---|---|---|
| | **JULY 28, 2012 U.S.** | **JULY 30, 2011 U.S.** | **JULY 28, 2012 Canada** | **JULY 30, 2011 (a) Canada** |
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| **Net sales** | $ 2,445,258 | $ 2,390,475 | $ 67,260 | $ 3,934 |
| **Gross margin** | 966,366 | 953,174 | 23,917 | 1,491 |
| **Selling and administrative expenses** | 798,852 | 764,715 | 31,686 | 1,799 |
| **Depreciation expense** | 49,892 | 42,013 | 1,667 | 79 |
| **Operating profit (loss)** | 117,622 | 146,446 | (9,436) | (387) |
| **Interest expense** | (1,231) | (1,045) | - | (790) |
| **Other income (expense)** | - | 154 | (1) | 12 |
| **Income (loss) from continuing operations before income taxes** | 116,391 | 145,555 | (9,437) | (1,165) |
| **Income tax expense** | 44,084 | 56,145 | - | - |
| **Income (loss) from continuing operations** | $ 72,307 | $ 89,410 | $ (9,437) | $ (1,165) |
| **Diluted earnings (loss) per common share from continuing operations (b)** | $ 1.15 | $ 1.22 | $ (0.15) | $ (0.02) |

**(a) The results of the Canadian operating segment reflect activities from the date of acquisition (July 18, 2011) through the period end.**

**(b) The diluted earnings per share from continuing operations by segment are separately calculated; therefore, the sum of diluted earnings per share from continuing operations by segment may differ, due to rounding, from the calculated consolidated diluted earnings per share from continuing operations. Diluted earnings per share from continuing operations by segment is a "non-GAAP financial measure," as that term is defined by Rule 101 of Regulation G (17 CFR Part 244) and Item 10 of Regulation S-K (17 CFR Part 229), which our management believes is useful information to investors.**

**BIG LOTS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | 13 WEEKS ENDED JULY 28, 2012 (Unaudited) | 13 WEEKS ENDED JULY 30, 2011 (Unaudited) |
|---|---|---|
| **Net cash used in operating activities** | $ (36,833) | $ (14,920) |
| **Net cash used in investing activities** | (42,284) | (18,796) |
| **Net cash provided by (used in) financing activities** | 58,453 | (192,350) |
| **Impact of foreign currency on cash** | (228) | 0 |
| **Decrease in cash and cash equivalents** | (20,892) | (226,066) |
| **Cash and cash equivalents:** | | |
| **Beginning of period** | 82,571 | 283,895 |
| **End of period** | $ 61,679 | $ 57,829 |

**BIG LOTS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | 26 WEEKS ENDED JULY 28, 2012 (Unaudited) | 26 WEEKS ENDED JULY 30, 2011 (Unaudited) |
|---|---|---|
| **Net cash provided by operating activities** | $ 88,749 | $ 110,625 |
| **Net cash used in investing activities** | (60,273) | (37,895) |
| **Net cash used in financing activities** | (35,195) | (192,440) |
| **Impact of foreign currency on cash** | (149) | 0 |
| **Decrease in cash and cash equivalents** | (6,868) | (119,710) |
| **Cash and cash equivalents:** | | |
| **Beginning of period** | 68,547 | 177,539 |
| **End of period** | $ 61,679 | $ 57,829 |

**BIG LOTS, INC. AND SUBSIDIARIES**
**RECONCILIATION OF NON-GAAP FINANCIAL MEASURES**
**(In thousands, except per share data)**
**(Unaudited)**

The following table reconciles gross margin, gross margin rate, operating profit, operating profit rate, income tax expense, effective income tax rate, income from continuing operations, net income, diluted earnings per share from continuing operations, and diluted earnings per share for the year-to-date 2012 for our consolidated and U.S. segment results (GAAP financial measures) to adjusted gross margin, adjusted gross margin rate, adjusted operating profit, adjusted operating profit rate, adjusted income tax expense, adjusted effective income tax rate, adjusted income from continuing operations, adjusted net income, adjusted diluted earnings per share from continuing operations, and adjusted diluted earnings per share (non-GAAP financial measures).

**Year-to-date 2012 - Twenty-Six weeks ended July 28, 2012**

| **Consolidated Results** | **As reported** | **Adjustment to exclude change in inventory accounting principle** | **As Adjusted (non-GAAP)** |
|---|---|---|---|
| **Gross margin** | $ 990,283 | $ 5,574 | $ 995,857 |
| **Gross margin rate** | 39.4% | 0.2% | 39.6% |
| **Operating profit** | 108,186 | 5,574 | 113,760 |
| **Operating profit rate** | 4.3% | 0.2% | 4.5% |
| **Income tax expense** | 44,084 | 2,186 | 46,270 |
| **Effective income tax rate** | 41.2% | (0.1)% | 41.1% |
| **Income from continuing operations** | 62,870 | 3,388 | 66,258 |
| **Net income** | 62,821 | 3,388 | 66,209 |
| **Diluted earnings per share from continuing operations** | $ 1.00 | $ 0.05 | $ 1.05 |
| **Diluted earnings per share** | $ 1.00 | $ 0.05 | $ 1.05 |

**U.S. Segment Results**

| | **As reported** | **Adjustment to exclude change in inventory accounting principle** | **As Adjusted (non-GAAP)** |
|---|---|---|---|
| **Gross margin** | $ 966,366 | $ 5,574 | $ 971,940 |
| **Gross margin rate** | 39.5% | 0.2% | 39.7% |
| **Operating profit** | 117,622 | 5,574 | 123,196 |
| **Operating profit rate** | 4.8% | 0.2% | 5.0% |
| **Income tax expense** | 44,084 | 2,186 | 46,270 |
| **Effective income tax rate** | 37.9% | 0.0% | 37.9% |
| **Income from continuing operations** | 72,307 | 3,388 | 75,695 |
| **Diluted earnings per share from continuing operations** | $ 1.15 | $ 0.05 | $ 1.20 |

The adjusted gross margin, adjusted gross margin rate, adjusted operating profit, adjusted operating profit rate, adjusted income tax expense, adjusted effective income tax rate, adjusted income from continuing operations, adjusted net income, adjusted diluted earnings per share from continuing operations, and adjusted diluted earnings per share are "non-GAAP financial measures" as that term is defined by Rule 101 of Regulation G (17 CFR Part 244) and Item 10 of Regulation S-K (17 CFR Part 229). These non-GAAP financial measures exclude from the most directly comparable financial measures calculated and presented in accordance with accounting principles generally accepted in the United States of America ("GAAP") a pretax charge for a change in an accounting principle associated with our implementation of new inventory management information systems of $5,574 ($3,388, net of tax).

Our management believes that the disclosure of these non-GAAP financial measures provides useful information to investors because the non-GAAP financial measures present an alternative and appropriate method for measuring our operating performance, excluding certain items included in the most directly comparable GAAP financial measures. Our management uses these non-GAAP financial measures, along with the most directly comparable GAAP financial measures, in evaluating our operating performance.

**Exhibit 99.2**

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

## BIG - Q2 2012 Big Lots, Inc. Earnings Conference Call

## EVENT DATE/TIME: AUGUST 23, 2012 / 12:00PM GMT

**OVERVIEW:**

BIG reported 2Q12 consolidated adjusted income from continuing operations of $22.1m or $0.36 per diluted share. Expects FY12 consolidated adjusted diluted EPS from continuing operations to be $2.80-2.95, 3Q12 consolidated loss per diluted share from continuing operations to be $0.20-0.30, and 4Q12 consolidated diluted EPS from continuing operations to be $1.97-2.12.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

## CORPORATE PARTICIPANTS

**Andy Regrut** *Big Lots, Inc. - Director, IR*

**Tim Johnson** *Big Lots, Inc. - SVP & CFO*

**Joe Cooper** *Big Lots, Inc. - EVP & President - Big Lots Canada*

**Steve Fishman** *Big Lots, Inc. - Chairman, CEO & President*

## CONFERENCE CALL PARTICIPANTS

**Meredith Adler** *Barclays Capital - Analyst*

**Joe Feldman** *Telsey Advisory Group - Analyst*

**David Mann** *Johnson Rice & Company - Analyst*

**Laura Champine** *Canaccord Genuity - Analyst*

**Jeff Stein** *Northcoast Research - Analyst*

**Charles Grom** *Deutsche Bank - Analyst*

**Dan Wewer** *Raymond James & Associates - Analyst*

**Peter Keith** *Piper Jaffray & Co. - Analyst*

**John Zolidis** *Buckingham Research Group - Analyst*

**Brad Thomas** *KeyBanc Capital Markets - Analyst*

**Patrick McKeever** *MKM Partners - Analyst*

**Anthony Chukumba** *BB&T Capital Markets - Analyst*

**Matt Boss** *JPMorgan - Analyst*

**Mark Mandel** *ThinkEquity LLC - Analyst*

## PRESENTATION

---

**Operator**

Ladies and gentlemen, welcome to the Big Lots second quarter 2012 teleconference. This call is being recorded. During this session, all lines will be muted until the question-and-answer portion of the call.

(Operator Instructions)

At this time, I would like to introduce today's first speaker, Director of Investor Relations, Andy Regrut. Please go ahead.

---

**Andy Regrut - *Big Lots, Inc. - Director, IR***

Thanks, Danna, and thank you, everyone, for joining us for our second quarter conference call. With me here today in Columbus are Steve Fishman, our Chairman, CEO and President; Chuck Haubiel, Executive Vice President, Chief Administrative Officer; Joe Cooper, Executive Vice President and President of Big Lots Canada; and Tim Johnson, Senior Vice President, Chief Financial Officer. Before we get started, I'd like to remind you that any forward-looking statements we make on today's call involve risks and uncertainties and are subject to our Safe Harbor Provisions as stated in our press release and our SEC filings, and that actual results can differ materially from those described in our forward-looking statements.

Our consolidated financials include results from our U.S. operations and from our Canadian business that was acquired on July 18, 2011. Our statements also include immaterial amounts of discontinued operations activity. All commentary today is focused on adjusted non-GAAP results from continuing operations. Specifically, our Q1 and year-to-date results, along with our annual guidance, excludes the non-recurring, non-cash after-tax charge of $3.4 million, or $0.05 per diluted share in Q1. As a reminder, this charge relates to a change in accounting principle relating to inventory valuation and was the direct result of our successful "go live" of a new merchandising system at the beginning of the fiscal year. A reconciliation of GAAP to non-GAAP adjusted earnings on a year to date basis and for our annual guidance is available in today's press release. With that, I'll turn it over to T.J.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**Tim Johnson** - ***Big Lots, Inc. - SVP & CFO***

Thanks, Andy, and good morning, everyone. I'm going to briefly cover Q2 results and then turn it over to Joe to talk about our progress in Canada. I'll then come back and talk to you about forward guidance, and Steve is going to give you some perspective on results and our merchandising efforts going forward.

Sales for U.S. operations were $1.183 billion, an increase of 1.7% compared to $1.163 billion we reported for the second quarter of last year. Comparable store sales for stores open at least 15 months decreased 1.9%, compared to our guidance of slightly positive to slightly negative. From a merchandise perspective, our better-performing areas included Electronics, which comped up low-double digits; Hardlines, which was up mid-single digits; and Consumables, where comps were flat for the quarter. As you may recall, Electronics and Consumables were challenged in Q1, so we were encouraged to see those business trends actually improve in the second quarter. The balance of our discretionary categories experienced some challenges in Q2, namely, Furniture and Home were down low singles, Seasonal was down mid-singles; and Play and Wear, which comped down low-double digits.

For the second quarter of fiscal 2012, operating profit dollars from continuing operations for our U.S. business were $42.6 million, as our operating rate declined to 3.6%, compared to 5.2% last year. Our gross margin rate of 39.3% was down 20 basis points to last year, due to merchandise mix pressures. As I just mentioned, our lower margin categories, namely, Consumables, Hardlines, and Electronics, were our better performers, while our higher-margin discretionary categories underperformed. Our overall markdown rate was similar to last year but above our forecast, with the majority of the variance due to the softness in Seasonal sales of Lawn and Garden and Summer. The higher markdowns were necessary in order to manage our inventory levels to our glide path as we exited Q2.

Total expense dollars were $423 million, and the second-quarter expense rate was 35.7%, up 140 basis points to last year. Expense deleverage came from higher depreciation and occupancy costs, an increase in advertising spend, higher healthcare costs, and the deleveraging impact of a negative 1.9% comp. Interest expense of U.S. operations was slightly higher than last year, and our U.S. tax rate was 39.1%, which was above last year's rate of 38.2%.

In total, our U.S. business reported income from continuing operations of $25.4 million, or $0.42 per diluted share for the second quarter of fiscal 2012, compared to last year's $0.52 per diluted share.

From a real estate perspective, we opened 18 new stores and closed 9 in the second quarter, leaving us with 1,463 stores and total selling square footage of 31.8 million.

Joe will touch on Canada in a moment, but in terms of the P&L, our net loss of $3.3 million, or $0.05 per diluted share, was better than our guidance, which called for a net loss of $4 million to $6 million, or $0.07 to $0.10 per diluted share. So, in total, from a consolidated point of view, we reported adjusted income from continuing operations of $22.1 million, or $0.36 per diluted share. This compares to $35.7 million, or $0.50 per diluted share a year ago.

Moving on to the balance sheet, inventory on a consolidated basis ended the quarter at $881 million, compared to $780 million last year. The increase was driven by growth and improvement of inventory content related to our Canadian operations, a 3% increase in U.S. store count, and a 6% increase in per store inventory in our U.S. stores. The inventory per store increase in U.S. stores was isolated to two key merchandise categories, Consumables and Furniture.

Consumables growth was focused in certain departments or strategies where we believed our assortment was not broad enough or deep enough in Q1. For example, growth was intentional in food, captive label food, and specialty food classifications, as we attempt to become more consistent in these businesses. Additionally, as many of you know, we also delivered a large famous-maker branded closeout deal near the end of second quarter, which has influenced inventory levels and is expected to provide sales well into Q3. Our inventory levels in Furniture are above last year as well, partly due to slower Q2 sales, but also due to our build up for Back-to-School and Back-to-Campus events, Labor Day weekend, and expectations for a larger holiday fireplace business this year.

CapEx for the second quarter of fiscal 2012 totaled $42.4 million, compared to $28.3 million last year. On a year-to-date basis, CapEx totaled $60.7 million, versus $47.5 million a year ago. Depreciation expense for the quarter was $26.3 million, an increase of $4.8 million to last year.

We ended the quarter with $62 million of cash and cash equivalents and $243 million of borrowings under our credit facility. This compares to $58 million of cash and cash equivalents and $60 million of borrowings under our credit facility last year.

During the second quarter of fiscal 2012, we invested $149 million to repurchase 4 million shares. On a year-to-date basis through yesterday, we have invested $254 million to repurchase 6.7 million shares of our Company stock, or 10% of our outstanding share base as of the beginning of fiscal 2012. As of the end of the day yesterday, we had $45 million remaining on our $200 million share repurchase program announced in May of 2012. I'll now turn it over to Joe for an update on our Canadian operations.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**Joe Cooper** - ***Big Lots, Inc. - EVP & President - Big Lots Canada***

Thanks, T.J. It's been just over a year since we added Liquidation World to the Big Lots family and, during the last 12 months, we've made a significant amount of progress in turning around this business. From a sales and merchandise perspective, volumes built quarter to quarter, and Q2 sales came in at $35 million, which was at the high end of our guidance. Performance was driven by strength in Consumables, Seasonal, and Furniture. Customers continue to respond favorably to our focus on improving merchandise through expanded assortments, higher quality, and extreme value through our closeouts.

Inventory content and dollar levels improved throughout the quarter, as we ended Q2 with $33 million of inventory and a fully assorted store with most major categories well represented. Key categories which experienced the most growth in inventory were Consumables, Furniture, and Home, whereas Seasonal, Lawn and Garden, and Summer inventory levels were down and on their glide path to exit the store and free up available space for our fall seasonal goods. From a stores perspective, we ended Q2 with 81 stores in Canada. Now I'll turn it back over to T.J. for a look at our forward guidance.

**Tim Johnson** - ***Big Lots, Inc. - SVP & CFO***

Thanks, Joe. For Q3, we are forecasting results from our U.S. business to be a loss from continuing operations in the range of $0.13 to $0.20 per diluted share, compared to income from continuing operations of $0.17 per diluted share in the third quarter of fiscal 2011. The anticipated loss is based on a mid-single digit decline in comparable store sales, a lower gross margin rate, and expense deleverage on lower comps. The decline in the gross margin rate is a function of a higher markdown rate and expected merchandise mix pressure, each of which assumes our discretionary businesses could remain challenged in the fall season. Expense deleverage is the result of a mid-single digit comp sales decline, as expenses on a per store basis are actually forecasted to be flat to down slightly for Q3 compared to last year.

In Canada, third-quarter sales are expected to be in the range of $35 million to $38 million, resulting in a net loss in the range of $4 million to $6 million, or $0.07 to $0.10 per diluted share. This compares to sales of $21.5 million in the third quarter of fiscal 2011, which resulted in a net loss of $7.1 million, or $0.11 per diluted share.

For the consolidated Company for the third quarter of fiscal 2012, we are forecasting a loss from continuing operations in the range of $0.20 to $0.30 per diluted share, compared to income of $0.06 per diluted share for the third quarter of fiscal 2011.

For Q4 for our U.S. business, we're forecasting income from continuing operations in the range of $2.00 to $2.12 per diluted share, compared to income from continuing operations of $1.83 per diluted share in the fourth quarter of fiscal 2011. This forecast assumes a low-single digit decline in comparable store sales, a lower gross margin rate, partially offset by expected expense leverage. The decline in the gross margin rate anticipates a higher markdown rate and expected mix pressures, and the expense leverage assumes lower bonus expense and the leveraging impact of the extra week in the fourth quarter.

In Canada, fourth quarter sales are expected to be in the range of $48 million to $52 million. At this level of sales, we anticipate our operating results will be in the range of a $2 million loss to the potential of breaking even for the all-important holiday quarter. This translates to an earnings per share range of breakeven to a loss of $0.04 per diluted share and compares to sales of $36.6 million in the fourth quarter of 2011, which resulted in a net loss of $5 million, or $0.08 per diluted share.

For the consolidated Company, income from continuing operations for the fourth quarter is expected to be in the range of $1.97 to $2.12 per diluted share, compared to income of $1.75 per diluted share for the fourth quarter of fiscal 2011. Our updated outlook for the full year fiscal 2012 calls for consolidated adjusted income from continuing operations to be in the range of $2.80 to $2.95 per diluted share. This compares to fiscal 2011 of $2.99 per diluted share. The average diluted share count is now forecasted to be approximately 61 million shares for fiscal 2012, with no assumption for additional share repurchase activity. We expect this level of financial performance will generate approximately $125 million of cash flow.

For our U.S. operations, we estimate adjusted income from continuing operations for the full year of 2012 to be in the range of $3.05 to $3.15 per diluted share. This compares to our 2011 result of $3.18 per diluted share. Our updated guidance is based on a total sales increase in the range of 3% to 4% and a comparable store sales decrease in the low-single digits.

We estimate the adjusted operating profit rate for the U.S. operations for 2012 will be in the range of 5.5% to 6%. The adjusted gross margin rate for fiscal 2012 is expected to be lower than 2011, driven by higher anticipated markdowns and merchandise mix pressure. Expenses as a percent of sales are expected to increase in this model, with the majority of the increase coming from higher depreciation, healthcare costs, rent and occupancy, and the deleveraging impact of a low-single digit comp.

Filling out the rest of the U.S. P&L for 2012, we expect net interest expense of approximately $4 million, and the effective income tax rate is forecasted in the neighborhood of 38.0% to 39.0%.

For our Canadian operations for fiscal 2012, we now expect sales to be in the range of $152 million to $158 million, with a net loss in the range of $13 million to $15 million, or $0.22 to $0.26 per diluted share. Now I'll turn it over to Steve for some closing remarks.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

The softness first experienced in the second half of Q1 continued on into Q2. You'll recall in Q1 our challenges were centered on Electronics and Consumables. We intensely focused on those categories, made changes, and experienced some trend improvement in the second quarter. However, as we move through Q2, our more discretionary business has softened, namely, Furniture, Home, and Seasonal. When you look into the details of each of these discretionary businesses, I believe there are different reasons for each of these categories missing their Q2 forecast, and although we do believe we have a solid 9 Weeks of Christmas strategy, we're anticipating certain of our discretionary businesses could remain challenged and pressure margins near term.

When I look more broadly across the spring season and the inconsistencies in our business, the common theme I see is change. Our business needs to be constantly evolving. I've said this on many occasions. Our model is different. When we're not changing in merchandising and driving it all the way to the store and, ultimately, the customer, we fall behind. As many of you know, we've been working on our long-range plan, our next three-year strategic plan to include 2013 through 2015. The long-range plan is all about how we see the business evolving in the future.

While it's far from complete at this point, there are certain initiatives identified to test this year, and into the spring of 2013, which could give us some early indications how business could look going forward. Specifically, I want to share three key tests which you may come across in your travels to our stores. First, after months of review and thoughtful consideration, we will begin to test coolers and freezers in a group of our stores. We believe this could be an important step toward expanding our food offering and providing more consistency in our Consumables business. We believe we now have the register systems and in-store disciplines to allow us to confidently address what have been obstacles in the past. This test will be executed in five different markets, beginning in spring 2013.

