# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**Alan Willis, Individually and
on Behalf of All Others Similarly
Situated,**

       **Plaintiffs,**               **Case No. 2:12–cv–604**

       **v.**                       **Judge Michael Watson**

**Big Lots, Inc., *et al.*,**

       **Defendants.**

## OPINION AND ORDER

Defendants move to dismiss Plaintiffs' amended complaint for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and several provisions of the Private Securities Litigation Reform Act ("PSLRA"). ECF No. 28.  For the following reasons, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND AND FACTS

This securities class action involves allegations that, during a period of time in 2012, Defendant Big Lots, Inc. ("Big Lots" or the "Company") and several of its officers wrongfully inflated the value of Big Lots' stock by concealing from the public the true financial condition of the Company.

### A.    PROCEDURAL HISTORY

Plaintiff Alan Willis filed the initial Complaint in this action on July 9, 2012. ECF No. 1.  On March 5, 2013, the Court appointed the City of Pontiac General

Employees' Retirement System lead plaintiff in this matter. Order 10, ECF No. 17. On April 4, 2013, Plaintiffs filed an Amended Complaint. ECF No. 18.

The Amended Complaint names as Defendants Big Lots; Steven Fishman ("Fishman"), Big Lots' Chairman and CEO; Joe Cooper ("Cooper"), who served as Big Lots' CFO and Executive Vice President of Loss Prevention and Risk Management; Charles Haubiel ("Haubiel"), Big Lots' General Counsel; and Timothy Johnson ("Johnson"), who served as Big Lots' Senior Vice President of Finance.[1] Am. Compl. ¶¶ 33–37, ECF No. 18. All of the Individual Defendants served in these capacities at all relevant times. The Amended Complaint alleges causes of action for: violation of § 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 against all Defendants (Count I); violation of § 20(a) of the Act against the Individual Defendants (Count II); and violation of § 20A of the Act against the Individual Defendants (Count III).

Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and certain provisions of the PSLRA. ECF No. 28. The briefing on the motion is complete and the issues presented therein are ripe for decision. Defendants have requested oral argument, but, as the Court concludes that such argument is unnecessary for resolution of the motion, that request is denied.

---

[1] Collectively the individually named defendants will be referred to as "Individual Defendants."

## B.    THE AMENDED COMPLAINT

The class period relevant to the Amended Complaint is February 2, 2012 through August 23, 2012.  Am. Compl. ¶ 1, ECF No. 18.  Plaintiffs contend that, on several occasions during that period, Defendants knowingly or recklessly provided false and misleading information to investors, resulting in an overvaluation of Big Lots' stock.  According to Plaintiffs, in the months prior to the class period, the Company began to suffer significant disruptions to its critical merchandising operations.  These disruptions, which were not disclosed by Defendants, continued into the class period, and, despite the rosy picture of Big Lots' financial prospects painted by Defendants, the disruptions made it virtually impossible for the Company to meet performance projections.  Simultaneously and during a time when the Company itself was buying back millions of shares of its own stock, the Individual Defendants and other Company insiders sold large quantities of their own stock under circumstances Plaintiffs characterize as suspicious.

The Amended Complaint specifically alleges the following:  Big Lots is the "nation's largest broadline closeout retailer" and its shares trade on the New York Stock Exchange.  *Id.* ¶ 33.  Its business model involves sourcing merchandise through so-called "closeout deals," such as "where merchandise has been overproduced, discontinued or rejected by other retailers."  *Id.* ¶ 43.  In such instances, "Big Lots is often able to source branded products at a substantial discount to retail" and pass savings on to its customers.  *Id.*

Big Lots divides its merchandising operations into the following six categories: consumables; furniture; home; seasonal; play 'n wear; hardlines; and others.  *Id.* ¶ 45.  These categories are further subdivided into "departments" and "classifications."  *Id.*  Plaintiffs allege that consumables is Big Lots' largest and most important merchandise category, accounting for more than 30% of sales in fiscal years 2011 and 2012.  *Id.*  Other key categories and departments include seasonal, electronics (a department within the play 'n wear category), furniture, and domestics (a department within the home category).  *Id.*  According to Plaintiffs, Big Lots' sales performance in these categories and departments, along with growth in same store sales ("SSS"), are closely followed by investments analysts when projecting Big Lots' financial performance.  *Id.*  SSS is a comparison of the sales of a given store between different financial periods.  *Id.* at n.2.

Plaintiffs allege that Big Lots' performance had been relatively marginal in the time period prior to the middle of fiscal year 2011.  The Company "had experienced three consecutive quarters of flat or negative SSS growth," and its stock was trading lower than its competitors as measured by comparing price-to-earnings ratios.  *Id.* ¶ 48.  As a result of disappointing performance, Big Lots' management implemented new strategies focusing on the Company's key merchandising categories and hired Doug Wurl, formerly a merchandising executive at Sears, as Executive Vice President of Merchandising.  *Id.* ¶ 49.

Plaintiffs contend that those changes initially improved sales at Big Lots: in the third quarter of 2011, the Company experienced SSS increases of 1.7% and revised earnings per share guidance for fiscal year 2011 upward. *Id.* ¶ 50. The Individual Defendants explained the improved performance to investors during a conference call on December 2, 2011, with Fishman proclaiming that Big Lots' merchandising personnel "look and are executing as good as [they've] ever done before." *Id.* ¶ 51. Fishman further stated that the Company was "very well positioned" to succeed in the key merchandising categories. *Id.* During the December 2nd call, the Individual Defendants also "made clear that improving sales trends would continue through" the fourth quarter of 2011 and into the 2012 fiscal year. *Id.* ¶ 52.

According to Plaintiffs, despite the improved performance at the end of fiscal year 2011 and the representations made by Defendants, changes to Big Lots' merchandising operations "substantially impaired the Company's ability to meet sales targets" going forward. *Id.* ¶ 56. Specifically, they point to efforts by Wurl to move Big Lots away from its closeout business model toward a more conventional retail model. *Id.* ¶ 57. They allege, for example, that "Wurl wanted the presentation of store merchandise planned out months in advance, so that items would appear coherent and attractive." *Id.* This strategy conflicted with Big Lots' closeout model because the availability of closeout merchandise could not be predicted far in advance, and "ultimately weakened the Company's sales performance." *Id.* Wurl's desired changes brought him into conflict with Fishman

and other Company leaders and the conflict resulted in merchandising employees having to implement conflicting and/or inconsistent directives from management.  *Id.* ¶ 58.

Plaintiffs further allege that Wurl began to lay off many merchandising employees starting in late 2011, and that, in early 2012, many key Company personnel left Big Lots out of dissatisfaction with the direction the Company was taking.  *Id.* ¶¶ 58–59.  Plaintiffs contend that the loss of employees:

> seriously impaired the capabilities of Big Lots' specialized merchandising teams and irreparably damaged Big Lots' critical vendor network.  Remaining personnel were unable to secure the high-quality closeout deals that formed the foundation of Big Lots' business, and instead resorted to sourcing low-quality, inferior products which were poorly received by customers.  The deterioration of Big Lots' core merchandising capabilities diminished its ability to consistently meet sales targets across merchandise categories and exacerbated structural weaknesses in Big Lots' opportunistic, deal-centered business model. Sales slowed by February 2012, particularly in the Company's key sales categories.

*Id.* ¶ 60.

On February 2, 2012, the first day of the class period, Big Lots issued a press release reporting preliminary financial results for the fourth quarter of fiscal year 2011, which had ended January 28, 2012.  *Id.* ¶ 61.  According to the release, the Company had "'exceeded [its] guidance' on 'improving trends.'"  *Id.* The release reported fourth quarter SSS growth of 3.4%, growth in U.S. sales of 7.7%, and revised upward earnings per share projections for fiscal year 2011 to $2.94–$2.97, representing a 4% to 5% increase over fiscal year 2010.  *Id.* The February 2, 2012 statements drove Big Lots' stock price to $42.82, an 8% one-

day increase.  *Id.* ¶ 63.  According to Plaintiffs, Defendants' February 2, 2012

statements were materially false and misleading given that "that mass layoffs of

key personnel and Wurl's failure to successfully integrate as head of Big Lots'

merchandising operations had critically impaired Big Lots' merchandising

operations and the Company's ability to secure appropriate closeout inventory

and effectively execute its merchandising strategies."  *Id.* ¶ 62.

On March 2, 2012, Big Lots issued a press release detailing financial

results for the fourth quarter of fiscal year 2011 and fiscal year 2011 overall.  *Id.*

¶ 67.  The release also made forecasts for FY 2012, advising investors:

> [T]hat FY 2012 EPS would "be in the range of $3.40 to $3.50," SSS
> would increase "2% to 3%," U.S. sales would increase "8% to 9%,"
> and that Big Lots' financial performance would "result in cash flow of
> approximately $200 million." The release also noted that 1Q12 EPS
> would be "$0.75 to $0.81, a 7% to 16% increase" over 1Q11, while
> SSS would increase "2% to 4%" in 1Q12, with an increase in U.S.
> sales of "6% to 8%."

*Id.* ¶ 69.  That same day, the Individual Defendants also participated in a

conference call with investors, wherein they emphasized that positive trends from

fiscal year[2] 2011 had carried into the first quarter of 2012 and "would propel

growth throughout" FY 2012.  *Id.* ¶¶ 69–70.  Plaintiffs allege that, during that call,

"Fishman concealed the major employee defections and layoffs" and voiced

support for Wurl's initiatives, despite his conflicts with Wurl.  *Id.* ¶ 74.  The press

release and a transcript of the March 2nd Conference Call were included in Big

Lots' Form 8-K, which Haubiel signed and Big Lots filed on March 7, 2012.  *Id.*

---

[2] Fiscal year will hereafter be referred to either as "fiscal year" or as "FY."

¶¶ 75–76. Plaintiffs contend that the statements made on March 2nd and 7th resulted in respective 3% daily increases in Big Lots' stock price. *Id.* ¶ 78.

Plaintiffs allege that the statements made in the March 2nd Press Release and conference call and restated in the Form 8-K were materially false and misleading given:

(a) that, by February 2012, sales in the Company's key merchandising categories did not "have legs" and would not "grow organically" in FY 2012, but in fact had slowed;

(b) that 1Q12 sales in Big Lots' consumables category, which represented a third of its business and served as a key driver of customer traffic, had not "picked up" but in fact had declined as a result of poor brand selection and limited product array;

(c) that 1Q12 sales in the Company's video game, DVD and tablet classifications did not "continue to be good," but in fact had deteriorated as a result of outdated offerings and poor product selection;

(d) that because of softening sales figures, the robust sales trends experienced by Big Lots at the end of FY 2011 had reversed, and thus the Company did not have "improving trends coming out of FY 2011" and its sales performance was not "consistent" with the "record results" of FY 2011—indeed, Big Lots was on target to miss its easiest quarterly sales comparison in at least ten years;

(e) that Big Lots had experienced mass defections and layoffs of key personnel which materially impaired the Company's future growth prospects and precluded Big Lots from posting the numbers disseminated by defendants;

(f) that Wurl's merchandising strategies did not "drive business" on the back of Fishman's "real[] support," as Wurl's more conventional retail strategies in fact ran against Big Lots' unique closeout-focused business model and diminished its sales performance, and Fishman was privately acting to prevent the changes endorsed by Wurl;

(g) that the Company could not provide "more consistent and predictable results" in FY 2012, as the loss of key personnel and a lack of focused leadership had critically impaired Big Lots' merchandising operations and its ability to meet sales targets, particularly within the Company's key sales categories;

(h) that the execution of merchandising sales strategies was neither focused nor better than ever before – to the contrary, the Company's merchandising operations had fallen into disarray, many senior personnel had left, and customers were not responding positively to many of the Company's sales initiatives;

(i) that the Company was not "aggressively approaching" an unprecedented level of closeout activity, nor had closeouts in consumables been extraordinarily "aggressive" or "active," as impaired merchandising teams failed to secure available closeout inventory and the consumables product pipeline had dried up;

(j) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to increase 6%-8%, and the Company could not possibly achieve EPS of $0.75-$0.81 as claimed by defendants;

(k) that the Company could not meet its FY 2012 sales and earnings numbers as SSS were not on track to increase 2%-3%, but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(l) that as a result of (a)-(k) above, defendants had no reasonable basis to expect, and, in fact, did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81, or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

*Id.* ¶ 77.

According to Plaintiffs, the false statements artificially inflated Big Lots' stock, and, during March 2012, various company insiders, including the Individual Defendants, sold large volumes of their Big Lots stock, taking advantage of prices that they knew were inflated. *Id.* ¶ 81. During that month, seventeen

insiders sold 730,000 shares of Big Lots stock for gross proceeds of over $33 million.  *Id.*

On March 26, 2012, Big Lots filed its annual report for FY 2011 on a Form 10-K, which was signed by Fishman, Cooper, and Haubiel.  *Id.* ¶ 83.  The report did not mention the employee layoffs and resignations previously discussed.  *Id.* ¶ 84.  The report also suggested that the strategies and initiatives that had helped achieve successful results in 2011 would continue to "grow the basket" in FY 2012.  *Id.* ¶ 85.  On March 27, 2012, Fishman and Johnson participated in a conference call with investors and "repeated and addressed information previously made public in defendants' February and March 2012 statements."  *Id.* ¶ 88.  Plaintiffs contend that the March 26th and 27th statements drove Big Lots' stock to its class-period high of $46.81 on March 27, 2012.  *Id.* ¶ 94.