Coinciding with the installation of coolers and freezers, we will begin to test accepting SNAP benefits, previously referred to as the Federal Food Stamps Program. There's no debating that a growing percentage of the consumer base is economically stressed and becoming more dependent on government assistance. In each of the last two years, over six million Americans have been added to SNAP, resulting in the neighborhood of 15% or more of our total population being enrolled in this program. Our business needs to provide customers multiple reasons to shop our stores.

Second, during the third quarter, we will begin testing a new rewards loyalty program in several markets. To date, we've done a very good job building a large program with now over 13 million members. The program has allowed us to cost effectively communicate with our membership by sending out our ad circulars online and announcing unique in-store events or new merchandise arrivals. However, we've not seen a meaningful lift in transactions from our incentive programs and, as a result, our test will focus on several new alternative rewards schemes designed to encourage increased frequency compared to our current program.

And, finally, we will be testing full market remodels later this fall. This program is designed to execute a full remodel and provide a like-new in-store experience. This is the most extensive remodel effort we've ever undertaken by addressing all physical aspects of the store and, in most cases, will include physically relaying the entire store to our current layout. We recognize the need to enhance the shopping experience in some of our larger, successful, and more mature markets that are important to us. The goal is clear -- drive sustainable change in sales or customer behavior by improving the physical plant and appearance of our stores. We're being selective, and we'll monitor financial returns very closely. Chuck is very close to this project and can cover any questions you may have during Q&A.

All of these tests have a similar goal -- evolve the model and drive sales, and, more specifically, bring more customers into our stores. These items are only a portion of our next LRP, but we are far enough along in development that I thought it was important for you to know that we're moving forward and not standing still. We do have plans to change our business, and we are constantly looking to the future. In this context, in a separate press release this morning, we announced some organizational changes and promotions. Specifically, I've asked John Martin to step back in to lead our merchandising efforts, while also taking responsibility for our marketing programs and strategies as well.

John has been successful as our EVP of Merchandising from 2003 up until early 2011, when I asked him to move into an administrative -- an administration role enhancing our human resource training and development efforts and while also improving the execution of our store operations team. As EVP of Merchandising and Marketing, John will bring nearly 10 years of Big Lots knowledge, closeout experience, and most recently, a broader customer perspective after his time leading our stores organization. Just as important, he brings stability to the merchant organization at a time when business is tough, and I'm confident he will partner with the team to improve the details of our execution. We're fortunate to have bench strength within our Company to make such a timely change and fortunate to have seasoned executives like Lisa Bachmann and Chuck to take on additional responsibilities, which should make this transition smooth.

Additionally, as you may have noticed in this release and on the call today, Joe and T.J.'s roles have changed as well. I've asked Joe to focus his full attention on his role as President of Big Lots Canada. Much has been accomplished, but the real heavy lifting is ahead of us and as we prepare to launch our Big Lots brand next year. We're fortunate to have T.J. ready to step into his new role as CFO, and this is in an element of a well-defined succession plan for the future. And I'm confident his transition will be seamless, both internally as well as when communicating with the Street. So, with that, I'll turn the call back over to Andy.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

**Andy Regrut** - ***Big Lots, Inc. - Director, IR***

Thanks, Steve. Danna, we would now like to open the lines for questions at this time.

## QUESTIONS AND ANSWERS

**Operator**

Thank you.

(Operator Instructions)

First we'll hear from Meredith Adler from Barclays.

***Meredith Adler - Barclays Capital - Analyst***

Thanks for taking my question. You didn't actually mention anything about addressing the areas of the store that are weakest, which is more the discretionary categories, and I was wondering if you could start by saying whether you think this is a reflection of what's going on in the environment. You guys don't usually blame external factors, but clearly things have been difficult. And what can you do in the context of a weak environment, if you think that's part of the problem?

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

Meredith, I'll address three specific areas that probably have been the weakest. And yes, I think we don't traditionally talk about the environment, but I think in a couple of the issues, there may be a piece of what has challenged us. First was Seasonal. I think Seasonal was a piece of two things. Number one, you've heard not only us but other people talk about the Seasonal business being particularly stressed this spring and summer season. The weather was hotter than normal. We had very little rain and moisture, and the lawn and garden piece of the business was particularly challenged. You've heard other retailers say the same thing. So from that piece, I would say part of it is the economics.

The second piece where we were most challenged in the second quarter, besides the weather-related goods, was in the patio furniture business. We sold very well early, really good quality patio sets. We did not sell and had some issues with our opening price points goods. They were quality issues. They were our issues, and they will be addressed for next spring.

The good news about addressing that piece of the business into the fall is there's not really a direct relationship in our minds between what happens with Trim-a-Tree and what happens with Lawn and Garden in the spring and summer seasons. The Trim-a-Tree program has been developed and is much further along, and we've had consistency of success in that program, and I think what you're going to see is even a heightened quality and value awareness going into the fall of this year. But unfortunately, it doesn't really take hold until the fourth quarter, and it's one of the things that we've always had a nemesis in the third quarter of the business. So we feel good about Trim-a-Tree in the fourth quarter.

The second piece of the business is Furniture. I think there's two issues there. I think the customer continues to be stressed. Even the good businesses in the first quarter, particularly the mattress business and the upholstery business, softened in the second quarter, although it was up slightly, not as strong as it was in the first quarter. So I think the consumer continues to be slightly stressed, and we're seeing the same kind of performance right now into the early third quarter.

On the other hand, the RTA business and the casegoods business has been particularly challenged, mostly in the dining classification and then some back-to-school classifications. We've done quite well, but in surrounding areas, we haven't done as well. But we're addressing that and turning the inventory, and I think part of that is all about change and newness. And we've already addressed by taking markdowns on the floor in Furniture. We're already seeing a lift in the last 10 days because of that, and there will be more change going into the tax time of the year, which is the most important time of the year, the end of the fourth quarter and the beginning of the first quarter next year.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

The third piece of the business challenged was Home. I think that was more self-inflicted than anything. We have made major changes and major commitment to inventory and floor space to that program that got executed mid to late second quarter. Parts of that program worked, particularly top of bed and bedding. That's doing well. Other parts of it, from an execution standpoint, we have not done as well with, particularly the housewares and the decorative areas. But we believe that we will be up and running at a better rate. Going into the end of third quarter and into fourth quarter, we believe we have a very solid program. We're already seeing receipts of that inventory.

---

**Meredith Adler** - *Barclays Capital - Analyst*

So I would just follow with that, that you certainly have pretty conservative guidance for the second half. Is it that you expect the external factors to remain difficult? Are you being very conservative about the categories that have already been weak? Or are you generally concerned about even things like Consumables that performed reasonably well in the second quarter?

---

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Yes, Meredith this is TJ. I think from a guidance perspective, we have to look at most recent trends, as we always do. And coming out of the latter parts of July and looking at the first three weeks of August is really what drove our decision to put third quarter guidance at negative mid single-digits. So before we get the question, I'll go ahead and make the statement that August to date, we are in the range of negative mid single-digits, and that was obviously a heavily contributing factor to where do we set our sales expectations for third quarter.

As Steve just mentioned, in some of the discretionary categories, we do believe as the fall season goes on, but more likely as you start to see the 9 Weeks of Christmas strategies, we do believe that there's an opportunity for some of those businesses to get better. But again, that's very late in the third quarter and on into the fourth. So, we're not expecting any level of change in discretionary businesses through the third quarter. When we look at the fourth quarter, we set guidance at a negative low single-digit comp, as you know.

Two factors to consider there. I guess first off, we do have the benefit of two extra shopping days between Thanksgiving and Christmas. But additionally, we are cautious about the early part of November, and candidly, the latter part of October, around the national general election. We've seen historically -- going back to '08, or any time there's a significant focus on the election, that people start to have a different focus in retail or certainly breaking through in retail and print or on TV, heaven forbid, is very, very difficult. So, we do have a cautious point of view on late October and early November as a result of that as well.

To your point, we do feel good about, as we mentioned, starting to see some improvement in our single largest business, which is Consumables. But again, recognize that, that's 30% of our business compared to some other retailers where it's much higher, and the 70% of our business which is discretionary is where we really need to see some improvement in trend before we would get more optimistic in our guidance.

---

**Meredith Adler** - *Barclays Capital - Analyst*

Great, and I'm sorry, I'll be selfish and ask one more question. The inventory per store was up about -- I think you said 6%. Can you just tell us how you feel about the inventory that is there at the stores? And are you sitting on a meaningful amount of potential markdowns right now, or have you cleared what you should have cleared?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Well, first off, Meredith, we always address the inventory. We never sit on anything, and we address our problems all the time. And in fact, we've already started to address our problems. It's one of the reasons why I think guidance for third quarter and fourth quarter shows margins challenged. We've always confronted those.

The majority of the inventory by store actually is in two specific areas. In fact, when you take a look at it, the other areas are actually flat to down. It's all concentrated in Consumables, which a primary piece of it is the national branded closeout that you may have seen in our stores if you were in there in the last six to eight weeks, and that carries into the third quarter and, of course, plans that we have in food for the fourth quarter, so overall, we feel good. If there is an issue there, we've already addressed it with markdowns.

And the second piece of it is in Furniture. A piece of it is early receipts of fireplace, which again does not relate to the first or the second or even early third quarter parts of the business. That is a business that three years ago was nothing and last year was a significant piece of our business, and we have a major increase planned this year. The balance of it is issues in casegoods and upholsteries.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

We have already taken markdowns on that, and the balance that we haven't, we have saved and have planned for markdowns right after Labor Day weekend, because the majority of those items are on Labor Day promotion, and Labor Day promotion is a very large four or five day event for us. We can't react to taking additional markdowns until the week after. So, we have addressed our issues.

---

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Yes, Meredith, this is TJ again. In the third quarter specifically, if you go back and remember our commentary at the beginning of the year, we talked about the potential of gross margins improving year-over-year. Well, clearly we're talking about a much different scenario today, and we're forecasting a margin rate down.

The single biggest variable in that change is markdowns to address inventory that coming out of second quarter, or elements of the back-to-school sets, or elements of different Roadshow events that have not done well. We're doing our best to make sure that there are markdown provisions in our third quarter guidance to address those very same issues.

---

**Meredith Adler** - *Barclays Capital - Analyst*

Wonderful. Thank you very much.

---

**Operator**

Next, we'll take our question from Joe Feldman with Telsey Advisory Group.

---

**Joe Feldman** - *Telsey Advisory Group - Analyst*

Hello, guys. Thanks for taking the question. A question about -- if you could talk about the cadence. I know you mentioned August to date is running down mid-singles, but I guess we were hoping to hear that trends maybe improved through the quarter as you started to fix things with Consumables. But is that the -- like, when did things soften up? Because I thought the quarter started off a little better than it ended in the first.

---

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Joe, it's TJ. Actually, the first quarter is where the softness started. So, the first quarter, you'll recall, we did get off to a pretty good start. And it really wasn't until the latter part of the first quarter that our business started to get more challenged in total. Speaking to the quarter, the month of May was -- from a comp perspective was a decent month for us, because we did have one extra ad circular. Ex that extra ad circular, comps were down.

The month of June was probably where we had more challenges of the three months, as Steve mentioned, particularly in some of the Seasonal businesses and weather challenges and where we -- it started to become apparent to us that some of the product -- that the opening price points in patio or gazebos were not going to happen the way we thought.

The month of July -- 4th of July in particular, we had a lot of activity in the store from an advertising standpoint. And the early back-to-school sets, as Steve mentioned, some of the product did sell-through well. It was really the latter part of July and then on into early August where it became apparent to us in some of the early back-to-school sets that we did not have the depth of inventory of some of the good items that we would have liked. And some of the recent events, i.e., the Furniture Roadshow or some of the Home events, were not performing up to our expectations.

So again, those events or inventory live on into the fourth quarter. We're not anticipating they get any better. As much as we would like to believe they will, we are not seeing it. So that's what really led us to where we are. I do want to point out, though, that from a Seasonal perspective, as Steve mentioned, we pay very close attention and have very strict disciplines to our glide paths on Seasonal product.

So if you were to look at our Lawn and Garden and Summer inventories or Seasonal inventories in total, they are on a glide path, and we are taking our markdowns as needed and have every intention of those categories being out of the store, so to speak, on time, so that as the new fall Seasonal goods start to set, they have their prominent place in the store. So I do think it's important to keep that in mind.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

---

**Joe Feldman** - *Telsey Advisory Group - Analyst*

Got it. That's helpful, thank you very much. And I had one more question for you guys. With some of the -- and congratulations, by the way, TJ -- but with some of the changes in promotions today, with regard to the merchandising organization, I know you in the past, you guys have spoken about doing more direct buying and having your buyers specialize more by category. Is that part of this evolution and what you're hoping to accomplish with some of the changes today?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Joe, the changes today are very simple. When I joined the Company in 2005, this team put together what I consider to be a really strong commitment and program to develop the model to where it's gotten to today. John Martin and I were team members together in building that model. I thought it was probably in the best interest of the team, and the team supported it.

I think the merchandising organization will agree to ask John to step back in and the two of us work on solidifying the model and being successful. The Board of Directors was extremely supportive of it, and we have the utmost confidence that the group that knows each other and knows each other extremely well and has worked together for seven years will be capable of overcoming this temporary blip in our top-line sales.

---

**Joe Feldman** - *Telsey Advisory Group - Analyst*

Got it. That's helpful. Thanks, and good luck, guys.

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Thanks.

---

**Operator**

Thank you. Next, we'll hear from David Mann with Johnson Rice.

---

**David Mann** - *Johnson Rice & Company - Analyst*

Yes, thank you. Good morning. Just on the last question, perhaps, Steve, you could expound a little more on how you see closeouts playing in the future assortments. Would you expect them to be less or more, and how important do you think that is?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

I think the model really hasn't varied too dramatically, David, over the years, and I think closeouts will always be a very important part of our business. I don't see any different flow of closeouts today and as a percent to total than it's been dramatically over the years. I think the issue probably will revolve around some of the basic programs where customers need to expect and demand branded merchandise on a consistent basis. So I think we're working really, really hard, particularly in Consumables and food, to really understand how to continue to grow that business and have more consistency.

We've had some wonderful early conversations with major, major consumer products manufactures at breaking through and not just the closeout part of the business but figuring out a way to give us, day in and day out, consistency of brand names that customers demand and asked for everyday. And I think you'll see us evolve a little bit more aggressively there, and probably we'll talk about more of that on the long-range plan conversation in March. And we're way ahead there of where we wanted to be.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

But closeouts, they give our customer the excitement that they look for all the time. It's very interesting. We do a tremendous amount of consumer research. Price is not our issue. We are in the value business, and our customer absolutely loves what we offer them. And very few of them ever mention anything other than we have great prices. But consistency of brand names, day in and day out, is an issue. I think that's part of what has challenged our business in the near term, and that's what we're working on very, very hard.

---

**David Mann** - *Johnson Rice & Company - Analyst*

And then in terms of the research that you're alluding to when you're talking about some of the tests that you're doing for next year, are those areas where the research is pointed that the customers asked for that?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Absolutely.

---

**David Mann** - *Johnson Rice & Company - Analyst*

Okay. One last question, if I could. Obviously, you've made some changes to the top level of the team. In terms of the merchant team, have there -- how do you foresee deeper into the merchant organization, the changes there? Are you expanding? Going to make a lot of changes? Can you talk a little bit about that?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Well, I think there's a lot of stability that we want in our merchandising organization. We have a lot of confidence in the team the way that it's put together today. I think they understand the strategy and they understand the model. We do have probably one team member that's relatively new that's been with us for maybe six months, but the balance of them have spent time and have grown up in the Big Lots strategy and understand how to execute. Whether I think the organization is broad enough going forward with the initiatives that we have, I think we'll talk about that a little bit more again in the spring.

And I'm not trying to be elusive, but we clearly, in the long-range plan, have a set organizational structure that probably will be a little bit more broad and bring a little bit more expertise so we can define some of the selective businesses and really get closer to manufacturers. I alluded to part of that on the last call, where I said we infused the finders into the business. The Consumables business and food business is getting quite large, and so we've added staff there. So, we'll take a look at what's right to run the business as we go forward.

---

**David Mann** - *Johnson Rice & Company - Analyst*

Thank you.

---

**Operator**

(Operator Instructions)

Next, we'll hear from Laura Champine with Canaccord.

---

**Laura Champine** - *Canaccord Genuity - Analyst*

Good morning. Steve, I wanted to dig a little bit further into what's happening with the merchant group. You'd mentioned that it was your decision to move Mr. Martin into the administrative functions. If you could tell us more about why. And then, on the decision not to hire externally for this role, if I look at the 2003 period through today, the comp has been flat to, at maximum, up 4.6% on an annual basis. Is that a level where you're comfortable, or why not look outside the organization for talent in merchandising?



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

---

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

Well, I think first off, the Board and I had a lengthy discussion about that, so it wasn't just my decision. And when we make major decisions at the executive level, our Board of Directors supports the decisions that we make. We have extensive conversation about it. John really understands this business, and he understands how the strategy and the model was put together.

I think you bring up a really valid point, and we challenge ourselves every day about the flat to 4%. If we're up flat, we want to be up 5%. If we're up 4%, we want to be up 10%. So I don't think we ever strive to keep the business at a particular level. I think the challenge to the top line of this model is and has continued to be of the inconsistencies of the ability to give the customer close-outs on a consistent basis and day in and day out reasons to add to the basket.

I think John understands that. I think he's got a history, along with the rest of the merchandising team, of understanding that. I'd love to tell you that going outside can bring a fresh perspective on the business. We have done that on a number of occasions with some limited success. We would like to tell you that we would have more success, but it being a very complicated model. The success we've really had in most of our businesses have been people we've brought in at lower levels. Let them spend time to understand the strategy and the model, experience the fluctuations of the business, and then figure out how to develop businesses going forward.

So it's not that we don't want people from the outside, and it's not that we won't continue to look outside to bring a fresh perspective to the business. I think we have demonstrated on many occasions, just because we do things the way we do today, that doesn't mean they're right for tomorrow. I think a perfect example is talking about the three initiatives that I just addressed to you. We recognized the fact and I have been challenged more than any probably CEO in the Hardlines business in the United States about why we haven't done coolers and freezers. And we feel now is the right time to do it. We haven't felt in the past it was the right time to do it.

The Rewards program was a fabulous program and has been developed as a communications tool, but it hasn't grown fast enough, the transactions part of the business, and we're revising that. And the fact that our store organization, we've been challenged for many, many years about our execution in the stores. John's done a terrific job day in and day out, consistency of execution in our stores, and I wouldn't be embarrassed to have you go into any one of our 1,463 stores today. We're better than we've ever been before, and because of that experience, I think John can bring some breadth and some excitement and some change to the merchandising part of the business at the same time, because he's been given a different perspective on the business. And now he can bring it back into merchandising.

---

**Laura Champine** - ***Canaccord Genuity - Analyst***

Thanks, Steve.

---

**Operator**

We'll take our next question from Jeff Stein with Northcoast Research.

---

**Jeff Stein** - ***Northcoast Research - Analyst***

Steve, I'm wondering, the back-to-school program that you guys put together this year, this was, I would suspect, one of your first initiatives to try to put that 9 Weeks of Christmas planning to use in other times of the year, and it sounds like the results were kind of mixed. And I'm wondering if you could just give us some insight into where it worked, where it didn't work, and then maybe talk a little bit about the next program that's coming on, which I would presume is your Halloween and harvest program. What, if any, changes you've made to that program for the upcoming year to improve it.

---

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

It's really interesting, Jeff. I think one of the most frustrating things is we've put together a program that actually, the actual performance of the 9 Weeks of Christmas items that we went after have done pretty well. But the problem has been the surrounding businesses to them, and that's where we have been surprised. The overall strategy of the 9 weeks of back-to-school and the specific items that you see in the store that we have promoted and shown are doing very, very well and, in some cases, have sold down probably too early. And we just don't have enough steam to take us into the balance of back-to-school.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Back-to-school is an example. Traditionally, you do about less than 20% of your business in July and about 40% in August and 40% in September. And we're losing some steam, because we sold some of the items, particularly in stationery and in RTA, so well so early, we just don't have enough steam to get there in the past. The biggest issue is we are not seeing surrounding sales to many of those businesses, so that's been the biggest piece of the disappointment.

I'm being cautious when I come to the next piece of the business, which you alluded to, which is harvest and Halloween, because we've always had such high expectations to make change. The quality that's in the store is better than it's been ever before. It looks really good, and actually, the initial sales are decent, but it's very early, Jeff, into the third quarter. That piece of the business really doesn't pick up until September into October. So I'm trying to be pretty cautious about it, and rightly so. Based upon what's happened to us in the last 90 days or so, I don't think you'd expect me to be any other way.

---

**Jeff Stein** - ***Northcoast Research - Analyst***

Can you elaborate a little bit, Steve, on the food stamp program and when that is going to be tested and how many stores? I presume you're going to need to have the coolers and freezers in place before you get that off the ground?

---

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

Yes, that's correct. I guess I can share a little bit with you. We will have -- we've identified a little under 100 locations that probably we will be capable of going into between 70 and 80 locations, starting the end of the first quarter into early second quarter. It's an issue of getting the whole thing executed, 10 coolers in a store. And at the same time, we will be between now and the middle of the first quarter working at conversion of our register systems to be capable of handling the EBT cards.