Plaintiffs allege that the statements made and/or released on March 26th and 27th were materially false and misleading given:

> (a) that, by February 2012, sales in the Company's key merchandising categories had slowed as major merchandising initiatives implemented in FY 2011 no longer "positively impacted sales" and failed to increase transaction values;
>
> (b) that 1Q12 sales in Big Lots' consumables category, which represented a third of its business and served as a key driver of customer traffic, were declining as a result of poor brand selection and limited product array;
>
> (c) that 1Q12 sales in the Company's video game, DVD and tablet classifications had slowed as a result of outdated offerings and poor product selection, and thus the "major shift" experienced in 4Q11 in electronics had reversed;

(d) that because of softening sales figures, the robust sales trends experienced by Big Lots at the end of FY 2011 had not been maintained, and thus defendants did not "expect positive trends in growth and shareholder returns" in 1Q12;

(e) that defendants did not expect "another solid year" for FY 2012, as Big Lots was on target to miss its easiest quarterly sales comparison in at least ten years;

(f) that Big Lots was not "growing organically" as a result of its merchandise offerings," as [sic] Big Lots' was offering an increasingly outdated and narrow selection of merchandise in several of its key sales categories, including consumables and electronics;

(g) that the Company was not "growing [its] organizational capabilities" but rather had experienced mass defections and layoffs of key personnel – which materially impaired the Company's future growth prospects and precluded Big Lots from posting the numbers disseminated by defendants;

(h) that Big Lots was not "benefit[ing] substantially from the leadership and experience of [its] senior executives," as infighting among the Company's senior leadership and failed strategic initiatives had substantially impaired the Company's merchandising operations;

(i) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to increase 6%-8%, and the Company could not possibly achieve the $0.75-$0.81 EPS defendants had claimed;

(j) that the Company could not meet its FY 2012 sales and earnings numbers, as SSS were not on track to increase 2%-3%, but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(k) that as a result of (a)-(j) above, defendants had no reasonable basis to expect, and, in fact, did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81 or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

*Id.* ¶ 93.

On April 9, 2012, Big Lots released its 2011 annual report, which was opened by a letter from Fishman to shareholders wherein he, *inter alia*, emphasized that the Company was in a "growth mode." *Id.* ¶ 96. The report also attached the 2011 Form 10-K as an exhibit. *Id.* ¶ 98. The statements in the annual report purportedly increased Big Lots' stock price by nearly 6% to $45.32 per share. *Id.* ¶ 100.

Plaintiffs allege that the statements made in the annual report were materially false and misleading given:

(a) that by February 2012, Big Lots was not in "growth mode," as sales trends in the Company's key merchandising categories had not continued to accelerate after FY 2011, but in fact had slowed;

(b) that in 1Q12 sales in the Company's electronics and consumables categories had slowed as a result of poor merchandise selection and poorly executed merchandising initiatives;

(c) that the merchandise assortment did not "continue to get stronger and more focused on value and brands," as Big Lots was offering an increasingly outdated and narrow selection of merchandise in several of its key sales categories, including consumables and electronics;

(d) that Big Lots had not "creat[ed] meaningful employment opportunities," as heightened employee dissatisfaction had led to mass defections and layoffs of key personnel, which materially impaired the Company's future growth prospects and precluded the Company from posting the numbers disseminated by defendants;

(e) that Big Lots was not executing a consistent, focused strategy— to the contrary, Big Lots' merchandising operations had fallen into disarray, key personnel had left, and the Company's sales initiatives were being poorly received by consumers;

(f) that the Company was not "ideally positioned for the future," as impaired merchandising teams failed to successfully execute sales strategies or secure appropriate closeout inventory and the consumables product pipeline had dried up;

(g) that the Company could not meet its 1Q12 sales and earnings numbers, as SSS were not "on plan" to increase 2%-4% but were in fact decreasing, U.S. sales were not "on plan" to increase 6%-8%, and the Company could not possibly achieve EPS of $0.75-$0.81 as claimed by defendants;

(h) that the Company could not meet its FY2012 sales and earnings numbers, as SSS were not on track to increase 2%-3% but were in fact decreasing and the Company could not possibly achieve EPS of $3.40-$3.50 or $200 million of cash flow; and

(i) that as a result of (a)-(h) above, defendants had no reasonable basis to expect, and in fact did not expect, Big Lots to post 1Q12 SSS growth or EPS of $0.75-$0.81, or FY 2012 SSS growth, EPS of $3.40-$3.50 or cash flow of $200 million.

*Id.* ¶ 99.

Plaintiffs contend that the truth about Big Lots' financial condition began to emerge two weeks after the release of the annual report. On April 23, 2012, after stock markets had closed, Big Lots issued a press release updating financial forecasts for the first quarter of the 2012 fiscal year. *Id.* ¶ 102. The press release stated that: "we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%." *Id.* It further stated that consumables and electronics were below expectations for the quarter. *Id.* On April 24, 2012, Big Lots' stock dropped 24% from its closing price of the previous day, from $45.71 to $34.71. *Id.* ¶ 106.

Plaintiffs allege that Defendants attempted to blame the downgrade in guidance on a slowdown in sales that had occurred in April 2012 but that they were aware that problems previously mentioned had begun much earlier. *Id.* ¶ 107. They further contend that during the first quarter of 2012, the Company's stock price was also artificially inflated by a $99 million stock repurchase authorized by Defendants. *Id.*

On May 23, 2012, the Company released its results for the first quarter of 2012. *Id.* ¶ 110. Instead of growing 7% to 16% as originally projected on March 2nd, earnings per share fell 3%. *Id.* Additionally, SSS declined 1% for the quarter and U.S. sales increased by less than 3% instead of the projected 6% to 8% increase. *Id.* ¶ 111. The May 23rd Press Release also revised downward previously issued guidance for overall performance during FY 2012. *Id.* ¶ 112.

On May 23rd, in conjunction with the release of first quarter results, Cooper, Fishman, and Johnson participated in a conference call wherein Johnson attributed the performance deficiencies to slowdowns in sales of consumables and electronics. *Id.* ¶ 113. During the call, Fishman "repeatedly denied the existence of any larger issues which could call into question the viability of Big Lots' business model or the integrity of its merchandising operations." *Id.* ¶ 115. According to Plaintiffs, Defendants "tried to mitigate the fallout from the April 23 and May 23, 2012 revelations" by failing to disclose "the turmoil in the Company's merchandising operations brought on by Wurl." *Id.* ¶ 116. During the call, the "Defendants provided 2Q12 and FY 2012 estimates

which failed to acknowledge the true state of Big Lots' sales capabilities and earnings potential." *Id.* ¶ 118. These statements were repeated in a Form 8-K with the Securities Exchange Commission ("SEC") filed on May 29, 2012, which included as exhibits a copy of the May 23rd Press Release and a transcript of the May 23rd Conference Call. *Id.* ¶ 120.

On June 5, 2012, Haubiel and Johnson represented Big Lots at a conference where Johnson "continued to downplay the significance of the [first quarter] earnings miss to Big Lots' overall operating performance. *Id.* ¶ 122. On June 6, 2012, the Company filed its Form 10-Q for the first quarter of FY 2012, which had ended on April 28, 2012. *Id.* ¶ 123.

Plaintiffs allege that the statements made in May and June of 2012, including at the June 5th conference and in Form 10-Q, were materially false and misleading given:

> (a) that as a result of mass defections, layoffs of key personnel and Wurl's failure to successfully integrate into Big Lot's merchandising operations, the volatility underlying the Company's closeout-focused business model had in fact been exacerbated and downward sales trends had accelerated;
>
> (b) that sales in several of the Company's key merchandising categories—including furniture, home and seasonal—had softened in the first weeks of 2Q12 as a result of ongoing "execution" failures within Big Lots' merchandising operations;
>
> (c) that Big Lots' gross margin rate was not increasing but in fact declining as a result of an unfavorable merchandising mix and elevated markdown levels;

(d) that the Company could not meet its 2Q12 sales and earnings numbers, as U.S. sales were not on track to increase 3%-4% and the Company could not [sic] possible achieve EPS of $0.37-$0.42;

(e) that the Company could not meet its revised FY 2012 sales and earnings numbers, as U.S. sales were not on track to increase 5.5%-6.5% and the Company could not possibly achieve EPS of $3.25-$3.40; and

(f) that as a result of (a)-(e) above, defendants had no reasonable basis to expect, and in fact did not expect, Big Lots to post 2Q12 U.S. sales growth of 3%-4% or EPS of $0.37- $0.42, or FY 2012 U.S. sales growth of 5.5%-6.5% or EPS of $3.25-$3.40.

*Id.* ¶ 125. The purportedly false statements made in May and June had the effect of stabilizing Big Lots' stock price at an inflated value. *Id.* ¶ 126.

On August 23, 2012, the final day of the class period, Defendants released earnings results for the second quarter of 2012, announcing that Big Lots had again failed to meet quarterly projections. *Id.* ¶ 128. According to Plaintiffs, "[d]ownward sales trends had not only failed to improve but accelerated downward, demonstrating that the Company's 'execution issues' were much deeper than originally disclosed and symptomatic of underlying structural problems in Big Lots' business model." *Id.* On August 23rd, the Company also announced Wurl's resignation. *Id.* The results released on August 23rd caused Big Lots' stock price to fall from $38.84 per share on August 22nd to $30.76 per share by the close of trading on August 23rd. *Id.* ¶ 131.

On November 29, 2012, Big Lots received a subpoena from a grand jury in the Southern District of New York requesting documents related to Fishman's stock trades . *Id.* ¶ 135. Fishman was also under investigation by the SEC. *See*

*id.* ¶ 140. On December 4, 2012, he announced his retirement from Big Lots, agreeing to remain in his position until the appointment of a successor. *Id.* ¶¶ 34, 136.

Plaintiffs allege that the Individual Defendants were "directly involved in the day-to-day operations of Big Lots, including the improper dissemination of materially false and misleading information regarding Big Lots' sales, financial performance and business prospects." *Id.* ¶ 39. During the class period, Wurl reported directly to Fishman. *Id.* ¶ 47. Information concerning merchandising was funneled to Wurl through two General Merchandising Managers, who in turn supervised division managers with oversight over divisional merchant teams. *See id.* ¶¶ 46–47. Additionally, the Individual Defendants received daily and weekly sales reports and summaries that "included sales by region, sales to plan, and comparable store sales for each of the Company's merchandising divisions." *Id.* ¶ 47. They also attended weekly meetings to discuss the Company's sales performance. *Id.* At the meetings, the Individual Defendants "discussed Big Lots' business performance for the previous week and business prospects in detail, with top priority given to any downward sales trends or problems identified within the Company's merchandising operations." *Id.* ¶ 151.

According to Plaintiffs, "[b]ecause of these extensive information delivery and reporting systems, during the Class Period the Individual Defendants knew of declines within the Company's key merchandising categories and problems

within the Company's critical merchandising operations as they occurred." *Id.*

¶ 151.  In sum,

> [t]he Individual Defendants' job responsibilities, certifications, actions, statements and participation in Big Lots' extensive reporting and information distribution network in and around the Class Period confirm that each of the Individual Defendants knew or recklessly disregarded the impairment to the Company's merchandising operations and slowdown in the Company's sales performance and the surrounding circumstances set forth [in the Amended Complaint].

*Id.* ¶ 153.

> Plaintiffs also allege that the following are additional indicators of scienter

on the part of the Individual Defendants:

> (i) defendants' unprecedented insider trading spree—unusual in its nature, timing, amount and coordination—which allowed the Individual Defendants to secure tens of millions of dollars in ill-gotten proceeds for themselves;

> (ii) the wide divergence between internal sales reports and discussions and the Individual Defendants' representations to the public;

> (iii) the short proximity between the Individual Defendants' fraudulent statements and omissions, including their insider sales, and the disclosure of adverse information inconsistent with earlier representations;

> (iv) the multitude of governmental investigations and news reports concerning the impropriety of the Individual Defendants' conduct during the Class Period;

> (v) defendants' efforts to minimize investor scrutiny of quarterly sales volatility, which had significantly depressed Big Lots' stock price, and deflect[ed] criticism away from Company management; and

> (vi) the resignation of key Company personnel.

*Id.* ¶ 154.

Plaintiffs allege that Defendants' scheme to deceive the market through a course of conduct that artificially inflated the value of Big Lots common stock through the class period had its intended effect and directly and proximately caused Big Lots common stock to trade at artificially inflated levels.  *Id.* ¶ 172–73.

Plaintiffs claim that, as a result of Defendants' statements, Plaintiffs "relied, to their detriment, on such statements and documents and/or the integrity of the market, in purchasing their Big Lots common stock during the class period."  *Id.* ¶ 177.  They allege that Defendants' "false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by [Plaintiffs], and maintained the artificial inflation in the price of Big Lots common stock throughout the Class Period, until the truth leaked into, and was partially revealed to, the market, at which time the prior inflation came out."  *Id.* ¶ 176.   Accordingly, Plaintiffs claim had they known the truth, they would not have purchased Big Lots' stock.  *Id.* ¶ 177.