So I think what you're going to see probably in five markets that TJ can talk to you about later on when we finalize -- we really have finalized most of them but we want to -- we're working on the final locations of what we can handle and what we can't handle and what stores we're capable of making the changes in and moving to either the front of the store or the side walls and those kinds of things. But it will be a pretty extensive program. The other piece of it that gives us a little bit more confidence that it's the right thing to do is we have the right team in place who can execute it.

We have people -- again, to Laura's comment and Meredith's comment or somebody about why we don't bring people in, we've got really good people that have joined the organization in the last six months with direct experience in other significant large retailers that have put these programs together that are now employed by us. So we have some history and understanding of how to get that executed, so we feel pretty good about that. And it's a good time to do it.

Before was not the right time to do it for us. We were not prepared to do it. We weren't operationally capable of doing it, and the register systems, until we made the investments into seven and eight, weren't capable of doing it. And now it's a function of making changes to the software to be prepared to handle them. So the coolers will go in mid-first quarter, and then we'll be able to handle the EBT cards selectively weeks after that.

---

**Jeff Stein** - ***Northcoast Research - Analyst***

Got it. Thank you.

---

**Operator**

We'll take our next question from Charles Grom with Deutsche Bank.

---

**Charles Grom** - ***Deutsche Bank - Analyst***

Thanks. Good morning. Steve, TJ, when you look at the model and you start to do this long-range plan and you look at the mix, and I think the key category here is obviously going to be the Consumables and the mix of closeouts there versus never-outs. So I'm just going to -- where are you today?

And I'm wondering, as you move towards adding more of these never-out categories, whether they're in coolers or throughout the store, what are the margin implications to the structure of the model when you take a step back from it all? Because clearly traffic is the issue, transactions are the issue, and by adding Consumables, you can drive better traffic. The offset to that is margins, so I'm just wondering what you guys have done so far on the front to analyze it.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Yes, Chuck it's TJ. I'll start, and then everyone else can chime in. I guess the only element of the LRP as it relates to Consumables that we're in a position to talk about today is really the coolers and freezers. And Steve mentioned, we do have five markets identified, representative of the country in different types of economic areas, situations, et cetera, to try to understand what that does, not just to sales of Consumables but what's the halo effect on the rest of the store. How much of our challenges today or in the last few quarters have been a function of not having enough people through the door to see our discretionary categories, as an example.

Additionally, in some of these locations, what we want to try to understand is really how is the customer shopping the store. So, one of the nice additions that we're going to execute when we put coolers in is actually looking at, for the first time, trying to gather some traffic counter data and look at conversion, et cetera. So, is it really a foot traffic issue, or is it a conversion issue? Trying to really understand that, as we not only put together the long-range plan but execute our business next year.

In terms of the long-range plan, this cooler and freezer discussion, it is important to understand it is a test. So, we tend to test things for a period of time, and then if successful, we will do as best we can to roll something like this or Rewards or a remodel program as quick as it makes sense for us. In terms of margins, I think that is what we're going to learn in the test. Everybody knows the margins in refrigerated food or coolers are challenged. And to that extent, that would put some level of pressure on the Consumables margin.

But what we don't know sitting here today is, what does that do to transactions and getting customers into shop the rest of the store and some of our discretionary businesses where we have higher margins? So, that's what we're going to learn from the test, not just do we sell Consumables, but what's the halo effect? How can we get more people interested our discretionary mix where, when we're executing well, we think we really differentiate?

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Yes, I think on top of that, Chuck, I would just add that freezers and coolers aren't the only thing that we're working on in Consumables too, because we absolutely understand there's going to be pressure on the margin on that piece of the business. What we need to do is to figure out how to surround ourselves with other pieces of business that give the customers a reason to pick up other items and at the same time maybe have an opportunity to do more. The Fresh Finds program we talked about for the last 12 months is probably double in SKU count today. We probably have almost 250 SKUs versus about 50% of that a year ago at this particular point.

We're also looking at other items to add to the food portion of Fresh Finds. If that's successful, we would expand it to the health and beauty aids parts of the business. There's an opportunity there, that, along with the international food part of the business that was almost nothing a year ago that is relatively significant to us today and will only grow into the fall season. And into next year, we have some pretty big plans. There's margin opportunity there.

So, along with understanding what we can get out of coolers and traffic and those kinds of things, we're very, very conscious of things that we can surround that piece of the business with, other margin enhancers to try to offset some of that. That clearly will not offset probably the actual hit of margin directly to the cooler piece of the business.

But if we do get better and we do get better in some of the discretionary businesses because of the increase in traffic, that's where the opportunities are, and that's why we're working so hard in Home and continued to grow in Furniture and continuing to grow the Seasonal pieces of the business, where the margins offer us much larger opportunity. And remember, again, this is a test, Chuck. It's a test.

**Charles Grom** - *Deutsche Bank - Analyst*

I got it. Okay. Just as a follow-up, Steve, one of the things you've done a great job with since you become CEO is reducing expenses, and particularly when sales were tough, call it four or five years ago. As part of the deep dive and in order to fund the potential margin implications for adding more Consumables, are there buckets of opportunities that you guys are looking at to say, you know, we can cut costs further?

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Absolutely. You know, I think it's a very good point to bring up, just because you, along with a lot of the folks on the phone, have followed us for a long period of time. We are no less consumed with taking a look at trying to figure out how to take cost out of our business than we've ever been before.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

One of the big issues, quite honestly, no pressure on anybody, but we're letting Lisa Bachmann take a look at and being responsible for the day in and day out operations of our business. And the piece of the long-range plan specifically that her and her team are responsible for is the day-to-day operations and the cost structure of the business through distribution, transportation, IT, and now, of course, adding store organization to it.

Because stores clearly is always the number one piece of the business, as we continue to operate efficiently, execute more efficiently, figuring out how to take cost out of the business without taking anything away from customer service at the same time. So you'll hear us talk in March about the cost structure of the business the same way we talk about the merchandising initiatives.

---

**Charles Grom** - ***Deutsche Bank - Analyst***

Okay. Good luck. Thanks.

---

**Operator**

We'll take our next question from Dan Wewer with Raymond James.

---

**Dan Wewer** - ***Raymond James & Associates - Analyst***

Steve, earlier you noted that you probably pushed back more on coolers and freezers than any other Hardlines CEO. In fact, I guess, probably when you joined the Company, I think you took the freezers out of the store. And you made some very cogent arguments about concerns about margins and profitability. But even now on this test, it sounds like you are still not fully embracing the potential benefits of coolers. If you look at your competitors, they're opening new stores with 18, in some cases, as many as 30 coolers in a store, and you're only talking about 10. If it's just a test, why not go full throttle with this and do something really significant, 20 or 30 coolers, to see if there's a big pay back out there?

---

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

Let me address two issues. Number one, we absolutely did the right thing when we did it. Government assistance wasn't even remotely in the range in 2005, 2006 in our first long-range plan. 2007 and into 2008, when we addressed our second long-range plan, the current administration has changed the landscape to that, and it didn't start occurring until 2008 into 2009 and 2010.

So first off, I can't be embarrassed about the fact that we've made the decision now being the right time for us to do it versus before, and I think stepping up to the plate and admitting that now is a better time for us to do it, we weren't operationally prepared to execute it, and we weren't capitalized from a register system standpoint and a software program to be able to handle it.

Number two, when each one of those retailers that you're alluding to started their program, they started with half the amount of coolers and freezers that we're putting in, in the way of a test. To say that I'm not embracing the test would be a misstatement. I don't go into any tests and the organization doesn't do anything without embracing the possibility of rolling it out. 10 is a good number for us and is significant enough from a carve-out standpoint and an inventory and a capital investment standpoint for us to get a very good idea about what's right and what's not right. Remember, our Consumables business is 30% of our business, not 60% to 65% of our business, like many of those retailers you are alluding to.

Our model is dramatically different than theirs. We're talking about a shift in our model that's going to be done intelligently over time. If this test works, we have never hesitated to roll things out much quicker than many other retailers would roll out tests. We'll know something well into 2013, and we'll be prepared into 2014, 2015 to make a commitment to the balance, as much of the chain as we can execute, if that works out and we find out from a margin standpoint and a modeling standpoint it's right for us to do.

---

**Dan Wewer** - ***Raymond James & Associates - Analyst***

Just as a follow-up on the long-range plan, is there any thought that perhaps Big Lots should attempt to simplify its merchandise model? I think when the analysts and investors are listening to the discussions, this is becoming an incredibly complex business in balancing between closeouts and never-outs. And there's just so many different categories in a small box format, and it seems like very seldom are most of the businesses performing well at the same time. But again, do you think the business, the merchandising model is getting too complicated? And when you think about the new three-year program, would you look to simplify that?



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

I think that's a real fair challenge that we challenge ourselves on, and I think we're talking an awful lot into the next three years of really concentrating on the businesses we can really be in and be more successful and have a higher degree of an opportunity of being success, as you alluded to, on a consistent basis. And probably over time, we've done a good job at moving away from a lot of the businesses we haven't been successful with. I think it will be easier for us to execute that next strategy with that in mind. And I will tell you, we're thinking about it in those terms.

---

**Dan Wewer** - *Raymond James & Associates - Analyst*

Okay, great. Thank you.

---

**Operator**

(Operator Instructions)

Next, we'll hear from Peter Keith with Piper Jaffrey.

---

**Peter Keith** - *Piper Jaffray & Co. - Analyst*

Hello. Thanks. Good morning, everyone. So, I've got a question just on the capital allocation strategy and balance sheet. I'll ask it in two parts. The $149 million that you purchased in Q2 was arguably a little bit stronger than what you've done in the past. And I'm looking for it. It looks like you maybe purchased just a little bit more in August and then you've taken on some additional debt. So, I guess, what was the thinking between the share repurchases in Q2? If trends had started to slow down a bit in June, why do they remain so heavy? And then, are we going to be a bit restricted on a go-forward basis, now that you have a pretty sizeable debt position? And it looks like you're going to have some CapEx projects looking out to next year.

---

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Yes, Peter, it's TJ. I think now would be appropriate to remind everybody that from time to time, when we do have an open trading window, the Company can put in place the 10b5-1 plan, that once the trading window closes, can be executed by our broker, regardless of whether -- what trends are. So for instance, if we put a trading plan in place and the window closes and comps go up 10 or down 10, we do not have any influence over that plan. It is set and it is not able to be pulled back. So to your question around the month of June, the Company put in place the trading plan, the window closes, and then the quarter goes on. We cannot change that plan once it goes into place.

The $149 million that we purchased in the second quarter might appear to be a large number and certainly is a lot of money there, but we have certainly done that amount or more in quarters in the past. So, a pre-arranged trading plan that's executed by our broker when the trading window is closed and cannot be pulled back by the Company is not something that we can obviously impact.

I would say, in terms of the guidance and the capital allocation strategy, to your question, if we perform at these guidance levels for the balance of the year, we end the year in round numbers with about $140 million to $150 million drawn on our credit facility. And again, that assumes no spending of the $45 million that's left under the repurchase program. So again, assuming guidance exiting fiscal 2012 with $140 million to $150 million on our credit facility, looking forward to 2013, when we would expect to generate cash, did not seem to us to be unrealistic as to what to do.

---

**Peter Keith** - *Piper Jaffray & Co. - Analyst*

Okay. Thanks for the detailed answer.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

---

**Operator**

(Operator Instructions)

We'll hear next from John Zolidis with the Buckingham Research Group.

---

**John Zolidis** - ***Buckingham Research Group - Analyst***

Good morning. Interesting to hear the capitulation on the coolers and the freezers and also the remodels. Steve, I think when I met you, you told me that you didn't want to spend any money to make the stores look better. And now it seems like you are focused on trying to do some traffic-driving initiatives versus previously only focusing on tickets. So, are you going to share traffic data with us in the future, and is that going to be a part of the focus going forward? Thanks.

---

**Steve Fishman** - ***Big Lots, Inc. - Chairman, CEO & President***

I'll separate it into two areas, and then if TJ wants to jump in. I never said that I didn't want to spend any money on the stores. What I said was, and I'll continue to do it, is spend capital where we think we can get a fair return on our investment. The Company when I joined it, John, had gone through a tremendous capital campaign and not gotten what we considered to be a fair return on investment for that investment. And that was much earlier in the previous Management's tenure. So we had some level of history that said they had spent capital and not gotten a return on investment. We have spent capital on our stores. We always have spent capital on our stores. We'll continue to do it.

What we're doing here is something slightly different. We're investing in markets that are a little bit older, seven years later -- John, not 2005, that we want to be in long term that we either have long-term leases that are very valuable to us or, in some cases, we may even own the real estate, that are going to produce continued growth and profit opportunities for us. And after 7 years, maybe 8, 9, 10 years, depending upon when they were touched the last time, could potentially bring us a benefit. And like anything, you want to invest in your assets, and you want to make sure that they're viable and in good shape. And they would be areas where we don't have the opportunity to move down the road for one reason or another and/or we like where we're at and we want to be there long term. So, that's that piece.

The other piece was on the traffic -- oh, the coolers. I don't know how to address it, other than to say that this is today, and that was a different time at that particular point. I don't consider succumbing, the term that I would use that we've decided to put coolers in. Every single business, whether it's retail or not retail model, needs to evolve and change to current times. Retail changes as fast or faster than many businesses, except for maybe the specific electronics business, the Internet businesses, software businesses, and those kinds of things. We weren't EBT capable at the time when we had these discussions. We didn't have the pressure on our traffic that we do today, so say whatever you want to.

I think it's the right thing to do now. I didn't think it was the right thing to do then. Hopefully, there will be some level of respect that people say we stepped up to the plate and said, this is good for our model as we move forward. If we take the heat that we should have done before and we didn't do it then, so be it. There's nothing I can do about that. I think we're doing the right thing for the business and for the future part of the model, and it works for 2012 and 2013 through 2015.

---

**Operator**

Again, please limit yourself to one question today. We'll hear next from Brad Thomas of KeyBanc Capital Markets.

---

**Brad Thomas** - ***KeyBanc Capital Markets - Analyst***

Yes, thanks for taking my question. Most of my questions on the domestic segment have been answered, but maybe if I could just switch gears over to Canada. And perhaps you could provide a little bit more color on how you're feeling about inventory levels and in-stocks there, the availability of closeouts that you're seeing, and how you're feeling about the store operations and staffing.

---



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**Joe Cooper** - *Big Lots, Inc. - EVP & President - Big Lots Canada*

Sure. This is Joe. I'll handle that one. There's several questions in there, but overall feeling very, very good about the progress up in Canada. We've got a very strong executive team in place now. And the merchant organization is very focused and doing a great job, actually combining a great closeout presentation in our stores, along with some real good what we call, in and out and never-out programs across the store. So, inventory levels have continued to grow since last summer, and really, I think we're in a pretty good place now. Certainly, we'll build as we approach the all important 9 Weeks of Christmas, but feeling good about the inventory assortment and the levels at this point in time.

---

**Brad Thomas** - *KeyBanc Capital Markets - Analyst*

Great. Thanks so much.

---

**Joe Cooper** - *Big Lots, Inc. - EVP & President - Big Lots Canada*

Sure.

---

**Operator**

Again, please limit yourself to one question. We'll hear next from Patrick McKeever with MKM Partners.

---

**Patrick McKeever** - *MKM Partners - Analyst*

Thanks. Good morning, everyone. So, on the three tests that you talked about for next year, Steve, the coolers and freezers, the SNAP, the -- I guess that was a combination, those two together were one. And then you talked about the new -- or looking at changes in the loyalty program, the Rewards program, and the full market remodels. You didn't mention e-commerce, so I was just wondering, that's come up in the past on some of these calls, and I was just wondering if that factored into your thinking, if you decided -- looked at that as a potential option and decided not to test that in favor of these other things. So just wondering, I guess, what your current thinking is on e-commerce.

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

We really only shared just a few issues with the long-range plan. There will be a lot more that we'll share in February, March, whenever we do our next conference call. We constantly try to figure out what the right model is for us to go online. And there will be some significant efforts before next year so that we will be prepared to talk to you about whatever online efforts we feel are in our best interest going forward. But we are absolutely looking at it.

---

**Patrick McKeever** - *MKM Partners - Analyst*

Do you feel like it's hurting you not to have -- not to be doing business online?

---

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

If I had a really good model that I thought would be capable of enhancing sales and enhancing margin, I would say yes to you. I haven't seen anybody come to market with a model yet that I really think is helping their business, other than the folks outside of, of course, an Amazon or some of the guys that are really big in it. Any major retailers that have anything short of what I'd consider to be, quite honestly, a bridal registry. Because other than that, there are people online, but I don't think anybody is significantly talking about adding to their comp store sales because of it. But we're going to look at it, and we are going to try to figure out how to be a part of it.

But hopefully, we'll figure out a way to do additional sales and make money doing it at the same time. The other piece is, is I haven't seen anybody who's talking about making money doing it, so it's a conflict. I don't want to call it like the coolers of seven years ago. We really would love to go to market online. We'd just like to figure out a model that works.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

**Patrick McKeever** - *MKM Partners - Analyst*

Okay, great. Thank you, Steve.

**Operator**

Again, please limit yourself to one question today. We'll hear next from Anthony Chukumba with BB&T Capital Markets.

**Anthony Chukumba** - *BB&T Capital Markets - Analyst*

Good morning. Had a question, Canada, it seems like results there are better than you expected, and it's like you're going to breakeven in the fourth quarter. I guess what I'm wondering is, is there a possibility that Canada has been a distraction? Because it seems like you bought the Canadian operations, like I said, they are actually performing better than you expected. But suddenly, we've seen some heightened levels of inconsistency in the U.S. operation. So how do you think about that?

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

Canada hasn't been a distraction to us.

**Joe Cooper** - *Big Lots, Inc. - EVP & President - Big Lots Canada*

Let me just add. I think part -- this is Joe. Part of the benefit of having a deep team -- as you may recall, TJ was promoted to Senior Vice President last year, and enabling me to go up North, and today he's promoted to CFO. So, I can tell you from my standpoint, Canada has not been a distraction from myself, and I'm the only committed resource out of Columbus up in Canada. So, I just support Steve's comment there.

**Anthony Chukumba** - *BB&T Capital Markets - Analyst*

Okay, thank you.

**Operator**

Again, please limit yourself to one question. Our last question will come from Matt Boss with JPMorgan.

**Matt Boss** - *JPMorgan - Analyst*

In the Consumable category, what was the impact of the Procter & Gamble deal in the quarter? Any significant deals planned for the second half? Can you speak to the closeout pipeline today?

**Tim Johnson** - *Big Lots, Inc. - SVP & CFO*

Matt, this is TJ. The Proctor & Gamble deal, as you know, or the large branded manufacture deal, delivered very late in the quarter. Really started to hit specific categories in late June and into early July and really wasn't fully set until the end of July or even the first part of August. So -- and that was anticipated. You'll recall from the last conversation we had on this conference call, we anticipated a larger-sized deal late in the quarter. We're not going to separate out for you or de-layer sales by deal, but clearly, we're excited about having the merchandise. And there's still plenty of that merchandise available in stores today. I'll defer to Steve on the closeout pipeline.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

The closeout pipeline is good and working hard with the relationships with these major branded manufactures and continues to be good and continues to flow in. And we feel really good about the balance of the third quarter and into the fourth quarter with what we've got going on, particularly when it addresses the Consumables piece of the business, which I think was really your question.

**Mark Mandel** - *ThinkEquity LLC - Analyst*

Okay, great. One last question, aside from the additional two holiday shopping days in the fourth quarter, can you speak to initiatives on the Furniture, Home, and Seasonal side? I know you spoke to the 9 Weeks of Christmas, but anything else to justify a little bit more robust assumption for the fourth quarter versus the third?

**Steve Fishman** - *Big Lots, Inc. - Chairman, CEO & President*

I think the program is solid. I think Furniture is strong. I think particularly fireplaces we have high expectations for. I think there will be more change into the fourth quarter in Furniture, particularly in upholstery, although it's the smallest quarter of the year, so I'd be more concerned about the first quarter. I think the food program and the HBC program is really good.

We had the entire field organization -- senior field organization in about three weeks ago and did a complete walk-through. We take the entire 9 weeks and we set it up here at the corporate office, end cap by end cap, pallet by pallet, promotional activity and marketing activity, sign by sign. And I think it looked terrific, and I think the inventory investments and the items are really strong. But the only reason I'm somewhat cautious is, and I mentioned it, I think, to Jeff when he asked the questions about the 9 weeks of back-to-school, the items themselves have done very, very well. The concern would be selling merchandise around it. But there's a pretty expanded program this year versus last year.

Electronics looks terrific, doing quite well at back-to-school, doing quite well now for us, even though it's not in the marketplace and there are other retailers struggling with electronics. That's our opportunity time, focusing in on accessories and tablets at this particular point, It's been very, very good for us. Hardlines looks really, really good. I'm real excited about that, and that team has done a great job. And that's been one of the strongest businesses through the first and the second quarter and the third quarter for us as a team. So, you'll tell me when you see the stores the first week of November what you think about it.

**Andy Regrut** - *Big Lots, Inc. - Director, IR*

We appreciate all of you taking the time. Thank you so much.