Plaintiffs allege that two statements disclosed the truth: an April 23, 2012 Press Release and an August 23, 2012 Press Release.  Plaintiffs allege that the April 23, 2012 Press Release "revealed that Big Lots was revising down its recently issued guidance and that instead of achieving 'record breaking' sales growth as defendants represented, Big Lots would be in fact be achieving record breaking sales decline."  *Id.* ¶ 178.  Through that press release and the statements that followed it, Defendants attempted to keep Big Lots' stock

artificially inflated by representing the miss as one-off and readily-rectifiable. *Id.* Nevertheless, Defendants stock fell 24% on April 24, 2012.

Plaintiffs claim that the full truth of Big Lots' financial condition was revealed in a press release issued on August 23, 2012, which stated that Big Lots would "miss its sales and earning guidance for a second consecutive quarter [of 2012] and that the head of the Company's critical merchandising operations had resigned." *Id.* ¶ 179. Plaintiffs claim that this was when the market learned that the first quarter of 2012 had not been an isolated incident but rather was "indicative of serious problems within the Company's merchandising operations and business model." *Id.* By the next day, the Company's stock fell $8.00 a share, which constituted a one-day decline of 21%. *Id.* ¶ 180.

## II. STANDARD OF REVIEW

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). A Rule 12(b)(6) motion requires dismissal if the complaint fails to state a claim upon which relief can be granted. While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must also "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory."

*Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (quotations and citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it] [is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

In addition to the basic pleading requirements found in Rule 8, Rule 9(b) specifies that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). In the Sixth Circuit, Rule 9(b)'s heightened pleading standard has been interpreted to require "plaintiffs to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). Failure to comply with the heightened pleading requirements of Rule 9(b) is treated as a failure to state a claim for which relief can be granted. *United States ex rel. Howard v. Lockheed Martin Corp.*, 499 F. Supp. 2d 972, 976 (S.D.

Ohio 2007) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999)).

Defendants also move to dismiss pursuant to several provisions of the PSLRA. The PSLRA requires complaints alleging claims for securities fraud arising from material misstatements or omissions to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, such a complaint, "with respect to each act or omission alleged to violate [the Act], [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for the particular type of claim brought. *Id.* § 78u-4(b)(2)(A). The PSLRA requires dismissal of a complaint if the above requirements are not met. *Id.* § 78u-4(b)(3)(A). Finally, the PSLRA includes a safe harbor provision that shields defendants from liability for purported fraud based on "forward-looking statements,"—as defined by the PSLRA—that meet certain requirements. *See id.* § 78u-5. In considering a motion to dismiss based on the safe harbor provision, the Court "shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." *Id.* § 78u-5(e).

## III.   ANALYSIS

Plaintiffs' three claims are brought pursuant to §§ 10(b), 20(a), and 20A of the Act, codified as amended at 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Count I is brought pursuant to § 10(b) and Rule 10b-5, which deal with fraud in connection with the sale of securities. Count II is brought pursuant to § 20(a), which establishes instances in which individuals controlling others who have violated the Act (in this case, violations of Rule 10b-5) can be deemed personally liable for those violations. *See* 15 U.S.C. § 78t(a). Finally, Count III is brought pursuant to § 20A, which establishes a private cause of action for injuries suffered as a result of another's insider trading. *See id.* § 78t-1.

### A. Counts I & II

Section 10(b) of the Act makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, issued by the SEC pursuant to § 10(b), provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish a cause of action under Rule 10b-5, a plaintiff must plead the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Defendants focus their motion on elements one, two, and six.

Defendants argue that Counts I (violations of § 10-b and Rule 10b-5) and II (Rule 10b-5 liability of Individual Defendants as controlling persons under § 20(a)) of the Amended Complaint should be dismissed on various grounds. First, they assert that the statements identified by Plaintiffs as false and misleading are protected by the forward-looking statement safe harbor of the PSLRA. Second, they contend that Plaintiffs have failed to plead with particularity that any challenged statement was materially false or misleading, as also required by the PSLRA and Federal Rule of Civil Procedure 9(b). Third, they argue that Plaintiffs have failed to plead facts leading to a strong inference

of scienter, as required by the PSLRA. Fourth, they argue that the Amended Complaint fails to establish loss causation. With regard to Count II, they assert that the Amended Complaint fails to state a claim for control-person liability.

### 1. PSLRA Safe Harbor and Particularity and Materiality Requirements

The PSLRA's safe harbor extends to any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A).

Defendants argue that all of the statements identified in the Amended Complaint as potentially fraudulent are forward looking and meet the above requirements to qualify for the safe harbor.

The PSLRA defines "forward-looking statement" to include:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) . . . .

*Id.* § 78u-5(i)(1). Statements of present or historical fact are not forward looking. *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003).

"[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." *Miller*, 346 F.3d at 672. Regarding the sufficiency of cautionary language, the Sixth Circuit has noted that "the legislative history [of the PSLRA] makes clear that 'boilerplate warnings will not suffice. . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558–59 (6th Cir. 2001), *partially abrogated by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (quoting H.R. Rep. No. 104–369, at 43 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 742). Rather, "cautionary statements must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *Id.* at 559. Any oral forward-looking statement is not actionable for securities fraud if:

accompanied by a cautionary statement—

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

[if—]

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established [for written forward-looking statements].

15 U.S.C. § 78u-5(c)(2).

Accordingly, the Court will determine whether the statements meet the PSLRA's definition of forward looking. If a particular statement is forward looking, the Court will then consider whether it meets the safe harbor requirement of being accompanied by meaningful cautionary statements.

If a statement is not forward-looking, the Court will proceed to analyze the statements. Plaintiffs must allege fact(s) sufficient to show the following: (1) Defendants made a statement or omission that was false or misleading; (2) that this statement or omission concerned a material fact; and (3) the time, place, and content of the alleged misrepresentation or omission on which Plaintiffs relied and the fraudulent scheme. *In re Omnicare Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014).

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 484 U.S. 224, 240 (1988). An omission of fact is material if there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The question the Court asks is "would the information, had it been presented accurately, have significantly altered the total mix of information made available?" *Id.* (internal citations and quotation marks omitted). The Court, however, must "tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in the full context." *In re Omnicare*, 769 F.3d at 472.

> [O]pinions may be deemed false or misleading under the securities laws if proof of their falsity can be established through the orthodox evidentiary process. For such statements, a company is generally under no obligation to disclose its expectations for the future to the investing public. If a company chooses to volunteer such information, though, its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts to the extent that the volunteered disclosure was misleading. Our securities laws therefore require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (internal citations, quotation marks, and alterations omitted).

The Court of Appeals for the Sixth Circuit has recently attempted to clarify the Court's duty when considering such statements in light of a motion to

dismiss. Courts "must apply a different analytical framework to cases based on affirmative misrepresentations, as opposed to omissions, and . . . different rules apply when the misrepresentation or omission concerns hard, as opposed to soft, information." *In re Omnicare, Inc.*, 769 F.3d at 470.

An actionable misrepresentation is an affirmative statement that is misleading or false. *Id.* That misrepresentation can concern either hard or soft information. *See id.* Hard information relates to historical information or facts that are objectively false or misleading. *Id.* Soft information includes predictions and matters of opinions; as such, Plaintiffs are required to plead additional facts that show the statement concerning soft information is known to be false. *Id.*

The Court's review will adhere to the Sixth Circuit's guidance and will "evaluate materiality and whether the statement was misleading or false—two objective inquiries—under the material-misrepresentation [part of the analysis] and then . . . save all subjective inquiries for the scienter analysis." *Id.* at 471.

An actionable omission is an alternative to a misleading or false statement; an actionable omission is a defendant's failure to disclose information when it was required to do so whether due to insider trading, a statute requiring disclosure, or, when a prior disclosure is inaccurate, incomplete, or misleading, to amend that statement. *Id.* However, different pleading requirements apply depending on whether the prior disclosure failed to disclose hard information or soft information. *Id.* If hard information is omitted, then a defendant has a duty to disclose that information "if it renders a prior disclosure objectively inaccurate,

incomplete, or misleading." *Id.* If soft information is omitted, a defendant only has a duty to disclose that information it if is virtually as certain as hard facts and contradicts the prior statement, i.e. "the new information must be so concrete [a] defendant must have actually known that the new information renders the prior statement misleading or false and still did not disclose it." *Id.*

The Amended Complaint identifies thirteen distinct sources of allegedly fraudulent statements made by Defendants during the class period: a press release issued on February 2, 2012; a press release issued on March 2, 2012; a conference call with investors on March 2, 2012; a Form 8-K issued on March 7, 2012; Big Lots' annual Form 10-K report released on March 26, 2012; a conference call on March 27, 2012; Big Lots' annual report issued on April 10, 2012; a press release issued on April 23, 2012; a press release issued on May 23, 2012; a conference call on May 23, 2012; a Form 8-K issued on May 29, 2012; a conference call on June 5, 2012; and a Form 10-Q issued on June 6, 2012. Plaintiffs generally contend that statements made in those sources were fraudulent for omitting and/or concealing information concerning the true state of Big Lots' performance and merchandising operations. Specifically, they contend that by February 2012, it was apparent to Defendants that Wurl's initiatives had come into conflict with Big Lots' culture and were failing. Additionally, key personnel had left the Company, either voluntarily or as a result of Wurl's "purge," further weakening the merchandising operations critical to the Company's success. These issues had caused sales to slump by the start of the

class period and made it impossible for Big Lots to meet the earnings projections in which Defendants expressed confidence.

The Court will consider each source in turn.

**February 2nd Press Release:**  The Court determines that each of the statements from the February 2nd Press Release cited in ¶ 61 of the Amended Complaint are statements of present or historical fact and thus are not forward looking.  In this regard, the cited statements all relate to the financial results of the fourth quarter of FY 2011, which had ended on January 28, 2012.

However, the Court concludes that Plaintiffs have failed to adequately state the reason or reasons why the cited statements are misleading as required by the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(1).  As noted by Defendants, Plaintiffs make no general allegations that the numerical financial results Big Lots reported for FY 2011 were false or not accurate from an objective standpoint.  While the Amended Complaint alleges that the issues under Wurl's leadership resulted in the positive sales trends toward the end of 2011 that were not sustainable leading into 2012, Am. Compl. ¶ 62, ECF No. 18, the purportedly false statements from the February 2nd Press Release do not at all relate to trends entering 2012.

**March 2nd Press Release:**  The Court likewise determines that each of the statements cited in ¶ 67 of the Amended Complaint from the March 2nd Press Release are not forward looking but that Plaintiffs have failed to sufficiently allege that the statements were false.  The cited statements characterize the financial

results achieved in FY 2011 and Fishman's explanation of the results.  As with the February 2nd statements, there are no allegations in the Amended Complaint that Big Lots did not actually achieve the results reported for 2011.

Turning to the statements identified in ¶ 68, the Court concludes that they are all forward looking as defined by the PSLRA as the statements are clearly projections of Big Lots' financial performance for the first quarter of FY 2012 and FY 2012 as a whole.  *See* 15 U.S.C. § 78u-5(i)(1)(A).  Accordingly, the Court must consider whether those statements were accompanied by meaningful cautionary language.  The release contains the following, lengthy disclaimer:

### Cautionary Statement Concerning Forward-Looking Statements

Certain statements in this release are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, and such statements are intended to qualify for the protection of the safe harbor provided by the Act. The words "anticipate," "estimate," "expect," "objective," "goal," "project," "intend," "plan," "believe," "will," "should," "may," "target," "forecast," "guidance," "outlook" and similar expressions generally identify forward-looking statements. Similarly, descriptions of our objectives, strategies, plans, goals or targets are also forward-looking statements. Forward-looking statements relate to the expectations of management as to future occurrences and trends, including statements expressing optimism or pessimism about future operating results or events and projected sales, earnings, capital expenditures and business strategy. Forward-looking statements are based upon a number of assumptions concerning future conditions that may ultimately prove to be inaccurate. Forward-looking statements are and will be based upon management's then-current views and assumptions regarding future events and operating performance, and are applicable only as of the dates of such statements. Although we believe the expectations expressed in forward-looking statements are based on reasonable assumptions within the bounds of our knowledge, forward-looking statements, by their nature, involve risks, uncertainties and other factors, any one or

a combination of which could materially affect our business, financial condition, results of operations or liquidity.

Forward-looking statements that we make herein and in other reports and releases are not guarantees of future performance and actual results may differ materially from those discussed in such forward-looking statements as a result of various factors, including, but not limited to, the current economic and credit crisis, the cost of goods, our inability to successfully execute strategic initiatives, competitive pressures, economic pressures on our customers and us, the availability of brand name closeout merchandise, trade restrictions, freight costs, the risks discussed in the Risk Factors section of our most recent Annual Report on Form 10-K, and other factors discussed from time to time in our other filings with the SEC, including Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. This release should be read in conjunction with such filings, and you should consider all of these risks, uncertainties and other factors carefully in evaluating forward-looking statements.

You are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. We undertake no obligation to publicly update forward-looking statements, whether as a result of new information, future events or otherwise. You are advised, however, to consult any further disclosures we make on related subjects in our public announcements and SEC filings.

DeMay Decl. Ex. A 14–15, ECF No. 28-2 (emphasis in original).

Defendants argue the statement is substantive and tailored to the specific future projections. Plaintiffs claim the statement fails to meaningfully warn, and Defendants' blanket statement is not tailored to the referenced future projections.