**Operator**

Ladies and gentlemen, a replay of this call will be available to you within the hour and will end at 11.59 PM on Thursday, September 6, 2012. You can access the replay by dialing 888-203-1112, toll-free USA and Canada, or 719-457-0820, international, and entering passcode 9878343. Again, that phone number is 888-203-1112, toll-free USA and Canada, or 719-457-0820, international, entering passcode 9878343. Ladies and gentlemen, this concludes today's presentation. Thank you for your participation. You may now disconnect.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Source: BIG LOTS INC, EX-99.2, 8/28/2012 | Powered by Intelligize

## Disclaimer

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2012 Thomson Reuters. All Rights Reserved.



© 2012 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

**Exhibit 99.3**

**FOR IMMEDIATE RELEASE**

# BIG LOTS ANNOUNCES PROMOTIONS AND ORGANIZATIONAL CHANGES

COLUMBUS, OH - (August 23, 2012) - Big Lots, Inc. (NYSE: BIG), North America's largest broadline closeout value retailer, today announced executive promotions and certain organizational changes.

Commenting on today's announcement, Steve Fishman, Chairman, CEO and President stated, “I've always believed our people are our greatest asset and that we continue to develop some of the most talented leaders in the retail industry. As our business continues to evolve, we are positioning our company for the future and rewarding performance of five of our more tenured executives.”

The following promotions are effective immediately:

Lisa M. Bachmann has been promoted to EVP, Chief Operating Officer. In her new role, she will assume responsibility for Store Operations, while retaining responsibility for the Merchandise Planning and Allocation, Information Technology and Distribution and Transportation Services departments. Ms. Bachmann will continue to serve as the company's Chief Information Officer and will continue to report directly to Mr. Fishman. Bachmann joined Big Lots in 2002 as Senior Vice President, Merchandise Planning/Allocation, and in July 2005, she assumed the additional role of Chief Information Officer. In March 2010, she was promoted to Executive Vice President and assumed responsibility for Distribution and Transportation services.

Charles W. Haubiel II has been promoted to EVP, Chief Administrative Officer. In his new role, he will assume responsibility for the Human Resources and Loss Prevention departments, while retaining responsibility for the Legal and Real Estate departments. Mr. Haubiel will continue to serve as the company's General Counsel and Corporate Secretary and will continue to report directly to Mr. Fishman. Haubiel joined Big Lots in 1997, and was promoted to Vice President, General Counsel and Corporate Secretary in 2000. He became Senior Vice President, General Counsel and Corporate Secretary in November 2004, and assumed the responsibility for Real Estate in January 2008. In March 2010, he was promoted to Executive Vice President.

John C. Martin has been promoted to EVP, Chief Merchandising Officer. In his new role, he will assume responsibility for the company's Merchandising, Global Sourcing and Marketing departments. Mr. Martin will continue to report directly to Mr. Fishman. Martin joined Big Lots in 2003 as Executive Vice President, Merchandising, and in April 2011, he shifted his focus to Executive Vice President, Administration.

Source: BIG LOTS INC, EX-99.3, 8/28/2012 | Powered by Intelligize

Timothy A. Johnson has been promoted to SVP, Chief Financial Officer. In his new role, he will assume responsibility for the Treasury and Risk Management departments and will now have responsibility for overseeing all of the financial activities of the company. Mr. Johnson will report directly to Mr. Fishman. Johnson joined Big Lots in 2000 as Director of Strategic Planning and was promoted to Vice President, Strategic Planning and Investor Relations in February 2004. He was promoted to Senior Vice President, Finance in July 2011.

Michael A. Schlonsky has been promoted to Senior Vice President, Human Resources. In his new role, he will combine responsibility for talent management with his current areas of responsibility and will have primary oversight of the Human Resources department. Mr. Schlonsky will report to Mr. Haubiel. Schlonsky joined Big Lots in 1993, was promoted to Director of Risk Management in 1998 and became a Vice President in 2000. He most recently served as Vice President, Associate Relations and Benefits.

Big Lots also announced today that Douglas N. Wurl, Executive Vice President, Merchandising, has resigned his position with the Company.

**Exhibit 4.4**

BIG LOTS
2012 LONG-TERM INCENTIVE PLAN

EFFECTIVE MAY 23, 2012

Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

CONTENTS


| | |
|---|---|
| Article 1. Establishment, Purpose, and Duration | 3 |
| Article 2. Definitions | 3 |
| Article 3. Administration | 9 |
| Article 4. Shares Subject to this Plan and Award Limitations | 10 |
| Article 5. Eligibility and Participation | 12 |
| Article 6. Options | 12 |
| Article 7. Stock Appreciation Rights | 13 |
| Article 8. Restricted Stock and Restricted Stock Units | 14 |
| Article 9. Deferred Stock Units | 16 |
| Article 10. Performance Shares, Performance Share Units, and Performance Units | 17 |
| Article 11. Cash-Based Awards and Other Stock-Based Awards | 18 |
| Article 12. Nonemployee Director Awards | 18 |
| Article 13. Qualified Performance-Based Awards and Performance Mesasures | 18 |
| Article 14. Transferability of Awards | 23 |
| Article 15. Impact of Termination of Employment or Service on Awards | 23 |
| Article 16. Substitution Awards | 24 |
| Article 17. Dividend-Equivalent Rights | 25 |
| Article 18. Beneficiary Designation | 25 |
| Article 19. Rights of Participants | 25 |
| Article 20. Change in Control | 26 |
| Article 21. Amendment, Modification, Suspension, and Termination | 27 |




Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

| | |
|---|---|
| Article 22. Withholding | 27 |
| Article 23. Successors | 28 |
| Article 24. General Provisions | 28 |




Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**Big Lots 2012 Long-Term Incentive Plan**

ARTICLE 1. ESTABLISHMENT, PURPOSE, AND DURATION

**1.1 Establishment**. Big Lots, Inc., an Ohio corporation (hereinafter referred to as the "Company"), establishes an incentive compensation plan to be known as the Big Lots 2012 Long-Term Incentive Plan (hereinafter referred to as the "Plan"), as set forth in this document.

This Plan permits the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Deferred Stock Units, Performance Shares, Performance Share Units, Performance Units, Cash-Based Awards, and Other Stock-Based Awards.

This Plan shall become effective upon shareholder approval (the "Effective Date") and shall remain in effect as provided in Section 1.3 (*Establishment, Purposes, and Duration*/*Duration of this Plan*) hereof.

**1.2 Purpose of this Plan**. This Plan is intended to promote the Company's long-term financial success by motivating performance through incentive compensation and to encourage Participants to acquire ownership interests in the Company. This Plan is also intended to provide a means whereby Employees, Directors, and Third Party Service Providers of the Company develop a sense of proprietorship and personal involvement in the development and financial success of the Company, and to encourage them to devote their best efforts to the business of the Company, thereby advancing the interests of the Company and its shareholders. A further purpose of this Plan is to provide a means through which the Company and its Affiliates may attract able individuals to become Employees or serve as Directors or Third Party Service Providers of the Company and its Affiliates and to provide a means whereby those individuals upon whom the responsibilities of the successful administration and management of the Company are of importance, can acquire and maintain stock ownership, thereby strengthening their concern for the welfare of the Company.

**1.3 Duration of this Plan**. Unless sooner terminated as provided herein, this Plan shall terminate ten (10) years from the Effective Date. After this Plan is terminated, no Awards may be granted but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and this Plan's terms and conditions. Notwithstanding the foregoing, no Incentive Stock Options may be granted more than ten (10) years after the earlier of (a) adoption of this Plan by the Board, or (b) the Effective Date.

**1.4 No More Grants Under Prior Plan**. After the Effective Date, no more grants will be made under the Prior Plan.

ARTICLE 2. DEFINITIONS

Whenever used in this Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized.

**2.1 "Affiliate"** shall mean (a) in the case of an ISO, a "parent corporation" or a "subsidiary corporation" of the Company, as those terms are defined in Code Sections 424(e) and (f), respectively; and (b) in all other cases, any other entity regardless of its form (including, but not limited to, a partnership or a limited liability company) that directly or indirectly controls, is controlled by or is under common control with, the Company within the meaning of Code Section 414(b), as modified by Code Section 409A.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.2 "Annual Award Limit"** or **"Annual Award Limits"** have the meaning set forth in Section 4.3 (*Shares Subject to this Plan and Award Limitations/Annual Award Limits*).

**2.3 "Award"** means, individually or collectively, a grant under this Plan of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Deferred Stock Units, Performance Shares, Performance Share Units, Performance Units, Cash-Based Awards, or Other Stock-Based Awards, in each case subject to the terms of this Plan. At the Committee's discretion, an Award may be granted as a Qualified Performance-Based Award.

**2.4 "Award Agreement"** means either (a) a written agreement entered into by the Company and a Participant setting forth the terms and provisions applicable to an Award granted under this Plan, or (b) a written or electronic statement issued by the Company to a Participant describing the terms and provisions of such Award, including any amendment or modification thereof. The Committee may provide for the use of electronic, internet or other non-paper Award Agreements, and the use of electronic, internet or other non-paper means for the acceptance thereof and actions thereunder by a Participant.

**2.5 "Beneficial Owner"** or **"Beneficial Ownership"** shall have the meaning ascribed to such term in Rule 13d-3 of the General Rules and Regulations under the Exchange Act.

**2.6 "Board"** or **"Board of Directors"** means the Board of Directors of the Company.

**2.7 "Cash-Based Award"** means an Award, denominated in cash, granted to a Participant as described in Article 11 (*Cash-Based Awards and Other Stock-Based Awards*).

**2.8 "Change in Control"** means any one or more of the following events:

(a) Any person or group (as defined for purposes of Section 13(d) of the Exchange Act) becomes the beneficial owner, directly or indirectly, of 20 percent or more of the outstanding equity securities of the Company entitled to vote for the election of directors;

(b) A majority of the members of the Board of Directors then in office is replaced within any period of two years or less by directors not nominated and approved by a majority of the directors in office at the beginning of such period (or their successors so nominated and approved), or a majority of the Board of Directors at any date consists of persons not so nominated and approved; or

(c) The consummation of a merger or consolidation with another entity or the sale or other disposition of all or substantially all of the Company's assets (including, without limitation, a plan of liquidation), which has been approved by shareholders of the Company.

Provided, however, the other provisions of this Section 2.8 (*Definitions/Change in Control*) notwithstanding, the term "Change in Control" shall not mean any merger, consolidation, reorganization, or other transaction in which the Company exchanges or offers to exchange newly-issued or treasury Common Shares representing 20 percent or more, but less than 50 percent, of the outstanding equity securities of the Company entitled to vote for the election of directors, for 51 percent or more of the outstanding equity securities entitled to vote for the election of at least the majority of the directors of a corporation other than the Company or an Affiliate (the "Acquired Corporation"), or for all or substantially all of the assets of the Acquired Corporation.

Provided further, if a Change in Control constitutes a payment event with respect to any Award that provides for the deferral of compensation and is subject to Code Section 409A, payments to be made upon a Change in Control shall only be made upon a "change in control event" within the meaning of Code Section 409A.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.9 "Code"** means the U.S. Internal Revenue Code of 1986, as amended from time to time. For purposes of this Plan, references to sections of the Code shall be deemed to include references to any applicable rules, regulations, and authoritative interpretations thereunder and any successor or similar provision.

**2.10 "Committee"** means the Compensation Committee of the Board or such other committee to which the Board assigns the responsibility of administering this Plan. The Committee shall consist of at least three members of the Board, each of whom may serve on the Committee only if the Board determines that he or she (a) is a "Non-employee Director" for purposes of Rule 16b-3 under the Exchange Act, (b) satisfies the requirements of an "outside director" for purposes of Code Section 162(m), and (c) qualifies as "independent" in accordance with applicable stock exchange listing standards. The members of the Committee shall be appointed from time to time by and shall serve at the discretion of the Board. If the Committee does not exist or cannot function for any reason, the members of the Board that each satisfy the requirements of an "outside director" for purposes of Code Section 162(m) may take any action under the Plan that would otherwise be the responsibility of the Committee.

**2.11 "Company"** means Big Lots, Inc., an Ohio corporation, and any successor thereto as provided in Article 23 (*Successors*) herein.

**2.12 "Covered Employee"** means any key Employee who is or may become a "Covered Employee," as defined in Code Section 162(m), and who is designated, either as an individual Employee or class of Employees, by the Committee as a "Covered Employee" under this Plan on or before the Final Pre-Establishment Date.

**2.13 "Deferred Annual Amount"** has the meaning set forth in Section 9.1 (*Deferred Stock Units/In General*).

**2.14 "Deferred Stock Unit"** means a Participant's contractual right to receive a stated number of Shares or, if provided by the Committee on the Grant Date, cash equal to the Fair Market Value of such Shares, under the Plan at the end of a specified period of time or upon the occurrence of a specified event, as further described in Section 9.1 (*Deferred Stock Units/In General*).

**2.15 "Deferral Election Form"** has the meaning set forth in Section 9.1 (*Deferred Stock Units/In General*).

**2.16 "Director"** means any individual who is a member of the Board of Directors of the Company or the board of directors of any Affiliate of the Company.

**2.17 "Disability"** means:

(a) With respect to ISOs, as that term is defined in Code Section 22(e)(3);

(b) If Disability constitutes a payment event with respect to any Award that is subject to Code Section 409A, Disability shall mean, unless the Committee determines otherwise in accordance with Code Section 409A, that the Participant is (i) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, (ii) by reason of any readily determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of at least three (3) months under an accident and health plan covering employees of the Participant's employer, or (iii) determined to be totally disabled by the Social Security Administration or the Railroad Retirement Board; and

(c) Unless the Committee determines otherwise, with respect to any other Award, a physical or mental condition that, for more than six (6) consecutive months, renders the Participant incapable, with reasonable accommodation, of performing his or her assigned duties on a full-time basis.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.18 "Dividend-Equivalent Right"** means the right to receive an amount, calculated with respect to a Full Value Award, which is determined by multiplying the number of Shares subject to the applicable Award by the per-Share cash dividend, or the per-Share Fair Market Value (as determined by the Committee) of any dividend in consideration other than cash, paid by the Company on Shares.

**2.19 "Effective Date"** has the meaning set forth in Section 1.1 (*Establishment, Purpose, and Duration/Establishment*).

**2.20 "Elective Deferred Stock Units"** has the meaning set forth in Section 9.1 (*Deferred Stock Units/In General*).

**2.21 "Eligible Individual"** means an individual who is an Employee, Director, and/or Third Party Service Provider.

**2.22 "Employee"** means any employee of the Company or any of its Affiliates.

**2.23 "Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**2.24 "Exercise Price"** means the price at which a Share may be purchased by a Participant pursuant to an Option.

**2.25 "Fair Market Value"** or **"FMV"** means a price that is equal to the opening, closing, actual, high, low, or average selling prices of a Share reported on the New York Stock Exchange ("NYSE") or other established stock exchange (or exchanges) on the applicable date, the preceding trading day, the next succeeding trading day, or an average of trading days, as determined by the Committee and, to the extent applicable, in a manner consistent with Code Section 409A. Unless the Committee determines otherwise, Fair Market Value shall be deemed to be equal to the average of the reported opening and closing prices of a Share on the most recent date on which Shares were publicly traded. In the event Shares are not publicly traded at the time a determination of their value is required to be made hereunder, the determination of their Fair Market Value shall be made by the Committee in such manner as it deems appropriate taking into account all information material to the value of the Company within the meaning of Code Section 409A.

**2.26 "Final Pre-Establishment Date"** means the last day a performance goal is considered pre-established under Code Section 162(m). As of the Effective Date, a performance goal shall be considered pre-established under Code Section 162(m) if the Committee establishes the performance goal within ninety (90) days after the commencement of the period of service to which the performance goal relates, or, in any event, no later than twenty-five percent (25%) of the period of service to which the performance goal relates has elapsed; provided that the outcome of the performance goal is substantially uncertain at the time the Committee establishes the performance goal.

**2.27 "Full Value Award"** means an Award other than an ISO, NQSO, or SAR, which is settled by the issuance of Shares.

**2.28 "Grant Date"** means the later of (a) the date the Committee establishes the terms of an Award, or (b) any later date specified in the Award Agreement. In no event may the Grant Date be earlier than the Effective Date.

**2.29 "Grant Price"** means the price established at the time of grant of an SAR pursuant to Article 7 (*Stock Appreciation Rights*), used to determine whether there is any payment due upon exercise of the SAR.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.30 "Incentive Stock Option"** or **"ISO"** means an Option to purchase Shares granted under Article 6 (*Options*) to an Employee and that is designated as an Incentive Stock Option and that meets the rules and requirements of Code Section 422, or any successor provision.

**2.31 "Insider"** shall mean an individual who is, on the relevant date, an officer, or Director of the Company or an Affiliate, or a more than ten percent (10%) Beneficial Owner of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, as determined by the Board in accordance with Section 16 of the Exchange Act.

**2.32 "Nonemployee Director"** means a Director who is not an Employee.

**2.33 "Nonemployee Director Award"** means any Award granted to a Nonemployee Director as described in Article 12 (*Nonemployee Director Awards*).

**2.34 "Nonqualified Stock Option"** or **"NQSO"** means an Option that is not intended to meet the requirements of Code Section 422, or that otherwise does not meet such requirements.

**2.35 "Option"** means an Incentive Stock Option or a Nonqualified Stock Option, as described in Article 6 (*Options*).

**2.36 "Other Stock-Based Award"** means an equity-based or equity-related Award not otherwise described by the terms of this Plan, granted pursuant to Article 11 (*Cash-Based Awards and Other Stock-Based Awards*).

**2.37 "Participant"** means any Eligible Individual as set forth in Article 5 (*Eligibility and Participation*) to whom an Award is granted.

**2.38 "Performance Measures"** means business criteria or measures as described in Article 13 (*Qualified Performance-Based Awards and Performance Measures*) on which the performance goals are based and which are approved by the Company's shareholders pursuant to this Plan in order to qualify Awards for the exception for qualified performance-based compensation of Code Section 162(m).

**2.39 "Performance Period"** means the period of time during which the performance goals must be met in order to determine the degree of payout and/or vesting with respect to an Award.

**2.40 "Performance Share"** means a grant of a stated number of Shares to a Participant under the Plan that is forfeitable by the Participant until the attainment of specified performance goals, or until otherwise determined by the Committee or in accordance with the Plan, subject to the continuous employment of the Participant through the applicable Performance Period.

**2.41 "Performance Share Unit"** means a Participant's contractual right to receive a stated number of Shares or, if provided by the Committee on or after the Grant Date, cash equal to the Fair Market Value of such Shares, under the Plan at a specified time that is forfeitable by the Participant until the attainment of specified performance goals, or until otherwise determined by the Committee or in accordance with the Plan, subject to the continuous employment of the Participant through the applicable Performance Period.

**2.42 "Performance Unit"** means a Participant's contractual right to receive a cash-denominated award, payable in cash or Shares, under the Plan at a specified time that is forfeitable by the Participant until the attainment of specified performance goals, or until otherwise determined by the Committee or in accordance with the Plan, subject to the continuous employment of the Participant through the applicable Performance Period.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.43 "Person"** shall have the meaning ascribed to such term in Section 3(a)(9) of the Exchange Act and used in Sections 13(d) and 14(d) thereof, including a "group" as defined in Section 13(d) thereof.

**2.44 "Plan"** means the Big Lots 2012 Long-Term Incentive Plan.

**2.45 "Plan Year"** means the Company's fiscal year**.**

**2.46 "Prior Plan"** means the Big Lots 2005 Long-Term Incentive Plan, as amended and restated, effective May 27, 2010.

**2.47 "Qualified Performance-Based Awards"** means compensation under an Award that is intended to satisfy the requirements of Code Section 162(m) for certain performance-based compensation paid to Covered Employees. Notwithstanding the foregoing, nothing in this Plan shall be construed to mean that an Award which does not satisfy the requirements for performance-based compensation under Code Section 162(m) does not constitute performance-based compensation for other purposes.

**2.48 "Restricted Stock**" means an Award granted to a Participant pursuant to Article 8 (*Restricted Stock and Restricted Stock Units*).

**2.49 "Restricted Stock Unit"** means an Award granted to a Participant pursuant to Article 8 (*Restricted Stock and Restricted Stock Units*), except no Shares are actually awarded to the Participant on the Grant Date.

**2.50 "Restriction Period"** means the period when Restricted Stock, Restricted Stock Units, Deferred Stock Units and/or Other Stock-Based Awards are subject to a substantial risk of forfeiture (based on the passage of time, the achievement of performance goals, or upon the occurrence of other events as determined by the Committee, in its discretion).

**2.51 "Share"** means a common share of the Company, par value $.01 per share (as such par value may be amended from time to time), whether presently or hereafter issued, and any other stock or security resulting from adjustment thereof as described hereinafter, or a share of common stock of any successor pursuant to Article 23 (*Successors*).

**2.52 "Share Authorization"** has the meaning set forth in Section 4.1(a) (*Shares Subject to this Plan and Award Limitations/Share Authorization*).

**2.53 "Stock Appreciation Right"** or "**SAR**" means an Award, designated as an SAR, pursuant to the terms of Article 7 (*Stock Appreciation* Rights) herein.