The Court finds that the statement adequately warns readers and provides a litany of examples as to what a reader should identify as a forward-looking statement and a long list of what these statements relate to and factors that may cause the actual future result to differ from the stated projections. Thus, the Court finds that the statement is materially cautionary. *See In re Cardinal Health*

*Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 (S.D. Ohio 2006) *judgment entered sub nom. In re Cardinal Health Inc. Sec. Litig.*, No. C2–04–575, 2007 WL 1026347 (S.D. Ohio Mar. 29, 2007) (citing *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful cautionary language' calls for 'substantive' company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.").  The disclaimer clearly states that the "actual results may differ from those discussed in such forward-looking statements."  DeMay Decl. Ex. A 15, ECF No. 28-2.  The statement lists risk factors, even acknowledging that the risks also include those discussed in "our most recent Annual Report" and other factors discussed from time to time in our other filings with the SEC.  Accordingly, the statements contained in the March 2nd Press Release are protected under the PSLRA's safe harbor.

***March 2nd Conference Call:*** Plaintiffs have identified several statements made in the March 2nd Conference Call as false or misleading.  *See* Am. Compl. ¶¶ 69–74, ECF No. 18.  Turning first to those cited in ¶ 69, the Court concludes that the statements are not forward looking.  In these statements, Fishman said that:

> 1) "Our fourth quarter was a success as we executed our strategies extremely well over the holiday season, maybe better than we ever have before";

2) "[Big Lots] significant improvements in [consumables] in 2011 with our merchandise, with planned events, and our team, and the changes have translated into meaningful sales growth";

3) "[P]roduct presentation, and in-store execution . . . steadily improved as the year went along";

4) Big Lots "offered great quality seasonal product, all priced at extreme values, and the customers responded in a big way"; and

5) The "other big winner for the holidays was electronics."

DeMay Decl. Ex. C 18; ECF No. 28-2. These statements all relate to historical facts concerning FY 2011.

The Court further determines that the fourth and fifth statements are not actionable as Plaintiffs have not sufficiently alleged that they were materially false. In the Court's view, the fourth and fifth statements identified above are almost completely subjective and of the type usually considered to be corporate puffery. *Indiana State Dist. Counsel & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (Statements fall in the "realm of corporate puffery" when they are "loosely optimistic statements that are so vague, so lacking in specificity or clearly constitute the opinion that no reasonable investor could find them important." (internal citation and quotation marks omitted)). The fact that Defendants describe FY 2011 as a year in which Big Lots indisputably was successful render these statements nearly impossible to disprove. These statements, therefore, are not actionable.

The first, second, and third statements, however, are different. Construing all the facts in the Amended Complaint as true, Plaintiffs have sufficiently alleged

that these statements were both false and material. According to these statements, Big Lots had achieved success in execution of strategies, significant improvements in merchandising operations, and steady improvement in product presentation and in-store execution. However, according to Plaintiffs, the negative effects of Wurl's actions had already begun to be felt by the end of FY 2011. *See* Am. Compl. ¶ 56, ECF No. 18.

Failing to accurately cite the progress of the merchandise category is material given the importance of the merchandising operations to Big Lots' business model. In other words, a reasonable investor would have placed great significance on knowing that the initiatives spearheaded by Wurl, who was hired by Big Lots to turn performance around, were having the opposite effect. The Amended Complaint alleges that Defendants were provided with information concerning Big Lots' sales performance through daily and weekly reports and as such were aware of the true state of Big Lots' performance. Defendants make much of the fact that the Amended Complaint lacks allegations concerning the specific contents of any of the reports. Accordingly, Defendants argue that Plaintiffs have failed to satisfy the PSLRA's requirement that they state with particularity the basis for concluding that the given statements were false.

The PSLRA requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief

is formed." 15 U.S.C. § 78u-4(b)(1).  Here, Plaintiffs have identified allegedly fraudulent statements, argue that the statements were necessarily false given the information contained in the frequent reports received by Defendants, and have alleged with particularity the degree to which the Individual Defendants "had their fingers on the pulse" of Big Lots' sales performance, with the receipt of frequent reports and attendance at weekly meetings.   *See, e.g.*, Am. Compl. ¶ 5, ECF No. 18 ("[Fishman] had described consumables as so important that he 'lose[s] sleep very night' over the category's performance.").  The Amended Complaint also alleges detailed facts tending to establish that Big Lots' critical merchandising operations were severely impaired as of the start of FY 2012, contradicting Defendants' assertion that sales only began to slump in April and not as a result of any inherent weaknesses with those operations.

If the allegations contained in the Amended Complaint are taken as true, the frequent reports received by Defendants necessarily must have shown warning signs of slumping sales performance.  While the truth or falsity of those allegations will ultimately be determined through discovery, the Amended Complaint is not defective for lack of more detailed information concerning the reports.

Turning to the allegedly fraudulent statements by Cooper referred to in ¶ 70, all the statements attributed to Cooper fall squarely within the PSLRA's definition of forward looking as they consist of projections of performance during

the first quarter of FY 2012.  At the start of the conference call, Andy Regrut, Big

Lots' Director of Investor Relations stated that:

> I would like to remind you that any forward-looking statements we
> make on today's call involve risk and uncertainties and are subject to
> our Safe Harbor provisions as stated in our press release and SEC
> filings, and that actual results can differ materially from those
> described in our forward-looking statements.

DeMay Decl. Ex. C 17; ECF No. 28-2.  As that language references the

cautionary language in the March 2nd Press Release, it satisfies the

requirements of 15 U.S.C. § 78u-5(c)(2)(A).  In order for forward-looking

statements to qualify for the safe-harbor, the cautionary language in the March

2nd Press Release must also satisfy the PSLRA.  As the Court already

determined that the safe harbor provision contained in the March 2nd Press

Release satisfies the PSLRA, any forward-looking statements made on this

conference call are protected.

The Court concludes that the statement in ¶ 70 attributed to Johnson is

forward looking.  During the call, Johnson stated that "February was on plan, and

. . . the key categories that were good for us in [sic] fourth quarter we think have

legs here into 2012."  DeMay Decl. Ex. C 24; ECF No. 28-2.  The statement that

"February was on plan" and "the key categories that were good for us," although

implying some present circumstances, are the basis for the forward-looking

statement that "we think we have legs here in 2012." *See Miller*, 346 F.3d at

677.

Paragraph 70 also refers to the following statements made by Fishman:

1) "Electronics continues to be good";

2) that the availability of closeout consumable inventory had "picked up";

3) that "both Fresh Finds and international foods is doing quite well";

4) that "we will probably do in the range of double the business in both of those programs this year"; and

5) that "[t]here is not much yet that is not working" in those programs.

DeMay Decl. Ex. C 24, 25, 34; ECF No. 28-2. Only the fourth statement is forward-looking as it offers a prediction of future performance in the "Fresh Finds" and "international foods" programs referred to in the third statement. However, as the Amended Complaint lacks detailed allegations concerning specific performance regarding the programs mentioned in sentences three and five, the Court finds that the third, fourth, and fifth statements are not actionable.

On the other hand, largely for reasons stated previously, the Court finds that the Amended Complaint sufficiently alleges that the first two statements were materially false when made. The Amended Complaint details the importance of the consumables and electronics categories to Big Lots' performance and alleges that Defendants were aware at the time those statements were made and that the Company was experiencing difficulties within those areas. The Court finds this information verifiable.

In ¶ 71, the following allegedly fraudulent statements are attributed to Fishman during the March 2nd Conference Call:

1) that February sales were "pretty consistent" with fourth quarter 2011 results;

2) that "[in 2012] [w]e will grow organically. We will grow our US store footprint. We will turn around Canada, and we will grow our organizational capabilities;" and

3) "We feel real good about the guidance that we have given" for the first quarter.

DeMay Decl. Ex. C 22, 24, 26; ECF No. 28-2. The Court holds that the first statement is one of present fact of current first quarter sales trends and that Plaintiffs have sufficiently alleged it was materially false. *See* Am. Compl. ¶ 9, ECF No. 18 (alleging circumstances that led to the Company's downturn at this time); *id.* ¶ 76 (claiming several categories' sales had declined and providing specific reasons). The Court determines that, while on first review this statement appears to be that of Fishman's opinion because he states that the sales were "pretty" consistent, the statement is verifiable because the sales were either consistent or not, which is a calculable result.

As for the other two statements, while the second is forward-looking and the third is not, neither is actionable. Rather, the Court considers them to be immaterial, non-specific puffery. Further, the Court notes that the context of the third statement somewhat belies Plaintiffs' theory of this case. In this regard, the questioner to whom Fishman was responding was actually wondering why first quarter projected SSS growth was not higher given that the first quarter of FY 2011 had been particularly bad and given the good sales trends leading into FY 2012. DeMay Decl. Ex. C 26; ECF No. 28-2 ("[I ]am surprised that you are not a

bit more upbeat on the sales outlook for the first quarter in light of the comparisons . . . .").

In ¶¶ 72 and 73 of the Amended Complaint, the following statements are also attributed to Fishman:

1) "We have improving trends coming out of 2011 and a focused strategy to execute in 2012;"

2) "We have stronger, more aggressive plans" to address quarter to quarter consistency issues;

3) "We feel very, very good that we have very specific merchandising plans for our execution on a quarter-by-quarter [basis]."

4) "I will tell you that [closeout availability] for some reason seems to have picked up to a more aggressive posture in the last two to three weeks in particular. It tends to be in the Consumables area, which to us is good because we just like— the Consumables business is the largest closeout piece of our business as a percent to total. So if you were taking a look at it, where we always talk about, anywhere from a third to half of our business being closeout, Consumables is between 70% and 75%, almost 80% closeouts. So it's been pretty aggressive and pretty active. We continue to work on relationships with the people who we do business with, the branded ones in particular.

I can't speak to why it has picked up. I can only assume that they either have a lot of inventory or somebody is pushing back. That is the same thing that happens all the time, but that is really where it is happening in a pretty aggressive posture, particularly in food and in HBC;" and

5) "[W]e are really aggressively approaching [closeout opportunities], and we are out there in the market probably stronger than we have ever been before in addressing those opportunities and making sure those opportunities aren't getting by us"

DeMay Decl. Ex. C 22, 25, 28, 33; ECF No. 28-2. All of the above statements are statements of present fact, and the Court concludes that Plaintiffs have sufficiently alleged that they were materially false when stated, especially in light of the purported disarray within Big Lots' merchandising operations. Fishman states in the first sentence that "we have improving trends coming out of 2011"; whereas, Plaintiffs allege that by the end of FY 2011 Defendants trends were not improving. This is information that is verifiable because whether these trends were in in fact declining can be determined by looking at the fourth quarter of FY 2011 final weeks' outputs. This same logic applies to the fourth sentence: whether the consumables category was doing as well as Fishman states would only require a review of the actual output numbers of that category. The second, third, and fifth sentences concern soft information because they are a matter of Fishman's opinion. Whether Plaintiffs sufficiently alleged Fishman knew the statements were false when stated is addressed below.

Paragraph 74 cites allegedly false statements made by both Fishman and Johnson. Fishman stated that:

1) Big Lots "has created meaningful employment opportunities and new jobs";

2) "Organizationally, we will continue to invest in our people to train and develop them, to provide meaningful employment opportunities to support our future growth"; and

3) "what Doug [Wurl] has done and I really support it."

DeMay Decl. Ex. C 22, 28, ECF No. 28-2. Johnson stated:[3]

> 4) "Doug and his team have some different strategies to hopefully drive business and not be as reliant on Seasonal in third quarter."

*Id.* at 25. The first statement is not forward looking, but Plaintiffs have failed to allege sufficient facts demonstrating its falsity. Even assuming the allegations concerning layoffs and mass defections are true, it is entirely possible that those issued occurred at a time when Big Lots was adding new employees overall. The second statement is forward looking but the Court also determines that it is immaterial, corporate puffery, and, as with the first statement, is thus not actionable. The fourth statement borders on being forward looking, but also is not supported by sufficient allegations as to its material falsity. In this regard, the general thrust of the Amended Complaint is that Wurl had strategies that simply were not successful, not that he had no strategies at all. Finally, the Court determines that Plaintiffs have sufficiently alleged that the third statement is materially false given the allegations of Wurl's conflicts with Fishman and others over the direction of the Company. *See* Am. Compl. ¶ 169, ECF No. 18. This statement is a matter of opinion, given that Fishman "supports" what Wurl has done, and whether Fishman knew the statement to be false is addressed below.

***March 7th Form 8-K:*** The Form 8-K submitted on March 7, 2012 and signed by Haubiel incorporated as exhibits the March 2nd Press Release and the transcript

---

[3] In ¶ 74 of the Amended Complaint, Johnson's statement seems to mistakenly be attributed to Fishman. *See* Am. Compl. ¶ 74, ECF No. 18.

of the March 2nd Conference Call.  As such, the analysis applicable to those

sources also applies to the Form 8-K.  *See* Am. Compl. ¶ 75, ECF No. 18.

***Form 10-K Annual Report:*** Plaintiffs identify, as fraudulent, several statements

in the Form 10-K Annual Report submitted on March 26, 2012 and signed by

Fishman, Cooper, and Haubiel.  *See id.* ¶¶ 83–86.  Plaintiffs highlight that

Fishman and Cooper submitted certifications pursuant to §§ 302 and 906 of the

Sarbanes-Oxley Act.