**2.54 "Termination of Employment or Service"** means the occurrence of any act or event that causes a Participant to cease being an employee of the Company and any Affiliate, including, without limitation, death, Disability, dismissal, severance at the election of the Participant, or severance as a result of the discontinuance, liquidation, sale, or transfer by the Company or its Affiliates of a business owned or operated by the Company or any Affiliate. With respect to any Participant who is not an employee of the Company or any Affiliate, the Award Agreement shall establish what act or event shall constitute a Termination of Employment or Service for purposes of this Plan. A Termination of Employment or Service shall occur with respect to a Participant who is employed by an Affiliate if the Affiliate shall cease to be an Affiliate and the Participant shall not immediately thereafter become an employee of the Company or an Affiliate. Notwithstanding the foregoing, as described in Section 15.4 (*Impact of Termination of Employment or Service on Awards/Change in Participant Status*), no Termination of Employment or Service shall occur if the Participant continues to be an Employee, Director, or Third Party Service Provider after such termination. Provided, however, if a Termination of Employment or Service constitutes a payment event with respect to any Award that provides for the deferral of compensation and is subject to Code Section 409A, payments to be made upon a Termination of Employment or Service shall only be made upon a "separation from service" within the meaning of Code Section 409A.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**2.55 "Third Party Service Provider"** means any consultant, agent, advisor, or independent contractor who renders services to the Company or an Affiliate pursuant to a written agreement that (a) are not in connection with the offer and sale of the Company's securities in a capital raising transaction, and (b) do not directly or indirectly promote or maintain a market for the Company's securities.

## ARTICLE 3. ADMINISTRATION

**3.1 General**. The Committee shall be responsible for administering this Plan, subject to this Article 3 (*Administration*) and the other provisions of this Plan. The Committee may employ attorneys, consultants, accountants, agents, and other individuals, any of whom may be an Employee, and the Committee, the Company, and its officers and Directors shall be entitled to rely upon the advice, opinions, or valuations of any such individuals. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Participants, the Company, and all other interested individuals.

**3.2 Authority of the Committee**. The Committee shall have full and exclusive discretionary power to interpret the terms and the intent of this Plan and any Award Agreement or other agreement or document ancillary to or in connection with this Plan, to determine eligibility for Awards and to adopt such rules, regulations, forms, instruments, and guidelines for administering this Plan as the Committee may deem necessary or proper. Such authority shall include, but not be limited to, (a) selecting Participants, (b) establishing all Award terms and conditions, including the terms and conditions set forth in Award Agreements and any ancillary document or materials, (c) granting Awards as an alternative to or as the form of payment for grants or rights earned or due under compensation plans or arrangements of the Company, (d) construing any ambiguous provision of the Plan or any Award Agreement, (e) establishing performance goals, and for Qualified Performance-Based Awards, establishing and certifying satisfaction of performance goals in accordance with the requirements of Code Section 162(m), (f) subject to Article 21 (*Amendment, Modification, Suspension, and Termination*), adopting modifications and amendments to this Plan or any Award Agreement, including without limitation, any that are necessary to comply with the laws of the countries and other jurisdictions in which the Company or its Affiliates operate, and (g) making any other determination and taking any other action that it deems necessary or desirable for the administration or operation of the Plan and/or any Award Agreement.

**3.3 Delegation**. The Committee may delegate to one or more of its members or to one or more officers of the Company or its Affiliates or to one or more agents or advisors such administrative duties or powers as it may deem advisable, and the Committee or any individuals to whom it has delegated duties or powers as aforesaid may employ one or more individuals to render advice with respect to any responsibility the Committee or such individuals may have under this Plan. Subject to applicable law, the Committee may authorize one or more officers of the Company to do one or more of the following on the same basis as can the Committee: (a) designate Employees to be recipients of Awards; (b) designate Third Party Service Providers to be recipients of Awards; and (c) determine the size of and make any such Awards; provided, however, (i) the Committee shall not delegate such responsibilities to any such officer for Awards granted to a Nonemployee Director or an Employee who is considered an Insider; (ii) the Committee shall not delegate any duties required to be taken by the Committee to comply with Code Section 162(m); and (iii) the officer(s) shall report periodically to the Committee regarding the nature and scope of the Awards granted pursuant to the authority delegated.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

ARTICLE 4. SHARES SUBJECT TO THIS PLAN AND AWARD LIMITATIONS

**4.1 Number of Shares Available for Awards**.

(a) **Share Authorization**. Subject to adjustment as provided in Section 4.4 (*Shares Subject to this Plan and Award Limitations/Adjustments in Authorized* Shares) herein, the maximum number of Shares available for grant to Participants under this Plan (the "Share Authorization") shall be:

(i) seven million seven hundred fifty thousand (7,750,000) Shares, plus

(ii) any Shares subject to the 4,702,362 outstanding awards as of March 15, 2012 under the Prior Plan that on or after March 15, 2012 cease for any reason to be subject to such awards (other than by reason of exercise or settlement of the awards to the extent they are exercised for or settled in vested and nonforfeitable Shares).

(b) **Limit on Full Value Awards**. To the extent that a Share is issued pursuant to the grant or exercise of a Full Value Award, it shall reduce the Share Authorization by two and fifteen one-hundredths (2.15) Shares; and, to the extent that a Share is issued pursuant to the grant or exercise of an Award other than a Full Value Award, it shall reduce the Share Authorization by one (1) Share.

(c) **Limits on ISOs**. The maximum number of Shares of the Share Authorization that may be issued pursuant to the exercise of ISOs granted under this Plan shall be seven million seven hundred fifty thousand (7,750,000) Shares.

(d) **Minimum Vesting Requirements for Awards**. Except with respect to a maximum of five percent (5%) of the Share Authorization, any Full Value Awards which vest on the basis of the Participant's continued employment with or provision of service to the Company shall not provide for vesting which is any more rapid than annual pro rata vesting over a three (3) year period, and any Full Value Awards which vest upon the attainment of performance goals shall provide for a performance period of at least twelve (12) months. Notwithstanding the foregoing, the Committee may permit acceleration of vesting of such Full Value Awards in the event of the Participant's death, Disability, or retirement, or a Change in Control. The Committee shall, in its sole discretion, determine the vesting schedule, if any, that will apply to Awards that are not Full Value Awards.

**4.2 Share Usage**. Subject to the terms of this Plan, Shares covered by an Award shall only be counted as used to the extent they are actually issued. Any Shares related to Awards which (a) terminate by expiration, forfeiture, cancellation, or otherwise without the issuance of such Shares, (b) are settled in cash in lieu of Shares, or (c) are exchanged with the Committee's permission prior to the issuance of Shares for Awards not involving Shares, shall be available again for grant under this Plan. Shares which are (i) not issued or delivered as a result of the net settlement of an Option or Share-settled SAR, (ii) withheld to satisfy tax withholding obligations on an Option or SAR issued under the Plan, (iii) tendered to pay the Exercise Price of an Option or the Grant Price of a Stock Appreciation Right under the Plan, or (iv) repurchased on the open market with the proceeds of an Option exercise will no longer be eligible to be again available for grant under this Plan. To the extent permitted by applicable law or stock exchange rule, Shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form of combination by the Company or any Affiliate shall not be counted against Shares available for grant pursuant to the Plan. The Shares available for issuance under this Plan may be authorized and unissued Shares or treasury Shares.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**4.3 Annual Award Limits**. The following limits (each an "Annual Award Limit" and, collectively, "Annual Award Limits"), as adjusted pursuant to Section 4.4 (*Shares Subject to this Plan and Award Limitations/Adjustments in Authorized* Shares) and/or Section 21.2 (*Amendment, Modification, Suspension, and Termination/Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events*), shall apply to grants of such Awards under this Plan:

(a) **Options**: The maximum aggregate number of Shares subject to Options granted in any one Plan Year to any one Participant shall be two million (2,000,000).

(b) **SARs**: The maximum number of Shares subject to Stock Appreciation Rights granted in any one Plan Year to any one Participant shall be two million (2,000,000).

(c) **Restricted Stock**: The maximum aggregate grant with respect to Awards of Restricted Stock in any one Plan Year to any one Participant shall be one million (1,000,000).

(d) **Restricted Stock Units**: The maximum aggregate grant with respect to Awards of Restricted Stock Units in any one Plan Year to any one Participant shall be one million (1,000,000).

(e) **Deferred Stock Units**: The maximum aggregate grant with respect to Awards of Deferred Stock Units in any one Plan Year to any one Participant shall be one million (1,000,000).

(f) **Performance Shares, Performance Share Units, or Performance Units**: The maximum aggregate Award of Performance Shares, Performance Share Units or Performance Units that a Participant may receive in any one Plan Year shall be one million (1,000,000) Shares, or equal to the value of one million (1,000,000) Shares, determined as of the Grant Date.

(g) **Cash-Based Awards**: The maximum aggregate amount awarded or credited with respect to Cash-Based Awards to any one Participant in any one Plan Year may not exceed the greater of seven million dollars ($7,000,000) or the value of one million (1,000,000) Shares, determined as of the Grant Date.

(h) **Other Stock-Based Awards**: The maximum aggregate grant with respect to Other Stock-Based Awards pursuant to Section 11.2 (*Cash-Based Awards and Other Stock-Based Awards/Other Stock-Based Awards*) in any one Plan Year to any one Participant shall be one million (1,000,000) Shares.

**4.4 Adjustments in Authorized Shares**. In the event of any corporate event or transaction (including, but not limited to, a change in the Shares of the Company or the capitalization of the Company) such as a merger, consolidation, reorganization, recapitalization, separation, partial or complete liquidation, stock dividend, special cash dividend, stock split, reverse stock split, split up, spin-off, or other distribution of stock or property of the Company, combination of Shares, exchange of Shares, dividend in kind, or other like change in capital structure, number of outstanding Shares or distribution (other than normal cash dividends) to shareholders of the Company, or any similar corporate event or transaction, the Committee, in order to prevent dilution or enlargement of Participants' rights under this Plan, shall substitute or adjust, as applicable, the number and kind of Shares that may be issued under this Plan or under particular forms of Awards, the number and kind of Shares subject to outstanding Awards, the Exercise Price or Grant Price applicable to outstanding Awards, the Annual Award Limits, and other value determinations applicable to outstanding Awards. Any such adjustment shall be done in a manner consistent with Code Section 409A and, where applicable, Code Section 424. The Committee may also make appropriate adjustments in the terms of any Awards under this Plan to reflect such changes or distributions, including modifications of performance goals and changes in the length of Performance Periods as permitted by Code Section 162(m), or as the Committee otherwise determines. The determination of the Committee as to the foregoing adjustments, if any, shall be at the discretion of the Committee and shall be conclusive and binding on Participants under this Plan.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

Subject to the provisions of Article 21 (*Amendment, Modification, Suspension, and Termination*) and notwithstanding anything else herein to the contrary, without affecting the number of Shares reserved or available hereunder, the Committee may authorize the issuance or assumption of benefits under this Plan in connection with any merger, consolidation, acquisition of property or stock, or reorganization upon such terms and conditions as it may deem appropriate (including, but not limited to, a conversion of equity awards into Awards under this Plan), subject to compliance with the rules under Code Sections 409A, 422 and 424, to the extent applicable.

## ARTICLE 5. ELIGIBILITY AND PARTICIPATION

**5.1 Eligibility**. Individuals eligible to participate in this Plan include all Employees, Directors, and Third Party Service Providers.

**5.2 Actual Participation**. Subject to the provisions of this Plan, the Committee may, from time to time, select from the Eligible Individuals, those individuals to whom Awards shall be granted. Grants need not be uniform as among Participants.

**5.3 Conditions of Participation**. By accepting an Award, each Participant agrees in his or her own behalf and in behalf of his or her beneficiaries (1) to be bound by the terms of the Award Agreement and the Plan and (2) that the Committee (or the Board) may amend the Plan and the Award Agreement without any additional consideration to the extent necessary to avoid penalties arising under Code Section 409A, even if those amendments reduce, restrict or eliminate rights or Awards granted under the Plan or an Award Agreement (or both) before those amendments; provided, however, that the Company or the Committee may (but neither is required to) reimburse an affected Participant or his or her beneficiary for any diminution in the value of an Award associated with any such change.

## ARTICLE 6. OPTIONS

**6.1 Grant of Options**. Subject to the terms and provisions of this Plan, Options may be granted to Eligible Individuals in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee; provided that ISOs may be granted only to Employees of the Company or of any parent or subsidiary corporation (as permitted under Code Sections 422 and 424). However, unless legitimate business criteria exist (within the meaning of Treas. Reg. Section 1.409A-1(b)(5)(iii)(E)(1)), an Eligible Individual may only be granted Options to the extent that such individual provides services to the Company or an Affiliate of the Company that is part of the Company’s controlled group for purposes of Code Section 409A.

**6.2 Option Award Agreement**. Each Option grant shall be evidenced by an Award Agreement that shall specify the Exercise Price, the term of the Option, the number of Shares to which the Option pertains, the conditions upon which an Option shall become vested and exercisable, and such other provisions as the Committee shall determine which are not inconsistent with the terms of this Plan. The Award Agreement also shall specify whether the Option is intended to be an ISO or a NQSO.

**6.3 Exercise Price**. The Exercise Price for each grant of an Option shall be determined by the Committee and shall be specified in the Award Agreement; provided, however, the Exercise Price must be at least equal to (a) one hundred percent (100%) of the FMV of the Shares as determined on the Grant Date, or (b) one hundred ten percent (110%) of the FMV of the Shares as determined on the Grant Date in the case of an ISO granted to an individual who owns or who is deemed to own shares possessing more than ten percent (10%) of the total combined voting power of all classes of shares of the Company or any Affiliate, as determined under Code Section 422.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**6.4 Term of Options**. Each Option granted to a Participant shall expire at such time as the Committee shall determine at the time of grant; provided, however, no Option shall be exercisable earlier than six (6) months after the Grant Date or later than the seventh (7th) anniversary date of the Grant Date.

**6.5 Exercise of Options**. Options granted under this Article 6 (*Options*) shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance approve, which terms and restrictions need not be the same for each grant or for each Participant.

Options granted under this Article 6 (*Options*) shall be exercised by the delivery of a notice of exercise to the Company or an agent designated by the Company in a form specified or accepted by the Committee (setting forth the number of Shares with respect to which the Option is to be exercised, accompanied by full payment for the Shares), or by complying with any alternative exercise procedure(s) the Committee may authorize.

**6.6 Payment**. A condition of the issuance of the Shares as to which an Option shall be exercised shall be the payment of the Exercise Price. The Exercise Price of any Option shall be payable to the Company in full either: (a) in cash; (b) by tendering (either by actual delivery or attestation) previously acquired Shares having an aggregate Fair Market Value at the time of exercise equal to the Exercise Price (provided that except as otherwise determined by the Committee, the Shares that are tendered must have been held by the Participant for at least six (6) months (or such other longer period, if any, as the Committee may permit) prior to their tender to satisfy the Exercise Price if acquired under this Plan or any other compensation plan maintained by the Company or have been purchased on the open market); (c) by a cashless (broker-assisted) exercise; (d) by a combination of (a), (b) and/or (c); or (e) any other method approved or accepted by the Committee in its sole discretion.

Subject to any governing rules or regulations, as soon as practicable after receipt of written notification of exercise and full payment (including satisfaction of any applicable tax withholding), the Company shall deliver to the Participant evidence of book entry Shares or Share certificates in an appropriate amount based upon the number of Shares purchased under the Option(s).

Unless otherwise determined by the Committee, all payments under all of the methods indicated above shall be paid in United States dollars.

**6.7 Other Conditions and Restrictions**. The Committee may impose such other conditions and/or restrictions on any Shares acquired pursuant to the exercise of an Option granted under this Article 6 (*Options*) as it may deem advisable or desirable. Such conditions and restrictions may include, but shall not be limited to, minimum holding period requirements, restrictions under applicable federal securities laws, under the requirements of any stock exchange or market upon which such Shares are then listed and/or traded, or under any blue sky or state securities laws applicable to such Shares.

**6.8 Notification of Disqualifying Disposition**. If any Participant shall make any disposition of Shares issued pursuant to the exercise of an ISO under the circumstances described in Code Section 421(b) (relating to certain disqualifying dispositions), such Participant shall notify the Company of such disposition within ten (10) days thereof.

## ARTICLE 7. STOCK APPRECIATION RIGHTS

**7.1 Grant of SARs**. Subject to the terms and conditions of this Plan, SARs may be granted to Eligible Individuals in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee. However, unless legitimate business criteria exist (within the meaning of Treas. Reg. Section 1.409A-1(b)(5)(iii)(E)(1)), an Eligible Individual may only be granted SARs to the extent that such individual provides services to the Company or an Affiliate of the Company that is part of the Company's controlled group for purposes of Code Section 409A.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**7.2 SAR Award Agreement**. Each SAR Award shall be evidenced by an Award Agreement that shall specify the Grant Price, the term of the SAR, and such other provisions as the Committee shall determine which are not inconsistent with the terms of this Plan.

**7.3 Grant Price**. The Grant Price for each grant of an SAR shall be determined by the Committee and shall be specified in the Award Agreement; provided, however, the Grant Price must be at least equal to one hundred percent (100%) of the FMV of the Shares as determined on the Grant Date.

**7.4 Term of SAR**. Each SAR granted to a Participant shall expire at such time as the Committee shall determine at the time of grant; provided, however, no SAR shall be exercisable earlier than six (6) months after the Grant Date or later than the seventh (7th) anniversary date of the Grant Date.

**7.5 Exercise of SARs**. SARs may be exercised upon whatever terms and conditions the Committee, in its sole discretion, imposes.

**7.6 Settlement of SARs**. Upon the exercise of a SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(a) The excess of the Fair Market Value of a Share on the date of exercise over the Grant Price; by

(b) The number of Shares with respect to which the SAR is exercised.

At the discretion of the Committee, the payment upon SAR exercise may be in cash, Shares, or any combination thereof, or in any other manner approved by the Committee in its sole discretion. The Committee's determination regarding the form of SAR payout shall be set forth in the Award Agreement pertaining to the grant of the SAR.

**7.7 Other Conditions and Restrictions**. The Committee may impose such other conditions and/or restrictions on any Shares received upon exercise of an SAR granted pursuant to this Plan as it may deem advisable or desirable. Such conditions and restrictions may include, but shall not be limited to, a requirement that the Participant hold the Shares received upon exercise of an SAR for a specified period of time.

## ARTICLE 8. RESTRICTED STOCK AND RESTRICTED STOCK UNITS

**8.1 Grant of Restricted Stock or Restricted Stock Units**. Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Shares of Restricted Stock and/or Restricted Stock Units to Eligible Individuals in such amounts as the Committee shall determine. Restricted Stock Units shall be similar to Restricted Stock except that no Shares are actually awarded to the Eligible Individual on the Grant Date.

**8.2 Restricted Stock or Restricted Stock Unit Award Agreement**. Each Award of Restricted Stock and/or Restricted Stock Unit shall be evidenced by an Award Agreement that shall specify the Restriction Period, the number of Shares of Restricted Stock or the number of Restricted Stock Units granted, and such other provisions as the Committee shall determine which are not inconsistent with the terms of this Plan.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**8.3 Other Conditions and Restrictions**. The Committee may impose such other conditions and/or restrictions on any Shares of Restricted Stock or Restricted Stock Units granted pursuant to this Plan as it may deem advisable or desirable. Such conditions and restrictions may include, but shall not be limited to, without limitation, a requirement that the Participant pay a stipulated purchase price for each Share of Restricted Stock or each Restricted Stock Unit, restrictions based upon the achievement of specific performance goals, acceleration of a Restriction Period based on the achievement of performance goals, time-based restrictions on vesting following the attainment of the performance goals, time-based restrictions, and/or restrictions under applicable laws or under the requirements of any stock exchange or market upon which such Shares are listed or traded, or holding requirements or sale restrictions placed on the Shares by the Company upon vesting of such Restricted Stock or Restricted Stock Units.

To the extent deemed appropriate by the Committee, the Company may retain the certificates representing Shares of Restricted Stock in the Company's possession until such time as all conditions and/or restrictions applicable to such Shares have been satisfied or lapse. Except as otherwise provided in this Article 8 (*Restricted Stock and Restricted Stock Units*), Shares of Restricted Stock covered by each Restricted Stock Award shall become freely transferable by the Participant after all conditions and restrictions applicable to such Shares have been satisfied or lapse (including satisfaction of any applicable tax withholding obligations), and Restricted Stock Units shall be settled in cash, Shares, or a combination of cash and Shares as the Committee, in its sole discretion shall determine.

**8.4 Certificate Legend**. In addition to any legends placed on certificates pursuant to Section 8.3 (*Restricted Stock and Restricted Stock Units/Other Conditions and Restrictions*), each certificate representing Shares of Restricted Stock granted pursuant to this Plan may bear a legend such as the following or as otherwise determined by the Committee in its sole discretion:

"The sale or transfer of Shares of stock represented by this certificate, whether voluntary, involuntary, or by operation of law, is subject to certain restrictions on transfer as set forth in the Big Lots 2012 Long-Term Incentive Plan, and in the associated Award Agreement. A copy of this Plan and such Award Agreement may be obtained from Big Lots, Inc."