In ¶ 83, Plaintiffs claim that Fishman, Cooper, and Haubiel affirmed the

previously announced FY 2011 sales and earning numbers, including excerpted

parts of the following statement:

> In 2012, we anticipate:
> - Earnings per diluted share from continuing operations to be <u>$3.35 to $3.45</u>, including the expected impact of a non-cash, non-recurring charge of $0.05 per diluted share related to a change in accounting principle associated with the implementation of our new retail inventory systems in the U.S. during the first quarter of 2012.
> - Net sale increase in both the U.S. and Canada:
>     - U.S. comparable stores sales [or same store sales] increase of <u>2% to 3%</u> . . .

DeMay Decl. Ex. E 22, ECF No. 28-2 (emphasis added).  The underlined

portions are the statements cited by Plaintiffs.  In context, the cited earning and

net sales are forecast numbers and therefore forward-looking.  The 10-K Report

included a section that detailed the risk factors associated with the statements

contained in the Report.  This section is identical to the statement discussed

above and was also accompanied by a list of additional factors that may affect

the Company's performance for investors to consider.  *See id.* at 7–12.  For the

reasons detailed above, the Court finds the statement sufficient to insulate

forward-looking statements included in the Report.  *Id.* at 7 (listing words—

including "anticipate"—that precede the statements insulated by the provision

because the statements are forward looking).

In ¶ 84, Plaintiffs allege that the following are fraudulently stated because

significant employee defections and layoffs had already occurred:

> [The] 'Ready for business' [program] also focuses on development of
> our field management team and improving our training programs,
> which is key to our store growth strategy. . . .  We believe our focus
> on standards and investments made in talent development have
> improved the performance of our new stores during their initial
> months of operation.  In 2012, we have three significant training and
> development programs, which are either new or being tested,
> designed to identify and develop the management ranks within our
> store operations at all levels . . . .

DeMay Decl. Ex. E 24, ECF No. 28-2.  Plaintiffs allege that Defendants also

falsely represented the following:

> We believe that we benefit substantially from the leadership and
> experience of our senior executives. The loss of services of any of
> these individuals could have a material adverse impact on our
> business. Competition for key personnel in the retail industry is
> intense and our future success will also depend on our ability to
> recruit, train, and retain our senior executives and other qualified
> personnel.

DeMay Decl. Ex. E 12, ECF No. 28-2.

The first quoted paragraph addresses the Company's program to train its

field management team and to develop its "talent."  Plaintiffs assert that the first

paragraph is false and misleading because Big Lots was experiencing mass

defections and layoffs of key personnel. Am. Comp. ¶ 93, ECF No. 18. Defendants assert that the statement is immaterial because it constitutes mere generic expression of corporate optimism. Resp. 25, ECF No. 28. The statement addresses development programs that are geared toward "all levels"; in fact, the levels referred to are actually store-level employees and district managers. Plaintiffs argue that the statement contradicts the reality of the mass defections and layoffs of key personnel. However, taken in context, the paragraph claims improved performance of the Company's new stores due to the focus on standards and investments made in talent development, which is independent of any layoffs that may be occurring or defections taking place. Just because employees are leaving a company or being fired from a company, does not mean that a company does not or cannot continue to develop those still employed. Moreover, Plaintiffs fail to provide any specific allegation regarding the "Ready for business" program.

The second quoted paragraph discusses Big Lots' senior management. While Plaintiffs assert that there was infighting among the Company's leadership, Am. Comp. ¶ 93, ECF No. 18, and mass defections, *id.* ¶ 14, these allegations bear no weight on the information stated in the second paragraph. Even assuming Plaintiffs assertions are true, the Company could still benefit from the senior executives that remain.

In ¶ 85, Plaintiffs allege that Defendants represented the positive sales of FY 2011 would continue into FY 2012 as follows: first, by reviewing FY 2011

results and stating that "customers continue to respond to our new assortments and specialty offerings" in the "Consumables category" and "new merchandising initiatives positively impacted sales throughout the majority of the year[]" in the "Home category," DeMay Decl. Ex. E 26, ECF No. 28-2, and, second, by stating that "[s]trategically, we anticipate that opportunities exist to continue to grow the basket through the same successful initiatives that benefited results over the last few years." DeMay Decl. Ex. E 23, ECF No. 28-2.

The first statement clearly discusses past sale results. The second statement is more problematic as the Company "anticipate[s]" that opportunities exist to continue to grow. Defendants argue that the statement is plainly forward looking. Reply 3, ECF No. 36. However, the statement discusses a present state: Opportunities exist currently that enable to company to continue to grow. *See In re Huffy Corp. Sec. Lit.*, 577 F. Supp. 2d 968, 1013–14 (S.D. Ohio Sept. 17, 2008). Accordingly, the Court finds the second statement discusses the present state of the market.

Plaintiffs claim that these two statements are materially false and misleading because consumables sales were actually declining in 2012. Defendants do not respond to this argument. If Plaintiffs' allegation is taken as true, then sales in consumables were in fact already declining in *2012*. However, even assuming that assertion as true, it does not relate to Defendants' summary of *2011* results. Therefore, Plaintiffs have failed to plead the material falsity of the first sentence.

The operative word in sentence two is "anticipates." In their Amended Complaint, Plaintiffs sufficiently allege facts that, if true, support the assertion that Defendants did not anticipate growth of the company "basket" as it has occurred in past years because Defendants knew the opportunities simply did not exist in 2012. *See* Amend. Compl. ¶ 93, ECF No. 18 (Plaintiffs claim that the statement was materially false or misleading because "by February 2012, sales in the Company's key merchandising categories had slowed as major merchandising initiatives implemented in FY 2011" were no longer successful.). Accordingly, the Court finds Plaintiffs sufficiently pleaded the material falsity of the second sentence.

In ¶ 86, Plaintiffs quote the following statement:

An integral part of our business is the sourcing and purchasing of quality brand-name merchandise directly from manufacturers and other vendors typically at prices below those paid by traditional retailers. . . .[Excerpt: A discussion of ability to develop relationships, to purchase closeout merchandise, to supplement inventory with directly sourced merchandise.] We expect that the unpredictability of the retail and manufacturing environments coupled with what we believe is our dominant purchasing power position will continue to support our ability to source quality closeout merchandise at competitive prices.

We have a merchandising team with extensive closeout purchasing experience, which we believe has enabled us to develop successful long term relationships with many of the largest and most recognized vendors in North America. As a result of our relationships and our experience and reputation in the closeout industry, we believe many vendors offer buying opportunities to us prior to attempting to dispose of their merchandise through other channels.

Our merchandise is purchased from a broad and growing vendor base . . .

DeMay Decl. Ex. E 5, ECF No. 28-2.  Plaintiffs generally claim that this statement is materially false and misleading because the Company was experiencing slow sales in the first quarter of FY 2012.  However, Plaintiffs fail to assert how this statement, even considered in light of the statements considered in this 10-K Report is materially false or misleading.  Accordingly, Plaintiffs have failed to sufficiently plead the statement is materially false.

*March 27th Conference Call:*  Plaintiffs have identified numerous statements made in the March 27th Conference Call as false or misleading.  *See* Am. Compl. ¶¶ 88–92, ECF No. 18.  On the call, Fishman and Johnson answered questions from analysts and investors.  Plaintiffs contend that Fishman addressed information previously made public by Defendants in February 2012 and earlier in March.

Plaintiffs initially assert that there was no oral statement made to shield any forward-looking statements made in the March 27th Conference Call as required under 15 U.S.C. § 78u-5(c)(2)(A)(i) and **(ii)**.  Plaintiffs are correct. According to the transcript, no oral warning statement was given to the call's listeners.  The PSLRA immunizes an oral forward-looking statement as long as it is accompanied by sufficient **_oral_** cautionary statement that refers listeners to a more detailed, written statement.  15 U.S.C. § 78u-5(c)(2)(ii).  Defendants concede as much when they argue that the transcript was accompanied by a

warning when published by Thomson Reuters and that the safe harbor provision

is satisfied because Thomson Reuters included a written cautionary disclaimer.

In ¶ 89, the following allegedly fraudulent statements are attributed to

Fishman during the March 27th Conference Call:

> Our concept is unique niche, both in how we go to market and the
> size of our overall box.  For manufacturers, we are a channel of
> distribution to alleviate excess inventory.  We work with over 3000
> supplies, domestic, and interstation, and our vendor base continues
> to grow every day.
>
> . . .
>
> As we begin 2012, we expect positive trends in growth and
> shareholder returns.  First is growth.  We are in a growth mode, and
> I will spend a few minutes telling you about our plans for the
> upcoming year.
>
> And second, shareholder returns.  We've been a good steward of
> our cash and our shareholders' capital, making strategic investments
> for the future.  I will briefly discuss our initial guidance for fiscal 2012,
> which we're expecting to be another solid performance.
>
> Let me start with growth. After recent success and refocusing our
> strategies, we find ourselves deeply entrenched and committed to
> growing our business.  And yes, we are in a growth mode.  We are
> growing organically, and merchandise is the key.  We are expanding
> geographically in both the United States and Canada. And we are
> growing our organizational capabilities with investments in associate
> training and development and in information technology.
>
> For us, organic growth starts with merchandise.  We offer a unique
> product assortment with extreme value on branded merchandise and
> a high penetration of discretionary items, another element of
> distinction or differentiation.

DeMay Decl. Ex. F 2–3, ECF No. 28-2.  Specifically, Plaintiffs highlight the

following statements: "As we begin 2012, we expect positive trends in growth and

shareholder returns. First is growth. We are in a growth mode."; "And yes, we are in a growth mode. We are growing organically, and merchandise is the key."; "For us, organic growth starts with merchandise"; and "[O]ur vendor base continues to grow every day."

Plaintiffs allege that these statements are false and misleading because the Company was not growing its organizational capabilities and that sale figures were softening at the beginning of FY 2012. As such, Defendants did not expect positive trends in growth and shareholder returns in the first quarter of FY 2012. Defendants do not respond to this argument. All but the final phrase constitute corporate puffery. *E.g.*, *id.* at 3 ("First is growth. We are in growth mode."); *see Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 2015 WL 3746095, *6–7 (6th Cir. 2015). However, the statement that our vendor base continues to grow every day, taken in context, meets the plausibility standard, assuming Plaintiffs' allegations are true that Big Lots' was offering an increasingly outdated and narrow selection of merchandize in several of its key sales categories, including the categories of consumables and electronics.

In ¶ 90, Plaintiffs allege that Fishman singled out electronics:

We focus our merchandise on consumer buyer trends and strategically shift assortments and space towards hot categories as customer demands.

Here is a good example. A year ago, we decided to strategically shift our business away from traditional toys, a declining category. Instead, we moved toward a hot consumer buying trend, electronics. We allocated more floor space and inventory to tablets, MP3 players, camcorders and accessories, the toys of a new age. These

> toys have screens and memory cards and appeal to a broad customer base. The results were great. Q4 comps [or comparable same-store sales] were up nearly 20%. Maybe the most exciting aspect of this strategy is the year-round appeal of these items.

DeMay Decl. Ex. F 3, ECF No. 28-2.  Plaintiffs do not assert why this statement is materially false and misleading and Defendants provide no insight.  Plaintiffs concede that growth occurred in the third quarter of FY 2011, *see* Am. Compl. ¶ 50, ECF No. 18, however, as stated above, Plaintiffs allege that the negative effects of Wurl's actions had already begun to be felt by the end of the FY 2011. Accordingly, Plaintiffs have sufficiently pleaded that this statement is misleading: "The results were great. Q4 comps [or comparable same-store sales] were up nearly 20%."  DeMay Decl. Ex. F 3, ECF No. 28-2.  Whether fourth quarter comparable same-store sales were up nearly 20% in 2011 is an easily discernable fact.

In ¶ 91, Plaintiffs state that despite the following,

> [t]o support growth, we have also made and will continue to make investments in our organizational capabilities. Associate training and development is a major initiative.  We want to ensure that we have the next generation of leaders throughout the entire infrastructure of the organization,

DeMay Decl. Ex. F 4, ECF No. 28-2, Fishman failed to point-out the exit of Big Lots' employees and the exodus' effect on merchandise operations.  This statement mirrors that of the discussion regarding statements included in the Form 10-K of development programs for current employees.  Based on that analysis, Plaintiffs fail to state a claim because mass defections and layoffs of

key personnel are immaterial to the substance of Fishman's statement. Further,

Plaintiffs have failed to make any specific allegation regarding the company's

internal investments and training programs.

In ¶ 92, Plaintiffs allege Fishman reiterated FY 2012 numbers and that the

Company would bring in "record results." Am. Compl. ¶ 92, ECF No. 18.

> For fiscal 2012 we are expecting another solid year -- a US comp
> store sales increase in the range of 2% to 3%, earnings per share of
> $3.40 to $3.50 per diluted share, a 14% to 17% increase over 2011,
> and $200 million of cash flow.
>
> As I wrap up, we have a positive track record of success. Our
> prospects for the future are encouraging. We've delivered record
> earnings per share for a half a decade. We've generated strong
> returns for our shareholders. We've created meaningful employment
> opportunities for our associates. And we have strategies, teams and
> capital for continued success in the future.

DeMay Decl. Ex. F 3, ECF No. 28-2. These statements are forward looking, and,

given no oral warning was stated during the conference call, the statements are

not protected under the PSLRA's safe harbor. Plaintiffs allege that there was no

way that the Company could meet these projected earnings because the

numbers were already in fact decreasing. Based on this allegation and the

Courts prior discussion, Plaintiffs sufficiently allege the material falsity of these

statements. As these statements are predictions, they are considered soft

information and, as such, require a showing that the statement was made with

knowledge of its falsity. This element is addressed below.