**8.5 Rights**. Unless otherwise determined by the Committee and set forth in a Participant's Award Agreement, to the extent permitted or required by law, as determined by the Committee, Participants holding Shares of Restricted Stock granted hereunder shall have the right to exercise full voting rights with respect to those Shares during the Period of Restriction. Unless otherwise determined by the Committee and set forth in a Participant's Award Agreement, a Participant receiving a Restricted Stock Award will have, with respect to the Restricted Stock, all of the rights of a shareholder of the Company holding the class of Shares that is the subject of the Restricted Stock, including, if applicable, the right to vote the shares and the right to receive any Dividend-Equivalent Rights pursuant to Article 17 (*Dividend-Equivalent Rights*) of this Plan. Any dividends paid on Restricted Stock will be subject to the same restrictions that affect the Restricted Stock with respect to which the dividend was paid. Dividends paid out of escrow will be treated as remuneration for employment unless an election has been made under Section 8.6 (*Restricted Stock and Restricted Stock Units/Section 83(b) Election*). A Participant shall have no voting rights with respect to any Restricted Stock Units granted hereunder. A Participant shall have no dividend rights with respect to any Restricted Stock Units granted hereunder unless the Participant is also granted Dividend-Equivalent Rights.

**8.6 Section 83(b) Election**. The Committee may provide in an Award Agreement that the Award of Restricted Stock is conditioned upon the Participant making or refraining from making an election with respect to the Award under Code Section 83(b). If a Participant makes an election pursuant to Code Section 83(b) concerning a Restricted Stock Award, the Participant shall be required to file promptly a copy of such election with the Company.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

## ARTICLE 9. DEFERRED STOCK UNITS

**9.1 In General**. The Committee may, in accordance with the requirements of Code Section 409A, permit an Employee or Director to elect to defer receipt of all or a portion of his annual compensation, annual incentive bonus and/or long-term compensation (other than Options or SARs) ("Deferred Annual Amount") payable by the Company or an Affiliate and receive in lieu thereof an Award of elective Deferred Stock Units equal to the number which may be obtained by dividing (a) the amount of the Deferred Annual Amount, by (b) the Fair Market Value of a Share on the date such compensation and/or annual bonus would otherwise have been paid ("Deferred Stock Units"). Deferred Stock Units shall be evidenced by a deferral election form ("Deferral Election Form") containing such terms and conditions not inconsistent with this Plan or Code Section 409A as the Committee shall determine, including customary representations, warranties and covenants with respect to securities law matters. The Deferral Election Form shall serve as the Award Agreement for the Deferred Stock Units. Upon receipt of a Deferral Election Form, the Company shall establish a notional account for the Participant and will record in such account the number of Shares underlying the Deferred Stock Units awarded to the Participant. No Shares will be issued to the Participant at the time Deferred Stock Units are credited in connection with a Deferral Election Form.

**9.2 Rights as a Stockholder**. The Committee may, in its discretion, provide in the Deferral Election Form related to a Deferred Stock Unit, that Dividend Equivalent Rights shall be granted with respect to such Deferred Stock Unit, and if Dividend Equivalent Rights are granted, whether such Dividend Equivalent Rights shall be currently paid to, or credited to the account of, a Participant credited with Deferred Stock Units. Unless otherwise provided by the Committee in the Deferral Election Form, (a) any cash dividends or distributions credited to the Participant's account shall be deemed to have been invested in additional Deferred Stock Units on the record date established for the related dividend or distribution in an amount equal to the number which may be obtained by dividing (i) the value of such dividend or distribution on the record date by (ii) the Fair Market Value of a Share on such date, and such additional Deferred Stock Units shall be subject to the same terms and conditions as are applicable in respect of the Deferred Stock Units with respect to which such dividends or distributions were payable, and (b) if any such dividends or distributions are paid in Shares or other securities, such shares and other securities shall be subject to the same Restriction Period and other restrictions, if any, as apply to the Deferred Stock Units with respect to which they were paid. A Participant shall not have any rights as a shareholder in respect of Deferred Stock Units awarded pursuant to the Plan (including, without limitation, the right to vote on any matter submitted to the Company's shareholders) until such time as the Shares attributable to such Deferred Stock Units have been issued to such Participant or his beneficiary.

**9.3 Vesting**. Unless otherwise provided in the Deferral Election Form related to a Deferred Stock Unit, each Deferred Stock Unit, together with any Dividend-Equivalent Rights credited with respect thereto, shall not be subject to any Restriction Period and shall be non-forfeitable at all times.

**9.4 Settlement**. Subject to Article 24 (*General Provisions*), and the last sentence of Section 9.1 (*Deferred Stock Units/In General*), unless otherwise provided in the Deferral Election Form related to a Deferred Stock Unit, the Company shall issue the Shares underlying any of a Participant's Deferred Stock Units (and any related Dividend-Equivalent Rights) credited to such Participant's account under this Plan within ninety (90) days following the date of such Participant's Termination of Employment or Service (or such other Code Section 409A-compliant distribution event as may be elected by the Participant in the initial Deferral Election Form in accordance with the rules and procedures of the Committee and Code Section 409A). The Committee may provide, or the Participant may elect, in the Deferral Election Form applicable to any Deferred Stock Unit that, in lieu of issuing Shares in settlement of that Deferred Stock Units, the Fair Market Value of the Shares corresponding to such Deferred Stock Units shall be paid in cash. For each Share received in settlement of Deferred Stock Units, the Company shall deliver to the Participant a certificate representing such Share, bearing appropriate legends, if applicable. Notwithstanding any other provision of the Plan to the contrary, any distribution that complies with Code Section 409A shall be deemed for all purposes to comply with the Plan requirements regarding the time and form of distributions.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**9.5 Further Deferral Elections**. If permitted by the Committee in the Deferral Election Form, a Participant may, elect to further defer receipt of Shares issuable in respect of Deferred Stock Units in accordance with the requirements of Code Section 409A. Any such redeferral election shall be valid only if : (a) such election does not take effect until at least twelve (12) months after the date on which it is made; (b) in the case of an election not related to a payment on account of Disability, death, or an unforeseeable emergency (within the meaning of Code Section 409A), the distribution is deferred for at least five (5) years from the date such distribution would otherwise have been paid; and (c) any election related to a distribution at a specified time or pursuant to a fixed schedule (within the meaning of Code Section 409A) is made at least twelve (12) months prior to the date on which distributions are otherwise scheduled to be paid. Any redeferral election in accordance with this paragraph shall be irrevocable on the date it is filed with the Committee unless subsequently changed pursuant to this paragraph.

ARTICLE 10. PERFORMANCE SHARES, PERFORMANCE SHARE UNITS, AND PERFORMANCE UNITS

**10.1 Grant of Performance Shares, Performance Share Units, and Performance Units**. Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Performance Shares, Performance Share Units, and/or Performance Units to Eligible Individuals in such amounts and upon such terms as the Committee shall determine.

**10.2 Value of Performance Shares, Performance Share Units, and Performance Units**. Each Performance Share and each Performance Share Unit shall have an initial value equal to the Fair Market Value of a Share on the Grant Date. Each Performance Unit shall have an initial value that is established by the Committee at the time of grant. The Committee shall set performance goals in its discretion which, depending on the extent to which they are met, will determine the value and/or number of Performance Shares, Performance Share Units, and/or Performance Units that will be paid out to the Participant.

**10.3 Earning of Performance Shares, Performance Share Units, and Performance Units**. Subject to the terms of this Plan, after the applicable Performance Period has ended, the holder of Performance Shares, Performance Share Units, and/or Performance Units shall be entitled to receive payout on the value and number of Performance Shares, Performance Share Units, and/or Performance Units earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding performance goals have been achieved. Performance goals may include minimum, maximum and target levels of performance, with the size of the Award or payout of Performance Shares, Performance Share Units or Performance Units or the vesting or lapse of restrictions with respect thereto, based on the level attained. The Committee may also provide in any such Award that any evaluation of performance against a performance goal may include or exclude events that occur during a Performance Period (including the income tax effects attributable thereto), singularly or in combination.

**10.4 Form and Timing of Payment of Performance Shares, Performance Share Units, and Performance Units**. Payment of earned Performance Shares, Performance Share Units, and/or Performance Units shall be as determined by the Committee and as evidenced in the Award Agreement. Subject to the terms of this Plan, the Committee, in its sole discretion, may pay earned Performance Shares, Performance Share Units, and/or Performance Units in the form of cash or in Shares (or in a combination thereof) equal to the value of the earned Performance Shares, Performance Share Units, and/or Performance Units at the close of the applicable Performance Period, but no later than the fifteenth (15th) day of the third month after the year in which the Performance Period ended. Any Shares may be granted subject to any restrictions deemed appropriate by the Committee. The determination of the Committee with respect to the form of payout of such Awards shall be set forth in the Award Agreement pertaining to the grant of the Award.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

## ARTICLE 11. CASH-BASED AWARDS AND OTHER STOCK-BASED AWARDS

**11.1 Grant of Cash-Based Awards**. Subject to the terms and provisions of the Plan, the Committee, at any time and from time to time, may grant Cash-Based Awards to Eligible Individuals in such amounts and upon such terms as the Committee may determine.

**11.2 Other Stock-Based Awards**. The Committee, at any time and from time to time, may grant to Eligible Individuals other types of equity-based or equity-related Awards not otherwise described by the terms of this Plan (including the grant or offer for sale of unrestricted Shares) in such amounts and subject to such terms and conditions, as the Committee shall determine. Such Awards may involve the transfer of actual Shares to Participants, or payment in cash or otherwise of amounts based on the value of Shares and may include, without limitation, Awards designed to comply with or take advantage of the applicable local laws of jurisdictions other than the United States.

**11.3 Value of Cash-Based and Other Stock-Based Awards**. Each Cash-Based Award shall specify a payment amount or payment range as determined by the Committee. Each Other Stock-Based Award shall be expressed in terms of Shares or units based on Shares, as determined by the Committee. The Committee may establish performance goals in its discretion. If the Committee exercises its discretion to establish performance goals, the number and/or value of Cash-Based Awards or Other Stock-Based Awards that will be paid out to the Participant will depend on the extent to which the performance goals are met.

**11.4 Payment of Cash-Based Awards and Other Stock-Based Awards**. Payment, if any, with respect to a Cash-Based Award or an Other Stock-Based Award shall be made in accordance with the terms of the Award, in cash or Shares as the Committee determines. The Company may pay earned Cash-Based Awards and Other Stock-Based Awards in the form of cash or in Shares (or in a combination thereof) equal to the value of the earned Award at the close of the applicable Performance Period, if any, but no later than the fifteenth (15th) day of the third month after the year in which the Performance Period ended, the award vests (unless a valid deferral election has been made), or the date the payment was otherwise scheduled to be made.

## ARTICLE 12. NONEMPLOYEE DIRECTOR AWARDS

The Board or a committee of the Board shall determine all Awards to Nonemployee Directors. The terms and conditions of any grant to any such Nonemployee Director shall be set forth in an Award Agreement. Nonemployee Directors, pursuant to this Article 12 (*Nonemployee Director Awards*), may be awarded, or may be permitted to elect to receive, pursuant to the procedures established by the Board or a committee of the Board, all or any portion of their annual retainer, meeting fees or other fees in Shares, Restricted Stock, Restricted Stock Units, Deferred Stock Units or other Awards as contemplated by this Plan in lieu of cash.

## ARTICLE 13. QUALIFIED PERFORMANCE-BASED AWARDS AND PERFORMANCE MESASURES

**13.1 In General**. The Committee shall have the discretionary authority, consistent with Code Section 162(m), to structure any Awards granted to Covered Employees under this Plan to qualify as Qualified Performance-Based Awards. Only the Committee may grant Awards intended to be Qualified Performance-Based Awards. With respect to any Award intended to be a Qualified Performance-Based Award, this Plan and the applicable Award Agreement shall be interpreted and operated consistent with that intention.

**13.2 Options and SARs**. Compensation attributable to an Option or SAR is deemed to be a Qualified Performance-Based Award as long as (a) the Committee grants the Option and the SAR, (b) the Exercise Price and Grant Price, respectively, are not less than the Fair Market Value, and (c) such Option or SAR complies with the limitations imposed by Section 4.3 (*Shares Subject to this Plan and Award Limitations/Annual Award Limits*).



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**13.3 Qualified Performance-Based Awards Other Than Options or SARS**. With respect to Qualified Performance-Based Awards that are not intended to be Options or SARs within the scope of Section 13.2 (*Qualified Performance-Based Awards and Performance Measures/Options and SARs)*, the vesting, exercisability, lapse of restrictions, payment or grant, as applicable, must be contingent upon the (a) attainment of a pre-established performance goal or measure (or combination thereof) as specified in this Article 13 (*Qualified Performance-Based Awards and Performance Measures*), and (b) certification described in Section 13.9 (*Qualified Performance-Based Awards and Performance Measures/Certification of Performance*).

**13.4 Pre-Establishment Prerequisite for Qualified Performance-Based Awards Other Than Options or SARs**. With respect to Qualified Performance-Based Awards that are not intended to be Options or SARs within the scope of Section 13.2 (*Qualified Performance-Based Awards and Performance Measures/Options and SARs)*, the Committee shall establish in writing on or before the Final Pre-Establishment Date (a) the Covered Employees to which objective performance goals or measures applicable to a given Performance Period will apply, (b) the objective performance goals or measures (as described in Article 13 (*Qualified Performance-Based Awards and Performance Measures*)) applicable to a given Performance Period, and (c) such performance goals shall state, in terms of an objective formula or standard, the method for computing the amount of compensation payable to the Covered Employee Participant if such performance goals are obtained. A formula or standard is objective if a third party having knowledge of the relevant performance results could calculate the amount to be paid to the Covered Employee.

**13.5 Qualified Performance-Based Awards that have Base Pay or Salary-Based Formula Terms**. With respect to any Qualified Performance-Based Award compensation formula that is based, in whole or in part, on a percentage of salary or base pay, such salary or base pay must be fixed on or before the Final Pre-Establishment Date for the service period to which the Qualified Performance-Based Award relates.

**13.6 Prohibited Discretion**. The terms of the objective formula or standard of a Qualified Performance-Based Award must preclude discretion to increase the amount of compensation payable that would otherwise be due upon attainment of the goal. However, the Committee shall retain the discretion to reduce or eliminate the amount of any Award payable to any Participant either on a formula or discretionary basis or any combination, as the Committee determines in its sole discretion.

**13.7 Performance Goals for Qualified Performance-Based Awards**. The performance goals upon which the payment or vesting of an Award to a Covered Employee that is intended to qualify as Qualified Performance-Based Awards shall be limited to the following Performance Measures, which will be derived using the accounting principles generally accepted in the United States of America, to the extent applicable, and will be reported or appear in the Company's filings with the Securities and Exchange Commission (including, but not limited to, Forms 8-K, 10-Q and 10-K) or the Company's annual report to shareholders and will be derived from one or more (or any combination of one or more) of the following:

(a) Earnings per common share from continuing operations; or

(b) Earnings per common share; or

(c) Operating profit (loss) or Operating income (loss) (as the case may be); or

(d) Income (Loss) from continuing operations before unusual or infrequent items; or

(e) Income (Loss) from continuing operations; or



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

(f) Income (Loss) from continuing operations before income taxes; or

(g) Income (Loss) from continuing operations before extraordinary item and/or cumulative effect of a change in accounting principle (as the case may be); or

(h) Income (Loss) before extraordinary item and/or cumulative effect of a change in accounting principle (as the case may be); or

(i) Net income (loss); or

(j) Income (Loss) before other comprehensive income (loss); or

(k) Comprehensive income (loss); or

(l) Income (Loss) before interest and income taxes (sometimes referred to as "EBIT"); or

(m) Income (Loss) before interest, income taxes, depreciation and amortization (sometimes referred to as "EBITDA"); or

(n) Any other objective and specific income (loss) category or non-GAAP financial measure that appears as a line item in the Company's filings with the Securities and Exchange Commission or the annual report to shareholders; or

(o) Either of items (a) or (b) on a basic basis and any of items (c) through (n) on a basic earnings per share basis, as basic earnings per share is defined in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 260, Earnings Per Share (formerly Statement of Financial Accounting Standards ("SFAS") No. 128), including authoritative interpretations or amendments thereof which may be issued from time to time as long as such interpretations or amendments are utilized on the consolidated statements of operations or statement of operations, as applicable, or in the notes to the consolidated financial statements; or

(p) Either of items (a) or (b) on a diluted basis and any of items (c) through (n) on a diluted earnings per share basis, as diluted earnings per share is defined in ASC 260, Earnings Per Share (formerly SFAS No. 128), including authoritative interpretations or amendments thereof which may be issued from time to time as long as such interpretations or amendments are utilized on the consolidated statements of operations or statement of operations, as applicable, or in the notes to the consolidated financial statements; or

(q) Common stock price; or

(r) Total shareholder return expressed on a dollar or percentage basis as is customarily disclosed in the proxy statement accompanying the notice of annual meetings of shareholders; or

(s) Percentage increase in comparable store sales; or

(t) Gross profit (loss) or gross margin (loss) (as the case may be); or

(u) Economic value added; or

(v) Any of items (a) through (u) with respect to any subsidiary, Affiliate, business unit, business group, business venture or legal entity, including any combination thereof, or controlled directly or indirectly by the Company whether or not such information is included in the Company's annual report to shareholders, proxy statement or notice of annual meeting of shareholders; or



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

(w) Any of items (a) through (u) above may be determined before or after a minority interest's share as designated by the Committee; or

(x) Any of items (a) through (u) above with respect to the period of service to which the performance goal relates whether or not such information is included in the Company's filings, annual report to shareholders, proxy statement or notice of annual meetings of shareholders; or

(y) Total shareholder return ranking position meaning the relative placement of the Company's total shareholder return (as determined in (r) above) compared to those publicly held companies in the Company's peer group as established by the Committee prior to the beginning of a vesting period or such later date as permitted under the Code. The peer group shall be comprised of not less than eight and not more than sixteen companies, including the Company; or

(z) With respect to items (a), (b), (o) and (p) above, other terminology may be used for each such performance criteria (including, but not limited to, "Basic EPS," "income (loss) per common share," "diluted EPS," or "earnings per common share-assuming dilution") as contemplated in ASC 260, Earnings Per Share (formerly SFAS No. 128), as amended, revised or superseded.

**13.8 Evaluation of Performance**. The Committee may provide in any Award that any evaluation of performance may include or exclude any of the following events that occur during a Performance Period (including the income tax effects attributable thereto), singularly or in combination, to the goals/targets in recognition of the following categories (or any particular item(s) within the following categories or portion(s) thereof):

(a) Asset impairments as described in ASC 360, Property, Plant and Equipment (formerly SFAS No. 144), as amended, revised or superseded; or

(b) Costs associated with exit or disposal activities as described in ASC 420, Exit or Disposal Cost Obligations (formerly SFAS No. 146), as amended, revised or superseded; or

(c) Impairment charges (excluding the amortization thereof) related to goodwill or other intangible assets, as described in ASC 350, Intangibles - Goodwill and Other (formerly SFAS No. 142), as amended, revised or superseded; or

(d) Integration costs related to all merger and acquisition activity of the Company and/or its Affiliates, including, without limitation, any merger, acquisition, reverse merger, triangular merger, tender offer, consolidation, amalgamation, arrangement, security exchange, business combination or any other purchase or sale involving the Company and/or its Affiliates (or foreign equivalent of any of the foregoing); or

(e) Transaction costs related to all merger and acquisition activity of the Company and/or its Affiliates, including, without limitation, any merger, acquisition, reverse merger, triangular merger, tender offer, consolidation, amalgamation, arrangement, security exchange, business combination or any other purchase or sale involving the Company and/or its Affiliates (or foreign equivalent of any of the foregoing); or

(f) Any profit or loss attributable to the business operations of a specified segment as described in ASC 280, Segment Reporting (formerly SFAS No. 131), as amended, revised or superseded; or



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

(g) Any profit or loss attributable to a specified segment as described in ASC 280, Segment Reporting (formerly SFAS No. 131), as amended, revised or superseded acquired during the Performance Period or an entity or entities acquired during the Performance Period to which the performance goal relates; or

(h) Any tax settlement(s) with a tax authority; or

(i) Any extraordinary item, event or transaction as described in ASC 225-20, Income Statement - Extraordinary and Unusual Items (formerly Accounting Principles Board Opinion ("APB") No. 30), as amended, revised or superseded; or

(j) Any unusual in nature, or infrequent in occurrence items, events or transactions (that are not "extraordinary" items) as described in ASC 225-10, Income Statement - Extraordinary and Unusual Items (formerly APB No. 30), as amended, revised or superseded; or

(k) Any other non-recurring items, any events or transactions that do not constitute ongoing operations, or other non-GAAP financial measures (not otherwise listed); or

(l) Any change in accounting principle as described in ASC 250, Accounting Changes and Error Corrections (formerly SFAS No. 154), as amended, revised or superseded; or

(m) Unrealized gains or losses on investments in debt and equity securities as described in ASC 320, Investments - Debt and Equity Securities (formerly SFAS No. 115), as amended, revised or superseded; or

(n) Any gain or loss recognized as a result of derivative instrument transactions or other hedging activities as described in ASC 815, Derivatives and Hedging (formerly SFAS No. 133), as amended, revised or superseded; or

(o) Stock-based compensation charges as described in ASC 718, Compensation - Stock Compensation and ASC 505-50, Equity Based Payments to Non Employees (formerly SFAS No. 123R), as amended, revised or superseded; or

(p) Any gain or loss as reported as a component of other comprehensive income as described in ASC 220, Comprehensive Income (formerly SFAS No. 130), as amended, revised or superseded; or

(q) Any expense (or reversal thereof) as a result of incurring an obligation for a direct or indirect guarantee, as described in ASC 460, Guarantees (formerly FASB Interpretations ("FIN") No. 45), as amended, revised or superseded; or

(r) Any profit or loss as the result of the consolidation of a variable interest entity as described in ASC 810, Consolidation (formerly FIN No. 46R), as amended, revised or superseded; or

(s) Any expense, gain or loss (including, but not limited to, judgments, interest on judgments, settlement amounts, attorneys' fees and costs, filing fees, experts' fees, and damages sustained as a result of the imposition of injunctive relief) as a result of claims, litigation or lawsuit settlement (including collective actions or class action lawsuits); or

(t) Any charges associated with the early retirement of debt; or

(u) The relevant tax effect(s) of tax laws or regulations, or amendments thereto, that become effective after the beginning of the applicable Performance Period.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

To the extent such inclusions or exclusions affect Awards to Covered Employees, they shall be prescribed in a form that meets the requirements of Code Section 162(m) for deductibility.