*2011 Annual Report*: The 2011 Annual Report submitted on April 10, 2012 was

incorporated as an exhibit in the March 26th Form 10-K. As such, the analysis

applicable to the statements in the Form 10-K also applies to the Annual Report.

*See id.* ¶ 98.

Paragraph 96 cites additional statements that Plaintiffs allege were false or

misleading when stated by Fishman:

1) Not many companies can say it these days, but WE ARE IN A GROWTH MODE. We're growing organically… we're growing geographically… we're growing organizationally… and often growth in one area leads to growth in another.

2) As promised, we focused on [the Consumables] category in 2011 and made significant improvements which translated into meaningful sales growth.

3) These improvements resonated with consumers and generated shopping excitement.

4) We correctly anticipated a shift in consumer buying trends toward electronics, the toys of a new age.

5) In fact, with the exception of the planned decline in toys, all major categories generated comparable sales increases in the second half of the year.

6) I see a merchandise assortment that continues to get stronger and more focused on value and brands. Special initiatives, like our Friends & Family 20% off discount event, have been successful in introducing new consumers to Big Lots. And strategic shifts in merchandise, like our move to the new toy business, should have a lasting appeal with shoppers.

DeMay Decl. Ex. G, PAGEID ## 638–39, ECF No. 28-2.  Sentences one and

three are clear corporate puffery; the kind of rosey affirmation commonly heard

from corporate executives.  *See Indiana State*, 583 F.3d at 944.  Sentences two,

four, and five mirror the same statements that the Court addressed above.  In

sentence two, regarding 2011 sales, Fishman claims that there was meaningful

sales growth in 2011. However, Plaintiffs allege that by the end of the fourth quarter of FY 2011 sales had already decreased, which would mean that there was not "meaningful growth." In sentence four, Fishman claims that Defendants correctly anticipated the shift in consumer buying trends toward electronics; whereas, Plaintiffs claim that the first quarter sales of FY 2012 electronics (and consumables) had slow sales. While both these allegations will need to be supported, they are sufficient (as addressed above) to withstand Defendants' motion to dismiss. Sentence five is sufficient under the same analysis. These sentences state information verifiable by facts.

Sentence six, however, describes a program instituted by the Company and its effect on attracting customers. Plaintiffs claim that this statement is materially false and misleading given that Big Lots was not executing a consistent and focused strategy; rather, merchandising operations had fallen into disarray. Plaintiffs cite as support the departure of key personnel and poor reception by customers. This argument is not well taken. The Court finds that Plaintiffs fail to adequately allege that sentence six is false because Plaintiffs fail to provide specific allegations regarding the failure of the "Friends & Family 20% off discount event" and how the strategic shift did not have "a lasting appeal with shoppers."

See Pension Fund Group, 2015 WL 3746095, *7 (finding statements about the quality of a product and a customer's preference loosely optimistic and immaterial).

Paragraph 97 also cites additional allegedly false statements also attributable to Fishman:

1) Our success has led to job creation . . . .

2) At a time when many retailers are eliminating jobs, pulling back, or shutting their doors altogether, we continue to grow, open new stores, and create meaningful employment opportunities.

3) I think we're ideally positioned for the future.

DeMay Decl. Ex. G, PAGEID ## 638–40, ECF No. 28-2. The Court has addressed statements like those of sentences one and two previously and found them inadequately plead. The third sentence mirrors that of what prior Courts have deemed corporate puffery. *See, e.g.*, *Indiana State*, 583 F.3d at 944 (finding similar statements "do nothing more than vaguely predict positive future results"). Thus, none of the sentences in ¶ 97 are actionable.

***April 23rd Press Release***: Plaintiffs state that as of the April 23rd Press Release "the truth about defendants' fraud begins to emerge" and attributes this conclusion to the following paragraph included in the April 23rd Press Release:

> Based on retail sales results quarter-to-date and assumptions for the balance of the first quarter of fiscal 2012, we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%. [U.S. comparable store sales were on plan through the first six weeks of the quarter; however, sales compared to plan began to slow in late March and trends have further softened as we moved through the month of April.] From a merchandising perspective, furniture, hardlines, and seasonal, particularly lawn and garden, have been our best performing businesses; whereas, consumables and play n' wear, particularly electronics, are currently below expectations for the quarter.

DeMay Decl. Ex. H 1, ECF No. 28-3; *see* Am. Compl. ¶ 102, ECF No. 18
(Plaintiffs did not include the bracketed part.).  Plaintiffs claim that this statement
fails to disclose the full truth of the earnings and sales decline or the extent the
merchandizing operations had been impaired.  *See* Am. Compl. ¶ 107, ECF No.
18.  For example, rather than an "increase of 2% to 4%," Plaintiffs claim Big Lots
was in fact experiencing a decline of comparable store sales; such that first
quarter sales for FY 2012 were lower than that of first quarter sales for FY 2011.
*Id.* ¶ 103.

The Court finds this statement, taken in its entirety, is not forward looking.
The phrases "slightly negative" and "below expectations" are matters of opinion
and the statement is material.  The Court considers this statement a mix of
opinion and verifiable facts, as identified in *In re Omnicare, Inc. Securities
Litigation*, 769 F.3d 455 (6th Cir. 2014), and addresses the Defendants'
knowledge of its falsity below.

***May 23rd Press Release***:  Plaintiffs contend that the May 23rd Press Release
further revealed the reality of the Big Lots' financial affairs.  Plaintiffs contend that
the release discloses that Big Lots was not growing and that Big Lots' stock
repurchase activity suggests an effort to bolster the Company's share price and
other earning numbers.  Plaintiffs highlight the following statements addressing
the outlook for second quarter of FY 2012:

1) We now estimate our fiscal 2012 consolidated adjusted income from
continuing operations to be in the range of $3.25 to $3.40 per diluted share

(non-GAAP), compared to our prior guidance of $3.40 to $3.50 per diluted share. . .

2) [We now estimate adjusted income from U.S. operations will be in the range of $3.50 to $3.60 per diluted share (non-GAAP), compared to our prior guidance of $3.63 to $3.73 per diluted share (non-GAAP).] This is based on U.S. comparable store sales in the range of flat to a 1% increase and a total U.S. sales increase in the range of 5.5% to 6.5%.

DeMay Decl. Ex. I 1–2, ECF No. 28-3; *see* Am. Compl. ¶ 116, ECF No. 18

(Plaintiffs did not include the bracketed part.). These statements are all forward looking and accompanied by a safe harbor provision that meets the PSLRA requirements, as discussed above.

***May 23rd Conference Call***: Cooper, Fishman, and Johnson held a conference call on May 23rd in conjunction with the press release that was sent out the same day. Plaintiffs contend the following statements relevant for the Court's consideration:

In ¶ 113, from Johnson:

The two most challenging areas in merchandising were Consumables and Electronics. Consumables was down low singles and Electronics was slightly positive after a 20% comp in Q4. The combination of the miss in Consumables and the slowdown in Electronics trends contributed to nearly 3 points of the comp miss to our original forecast, or said another way, was the large majority of our miss.

DeMay Decl. Ex. H 3, ECF No. 28-3. The Courts finds this statement is about past performance and Plaintiffs have sufficiently pleaded that the statement is materially misleading as to Big Lots' alleged end of FY 2011 sales slump for the reasons stated above. The statement contains verifiable facts.

In ¶ 114, from Fishman regarding the consumables category:

1) "The challenges were isolated to our business, which were more closeout in nature . . . "

2) ". . . I won't allow or acknowledge macro excuses for what I believe is a straightforward execution issue."

3) "Our shortfall was either we bought the wrong brand or item, or we weren't broad enough in our selections . . ."

Fishman also addressed the electronics category:

4) "I believe execution came up short here as well. . . ."

5) "I believe the slowdown from [quarter 4] into [quarter 1 of FY 2012] was the result of not keeping pace with technology."

6) Fishman attributed the slowdown to "underestimate[ing] the end-of-life impact" of tablets and video games and the DVD selection "w[as] somewhat out of date."

*Id.* at 5, 6. As for sentences two and five, Plaintiffs contend that Fishman iterated, in response to questions, that these "miss[es]" were nothing beyond poor execution. Plaintiffs allege that these statements were false and misleading given that there were larger issues that would call into question the viability of Big Lots' business model or the integrity of its merchandising operations. *See* Am. Compl. ¶ 115, ECF No. 18.

These statements contain matters of Fishman's opinion and likely relied upon by a reasonable investor as they discuss the Company's current slowdown. And, as addressed below, the statements withstand Defendants motion to dismiss based on the knowledge of their falsity.

Fishman also stated—as to both categories—that:

7) "[W]e believe we have identified our misses and have a plan to correct them."

DeMay Decl. Ex. H 5–6, ECF No. 28-3. Sentence seven is non-actionable as it

is not material because the statement provides so little information as to the

matters of Big Lots' operations that a reasonable investor would not rely on it.

Plaintiffs claim Fishman repeatedly denied any larger issues in the following

statement:

> As we look forward, I would anticipate certain of our businesses will remain solid while a few could remain stressed. However, as we execute to and enter the back half of the year, we are forecasting comps to move back into positive territory as I believe the content changes coming from Consumables and Electronics will improve those businesses. I believe the recently completed Home expansion will provide an incremental sales opportunity.

*Id.* at 6. This statement is forward looking and, therefore, non-actionable

because it is protected by an adequate safe harbor statement. This conference

call contained a verbal warning, much like the verbal warning included on the

March 2nd Conference Call.

Fishman insinuated that the Company was in fact hiring without noting any

loss of key personnel: "We haven't filled every one of the finders, but I think the

majority of them have been filled." *Id.* at 9. As addressed above, Plaintiffs'

personnel argument is misplaced; moreover, Plaintiffs fail to sufficiently plead the

material falsity of this statement.

Plaintiffs also allege that, instead of disclosing the Company's diminished capabilities to secure closeout inventory, Fishman stated:

> I think the secret sauce to our business is the fact that you will see the deals in the stores when you see them. And I think that is something we have always held very, very close to our vest. But I think that there is **good flow in every one of the businesses** that we deal in at this particular point.

*Id.* at 13 (emphasis in original). This statement is another example of corporate puffery. "[I]n every one of the businesses" is a broad generalization and not likely a statement a reasonable investor would rely upon as it seems highly improbable that every one of Big Lots' businesses were doing well.

Fishman also continued to advocate for the work of Wurl:

> I think the relationship-building that Doug has really initiated with his team and with some of the major manufacturers, the best manufacturers in the country, that we probably didn't have as close a relationship with in the past few years is only going to continue to grow.
>
> He is not only structuring the business or restructuring it around giving him some more talent in those businesses, but also infusing some relationship people that we have really never had before to continue to grow those things.

*Id.* at 7–8; *see* Am. Compl. ¶ 116, ECF No. 18. Plaintiffs' sufficiently plead the material falsity as to this statement, alleging Wurl's initiatives and managerial style was not successful. *See* Am. Compl. ¶ 57–59, ECF No. 18.

The conference call also restates what was addressed in the press release, *see* Am. Compl. ¶ 118, ECF No. 18, and therefore, that analysis applies here.

***May 29th Form 8-K***: The Form 8-K submitted on May 29, 2012 and signed by

Haubiel incorporated as exhibits the May 23, 2012 Press Release and the

transcript of the May 23, 2012 Conference Call.  As such, the analysis applicable

to those sources also applies to the May 29th Form 8-K.  *See id*. ¶ 75.

***June 5th Conference Call***:  In ¶ 122, Plaintiffs identify a response given by

Johnson to questions that pressed him on details that caused the financial

downturn of first quarter of FY 2012 and claim Johnson downplays the downturn:

1) Our misstep in electronics was really isolated to a couple select areas.

2) There were certain instances where we had deals last year that we did not
   have deals this year.  Part of that may have been because it was not
   available to us; part of that may have been because we might not have
   made the right phone call or tried to source it through the right vendor or
   come across it in the right way or might not have been aggressive enough
   in trying to find alternatives to offset that deal.

DeMay Decl. Ex. L 3–4, ECF No. 28-3.  Defendants specifically highlight

sentence one as taken out of context; in context, they claim, the sentence is

clearly discussing the Company's future prospects and is therefore protected

under the safe harbor.  *See* Reply 2, ECF No. 36.  However, these statements do

not fall within the safe harbor because Defendants failed to make the oral

statement required under 15 U.S.C. § 78u-5(c)(2)(A)(i) & (ii) to safely harbor

them from suit.  Discussion assessing this shortcoming is addressed in the

analysis regarding the March 27th Conference Call.

The Court finds sentence one actionable for the same reasons addressed

in the Courts' analysis of ¶ 114.  The Court finds the statement to consist of

verifiable facts because Plaintiffs allege that the electronics category was experiencing difficulty throughout its operation, not just in a couple select areas. Therefore, if that category was experiencing difficulty across its operations, that fact can be confirmed by reviewing output numbers of all operations in this category.

While Plaintiffs note that the deals addressed in the second statement represent around three-quarters of Big Lots' business, *see* Am. Compl. ¶ 122, ECF No. 18, the Court finds the statement not material as it is nonspecific and, without more, fails to provide content by which to even find an alleged misrepresentation.