**13.9 Certification of Performance**. No Qualified Performance-Based Award shall vest, have restrictions lapse, be payable or granted, as the case may be, any earlier than the Committee certifies in writing (in any manner allowable under Code Section 162(m)) the extent or level of achievement (if at all) to which the objective performance goals (and other material terms) applicable to the Performance Period were satisfied. As provided in Section 13.6 (*Qualified Performance-Based Awards and Performance Measures/Prohibited Discretion*), the Committee may reduce or eliminate (but not increase) the amount of any Award otherwise payable to a Participant.

**13.10 Death, Disability or Other Circumstances**. The Committee may provide in the Award Agreement that an Award intended to qualify as a Qualified Performance-Based Award under this Article 13 (*Qualified Performance-Based Awards and Performance Measures*) shall be payable, in whole or in part, in the event of the Participant's death or Disability, a Change in Control, or under other circumstances consistent with the requirements of Code Section 162(m).

**13.11 Committee Discretion**. In the event that applicable tax and/or securities laws change to permit Committee discretion to alter the governing Performance Measures without obtaining shareholder approval of such changes, the Committee shall have sole discretion to make such changes without obtaining shareholder approval. In addition, in the event that the Committee determines that it is advisable to grant Awards that shall not qualify as Qualified Performance-Based Awards, the Committee may make such grants without satisfying the requirements of Code Section 162(m) and base vesting on Performance Measures other than those set forth in Section 13.1 (*Qualified Performance-Based Awards and Performance Measures/In General*).

**13.12 Shareholder Approval for Qualified Performance-Based Awards**. The material terms of the performance goals with respect to Qualified Performance-Based Awards must be reapproved by the Company's shareholders no later than the first shareholders meeting that occurs in the fifth (5th) year following the year in which the shareholders previously approved the provisions of this Article 13 (*Qualified Performance-Based Awards and Performance Measures*), if Qualified Performance-Based Awards are to be made under Article 13 (*Qualified Performance-Based Awards and Performance Measures*) after the date of such shareholders meeting and if required by Code Section 162(m). The material terms include the employees eligible to receive Qualified Performance-Based Awards, a description of the business criteria on which the performance goal is based, and either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained.

## ARTICLE 14. TRANSFERABILITY OF AWARDS

During a Participant's lifetime, his or her Awards shall be exercisable only by the Participant (or by the Participant's legal representative in the event of the Participant's incapacity). Awards shall not be transferable other than by will or the laws of descent and distribution; no Awards shall be subject, in whole or in part, to attachment, execution, or levy of any kind; and any purported transfer in violation hereof shall be null and void.

## ARTICLE 15. IMPACT OF TERMINATION OF EMPLOYMENT OR SERVICE ON AWARDS

**15.1 In General**. Unless otherwise determined by the Committee and set forth in the Award Agreement, upon a Participant's Termination of Employment or Service with or to the Company or an Affiliate, for any reason whatsoever, except as otherwise set forth in this Article 15 (*Impact of Termination of Employment or Service on Awards*), in an Award Agreement or, with the consent of such individual, as determined by the Committee at any time prior to or after such termination, Awards granted to such Participant will be treated as follows:



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

(a) Any Options and SARs will (i) to the extent not vested and exercisable as of the date of such Termination of Employment or Service with or to the Company or an Affiliate, terminate on the date of such termination, and (ii) to the extent vested and exercisable as of the date of such Termination of Employment or Service with or to the Company or an Affiliate, remain exercisable for a period of one (1) year following the date of such termination (but in no event beyond the maximum term of such Award); provided, however, that a Participant may not exercise an ISO more than three (3) months following the date of such termination for any reason other than death or Disability (but in no event beyond the maximum term of such Award).

(b) Any unvested portion of any Restricted Stock, Restricted Stock Units, or Deferred Stock Units will be immediately forfeited.

(c) Any Performance Shares, Performance Share Units, or Performance Units will be immediately forfeited and terminate.

(d) Any other Awards, including, but not limited to, Cash-Based Awards and Other Stock-Based Awards, to the extent not vested will be immediately forfeited and terminate.

**15.2 Upon Termination of Employment or Service in Connection with a Change in Control**. Except as otherwise provided in an Award Agreement, upon a Termination of Employment or Service in connection with a change in control, Awards granted to a Participant will be treated as set forth in Article 20 (*Change in Control*).

**15.3 Bona Fide Leave**. Notwithstanding the fact that a Participant's employment ostensibly terminates and except as otherwise provided in an Award Agreement, if the Participant is on a bona fide leave of absence, as defined in Treas. Reg. Section 1.409A-1(h)(1), then the Participant will be treated as having a continuing employment relationship (and not as having terminated employment for purposes of this Plan) so long as the period of the leave does not exceed six (6) months, or if longer, so long as the Participant retains a right to reemployment with the Company or an Affiliate under an applicable statute or by contract.

**15.4 Change in Participant Status**. If a Participant changes status from an Employee, Director, or Third Party Service Provider to an Employee, Director, and/or Third Party Service Provider, without interruption, the Committee, in its sole discretion, may permit any Award held by such Participant at the time of such change in status to be unaffected by such status change; provided, however, that an ISO held by an Employee shall be treated as a NQSO on the first (1st) day that is three (3) months after the date that the Participant ceases to be an Employee.

## ARTICLE 16. SUBSTITUTION AWARDS

Awards may be granted under the Plan from time to time in substitution for stock options and other awards held by employees or directors of other entities who are about to become Employees, whose employer is about to become an Affiliate as the result of a merger or consolidation of the Company or its Affiliate with another corporation, or the acquisition by the Company or its Affiliate of substantially all the assets of another corporation, or the acquisition by the Company or its Affiliate of at least fifty percent (50%) of the issued and outstanding stock of another corporation as the result of which such other corporation will become a subsidiary. The terms and conditions of the substitute Awards so granted may vary from the terms and conditions set forth in the Plan to such extent as the Board at the time of grant may deem appropriate to conform, in whole or in part, to the provisions of the award in substitution for which they are granted to ensure that the requirements imposed under Code Section 409A and 424, to the extent applicable, are satisfied.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

ARTICLE 17. DIVIDEND-EQUIVALENT RIGHTS

Any Participant selected by the Committee may be granted Dividend-Equivalent Rights (in connection with any Award other than an Option of SAR) based on the dividends declared on Shares that are subject to the Award to which they relate, to be credited as of dividend payment dates, during the period between the date the Award is granted and the date the Award is exercised, vests or expires, as determined by the Committee. Such Dividend-Equivalent Rights shall be converted to cash or additional Shares by such formula and at such time and subject to such limitations as may be determined by the Committee. Notwithstanding the foregoing, if any Award for which Dividend-Equivalent Rights have been granted has its vesting or grant dependent upon the achievement of one or more performance goals, then the Dividend-Equivalent Rights shall accrue and only be paid to the extent the Award becomes vested. Under no circumstances may Dividend-Equivalent Rights be granted for any Option or SAR.

ARTICLE 18. BENEFICIARY DESIGNATION

Each Participant under this Plan may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any benefit under this Plan is to be paid in case of his death before he receives any or all of such benefit. Each such designation shall revoke all prior designations by the same Participant, shall be in a form prescribed by the Committee, and will be effective only when filed by the Participant in writing with the Company during the Participant’s lifetime. In the absence of any such beneficiary designation, benefits remaining unpaid or rights remaining unexercised at the Participant’s death shall be paid to or exercised by the Participant’s executor, administrator, or legal representative.

ARTICLE 19. RIGHTS OF PARTICIPANTS

**19.1 Employment/Service**. Nothing in this Plan or an Award Agreement shall interfere with or limit in any way the right of the Company or its Affiliates to terminate any Participant’s employment or service on the Board or to the Company or its Affiliates at any time or for any reason, nor confer upon any Participant any right to continue his employment or service as a Director or Third Party Service Provider for any specified period of time. Neither an Award nor any benefits arising under this Plan shall constitute an employment contract with the Company or any of its Affiliates and, accordingly, subject to Article 3 (*Administration*) and Article 21 (*Amendment, Modification, Suspension, and Termination*), this Plan and the benefits hereunder may be terminated at any time in the sole and exclusive discretion of the Committee without giving rise to any liability on the part of the Company or its Affiliates. Nothing contained herein shall be deemed to alter the relationship between the Company or an Affiliate and a Participant, or the contractual relationship between a Participant and the Company or an Affiliate if there is a written contract regarding such relationship.

**19.2 Participation**. No individual shall have the right to be selected to receive an Award under this Plan, or, having been so selected, to be selected to receive a future Award.

**19.3 Rights as a Shareholder**. Except as otherwise provided herein, a Participant shall have none of the rights of a shareholder with respect to Shares covered by any Award until the Participant becomes the record holder of such Shares.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

## ARTICLE 20. CHANGE IN CONTROL

**20.1 Impact of Event**. Notwithstanding any other provision of the Plan to the contrary and unless otherwise specifically provided in an Award Agreement, but subject to Section 4.4 (*Shares Subject to this Plan and Award Limitations/Adjustments in Authorized Shares*) in the event of a Change in Control:

(a) Any Options and SARs outstanding as of the date of such Change in Control and not then exercisable shall become fully exercisable to the full extent of the original grant;

(b) All remaining Restriction Periods shall be accelerated and any remaining restrictions applicable to any Restricted Stock Awards shall lapse and such Restricted Stock shall become free of all restrictions and become fully vested and transferable to the full extent of the original grant;

(c) All remaining Restriction Periods shall be accelerated and any remaining restrictions applicable to any Restricted Stock Units shall lapse and such Restricted Stock Units shall become free of all restrictions and become fully vested and redeemed to the full extent of the original grant (i.e., the Restriction Period shall lapse);

(d) Any performance goal or other condition with respect to any Performance Units, Performance Shares, and Performance Share Units shall be deemed to have been satisfied in full, and the Common Shares or cash subject to such Award shall be fully distributable;

(e) Any remaining restrictions, performance goals or other conditions with respect to any Deferred Stock Units shall lapse and such Deferred Stock Unit shall be deemed to have been satisfied in full, and the Common Shares or cash subject to such Award shall be fully distributable; and

(f) Any Cash-Based Awards and Other Stock-Based Awards outstanding as of the date of such Change in Control and not then vested shall vest to the full extent of the original grant.

Notwithstanding the foregoing, with respect to any Award that provides for the deferral of compensation and is subject to Code Section 409A, unless the Committee determines otherwise in the Award Agreement, such Award shall be paid, distributed or settled, as applicable: (i) on the occurrence of a Change in Control if that Change in Control constitutes a “change in control event” within the meaning of Code Section 409A; or (ii) in accordance with the terms provided in the Award Agreement if that Change in Control does not constitute a “change in control event” within the meaning of Code Section 409A.

**20.2 Effect of Code Section 280G**. Except as otherwise provided in the Award Agreement or any other written agreement between the Participant and the Company or any Affiliate in effect on the date of the Change in Control, if the sum (or value) due under Section 20.1 (*Change in Control/Impact of Event*) that are characterizable as parachute payments, when combined with other parachute payments attributable to the same Change in Control, constitute “excess parachute payments” as defined in Code Section 280G(b)(1), the entity responsible for making those payments or its successor or successors (collectively, “Payor”) will reduce the Participant’s benefits under the Plan by the smaller of (a) the value of the sum or the value of the payments due under Section 20.1 (*Change in Control/Effect of Code Section 280G*), or (b) the amount necessary to ensure that the Participant’s total “parachute payment” as defined in Code Section 280G(b)(2)(A) under the Plan and all other agreements will be $1.00 less than the amount that would generate an excise tax under Code Section 4999. Any reduction pursuant to this Section 20.2 (*Change in Control/Effect of Code Section 280G*) shall be first applied against parachute payments (as determined above) that are not subject to Code Section 409A and, thereafter, shall be applied against all remaining parachute payments (as determined above) subject to Code Section 409A on a pro rata basis.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

ARTICLE 21. AMENDMENT, MODIFICATION, SUSPENSION, AND TERMINATION

**21.1 Amendment, Modification, Suspension, and Termination**. Subject to Section 21.3 (*Amendment, Modification, Suspension, and Termination/Awards Previously Granted*) and Section 21.5 (*Amendment, Modification, Suspension, and Termination/Repricing Prohibition*), the Committee may, at any time and from time to time, alter, amend, modify, suspend, or terminate this Plan and/or any Award Agreement in whole or in part; provided, however, that no material amendment of this Plan shall be made without shareholder approval if shareholder approval is required by law, regulation, or stock exchange rule.

**21.2 Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events**. Except to the extent prohibited under Code Sections 409A and 424, to the extent applicable, the Committee may make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (other than those described in Section 4.4 (*Shares Subject to this Plan and Award Limitations/Adjustments in Authorized Shares*) hereof), affecting the Company or the financial statements of the Company or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent unintended dilution or enlargement of the benefits or potential benefits intended to be made available under this Plan. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under this Plan.

**21.3 Awards Previously Granted**. Notwithstanding any other provision of this Plan to the contrary (other than Section 21.4 (*Amendment, Modification, Suspension, and Termination/Amendment to Conform to Law*)), no termination, amendment, suspension, or modification of this Plan or an Award Agreement shall adversely affect in any material way any Award previously granted under this Plan, without the written consent of the Participant holding such Award.

**21.4 Amendment to Conform to Law**. Notwithstanding any other provision of this Plan to the contrary, the Board of Directors may amend the Plan or an Award Agreement, to take effect retroactively or otherwise, as deemed necessary or advisable for the purpose of (a) conforming the Plan or an Award Agreement to any present or future law relating to plans of this or similar nature (including, but not limited to, Code Section 409A to the extent applicable), and to the administrative regulations and rulings promulgated thereunder; (b) permitting the Company or its Affiliates to receive a tax deduction under applicable law; or (c) avoiding an expense charge to the Company or its Affiliates. By accepting an Award under this Plan, a Participant consents to any amendment made pursuant to this Section 21.4 (*Amendment, Modification, Suspension, and Termination/Amendment to Conform to* Law) to any Award granted under the Plan without further consideration or action.

**21.5 Repricing Prohibition**. Except to the extent (a) approved by the Company's shareholders, or (b) provided in Section 4.4 (*Shares Subject to this Plan and Award Limitations/Adjustments in Authorized Shares*), the Committee shall not have the power or authority to reduce, whether through amendment or otherwise, the Exercise Price or the Grant Price of any outstanding Option or SAR or to grant any new Award, or make any cash payment, in substitution for or upon the cancellation of Options or SARs previously granted.

**21.6 Reload Prohibition**. Regardless of any other provision of the Plan, no Participant will be entitled to (and no Committee discretion may be exercised to extend to any Participant) an automatic grant of additional Awards in connection with the exercise of an Option or otherwise.

ARTICLE 22. WITHHOLDING

**22.1 Tax Withholding**. The Company shall have the power and the right to deduct or withhold, or require a Participant to remit to the Company, the minimum statutory amount to satisfy federal, state, provincial, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Plan. As soon as practicable after the date as of which the amount first becomes includible in the gross income of the Participant (but no later than the last business day of the calendar quarter during which the amount first becomes includible in gross income), the Participant shall pay to the Company or an Affiliate (or other entity identified by the Committee), or make arrangements satisfactory to the Company or other entity identified by the Committee regarding the payment of any federal, state, provincial, or local taxes of any kind (including any employment taxes) required by law to be withheld with respect to such income. The obligations of the Company under this Plan shall be conditional on such payment or arrangements, and the Company and its Affiliates shall, to the extent permitted by law, have the right to deduct any such taxes from any payment otherwise due to the Participant.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**22.2 Share Withholding**. With respect to withholding required upon the exercise of Options or SARs, upon the lapse of restrictions on Restricted Stock and Restricted Stock Units, or upon the achievement of performance goals related to Performance Shares, or any other taxable event arising as a result of an Award granted hereunder, unless the Participant has elected, with the approval of the Committee, to satisfy the withholding requirement, in whole or in part, by paying the taxes in cash or transferring to the Company Shares owned by the Participant that would satisfy the minimum statutory total tax (but no more than such minimum) with respect to the Company's withholding obligation, the Participant shall be deemed to have elected to have the Company withhold a number of Shares that would satisfy the minimum statutory total tax (but no more than the such minimum) that could be imposed on the transaction. All such elections shall be irrevocable, made by the Participant in a manner approved by the Committee, and shall be subject to any restrictions or limitations that the Committee, in its sole discretion, deems appropriate.

## ARTICLE 23. SUCCESSORS

All obligations of the Company under this Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company. All obligations imposed upon a Participant, and all rights granted to the Company hereunder, shall be binding upon each Participant's heirs, legal representatives, and successors.

## ARTICLE 24. GENERAL PROVISIONS

**24.1 Recovery of Compensation**. Any Award issued under this Plan will be subject to any clawback policy developed by the Board of Directors or the Committee that is consistent with applicable law, whether such Award was granted before or after the effective date of any such clawback policy.

**24.2 Legend**. The certificates for Shares may include any legend which the Committee deems appropriate to reflect any restrictions on transfer of such Shares.

**24.3 Gender and Number**. Except where otherwise indicated by the context, any masculine term used herein also shall include the feminine, the singular shall include the plural, and the plural shall include the singular.

**24.4 Severability**. In the event that any one or more of the provisions of this Plan shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

**24.5 Compliance with Legal and Exchange Requirements**. The Plan, the granting and exercising of Awards thereunder, and any obligations of the Company under the Plan, shall be subject to all applicable federal and state laws, rules, and regulations, and to such approvals by any regulatory or governmental agency as may be required, and to any rules or regulations of any stock exchange on which the Shares are listed. The Company, in its discretion, may postpone the granting and exercising of Awards, the issuance or delivery of Shares under any Award or any other action permitted under the Plan to permit the Company, with reasonable diligence, to complete such stock exchange listing or registration or qualification of such Shares or other required action under any federal or state law, rule, or regulation and may require any Participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of Shares in compliance with applicable laws, rules, and regulations. The Company shall not be obligated by virtue of any provision of the Plan to recognize the exercise of any Award or to otherwise sell or issue Shares in violation of any such laws, rules, or regulations, and any postponement of the exercise or settlement of any Award under this provision shall not extend the term of such Awards. Neither the Company nor its Affiliates, or the directors or officers of any such entities, shall have any obligation or liability to a Participant with respect to any Award (or Shares issuable thereunder) that shall lapse because of such postponement.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**24.6 No Limitation on Compensation**. Nothing in the Plan shall be construed to limit the right of the Company to establish other plans or to pay compensation to its employees, in cash or property, in a manner which is not expressly authorized under the Plan.

**24.7 Investment Representations**. The Committee may require any individual receiving Shares pursuant to an Award under this Plan to represent and warrant in writing that the individual is acquiring the Shares for investment and without any present intention to sell or distribute such Shares.

**24.8 Employees Based Outside of the United States**. Notwithstanding any provision of this Plan to the contrary, in order to comply with the laws in other countries in which the Company or its Affiliates operate or have Employees, Directors or Third Party Service Providers, the Committee, in its sole discretion, shall have the power and authority to:

(a) Determine which Affiliates shall be covered by this Plan;

(b) Determine which Employees, Directors and/or Third Party Service Providers outside the United States are eligible to participate in this Plan;

(c) Modify the terms and conditions of any Award granted to Employees, Directors and/or Third Party Service Providers outside the United States to comply with applicable foreign laws;

(d) Establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable. Any subplans and modifications to Plan terms and procedures established under this Section 24.8 (*General Provisions/Employees Based Outside of the United* States) by the Committee shall be attached to this Plan document as appendices; and

(e) Take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local government regulatory exemptions or approvals.

Notwithstanding the above, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate applicable law.

**24.9 Uncertificated Shares**. To the extent that this Plan provides for issuance of certificates to reflect the transfer of Shares, the transfer of such Shares may be effected on a noncertificated basis, to the extent not prohibited by applicable law or the rules of any stock exchange.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**24.10 Unfunded Plan**. It is intended that this Plan be an "unfunded" plan for incentive compensation. The Committee may authorize the creation of trusts or other arrangements to meet the obligations created under this Plan to deliver Shares or make payments; provided, however, that, unless the Committee otherwise determines, the existence of such trusts or other arrangements is consistent with the "unfunded" status of this Plan and Participants shall have no right, title, or interest whatsoever in or to any investments that the Company or its Affiliates may make to aid it in meeting its obligations under this Plan.