***June 6th Form 10-Q***: Plaintiffs attribute the following statements as materially false and misleading when made:

1) Based on the sales trends exiting the first quarter of 2012 and the beginning weeks of May, we expect comparable store sales to be slightly positive to slightly negative during the second quarter of 2012.

2) In the second quarter of 2012, we expect our gross margin rate will be higher than the second quarter of 2011, as we expect a lower markdown rate in 2012 as compared to 2011.

DeMay Decl. Ex. M 18, ECF No. 28-3.  As the Form 10-Q has a sufficient safe-harbor statement, the sentences are not actionable because they are forward looking and therefore protected.

Having determined that Plaintiffs have sufficiently alleged that certain statements meet the first element required to show securities fraud under

§ 10(b), the Court moves to its consideration whether these claims satisfy the second element.

### 2. The PSLRA's Scienter Requirements

Defendants next allege that the Amended Complaint fails to meet the PSLRA's pleading standards regarding the scienter element of a claim brought under Rule 10b-5.  To satisfy this element, Plaintiffs must plead facts sufficient to show that Defendants had "a mental state embracing intent to deceive, manipulate, or defraud."  *In re Omnicare, Inc.*, 769 F.3d at 472.

The PSLRA requires that a plaintiff bringing a securities fraud claim "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has interpreted this provision to require dismissal of a complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  In making this determination, a court must collectively examine all of the facts alleged.  *Id.* at 323; s*ee also La. Sch. Emps' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010) ("[T]he Sixth Circuit subjects the scienter test to the 'totality of circumstances' analysis, whereby the alleged facts collectively must give rise to a strong inference of actual knowledge or recklessness.").

Further, the Supreme Court has created a three-part test for the Court to apply in assessing the sufficiency of Plaintiffs' scienter allegations.

> First, a court must "accept all factual allegations in the complaint as true." Second, a court "must consider the complaint in its entirety" and decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Third, assuming that plaintiff's allegations create a "powerful or cogent" inference of scienter, a court must compare this inference with other competing possibilities, allowing the complaint to go forward "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."

*In re Omnicare, Inc.*, 769 F.3d at 473 (citing and quoting throughout *Tellabs*, 551 U.S. at 322–24).

For purposes of satisfying the scienter element of a Rule 10b-5 action in the Sixth Circuit, a plaintiff need only allege that defendant's behavior was reckless. *See Ernst & Young*, 622 F.3d at 478 ("We have held that, following passage of the PSLRA, a plaintiff may plead scienter in a securities fraud complaint by alleging facts that give rise to a strong inference of recklessness."). "Recklessness sufficient to satisfy 10b-5 is 'a mental state apart from negligence and akin to conscious disregard.'" *Id.* (quoting *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999)). It is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979).

In the Sixth Circuit, a plaintiff bears the same burden of proof as for statements of present or historical facts. *In re Omnicare, Inc.*, 769 F.3d at 470. However, a plaintiff must establish that a defendant acted with actual knowledge

of a statement's falsity in the case of forward-looking statements or statement of

opinions. *Id.*

However, to assess whether Plaintiffs have adequately alleged scienter,

this Court must employ a "totality of the circumstances" test that requires

consideration of factors such as:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Tween Brands, Inc.*, Nos. 2:07–cv–852, 894, 925, 2009 WL 1542795, at *8,

(quoting *Brown v. Earthboard Sports, USA, Inc.*, 481 F.3d 901, 917 (6th Cir.

2007)).

For liability to attach to a corporation, the Sixth Circuit directs the Court to consider the individual agent who issued or stated the misrepresentation, the individual agent who authorized, requested, reviewed or approved the misrepresentation before it was issued or stated, and any high managerial agent or member of the board of directors who ratified, recklessly disregarded or tolerated the misrepresentation after its issuance or statement. *In re Omnicare, Inc.*, 769 F.3d at 476. The later of these considerations applies in this case. All of the named individuals—identified with each statement—are high managerial agents. *See* Am. Compl. ¶ 144, ECF No. 18. Further, any press release, filing with the SEC or form issued on behalf of Big Lots would be at the very least reviewed, if not partly drafted, by one or more of the individuals as envisioned by the rule. *See, e.g.*, DeMay Decl. Ex. D, PAGEID # 427; ECF No. 28-2 (Haubiel signed Big Lot's Form 8-K submitted to the SEC on March 2, 2012.). Thus, Plaintiffs satisfactorily plead that the Company meets the requisite scienter if the Individual Defendants satisfy this element.

Accordingly, the Court now reviews whether Plaintiffs have satisfied the scienter element by sufficiently alleging that the Individual Defendants knew of the falsity of their statements or that Defendants recklessly made the statements.[4]

---

[4] The Sixth Circuit determined that all subjective inquiries for the scienter analysis should be analyzed together, which includes whether a statement of hard information was made with reckless disregard of its falsity or whether a statement of soft information

Defendants make two arguments in favor of dismissal.  Defendants allege that: (1) Plaintiffs' allegations regarding the information conveyed in the internal reports are conclusory, as the allegations do not include what information was contained in the reports (targeting Plaintiffs' allegations under the second and sixth factor listed above) and (2) Plaintiffs' allegations of insider trading does not support an inference of scienter (targeting Plaintiffs' allegations under the first factor listed above).

Defendants first argue that the *In re Huntington*, 674 F. Supp. 2d 957 (S.D. Ohio 2009) (Watson, J.) case requires dismissal because Plaintiffs fail to allege specific facts showing that Defendants "disclosure was incompatible with any reports, data or signs. . . ." *Id.* at 965.  Defendants assert that it is only reasonable to infer that, at the beginning of 2012, the Individual Defendants continued to believe the Company would perform well.

Defendants' position is misplaced because Plaintiffs do cite to "reports, data, or signs"—daily "Flash Reports" through Big Lot's messaging system, sales data, the "Weekly Summary" (which is approved by Johnson), weekly executive meetings with managers, and special "micro-strategy reporting," which allows certain senior executives (which included Fishman) to receive hourly sales performances.  Am. Compl. ¶ 151, ECF No. 18.  Notably, in *Huntington*, the Court determined that the information alleged by those plaintiffs was that of a

---

was known to be false when stated.  *In re Omnicare, Inc.*, 769 F.3d at 471.  Accordingly, as the following analysis concludes, Plaintiffs satisfactorily plead the scienter element.

different company, not that of the defendant company, and that different company constituted less than three percent of the defendant company's total assets. *Huntington*, 674 F. Supp. 2d at 970–71. In this case, the Individual Defendants' access to information central to the Company's business operations creates a strong inference of scienter because Plaintiffs allege that Defendants made false statements about significant portions of the Company's operations. *See, e.g.*, Am. Compl. ¶¶ 72–73, ECF No. 18 (alleging false statements about the Company's largest sale category, Consumables, which accounts for nearly a third of the Company's operations). At the very least, the Court finds that the Individual Defendants acted recklessly by not reviewing the allegedly contradictory information in these reports as Plaintiffs allege that the information was inconsistent with Defendants' statements.

In addition, while it may be reasonable to infer that the Individual Defendants continued to believe that the Company would do well, that assertion is not the crux of Plaintiffs' Amended Complaint. Put simply, Plaintiffs allege that Defendants misstated the company's current state, not its future state.

The Court has already found that Plaintiffs sufficiently alleged with particularity that the statements noted above are either false or misleading. For those additional reasons, the Court finds that this factor favors finding scienter. *See Frank v. Dana Corp.*, 646 F.3d 954, 961–62 (6th Cir. 2011) (In considering an individual defendants' recklessness, "[i]t is difficult to grasp the thought that

[the individual defendants] really had no idea that [the company] was on the road to bankruptcy.").

Defendants' second argument is that Plaintiffs' allegation of insider trading does not support an inference of scienter. Defendants claim that their stock holdings actually increased, that it was equally as plausible to say that Defendants were selling for the simple reason that the stock had reached record prices, and that Plaintiffs take the stock sales out of context.

Plaintiffs allege that Defendants participated in an unprecedented insider-trading spree that was unusual in its nature, timing, amount, and coordination and that the trades' proximity to the Individual Defendants' fraudulent statements and omissions was short is suspect given the later disclosure of the adverse and inconsistent information. Am. Compl. ¶ 154, ECF No. 18. Plaintiffs claim that the insider trading was highly unusual by almost any metric.

Defendants first argue that the stock holdings of the Individual Defendants increased as a result of common stock awards or stock purchase option awards, and the sales constitute only a small portion of what these Individual Defendants actually acquired. Therefore, Defendants argue, viewed as a whole, the Defendants' stock holdings actually increased. Mot. 21–22, ECF No. 32. Plaintiffs do not respond to this specific argument.

Defendants next argue that it is equally plausible that the Individual Defendants sold their stock merely because the price of each stock was high.

Defendants claim that this is a more compelling and perfectly innocent inference that is easily drawn.

Plaintiffs respond by arguing that the sales were highly indicative of scienter. In support of their allegations that the trading was unusual, Plaintiffs point to the sharp contrast in stock prices from a fourteen-year high in March, 2012, when all but one of the sales occurred, at $46.60 per share, to the deflated price after August, 2012 at $29.97 per share. Am. Compl. ¶ 156, ECF No. 18; *see also id.* ¶ 159. Plaintiffs detail sales by all the Individual Defendants in March, 2012, with the exception of one sale on February 29, 2012. In addition, Plaintiffs allege insider trading by a total of seventeen individuals between March 6 and March 28. *See* Am. Compl. ¶ 17, 160 n.7, ECF No. 18.

There is much debate as to the total dollar amount each Individual Defendant accrued as a result of their sales. *See id.* 20–22 (discussing the taxes needed to be paid or the stock price to exercise an option); Resp. 21–22, ECF No. 33 (claiming the Defendants play "word games" to manipulate what Defendants characterize as the worth of the sales). It is not the Court's role to parse through each sale to decipher its value; rather, it is the Court's role to look at the totality of the circumstances.

Defendants innocent inference is as follows: Because one of the Individual Defendants acquired shares—part of the normal course of compensation, does not mean that the individual could not then sell what they could, when they could. The Court finds that this is a plausible opposing inference. The Court also finds it

reasonable. However, the Court finds that Plaintiffs have sufficiently cast doubt on that innocent inference, such that the timing of the trades had to do with purported fraudulent intent.

The insider trading by seventeen employees alleged by Plaintiffs occurred during the class period and prior to any significant stock price drop. *See* Am. Compl. ¶ 157, ECF No. 18. *Cf. Tellabs*, 551 U.S. at 324 ("The Shareholders . . . did not allege that [the individual defendant] sold any shares during the class period."). This supports Plaintiffs allegations of motive. Plaintiffs also claim that the stock sales by the Individual Defendants were unusual. *See, e.g., id*. ¶ 159 ("Haubiel sold more Big Lots shares in March 2012 than he has in the past ten years."). Plaintiffs allege that the Individual Defendants sold stock outside of their 10b5-1 plans.[5] *Id.* ¶ 160.

Accepting all factual allegations in the complaint as true, *see Tellabs*, 551 U.S. at 321, Plaintiffs plead facts that are at least as likely as Defendants plausible opposing inference. Accordingly, the Court finds Plaintiffs inference of scienter cogent and compelling, strong in light of other considerations. *Id.* at 324.

Defendants' access to information and Individual Defendants' insider trades were not Plaintiffs only allegation in support of an indicia of scienter. *See* Am. Compl. ¶¶ 164–71, ECF No. 18.

---

[5] A 10b5-1 plan provides a preset sale schedule for insiders of a corporation. *See* 17 C.F.R. § 240.10b5-1.

Plaintiffs claim that there was a wide divergence between the internal sales reports and discussions and what the Individual Defendants represented to the public, that there have been several investigations by the government of the Individual Defendants, and that key personnel resigned—including Fishman— either as a result of or, at the very least in close proximity with, Defendants alleged wrongdoing.  Am. Compl. ¶ 154, ECF No. 18.

In further support, Plaintiffs claim that the stock repurchase during the first quarter of FY 2012 artificially inflated prices prior to the Individual Defendants' own sales.  Id. ¶ 107.

Plaintiffs also assert that the United States Department of Justice ("DOJ") formally opened a criminal investigation and the SEC opened a civil investigation in to the trades conducted by Fishman.  Id. ¶ 107.  Defendants argue that Plaintiffs' reliance on post-class period events cannot support the inference of scienter.  Reply 18, ECF No. 36 (citing Ernst & Young, 622 F.3d at 484).  However, if these investigations are, in fact, into occurrences during the class period and address the allegedly fraudulent behavior, the investigations could be illustrative.  Without more information, the Court finds this factor neither points toward nor against finding an indicia of scienter.  However, the DOJ sought information about Fishman's March 20, 2012 insider trade.

Finally, Wurl resigned from his position on August 23, 2012, the last day of the class period.  Given that many allegations of falsity rest on Wurl's

mismanagement, the timing of Wurl's resignation is noteworthy. In addition, Fishman resigned a few months later in the wake of the DOJ investigation.

As such, when viewing the evidence as a whole, the Court is not persuaded by Defendants' argument. The Court finds, based on all of the facts alleged and the totality of the circumstances, that Plaintiffs sufficiently plead a strong inference that Defendants acted with the requisite state of mind. *See Tellabs*, 551 U.S. at 323.[6]

The Court now turns to whether Defendants had the requisite state of mind when making their statements on March 2nd, 26th and 27th, April 23rd, and May 23rd that the Court determined to be based on soft information.