**24.11 No Fractional Shares**. No fractional Shares shall be issued or delivered pursuant to this Plan or any Award. The Committee shall determine whether cash, Awards, or other property shall be issued or paid in lieu of fractional Shares or whether such fractional Shares or any rights thereto shall be forfeited or otherwise eliminated (i.e., rounded down to the nearest whole Share).

**24.12 No Impact on Benefits**. Except as may otherwise be specifically stated under any employee benefit plan, policy or program, no amount payable in respect of any Award shall be treated as compensation for purposes of calculating a Participant's right under any such plan, policy or program.

**24.13 Compliance with Code Section 409A**.

(a) **In General**. The Plan is intended to be administered in a manner consistent with the requirements, where applicable, of Code Section 409A. All Award Agreements shall be construed and administered such that the Award either (i) qualifies for an exemption from the requirements of Code Section 409A or (ii) satisfies the requirements of Code Section 409A. To the extent that any provision of the Plan or an Award Agreement would cause a conflict with the requirements of Code Section 409A, or would cause the administration of the Plan or an Award to fail to satisfy the requirements of Code Section 409A, such provision shall be deemed amended to the extent practicable to avoid adverse tax consequences under Code Section 409A for the Participant (including his or her beneficiaries). In no event shall a Participant, directly or indirectly, designate the calendar year in which payment, distribution or settlement, as applicable, of an Award subject to Code Section 409A is made, except in accordance with Code Section 409A. Notwithstanding any provision in this Plan to the contrary, neither the Company nor the Committee shall have any liability to any person in the event such Code Section 409A applies to any Award in a manner that results in adverse tax consequences for the Participant or any of his or her beneficiaries.

(b) **Six-Month Delay for Specified Employees**. Notwithstanding anything in this Plan or an Award Agreement to the contrary, if a Participant is a "specified employee," within the meaning of Code Section 409A and as determined under the Company's policy for determining specified employees, on the date of his "separation from service", within the meaning of Code Section 409A, the distribution, payment or settlement, as applicable, of all of Participant's Awards that are both (i) subject to Code Section 409A and (ii) distributable, payable or settleable, as appropriate, on account of a separation from service, shall be postponed for six (6) months following the date of the Participant's separation from service. If a distribution, payment or settlement, as applicable, is delayed pursuant to this paragraph, the distribution, payment or settlement, as applicable, shall be made within the thirty (30)-day period following the first (1st) business day of the seventh (7th) month following the Participant's separation from service; provided that if the Participant dies during such six (6)-month period, any postponed amounts shall be paid within ninety (90) days of the Participant's death. This distribution, payment or settlement, as applicable, shall include the cumulative amount of any amount that could not be paid or provided during such period.

(c) **Elective Deferrals**. No Participant elective deferrals or re-deferrals of compensation (as defined under Code Section 409A and/or guidance thereto) other than in regard to Deferred Stock Units are permitted under this Plan. Instead, any such elective deferrals of compensation shall only be permitted pursuant to the Company's nonqualified deferred compensation plan. To the extent elective deferrals or re-deferrals are permitted under this Plan, such elections shall be made in accordance with the requirements of Code Section 409A and the rules, procedures and forms specified from time to time by the Committee.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

(d) **Mandatory Deferrals**. If, at the grant of an Award under this Plan, the Committee decides that the payment of compensation with respect to such Award shall be deferred compensation within the meaning of Code Section 409A, then, the Committee shall set forth the time and form of payment in the Award Agreement in a manner consistent with Code Section 409A.

(e) **Timing of Payments**. Payment(s) of compensation that is subject to Code Section 409A shall only be made in the form and upon an event or at a time permitted under Code Section 409A.

**24.14 Nonexclusivity of this Plan**. The adoption of this Plan shall not be construed as creating any limitations on the power of the Board or Committee to adopt such other compensation arrangements as it may deem desirable for any Participant.

**24.15 No Constraint on Corporate Action**. Nothing in this Plan shall be construed to: (a) limit, impair, or otherwise affect the Company's or an Affiliate's right or power to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell, or transfer all or any part of its business or assets; or (b) limit the right or power of the Company or an Affiliate to take any action which such entity deems to be necessary or appropriate.

**24.16 Headings and Captions**. The headings and captions herein are provided for reference and convenience only, shall not be considered part of this Plan, and shall not be employed in the construction of this Plan.

**24.17 Offset**. Subject to the requirements of Code Section 409A, if applicable, (a) any amounts owed to the Company or an Affiliate by a Participant of whatever nature up to the fullest extent permitted by applicable law may be offset by the Company from the value of any Award to be transferred to the Participant, and (b) no Shares, cash or other thing of value under the Plan or an Award Agreement shall be transferred unless and until all disputes between the Company and the Participant have been fully and finally resolved and the Participant has waived all claims to such against the Company and its Affiliates. However, no waiver of any liability (or the right to apply the offset described in this Section 24.17 (*General Provisions/Offset*) may be inferred because the Company pays an Award to a Participant with an outstanding liability owed to the Company or an Affiliate.

**24.18 Governing Law**. The Plan and each Award Agreement shall be governed by the laws of the State of Ohio, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Plan to the substantive law of another jurisdiction. The Plan shall be construed to comply with all applicable law and to avoid liability (other than a liability expressly assumed under the Plan or an Award Agreement) to the Company, an Affiliate or a Participant. Recipients of an Award under this Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts located in Franklin County, Ohio, to resolve any and all issues that may arise out of or relate to this Plan or any related Award Agreement.

**24.19 Delivery and Execution of Electronic Documents**. To the extent permitted by applicable law, the Company may (a) deliver by email or other electronic means (including posting on a web site maintained by the Company or an Affiliate or by a third party under contract with the Company or an Affiliate) all documents relating to the Plan or any Award thereunder (including without limitation, prospectuses required by the Securities and Exchange Commission) and all other documents that the Company is required to deliver to its security holders (including without limitation, annual reports and proxy statements), and (b) permit Participants to electronically execute applicable Plan documents (including, but not limited to, Award Agreements) in a manner prescribed by the Committee.



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**24.20 No Representations or Warranties Regarding Tax Affect**. Notwithstanding any provision of the Plan to the contrary, the Company, its Affiliates, the Board, and the Committee neither represent nor warrant the tax treatment under any federal, state, local or foreign laws and regulations thereunder (individually and collectively referred to as the "Tax Laws") of any Award granted or any amounts paid to any Participant under the Plan including, but not limited to, when and to what extent such Awards or amounts may be subject to tax, penalties and interest under the Tax Laws.

**24.21 Indemnification**. To the maximum extent permitted under the Company's Articles of Incorporation and Code of Regulations, each person who is or shall have been a member of the Board, a committee appointed by the Board, or an officer of the Company to whom authority was delegated in accordance with Article 3 (*Administration*), shall be indemnified and held harmless by the Company against and from any (a) loss, cost, liability, or expense (including attorneys' fees) that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under this Plan or any Award Agreement, and (b) from any and all amounts paid by him or her in settlement thereof, with the Company's prior written approval, or paid by him or her in satisfaction of any judgment in any such action, suit, or proceeding against him or her; provided, however, that he or she shall give the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's Articles of Incorporation or Code of Regulations, by contract, as a matter of law, or otherwise, or under any power that the Company may have to indemnify them or hold them harmless.

**24.22 No Obligation to Disclose Material Information**. Except to the extent required by applicable securities laws, none of the Company, an Affiliate, the Committee, or the Board shall have any duty or obligation to affirmatively disclose material information to a record or beneficial holder of Shares or an Award, and such holder shall have no right to be advised of any material information regarding the Company or any Affiliate at any time prior to, upon or in connection with receipt or the exercise or distribution of an Award. The Company makes no representation or warranty as to the future value of the Shares that may be issued or acquired under the Plan.

**24.23 Entire Agreement**. Except as expressly provided otherwise, this Plan and any Award Agreement constitute the entire agreement with respect to the subject matter hereof and thereof, provided that in the event of any inconsistency between this Plan and any Award Agreement, the terms and conditions of the Plan shall control.

*****



Source: BIG LOTS, INC., EX-4.4, 5/23/2012 | Powered by Intelligize

**Exhibit 10.2**

**BIG LOTS 2012 LONG-TERM INCENTIVE PLAN**
**NON-QUALIFIED STOCK OPTION AWARD AGREEMENT**

| | | | |
|---|---|---|---|
| Participant: | ______________________ | Number of Shares: | ______________________ |
| Grant Date: | ______________________ | Exercise Price: | ______________________ |

In accordance with the terms of the Big Lots 2012 Long-Term Incentive Plan, as may be amended ("Plan"), this Non-Qualified Stock Option Award Agreement ("Agreement") is entered into as of the Grant Date by and between you, the Participant, and the Company in connection with the Company's grant of the right to purchase, at the option of the Participant, at the Exercise Price ("Option") an aggregate of the number of Shares of the Company. The Option is subject to the terms and conditions of this Agreement and the Plan. Except as otherwise expressly provided herein, capitalized terms used but not defined in this Agreement shall have the respective meanings ascribed to them in the Plan. To ensure that you fully understand the terms and conditions of this Award, you should carefully read the Plan and this Agreement.

**Nature of Grant**

The Option is a Non-Qualified Stock Option ("NQSO") and, as such, is not an Incentive Stock Option ("ISO") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended.

**Exercisability of Option**

The Option will become vested and exercisable in increments according to the vesting schedule. However, if an Acceleration Event occurs before the latest date in the vesting schedule, the then-remaining unvested portion of the Option will vest and become exercisable on the day on which the Acceleration Event occurred, but only if the Acceleration Event occurred at least six (6) months following the Grant Date (and such vesting shall be deemed to have occurred immediately prior to the Participant's Termination of Employment or Service). "Acceleration Event" means the earlier of the Participant's death or Disability. Except as provided in the Plan, the Option, to the extent that it is vested, may be exercised any time from the date it vests through the date that it expires. Vesting is always subject to all other Plan requirements being satisfied.

| Shares | Vesting Date | Expiration Date |
|---|---|---|

**Acceptance**

The Participant hereby accepts the Option and acknowledges receipt of a copy of the Plan, as in effect on the Grant Date. By accepting the Option, the Participant agrees to all of the terms and conditions of the Plan and this Agreement, and the Participant agrees to accept as binding, conclusive and final all determinations, decisions and interpretations of the Committee upon any issues arising under the Plan and/or this Agreement. The Participant also represents and warrants to the Company that he or she is aware of and agrees to be bound by the Company's insider trading policies and the applicable laws and regulations relating to the receipt, ownership and transfer of the Company's securities.

Accepted as of ________________________, 20___
"Participant,"

______________________________________

BIG LOTS, INC.

By: ______________________

Source: BIG LOTS, INC., EX-10.2, 5/29/2012 | Powered by Intelligize

**Exhibit 10.3**

**BIG LOTS 2012 LONG-TERM INCENTIVE PLAN**
**RESTRICTED STOCK AWARD AGREEMENT**

Participant: ______________________________

Grant Date: ______________________________

Restricted Stock [1]: ______________________________

In accordance with the terms of the Big Lots 2012 Long-Term Incentive Plan, as may be amended ("Plan"), this Restricted Stock Award Agreement ("Agreement") is entered into as of the Grant Date by and between you, the Participant, and the Company in connection with the Company's grant of the Restricted Stock to you. The Restricted Stock is subject to the terms and conditions of this Agreement and the Plan. Except as otherwise expressly provided herein, capitalized terms used but not defined in this Agreement shall have the respective meanings ascribed to them in the Plan. To ensure that you fully understand the terms and conditions of this Award, you should carefully read the Plan and this Agreement.

**Description of the Restricted Stock**

This Agreement describes the Restricted Stock you have been granted and the conditions that must be met before you may receive the Restricted Stock. The Restricted Stock is the Company's Shares that you will own after the Restricted Stock vests (i.e., all restrictions lapse) and you comply with the terms of this Agreement and the Plan. However, you will forfeit any rights to the Restricted Stock (i.e., they will not be transferred to you) to the extent you do not comply with the terms of this Agreement and the Plan. No portion of the Restricted Stock that has not vested may be sold, transferred, assigned, pledged, encumbered or otherwise disposed of by you in any way (including a transfer by operation of law); and any attempt by you to make any such sale, transfer, assignment, pledge, encumbrance or other disposition shall be null and void and of no effect.

**Vesting of the Restricted Stock**

If (i) the First Trigger, as defined in Exhibit A, is met before your Termination of Employment or Service, and (ii) one of the events described below occurs after the First Trigger is met and your Termination of Employment or Service has not occurred on or prior to the vesting day associated with such occurrence, then your Restricted Stock will vest and be transferred to you without restriction to the extent and upon the earlier occurrence of the following:

(a) If the Second Trigger, as defined in Exhibit A, is met, all of your Restricted Stock will vest on the first trading day[2] after the Company files its Annual Report on Form 10-K ("Form 10-K") with the U.S. Securities and Exchange Commission for the fiscal year in which the Second Trigger was met. Note that the First Trigger and Second Trigger may be met in the same fiscal year.

(b) If you die or suffer a Disability, a fraction of your Restricted Stock will vest for each consecutive year that you have completed with the Company prior to your Termination of Employment or Service, with such measurement period beginning with the Grant Date. Such fraction shall be the reciprocal of the Outside Date, as defined in Exhibit A (i.e., 1/(Outside Date)). Note that if a portion of your Restricted Stock vests upon your death or Disability, the later occurrence of any of other event will not cause the vesting of the remaining Restricted Stock.

(c) If events (a) or (b) above do not occur before the Outside Date, all of your Restricted Stock will vest on the first day of the Company's first trading window following the Outside Date.

Subject to the terms of the Plan, if the First Trigger is not met before the Outside Date occurs, this Agreement will expire and all of your rights in the Restricted Stock will be forfeited.

---

[1] Denotes the number of Big Lots, Inc. common shares, par value $0.01 per share, underlying the Restricted Stock Award.
[2] As determined by the New York Stock Exchange or other national securities exchange or market that regulates Big Lots, Inc. common shares.

Subject to the terms of the Plan, your Restricted Stock shall not vest before the first anniversary of the Grant Date. If the First Trigger is met and either event (a) or (b) above is also met before the first anniversary of the Grant Date, your Restricted Stock will vest on the first day of the Company's trading window first following the first anniversary of the Grant Date.

**Rights in the Restricted Stock**

Until the restrictions and conditions described in this Agreement and the Plan have been met or this Agreement expires, whichever occurs earlier, your Restricted Stock will be held in escrow. The Company will defer distribution of any dividends that are declared on your Restricted Stock until the Restricted Stock vests. These dividends will be distributed at the same time your Restricted Stock vests or will be forfeited if your Restricted Stock does not vest.

You may vote your Restricted Stock before all the terms and conditions described in this Agreement are met or until this Agreement expires, whichever occurs earlier. This is the case even though your Restricted Stock will not be distributed to you until the Restricted Stock vests.

Subject to the Company's insider trading policies and applicable laws and regulations, after you become vested in any portion of your Restricted Stock, you shall be free to deal with and dispose of the vested Restricted Stock, and you may request the Company's transfer agent to issue a certificate for such vested Restricted Stock in your name and free of any restrictions.

**Tax Treatment of the Restricted Stock**

*You should consult with a tax or financial adviser to ensure you fully understand the tax ramifications of your Restricted Stock.*

This brief discussion of the U.S. federal tax rules that affect your Restricted Stock is provided as general information (not as personal tax advice) and is based on the Company's understanding of U.S. federal tax laws and regulations in effect as of the Grant Date. Article 22 of the Plan further describes the manner in which withholding may occur.

You are not required to pay income taxes on your Restricted Stock on the Grant Date. However, you will be required to pay income taxes (at ordinary income tax rates) when, if and to the extent your Restricted Stock vests. The amount of ordinary income you will recognize is the value of your Restricted Stock when it vests. Also, the Company is required to withhold taxes on this same amount. You may elect to allow the Company to withhold, upon the vesting of your Restricted Stock, from the common shares to be issued pursuant to your vested Restricted Stock a number of common shares that would satisfy the required statutory minimum (but no more than such required minimum) with respect to the Company's tax withholding obligation. If you are at the Grant Date, or subsequently become, subject to the Company's trading windows, you may only make this election during an open trading window. If you wish to make the withholding election permitted by this paragraph, you must give notice to the Company in the manner then prescribed by the Company.

Any appreciation of your Restricted Stock after it vests could be eligible to be taxed at capital gains rates when you sell the common shares. If your Restricted Stock does not vest, your Restricted Stock will expire and no taxes will be due.

**Section 83(b) Election**

Subject to Section 8.6 of the Plan, you shall have the right to make an election under Section 83(b) of the Internal Revenue Code with respect to your Restricted Stock.

**General Terms and Conditions**

Nothing contained in this Agreement obligates the Company or a subsidiary to continue to employ you in any capacity whatsoever or prohibits or restricts the Company or a subsidiary from terminating your employment at any time or for any reason whatsoever; and this Agreement does not in any way affect any employment agreement that you may have with the Company.



Source: BIG LOTS, INC., EX-10.3, 5/29/2012 | Powered by Intelligize

This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws of conflicts of laws, of the State of Ohio.

If any provision of this Agreement is adjudged to be unenforceable or invalid, then such unenforceable or invalid provision shall not effect the enforceability or validity of the remaining provisions of this Agreement, and the Company and you agree to replace such unenforceable or invalid provision with an enforceable and valid arrangement which in its economic effect shall be as close as possible to the unenforceable or invalid provision.

You represent and warrant to the Company that you have the full legal power, authority and capacity to enter into this Agreement and to perform your obligations under this Agreement and that this Agreement is a valid and binding obligation, enforceable in accordance with its terms, except that the enforcement of this Agreement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereinafter in effect relating to creditors' rights generally and to general principles of equity. The Company represents and warrants to you that it has the full legal power, authority and capacity to enter into this Agreement and to perform its obligations under this Agreement and that this Agreement is a valid and binding obligation, enforceable in accordance with its terms, except that the enforcement of this Agreement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereinafter in effect relating to creditors' rights generally and to general principles of equity.

**Acceptance**

You hereby accept the Restricted Stock and acknowledge receipt of a copy of the Plan, as in effect on the Grant Date. By accepting the Restricted Stock, you agree to all of the terms and conditions of the Plan and this Agreement, and you agree to accept as binding, conclusive and final all determinations, decisions and interpretations of the Committee upon any issues arising under the Plan and/or this Agreement. You also represent and warrant to the Company that you are aware of and agree to be bound by the Company's insider trading policies and the applicable laws and regulations relating to the receipt, ownership and transfer of the Company's securities.

| | |
|---|---|
| Accepted as of ________________________, 20___ | BIG LOTS, INC. |
| "Participant," | |
| _______________________________________ | By: _______________________ |



Source: BIG LOTS, INC., EX-10.3, 5/29/2012 | Powered by Intelligize

**EXHIBIT A**

As used in this Agreement, the following terms shall have the meanings set forth below:

**Applicable Performance Criteria** shall mean the *greater* of Performance Criteria Item (A) or (B) below; provided, however, that if none of performance criteria (A) or (B) appear on the consolidated statements of operations included in the Form 10-K for the applicable fiscal year, then the *greater* of Performance Criteria Item (C) or (D), as its appears in the Form 10-K for the applicable fiscal year, shall be the Applicable Performance Criteria.

**First Trigger** shall mean the Company has earned at least **$_____** under the Applicable Performance Criteria for any fiscal year during the Restriction Period.

**Performance Criteria Item** shall mean the *greater* of performance criteria (A), or (B), or under circumstances described above, the greater of (C) or (D) below, with each of (A) through (D) (as the case may be) adjusted to remove the effect of any Unusual or Non-recurring Event, Transaction, or Accrual Items:

(A) Earnings per Common Share - diluted from continuing operations.

(B) Earnings per Common Share - diluted from continuing operations before extraordinary item and/or cumulative effect of a change in accounting principle (as the case may be).

If neither (A) nor (B) appear:

(C) Earnings per Common Share - diluted.

(D) Earnings per Common Share - diluted before extraordinary item and/or cumulative effect of a change in accounting principle (as the case may be).

**Outside Date** shall mean the **_____** anniversary of the date upon which the Restricted Stock Award was granted to the Participant.

**Restriction Period** shall mean the period commencing on Grant Date and continuing until the Outside Date.

**Second Trigger** shall mean the Company has earned at least **$_____** under the Applicable Performance Criteria for any fiscal year during the Restriction Period.

**Unusual or Non-recurring Event, Transaction or Accrual Items** shall mean any expense, gain or loss (including, but not limited to, judgments, interest on judgments, settlement amounts, attorneys' fees and costs, filing fees, experts' fees, and damages sustained as a result of the imposition of injunctive relief) as a result of claims, litigation or lawsuit settlement (including collective actions or class action lawsuits). With regard to Unusual or Non-recurring Event, Transaction or Accrual Items, the expenses, gains or losses as a result of claims, litigation or lawsuit settlements are intended to and shall be applicable only to claims, litigation and lawsuit settlements that are specifically (A) reported, appearing or disclosed in the Company's filings with the Securities and Exchange Commission, the Company's annual reports to shareholders or the Company's definitive proxy statements or (B) addressed in the quarterly Litigation and Claims Report of the Company's General Counsel to the Audit Committee of the Company's Board of Directors.



Source: BIG LOTS, INC., EX-10.3, 5/29/2012 | Powered by Intelligize