**Fishman's Statements during the March 2nd Conference Call:**

Plaintiffs allege that, on March 2, 2012, Fishman lied when he stated that Defendants "have stronger plans," that Defendants "feel very very good" discussing the Company's execution on a "quarter-to-quarter" basis; and that "we are out there in the market probably stronger than we have ever been before." Am. Comp. ¶¶ 72–73, ECF No. 18.

With regard to the Company's operations, Plaintiffs claim "that because of softening sales figures, the robust sales trends experienced by Big Lots at the

[6] Plaintiffs request that the Court take judicial notice of two documents: Big Lots' report filed with the S.E.C. on June 17, 2013, in which it announced Haubiel's termination from the Company, and an e-mail sent by Fishman to the S.E.C. that describes a March 2011 trading window for all 10b5-1 plans. ECF Nos. 37 & 44. While both filings satisfy the standard as laid out in Federal Rule of Evidence 201, the Court finds these additional facts do not affect the Courts determination.

end of FY 2011 had reversed, and thus the Company did not have 'improving trends coming out of FY 2011' and its sales performance was not 'consistent' with the 'record results' of FY 2011." *Id.* ¶ 77. Plaintiffs also claim that the negative effect of Wurl's mismanagement was already affecting Big Lots' operations.

Plaintiffs allege that Fishman received hourly special "micro-strategy reporting," *id.* ¶ 151, and that Wurl directly reported to him. *Id.* ¶ 47. Furthermore, Fishman "had described consumables as so important that he 'lose[s] sleep every night' over the category's performance." *Id.* ¶ 5. In addition, just over two weeks later, Fishman sold 19% of his holdings in Big Lots and did not make any other statements directly attributable to him between March 2nd and the March 20th sale. *See id.* ¶ 75 (Big Lots' Form 8-K issued March 7, 2012 included a transcript from the Conference Call).

Plaintiffs also allege that Fishman lied when he said that he supports what Wurl had done at the Company. *Id.* ¶ 74. Plaintiffs claim that Wurl's desired changes created a conflict between Fishman and Wurl. *Id.* ¶ 58. As a result, Big Lots' employees implemented conflicting and inconsistent directives. *Id.* Plaintiffs allege that the conflict persisted into 2012, causing key personnel to leave and "seriously impair[ing] the capabilities of Big Lots' specialized merchandising teams and irreparably damaging Big Lots' critical vendor network." *Id.* ¶¶ 58–60.

Assuming that Plaintiffs allegations are true, the Court is satisfied that given Fishman's awareness of company's operations and tumultuous working relationship with Wurl, Plaintiffs have sufficiently alleged that Fishman knew he was lying when he made the statements on March 2nd.

**Fishman's Statement during the March 27th Conference Call:** Plaintiffs allege that Fishman knew his statements were false when made because the Company could not meet its FY 2012 sales and earning numbers because Big Lots was not on "track." In addition to the allegations highlighted in the Court's analysis of Fishman's statements on March 2nd, Plaintiffs point out that Fishman's March 2nd sale, a sale the DOJ began investigating, a week prior to making the statement. *Id.* ¶¶ 107, 160. The Court notes that Plaintiffs' theory of fraud is that during this period Defendants aim was to inflate the stock price. Fishman sold his stock a week prior to making the statement in the March 27th Conference Call which, according to Plaintiffs' theory, maintained Big Lots' stock at artificially inflated levels. However, given its proximity and the DOJ investigation, the Court is persuaded that, accepting Plaintiffs allegations as true, given that Fishman "lost sleep" thinking about the Company, Fishman knew at the time he stated the information that it was false. *See id.* ¶ 5.

**The April 23rd Press Release:** The April 23rd Press Release is the turning point in Plaintiffs' story of Defendants' alleged fraudulent scheme. The Press Release identifies the Company's change in expectation from guidance issued on March 2, 2012. Between March 2, 2012 and April 23, 2012, Plaintiffs allege that all of

the Individual Defendants conducted insider trading. This paired with the Court's conclusion as to Fishman's knowledge of the falsity of his statement on March 2nd and 27th leads the Court to conclude that at least one of the Individual Defendants (Fishman) knew that the Company was more than just "slightly negative" or "below expectations."

**Fishman's statements during the May 23rd Conference Call:** During the May 23rd Conference Call, Fishman addressed Big Lots' mounting problems, which he claimed were "closeout in nature," "a straightforward execution issue," a "shortfall" or due to the fact that "execution came up short," due to "not keeping pace with technology," and an "underestimat[ion] [of] the end-of-life impact" of electronic products. *Id.* ¶ 114. Based on the Courts' foregoing assessment, Plaintiffs have sufficiently alleged that these statements were known to be false when stated. The crux of Plaintiffs' allegations is that Fishman and the other Individual Defendants downplayed the Company's problems during this time. For the above reasons, assuming Plaintiffs' allegations are true, the Court finds that Plaintiffs meet their burden to establish that these statements were known to be false when stated.

### 3. Loss Causation

Defendants argue that Plaintiffs cannot show that the alleged fraud caused any loss because the earning shortfalls reported by Defendants did not convey to the market that Big Lots' earlier projections were misrepresented. Mot. at 28, ECF No. 28.

Under the PSLRA, it is a plaintiff's burden to prove that "the act or omission of the defendant alleged to violate [the Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Loss causation requires 'a causal connection between the material misrepresentation and the loss'" and "[i]t has been likened to proximate cause in tort law." *Brown*, 481 F.3d at 920 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). "Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *Indiana State*, 583 F.3d at 944.

In response to Defendants' motion, Plaintiffs argue that they have clearly satisfied the causal requirement and that courts have repeatedly rejected Defendants argument that the alleged fraud was never disclosed. Plaintiffs claim that "[t]he disappointing sales and earnings data and merchandising problems disclosed on April 23 and August 23, 2012, damaged the Class precisely because [the true data] had been concealed by and directly contradicted Defendants' earlier misstatements." Resp. 29, ECF No. 33 (emphasis omitted).

Plaintiffs allege that Defendants' false and misleading statements directly and proximately caused Big Lots common stock to trade at artificially inflated levels. Am. Compl. ¶ 173, ECF No. 18. Specifically, Defendants' false and misleading statement operated as fraud on Plaintiffs—class period purchasers of Big Lots common stock—"by misrepresenting sales and earning results and growth, as well as the performance of the Company's merchandising operations."

*Id.* ¶ 172.  As a result, Plaintiffs purchased Big Lots common stock at artificially inflated prices.  *Id.*  In addition, Plaintiffs allege that, beyond concealing the true state of Big Lots' operations, "[D]efendants affirmatively assured investors that Big Lots' 1Q12 sales and earnings was isolated" in its April 23, 2012 Press Release. *Id.* ¶¶ 175, 178.  Then, on August 23, 2013, Defendants revealed the truth of Big Lots' true financial condition because Defendants admitted that the Company would again miss its sales for a second consecutive quarter and that Wurl was resigning.  *Id.* ¶ 179.  Plaintiffs allege the timing and the magnitude of the decline in Big Lots common stock negates any inference that the loss suffered by Plaintiffs were caused by "changed market conditions, macroeconomic factors, or Company-specific facts unrelated to [D]efendants' fraudulent conduct."  *Id.* ¶ 183.

The Court is satisfied that Plaintiffs allegation that Defendants made false statements regarding their operations.  The April 23rd Press Release began to reveal Big Lots' operational deficiencies and the August 23rd Press Release confirmed these problems.  Both statements contained information that directly related to the information that Plaintiffs claim was false when made.  The market reacted immediately following the release of information on these dates.  *Id.* ¶¶ 178, 180.  The Court finds that this is sufficient to show that "economic loss occurred after the truth behind the misrepresentations or omissions became known to the market."  *See Halford v. AtriCure, Inc.*, No. 1:08–cv–867, 2010 WL 8973615, at *18 (S.D. Ohio Mar. 29, 2010); *see also In re Cardinal Health Inc.*,

26 F. Supp. 2d at 760 ("[W]here the Plaintiffs allege that the subject of the misrepresentation and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value.") (citing cases). The Court notes though that while Plaintiffs have sufficiently placed Defendants on notice of their economic loss under the pleading standard; Plaintiffs fail to state any dollar figure that they seek to recover. Failure to state a dollar figure weighs against finding loss causation. Plaintiffs overcome this missed factor by pleading more than simply boilerplate language and providing—what it claims to be— exact dates of the released information and the coinciding drop in share prices the day following the disclosure. See Am. Compl. ¶¶ 172–183, ECF No. 18; see also Ross v. Abercrombie & Fitch Co., 501 F. Supp. 1101, 1119 (S.D. Ohio 2007) (finding parallel allegations sufficient to withstand a motion to dismiss).

Accordingly, the Court is satisfied that Plaintiffs have adequately pleaded this requirement.

### 4. Control Person Liability

Count II of Plaintiffs' Amended Complaint alleges violations of Section 20(a) of the Act, 15 U.S.C. § 78t(a). Count II alleges that the Individual Defendants, as controlling persons of the Company, influenced and controlled the content and the dissemination of false information to the investing public and thus, as a direct and proximate result of the Individual Defendants wrongful conduct, Plaintiffs suffered damages. Claims under § 20(a) are dependent on the proof of liability under Section 10(b). See Indiana State, 583 F.3d at 947. As

the Court has already determined Plaintiffs sufficiently pled liability under § 10(b),

the Court now considers Plaintiffs arguments under § 20(a).

> Pursuant to § 20(a) of the Act:
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable [ ], unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Defendants do no not articulate an argument as to how Plaintiffs fail to allege a violation under § 20(a); Defendants merely state that Plaintiffs fail to plead a predicate violation of the Act.  Therefore, without any argument as to how any one of the Individual Defendants "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation," the Court refrains from dismissing Count II on this ground.

To the extent that Defendants argue that the Amended Complaint fails to allege specific facts to undermine the non-culpable inference that the Individual Defendants believed in good faith that the challenged statements were true, the Court addressed this argument above.  The Court notes that Defendants argument is that Plaintiffs "fail[] to plead specific facts showing that, at the time the statements were made, Defendants had specific information establishing that their forecasts of future performance and general statements of optimism were

lies." Mot. 15, ECF No. 28. Defendants limited their argument on this point to "forecasts of future performance" and "general statements of optimism." Without reference to any specific statement or a good faith basis for an Individual Defendant to make such a statement, the Court finds that Defendants insufficiently show why the Court should dismiss Count II. *See Cook v. Donahoe*, No. 3:11–cv–132, 2013 WL 93663, at *4 (S.D. Ohio Jan. 8, 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted).

As the Court has found that Plaintiffs sufficiently pled facts to support its allegations under § 10(a), the Court **DENIES** Defendants' motion to dismiss Count II.

## B. Count III

While Defendants move to dismiss the entirety of Plaintiffs' Amended Complaint, Defendants fail to articulate a separate reason as to why the Court should dismiss Count III.

Count III alleges violations of § 20A of the Act. Plaintiffs claim that the Individual Defendants "took advantage of their possession of material, non-public information regarding Big Lots to obtain millions of dollars in insider trading profits during the Class Period." Am. Compl. ¶ 208, ECF No. 18. The insider trading occurred contemporaneously with Plaintiffs' purchases of Big Lots' stock

during the class period. *Id.* ¶ 209. Plaintiffs allege they "would not have purchased the stock at the prices paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein." *Id.* ¶ 210.

For the same reasons addressed in response to Defendants' motion to dismiss Count II, the Court **DENIES** Defendants' motion to dismiss Count III.

## IV.    CONCLUSION

For the above-stated reasons, Defendants' Motion to Dismiss the Amended Complaint, ECF No. 28, is **GRANTED in PART and DENIED in PART**.[7]

In sum, the Court finds the follow statements sufficiently supported by facts:

---

[7] To the extent Plaintiffs seek leave to amend their Amended Complaint, the Court **DENIES** their request. *See Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) (affirming a district court's finding that a request (similar to Plaintiffs' request) in an opposition to a motion to dismiss did not constitute a motion for leave to amend the plaintiffs complaint).

| Source | ¶ of Compl. | Statements Surviving Mot. to Dismiss |
|---|---|---|
| March 2nd Conference Call | ¶ 69 | Statements 1, 2, 3 |
| | ¶ 70 | Statements 1, 2 |
| | ¶ 71 | Statement 1 |
| | ¶¶ 72–73 | Statements 1, 2, 3, 4, 5 |
| | ¶ 74 | Statement 3 |
| | | |
| March 7th Form 8-5 | See March 2nd Conference Call | |
| | | |
| March 26th Form 10-K | ¶ 85 | Sentence 2 |
| | | |
| March 27th Conference Call | ¶ 89 | Paragraph 1 |
| | ¶ 90 | Only: "The results were great.  Q4 comps were up nearly 20%." |
| | ¶ 92 | All |
| | | |
| 2011 Annual Report | ¶ 96 | Statements 2, 4, 5 |
| | | |
| April 23rd Press Release | ¶ 102 | All |
| | | |
| May 23rd Conference Call | ¶ 113 | All |
| | ¶ 114 | Statements 1, 2, 3, 4, 5, 6 |
| | ¶ 116 | All |
| | See April 23 Press Release | |
| | | |
| May 29th Form 8-K | See May 23rd Conference Call | |
| | | |
| June 5th Conference Call | ¶ 122 | Statement 1 |

**IT IS SO ORDERED.**

*Michael H. Watson* (signature)

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**