# EXHIBIT O

Confidential
BJORN STEINHOLT - 07/21/2016

1                UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5    ALAN WILLIS, Individually    ) Case No.
     and on Behalf of All Others  )
6    Similarly Situated,          ) 2:12-cv-00604-MHW-NMK
                                   )
7                 Plaintiffs,      )
                                   )
8          vs.                     )
                                   )
9    BIG LOTS, INC., STEVEN S.     )
     FISHMAN, JOE R. COOPER,       )
10   CHARLES W. HAUBIEL II and     )
     TIMOTHY A. JOHNSON,           )
11                                 )
                  Defendants.      )
12   _____)

13

14              C O N F I D E N T I A L

15

16        VIDEO DEPOSITION OF BJORN STEINHOLT

17                  PAGES 1 - 144

18                 JULY 21, 2016

19              SAN DIEGO, CALIFORNIA

20

21

22

23   Reported by:

24        KARLA MEYER BAEZ

25        RPR-CRR, CSR No. 4506

```
 1              VIDEO DEPOSITION OF BJORN STEINHOLT, an

 2    expert witness, taken on behalf of the Defendants,

 3    at 655 West Broadway, Suite 1900, San Diego,

 4    California, commencing 9:37 a.m., on Thursday, July

 5    21, 2016, before Karla Meyer Baez, CSR No. 4506.

 6

 7

 8

 9

10                    A P P E A R A N C E S

11

12       FOR THE PLAINTIFFS:

13            ROBBINS GELLER RUDMAN & DOWD LLP

14            BY: DAVID W. MITCHELL, ESQ.

15                LUCAS F. OLTS, ESQ.

16                AUSTIN BRANE, Esq.

17            655 West Broadway, Suite 1900

18            San Diego, California 92101

19            T: 619.231.1058

20            davidm@rgrdlaw.com

21            lolts@rgrdlaw.com

22            abrane@rgrdlaw.com

23

24

25
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 3

```
 1   APPEARANCES (CONTINUED):

 2

 3        FOR THE DEFENDANTS:

 4             CRAVATH SWAINE & MOORE LLP

 5             BY: MICHAEL PASKIN, ESQ.

 6                 MATTHEW P. HENDRICKSON, ESQ.

 7             Worldwide Plaza

 8             825 Eighth Avenue

 9             New York, New York 10019

10             T: 212.474.1760

11             mpaskin@cravath.com

12             mhendrickson@cravath.com

13

14

15        ALSO PRESENT:

16             Claire O'Brien, Cravath

17             Monica Kozycz, Cravath

18             Pierrick Morel, Cornerstone Research

19             Collette Stark, Video Operator

20

21

22

23

24

25
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 4

```
 1                          INDEX

 2   EXAMINATION

 3   Witness Name                                Page

 4   BJORN STEINHOLT, CFA

 5      By Mr. Paskin ............................ 6

 6

 7                    E X H I B I T S

 8   Exhibit      Description                     Page

 9   Exhibit 1    Packet marked Exhibit 2         6

10   Exhibit 2    UCLA Law Review Cornell and Morgan  98
                  article, STEINHOLT002254 through
11                2297

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              SAN DIEGO, CALIFORNIA

 2         THURSDAY, JULY 21, 2016, 9:37 A.M.

 3                     - - -

 4         THE VIDEO OPERATOR:  Good morning.  Here

 5    begins videotape number one in the deposition of

 6    Bjorn Steinholt in the matter of Willis versus Big

 7    Lots, Incorporated filed in the United States

 8    District Court, Southern District of Ohio, Case

 9    Number 2:12-cv-00604-MHW-NMK.

10         Today is July 21, 2016.  The time on the

11    video monitor is 9:37 a.m.  The video operator today

12    is Collette Stark.  This video deposition is taking

13    place at Robbins Geller, 655 West Broadway, Suite

14    1900, San Diego, California.

15         Counsel, please voice identify yourselves

16    and state whom you represent.

17         MR. PASKIN:  Michael Paskin and Matt

18    Hendrickson from Cravath for the defendants, and

19    also present from Cravath are Monica Kozycz and

20    Claire O'Brien, who are summer associates, and also

21    with us is Pierrick Morel from Cornerstone Research.

22         MR. MITCHELL:  David Mitchell from Robbins

23    Geller Rudman & Dowd on behalf of Plaintiffs in the

24    class.

25         MR. OLTS:  Lucas Olts, Robbins Geller, for
```

```
 1   Plaintiffs.

 2           MR. BRANE: Austin Brane, Robbins Geller,

 3   Plaintiffs.

 4           THE VIDEO OPERATOR:  The court reporter

 5   today is Karla Baez of DTI.  She will now swear in

 6   the witness.

 7

 8               BJORN STEINHOLT, CFA,

 9   having been first duly sworn by the Certified

10   Shorthand Reporter, was examined and testified as

11   follows:

12                     EXAMINATION

13   BY MR. PASKIN:

14      Q.  Good morning, Mr. Steinholt.

15      A.  Good morning.

16      Q.  You submitted an expert report in this

17   case; correct?

18      A.  That is correct, yes.

19          (Deposition Exhibit 1 was marked for

20          identification)

21   BY MR. PASKIN:

22      Q.  I am putting in front of you what's been

23   marked as Steinholt Exhibit 1.  The cover page says

24   Exhibit 2 because your expert report you understand

25   was Exhibit 2 to Plaintiffs' motion for class
```

1  certification; is that correct?

2        A.  Yes.

3        Q.  Okay.  So why don't you take a look at

4  Exhibit 1, and you can just let me know if it's a

5  copy of your expert report and the exhibits thereto.

6        A.  Yes, it is.

7        Q.  Okay.  Just for ease of reference, I've

8  included some physical tabs on the side that mark

9  where the various exhibits to your report start, A

10  through E.

11            If you could turn to Exhibit A to your

12  expert report, is this a copy of your current CV?

13        A.  There would be one more deposition since

14  the time of this CV here.

15        Q.  Okay.  What would that deposition be?

16        A.  That was a deposition in -- I can get back

17  to you with the actual case.  It related to Franklin

18  Funds, and it was in the middle or end of June.

19        Q.  Okay.  So as of the date that this -- that

20  your expert report was filed with the court on May

21  27th, Exhibit A here constituted a true and accurate

22  copy of your CV; is that correct?

23        A.  That's correct, yes.

24        Q.  So if you turn to the second page of your

25  report -- excuse me -- Exhibit A to your report, the

```
 1   CV --
 2         A.  Yes.
 3         Q.  -- you see there is a section that says
 4   Educational Background?
 5         A.  Yes.
 6         Q.  Okay.  So let me just make sure that I have
 7   this correct.  In 1987 you graduated with degrees
 8   from both Cal State Long Beach and University of
 9   Trondheim in Norway; correct?
10         A.  Yes.  I mean it was -- I was part of a
11   program that California State University in Long
12   Beach had with University of Trondheim where I took
13   additional classes at California State University in
14   Long Beach to satisfy the requirement to become a
15   civil engineer, which is a Norwegian designation
16   similar to a master level engineering designation,
17   so that's why it's the same date.
18         Q.  Okay.  And the -- those degrees, both the
19   Norwegian degree and the degree from Long Beach,
20   were in the field of civil engineering; is that
21   correct?
22         A.  It was engineering but it was computer
23   science.
24         Q.  Okay.  They weren't in economics or finance
25   or anything like that; correct?
```

```
 1       A.  No.  I've used some of the models that I
 2  developed in my computer science classes to do
 3  financial modeling; but, no, it was not in
 4  economics.
 5       Q.  Okay.  Then in 1989 you received a Master
 6  of International Business from the University of San
 7  Diego; right?
 8       A.  That's correct, yes.
 9       Q.  What is a Master of International Business?
10       A.  It's basically the same as an MBA but you
11  had to have two additional -- there were two
12  additional requirements.  One was the second
13  language requirement and one was in -- taking an
14  interdisciplinary class, in other words from one of
15  the other class -- from one of the other schools.
16            Also your electives was focused on
17  international business, and mine was focused on
18  finance.
19       Q.  Okay.  So apart from your degree in
20  international business with a focus in finance from
21  University of San Diego, do you have any other
22  degrees related to the fields of finance or
23  economics?
24       A.  No.  It would -- I mean the Chartered
25  Financial Analyst designation is -- you know, is a
```

```
1   program where you go through a lot of the type of
2   analysis that I use in these type of cases, but of
3   course that is the CFA Institute.  It's not the
4   university.
5        Q.  We'll get to the CFA Institute in a second.
6            So you don't have any sort of Ph.D. or any
7   other advanced degree in finance or economics;
8   correct?
9        A.  I do not have a Ph.D., no.
10       Q.  So describe for me a little bit what the
11  program is that got you to be certified as a
12  Chartered Financial Analyst in 1997.
13       A.  It's a program where you have to basically
14  read what they call a body of knowledge, and you get
15  tested on it to make sure that you understand the
16  body of knowledge, and it relates to economics.  It
17  relates to finance, equity analysis, fixed income
18  analysis.  So it is all of the skills you need to be
19  a securities analyst.
20       Q.  Do you need to have a degree in finance or
21  economics in order to become a CFA?
22       A.  There isn't a requirement.  The vast
23  majority of the individuals who go through the
24  program have a degree, and most of them -- I believe
25  most of them would have a graduate degree in
```

1  business, but it's not a requirement.

2       Q.  Okay.  But in your experience are there

3  also people who go through the CFA program who have

4  backgrounds in, for example, you know, accounting?

5       A.  There could be.  I mean accounting is part

6  of what CFA covers because you have to know

7  accounting in order to do securities analysis.

8            I don't know the specific statistics on it,

9  but typically -- I mean there are CPAs that also

10  have CFA, the CFA designation; but I don't know, you

11  know, what the proportion would be of the membership

12  who has an accounting background.

13       Q.  So your CV also walks through on the first,

14  into the second page your work history; right?

15       A.  That's correct, yes.

16       Q.  And so starting in 1990 you worked at a

17  firm called Princeton Venture Research, Inc.?

18       A.  That's correct, yes.

19       Q.  And you stayed there until about 1998?

20       A.  January of 1998, yes.

21       Q.  Okay.  And what kind of work did you do at

22  that firm?

23       A.  I was hired by Bill McKiernan who had

24  opened a San Diego office for Princeton Venture

25  Research, and initially we were focused in on

```
 1   looking for opportunities in the San Diego area,

 2   investment opportunities, particularly as the

 3   defense industry was tapering off, and that was one

 4   of the focus.

 5           The other focus was litigation consulting,

 6   and so we did a lot of litigation consulting and

 7   also some venture capital and investment banking.

 8       Q.  And so then in '98 you moved to a firm

 9   called Business Valuation Services, Inc.; right?

10       A.  That's correct, yes.

11       Q.  Was that a move or did Princeton Venture

12   Research become Business Valuation Services?

13       A.  No.  I resigned from Princeton Venture

14   Research in January of 1998 and I joined Business

15   Valuation Services, a completely different firm, in

16   February of 1998.

17       Q.  Okay.  And you stayed there for a couple of

18   years until you went to Financial Markets Analysis

19   LLC; correct?

20       A.  That's correct, yes.

21       Q.  And that was another move to a different

22   firm?

23       A.  That was me starting up my own firm with

24   two other principals, yes.

25       Q.  Okay.  Who were the other principals in
```

 1   that?

 2        A.   That was Candace Preston and Mike Marek.

 3        Q.   Okay.  And so then in 2014 you moved to

 4   your current firm, which is called Caliber Advisors;

 5   right?

 6        A.   That's correct, yes.

 7        Q.   Could you describe for me the circumstances

 8   of your move from Financial Markets Analysis to

 9   Caliber?

10        A.   It really related to probably mostly

11   Candace moving into retirement and I was looking for

12   another firm to help me out, particularly with

13   support work and so on.

14        Q.   Okay.  So did you essentially close

15   Financial Markets Analysis and essentially merge

16   your team into Caliber?

17        A.   I closed the San Diego operation of

18   Financial Markets Analysis.  I think Financial

19   Markets Analysis still do some projects.  That would

20   be Candace and Mike still do some projects.

21        Q.   Okay.

22        A.   So it's not -- I don't think they have

23   closed completely.  But, yes, the San Diego

24   operation was moved to Caliber Advisors, yes.

25        Q.   Okay.  In approximately how many

```
 1   litigations have you submitted an expert report or
 2   expert testimony?
 3       A.  One of the things that I sometimes have a
 4   problem with is to distinguish between an expert
 5   report and a declaration or affidavit and so on.
 6       Q.  Just being inclusive, I'm really referring
 7   to all of those.
 8       A.  Okay.  That's easier, actually.  It's
 9   probably approximately 100 reports.
10       Q.  Okay.  100 reports of various forms?
11       A.  Correct.  Correct.  Not all of them would
12   be expert reports, but...
13       Q.  Understood.  Understood.  And then -- well,
14   just to clarify for a second, not all of them would
15   be expert reports, but would that be approximately
16   100 reports that were submitted in one way or
17   another to courts or other tribunals in connection
18   with litigation matters?
19       A.  Exactly.  So, for instance, you may have a
20   case that has settled and, you know, they ask me to
21   allocate the settlement proceeds and I write up my
22   allocation and they submit that as part of their
23   filings with the court.
24           I -- in my mind that is not an expert
25   report, but, you know.
```

1      Q.  Understood.  But the 100 situations or

2   approximately 100 situations are situations in which

3   you provided materials that were then submitted by

4   counsel to a court and tribunal for some purpose?

5      A.  Correct.  Yes.

6      Q.  As distinguished from, you know, reports

7   that you may have prepared for counsel or a client

8   for their own internal sort of consulting purposes;

9   correct?

10     A.  That's correct, yes.

11     Q.  And approximately how many times have you

12  provided testimony in any litigation-related matter,

13  either in a deposition or trial setting?

14     A.  All of those occasions are included on my

15  CV.

16     Q.  Okay.

17     A.  So I think there are approximately 30

18  cases.

19     Q.  Okay.  And those are all examples where you

20  gave testimony as somebody who was proffered as an

21  expert witness of some sort?

22     A.  Correct.  So it would be either at

23  deposition, hearing, arbitration.

24     Q.  Okay.  Has your testimony, either in an

25  expert report or your oral testimony in a deposition

 1   or in a trial ever been excluded by a court or other

 2   tribunal?

 3        A.  I don't believe so, no.

 4        Q.  Has your testimony ever been criticized by

 5   a court or other tribunal?

 6            MR. MITCHELL:  Objection to form.

 7        A.  Yes.  I think that the one that comes to

 8   mind is the Flowserve opinion.  There was a district

 9   court opinion in Flowserve.  It was later overturned

10   on appeal by the appellate court, but the district

11   court criticized me, yes.

12   BY MR. PASKIN:

13        Q.  Any other instances where a court

14   criticized your report or testimony?

15        A.  Nothing that comes to mind.  That one there

16   comes to mind.

17        Q.  Okay.  What was the basic nature of the

18   court's criticism of your work in the Flowserve

19   case?

20        A.  It had to do with my loss causation

21   standard that I used and the court used a different

22   loss causation standard and the district court was

23   then later overturned on appeal with respect to her

24   loss causation standard.

25        Q.  In approximately how many cases have you

```
 1   been retained by Robbins Geller or any of its
 2   predecessor firms to provide expert witness work?
 3       A.  I don't know.  It probably would be half of
 4   the totality of everything.
 5       Q.  Okay.  So --
 6       A.  But it would be very difficult --
 7       Q.  I'm not holding you to exact numbers here;
 8   but of the roughly hundred cases in which you've
 9   provided some sort of expert opinion, you would
10   estimate that in about 50 of those you were doing
11   that having been retained by Robbins Geller or one
12   of its predecessor firms?
13       A.  Yeah.  When you look at that entire period,
14   it would be probably more than half, yes.
15       Q.  Okay.  So roughly speaking more than 50?
16       A.  Correct, yes.
17       Q.  Okay.  And how about currently?  In how
18   many cases are you currently engaged by Robbins
19   Geller to provide expert report or testimony?
20       A.  Currently?  So I mean it's -- I've
21   submitted other reports.  No, I'm not currently
22   working on these things.
23       Q.  Let me try to break it down a little bit
24   because that probably can get a little bit
25   confusing.
```

1         In the last two years can you tell me in

2    how many cases you've submitted either an expert

3    report or provided, proffered expert testimony where

4    you were retained by Robbins Geller?

5         A.  I'm going to try and help myself a little

6    bit here.  I don't know.  Maybe a handful of times.

7    I'm not sure.

8         Q.  Do you know whether it's more or less than

9    ten?

10        A.  I think a handful of times over the past

11   year.

12        Q.  Okay.

13        A.  That's my count in my head.

14        Q.  Okay.  No, understood.

15        A.  Yeah.

16        Q.  And I also want to ask about cases where

17   you haven't yet submitted an expert report or

18   provided testimony but you're currently doing work

19   retained by Robbins Geller that you anticipate will

20   ultimately lead to either an expert report or expert

21   testimony.  How many of those do you currently have

22   going on?

23        A.  I have one other one where I anticipate

24   filing an expert report, yes.

25        Q.  Okay.  And I won't ask you what case that

```
 1  is because I imagine it's confidential at this

 2  point.

 3       A.  That's correct.

 4           MR. MITCHELL:  Highly.

 5           MR. PASKIN:  Well.  I don't know if I'd go

 6  that far.

 7       Q.  So in the -- well, first, in sort of all of

 8  the cases where you've submitted expert reports, the

 9  roughly 100 or so, approximately how many, or if you

10  can estimate the kind of rough percentage, of those

11  cases where your work related to class certification

12  issues?

13       A.  Maybe a quarter.

14       Q.  A couple dozen times?

15       A.  Yeah.

16           THE REPORTER:  Could we go off the record?

17           MR. PASKIN:  Yes, please.

18           THE VIDEO OPERATOR:  Off the record, the

19  time is 9:58 a.m.

20           (Brief interruption)

21           THE VIDEO OPERATOR:  Back on the record.

22  The time is 9:59 a.m.

23  BY MR. PASKIN:

24       Q.  So then just to narrow in a little bit

25  more, in the cases where you've worked with Robbins
```

1  Geller or their predecessor firms in approximately

2  how many cases have you submitted a report or

3  provided testimony with respect to class

4  certification?

5      A.  That is a very common thing that they ask

6  for, so out of the 25 total, a major -- probably

7  closer to 15, 20.

8      Q.  Okay.  In those cases where you've been

9  working with Robbins Geller and you've submitted a

10  report related to class certification, have those

11  all been securities class actions?

12      A.  I'm -- it's related to securities to some

13  extent.  I'm not sure if all of them have been 10b

14  cases, but it certainly has related to securities.

15      Q.  Okay.  Have you performed -- in all of

16  those cases that were in the class certification

17  stage and that related to securities, did you

18  express opinions about whether the trading market

19  for the securities at issue was efficient?

20      A.  I think for all of the class certification

21  ones that was the key, one of the key issues.

22      Q.  Okay.  So you've done that roughly 20 or 25

23  times for Robbins Geller; correct?

24      A.  15 to 20 times for Robbins Geller, probably

25  25 times or so overall.

```
 1        Q.  In any of those cases did you conclude and

 2   express an opinion that the market was not efficient

 3   for the securities at issue?

 4        A.  Every case I've had where I have concluded

 5   that the market was not efficient, Plaintiffs have

 6   not submitted a report in any of those cases.  So

 7   all of the cases where they submitted a report are

 8   cases obviously where I have concluded that the

 9   market is efficient.  For obvious reason it benefits

10   them.

11        Q.  Okay.  So is it fair to say, then, that in

12   working with Robbins Geller on class certification

13   issues there have been times when you have provided

14   consulting services that have not resulted in a

15   class certification expert report?

16        A.  I have -- if I understand your question

17   correctly, yes, I've consulted in many other cases

18   where I have not submitted a report for class

19   certifications for Robbins Geller, but that doesn't

20   mean that -- even if I did not submit a report, that

21   doesn't mean that I did not submit a report because

22   I thought the market was inefficient.  It may have

23   been for other reasons.

24        Q.  I understand.  So in the cases where you

25   did not submit reports but you did some class
```

```
 1   certification-related consulting work for Robbins

 2   Geller, on how many occasions -- without telling me

 3   the specifics of the cases, on how many occasions

 4   did you reach the conclusion that the market was not

 5   efficient for the securities at issue?

 6        A.   I have on occasions, on several occasions

 7   talked to attorneys, whether it's Robbins Geller or

 8   other attorneys, about securities that in my opinion

 9   did not trade in an efficient market, but I

10   can't -- I mean I can't really -- I can tell -- I

11   mean it's -- it relates to securities typically

12   that's not traded on a national exchange, on the

13   pink-sheets type of securities and so on, and I

14   don't know on how many occasions through the years

15   I've had those discussions, though.

16        Q.   Okay.  That's a good clarification.

17             So even on a consulting basis have you ever

18   expressed a view to Robbins Geller, or any of the

19   other counsel who have retained you for class

20   certification purposes, that a security that traded

21   on a national exchange such as the New York Stock

22   Exchange was not an efficient market?

23             MR. MITCHELL:  Objection to form.

24        A.   With respect to the New York Stock

25   Exchange, I do not believe I've had any such
```

```
 1    conversations with any attorney at Robbins Geller.
 2    I have had one particular case where I discussed
 3    that particular issue with another firm but not with
 4    Robbins Geller.  Typically stocks that trade on the
 5    New York Stock Exchange tend to trade in an
 6    efficient market.
 7    BY MR. PASKIN:
 8        Q.  In your report you state that you're being
 9    compensated at $425 per hour for the work that
10    you're providing in this case; correct?
11        A.  No.
12        Q.  Okay.
13        A.  475.
14        Q.  475.  My apologies.  In some, how is
15    Caliber being compensated for the work in connection
16    with your expert report or testimony in this case?
17        A.  Well, I mean the money goes to pay for
18    expenses and common expenses that we all have; and
19    then, you know, depending on what's left over, that
20    is something I have control over.
21        Q.  Okay.  Are there also analysts or support
22    staff who -- from Caliber or elsewhere who helped
23    you with your report?
24        A.  Yes.
25        Q.  Okay.  And are they also being compensated
```

```
 1  on an hourly basis for the time they've spent?

 2      A.  Yes.

 3      Q.  And that's sort of part of the total

 4  revenue that goes to Caliber in connection with your

 5  work; correct?

 6      A.  It's -- yeah, I mean it goes to Caliber,

 7  yes --

 8      Q.  Okay.

 9      A.  -- and it goes to pay for expenses and

10  this, that, and the other.

11      Q.  Okay.

12      A.  Yes.

13      Q.  You're saying that most of it goes to you,

14  even though it flows through Caliber; is that

15  correct?

16      A.  Most of it goes to me?

17          MR. MITCHELL:  Objection.

18      A.  I mean it's -- if there is -- in terms of

19  what's left over, yes, I have control over what's

20  left over, yes.

21  BY MR. PASKIN:

22      Q.  Okay.

23      A.  But there are -- that -- you know, there

24  are bills to be paid, there are also different

25  things and sometimes it's kind of difficult -- when
```

```
 1   everything goes into one pot, it's kind of difficult

 2   to kind of determine, you know, what comes from

 3   what, so to speak.

 4        Q.  Understood.  Understood.  Is that the

 5   general approach that you use at Caliber to bill

 6   Robbins Geller for the work that you do on cases

 7   where they retain you?

 8        A.  I just look at the hours worked and I

 9   multiply that by each individual's billable rate,

10   and I send an invoice to Robbins Geller.  They cut a

11   check to Caliber and send it back to me.

12        Q.  Okay.  And that's the approach you're using

13   in this case; correct?

14        A.  Yes.

15        Q.  And in all of your litigation engagements

16   with Robbins Geller?

17        A.  Well, since I started at Caliber, yes.

18        Q.  Right.  Understood.  Do you personally have

19   any business or financial relationship with Robbins

20   Geller outside of the financial relationship that

21   you have whereby they pay you and your support team

22   on an hourly basis for the work that you do in

23   connection with specific cases?

24        A.  No.

25        Q.  Do you know whether Caliber has any such
```

```
 1   relationship with Robbins Geller?

 2       A.  Not to my knowledge.

 3       Q.  So if you turn to the body of your report,

 4   not the exhibits, in paragraph 5 on page

 5   2 -- withdrawn.

 6           You see on page 2 there is a section that

 7   says Overview of Assignment; correct?

 8       A.  That's correct, yes.

 9       Q.  And in paragraph 5 under that section is a

10   description of the assignment that you were given by

11   Robbins Geller in this case; correct?

12       A.  That's correct, yes.

13       Q.  Okay.  And to summarize -- again, I'm not

14   reading this exactly and I just want to make sure

15   that I understand the basic substance -- you've been

16   asked to do two things in this case.  One of them is

17   to opine about the efficiency of the market in which

18   Big Lots stock traded during the class period;

19   correct?

20       A.  Correct.

21       Q.  And the other one is to explain a

22   methodology for determining class-wide damages;

23   correct?

24       A.  That's correct, yes.

25       Q.  And those are two things that you did in
```

```
 1   this case; correct?

 2        A.  That is correct, yes.

 3        Q.  And sort of the overview of what you did

 4   and the opinions that you're expressing in this case

 5   appear in paragraph 7 on page 3; correct?  Excuse

 6   me, 7 and 8 on page 3.

 7        A.  7 and 8, yes.  That's correct.

 8        Q.  Paragraph 7 essentially summarizes your

 9   opinion with respect to the market efficiency issue;

10   right?

11        A.  That's correct, yes.

12        Q.  And then paragraph 8 summarizes your

13   opinion with respect to the methodology for

14   class-wide damages; right?

15        A.  That's correct, yes.

16        Q.  So in paragraph 7 starting towards the end

17   of the second line you write, "It is my opinion that

18   the market in which Big Lots common stock traded

19   throughout the class period was impersonal, open,

20   well-developed, and efficient in that the market

21   prices quickly responded to incorporate and reflect

22   new material information as it became available."

23            In that sentence are you defining

24   "efficient" as meaning market prices quickly

25   responded to incorporate and reflect new material
```

```
 1   information as it became available?

 2       A.  Yes.  I mean, in paragraph 10 is where I

 3   explain that an efficient market is one that

 4   efficiently processes new and material information.

 5   So that is typically what we mean when we talk about

 6   an efficient market and that is that when new

 7   material information enters the market, it quickly

 8   gets incorporated into the stock price.

 9       Q.  So in that analysis does it matter the

10   degree to which that information gets incorporated

11   into the stock price?  Do you understand my

12   question?

13       A.  Yeah, I mean -- yes, I mean you can always

14   get into like an academic discussion in terms of,

15   you know, is it -- you know, hopefully it's

16   information reflected in the stock price, and

17   typically what we look at is whether or not regular

18   investors can take advantage of the information to

19   generate excess returns so that's -- so yes, it does

20   take that into account.

21           And there is no dispute that some

22   investors, the most sophisticated investors, the

23   ones who are quickest to analyze the information and

24   so on may have an advantage; but in general regular

25   investors, regular class members are justified in
```

```
 1   relying in -- on the stock price because the market
 2   is sufficiently efficient so that they can generate
 3   express returns by analyzing the information
 4   themselves.
 5        Q.  So in your opinion in an efficient market
 6   for the trading of a stock do prices always respond
 7   when new material information becomes available to
 8   investors?
 9        A.  Yeah.  That is what market efficiency
10   means, and that is if it's new, material, and of
11   course if it's different than what -- if it changes
12   market's expectations with respect to future cash
13   flows, yes, then the stock price will be impacted.
14        Q.  Why does it matter whether it changes the
15   market's expectations with respect to future cash
16   flows?
17        A.  So, let's say that the market
18   expects -- let's just take an example.  Company
19   earnings, is that material information?  Yes,
20   company's earnings -- it's very material because it
21   goes into your evaluation model.
22            So when a company reports earnings -- well,
23   are those earnings new and material?  Yes.  When
24   they report earnings it's new information and, as I
25   just said, earnings are material.
```

```
 1              But what if the market expects a
 2    dollar -- the company to report a dollar a share and
 3    the company reports a dollar a share?  Well, yes,
 4    it's new material information, but it's consistent
 5    with the expectations that the market already has.
 6    So it will not result in a change in the stock
 7    price.  Only when the new material information is
 8    different than market expectations will you see a
 9    change in the stock price.
10        Q.  So can you describe for me what economic
11    analysis you performed in this case specific to the
12    trading of Big Lots stock during the proposed class
13    period that led you to conclude that Big Lots stock
14    was trading in an efficient market?
15        A.  The first thing I looked at -- well, I
16    looked at the Cammer factors and --
17              THE REPORTER:  At the what factors?
18        A.  At Cammer, C-A-M-M-E-R, factors.
19              And effectively, as I discuss in my report,
20    I wanted to see whether or not the economic --
21    whether or not the competition that facilitates
22    market efficiency was present in this particular
23    stock.
24              So what I looked for was whether or not
25    there was evidence that market participants analyzed
```

 1   the information.  I did that by looking at analysts'

 2   reports.

 3            I looked at whether or not the investors in

 4   the stock were sophisticated investors.  I did so by

 5   looking at institutional ownership.  I also looked

 6   at whether or not there's evidence that there was --

 7   investors acted upon the new information by trading,

 8   and I looked at trading volume to see if there was

 9   significant trading volume in the stock.

10            Now, these are the same things as the

11   Cammer factors one, two, and three, but those things

12   were specific things that I looked at in order to

13   determining that the market was efficient.

14            In addition, Cammer factors point out that

15   it would be helpful to have direct evidence of

16   market efficiency to see that new material

17   information was in fact incorporated into the stock

18   price by looking at financial releases.

19            So I looked at all of the financial

20   releases during 2012 to see whether or not there was

21   an unusual number of statistically significant event

22   days on these financial -- relating to these

23   financial releases, and there was.

24            I also looked at two specific event days

25   during the class period to see whether or not the

```
 1   stock price on those two days quickly incorporated
 2   the new material information on those two days.
 3             So that's a rough summary of the analysis
 4   that I performed.
 5        Q.  Back to your report where we were looking
 6   before, in paragraph 8 you say that based on your
 7   more than 25 years as a damages expert and
 8   consultant in numerous other securities cases
 9   similar to this one, and then you go on and talk
10   about your opinion.
11             What are the other securities cases similar
12   to this one you are referring to?
13        A.  It's several hundred security cases that I
14   have worked on during the past quarter of a century.
15        Q.  Okay.  And what's your basis for concluding
16   they are similar to this one?
17        A.  They are similar in the sense that you
18   have -- you have the market prices of
19   publicly-traded securities that have been distorted
20   based on some alleged truth that was concealed by
21   misrepresentations.
22        Q.  Or so Plaintiffs allege; correct?
23        A.  Yes, of course.  I mean that's the
24   Plaintiffs' allegations, and every damage analysis
25   assumes that Plaintiffs will prevail at trial.  Of
```

```
 1   course if they do not prevail, if they cannot prove

 2   that there was a fraud, then there are no damages.

 3        Q.  Did you do anything more detailed than what

 4   you just described to conclude that this case was

 5   similar to the prior securities cases you've worked

 6   on?

 7        A.  Yes, I just -- I mean I reviewed the facts

 8   and -- to determine whether or not this case could

 9   be -- whether or not damages in this case could be

10   quantified using the type of methodology that we

11   typical use when we quantify damages in these type

12   of securities cases.

13        Q.  Okay.  And does your event study

14   methodology that you did for this case -- is that

15   the methodology that can be used to quantify

16   damages?

17        A.  Generally, yes.  It -- you can -- the event

18   study that I performed in this particular case was

19   specific for the analysis of market efficiency.  You

20   certainly could use that to come up with a

21   quantification of damages in this particular case,

22   but there may be certain adjustments that one may

23   want to do when you're focusing specific --

24   specifically on the quantifications of damages, but

25   it's still going to be part of what I call the event
```

 1  study framework that I usually use in -- I and other

 2  experts usually use in these type of cases.

 3      Q.  What kind of adjustments would you need to

 4  do -- withdrawn.

 5          Are you saying that in order to make the

 6  event study analysis that you've done thus far in

 7  this case applicable for determining class-wide

 8  damages that you would need to do some additional

 9  analysis or that you could do some additional

10  analysis?

11      A.  You may need to do add -- do the event

12  analysis a little bit different.  All of that

13  depends on how the facts comes out later on in the

14  litigation.

15          So when you go through discovery and when

16  you get a better sense of what Plaintiffs actually

17  can prove at trial, you want your damage analysis

18  not to be, you know, what you did months or years

19  before.  You want to incorporate as much as you can

20  of all of the information that's available.

21      Q.  Okay.  So I think what you've described is

22  a need to tailor your analysis with respect to

23  damages, depending on what ultimately gets proven

24  with respect to liability.  Is that fair?

25          MR. MITCHELL:  Objection to form.

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 35

1         A.  Well it could be with respect to liability.

2             The easiest example is that -- let's say

3    that there's no liability after the April decline.

4    Well, then obviously you get rid of damages

5    attributable to the decline in August.  I mean

6    that's, of course, a very, very easy example.

7             But there could be other things as well,

8    maybe -- maybe the starting point for the inflation

9    relating to the August decline -- maybe the starting

10   point is different than at the beginning of the

11   class period.  You have to make that adjustment.

12   But these -- but these types of adjustments are part

13   of the framework, part of the methodology in these

14   type of cases.

15        Q.  So let's for now take the Plaintiffs'

16   allegations and their theory of the case as a given.

17   So if the Plaintiffs are able to prove the case that

18   they've laid out in their complaint, can we take

19   your event study methodology that you've done thus

20   far and described in your report and use it to

21   calculate damages right now?

22        A.  Yes.  I mean right now Plaintiffs believe

23   they can prove everything, so that will mean that

24   the entire decline in April and the entire decline

25   in August is attributable to the fraud.

1           Now, you know, that may or may not be true

2    as the case moves forward; but I mean that's, of

3    course, Plaintiffs's best case scenario.  And the

4    starting point of that inflation is the beginning of

5    the class period.

6           So, yeah, that is -- you can use the event

7    analysis that I have performed right now to do that

8    calculation.  My point is that, you know, it's not a

9    rigid analysis, you know.  The event study framework

10   is not set in stone.

11          Obviously if there are new facts that come

12   out and are things that you would want to adjust

13   for, of course you'd adjust for it.

14          But this case is no different than any

15   other case in that respect.  You just make the

16   appropriate adjustment using this framework.

17      Q.  So then is it fair to say that your

18   current -- well, withdrawn.

19          Let's take a look at Exhibit C and E to

20   your report.  And can you just first generally

21   describe for me what you're portraying in Exhibit C

22   and D?

23      A.  Exhibit C is an event chronology, so it is

24   a chronology of the media that was on Bloomberg,

25   together with analysts' reports, and so it's a

```
 1   chronology that starts -- I believe it started
 2   on -- let's see -- February 1st of 2012, and then it
 3   goes through August 31st of 2012.
 4            And on the left I have five columns where I
 5   have the date, I have the reported volume, I have
 6   the closing price, I have the percentage change, and
 7   I have the t-statistics that's used to determine the
 8   statistical significance of the price movement on
 9   that particular day.
10            With respect to Exhibit E, that is
11   actually -- that's actually my regression analysis
12   where I for each day perform an analysis to
13   determine the statistical significance of the price
14   movement on that particular day.
15            I also looked at whether or not it's
16   statistically significant at the five percent level
17   or the one percent level statistically.
18       Q.  When you talk about your event study
19   framework, is that portrayed in Exhibit C, Exhibit
20   E, or some combination of the two?
21       A.  Well, the event study framework is simply
22   looking at the impact of an event on the stock
23   price; right?  So if you have a disclosure -- and I
24   talk about the disclosure of the alleged truth.
25            So the driving force in calculating damages
```

```
 1   in these cases, consistent with the U.S. Supreme

 2   Court decision Indura, is what happens when the

 3   disclosure of the alleged truth is made, what

 4   happened, what is the impact on the stock price.

 5            And that is what an event study is, is what

 6   is the impact of an event on the stock price.  So

 7   what you would do is to look at when the alleged

 8   truth that was concealed by the misrepresentation --

 9   when that is disclosed to the market, what happened

10   to the stock price.

11            So what you do is control for whatever

12   factors is outside of the event.  In this case this

13   particular analysis controls for market factors and

14   industry factors, and what you're -- what you have

15   left over is the company-specific factors.

16            So if the alleged truth is the

17   company-specific factors disclosed on that

18   particular day, then the price decline -- the

19   remaining price decline, or abnormal return on that

20   particular day reflects the damages.

21       Q.  Okay.  So just to make sure I understand,

22   on Exhibit E to your report -- let's look, for

23   example, at your entry for April 24th, 2012.

24            So you understand that April 23rd following

25   the close of the market is one of the dates when
```

1    Plaintiffs allege that a corrective disclosure was

2    made?

3        A.  Correct.

4        Q.  And that the impact of that disclosure, if

5    any, on the stock price, in your view, would have

6    happened the following day on April 24th; correct?

7        A.  Right.  So that's what you do.  You look at

8    what is the impact of that disclosure on the stock

9    price, and so you go to April 24th of 2012.

10           And as you can see, you have the market

11   return and return of the industry, which is in this

12   case labeled as peer group.  You control for that

13   and then you come up with a predicted return.  The

14   abnormal return is simply the difference between the

15   actual return and your predicted return.  So that is

16   the company-specific return that the market and

17   industry factors.  So that is the estimate of this

18   event study of the impact of the new material

19   information that was disclosed on that day.

20       Q.  Okay.  And so just sticking with April 24th

21   here, the actual return is negative 24.06 percent;

22   right?

23       A.  That's correct, yes.

24       Q.  And then the predicted return, based on the

25   market and industry factors, is just minus .26

```
 1   percent; right?

 2        A.   That's correct.

 3        Q.   So what you calculated to be the -- sort of

 4   the abnormal company-specific return on the date was

 5   this minus 23.80 percent; right?

 6        A.   That's correct, yes.

 7        Q.   And then the column to the right of that

 8   called t-statistic, which here is negative 12.67,

 9   that's just a statistical measure that says how

10   likely or unlikely the return that was experienced

11   is to have been caused randomly by the market and

12   industry factors, rather than company-specific

13   factors; correct?

14        A.   Yes.  I mean a high -- a large t-statistic

15   just means it's unlikely to have occurred simply by

16   chance.  In other words, it's evidence that the new

17   information that was disclosed on that particular

18   day caused abnormal return.

19        Q.   Okay.  And so then what you would do for

20   purposes of damages is take that negative 23.8

21   percent return and translate it into a dollar number

22   and then take that dollar number and say that that's

23   the amount of price inflation that existed in the

24   stock during this class period up until that point;

25   correct?
```

 1      A.  Well, there are two ways of doing it.  You

 2  can do it on a dollar basis or you can do it on a

 3  constant percentage basis.

 4      Q.  Okay.

 5      A.  And there are some legal issues involved in

 6  terms of which of the methodologies is the

 7  appropriate methodology.  For my purposes I was

 8  focusing in on whether or not it can be quantified.

 9      Q.  Okay.  Okay.  So leaving aside whether it's

10  appropriate to look at it on a dollar basis or a

11  percentage basis, you, as a sort of matter of your

12  analysis, what you would do is you would take that

13  abnormal company-specific return, you would -- and

14  you would in a constant way, whether it's expressed

15  as dollars or a percentage -- on a constant basis

16  you would carry that back to the beginning of the

17  class period as a reflection of the degree to which

18  you contend the price was inflated by fraud prior to

19  the corrective disclosure; is that correct?

20          MR. MITCHELL:  Objection to form.

21      A.  If that is consistent with the facts.  I

22  mean -- so what you have to do is to look at the

23  alleged truth concealed by the misrepresentation on

24  the first day of the class period and see, well, is

25  that the same as the disclosure of -- disclosure

```
 1  on -- or off of the market on April 23rd.

 2          So, yes, it could be -- if that's what the

 3  facts dictate, that's what you would do.

 4  BY MR. PASKIN:

 5      Q.  Okay.  Well, when you say "if that's what

 6  the facts dictate," have you done any analysis in

 7  this case, even based on Plaintiffs' allegations, to

 8  determine whether your negative 23.8 percent

 9  company-specific return is an appropriate measure of

10  damages for the class period up until that point?

11          MR. MITCHELL:  Objection to form.

12      A.  My understanding of Plaintiffs'

13  allegations at this point is that inflation would

14  start at the beginning of the class period.

15          Now, we can go through discovery and

16  there's going to be a lot of additional evidence

17  and, you know, that -- you know, that may or may not

18  be true, but based on Plaintiffs' best case

19  scenario, yes, that's what you would do.

20  BY MR. PASKIN:

21      Q.  Okay.  Have you done any analysis yourself

22  of Plaintiffs' allegations to determine whether the

23  company-specific return on April 24th was, in fact,

24  related in whole or in part to the allegations of

25  fraud?
```

1      A.   That would be a loss causation analysis.  I

2   have not performed a loss causation analysis in this

3   case.

4      Q.   That would also be a damages analysis,

5   correct, because in order to quantify damages you

6   would need to perform that analysis; correct?

7      A.   In --

8           MR. MITCHELL:  Objection.

9      A.   Well, the loss causation analysis is part

10  of a damages analysis, and it -- so you have to look

11  at what was concealed on the first day of the class

12  period, what Plaintiffs allege was concealed on the

13  first day of the class period; and it has to relate

14  to what was disclosed after the market closed on

15  April 23rd.

16     Q.   Okay.  What relevance, if any, would you

17  ascribe to other events that happened between the

18  beginning of the class period and the corrective

19  disclosure on April 24th?

20          MR. MITCHELL:  Objection to form.

21     A.   You would have to explain to me what kind

22  of events you're talking about.  I'm not sure.

23  BY MR. PASKIN:

24     Q.   Well, specifically you understand from the

25  allegations in the complaint that the Plaintiffs

```
 1   allege a series of allegedly false and misleading

 2   statements throughout the class period; correct?

 3        A.  Yes.

 4        Q.  And some of them Plaintiffs allege occurred

 5   on the first date of the proposed class period,

 6   March 2nd; and there were others that occurred

 7   between March 2nd and April 24th; right?

 8        A.  Correct, yes.

 9        Q.  So what, if any, analysis in order to

10   determine damages at various points during the class

11   period -- what analysis would you need to do with

12   respect to those other dates between March 2nd and

13   April 24th that the Plaintiffs make allegations of

14   fraud?

15        MR. MITCHELL:  Objection to form.

16        A.  This goes back to what I was explaining

17   earlier.  What drives it is what the

18   misrepresentations concealed, in other words the

19   alleged truth.  That is what drives the damages

20   analysis.

21            So if you have two misrepresentations or if

22   you have five misrepresentations, if it all conceals

23   the same alleged truth, then it wouldn't matter.

24            So the question is does the alleged truth

25   that is being concealed change over this period of
```

```
 1   time, and if that is -- if that is so, if the
 2   defendants can prove, for instance, that that is so,
 3   then that would impact inflation in the earlier part
 4   of the analysis.
 5           MR. MITCHELL:  Michael, whenever you're
 6   ready, we've been going for about an hour.
 7           MR. PASKIN:  That's fine.  We can take a
 8   break.
 9           THE VIDEO OPERATOR:  Off the record, the
10   time is 10:40 a.m.
11           (Recess)
12           THE VIDEO OPERATOR:  We are back on the
13   record.  Here begins disk number two in the
14   videotaped deposition of Bjorn Steinholt.  The time
15   is 10:56 a.m.
16   BY MR. PASKIN:
17       Q.  Mr. Steinholt, you have Exhibit E to your
18   report sitting there in front of you?
19       A.  I do, yes.
20       Q.  Okay.  So through Exhibit E you put these
21   boxes around the six dates, five dates?
22       A.  Six dates, I believe.
23       Q.  In Exhibit E you put boxes around the six
24   dates where you say financial information was
25   released by Big Lots, and you analyzed those dates;
```

```
 1   correct?

 2       A.  Correct.  Two of them relates to more

 3   pre-releases of a portion of the earnings, and the

 4   other four relates to the actual earnings releases.

 5       Q.  Okay.  But the statistical analysis that

 6   you performed with respect to those six dates is the

 7   same as the statistical analysis that you've done

 8   with respect to all of the dates reflected on

 9   Exhibit E, isn't it?

10       A.  Correct.  I have from the statistical

11   analysis for all of the days --

12       Q.  Okay.

13       A.  -- from February 2012 through December 10th

14   of 2012, yes.

15       Q.  Okay.  And so the only difference with

16   respect to the six dates that you've chosen, is that

17   for those dates you look at the -- what you call the

18   abnormal return and the t-statistic, and you just

19   state based on the t-statistic whether the abnormal

20   return is statistically significant at the five and

21   one percent levels; correct?

22           MR. MITCHELL:  Objection.

23       A.  The last two columns are just for the

24   financial releases, but you could effectively do the

25   same thing for every day.
```

```
 1   BY MR. PASKIN:

 2        Q.  Exactly.  That's what I was getting at.  So

 3   you or we or anybody could use your Exhibit E and we

 4   could look at the t-statistic numbers, and where the

 5   number, either positive or negative, is -- has an

 6   absolute value of 1.96 or greater, that's a date

 7   where your event study concludes as an economic

 8   matter and a statistical matter that the

 9   company-specific abnormal return, you know, to a

10   certain degree of statistical confidence, cannot be

11   explained simply by random price movement; correct?

12             MR. MITCHELL:  Objection to form.

13        A.  Well, the 1.96 benchmark just means that

14   the day is statistically significant at the five

15   percent level using a two-tailed test, which means

16   that randomly five percent of the time you would

17   have just randomly a day of equal or greater

18   magnitude.  So you can use that benchmark.  You can

19   use 10 percent.  You can use one percent.

20             But the five percent level is the most

21   common level; and given that this analysis relates

22   to not looking at whether or not the information was

23   positive or negative, you know, a two-tailed test is

24   appropriate.

25   /////
```

1  BY MR. PASKIN:

2      Q.  Okay.  And the five percent level and the

3  1.96 t-stat level, that's the benchmark that you

4  chose to measure statistical significance in your

5  event study here; right?

6      A.  It's -- it's not a matter of -- I mean I

7  have two.  I have one percent level.  I have five

8  percent level.  You can do the ten percent level.

9  It means different things.

10          You become more and more certain the lower

11  and lower the P value is.  What is important is the

12  P value, and that is the probability of an

13  equal or -- a result with equal or greater value

14  occurring randomly.  So the P value is really the

15  one that you would look at.

16          But we typically, you know, we -- very

17  often we look at the 1.96.  We look at 1.645.  Those

18  are different things one can look at, depending on

19  the circumstances.

20      Q.  Okay.  Okay.  1.96 is the t-stat threshold

21  that you chose to look at and you discussed in your

22  report here?

23      A.  No.  I looked at the five percent level and

24  I looked at the one percent level.  So those

25  are -- this relates to me looking at -- I'm doing a

 1   binomial distribution.  So that's what this is for,

 2   specifically for.

 3            So I could have done the same thing at the

 4   10 percent level and -- to see whether or not -- to

 5   see what the results would be using -- using the 10

 6   percent level.  The level that you use specifically

 7   goes into the calculation.  So if you use a higher

 8   level, you know, that will be accounted for when you

 9   do the analysis.

10      Q.  Okay.  And all I'm trying to clarify is the

11   level or levels that you chose to use in your report

12   are five percent and one percent to determine

13   whether you check yes or no under your statistical

14   significance columns; correct?

15            MR. MITCHELL:  Objection.

16      A.  This relates to a very specific analysis

17   that I performed, and I guess I'll take the time to

18   point out exactly what the analysis is.

19            Yes, it relates to the analysis I did in

20   paragraph 37, which is a specific analysis.  You

21   know, I -- my work -- back-up work also has one

22   percent level.  In this particular case it made

23   sense to have a higher level of threshold because if

24   you have a very, very low threshold it's a threshold

25   that's easily met, and it's not as informative as

```
 1   using a higher threshold.

 2   BY MR. PASKIN:

 3       Q.  Okay.  And so for all of the other dates in

 4   Exhibit E, if we looked at the t-statistic numbers

 5   that you computed based on your event study

 6   analysis, you -- we could fill in the columns under

 7   statistically significant yes or no.  Just depending

 8   on what the t-stat shows, we could fill in the rest

 9   of the columns; correct?

10           MR. MITCHELL:  Objection.

11       A.  Yes, you can use whatever level the expert

12   believes is the appropriate level to use, and you

13   can just do the calculation.  It's a very simple

14   thing to do.

15   BY MR. PASKIN:

16       Q.  Okay.  And you, the expert for the

17   Plaintiffs right here, chose 1.96 representing the

18   five percent level as at least the more permissive

19   of the two levels that you looked at in this case;

20   right?

21       A.  The 1.96 is -- by definition is the

22   benchmark for being statistically significant at the

23   five percent level using a two-tailed test.  I

24   didn't choose it.  It's -- by definition that's what

25   it is.
```

```
 1            Now, you can -- but you can -- if you use a
 2   different definition, you can use the one percent
 3   level or you can use the ten percent level.
 4       Q.  Okay.  Right.  And all I'm saying is that
 5   the level that you chose to use in this case is the
 6   1.96 five percent level; correct?
 7            MR. MITCHELL:  Objection.  Form.
 8       A.  Actually that's incorrect.  It is what I
 9   chose to use for the particular analysis that I did
10   in the paragraph I just referenced, which I think
11   was paragraph 37.
12   BY MR. PASKIN:
13       Q.  Okay.  The analysis that you did in your
14   event study that you prepared, as described in your
15   class certification report, was to use the 1.96 five
16   percent level; correct?
17       A.  No.  I did an analysis and the analysis had
18   to do with the binomial distribution, and it was
19   specifically an analysis that didn't take into
20   account the direction of the price movement.
21   Consequently I used a two-tailed test.
22            Had I done a different analysis -- had I
23   done a different analysis where I had determined
24   that the information was negative, I would not have
25   used a two-tailed test.  I would have used a
```

```
 1   one-tailed test, and then the benchmark would not
 2   have been 1.96.  It would have been 1.645.  It
 3   depends on the analysis that you do.
 4       Q.  Okay.  And maybe I'm not being clear.  All
 5   I'm trying to clarify is that the analysis that you
 6   chose to do in this case and that you present in
 7   your report in the text and also in Exhibit E is an
 8   analysis that chooses to determine statistical
 9   significance using the 1.96 t-stat and five percent
10   threshold; correct?
11       A.  And that's incorrect for the reasons I
12   stated.
13       Q.  So you did not choose to present
14   statistical significance using a 1.96 t-stat and a
15   five percent -- and a five percent threshold?
16           MR. MITCHELL:  Objection to form.
17       A.  I did an analysis that related to the
18   financial releases without determining the --
19   whether or not it was positive or negative, and I
20   did that analysis using statistical significance at
21   the five percent level and the one percent level
22   using a two-tailed test.
23           With respect to everything else, I -- no, I
24   mean it's -- it's -- I think I specifically state in
25   here that it's -- that the price declines following
```

```
 1   the two dates that I identified were statistically
 2   significant at the one percent level so I didn't use
 3   the five percent level.
 4   BY MR. PASKIN:
 5        Q.   Okay.  Let's pick a date on this chart.
 6   Look at February 16th, 2012.
 7        A.   February 16th.  Okay?
 8        Q.   Okay.
 9        A.   Yeah.
10        Q.   So on February 16th, 2012, the Big Lots
11   stock price increased by 1.25 percent; correct?
12        A.   That's correct, yes.
13        Q.   And when you net out for the industry and
14   market factors, you say that the abnormal return
15   specific to Big Lots is a positive return of .41
16   percent; is that correct?
17        A.   That's correct.
18        Q.   Okay.  And the t-stat associated with that
19   data is 0.2, positive 0.22; correct?
20        A.   That's correct.
21        Q.   Okay.  So utilizing the same analysis that
22   you did for the six dates that you discussed, if we
23   were to say is the return on February 16th
24   statistically significant at the five percent level,
25   the answer would be no; correct?
```

 1        A.  That's correct, yes.

 2        Q.  And at the one percent level the answer

 3   would be no; correct?

 4        A.  That's correct.

 5        Q.  And that's just following through on the

 6   same analysis that you've done with respect to the

 7   other dates?

 8        A.  That's correct.

 9        Q.  And you don't think it's inappropriate for

10   me to suggest that on February 16th, based on the

11   same type of analysis that you did, that there was

12   not a statistically significant return at either the

13   five percent or the one percent level for Big Lots

14   stock; correct?

15            MR. MITCHELL:  Objection to form.

16        A.  There wasn't.  It was not statistically

17   significant.

18   BY MR. PASKIN:

19        Q.  Okay.  Thank you.  And that same analysis

20   that we just talked through with respect to February

21   16th, 2012, is an analysis that -- is an analysis

22   that could be done for any of the dates on these,

23   you know, five pages, correct, four pages?

24        A.  It's an analysis that can be done for the

25   two levels here.  It can be done for the ten percent

1  level, absolutely, yes.

2      Q.  Okay.  So taking the two levels that you

3  chose to analyze for the six dates that you discuss

4  in your report at the five percent level, will you

5  agree with me that there are a total of 11 dates on

6  the four pages here between February 1st and

7  December 31st, 2012, where your data reflects

8  statistically significant abnormal returns for Big

9  Lots stock at the five percent level?

10     A.  I don't -- I don't know one way or the

11  other.  I mean if you represent that's what it is,

12  then that's fine.

13     Q.  Well, I'll represent that I went through

14  the list of t-stats and wherever I saw a positive or

15  negative number of 1.96 or greater, I added it to my

16  list --

17     A.  Right.

18     Q.  -- and I came up with 11 dates in total.

19     A.  Right.  Fair enough.  It's not something I

20  have done.  But yes, fair enough.

21     Q.  Okay.  And so for all of the other dates,

22  such as February 16th where the t-stat -- the

23  absolute value of the t-stat is less than 1.96,

24  based on the analysis that you've done here at both

25  the five percent level and the one percent level as

```
 1   an economic matter, the return that you've

 2   calculated specific to Big Lots stock cannot be

 3   separated from the industry and market-specific

 4   return; correct?

 5       A.  And that's where you're wrong; so --

 6       Q.  Okay.

 7       A.  And I can explain to you.

 8       Q.  Sure.

 9       A.  So when you do this analysis, this is just

10   a numbers analysis.

11       Q.  Uh-huh.

12       A.  And this relates to what I was talking

13   about earlier, the difference between using a

14   two-tailed test or a one-tailed test.

15           So for my analysis it was appropriate to

16   use a two-tailed test because I did not care whether

17   or not we were looking at a positive -- positive

18   information or negative information.

19           Now, when an expert looks at these things,

20   what the experts frequently will do is to do it a

21   little bit different.  What they will do is to

22   analyze the information disclosed and determine

23   whether or not it would be expected to be positive

24   or negative.

25           And if it is expected to -- if you're
```

```
 1   looking and testing whether or not it's a positive

 2   return or whether or not you're testing whether or

 3   not it's a negative return, you would use a

 4   one-tailed test, not the two-tailed test, which is

 5   what I used for my purposes here.

 6           So it depends on the circumstances, and,

 7   you know, the expert will make that determination.

 8       Q.  Okay.  And in this case, you know, with you

 9   as the expert, the determination that you made for

10   evaluating the six dates you chose was to use the

11   two-tailed test with the 1.96 threshold for five

12   percent statistical significance; correct?

13       A.  For the purposes -- for the reasons I

14   explained, because -- and I stated so in my report

15   too.  This does not take into account whether or not

16   the information disclosed on these particular days

17   were positive or negative.  I was just looking for a

18   statistically significant return.

19           But if you're looking for a statistically

20   significant price decline or if you're looking for a

21   statistically significant price increase, you would

22   do it differently.

23       Q.  Okay.  So for -- focusing on the five

24   percent level, which is the level that you discuss

25   for the six dates, you find that five of them have
```

```
 1   statistically significant abnormal returns and one

 2   of them does not; correct?

 3        A.   Correct.  So there is May 23rd, 2012, and I

 4   think that's the only one that's not statistically

 5   significant at the five percent level using a

 6   two-tailed test.

 7             So 1.75 is statistically significant at the

 8   ten percent level, and it's also statistically

 9   significant at the five percent level using a

10   one-tailed test.

11        Q.   If you used a one-tailed test, would these

12   numbers, the predicted returns and the t-stats be

13   the same or would they be different?

14        A.   The t-stats are the same, so -- but let's

15   say you were looking for whether or not there was

16   information on that particular day that caused a

17   price increase; right?  So then you wouldn't -- you

18   would only look at one tail of the distribution, and

19   that is the positive tail.  So no, the benchmark

20   would not be 1.96 for the five percent level.  It

21   would be 1.645 for the five percent level.

22             So it depends on what you look at, you

23   know.  Are you looking for positive information on

24   that particular day, something that caused the stock

25   price to increase, or are you looking for negative
```

```
 1   information, or are you looking for information and

 2   you don't know whether or not it will go up and

 3   down, and that sometimes happens too.

 4           Maybe there has been a pre-announcement of

 5   some information and you don't know whether or not

 6   the market over- or under-reacted.  Then you look at

 7   what happens when the actual information is

 8   released, and then you can look for a statistically

 9   significant price movement on that day, but that

10   could be either positive or negative, so now you

11   have to use a two-tailed test.

12     Q.   Regardless of whether you expect the result

13   to be -- withdrawn.

14           Regardless of whether you expect the

15   information disclosed in a financial release to be a

16   positive or negative impact on the stock price,

17   would you agree with me that financial releases by

18   companies tend to have significant stock price

19   returns more often than dates where no such releases

20   are made by companies?

21     MR. MITCHELL:  Objection to form.

22     A.   Because financial releases always have new

23   and material information, they -- they would be more

24   likely to be -- to result in statistically

25   significant price movements, and that's actually one
```

 1  of the reasons I did the analysis that I did.

 2          It doesn't always happen -- when we talked

 3  this morning, I was talking about if the company had

 4  an earnings release, it reported earnings of a

 5  dollar a share while the market expected a dollar a

 6  share.  Well, its new information is material

 7  information, but it's not different from market

 8  expectations, so you wouldn't expect the stock price

 9  to move.

10  BY MR. PASKIN:

11      Q.  But notwithstanding that, the event of

12  making an earnings release is an event that in your

13  experience in analyzing securities markets is more

14  likely to cause a significant stock price movement

15  than a date on which no such release is made;

16  correct?

17      A.  That's -- that's the same as what you asked

18  me previously; and, yes, I mean that was the premise

19  of my analysis when I was looking at these six

20  financial releases.  It doesn't always result in a

21  statistically significant price movement, but it's

22  more likely to result in a statistically significant

23  price movement.

24      Q.  Right.  So when you picked those six dates,

25  they were dates that by design you picked because

```
 1   you thought they were more likely to result in

 2   statistically significant price movements; correct?

 3        A.  Well --

 4            MR. MITCHELL:  Objection.

 5        A.  -- in an efficient market that would be

 6   true.

 7            So what I was testing for there was whether

 8   or not there was evidence that the market was

 9   efficient.  Of course, if the market is not

10   efficient and the stock price does not react to new

11   material information, then you wouldn't expect there

12   to be any more statistically significant price

13   movements on these days versus other days.

14        Q.  Well, but isn't efficiency also a question

15   of degree, it's not that the market is completely

16   unaware of information and has no reaction to it,

17   but maybe it reacts in different degrees?  Is that a

18   fair, you know, assessment?

19        A.  Well, but you -- but no, we have a

20   benchmark here.  It's the five percent level and the

21   one percent level.  So in other words it's

22   unlikely -- I'm not talking about stock prices not

23   reacting.  I'm looking for large reactions.  So yes,

24   you incorporate -- that is incorporated into the

25   analysis.
```

1      Q.   Okay.  The five percent and one percent

2   thresholds that you look at, though, are those

3   benchmarks based on random movement of the stock on

4   a random day, or are they based on random movement

5   of the stock on a date when earnings releases are

6   made?

7      A.   It would be a sample of -- the sample here

8   is the one year prior to February 1st; right?  So

9   that would include earnings release dates, but

10   mostly the dates will not be earnings release dates.

11      Q.   So the baseline that you chose is a

12   baseline that's based on a mix of days, most of

13   which are days when no company-specific information

14   is coming to market; correct?

15      A.   No financial releases, let's say that,

16   because everyday there is going to be some

17   information about the company.  So it's not

18   necessarily what some will call "no news days"

19   because there is always information in the market

20   about the company.

21          But, no, it would be predominantly days

22   where there's no financial releases.

23      Q.   Okay.  And in fact you selected the six

24   days when there were financial releases.  So the

25   remaining 240-some-odd days are dates on which there

```
1   were not financial releases; correct?

2        A.  Well, the -- this is the one-year period

3   prior to February of 2012.  I don't know -- I didn't

4   go through to see how many financial releases there

5   were during that period of time.  At least there

6   were four, but I'm not sure exactly whether or not

7   there were as many as in 2012 when there were six.

8        Q.  Okay.  Okay.  But certainly you would agree

9   that for establishing your baseline the number of

10  days that included financial releases would be no

11  more than a couple percent of the total days that

12  formulate the baseline sample; correct?

13       A.  Of course.  I mean that's the point,

14  because you want to see whether or not there's a

15  difference.

16          If you have -- if you pick dates -- if the

17  control period was filled with dates with financial

18  releases, there shouldn't be a difference, even in

19  an efficient market.

20          So your -- in order to come up with a

21  result that has any meaning, you know, you have to

22  have a difference between the control period and the

23  events that you're analyzing, and in this particular

24  case clearly there is -- you know, you look at these

25  particular earnings releases here and you can see
```

```
 1   that on virtually all of them -- actually all of
 2   them there are significant price movements, but on
 3   five of them they are quite significant.
 4   BY MR. PASKIN:
 5       Q.  Okay.  And you then state in your report
 6   that the likelihood that five out of six dates would
 7   be significant at the five percent level -- you
 8   know, the likelihood that that would occur randomly
 9   is something like 1 in 500 million or something;
10   right?
11       A.  I don't remember exactly what the number
12   was, but it's -- the likelihood is very, very, very
13   low.
14       Q.  Okay.  Did you do any analysis to determine
15   what the likelihood is that five out of six dates
16   including earnings releases show significant returns
17   at the five percent level?
18       A.  Five out of six dates including earnings
19   releases?
20       Q.  Yeah.
21       A.  I'm not following.
22       Q.  Well, you chose six dates where going into
23   your analysis you expected there to be greater than
24   average stock price movements; correct?
25       A.  That's correct.
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 65

```
 1        Q.  Okay.  And so I'm saying did you compare
 2   the greater-than-average stock price movements that
 3   your analysis showed you occurred with your
 4   assumption going into your exercise about what
 5   greater-than-average stock price movements might
 6   occur?
 7        A.  I don't even follow what you're talking
 8   about.
 9        Q.  Okay.  You picked a sample of dates where
10   you expected to find statistically significant stock
11   price movements; correct?
12        A.  A sample of days, you're talking about the
13   six event dates?
14        Q.  Yes.
15        A.  The financial releases?
16        Q.  Correct.
17        A.  Yes.
18        Q.  Okay.  And in fact two of those dates you
19   already knew from reading the complaint were dates
20   where the stock price declined significantly because
21   the Plaintiffs allege that they were dates of
22   corrective disclosures; correct?
23        A.  Already knew?  That has nothing to do with
24   it.  I mean a financial release is a financial
25   release, whether or not it's in the complaint or
```

 1  not.  That's not part of the selection process.

 2       Q.  Okay.  But what I'm saying is when you

 3  engaged in the selection process, you had read the

 4  complaint; correct?

 5       A.  Had I read the complaint?  I probably had,

 6  but that had nothing to do with it.

 7       Q.  Okay.

 8       A.  You -- if you follow -- if you're going to

 9  follow Cammer -- in Cammer it talks about financial

10  releases -- then you look at the financial releases;

11  right?

12       Q.  That's fine.  I'm just asking you.  When

13  you did your analysis and when you chose your dates,

14  prior to that point you had read the complaint;

15  correct?

16            MR. MITCHELL:  Objection.  Asked and

17  answered.

18       A.  Yes.

19  BY MR. PASKIN:

20       Q.  Okay.  And you knew from reading the

21  complaint that the Plaintiffs had identified April

22  24th and August 23rd as dates on which the stock

23  price fell significantly following the release of

24  financial information; correct?

25       A.  I wouldn't have given it a second thought.

```
 1   It has nothing to do with anything.  I mean if -- if
 2   you're going to select financial releases, it -- you
 3   know, you just select the financial releases.
 4        Q.  Okay.  But those are financial releases
 5   that you also knew were corrective disclosure dates
 6   identified by Plaintiffs; correct?
 7        A.  Yes.
 8        Q.  Okay.  So, before the break earlier we were
 9   talking a little bit about ways in which you would
10   have to tailor a damages model depending on how the
11   facts of the case turn out; right?
12        A.  Right.
13        Q.  Okay.  So leaving aside any work that you
14   might have to do based on what's learned in
15   discovery, what the court determines on summary
16   judgment, what a jury were to find or anything like
17   that, at this point in time you have available to
18   you the complaint and the court's decision on the
19   motion to dismiss; correct?
20        A.  Yes.
21        Q.  And as you state in your report, those are
22   both documents that you've read in connection with
23   your work here?
24        A.  Yes.
25        Q.  Okay.  So leaving aside anything that might
```

```
 1   happen in the future, right now based on the

 2   complaint and the court's decision in the motion to

 3   dismiss, you have the ability to analyze the content

 4   of statements that were alleged by the Plaintiffs in

 5   the complaint to be fraudulent; correct?

 6       A.  Correct.

 7       Q.  And you also have the ability to analyze

 8   statements that were alleged by the Plaintiffs to

 9   constitute corrective disclosures; right?

10       A.  Correct.

11       Q.  And you also have the ability to analyze

12   which statements the court determined to be

13   nonactionable as a matter of law; right?

14       A.  Correct.

15       Q.  And which statements the court determined

16   the case could proceed on; correct?

17       A.  Correct.  Yes.

18       Q.  So taking all of those allegations as they

19   are set forth in the complaint and limited by the

20   court's opinion on the motion to dismiss, what, if

21   any, analysis have you done to try to attribute the

22   stock price declines at the time of the corrective

23   disclosures to the information that was allegedly

24   misleading about the false statements?

25           MR. MITCHELL:  Objection to form.
```

 1        A.  I have not -- I mean I have not performed a

 2   damage analysis as part of this engagement.

 3            Clearly defendant -- Plaintiffs have

 4   identified two corrective disclosure dates, and I

 5   have not gone through and seen whether or not those

 6   two are the only corrective disclosure dates or --

 7   maybe or not, but let's just go through and just

 8   make the assumption that those are corrective

 9   disclosure dates.

10            If Plaintiffs can prove that those are

11   corrective disclosure dates and the alleged truth

12   that was disclosed on those two dates was concealed

13   from the very beginning of the class period, then

14   you would take inflation that was eliminated on

15   those two particular dates and you would have an

16   inflation going from the beginning of the class

17   period and then being reduced on these two dates as

18   you go through the class period.

19            So that is, you know, one interpretation of

20   the information that's available.

21            No.  There may be all sorts of adjustments

22   that you may want to do.  You may not -- instead

23   of -- I explained that earlier today.  You know,

24   maybe defendants didn't know or was not under an

25   obligation to disclose all of this information at

 1   the very beginning.

 2           Maybe it's, you know -- maybe it's a little

 3   bit later during the class period.  Well, then you

 4   would just have inflation go until the point

 5   liability starts.

 6           So there's a lot of different things that

 7   you can do, but the basic model, just looking at

 8   these two price declines -- assuming that these two

 9   are the only price declines that relate to correct

10   disclosures of the alleged truth, that's what your

11   starting point would be, and then you can make

12   whatever adjustments that you need.

13   BY MR. PASKIN:

14       Q.  But as a matter of economics there are

15   certain adjustments that don't have to wait for

16   discovery to be completed and for the judge or jury

17   to make findings of fact.

18           And specifically what I'm talking about is

19   the details of the statements as alleged by the

20   Plaintiffs in the complaint and also the details of

21   the analysis done by the court in the motion to

22   dismiss opinion.  Those are things that you already

23   have; correct?

24       A.  That's true.

25       Q.  And if I understand you correctly, you've

```
 1   done no analysis to this point, even accepting those

 2   documents, the complaint and the motion to dismiss

 3   opinion as, you know, gospel for purposes of an

 4   analysis -- you've done no work to this point to try

 5   to establish any connection or determine whether

 6   there is a connection between the information that

 7   was revealed in the corrective disclosures and the

 8   information that was allegedly concealed in the

 9   false statements, have you?

10           MR. MITCHELL:  Objection to form.

11       A.  You have a very, very long question there.

12   So let's just try to go through it here.

13           When it comes to establishing a connection,

14   doing the analysis to establish a connection,

15   between the price decline and the alleged fraud

16   that's a loss causation analysis.  And you're

17   correct.  You know, there's not a loss causation

18   analysis in here, and the reason there isn't a loss

19   causation analysis in here is that I was focusing --

20   in addition to market efficiency, I was focusing in

21   on the quantification of damages and whether or not

22   there was a methodology to quantify damages.

23           Now, you keep talking about -- well, you

24   know, you know this about the misrepresentation and

25   that about the misrepresentation.  That's -- that's
```

```
 1   an incomplete hypothetical.

 2          If I tell you that the company reported a

 3   buck a share and it was false, what are the damages?

 4   I don't know.  Why don't you know that?  Because you

 5   have to know what the alleged truth is.

 6          So the -- what's driving the damage

 7   analysis is the alleged truth.  The

 8   misrepresentations by themself is just statements

 9   that conceals the alleged truth, but what drives the

10   damage analysis is the alleged truth and the

11   disclosure of the alleged truth.

12          Now, I can assume based -- you know, based

13   on both the complaint and the opinion by the court

14   that listen, you know, there was a corrective

15   disclosure on two dates here and I can quantify the

16   impact of that.

17          But with respect to whether or not that is

18   an alleged truth that existed at the beginning of

19   the class period or maybe it is something that

20   defendants came to know during the class period,

21   that is something at this stage, you know, you -- I

22   cannot -- it's not an analysis that I can perform

23   without more information.

24          Now, I can assume that it all starts at the

25   beginning of the class period and I can explain to
```

```
 1   you what the damages would be under those

 2   circumstances.  But that is -- you know, that's one

 3   way of looking at it, and there are various ways of

 4   modifying that analysis if need be, as, you know,

 5   you get more information.

 6       Q.  Well, but the complaint alleges what the

 7   true information was at the time of the statements;

 8   correct?

 9       A.  According to my understanding of the

10   complaint, Plaintiffs alleged it was known at the

11   beginning of the class period.  So for both of the

12   corrective disclosures the information was known at

13   the beginning of the class period.  In that scenario

14   the analysis is very, very simple.

15           However, you know, as you proceed in this

16   case, these things may change.

17       Q.  Okay.  Well, the Plaintiffs allege that.

18   So the court did various things in the motion to

19   dismiss.

20           And with respect to some of the dates on

21   which false statements were made, you understand

22   that the court allowed some of those -- the case to

23   proceed with respect to portions and to be dismissed

24   with respect to other portions of those statements;

25   right?
```

```
1        A.  That's correct, yes.

2        Q.  And in fact there are also some dates on

3   which the court determined that there was no claim

4   stated regarding any false statements, and with

5   respect to those dates the complaint was dismissed

6   entirely; correct?

7        A.  Correct, yeah.

8        Q.  So have you done any analysis to account

9   for the difference in damages that would result from

10  the court's dismissal of certain portions of this

11  case?

12        MR. MITCHELL:  Objection.

13        A.  Of course.  I mean, instead of starting on

14  February 2nd, the case now starts on March 2nd, you

15  know.

16  BY MR. PASKIN:

17        Q.  Other than that.

18        A.  So -- other than that.  So the question

19  again -- the driving force is the alleged truth, and

20  that is what you need more information about in

21  order to make these type of adjustments.

22        And as I said to you earlier, the

23  misrepresentations -- misrepresentations -- the way

24  that misrepresentations act in a securities fraud

25  suit is that it conceals information.
```

1          So you have to know what the information is

2    that's being concealed in order to quantify damages.

3    So if you know that statement saying that the

4    company made a dollar is false, that is incomplete.

5    Well, what should I have reported?  Should I have

6    reported 50 cents?  Should I have reported 75 cents?

7    Should I have reported ten cents?  And that is where

8    the adjustment that I'm talking about comes into

9    play.

10         With respect to the corrective disclosures,

11   you know, are there confounding factors?  That's

12   another thing they can take a look at.  I'm not

13   aware of any confounding factors, but that is

14   something that one can also adjust for if there are

15   confounding factors.

16         So the framework to quantifying damages are

17   in place, but it is premature to go into that

18   quantification without further understanding of what

19   the facts will be proven at trial.

20       Q.  Okay.  Ultimately it's your job as an

21   economist to analyze and account for any confounding

22   factors; right?

23       A.  That's correct, yes.

24       Q.  Okay.  So if, for example, there's an

25   alleged fraud that -- you know, where a company

```
 1   says, you know, "we've discovered gold in our
 2   parking lot" and then a month later the company says
 3   "we didn't discover gold in our parking lot and our
 4   earnings have fallen by more than we thought they
 5   would."  Okay?
 6        A.  Right.
 7        Q.  You would agree with me that you would have
 8   to separate out in any stock price decline the
 9   portion that relates to the earnings miss from the
10   portion that relates to the fraud about the
11   discovery of gold; correct?
12            MR. MITCHELL:  Objection.
13        A.  Well, what you do is you go through the
14   analysis and what you do is you quantify the
15   confounding factors and you exclude the confounding
16   factors from the event analysis.
17            That's what you do with the market factors,
18   that's what you do with the industry factors, and
19   you would also do that if there are material
20   confounding factors.  You would also do that for
21   company-specific factors that are not fraud related.
22   BY MR. PASKIN:
23        Q.  Okay.
24        A.  I've done that in many cases.
25        Q.  Okay.
```

```
 1        A.   I mean this case is no -- I mean that is
 2   part of the framework, the event analysis framework
 3   when you're looking at an event and determining the
 4   impact of that event on the stock price.
 5        Q.   Okay.  But it's not something you've done
 6   in this case; correct?
 7        A.   No.  I'm not aware of any confounding --
 8   material confounding factors, but if you
 9   identify -- so the process -- what I've been
10   focusing in - on is whether or not there's a method
11   of quantifying damages.  So let me explain to you
12   what the method would be with respect to confounding
13   factors.
14            The method would be -- first you have to
15   identify the confounding factors.  Number two, you
16   would have to determine that the confounding factors
17   were material.  The way that you do that is to
18   determine whether or not they impacted future cash
19   flows because the value of the stock price is the
20   present value of future cash flows.
21            And then -- if the impact is material, then
22   you present value that, and then you have the value
23   of the confounding factors and you exclude that from
24   the overall price decline.  So that is the
25   methodology that you go through in order to do that
```

```
 1   type of an adjustment.
 2   BY MR. PASKIN:
 3       Q.  And that's a -- that's something, again,
 4   that you have not done to this point in this case;
 5   correct?
 6       A.  No.  I'm talking -- no.  What I was asked
 7   was whether or not methodology was there in order to
 8   quantify damages, and I haven't quantified damages.
 9   I haven't performed a loss causation analysis.  I
10   have just explained how to do it and how to quantify
11   it.
12       Q.  Now, the identification of confounding
13   factors, when it comes time in your view to analyze
14   that, identifying confounding factors is part of
15   your job as an economist; right?
16       A.  It's --
17           MR. MITCHELL:  Objection.
18       A.  -- part of the job of the expert to look at
19   the disclosure and look at and identify any material
20   confounding factors.  There will always be -- you
21   now, you'll have a press release.  There's always
22   going to be a lot of information.  The question is
23   whether or not it's material.
24           So, yes, you look at the information, and
25   it's an area where there is often very -- a lot of
```

```
 1   disagreement amongst the experts, where some say,
 2   well, this is material and the other side says,
 3   well, this is not material, and so on.
 4           So it's -- but that's what you do.  You
 5   identify the confounding factors.  You assess
 6   materiality the way that I -- the way I would do it
 7   and the way that securities analysts do it is to
 8   look at whether or not it has an impact on the
 9   future cash flows, and then you just present value
10   the future cash flows and then you exclude it from
11   the price decline.
12       Q.  Now, the first stage of what you described
13   is having the economist, the expert identify
14   confounding factors.  That's based on a comparison
15   of the information in the corrective disclosure with
16   the information or the -- you know, information
17   that's alleged to be concealed in the initial
18   fraudulent disclosure; correct?
19       A.  So that's where the loss causation analysis
20   comes in.  So what you would look at is exactly --
21   you would look at what was concealed, the alleged
22   truth concealed; and that of course has to relate to
23   what was disclosed, because if it doesn't relate
24   to -- if there is no relationship between the two,
25   then of course it's a confounding factor.
```

1          And if it is a confounding factor, what you

2     would have to do is then determine whether or not it

3     is material, and if it's material if it impacts

4     future cash flow of the company, and if it impacts

5     the future cash flow of the company then you can

6     present value -- present value those future cash

7     flows.

8          Now, there are different experts that do it

9     differently.  Some -- particularly people who have

10    more of a background in, you know, social sciences,

11    economists who may not have, you know -- you know,

12    the business school background, the securities

13    analyst's background, and they would perhaps develop

14    econometric models.

15         My preference as a securities analyst is to

16    do what every other securities analyst and investor

17    does out there, and that is to look at the future

18    cash flows and present value it.

19    Q.  Okay.  And that's an analysis that you --

20    at this point in the litigation today you could have

21    done by analyzing the corrective disclosures and the

22    alleged fraudulent statements; correct?

23         MR. MITCHELL:  Objection.

24    A.  I could have done?  It's -- if I was asked

25    to do a loss causation analysis, I would have

```
1   performed a loss causation analysis.  I was not
2   asked to do a loss causation analysis.
3   BY MR. PASKIN:
4       Q.  Okay.  But based on the information
5   currently available to you in the complaint, in the
6   court's decision, and in the content of the various
7   public disclosures themselves, that's an analysis
8   that you could have done; correct?
9           MR. MITCHELL:  Objection to form.
10      A.  If I was asked to do a loss causation
11  analysis, I could have performed a loss causation
12  analysis.  It wouldn't have been as good of a loss
13  causation analysis as after discovery when you
14  actually have all of the facts, but that's what you
15  do.
16          And when cases go to mediation and so on,
17  you have a Plaintiffs' expert or maybe a consultant
18  on behalf of Plaintiffs, a consultant on behalf of
19  defendants, you know.  You all come up with your
20  damage analysis.  You have a loss causation analysis
21  and you have, you know -- and then you sit down and
22  you mediate it.
23          So that's typically what you do at the
24  front end of these cases and at this stage, but it
25  will never be as good as when you have -- after
```

```
1   discovery when you have all of the evidence

2   available, and then you can, you know, sit down and

3   determine, well, what can Plaintiffs actually prove

4   in this particular case, because then you can tailor

5   the damage analysis specifically to what Plaintiffs

6   likely will prove at trial.

7        Q.  Well, but as the expert it's not your job

8   to answer the question of what Plaintiffs are likely

9   to prove; right?

10            Your job is to either accept their

11   allegations or reject them but to do economic

12   analysis based on facts that exist as you know them,

13   as they're given to you; right?

14            MR. MITCHELL:  Objection to form.

15       A.  That's not entirely true.

16            So when Plaintiffs present to the expert --

17   the Plaintiffs' expert a set of things that they

18   believe they can prove at trial, I think it would be

19   unwise of a plaintiff expert to accept those

20   allegations if they were inconsistent with economic

21   evidence.

22            So there has to be some consistency there.

23   You are correct that to a certain extent you have to

24   rely on what they say they will prove, but it's not

25   as if they can just tell you assume anything, you
```

1   know.  There has to be some, you know, reasonable

2   basis for it.  Otherwise I wouldn't take -- I

3   wouldn't take the case --

4   BY MR. PASKIN:

5       Q.  Okay.

6       A.  -- as an expert.

7       Q.  So notwithstanding the fact that as the

8   facts come into greater focus there can be some

9   refining work done to it, to an analysis that

10  attempts to determine the measure of damages

11  throughout the class period, based on the

12  allegations of the complaint and the court's

13  decision in the motion to dismiss, you know, at this

14  stage you could have performed an analysis that

15  quantified the measure of damages throughout the

16  class period; correct?

17          MR. MITCHELL:  Objection to form.  Asked

18  and answered.

19      A.  As I just stated, that is what is

20  being -- you do that for mediation throughout the

21  litigation.  You quantify damages.  Defendants'

22  experts do that.  Plaintiffs' experts do that.  And

23  then you mediate these things.

24          But that was not what I was asked to do

25  here.  What I was asked to do here was to explain

```
 1   the methodology one would use in order to quantify
 2   damages.
 3   BY MR. PASKIN:
 4       Q.  Okay.  So just so that we can be crystal
 5   clear about it, quantifying damages by an analysis
 6   of the alleged false statements at issue and the
 7   alleged corrective information at issue is an
 8   analysis that you could have done at this stage in
 9   the litigation but you have not done; correct?
10           MR. MITCHELL:  Objection to form.  Asked
11   and answered.
12       A.  If I was asked to do a preliminary damage
13   analysis in this particular case, yes, of course I
14   could; but it wouldn't have been as good as the
15   analysis that you would do after discovery.
16           And you don't want to -- you know, you want
17   the experts to do it -- at trial to have the
18   flexibility of looking at the evidence and not, you
19   know, being pigeonholed to a damage analysis that
20   was performed with incomplete evidence.  But yes,
21   you could do a damage analysis today.
22           I was not asked to do a damage analysis.  I
23   was not asked to do a loss causation analysis, but
24   it is something that I'm sure your experts already
25   have done in this particular case.  I would be
```

 1   surprised if your expert has not performed a damage

 2   analysis in this particular case.  It's something I

 3   could do.

 4          And so my objective here was just to

 5   briefly explain that damages can be quantified in

 6   this case and explain how to do so.

 7       Q.  So did you do anything -- well, withdrawn.

 8          Why don't we turn to paragraph 58 of your

 9   report, which is on page 27.  And just for

10   reference, this comes in a section that begins on

11   page 25 that says, "The event study framework can be

12   used to calculate class-wide common stock damages."

13          Okay.  So in paragraph 58 you say, "I and

14   other experts have used this event study damages

15   framework in numerous securities cases going to

16   trial.  While the actual damages analysis may have

17   to be modified," and then you go on.  And then you

18   finish the paragraph saying, "I know of no reason

19   why this case would be any different than the many

20   other similar securities fraud cases that I have

21   worked on over the past 25 years."

22          So have you done any analysis specific to

23   this case to reach the conclusion that you can

24   perform a class-wide damages calculation or that you

25   can create a model that provides for class-wide

 1   damages calculations?

 2            MR. MITCHELL:  Objection to form.

 3        A.  Yes.  I looked at this particular case and

 4   it -- you would use the same damages framework that

 5   you would use in all of the other securities class

 6   action cases.  You know, you would look at the price

 7   decline that occurred at the time of the corrective

 8   disclosure.

 9            In other words, you would perform an event

10   analysis.  What was the price decline associated

11   with this particular event?  That is what the event

12   analysis is.

13            And yeah, you would do that.  And that

14   would also include accounting for confounding

15   factors, and then the question is where is the

16   starting point for this inflation and, you know,

17   that -- when can you prove that defendants knew the

18   alleged truth and so where do you start it?  Do you

19   start it at the beginning of the class period or at

20   some other point in time?

21        Q.  And that's what you could do in this case

22   but you have not yet done; correct?

23            MR. MITCHELL:  Objection to form.  Asked

24   and answered.

25        A.  In terms of -- yeah, in my report I have

1   only done what I was asked to do, and that is to

2   explain the methodology, which is consistent with

3   the methodology that I have used, other experts have

4   used, that I see defendants' experts use in

5   mediations all the time, and I -- I added the last

6   sentence there because you don't know what you don't

7   know.  I mean maybe, you know, you have an expert

8   who comes up with a particular issue that's unique

9   to this particular case that I haven't thought of,

10  you know, in which case I'll take a look at it.

11        But I don't see why this case would be any

12  different than any of the other cases I've worked

13  on.

14      Q.  Okay.  Have you done any analysis to

15  determine whether the number of different alleged

16  fraudulent statements in this case and their content

17  and the court's decision with respect to those

18  statements on the motion to dismiss in any way could

19  make this case different in terms of performing a

20  damages analysis from any other case?

21      A.  I don't think that there is anything unique

22  in the opinion in this particular case.  I think

23  that in every case you have Plaintiffs who have a

24  lot of misrepresentations, and then the court then

25  decides which misrepresentations meet whatever the

 1    legal threshold is to remain in the case.

 2              But as I explained earlier, you don't just

 3    look at the false statement in order to quantify

 4    damages.  You have to have context.  And so even

 5    if -- you know, so when you have a false statement,

 6    for instance, if a company reports -- falsely

 7    reports that they have earnings of a dollar a share,

 8    you want to know, well, what is the truth; and it's

 9    the alleged truth that drives the damage analysis.

10              It's the alleged truth that you focus in on

11    in the quantification of damages.  So it's the

12    correct disclosures that you would focus in on.

13              Now, if Plaintiffs are unable to prove that

14    should -- that was known at the beginning of the

15    class period, well, you make an adjustment for that.

16              MR. MITCHELL:  Are you reaching a good

17    spot?  We have been going for an hour and ten

18    minutes, I think.

19              MR. PASKIN:  Pretty soon.

20         Q.  So I don't think you answered the first

21    part of the question that I just asked, which is

22    have you done an analysis to determine whether this

23    case -- including specifically the nature and

24    quantity of the alleged false statements and the

25    nuances of the court's decision with respect to

1   those statements in the motion to dismiss changes

2   this case at all from what you say is the typical

3   case where you can create a damages model on a

4   class-wide basis?  Have you done any analysis to

5   reach that conclusion?

6           MR. MITCHELL:  Objection to form.

7       A.  What I have done is I have reviewed the

8   court order.  I think it was a very specific and

9   very detailed court order in this case, which is

10  very, very helpful; and I did not see anything in

11  the court order that would make this case unique.

12  BY MR. PASKIN:

13      Q.  Okay.  The court's order is specific and

14  detailed, and in what way do you believe it was

15  helpful?

16      A.  It is helpful in terms of the

17  misrepresentation part, and what I've been

18  explaining to you throughout the morning is that

19  that is one component that you look at in terms of

20  damages.  The other part is the alleged truth, and

21  it's the alleged truth that drives the damages

22  analysis.

23      Q.  Okay.  Beyond what you just said, have you

24  done any economic analysis to determine whether the

25  content of the court's decision on the motion to

```
 1   dismiss impacts your ability to create a class-wide

 2   damages model?

 3            MR. MITCHELL:  Objection to form.

 4        A.  I have reviewed the order.  It is I think a

 5   very thorough and detailed order.

 6            I think it is helpful and -- but I did not

 7   see anything in that order that in any way would

 8   prevent class-wide damages to be calculated.

 9   BY MR. PASKIN:

10        Q.  Okay.  Did you do any economic analysis

11   utilizing any of the specifics from the court's

12   thorough, detailed, and helpful motion to dismiss

13   order?

14            MR. MITCHELL:  Objection to form.

15        A.  My only issue here relates to whether or

16   not damages can be calculated.  So when I reached a

17   point where I was comfortable that damages could be

18   calculated, I did not undertake any additional

19   analysis to quantify damages, you know, or make any

20   adjustments because of the reasons I already stated.

21   BY MR. PASKIN:

22        Q.  Okay.  Apart from just the sense that you

23   got from reading the court's decision, did you do

24   any more rigorous economic analysis to reach that

25   conclusion?
```

1              MR. MITCHELL:  Objection to form.

2        A.  I -- there isn't any -- any more rigorous

3   analysis that I can think of, but if you can

4   enlighten me in terms of what type of rigorous

5   economic analysis you think I should have performed,

6   I'd love to comment on it.

7   BY MR. PASKIN:

8        Q.  Okay.  Well, I take it since you can't

9   think of any type of economic analysis that you

10  could have performed that in fact that means you did

11  not perform any such economic analysis; correct?

12             MR. MITCHELL:  Objection to form.

13        A.  It's -- it's bizarre.  You're asking me

14  about -- I don't even know what you're talking

15  about.  I have no clue what you're talking about

16  when you're talking about this rigorous economic

17  analysis.

18             So I don't even know how to -- you know, I

19  don't even know how to respond to this economic --

20  rigorous economic analysis.

21        Q.  Okay.  Well, here's the question.

22             You looked at the court's decision and

23  reading the court's decision you came to the

24  judgment that there was nothing in there that would

25  prevent you from doing a class-wide damages model;

```
 1   correct?

 2        A.   That's correct, yes.

 3        Q.   But in fact you did not do such a

 4   class-wide damages model at this stage in the case;

 5   correct?

 6             MR. MITCHELL:  Objection.  Asked and

 7   answered.

 8        A.   I did not quantify damages.  I have a model

 9   to quantify damages, but I haven't quantified

10   damages.

11   BY MR. PASKIN:

12        Q.   The model being your event study?

13        A.   The event study framework, looking at the

14   price decline when the corrective disclosure is

15   made, quantifying the impact of the corrective

16   disclosure and using that as the inflation from the

17   point of -- from the point where, you know,

18   liability starts with respect to that corrective

19   disclosure.

20             That is the methodology.  That's the

21   methodology that I've used for a quarter of a

22   century, that I've seen every other expert use.

23   There is -- you know, that is what we do.

24        Q.   Okay.  And nothing in the Court's opinion,

25   in your view, based on your reading the Court's
```

```
 1   opinion, impacts in any way your ability to do what

 2   you just said in this case?

 3            MR. MITCHELL:  Objection to form.  Asked

 4   and answered.

 5       A.  It doesn't impact the ability to do it, but

 6   it has an impact on how you quantify damages,

 7   because you incorporate it into your analysis.  I

 8   gave you an example.  Instead of starting liability

 9   on February 2nd, you know, start liability on March

10   2nd.

11       Q.  Okay.

12       A.  So --

13       Q.  Other than that example, is there any other

14   way in which you've incorporated the court's opinion

15   in your analysis?

16            MR. MITCHELL:  Objection to form.

17       A.  I haven't quantified damages in this case.

18   So when you say "analysis," what are you talking

19   about?

20            What I'm saying is that I have looked at

21   whether or not damages can be quantified, and I have

22   explained to you the methodology for quantifying

23   those damages.

24   BY MR. PASKIN:

25       Q.  Is there any way that we can test the
```

```
 1   approach that you've taken to reach your conclusion
 2   that your methodology can be used to quantify
 3   damages?
 4        A.  If you have somebody who can perform an
 5   event analysis, yes.  You perform the event
 6   analysis.  You look at what the impact is of the
 7   event.  In this case it would be the corrective
 8   disclosure.  So now you have the impact of the
 9   alleged truth being revealed, and then the question
10   is when is the starting point of that inflation.
11        Q.  What about your judgment that nothing in
12   the court's opinion makes you unable to do a
13   class-wide damages model in this case?  With respect
14   to that conclusion, is there any analysis that you
15   performed that we can review and attempt to
16   replicate?
17        A.  So I just explained to you my methodology,
18   how to do it.
19           My opinion is that nothing in the court
20   order impacts that methodology.  Okay?  So let's
21   say -- let me read the rebuttal by the other expert
22   and see, you know -- you know, you're asking me to
23   respond to something I don't -- I don't know what
24   you're talking about.  I don't see the problem.
25           MR. PASKIN:  Okay.  Why don't we take a
```

```
 1   break.
 2             THE VIDEO OPERATOR:  Off the record, the
 3   time is 12:05 p.m.
 4             (Luncheon Recess)
 5             THE VIDEO OPERATOR:  Back on the record.
 6   Here begins disk number 3 in the videotaped
 7   deposition of Bjorn Steinholt.  The time is 1:08
 8   p.m.
 9   BY MR. PASKIN:
10        Q.  Mr. Steinholt, if you could turn in your
11   report to paragraph 56 on page 26.
12        A.  Yes.
13        Q.  Okay.  This is in the section where you
14   talk about a class-wide damages methodology.
15        A.  Right.
16        Q.  In the first sentence you quote an academic
17   article by Mitchell and Netter.
18             Do you see that?
19        A.  Yes.
20        Q.  Then after the quote you say, "With respect
21   to translating the results of the event analysis
22   into damages, the article further explains," and
23   then it quotes the article.  "This article does not
24   address specifically the issue of calculating
25   damages in private actions.  The methodology
```

```
 1   presented in this article, however, can be applied

 2   easily to such suits," close quote.

 3           That's a quote from Mitchell and Netter;

 4   right?

 5      A.  Correct.

 6      Q.  And then you refer to the fact that

 7   Mitchell and Netter refer to another article by

 8   Cornell and Morgan which you say, quote, "provides a

 9   more detailed explanation of the event study damages

10   framework," and then you go on.  So, and then you

11   cite to Cornell and Morgan down in the footnote.

12           Do you see that?

13      A.  Yes.

14      Q.  So do you rely on the analysis in Cornell

15   and Morgan as explaining how to do a -- you know, a

16   damages analysis in connection with a case like

17   this?

18      A.  I used that article.  I quote that article

19   because it goes into more detail --

20      Q.  Okay.

21      A.  -- in terms of how to translate the results

22   of the event study into a damage model.

23           Now, the Mitchell and Netter article, it

24   does go into the event study, so it does talk about

25   that aspect of it.
```

1        Q.  Okay.

2        A.  But what Cornell and Morgan does is just

3    simply explaining the concept of inflation and, you

4    know, the value line and so on.  So it provides a

5    structure that can be used in order to calculate

6    damages.

7        Q.  Okay.  And is it a structure that you

8    utilized in other cases?

9        A.  I think every expert uses this type of a

10   structure where you come up -- where you

11   use -- where you quantify the inflation or, you

12   know, damages in this or a similar manner.

13       Q.  The way you describe Cornell and Morgan's

14   work in paragraph 56 of your report is to say,

15   quote, "The event study approach can also be used to

16   quantify the inflation, i.e. the amount investors

17   overpaid for the stock throughout the class period";

18   and then you say "The daily inflation, along with

19   class members' actual purchases and sales, is then

20   used to calculate individual damages."

21           That's the approach that you would propose

22   to follow in this case; correct?

23       A.  Correct.  Yes.

24       Q.  Okay.  Let me put in front of you what's

25   been marked as Steinholt Exhibit 2 which you can

```
 1   take a look at it and let me know if it is a copy of
 2   the Cornell and Morgan article referenced in
 3   footnote 52 of your report.
 4              (Deposition Exhibit 2 was marked for
 5              identification)
 6        A.  Yes, it is.
 7   BY MR. PASKIN:
 8        Q.  Okay.  So you referenced in one of your
 9   answers just a few minutes ago that Cornell and
10   Morgan explain how to calculate something called a
11   value line; right?
12        A.  Correct.  Yes.
13        Q.  And so if we look at the Cornell and Morgan
14   article in the middle of page 886, you see they
15   write, quote, "Once one calculates the value line,
16   the measure of damages for an investor is simply the
17   difference between the price and the value on the
18   date of purchase, or for Plaintiffs who sold their
19   securities before the corrective disclosure the
20   difference between the price inflation at the time
21   of purchase and the price inflation at the time of
22   sale."
23              Do you see that?
24        A.  Yes.
25        Q.  Okay.  The next paragraph begins, quote,
```

1    "Calculating a value line is therefore equivalent to

2    measuring damages."

3          Could you define for me what the value line

4    is?

5          A.   The value line as it's -- I can use the

6    definition that this particular paper uses, which is

7    the value line would be where the stock would have

8    traded absent the alleged fraud.

9          Q.   Okay.  And so is that similar to saying the

10   price of the stock in the so-called but-for world?

11   Is it the same basic idea?

12         A.   It's the same basic idea.  It's the

13   price -- and the but-for world would be a world

14   where the company had made proper disclosure, so the

15   price then would reflect the alleged truth.

16         Q.   Okay.  So in this case did you calculate a

17   value line?

18         A.   No, I haven't quantified damages in this

19   case, no.

20         Q.   In your report in this case do you explain

21   how you would calculate a value line?

22         A.   How you would calculate a value line?

23         Q.   Yes, how you would in this case calculate a

24   value line.

25         A.   I reference this paper.  If you are going

 1   to calculate a value line, you know, this paper

 2   explains how to do it.

 3        Q.   Okay.  This paper is sort of general and

 4   talks about securities cases, as a general matter,

 5   that were written back in 1990; correct?

 6        A.   Yes.  I mean I -- let me just -- the

 7   calculation of the value line -- let's see.  It

 8   should be in here somewhere.  It is on page 899, the

 9   event study approach.  So if that's the objective,

10   if that's what you want to do, then that's -- that's

11   how you would calculate the value line, so -- and

12   this goes back to what we talked about earlier this

13   morning, should it be based on a percentage basis or

14   should it be based on the dollar basis.

15             While you can do it either way, this would

16   result in an -- in an inflation that would be

17   constant on a percentage basis during the class

18   period if there are no fraud-related events.  And

19   the alternative way of doing it is to keep the

20   inflation constant on a dollar basis.

21             Now, I don't make, you know -- for my

22   purposes I haven't opined one way or another whether

23   or not the constant dollar approach should be used

24   or the percentage methodology should be used, but

25   you can do either using the event study.  In other

```
 1   words, the event study can be translated into a

 2   constant dollar inflation or a constant percentage

 3   inflation.

 4         Q.  You mentioned in the middle of your answer

 5   there that you could take this constant dollar or

 6   constant percentage inflation and take it back

 7   through the class period if there are no -- your

 8   words -- fraud-related events.  What are

 9   fraud-related events?

10         A.  So fraud-related events would be some event

11   that would impact the stock price.  For instance, a

12   partial disclosure would impact stock price.  So in

13   this case there is a partial disclosure -- alleged

14   partial disclosure in April of 2012, and that will

15   reduce the inflation.  So you may have to make that

16   adjustment.

17         Q.  So what about additional alleged fraudulent

18   disclosures that occurred during the course of the

19   class period?  Are those all so-called fraud-related

20   events?

21         A.  Yeah.  You can look at the event analysis

22   and see whether or not the misrepresentations

23   maintain the price or whether or not it caused

24   additional inflation in the price.

25         Q.  What analysis would you do to determine
```

1    whether or not those statements maintained the

2    price, caused additional inflation, or, you know,

3    something else?

4         A.  That would be the event study.  So -- so

5    what the event study does is it looks at the stock

6    price and it determines what the impact on the stock

7    price is of an event.

8              So let's say that you have a

9    misrepresentation.  If that misrepresentation is new

10   false information that is unexpected to the market

11   and it causes the stock price to increase, then that

12   will also mark an increase in the inflation in the

13   stock price.

14        Q.  Okay.  So to the extent in your event study

15   that you prepared for this case -- to the extent

16   that on a date where the Plaintiffs allege a false

17   statement was made and the corresponding stock price

18   movement does not meet your sort of measure of

19   statistical significance, does that mean that you

20   conclude that it's a statement that maintained the

21   price rather than impacted the price?

22             MR. MITCHELL:  Objection to form.

23        A.  Maintained the price rather than impacted

24   the price, it will -- well, in terms of -- it

25   relates to whether or not it maintained inflation or

```
 1   increased inflation.
 2   BY MR. PASKIN:
 3        Q.  Fair enough.  Let me restate it.  I think I
 4   was right.
 5             So in the event study that you did in this
 6   case that we've looked at and we can see in Exhibit
 7   C and E to your report -- to the extent we look at
 8   one of the dates that the Plaintiffs contend was a
 9   date when a false statement occurred, if we see no
10   corresponding statistically significant
11   company-specific stock price movement based on your
12   economic calculations, do you conclude from that
13   that the statement was one that maintained inflation
14   rather than increased inflation?
15             MR. MITCHELL:  Objection to form.
16        A.  It depends.  So if you don't have an
17   increase -- if it caused an increase in the stock
18   price, that would be evidence that could mean that
19   inflation increased.
20             So if all of the factors line up, that is
21   one conclusion one could draw.
22             If the -- if there was no increase in the
23   stock price, then it could mean that the inflation
24   is maintained.  However, the misrepresentation may
25   relate to a completely different issue.  So, and
```

```
 1   that's where the alleged truth.  In other words, it
 2   may relate to a different alleged truth.  So you may
 3   have a portion of inflation that starts at the time
 4   of this particular misrepresentation.
 5   BY MR. PASKIN:
 6       Q.  Okay.  But so -- and I'll -- you can check
 7   your charts if you want, but I'll represent to you
 8   that for all of the dates where the Plaintiffs
 9   allege there was a false statement made, your
10   corresponding economic calculations don't conclude a
11   statistically significant company-specific price
12   impact at either the five percent or one percent
13   level?  You're agreeing with me about that?
14       A.  No, I think that's incorrect.
15       Q.  That's incorrect?
16       A.  Yes, I think so.
17       Q.  Okay.  So where -- where -- so for which
18   statements that are alleged to be false does your
19   analysis conclude there was a statistically
20   significant company-specific price impact?
21       A.  Well, I'm just going to give you one
22   example.
23       Q.  Okay.
24       A.  I haven't gone through it in great detail,
25   but certainly on May 23rd, 2012, there is a
```

 1   statistically significant price increase at the five

 2   percent level using a one-tailed test.

 3        Q.  Using the test that you sort of communicate

 4   in your exhibit here, you say no, though, right, the

 5   two-tailed test?

 6        A.  Well, the two-tailed test is if you -- if

 7   you're looking for a statistically significant price

 8   movement.  If you're looking for a misrepresentation

 9   that would increase the stock price, you would only

10   look at one tail, the positive tail of the

11   distribution.  That's a one-tailed test.  And the

12   benchmark for that is 1.645.

13        Q.  Okay.

14        A.  And 1.7, whatever this is, 1.75 is greater

15   than 1.645, so that is one of the -- that is

16   one -- that is one event where the expert would

17   have -- would look at it, probably do some

18   additional analysis and determine whether or not his

19   price increase was caused by the misrepresentation

20   or by something else.

21        Q.  Okay.  So for May 23rd, 2012, you conclude

22   that there was a company-specific price impact at

23   the five percent level or greater; right?

24        A.  The t-statistic on that day is

25   statistically significant at the five percent level

```
 1   using the one-tailed test.

 2        Q.  Okay.

 3        A.  So now it is up to the expert to do the

 4   analysis to determine whether or not that relates to

 5   the misrepresentation, something else, or -- so, you

 6   know, it's not an analysis I have performed.

 7        Q.  Okay.  And that was going to be my next

 8   question.

 9             You haven't performed that next step of the

10   analysis to determine whether that price increase

11   actually relates to the alleged fraud or not;

12   correct?

13        A.  Yeah, that's correct.  When you do an event

14   analysis, part of it is the statistical regression

15   analysis.  The regression analysis is effectively

16   just running the numbers.

17             But there are -- you know, the analysis

18   itself, there can be different information disclosed

19   on that particular day, and, you know, so it's a lot

20   more involved than just doing the regression

21   analysis, which is the portion that I show on

22   Exhibit E.

23        Q.  Right.  And just -- I think you answered

24   this earlier, but just to make sure we're clear, all

25   that you've done in this case to this point is the
```

```
 1   crunching the numbers that we see reflected on

 2   Exhibit E; correct?

 3             MR. MITCHELL:  Objection to form.

 4        A.  All I have done --

 5   BY MR. PASKIN:

 6        Q.  And to put it more specifically, you

 7   haven't done any of the analysis to try to examine

 8   the false statement, the corrective disclosures, or

 9   any other company-specific information to determine

10   any of the reasoning behind any of those price

11   movements; correct?

12             MR. MITCHELL:  Objection to form.

13        A.  No.  Actually let me clarify.

14             Exhibit E relates to my market efficiency

15   analysis.  It does not relate to my -- my -- any

16   analysis of damages.  It can be used kind of like a

17   rough -- it can be used to kind of get a sense of

18   what the damages would be, but it is not part of a

19   damages analysis.

20             I have not performed a damages analysis.  I

21   haven't quantified damages.  I have not performed a

22   loss causation analysis.

23             All I have done in this particular section

24   is to review the case and conclude that class-wide

25   damages can be calculated.
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 108

```
 1   //////

 2   BY MR. PASKIN:

 3       Q.  Okay.  And with respect to the ability to

 4   calculate class-wide damages, you say that the

 5   analysis reflected in Exhibit E is -- may be one

 6   piece of a class-wide damages analysis but it would

 7   require other steps in order to -- in order to, you

 8   know, actually do that work; correct?

 9       A.  I think that it is -- one would do

10   something -- whether or not it's exactly the same or

11   similar, one would do some sort of a regression

12   analysis similar to what I have in Exhibit E, but

13   Exhibit E was specifically performed for the purpose

14   of analyzing market efficiency.

15       Q.  Okay.

16       A.  So there may be some differences and I have

17   not performed a regression analysis for the purposes

18   of quantifying damages.

19       Q.  Okay.  So you did perform a regression

20   analysis for the purposes of analyzing market

21   efficiency.  But just to be clear, you performed no

22   such analysis in this case for the purposes -- for

23   the purpose of quantifying damages; correct?

24       A.  I -- for the purposes of -- no, I have not

25   performed an analysis to quantify damages.
```

1           Now, this may be very indicative of, you

2   know, what the regression analysis will be for the

3   purposes of quantifying damages, and I don't really

4   have a general objection to looking at it for that

5   purpose.

6           I'm just clarifying that this is

7   not -- this was not performed for the purposes of

8   quantifying damages.  For one thing it starts -- the

9   control period is right before the first financial

10  release in 2012.  There is no reason to start -- to

11  end the control period at that point in time if

12  you're doing it for damages purposes.

13          This was performed for the purposes of

14  analyzing market efficiency, specifically with

15  respect to, you know, financial releases; and that's

16  why the control period ends where it ends.

17          So it may be slightly different, you know,

18  when you perform it for the purposes of calculating

19  damages.  But I think it's -- it is indicative of

20  the results you will get when you are, you know,

21  running it for the purposes of quantifying damages.

22      Q.  Okay.  And beyond having to come up with a

23  regression analysis that's geared towards

24  quantifying damages, there are also the other

25  analyses that as an economist you would have to do

1   in order to create a value line that would actually

2   measure the degree of inflation and those damages in

3   a case; correct?

4       A.   There are various different steps that one

5   would have to look at, and I mean I've already gone

6   through a lot of these steps.  The event analysis

7   have to look at non-fraud-related factors.

8   Typically that is market factors and industry

9   factors.

10           But if there are material company-specific

11  factors, one has to consider that too and see if

12  that should be taken out of the company-specific

13  price decline, and then you have to determine

14  whether or not the -- when you have the alleged

15  truth, then you have to determine, you know, how far

16  back you would take that alleged truth, what

17  misrepresentations concealed this alleged truth, was

18  it at the beginning of the class period or was it at

19  some point during the class period.

20           And that's where, for instance, May 23rd

21  becomes kind of interesting, you know, because this

22  is -- you're looking at the five percent level using

23  the two-tailed test and it's not statistically

24  significant using that benchmark, while if you use a

25  one-tailed test it is statistically significant.

1          So how you have -- the expert has to

2    consider that and consider the information and make

3    a determination whether or not this is an increase

4    in inflation that starts at that point in time or

5    whether or not that is inflation that started at

6    some other point in time.

7          Q.  Okay.  And in order to tailor the general

8    approach that you just described to this case, you

9    would need to do all sorts of work that you haven't

10   done yet; right?

11         A.  Well, yeah.  This just outlines what you

12   have to do, but I haven't performed the analysis

13   yet.  That's correct.

14         Q.  Okay.  And your report doesn't -- other

15   than pointing to the Cornell article and describing

16   the general approach to event studies across all

17   cases, your report doesn't describe in detail the

18   way in which you would specifically create a value

19   line for this case, does it?

20         A.  Actually with respect to a value line, if

21   you assume that Plaintiffs are correct with respect

22   to the two corrective disclosures and the inflation

23   starts at the very beginning, it's a matter just to

24   go to, you know, page 899 and just -- the formula is

25   right there.  You just plug in the numbers from the

 1   event study and you have your value line.

 2        Q.  Okay.  But in giving that answer you're not

 3   taking into account at all as an economist any of

 4   the sort of comparison that you described that's

 5   required between the alleged false statements and

 6   the corrective disclosures; right?

 7        A.  Comparisons -- well, listen.  You have to

 8   have -- you have to make -- determine that the

 9   alleged truth concealed relate to the information

10   disclosed.

11        Q.  Right.

12        A.  That's the loss causation analysis.

13        Q.  Right.  That's -- you have not done that

14   here; right?

15        A.  I have not performed the loss causation

16   analysis in this case, no.

17        Q.  Okay.  But that's also the analysis that's

18   required to create a value line or an inflation band

19   to calculate damages; correct?

20            MR. MITCHELL:  Objection.  Form.

21        A.  You calculate damages, right? and then you

22   have to link those damages to Plaintiffs'

23   allegations, right? and those are the only damages

24   that are recoverable.

25            So, you know, you have economic loss and

```
 1   then you have loss causation.  So you have to tie it
 2   to -- you have to tie these losses to damages -- or
 3   these economic losses to the alleged fraud, and
 4   that's not -- that's not the purely economic
 5   analysis.  That's also a legal analysis.
 6           There are a lot of different -- I mean
 7   different circuits are arguing this all the time.
 8   So it's not -- the economic analysis is what I'm
 9   explaining here.  And then, you know, you can get
10   into the argument of what losses meets whatever loss
11   causation standard the particular court wants to
12   follow.
13           We talked earlier when I was criticized in
14   Flowered for using a different loss causation
15   standard than the district court wanted me to use.
16   She was reversed on appeal, so this issue of what
17   the correct loss causation standard is is not purely
18   an economic issue.  It's also a legal issue.
19           So you have to take some guidance from the
20   court in order to determine that you're doing it
21   correctly.
22   BY MR. PASKIN:
23       Q.  Guidance from the court, for example, in
24   the form of the motion to dismiss decision where the
25   court accepted Plaintiffs' allegations with respect
```

```
 1   to some statements and dismissed them with respect

 2   to others; right?

 3       A.  Actually the opinion goes into the loss

 4   causation with respect to price decline, so that's

 5   the loss causation, whether or not these -- the

 6   price declines on these two days can be linked to

 7   the alleged fraud.

 8           The misrepresentations are what

 9   concealed -- conceals the alleged truth, and that is

10   also important when you do the analysis, but the

11   driving force of the damages analysis is the alleged

12   truth.

13       Q.  On page 892 of the Cornell article, middle

14   of the page, the paragraph in the middle of the page

15   begins, quote, "The analysis is further complicated

16   if there is a series of exaggerations,

17   misstatements, and omissions, rather than one

18   isolated misrepresentation followed by a series of

19   revelations."

20           That describes the sort of situation that

21   the Plaintiffs allege in this case, correct, a

22   series of misstatements followed by a series of

23   revelations; correct?

24           MR. MITCHELL:  Objection.  Form.

25       A.  No, I don't see that at all.
```

 1   BY MR. PASKIN:

 2       Q.  You don't think in this case the Plaintiffs

 3   describe a series of misstatements?

 4       A.  No.  But if you have a series of

 5   misstatements that are different with respect to the

 6   alleged truth, that is the complication in the

 7   analysis.

 8       Q.  Okay.  So in this case you don't think

 9   there is any complication related to a series of

10   misstatements?

11       A.  That there are no complications with a

12   series misstatements?  You have to demonstrate that

13   it impacts the alleged truth.  That is the whole

14   point of this thing.

15       Q.  Okay.  Have you done any analysis to

16   determine whether in this case there are allegations

17   of a series of misstatements?

18           MR. MITCHELL:  Objection to form.

19       A.  There are a series of misstatements and

20   they all relate to the disclosures that were made

21   on -- to correct the disclosure dates.

22   BY MR. PASKIN:

23       Q.  Did you do any analysis to reach that

24   conclusion that you just stated?

25       A.  If I gave you -- I reviewed the complaint.

Confidential
BJORN STEINHOLT - 07/21/2016          Page 116

 1  That's my review of the complaint.  It's a review of
 2  the complaint.  You know, I mean that's what you do.
 3  You read the complaint.  You read the allegations.
 4      Q.  So you're just accepting that conclusion,
 5  you're not actually as an economist reaching that
 6  conclusion based on your own analysis; correct?
 7          MR. MITCHELL:  Objection to form.
 8      A.  Can you explain to me what conclusion you
 9  are talking about?
10  BY MR. PASKIN:
11      Q.  You stated two answers ago, "There are a
12  series of misstatements and they all relate to the
13  disclosures that are made on -- to correct the
14  corrective disclosure dates."
15          So you said previously there's a series of
16  misstatements and they all relate to the corrective
17  disclosures in this case, and my question to you is
18  what analysis did you do to reach that conclusion.
19          MR. MITCHELL:  Objection to form.
20      A.  What you do is that you read the complaint
21  and the allegations in the complaint.  That is my
22  understanding of the allegations in the complaint.
23  BY MR. PASKIN:
24      Q.  Okay.  So have you studied the statements,
25  the alleged statements and the alleged corrective

```
 1   disclosures and concluded as an economist that they

 2   are related to one another?

 3        A.  I have not performed a loss causation

 4   analysis.  This is -- you have a series of

 5   misrepresentations that conceals an alleged truth

 6   that was partially disclosed on -- in April and then

 7   more fully disclosed in August.  That is Plaintiffs'

 8   allegations.  I have not independently verified that

 9   their allegations are correct or not correct.

10        Q.  Okay.  And in the words of Cornell and

11   Morgan, does that fact pattern you just described,

12   as this case involving, further complicate the

13   analysis?

14            MR. MITCHELL:  Object to form.

15        A.  I do not see -- every case is specific;

16   right?  He's talking about the Washington Public

17   Power Supply System.  It was a very difficult case,

18   by the way, and there was a lot of disclosures in

19   that particular case.  There was a gradual

20   revelation of the alleged truth, and my recollection

21   is that he actually was the expert in that

22   particular case.

23            I do not see that fact pattern in this

24   particular case.  But even if that was the fact

25   pattern, it doesn't mean that damages cannot be
```

 1  calculated.  In fact, Cornell himself calculated

 2  damages in this very, very complicated case.

 3  BY MR. PASKIN:

 4     Q.  Right.  And my question is to the extent

 5  that this case before us today involves similar

 6  complicated issues, have you articulated in your

 7  report for today how your methodology would need to

 8  account for those issues in order to calculate

 9  damages throughout the class period?

10        MR. MITCHELL:  Objection to form.

11     A.  Just let me repeat.  The Washington Public

12  Power Supply System case was an extraordinarily

13  complicated case.

14        I do not see this fact pattern as being

15  similar at all to the facts in this particular case,

16  but even so the methodology I have described here is

17  the same methodology that you would follow in this

18  particular case.

19        Just because something is difficult doesn't

20  mean that you can't do it.  It's just difficult

21  because you have to go through every fraudulent

22  disclosures and make appropriate adjustments.  It

23  just means that you have to make more adjustments.

24        In this particular case I don't think it's

25  a particularly complicated case, but it's the same

```
 1   type of adjustments that you would make.
 2   BY MR. PASKIN:
 3        Q.  Okay.  But in this case you would still
 4   need to go through each of the alleged fraudulent
 5   disclosures and you would need to do an analysis to
 6   determine the degree to which they impact the
 7   inflation, you know, quantification; correct?
 8        A.  You would have to look at the
 9   misrepresentations and you would have to determine
10   whether or not the misrepresentations maintained
11   inflation that already existed in the stock price,
12   whether or not they increased the inflation.
13             Again, we talked a little bit about that
14   earlier, you know, looking at the price, whether or
15   not the misrepresentations caused an increase in the
16   stock price, whether or not there was a beginning of
17   a new alleged truth that was different from the
18   alleged truth beforehand.  But all of these things
19   are things that we encounter in every case.
20             There is nothing -- it's a bizarre argument
21   to say that, well, listen, you know, five
22   misrepresentations is more complicated than one
23   misrepresentation.  Yeah, you just do it five times
24   over.  I mean, so what?  You know, it's -- you still
25   go through and do the same thing.  Here is the
```

1  starting point of the inflation, here it ends, and
2  that's what you do.
3       Q.  And while you say that in this case you
4  could do that, you haven't done any of that analysis
5  specific to this case; right?
6            MR. MITCHELL:  Objection to form.
7       A.  I think it may be the tenth time I'm saying
8  this, but I haven't quantified damages in this case,
9  I haven't performed loss causation analysis in this
10  case; and if you ask me again, I mean I'll repeat it
11  to you.  I've just explained the methodology one
12  would go through in order to quantify damages.
13  BY MR. PASKIN:
14       Q.  Let's go back to Exhibit E to your report.
15  So the first date still remaining in the proposed
16  class period where the Plaintiffs alleged that
17  fraudulent statements were made is March 2nd;
18  correct?
19       A.  Correct.  Yes.
20       Q.  Okay.  And according to your statistical
21  analysis on March 2nd, there was -- there was a
22  statistically significant negative return for Big
23  Lots stock; correct?
24       A.  That's correct, yes.
25       Q.  And that's notwithstanding Plaintiffs'

```
 1   allegation that fraud that was committed on March

 2   2nd caused the price of Big Lots stock to be

 3   artificially inflated; right?

 4          MR. MITCHELL:  Objection to form.

 5      A.  They alleged that that is the starting

 6   point of the inflation at this point in time, yes.

 7   BY MR. PASKIN:

 8      Q.  Okay.

 9      A.  And yeah.

10      Q.  Okay.  Well, I guess my question is is

11   being that your analysis shows that there was a

12   significant company-specific negative stock price

13   return, do you conclude from that that the effect of

14   the alleged fraud can only have been to maintain

15   rather than to increase inflation in the stock

16   price?

17          MR. MITCHELL:  Objection to form.

18      A.  Well, it's not -- it's the starting point

19   of the inflation.  It's not maintaining an inflation

20   that existed prior to that point in time.

21   It's -- let me just give you a simple example.

22          Let's assume that the company reports

23   earnings of a dollar per share.  The truth is that

24   they only made 50 cents.  When they say that they

25   earned a dollar when they only made 50 cents, that's
```

 1   the starting point of the fraud and that would be

 2   the starting point of the inflation.

 3          Now, a different issue is, well, what

 4   happened to the stock price on that particular day?

 5   Well, maybe analysts and investors expected the

 6   company to report a dollar ten a share and they only

 7   reported a dollar a share.  Well, under those

 8   circumstances you would have a price decline even

 9   though that day represents the starting point of the

10   inflation.

11          So you wouldn't look at the price movement

12   on the first day of the class period necessarily to

13   determine whether or not it was maintaining

14   inflation or whatever.  If it's the first day of the

15   class period, it's the starting point of

16   the -- starting point of the inflation.

17          And it goes back to some of what I was

18   talking about earlier because you were kind of

19   simplifying the analysis by looking at, well, you

20   know, you have this misrepresentation here and the

21   stock price doesn't increase, so does that mean

22   that, you know, it's just maintaining inflation?

23          And I explained to you at that point in

24   time that that is not necessarily what it means.  It

25   means that there may be a new alleged truth that is

```
 1  being disclosed and so the inflation at that point
 2  in time could increase.
 3            So consistent with that framework, you
 4  know -- you know, you can have this as the starting
 5  point of the inflation, even if the stock price
 6  declines.
 7  BY MR. PASKIN:
 8      Q.  Have you done any analysis, any economic
 9  analysis to determine whether the degree to which
10  the stock price was inflated -- withdrawn.
11            Have you done any statistical analysis to
12  determine whether the degree to which the
13  stock -- the degree to which the stock price was
14  inflated on March 2nd?
15      A.  I keep repeating myself.  I have not
16  performed any quantification of damages or
17  inflation.  I have just explained the methodology
18  one would use in order to do so.
19      Q.  How would you figure out how the stock
20  price became inflated in the first place?
21      A.  So the stock price -- first of all, what
22  you have to understand is what stock price inflation
23  means.  It's the difference between the price and
24  its value reflecting the alleged truth.
25            So what you would do is to look at what
```

 1   happens when the alleged truth is disclosed, and

 2   that would be in this case April of 2012 and August

 3   of 2012.

 4           So you would look at those price declines

 5   in order to quantify what the inflation would be.

 6       Q.   In paragraph 54 of your report -- you see

 7   in paragraph 54 you talk a little bit about price

 8   maintenance; correct?

 9       A.   Let me see.  Yes, I'm talking about

10   preventing the stock price from declining.

11       Q.   Right.  Have you done any analysis in this

12   case to conclude whether the alleged

13   misrepresentations here had the effect of

14   maintaining an inflated stock price?

15           MR. MITCHELL:  Objection to form.

16       A.   I don't have whether or not it maintained?

17   BY MR. PASKIN:

18       Q.   Let me try to ask it better.

19           So here in paragraph 54 you say that in

20   some cases, you know, it can occur that a fraudulent

21   statement has the effect of maintaining, rather than

22   increasing, the amount of inflation in stock price;

23   right?

24       A.   I think I was talking about maintaining the

25   stock price, as opposed to increasing the stock

```
 1   price and, in other words, preventing the stock
 2   price from declining.
 3          And yeah, so that is one situation and
 4   that's what frequently happens.
 5      Q.  Are you simply talking about sort of raw
 6   stock price there, or are you talking about the
 7   degree of inflation in the stock price?
 8      A.  It can be -- it can be both, but the -- it
 9   can be a starting point of -- if it's the first day
10   of the class period, it can be the starting point of
11   the inflation.  If there is already inflation in the
12   stock price, it can be maintaining inflation.
13          And the point I was trying to make here is
14   that sometimes this very superficial argument that's
15   being made, and that is, well, you have a
16   misrepresentation and the stock price didn't
17   increase, consequently, you know, it didn't distort
18   the stock price.  Well, that is obviously not true,
19   even though it's commonly argued.
20          I remember ten years ago, I think it was, I
21   was the expert in the HealthSouth matter; and at the
22   time that fraud was disclosed -- I think it was the
23   biggest accounting fraud in the country -- they
24   reported I think a couple of billion dollars of
25   earnings that they didn't have.
```

```
 1              When you looked at their financial
 2      releases, when they released their audited
 3      financials, the stock price didn't increase,
 4      so -- and the reason it didn't increase is that the
 5      false results simply maintained the stock price, but
 6      that doesn't mean that this massive fraud didn't
 7      distort the stock price.  Of course reporting
 8      earnings of a couple of billion dollars when the
 9      real earnings were only, I think it was, 100 million
10      dollars or something like that -- you know, of
11      course that distorted the stock price.
12          Q.  Go to paragraph 38 of your report.  This is
13      in the section where you're talking about market
14      efficiency and the fifth Cammer Factor.
15              You say another way to assess Cammer factor
16      five is to, A, identify specific new and material
17      information that in an efficient market would be
18      expected to cause an observable stock price increase
19      or decrease, and then, B, test to determine whether
20      or not the stock price actually increased or
21      decreased as one would expect.
22              Is that also what would be called an
23      ex ante approach?
24          A.  Ex ante approach, yes, and that's the
25      problem, of course.
```

1      Q.   Essentially it means you would come up with

2    a theory about what you would expect the reaction

3    to, you know, some piece of information to be, and

4    then you would test whether or not the reaction

5    accords with your hypothesis; correct?

6      A.   Right.  Exactly.

7      Q.   And just to be clear, that is not the

8    approach that you used in this case; right?

9      A.   No, I -- this is what I did for two of the

10   price decline.  The prior -- the prior analysis was

11   one that did not take that into account, but then I

12   looked at the April and August decline, and that's

13   what I did.

14     Q.   Okay.  You looked at them in a -- sort of

15   in a directional basis, but you didn't come up with

16   an ex ante hypothesis even for the April and August

17   price declines about the degree to which the price

18   would fall in response to the information disclosed;

19   correct?

20     A.   Oh, the magnitude?

21     Q.   Yes.

22     A.   Yeah.  No, I mean -- well, the -- with

23   respect to magnitude, it only related to whether or

24   not it would be large enough to be statistically

25   significant; and that is what I say in the last

```
 1   sentence here, that this test is often limited to
 2   the events that most clearly represents undisputed
 3   disclosures of new and material information that
 4   would be expected to cause observable price
 5   movements.
 6           It's because, you know, the threshold for
 7   statistically -- statistical significance is rather
 8   high; right?  So you only -- so the information
 9   would have to have been really, really significant
10   in order to be able to make that conclusion ex ante.
11       Q.  Okay.  Now, for purposes of reaching your
12   conclusion that the market was efficient, you
13   hypothesized that there would be a price decline
14   from the two corrective disclosures; right?
15       A.  I -- my hypothesis was that there would be
16   statistically significant price declines.
17       Q.  Okay.
18       A.  So, which relates to the magnitude issue
19   that you were talking about earlier.
20       Q.  Got it.
21           And for purposes of evaluating market
22   efficiency, you made no attempt to quantify the
23   magnitude for purposes of your hypothesis; right?
24       A.  Right.  You wouldn't -- I mean nobody --
25   you wouldn't do that because you have information
```

```
 1   and you have different -- and I have it in here in
 2   my report somewhere.  I mean different investors
 3   will arrive at different conclusions.
 4            So the price will reflect the consensus
 5   from all of the investors, but -- so let's say the
 6   stock price declines three dollars.  While you think
 7   it should have declined $3.10 and someone else
 8   thinks it should decline $2.90 and so on, the stock
 9   price reflects the consensus.  With consensus I mean
10   what -- where the stock price settles out,
11   basically, when -- that reflects the buying and
12   selling of all the investors that are trading that
13   day.  And so it wouldn't -- so it would be overly
14   subjective to try to quantify the magnitude.
15            So you couldn't do -- the analysis that
16   you're proposing, is something that's not a
17   practical analysis.
18       Q.  But it's an analysis that economists
19   perform routinely to try to predict market reactions
20   to particular sorts of information; correct?
21       A.  No.  I mean when you -- the event study
22   itself doesn't -- I mean you can come up with a
23   model and you can have a model that somehow comes up
24   with a predictive price, and then you can run an
25   analysis to see how close the market is to your
```

 1  model, but the differences between the model and the

 2  market price doesn't really mean that the market is

 3  inefficient.

 4        It -- in most cases it means that your

 5  model is wrong, and that is what is called a joint

 6  hypothesis problem, and that is that you're testing

 7  basically two things at the same time.

 8        So if you try to do that, you know, you

 9  don't really get anywhere because, well, you know,

10  you may just have proven that you're not very good

11  at modeling, not that the market is inefficient.

12     Q.  I mean there are occasions in your

13  experience where the market reaction to some piece

14  of information can be significantly greater than

15  what appears to be the sort of discounted cash flow,

16  you know, impact of that information; right?

17        MR. MITCHELL:  Objection to form.

18     A.  Listen, that is an academic discussion.

19  You have academics on both sides of that particular

20  issue, and I typically stay away from, you know, how

21  correctly the market, you know, reflects the

22  information.

23        I think the supreme court -- I have it in

24  here -- is very, very straightforward -- is that,

25  you know, this academic discussion is not really

```
 1   what is at issue with respect to reliance, the

 2   reliance issue at class certification.

 3   BY MR. PASKIN:

 4       Q.  Okay.

 5       A.  So it's a -- it's not a particularly

 6   relevant issue.  Let's say that the stock price

 7   declines $3 in some theoretical world.  Some

 8   academics say, well, it should have declined $3.05.

 9   Another academic says, well, you know, it should

10   have declined $2.95.  You know, you don't know, they

11   don't know.

12           The evidence is that regardless

13   institutional investors in general are not able to

14   outperform the market.  So if institutional

15   investors are not able and these large funds are not

16   able to outperform the market, generally that's an

17   indication that investors in general are not able to

18   outperform the market.  So the price at least with

19   respect to regular investors, you know, is

20   efficient.

21       Q.  So just to make sure that I understand, in

22   reaching your conclusion about market efficiency

23   with respect to Big Lots stock during the proposed

24   class period here, is it fair to say that you have

25   no opinion one way or the other as to whether the
```

```
 1    market price is an accurate reflection of
 2    value-relevant information coming to the market?
 3            MR. MITCHELL:  Objection to form.
 4        A.  My opinion is that it's reasonably
 5    accurate, but to opine that it is at all times
 6    correct is something that, you know, it's impossible
 7    to determine.
 8    BY MR. PASKIN:
 9        Q.  Well, but you haven't done any analysis to
10    determine whether it's reasonably accurate, other
11    than that it's directionally accurate; correct?
12        A.  No.
13            MR. MITCHELL:  Objection to form.
14        A.  That's not true at all.
15    BY MR. PASKIN:
16        Q.  Okay.  What have you done to determine that
17    the market price reactions to news about Big Lots
18    are, you know, reasonably accurate at taking
19    value-relevant information and converting them into
20    market prices?
21            MR. MITCHELL:  Objection to form.
22        A.  Well, you have statistically -- if you're
23    asking me in terms of the price decline -- as I
24    talked about before, whether or not it should be $3
25    or 3.05 or 2.95 or whatever -- that is an analysis
```

```
 1    that is inherently subjective and for the reasons

 2    that I stated.

 3            So I have performed the standard analyses

 4    that are performed for class certification, and I

 5    have relied on the Cammer factors that I understand

 6    the court uses for this particular purpose, and so

 7    that is the analysis I have performed.

 8            But, you know, this whole notion that the

 9    stock price at all times have to be correct, the

10    only thing I can refer to is the academic

11    literature, as I explained earlier, that demonstrate

12    that, you know, mutual funds with respect to

13    actively-traded stocks do not outperform the market.

14            So if you cannot outperform the market and

15    you have all of these smart intelligent people

16    trying to get whatever little edge they can get for

17    any mispricing, that means that there are not very

18    many opportunities to take advantage of such

19    mispricing.  So that is the evidence for it.

20    BY MR. PASKIN:

21       Q.  Okay.  Those academic articles and all the

22    stuff that you cited, that doesn't have anything

23    specific to do with Big Lots; correct?

24       A.  It absolutely has to do with Big Lots

25    because Big Lots trades -- is an actively-traded
```

```
 1   stock, a U.S. stock, and academics who have studied

 2   these things have concluded time and time again that

 3   with respect to these type of stocks there is very,

 4   very little opportunity to earn excess returns.

 5        Q.  Okay.  And I'm just saying that those

 6   studies that you're referring to don't specifically

 7   mention trading in Big Lots stock during 2012;

 8   correct?

 9        A.  But that doesn't mean that it's --

10        Q.  Just answer my question.  Do they mention

11   trading in Big Lots stock during 2012?

12        A.  I'm sure that Big Lots stock is part

13   of -- Big Lots is part of the universe that they

14   have looked at.  So it is relevant to Big Lots, and

15   that's what my prior answer was.

16        Q.  Okay.

17        A.  So in terms of mentioning the specific

18   stocks that are in the universe, I had to go back

19   and look at the studies whether or not they

20   specifically mentioned the companies that are in

21   that universe, but Big Lots is in that universe.

22        Q.  As you sit here today, can you refer to any

23   academic study that specifically talks about trading

24   in Big Lots stock during 2012?

25        A.  That has nothing to do with my prior
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 135

1    answer.

2         Q.  But that's my question.  So you can answer

3    it.

4         A.  It's -- I don't know.  I have to look at

5    the academic studies to see what stocks or what

6    universes they include.

7         Q.  Okay.  As you sit here today, you cannot

8    identify an academic study that specifically

9    analyzes trading in Big Lots stock during 2012;

10   correct?

11            MR. MITCHELL:  Objection to form.

12        A.  I have -- let me just explain to you what

13   I've done.

14   BY MR. PASKIN:

15        Q.  I would like you to answer my question, and

16   then you can explain whatever you want.

17        A.  No.  No, I'm not going to let you put words

18   in my mouth in terms of --

19        Q.  I'm asking a simple question.

20        A.  No.  And I'm giving you my answer.

21            The academic studies look at a universe of

22   stocks that include Big Lots stocks.

23            In terms of whether or not they include --

24   any reference to that universe include the name Big

25   Lots, I do not know.

1      Q.  So as you're sitting here today, you can't

2   identify anything that specifically refers to Big

3   Lots in the academic literature; correct?

4      A.  The same answer.

5          MR. MITCHELL:  Object to form.  Asked and

6   answered.

7   BY MR. PASKIN:

8      Q.  And with respect to your conclusion that

9   Big Lots -- withdrawn.

10         You know that in the April 24th price

11  decline it was about 24 percent or $11; correct?

12     A.  Yeah.  I mean it is whatever it is.

13     Q.  It is what it is.  That's roughly what it

14  was.

15         So does it matter at all to your analysis

16  of market efficiency whether that price decline was

17  $11 or $5 or $26?  Does it?

18     A.  It mattered to the market, didn't it?

19     Q.  I'm asking if it matters to your analysis

20  of market efficiency.

21     A.  To my analysis of market efficiency?

22     Q.  Correct.

23     A.  Yeah, it would matter.  The price decline

24  would matter in the sense that you would have to get

25  to an equilibrium price that is set by the market.

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 137

1        Q.  Well, you're always going to get to an

2    equilibrium price; right?

3        A.  No, that's not true.

4            [unintelligible voices overlapping]

5            MR. MITCHELL:  Let's let him finish.

6    Mr. Steinholt, let Mr. Paskin finish.  Stop talking

7    over each other, please.

8        A.  If you're looking at stocks that are traded

9    in inefficient market, what you will find is that

10   these are stocks that are so-called neglected

11   stocks, in other words information comes out, nobody

12   cares, nobody trades on it.

13           In this particular case what you have is a

14   situation where you have new information coming out,

15   this information being analyzed, you have analysts'

16   reports revising their price target, analysts'

17   reports commenting on the price decline, you have

18   all sorts of different analyses.

19           And in my mind, you know, it seems to me

20   that the stock price is consistent with the

21   analysts' commentary in terms of where the stock

22   should have traded.

23   BY MR. PASKIN:

24       Q.  So there are analysts out there reviewing

25   all this information that's come to the market;

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 138

```
 1   correct?

 2        A.   There's analysts there that analyzes the

 3   new information.

 4        Q.   Okay.  And there are sophisticated

 5   investors analyzing that information; right?

 6        A.   There are a lot of sophisticated investors

 7   analyzing this information and trading on this

 8   information.

 9        Q.   Okay.  And in connection with your

10   conclusion that Big Lots stock traded in an

11   efficient market during the class period, did you do

12   anything to analyze the information that was coming

13   into the market?

14        A.   In terms of analyzing to determine what I

15   thought the stock price should have been, no.  I do

16   not have an analysis or a quantification what I

17   personally believe the stock price should be.

18             What I was interested in was that

19   mechanism, in other words whether or not the

20   stock -- the new and material information that came

21   to the market was analyzed by investors and whether

22   or not the investors were sophisticated and

23   understood the economic implication of the

24   information and whether or not they traded on the

25   information and whether or not the stock price
```

```
 1   thereby arrived at the consensus -- consensus price.

 2            Whether or not that price is consistent

 3   with what I personally believe is the correct price

 4   would be irrelevant because -- because we are

 5   talking about the market price which has a lot of

 6   input from a lot of investors, and different

 7   investors have different views.

 8            I may be overly optimistic.  I may be

 9   overly pessimistic.  Whether or not I'm overly

10   optimistic or overly pessimistic is irrelevant in

11   this particular case.

12            The question is as I stated in my report,

13   whether or not the market efficiently processed the

14   new information so that the new information became

15   reflected in the stock price, and that's what I

16   observed and that is what this -- and that is the

17   basis for my conclusion.

18       Q.   Right.  And from your perspective as long

19   as the market arrived at some equilibrium price,

20   whether it was an equilibrium price that reflected

21   an $11 decline or a $5 deline or a $20 decline,

22   you're satisfied that the fact that there was an

23   equilibrium price reached indicates to you that the

24   market was acting efficiently; correct?

25       A.   Not simply that.  Also that you have
```

```
 1   analysts' reports that explain the rationale that

 2   seemed consistent with the information that was

 3   disclosed.

 4          MR. PASKIN:  Why don't we take a short

 5   break.

 6          THE VIDEO OPERATOR:  Off the record, the

 7   time is 2:15 p.m.

 8          (Recess)

 9          THE VIDEO OPERATOR:  We are back on the

10   record.  The time is 2:28 p.m.

11          MR. PASKIN:  Thank you, Mr. Steinholt.  I

12   have no further questions today.

13          THE WITNESS:  Thank you.

14          MR. MITCHELL:  We'll designate as

15   confidential for now and reserve the right to read

16   and review the depo transcript.

17          THE VIDEO OPERATOR:  Off the record, the

18   time is 2:29 p.m.

19          THE REPORTER:  So, do you want a rough

20   draft?

21          MR. MITCHELL:  Sure.

22          MR. PASKIN:  Yes.

23          THE REPORTER:  Do you want your final

24   tomorrow as well?

25          MR. MITCHELL:  Yes.
```

Confidential
BJORN STEINHOLT - 07/21/2016                    Page 141

1    (Whereupon at 2:29 p.m. the deposition was

2    concluded)

3                    - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I,  BJORN STEINHOLT, CFA, do hereby declare

 4    under penalty of perjury that I have read and

 5    examined the foregoing testimony and the same is a

 6    true, correct, and complete transcription of the

 7    testimony given by me and any corrections appear on

 8    the attached errata sheet signed by me.

 9

10

11    _____    _____

12              (DATE)                          (SIGNATURE)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    REPORTER'S CERTIFICATE

2

3        I, KARLA MEYER BAEZ, Certified Shorthand

4    Reporter No. 4506 for the State of California, do

5    hereby certify:

6        That prior to being examined, the witness named

7    in the foregoing deposition,  BJORN STEINHOLT, CFA,

8    was duly sworn to testify the truth, the whole

9    truth, and nothing but the truth;

10       That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced by me to typewritten form and

13   that the same is a true, correct, and complete

14   transcript of said proceedings.

15       Before completion of the deposition, review of

16   the transcript {X} was { } was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed,

19   are appended hereto.

20       I further certify that I am not interested in

21   the outcome of the action.

22       Witness my hand this 22nd day of July, 2016.

23

24   _____

25       KARLA MEYER BAEZ, CSR NO. 4506

Confidential
BJORN STEINHOLT - 07/21/2016                 Page 144

 1   NAME OF CASE:       Willis v. Big Lots, Inc., et al.

 2   DATE OF DEPOSITION: July 21, 2016

 3   NAME OF WITNESS:    BJORN STEINHOLT, CFA

 4   Reason Codes:

 5       1.  To clarify the record

 6       2.  To conform the facts

 7       3.  To correct transcription errors

 8   Page_____ Line_____ Reason_____

 9   From_____to_____

10   Page_____ Line_____ Reason_____

11   From_____to_____

12   Page_____ Line_____ Reason_____

13   From_____to_____

14   Page_____ Line_____ Reason_____

15   From_____to_____

16   Page_____ Line_____ Reason_____

17   From_____to_____

18   Page_____ Line_____ Reason_____

19   From_____to_____

20   Page_____ Line_____ Reason_____

21   From_____to_____

22

23

24                        _____

25                        BJORN STEINHOLT, CFA

Confidential
BJORN STEINHOLT - 07/21/2016                    i1

**$**

**$11**
136:11,17 139:21

**$2.90**
129:8

**$2.95**
131:10

**$20**
139:21

**$26**
136:17

**$3**
131:7 132:24

**$3.05**
131:8

**$3.10**
129:7

**$425**
23:9

**$5**
136:17 139:21

**0**

**0.2**
53:19

**0.22**
53:19

**1**

**1**
6:19,23 7:4 64:9

**1.25**
53:11

**1.645**
48:17 52:2 58:21
105:12,15

**1.7**
105:14

**1.75**
58:7 105:14

**1.96**
47:6,13 48:3,17,20

50:17,21 51:6,15 52:2,
9,14 55:15,23 57:11
58:20

**10**
28:2 47:19 49:4,5

**100**
14:9,10,16 15:1,2 19:9
126:9

**10:40**
45:10

**10:56**
45:15

**10b**
20:13

**10th**
46:13

**11**
55:5,18

**12.67**
40:8

**12:05**
95:3

**15**
20:7,24

**16th**
53:6,7,10,23 54:10,21
55:22

**1900**
5:14

**1987**
8:7

**1989**
9:5

**1990**
11:16 100:5

**1997**
10:12

**1998**
11:19,20 12:14,16

**1:08**
95:7

**1st**
37:2 55:6 62:8

**2**

**2**
6:24,25 26:5,6 97:25
98:4

**2.95**
132:25

**20**
20:7,22,24

**2012**
31:20 37:2,3 38:23 39:9
46:13,14 53:6,10 54:21
55:7 58:3 63:3,7 101:14
104:25 105:21 109:10
124:2,3 134:7,11,24
135:9

**2014**
13:3

**2016**
5:2,10

**21**
5:2,10

**23.8**
40:20 42:8

**23.80**
40:5

**23rd**
38:24 42:1 43:15 58:3
66:22 104:25 105:21
110:20

**24**
136:11

**24.06**
39:21

**240-some-odd**
62:25

**24th**
38:23 39:6,9,20 42:23
43:19 44:7,13 66:22
136:10

**25**
20:6,22,25 32:7 85:11,
21

**26**
39:25 95:11

**27**
85:9

**27th**
7:21

**2:12-cv-00604-mhw-
nmk**
5:9

**2:15**
140:7

**2:28**
140:10

**2:29**
140:18

**2nd**
44:6,7,12 74:14 93:9,10
120:17,21 121:2 123:14

**3**

**3**
27:5,6 95:6

**3.05**
132:25

**30**
15:17

**31st**
37:3 55:7

**37**
49:20 51:11

**38**
126:12

**4**

**41**
53:15

**475**
23:13,14

**5**

**5**
26:4,9

**50**
17:10,15 75:6 121:24,
25

**500**
64:9

**52**
98:3

**54**
124:6,7,19

**56**
95:11 97:14

**58**
85:8,13

---

**6**

**655**
5:13

---

**7**

**7**
27:5,6,7,8,16

**75**
75:6

---

**8**

**8**
27:6,7,12 32:6

**886**
98:14

**892**
114:13

**899**
100:8 111:24

---

**9**

**98**
12:8

**9:37**
5:2,11

**9:58**
19:19

**9:59**
19:22

---

**A**

**a.m.**
5:2,11 19:19,22 45:10,
15

**ability**
68:3,7,11 90:1 93:1,5
108:3

**able**
35:17 128:10 131:13,
15,16,17

**abnormal**
38:19 39:14 40:4,18
41:13 46:18,19 47:9
53:14 55:8 58:1

**absent**
99:8

**absolute**
47:6 55:23

**absolutely**
55:1 133:24

**academic**
28:14 95:16 130:18,25
131:9 133:10,21 134:23
135:5,8,21 136:3

**academics**
130:19 131:8 134:1

**accept**
82:10,19

**accepted**
113:25

**accepting**
71:1 116:4

**accords**
127:5

**account**
28:20 51:20 57:15 74:8
75:21 112:3 118:8
127:11

**accounted**
49:8

**accounting**
11:4,5,7,12 86:14
125:23

**accurate**
7:21 132:1,5,10,11,18

**act**
74:24

**acted**
31:7

**acting**
139:24

**action**
86:6

**actions**
20:11 95:25

**actively-traded**
133:13,25

**actual**
7:17 39:15,21 46:4 59:7
85:16 97:19

**add**
34:11

**added**
55:15 87:5

**addition**
31:14 71:20

**additional**
8:13 9:11,12 34:8,9
42:16 90:18 101:17,24
102:2 105:18

**address**
95:24

**adjust**
36:12,13 75:14

**adjustment**
35:11 36:16 75:8 78:1
88:15 101:16

**adjustments**
33:22 34:3 35:12 69:21
70:12,15 74:21 90:20
118:22,23 119:1

**advanced**
10:7

**advantage**
28:18,24 133:18

**Advisors**
13:4,24

**affidavit**
14:5

**ago**

**act**
98:9 116:11 125:20

**agree**
55:5 59:17 63:8 76:7

**agreeing**
104:13

**allegation**
121:1

**allegations**
32:24 35:16 42:7,13,22,
24 43:25 44:13 68:18
82:11,20 83:12 112:23
113:25 115:16 116:3,
21,22 117:8,9

**allege**
32:22 39:1 43:12 44:1,4
65:21 73:17 102:16
104:9 114:21

**alleged**
32:20 37:24 38:3,7,16
41:23 44:19,23,24 68:4,
8 69:11 70:10,19 71:15
72:5,7,9,10,11,18 73:10
74:19 75:25 79:17,21
80:22 84:6,7 86:18
87:15 88:9,10,24 89:20,
21 94:9 99:8,15 101:13,
17 104:1,2,18 106:11
110:14,16,17 112:5,9
113:3 114:7,9,11 115:6,
13 116:25 117:5,20
119:4,17,18 120:16
121:5,14 122:25 123:24
124:1,12

**allegedly**
44:1 68:23 71:8

**alleges**
73:6

**allocate**
14:21

**allocation**
14:22

**allowed**
73:22

**alternative**
100:19

**amount**
40:23 97:16 124:22

**analyses**

Confidential
BJORN STEINHOLT - 07/21/2016

i3

109:25 133:3 137:18

**analysis**
10:2,17,18 11:7 12:18
13:8,15,18,19 28:9
30:11 32:3,24 33:19
34:6,9,10,12,17,22
36:7,9 37:11,12 38:13
41:12 42:6,21 43:1,2,4,
6,9,10 44:9,11,20 45:4
46:5,7,11 47:21 49:9,
16,18,19,20 50:6 51:9,
13,17,19,22,23 52:3,5,
8,17,20 53:21 54:6,11,
19,21,24 55:24 56:9,10,
15 60:1,19 61:25 64:14,
23 65:3 66:13 68:21
69:2 70:21 71:1,4,14,
16,18,19 72:7,10,22
73:4,14 74:8 76:14,16
77:2 78:9 79:19 80:19,
25 81:1,2,7,11,12,13,20
82:5,12 83:9,14 84:5,8,
13,15,19,21,22,23 85:2,
16,22 86:10,12 87:14,
20 88:9,22 89:4,22,24
90:10,19,24 91:3,5,9,
11,17,20 93:7,15,18
94:5,6,14 95:21 96:14,
16 101:21,25 104:19
105:18 106:4,6,10,14,
15,17,21 107:7,15,16,
19,20,22 108:5,6,12,17,
20,22,25 109:2,23
110:6 111:12 112:12,
16,17 113:5,8 114:10,
11,15 115:7,15,23
116:6,18 117:4,13
119:5 120:4,9,21
121:11 122:19 123:8,9,
11 124:11 127:10
129:15,17,18,25 132:9,
25 133:7 136:15,19,21
138:16

**analyst**
9:25 10:12,19 80:15,16

**analyst's**
80:13

**analysts**
23:21 79:7 122:5
137:24 138:2

**analysts'**
31:1 36:25 137:15,16,
21 140:1

**analyze**
28:23 55:3 56:22 68:3,
7,11 75:21 78:13
138:12

**analyzed**
30:25 45:25 137:15
138:21

**analyzes**
135:9 138:2

**analyzing**
29:3 60:13 63:23 80:21
108:14,20 109:14
138:5,7,14

**answer**
53:25 54:2 82:8 101:4
112:2 134:10,15 135:1,
2,15,20 136:4

**answered**
66:17 83:18 84:11
86:24 88:20 92:7 93:4
106:23 136:6

**answers**
98:9 116:11

**ante**
126:23,24 127:16
128:10

**anticipate**
18:19,23

**anybody**
47:3

**apart**
9:19 90:22

**apologies**
23:14

**appeal**
16:10,23 113:16

**appear**
27:5

**appears**
130:15

**appellate**
16:10

**applicable**
34:7

**applied**
96:1

**approach**
25:5,12 94:1 97:15,21
100:9,23 111:8,16
126:23,24 127:8

**appropriate**
36:16 41:7,10 42:9
47:24 50:12 56:15
118:22

**approximately**
13:25 14:9,15 15:2,11,
17 16:25 19:9 20:1

**April**
35:3,24 38:23,24 39:6,
9,20 42:1,23 43:15,19
44:7,13 66:21 101:14
117:6 124:2 127:12,16
136:10

**arbitration**
15:23

**area**
12:1 78:25

**argued**
125:19

**arguing**
113:7

**argument**
113:10 119:20 125:14

**arrive**
129:3

**arrived**
139:1,19

**article**
95:17,22,23 96:1,7,18,
23 98:2,14 111:15
114:13

**articles**
133:21

**articulated**
118:6

**artificially**
121:3

**ascribe**
43:17

**aside**
41:9 67:13,25

**asked**

26:16 60:17 66:16 78:6
80:24 81:2,10 83:17,24,
25 84:10,12,22,23
86:23 87:1 88:21 92:6
93:3 136:5

**asking**
66:12 91:13 94:22
132:23 135:19 136:19

**aspect**
96:25

**assess**
79:5 126:15

**assessment**
61:18

**assignment**
26:7,10

**associated**
53:18 86:10

**associates**
5:20

**assume**
72:12,24 82:25 111:21
121:22

**assumes**
32:25

**assuming**
70:8

**assumption**
65:4 69:8

**attempt**
94:15 128:22

**attempts**
83:10

**attorney**
23:1

**attorneys**
22:7,8

**attributable**
35:5,25

**attribute**
68:21

**audited**
126:2

**August**
35:5,9,25 37:3 66:22

Confidential
BJORN STEINHOLT - 07/21/2016                           i4

117:7 124:2 127:12,16

**Austin**
6:2

**available**
27:22 28:1 29:7 34:20
67:17 69:20 81:5 82:2

**average**
64:24

**aware**
75:13 77:7

**B**

**back**
7:16 19:21 25:11 32:5
41:16 44:16 45:12 95:5
100:5,12 101:6 110:16
120:14 122:17 134:18
140:9

**back-up**
49:21

**background**
8:4 11:12 80:10,12,13

**backgrounds**
11:4

**Baez**
6:5

**band**
112:18

**banking**
12:7

**based**
32:6,20 39:24 42:7,18
46:19 50:5 54:10 55:24
62:3,4,12 67:14 68:1
72:12 79:14 81:4 82:12
83:11 92:25 100:13,14
103:11 116:6

**baseline**
62:11,12 63:9,12

**basic**
16:17 26:15 70:7 99:11,
12

**basically**
9:10 10:13 129:11
130:7

**basis**
22:17 24:1 25:22 32:15
41:2,3,10,11,15 83:2
89:4 100:13,14,17,20
127:15 139:17

**Beach**
8:8,12,14,19

**beginning**
35:10 36:4 41:16 42:14
43:18 69:13,16 70:1
72:18,25 73:11,13
86:19 88:14 110:18
111:23 119:16

**begins**
5:5 45:13 85:10 95:6
98:25 114:15

**behalf**
5:23 81:18

**believe**
10:24 16:3 22:25 35:22
37:1 45:22 82:18 89:14
138:17 139:3

**believes**
50:12

**benchmark**
47:13,18 48:3 50:22
52:1 58:19 61:20
105:12 110:24

**benchmarks**
62:3

**benefits**
21:9

**best**
36:3 42:18

**better**
34:16 124:18

**beyond**
89:23 109:22

**Big**
5:6 26:18 27:18 30:12,
13 45:25 53:10,15
54:13 55:8 56:2 120:22
121:2 131:23 132:17
133:23,24,25 134:7,11,
12,13,14,21,24 135:9,
22,24 136:2,9 138:10

**biggest**
125:23

**bill**
11:23 25:5

**billable**
25:9

**billion**
125:24 126:8

**bills**
24:24

**binomial**
49:1 51:18

**bit**
10:10 17:23,24 18:6
19:24 34:12 56:21 67:9
70:3 119:13 124:7

**bizarre**
91:13 119:20

**Bjorn**
5:6 6:8 45:14 95:7

**Bloomberg**
36:24

**body**
10:14,16 26:3

**boxes**
45:21,23

**Brane**
6:2

**break**
17:23 45:8 67:8 95:1
140:5

**brief**
19:20

**briefly**
85:5

**Broadway**
5:13

**buck**
72:3

**business**
9:6,9,17,20 11:1 12:9,
12,14 25:19 80:12

**but-for**
99:10,13

**buying**
129:11

**C**

**C-a-m-m-e-r**
30:18

**Cal**
8:8

**calculate**
35:21 85:12 97:5,20
98:10 99:16,21,22,23
100:1,11 108:4 112:19,
21 118:8

**calculated**
40:3 56:2 90:8,16,18
107:25 118:1

**calculates**
98:15

**calculating**
37:25 95:24 99:1
109:18

**calculation**
36:8 49:7 50:13 85:24
100:7

**calculations**
86:1 103:12 104:10

**Caliber**
13:4,9,16,24 23:15,22
24:4,6,14 25:5,11,17,25

**California**
5:1,14 8:11,13

**call**
10:14 33:25 46:17
62:18

**called**
11:17 12:9 13:4 40:8
98:10 126:22 130:5

**Cammer**
30:16,18 31:11,14 66:9
126:14,15 133:5

**can't**
22:10 91:8 118:20
136:1

**Candace**
13:2,11,20

**capital**
12:7

**care**
  56:16

**cares**
  137:12

**carry**
  41:16

**case**
  5:8 6:17 7:17 14:20
  16:19 18:25 21:4 23:2,
  10,16 25:13 26:11,16
  27:1,4 30:11 33:4,8,9,
  14,18,21 34:7 35:16,17
  36:2,3,14,15 38:12
  39:12 42:7,18 43:3
  49:22 50:19 51:5 52:6
  57:8 63:24 67:11 68:16
  73:16,22 74:11,14 77:1,
  6 78:4 82:4 83:3 84:13,
  25 85:2,6,19,23 86:3,21
  87:9,10,11,16,19,20,22,
  23 88:1,23 89:2,3,9,11
  92:4 93:2,17 94:7,13
  96:16 97:22 99:16,19,
  20,23 101:13 102:15
  103:6 106:25 107:24
  108:22 110:3 111:8,19
  112:16 114:21 115:2,8,
  16 116:17 117:12,15,
  17,19,22,24 118:2,5,12,
  13,15,18,24,25 119:3,
  19 120:3,5,8,10 124:2,
  12 127:8 137:13 139:11

**cases**
  10:2 15:18 16:25 17:8,
  18 18:2,16 19:8,11,25
  20:2,8,14,16 21:1,6,7,8,
  17,24 22:3 25:6,23
  32:8,11,13 33:5,12 34:2
  35:14 38:1 76:24 81:16,
  24 85:15,20 86:6 87:12
  97:8 100:4 111:17
  124:20 130:4

**cash**
  29:12,15 77:18,20 79:9,
  10 80:4,5,6,18 130:15

**causation**
  16:20,22,24 43:1,2,9
  71:16,17,19 78:9 79:19
  80:25 81:1,2,10,11,13,
  20 84:23 107:22
  112:12,15 113:1,11,14,
  17 114:4,5 117:3 120:9

**cause**
  60:14 126:18 128:4

**caused**
  40:11,18 58:16,24
  101:23 102:2 103:17
  105:19 119:15 121:2

**causes**
  102:11

**cents**
  75:6,7 121:24,25

**century**
  32:14 92:22

**certain**
  33:22 47:10 48:10
  70:15 74:10 82:23

**certainly**
  20:14 33:20 63:8
  104:25

**certification**
  7:1 19:11 20:4,10,16,20
  21:12,15 22:20 51:15
  131:2 133:4

**certification-related**
  22:1

**certifications**
  21:19

**certified**
  6:9 10:11

**CFA**
  6:8 10:3,5,21 11:3,6,10

**chance**
  40:16

**change**
  30:6,9 37:6 44:25 73:16

**changes**
  29:11,14 89:1

**chart**
  53:5

**Chartered**
  9:24 10:12

**charts**
  104:7

**check**
  25:11 49:13 104:6

**choose**

**chooses**
  52:8

**chose**
  48:4,21 49:11 50:17
  51:5,9 52:6 55:3 57:10
  62:11 64:22 66:13

**chosen**
  46:16

**chronology**
  36:23,24 37:1

**circuits**
  113:7

**circumstances**
  13:7 48:19 57:6 73:2
  122:8

**cite**
  96:11

**cited**
  133:22

**civil**
  8:15,20

**claim**
  74:3

**Claire**
  5:20

**clarification**
  22:16

**clarify**
  14:14 49:10 52:5
  107:13

**clarifying**
  109:6

**class**
  5:24 6:25 9:14,15 19:11
  20:3,10,11,16,20 21:12,
  15,18,25 22:19 26:18
  27:19 28:25 30:12
  31:25 35:11 36:5 40:24
  41:17,24 42:10,14
  43:11,13,18 44:2,5,10
  51:15 69:13,16,18 70:3
  72:19,20,25 73:11,13
  83:11,16 86:5,19 88:15
  97:17,19 100:17 101:7,
  19 110:18,19 118:9
  120:16 122:12,15

**class-wide**
  26:22 27:14 34:7 85:12,
  24,25 89:4 90:1,8 91:25
  92:4 94:13 95:14
  107:24 108:4,6

**classes**
  8:13 9:2

**clear**
  52:4 84:5 106:24
  108:21 127:7

**clearly**
  63:24 69:3 128:2

**client**
  15:7

**close**
  13:14 38:25 96:2
  129:25

**closed**
  13:17,23 43:14

**closer**
  20:7

**closing**
  37:6

**clue**
  91:15

**Collette**
  5:12

**column**
  40:7

**columns**
  37:4 46:23 49:14 50:6,9

**combination**
  37:20

**come**
  33:20 36:11 39:13
  63:20 81:19 83:8 97:10
  109:22 127:1,15 129:22
  137:25

**comes**
  16:7,15,16 25:2 34:13
  71:13 75:8 78:13 79:20
  85:10 87:8 129:23
  137:11

**comfortable**

**125**:10 131:2,24 133:4
  138:11

**90:**17

**coming**
62:14 132:2 137:14
138:12

**comment**
91:6

**commentary**
137:21

**commenting**
137:17

**committed**
121:1

**common**
20:5 23:18 27:18 47:21
85:12

**commonly**
125:19

**communicate**
105:3

**companies**
59:18,20 134:20

**company**
29:18,22 30:2,3 60:3
62:17,20 72:2 75:4,25
76:2 80:4,5 88:6 99:14
121:22 122:6

**company's**
29:20

**company-specific**
38:15,17 39:16 40:4,12
41:13 42:9,23 47:9
62:13 76:21 103:11
104:11,20 105:22 107:9
110:10,12 121:12

**compare**
65:1

**comparison**
79:14 112:4

**Comparisons**
112:7

**compensated**
23:9,15,25

**competition**
30:21

**complaint**
35:18 43:25 65:19,25

**66:**4,5,14,21 67:18
68:2,5,19 70:20 71:2
72:13 73:6,10 74:5 81:5
83:12 115:25 116:1,2,3,
20,21,22

**completed**
70:16

**completely**
12:15 13:23 61:15
103:25

**complicate**
117:12

**complicated**
114:15 118:2,6,13,25
119:22

**complication**
115:6,9

**complications**
115:11

**component**
89:19

**computed**
50:5

**computer**
8:22 9:2

**concealed**
32:20 38:8 41:23 43:11,
12 44:18,25 69:12 71:8
75:2 79:17,21,22
110:17 112:9 114:9

**conceals**
44:22 72:9 74:25 114:9
117:5

**concept**
97:3

**conclude**
21:1 30:13 33:4 102:20
103:12 104:10,19
105:21 107:24 121:13
124:12

**concluded**
21:4,8 117:1 134:2

**concludes**
47:7

**concluding**
32:15

**conclusion**
22:4 85:23 89:5 90:25
94:1,14 103:21 115:24
116:4,6,8,18 128:10,12
131:22 136:8 138:10
139:17

**conclusions**
129:3

**confidence**
47:10

**confidential**
19:1 140:15

**confounding**
75:11,13,15,21 76:15,
20 77:7,8,12,15,16,23
78:12,14,20 79:5,14,25
80:1 86:14

**confusing**
17:25

**connection**
14:17 23:15 24:4 25:23
67:22 71:5,6,13,14
96:16 138:9

**consensus**
129:4,9 139:1

**consequently**
51:21 125:17

**consider**
110:11 111:2

**consistency**
82:22

**consistent**
30:4 38:1 41:21 87:2
123:3 137:20 139:2
140:2

**constant**
41:3,14,15 100:17,20,
23 101:2,5,6

**constitute**
68:9

**constituted**
7:21

**consultant**
32:8 81:17,18

**consulted**
21:17

**consulting**
12:5,6 15:8 21:14 22:1,
17

**contend**
41:18 103:8

**content**
68:3 81:6 87:16 89:25

**context**
88:4

**control**
23:20 24:19 38:11
39:12 63:17,22 109:9,
11,16

**controls**
38:13

**conversations**
23:1

**converting**
132:19

**copy**
7:5,12,22 98:1

**Cornell**
96:8,11,14 97:2,13
98:2,9,13 111:15
114:13 117:10 118:1

**Cornerstone**
5:21

**correct**
6:17,18 7:1,22,23 8:7,9,
21,25 9:8 10:8 11:15,18
12:10,19,20 13:6 14:11
15:5,9,10,22 17:16 19:3
20:23 23:10 24:5,15
25:13 26:7,8,11,12,19,
20,23,24 27:1,2,5,7,11,
15 32:22 39:3,6,23
40:2,6,13,25 41:19
43:5,6 44:2,8 46:1,2,10,
21 47:11 49:14 50:9
51:6,16 52:10 53:11,12,
16,17,19,20,25 54:1,3,
4,8,14,23 56:4 57:12
58:2,3 60:16 61:2 62:14
63:1,12 64:24,25 65:11,
16,22 66:4,15,24 67:6,
19 68:5,6,10,14,16,17
70:9,23 71:17 73:8
74:1,6,7 75:23 76:11
77:6 78:5 79:18 80:22
81:8 82:23 83:16 84:9

86:22 88:12 91:11 92:1,
2,5 96:5 97:22,23 98:12
100:5 106:12,13 107:2,
11 108:8,23 110:3
111:13,21 112:19
113:17 114:21,23
115:21 116:6,13 117:9
119:7 120:18,19,23,24
124:8 127:5,19 129:20
132:6,11 133:9,23
134:8 135:10 136:3,11,
22 138:1 139:3,24

**corrective**
39:1 41:19 43:18 65:22
67:5 68:9,22 69:4,6,8,
11 71:7 72:14 73:12
75:10 79:15 80:21 84:7
86:7 92:14,15,18 94:7
98:19 107:8 111:22
112:6 116:14,16,25
128:14

**correctly**
21:17 70:25 113:21
130:21

**corresponding**
102:17 103:10 104:10

**couldn't**
129:15

**counsel**
5:15 15:4,7 22:19

**count**
18:13

**country**
125:23

**couple**
12:17 19:14 63:11
125:24 126:8

**course**
10:3 29:11 32:23 33:1
35:6 36:3,13 61:9 63:13
74:13 79:22,25 84:13
101:18 126:7,11,25

**court**
5:8 6:4 7:20 14:23 15:4
16:1,5,9,10,11,13,21,22
38:2 67:15 68:12,15
70:21 72:13 73:18,22
74:3 87:24 89:8,9,11
94:19 113:11,15,20,23,
25 130:23 133:6

**court's**
16:18 67:18 68:2,20
74:10 81:6 83:12 87:17
88:25 89:13,25 90:11,
23 91:22,23 92:24,25
93:14 94:12

**courts**
14:17

**cover**
6:23

**covers**
11:6

**CPAS**
11:9

**Cravath**
5:18,19

**create**
85:25 89:3 90:1 110:1
111:18 112:18

**criticism**
16:18

**criticized**
16:4,11,14 113:13

**crunching**
107:1

**crystal**
84:4

**current**
7:12 13:4 36:18

**currently**
17:17,18,20,21 18:18,
21 81:5

**cut**
25:10

**CV**
7:12,14,22 8:1 11:13
15:15

---

**D**

**daily**
97:18

**damage**
32:24 34:17 69:2 72:6,
10 81:20 82:5 84:12,19,
21,22 85:1 88:9 96:22

**damages**
26:22 27:14 32:7 33:2,
9,11,16,21,24 34:8,23
35:4,21 37:25 38:20
40:20 42:10 43:4,5,10
44:10,19 67:10 71:21,
22 72:3 73:1 74:9 75:2,
16 77:11 78:8 83:10,15,
21 84:2,5 85:5,12,14,
16,24 86:1,4 87:20
88:4,11 89:3,20,21
90:2,8,16,17,19 91:25
92:4,8,9,10 93:6,17,21,
23 94:3,13 95:14,22,25
96:9,16 97:6,12,20
98:16 99:2,18 107:16,
18,19,20,21,25 108:4,6,
18,23,25 109:3,8,12,19,
21,24 110:2 112:19,21,
22,23 113:2 114:11
117:25 118:2,9 120:8,
12 123:16

**data**
53:19 55:7

**date**
7:19 8:17 37:5 40:4
44:5 47:6 53:5 60:15
62:5 98:18 102:16
103:9 120:15

**dates**
38:25 44:12 45:21,22,
24,25 46:6,8,16,17 50:3
53:1,22 54:7,22 55:3,5,
18,21 57:10,25 59:19
60:24,25 62:9,10,25
63:16,17 64:6,15,18,22
65:9,13,18,19,21 66:13,
22 67:5 69:4,6,9,11,12,
15,17 72:15 73:20 74:2,
5 103:8 104:8 115:21
116:14

**David**
5:22

**day**
37:9,12,14 38:18,20
39:6,19 40:18 41:24
43:11,13 46:25 47:14,
17 58:16,24 59:9 62:4
105:24 106:19 122:4,9,
12,14 125:9 129:13

**days**
31:22,24 32:1,2 46:11

57:16 61:13 62:12,13,
18,21,24,25 63:10,11
65:12 114:6

**December**
46:13 55:7

**decides**
87:25

**decision**
38:2 67:18 68:2 81:6
83:13 87:17 88:25
89:25 90:23 91:22,23
113:24

**declaration**
14:5

**decline**
35:3,5,9,24 38:18,19
57:20 71:15 76:8 77:24
79:11 86:7,10 92:14
110:13 114:4 122:8
127:10,12 128:13 129:8
132:23 136:11,16,23
137:17 139:21

**declined**
65:20 129:7 131:8,10

**declines**
52:25 68:22 70:8,9
114:6 123:6 124:4
127:17 128:16 129:6
131:7

**declining**
124:10 125:2

**decrease**
126:19

**decreased**
126:21

**defendant**
69:3

**defendants**
5:18 45:2 69:24 72:20
81:19 86:17

**defendants'**
83:21 87:4

**defense**
12:3

**define**
99:3

Confidential
BJORN STEINHOLT - 07/21/2016                    i8

**defining**
27:23

**definition**
50:21,24 51:2 99:6

**degree**
8:19 9:19 10:7,20,24,25
28:10 41:17 47:10
61:15 110:2 119:6
123:9,12,13 125:7
127:17

**degrees**
8:7,18 9:22 61:17

**deline**
139:21

**demonstrate**
115:12 133:11

**depending**
23:19 34:23 48:18 50:7
67:10

**depends**
34:13 52:3 57:6 58:22
103:16

**depo**
140:16

**deposition**
5:5,12 6:19 7:13,15,16
15:13,23,25 45:14 95:7
98:4

**describe**
10:10 13:7 30:10 36:21
97:13 111:17 115:3

**described**
33:4 34:21 35:20 51:14
79:12 111:8 112:4
117:11 118:16

**describes**
114:20

**describing**
111:15

**description**
26:10

**design**
60:25

**designate**
140:14

**designation**

8:15,16 9:25 11:10

**detail**
96:19 104:24 111:17

**detailed**
33:3 89:9,14 90:5,12
96:9

**details**
70:19,20

**determination**
57:7,9 111:3

**determine**
25:2 33:8 37:7,13 42:8,
22 44:10 49:12 52:8
56:22 64:14 71:5 77:16,
18 80:2 82:3 83:10
87:15 88:22 89:24
101:25 105:18 106:4,10
107:9 110:13,15 112:8
113:20 115:16 119:6,9
122:13 123:9,12 126:19
132:7,10,16 138:14

**determined**
51:23 68:12,15 74:3

**determines**
67:15 102:6

**determining**
26:22 31:13 34:7 52:18
77:3

**develop**
80:13

**developed**
9:2

**dictate**
42:3,6

**didn't**
50:24 51:19 53:2 63:3
69:24 76:3 125:16,17,
25 126:3,4,6 127:15
136:18

**Diego**
5:1,14 9:7,21 11:24
12:1 13:17,23

**difference**
39:14 46:15 56:13
63:15,18,22 74:9 98:17,
20 123:23

**differences**

108:16 130:1

**different**
12:15,21 16:21 24:24
29:11 30:8 34:12 35:10
36:14 48:9,18 51:2,22,
23 56:21 58:13 60:7
61:17 70:6 80:8 85:19
87:12,15,19 103:25
104:2 106:18 109:17
110:4 113:6,7,14 115:5
119:17 122:3 129:1,2,3
137:18 139:6,7

**differently**
57:22 80:9

**difficult**
17:6 24:25 25:1 117:17
118:19,20

**direct**
31:15

**direction**
51:20

**directional**
127:15

**directionally**
132:11

**disagreement**
79:1

**disclose**
69:25

**disclosed**
38:9,17 39:19 40:17
43:14 56:22 57:16
59:15 69:12 79:23
106:18 112:10 117:6,7
123:1 124:1 125:22
127:18 140:3

**disclosure**
37:23,24 38:3 39:1,4,8
41:19,25 43:19 67:5
69:4,6,9,11 72:11,15
78:19 79:15,18 86:8
92:14,16,19 94:8 98:19
99:14 101:12,13,14
115:21 116:14

**disclosures**
65:22 68:9,23 70:10
71:7 73:12 75:10 80:21
81:7 88:12 101:18
107:8 111:22 112:6

115:20 116:13,17
117:1,18 118:22 119:5
128:3,14

**discounted**
130:15

**discover**
76:3

**discovered**
76:1

**discovery**
34:15 42:15 67:15
70:16 76:11 81:13 82:1
84:15

**discuss**
30:19 55:3 57:24

**discussed**
23:2 48:21 53:22

**discussion**
28:14 130:18,25

**discussions**
22:15

**disk**
45:13 95:6

**dismiss**
67:19 68:3,20 70:22
71:2 73:19 83:13 87:18
89:1 90:1,12 113:24

**dismissal**
74:10

**dismissed**
73:23 74:5 114:1

**dispute**
28:21

**distinguish**
14:4

**distinguished**
15:6

**distort**
125:17 126:7

**distorted**
32:19 126:11

**distribution**
49:1 51:18 58:18
105:11

**district**

5:8 16:8,10,22 113:15

**documents**
67:22 71:2

**doesn't**
21:19,21 60:2,20 79:23
93:5 111:14,17 117:25
118:19 122:21 126:6
129:22 130:2 133:22
134:9

**doing**
17:10 18:18 41:1 48:25
71:14 91:25 100:19
106:20 109:12 113:20

**dollar**
30:2,3 40:21,22 41:2,10
60:5 75:4 88:7 100:14,
20,23 101:2,5 121:23,
25 122:6,7

**dollars**
41:15 125:24 126:8,10
129:6

**don't**
7:3 10:6 11:8,10 13:22
16:3 17:3 18:6 19:5
22:14 54:9 55:10 59:2,5
63:3 64:11 65:7 70:15
72:4 84:16 85:8 87:6,
11,21 88:2,20 91:14,18,
19 94:23,24,25 100:21
103:16 104:10 109:3
114:25 115:2,8 118:24
124:16 130:9 131:10,11
134:6 135:4 140:4

**Dowd**
5:23

**dozen**
19:14

**draft**
140:20

**draw**
103:21

**drives**
44:17,19 72:9 88:9
89:21

**driving**
37:25 72:6 74:19
114:11

**DTI**
6:5

**duly**
6:9

**E**

**earlier**
44:17 45:3 56:13 67:8
69:23 74:22 88:2
100:12 106:24 113:13
119:14 122:18 128:19
133:11

**earn**
134:4

**earned**
121:25

**earnings**
29:19,20,22,23,24,25
46:3,4 60:4,12 62:5,9,
10 63:25 64:16,18 76:4,
9 88:7 121:23 125:25
126:8,9

**ease**
7:7

**easier**
14:8

**easiest**
35:2

**easily**
49:25 96:2

**easy**
35:6

**econometric**
80:14

**economic**
30:10,20 47:7 56:1
82:11,20 89:24 90:10,
24 91:5,9,11,16,19,20
103:12 104:10 112:25
113:3,4,8,18 123:8
138:23

**economics**
8:24 9:4,23 10:7,16,21
70:14

**economist**
75:21 78:15 79:13
109:25 112:3 116:5
117:1

**economists**
80:11 129:18

**edge**
133:16

**Educational**
8:4

**effect**
121:13 124:13,21

**effectively**
30:19 46:24 106:15

**efficiency**
26:17 27:9 29:9 30:22
31:16 33:19 61:14
71:20 107:14 108:14,21
109:14 126:14 128:22
131:22 136:16,20,21

**efficient**
20:19 21:2,5,9 22:5,9,
22 23:6 27:20,24 28:3,6
29:2,5 30:14 31:13
61:5,9,10 63:19 126:17
128:12 131:20 138:11

**efficiently**
28:4 139:13,24

**either**
15:13,22,24 18:2,20
47:5 54:12 59:10 82:10
100:15,25 104:12

**electives**
9:16

**eliminated**
69:14

**encounter**
119:19

**ends**
109:16 120:1

**engaged**
17:18 66:3

**engagement**
69:2

**engagements**
25:15

**engineer**
8:15

**engineering**
8:16,20,22

**enlighten**
91:4

**enters**
28:7

**entire**
17:13 35:24

**entirely**
74:6 82:15

**entry**
38:23

**equal**
47:17 48:13

**equilibrium**
136:25 137:2 139:19,
20,23

**equity**
10:17

**equivalent**
99:1

**essentially**
13:14,15 27:8 127:1

**establish**
71:5,14

**establishing**
63:9 71:13

**estimate**
17:10 19:10 39:17

**evaluating**
57:10 128:21

**evaluation**
29:21

**event**
31:21,24 33:13,17,25
34:6,11 35:19 36:6,9,23
37:18,21,22 38:5,6,12
39:18 47:7 48:5 50:5
51:14 60:11,12 65:13
76:16 77:2,3,4 85:11,14
86:9,11 92:12,13 94:5,7
95:21 96:9,22,24 97:15
100:9,25 101:1,10,21
102:4,5,7,14 103:5
105:16 106:13 110:6
111:16 112:1 129:21

**events**
43:17,22 63:23 100:18
101:8,9,10,20 128:2

Confidential
BJORN STEINHOLT - 07/21/2016                    i10

**everyday**
62:16

**evidence**
30:25 31:6,15 40:16
42:16 61:8 82:1,21
84:18,20 103:18 131:12
133:19

**ex**
126:23,24 127:16
128:10

**exact**
17:7

**exactly**
14:19 26:14 47:2 49:18
63:6 64:11 79:20
108:10 127:6

**exaggerations**
114:16

**EXAMINATION**
6:12

**examine**
107:7

**examined**
6:10

**example**
11:4 29:18 35:2,6 38:23
75:24 93:8,13 104:22
113:23 121:21

**examples**
15:19

**excess**
28:19 134:4

**exchange**
22:12,21,22,25 23:5

**exclude**
76:15 77:23 79:10

**excluded**
16:1

**excuse**
7:25 27:5

**exercise**
65:4

**exhibit**
6:19,23,24,25 7:4,11,
21,25 36:19,21,23
37:10,19 38:22 45:17,

20,23 46:9 47:3 50:4
52:7 97:25 98:4 103:6
105:4 106:22 107:2,14
108:5,12,13 120:14

**exhibits**
7:5,9 26:4

**exist**
82:12

**existed**
40:23 72:18 119:11
121:20

**expect**
59:12,14 60:8 61:11
126:21 127:2

**expectations**
29:12,15 30:5,8 60:8

**expected**
56:23,25 60:5 64:23
65:10 122:5 126:18
128:4

**expects**
29:18 30:1

**expenses**
23:18 24:9

**experience**
11:2 60:13 130:13

**experienced**
40:10

**expert**
6:16,24 7:5,12,20 14:1,
2,4,12,15,24 15:21,25
17:2,9,19 18:2,3,17,20,
24 19:8 21:15 23:16
32:7 50:11,16 56:19
57:7,9 78:18 79:13
81:17 82:7,16,17,19
83:6 85:1 87:7 92:22
94:21 97:9 105:16
106:3 111:1 117:21
125:21

**experts**
34:2 56:20 79:1 80:8
83:22 84:17,24 85:14
87:3,4

**explain**
26:21 28:3 43:21 56:7
72:25 77:11 83:25 85:5,
6 87:2 98:10 99:20
116:8 135:12,16 140:1

**explained**
47:11 57:14 69:23
78:10 88:2 93:22 94:17
120:11 122:23 123:17
133:11

**explaining**
44:16 89:18 96:15 97:3
113:9

**explains**
95:22 100:2

**explanation**
96:9

**express**
20:18 21:2 29:3

**expressed**
22:18 41:14

**expressing**
27:4

**extent**
20:13 82:23 102:14,15
103:7 118:4

**extraordinarily**
118:12

---

**F**

**facilitates**
30:21

**fact**
31:17 42:23 62:23
65:18 70:17 74:2 83:7
91:10 92:3 96:6 117:11,
23,24 118:1,14 139:22

**factor**
79:25 80:1 126:14,15

**factors**
30:16,17,18 31:11,14
38:12,13,14,15,17
39:17,25 40:12,13
53:14 75:11,13,15,22
76:15,16,17,18,20,21
77:8,13,15,16,23 78:13,
14,20 79:5,14 86:15
103:20 110:7,8,9,11
133:5

**facts**
33:7 34:13 36:11 41:21
42:3,6 67:11 75:19

81:14 82:12 83:8
118:15

**fair**
21:11 34:24 36:17
55:19,20 61:18 103:3
131:24

**fall**
127:18

**fallen**
76:4

**false**
44:1 68:24 71:9 72:3
73:21 74:4 75:4 84:6
88:3,5,24 102:10,16
103:9 104:9,18 107:8
112:5 126:5

**falsely**
88:6

**far**
19:6 34:6 35:20 110:15

**February**
12:16 37:2 46:13 53:6,
7,10,23 54:10,20 55:6,
22 62:8 63:3 74:14 93:9

**fell**
66:23

**field**
8:20

**fields**
9:22

**fifth**
126:14

**figure**
123:19

**filed**
5:7 7:20

**filing**
18:24

**filings**
14:23

**fill**
50:6,8

**filled**
63:17

**final**
140:23

**finance**
8:24 9:18,20,22 10:7, 17,20

**financial**
9:3,25 10:12 12:18 13:8,15,18 25:19,20 31:18,19,22,23 45:24 46:24 52:18 59:15,17, 22 60:20 62:15,22,24 63:1,4,10,17 65:15,24 66:9,10,24 67:2,3,4 109:9,15 126:1

**financials**
126:3

**find**
57:25 65:10 67:16 137:9

**findings**
70:17

**fine**
45:7 55:12 66:12

**finish**
85:18 137:5,6

**firm**
11:17,22 12:8,15,22,23 13:4,12 23:3

**firms**
17:2,12 20:1

**first**
6:9 11:13 19:7 30:15 36:20 41:24 43:11,13 44:5 77:14 79:12 88:20 95:16 109:9 120:15 122:12,14 123:20,21 125:9

**five**
37:4,16 44:22 45:21 46:20 47:14,16,20 48:2, 7,23 49:12 50:18,23 51:6,15 52:9,15,21 53:3,24 54:13,23 55:4, 9,25 57:11,23,25 58:5, 9,20,21 61:20 62:1 64:3,6,7,15,17,18 104:12 105:1,23,25 110:22 119:21,23 126:16

**fixed**
10:17

**flexibility**
84:18

**flow**
80:4,5 130:15

**Flowered**
113:14

**flows**
24:14 29:13,16 77:19, 20 79:9,10 80:7,18

**Flowserve**
16:8,9,18

**focus**
9:20 12:4,5 83:8 88:10, 12

**focused**
9:16,17 11:25

**focusing**
33:23 41:8 57:23 71:19, 20 77:10

**follow**
65:7 66:8,9 97:22 113:12 118:17

**followed**
114:18,22

**following**
38:24 39:6 52:25 54:5 64:21 66:23

**follows**
6:11

**footnote**
96:11 98:3

**force**
37:25 74:19 114:11

**form**
16:6 22:23 34:25 41:20 42:11 43:20 44:15 47:12 51:7 52:16 54:15 59:21 68:25 71:10 81:9 82:14 83:17 84:10 86:2, 23 89:6 90:3,14 91:1,12 93:3,16 102:22 103:15 107:3,12 112:20 113:24 114:24 115:18 116:7,19 117:14 118:10 120:6 121:4,17 124:15 130:17 132:3,13,21 135:11 136:5

**forms**
14:10

**formula**
111:24

**formulate**
63:12

**forth**
68:19

**forward**
36:2

**four**
46:4 54:23 55:6 63:6

**framework**
34:1 35:13 36:9,16 37:19,21 75:16 77:2 85:11,15 86:4 92:13 96:10 123:3

**Franklin**
7:17

**fraud**
33:2 35:25 41:18 42:25 44:14 71:15 74:24 75:25 76:10,21 85:20 99:8 106:11 113:3 114:7 121:1,14 122:1 125:22,23 126:6

**fraud-related**
100:18 101:8,9,10,19

**fraudulent**
68:5 79:18 80:22 87:16 101:17 118:21 119:4 120:17 124:20

**frequently**
56:20 125:4

**front**
6:22 45:18 81:24 97:24

**fully**
117:7

**funds**
7:18 131:15 133:12

**further**
75:18 95:22 114:15 117:12 140:12

**future**
29:12,15 68:1 77:18,20 79:9,10 80:4,5,6,17

**G**

**geared**
109:23

**Geller**
5:13,23,25 6:2 17:1,11, 19 18:4,19 20:1,9,23,24 21:12,19 22:2,7,18 23:1,4 25:6,10,16,20 26:1,11

**general**
25:5 28:24 100:3,4 109:4 111:7,16 131:13, 17

**generally**
33:17 36:20 131:16

**generate**
28:19 29:2

**getting**
47:2

**give**
104:21 121:21

**given**
26:10 35:16 47:21 66:25 82:13

**giving**
112:2 135:20

**go**
10:1,23 11:3 19:5,16 32:9 34:15 39:9 42:15 59:2 63:4 69:7,18 70:4 71:12 75:17 76:13 77:25 81:16 85:17 96:10,24 111:24 118:21 119:4,25 120:12,14 126:12 134:18

**goes**
23:17 24:4,6,9,13,16 25:1 29:21 37:3 44:16 49:7 96:19 100:12 114:3 122:17

**going**
18:5,22 33:25 42:16 45:6 62:16 64:22 65:4 66:8 67:2 69:16 78:22 85:15 88:17 99:25 104:21 106:7 135:17 137:1

Confidential
BJORN STEINHOLT - 07/21/2016                                    i12

**gold**
76:1,3,11

**good**
5:4 6:14,15 22:16
81:12,25 84:14 88:16
130:10

**gospel**
71:3

**gradual**
117:19

**graduate**
10:25

**graduated**
8:7

**great**
104:24

**greater**
47:6,17 48:13 55:15
64:23 83:8 105:14,23
130:14

**greater-than-average**
65:2,5

**group**
39:12

**guess**
49:17 121:10

**guidance**
113:19,23

                    **H**

**half**
17:3,14

**handful**
18:6,10

**happen**
60:2 68:1

**happened**
38:4,9 39:6 43:17 122:4

**happens**
38:2 59:3,7 124:1 125:4

**haven't**
18:17 78:8,9 87:9 92:9
93:17 99:18 100:22
104:24 106:9 107:7,21
111:9,12 120:4,8,9

132:9

**He's**
117:16

**head**
18:13

**Healthsouth**
125:21

**hearing**
15:23

**help**
13:12 18:5

**helped**
23:22

**helpful**
31:15 89:10,15,16 90:6,
12

**Hendrickson**
5:18

**here's**
91:21

**high**
40:14 128:8

**higher**
49:7,23 50:1

**Highly**
19:4

**hired**
11:23

**history**
11:14

**holding**
17:7

**hopefully**
28:15

**hour**
23:9 45:6 88:17

**hourly**
24:1 25:22

**hours**
25:8

**hundred**
17:8 32:13

**hypothesis**
127:5,16 128:15,23

130:6

**hypothesized**
128:13

**hypothetical**
72:1

                    **I**

**I'd**
19:5 91:6

**I'll**
49:17 55:13 87:10
104:6,7 120:10

**I'm**
14:6 17:7,21 18:5,7
20:12,13 26:13 43:22
48:25 49:10 51:4 52:4,5
61:22,23 63:6 64:21
65:1 66:2,12 70:18
75:8,12 77:7 78:6 84:24
93:20 104:21 109:6
113:8 120:7 124:9
134:5,12 135:17,19,20
136:19 139:9

**I've**
7:7 9:1 17:20 21:4,17
22:15,25 76:24 77:9
87:12 89:17 92:21,22
110:5 120:11 135:13

**i.e.**
97:16

**idea**
99:11,12

**identification**
6:20 78:12 98:5

**identified**
53:1 66:21 67:6 69:4

**identify**
5:15 77:9,15 78:19
79:5,13 126:16 135:8
136:2

**identifying**
78:14

**imagine**
19:1

**impact**
37:22 38:4,6 39:4,8,18
45:3 59:16 72:16 77:4,

21 79:8 92:15 93:5,6
94:6,8 101:11,12 102:6
104:12,20 105:22 119:6
130:16

**impacted**
29:13 77:18 102:21,23

**impacts**
80:3,4 90:1 93:1 94:20
115:13

**impersonal**
27:19

**implication**
138:23

**important**
48:11 114:10

**impossible**
132:6

**inappropriate**
54:9

**include**
62:9 86:14 135:6,22,23,
24

**included**
7:8 15:14 63:10

**including**
64:16,18 88:23

**inclusive**
14:6

**income**
10:17

**incomplete**
72:1 75:4 84:20

**inconsistent**
82:20

**incorporate**
27:21,25 34:19 61:24
93:7

**incorporated**
5:7 28:8,10 31:17 32:1
61:24 93:14

**incorrect**
51:8 52:11 104:14,15

**increase**
57:21 58:17,25 102:11,
12 103:17,22 105:1,9,
19 106:10 111:3 119:15

Confidential
BJORN STEINHOLT - 07/21/2016

i13

121:15 122:21 123:2
125:17 126:3,4,18

**increased**
53:11 103:1,14,19
119:12 126:20

**increasing**
124:22,25

**independently**
117:8

**indicates**
139:23

**indication**
131:17

**indicative**
109:1,19

**individual**
97:20

**individual's**
25:9

**individuals**
10:23

**Indura**
38:2

**industry**
12:3 38:14 39:11,17,25
40:12 53:13 56:3 76:18
110:8

**inefficient**
21:22 130:3,11 137:9

**inflated**
41:18 121:3 123:10,14,
20 124:14

**inflation**
35:8 36:4 40:23 42:13
45:3 69:14,16 70:4
86:16 92:16 94:10 97:3,
11,16,18 98:20,21
100:16,20 101:2,3,6,15,
24 102:2,12,25 103:1,
13,14,19,23 104:3
110:2 111:4,5,22
112:18 119:7,11,12
120:1 121:6,15,19
122:2,10,14,16,22
123:1,5,17,22 124:5,22
125:7,11,12

**information**

27:22 28:1,4,7,10,16,
18,23 29:3,7,19,24
30:4,7 31:1,7,17 32:2
34:20 39:19 40:17
45:24 47:22 51:24
56:18,22 57:16 58:16,
23 59:1,5,7,15,23 60:6,
7 61:11,16 62:13,17,19
66:24 68:23 69:20,25
71:6,8 72:23 73:5,7,12
74:20,25 75:1 78:22,24
79:15,16 81:4 84:7
102:10 106:18 107:9
111:2 112:9 126:17
127:3,18 128:3,8,25
129:20 130:14,16,22
132:2,19 137:11,14,15,
25 138:3,5,7,8,12,20,
24,25 139:14 140:2

**informative**
49:25

**inherently**
133:1

**initial**
79:17

**initially**
11:25

**input**
139:6

**instance**
14:19 45:2 88:6 101:11
110:20

**instances**
16:13

**Institute**
10:3,5

**institutional**
31:5 131:13,14

**intelligent**
133:15

**interdisciplinary**
9:14

**interested**
138:18

**interesting**
110:21

**internal**
15:8

**international**
9:6,9,17,20

**interpretation**
69:19

**interruption**
19:20

**investment**
12:2,7

**investor**
80:16 98:16

**investors**
28:18,22,25 29:8 31:3,
4,7 97:16 122:5 129:2,
5,12 131:13,15,17,19
138:5,6,21,22 139:6,7

**invoice**
25:10

**involved**
41:5 106:20

**involves**
118:5

**involving**
117:12

**irrelevant**
139:4,10

**isn't**
10:22 46:9 61:14 71:18
91:2

**isolated**
114:18

**issue**
20:19 21:3 22:5 23:3
27:9 84:6,7 87:8 90:15
95:24 103:25 113:16,18
122:3 128:18 130:20
131:1,2,6

**issues**
19:12 20:21 21:13 41:5
118:6,8

**it's**
7:4 8:17 9:10 10:3,13
11:1 13:22 14:8 17:20
18:8 19:1 20:12 22:7,11
24:6,18,25 25:1 28:15
29:10,11,20,24 30:4
32:13 33:25 36:8,25
37:15 40:15,16 41:9,14

48:6 49:24,25 50:13,24
52:24,25 54:9,24 55:19
57:1,3 58:8 60:7,21
61:15,20,21 62:17
64:12 65:25 70:2 72:22
75:20 77:5 78:16,23,25
79:4,25 80:3,24 82:7,24
85:2 88:8,10,11 89:21
91:13 99:5,12 102:20
106:6,19 108:10 109:19
110:23 111:23 113:8,18
116:1 118:20,24,25
119:20,24 121:18,19,21
122:14,15,22 123:23
125:9,19 128:6 129:18
131:5 132:4,6,10,11
134:9 135:4

**its**
17:1,12 60:6 123:24

_____

**J**

**January**
11:20 12:14

**job**
75:20 78:15,18 82:7,10

**joined**
12:14

**joint**
130:5

**judge**
70:16

**judgment**
67:16 91:24 94:11

**July**
5:2,10

**June**
7:18

**jury**
67:16 70:16

**justified**
28:25

_____

**K**

**Karla**
6:5

**keep**

71:23 100:19 123:15

**key**
20:21

**kind**
11:21 19:10 24:25 25:1,
2 34:3 43:21 107:16,17
110:21 122:18

**knew**
65:19,23 66:20 67:5
86:17

**know**
7:4 9:25 11:4,6,8,10,11
14:20,25 15:6 17:3
18:6,8 19:5 22:14 23:19
24:23 25:2,25 28:15
34:18 36:1,8,9 42:17
47:9,23 48:16 49:8,21
54:23 55:10 57:7,8
58:23 59:2,5 61:18
63:3,21,24 64:8 67:3
69:19,23,24 70:2 71:3,
17,24 72:4,5,12,14,20,
21 73:2,4,15 74:15
75:1,3,11,25 76:1 79:16
80:10,11 81:19,21 82:2,
12 83:1,13 84:16,19
85:18 86:6,16 87:6,7,10
88:5,8 90:19 91:14,18,
19 92:17,23 93:9 94:22,
23 96:15 97:4,12 98:1
100:1,21 102:2 106:6,
17,19 108:8 109:2,15,
17,20 110:15,21 111:24
112:25 113:9 116:2
119:7,14,21,24 122:20,
22 123:4 124:20 125:17
126:10 127:3 128:6
130:8,9,16,20,21,25
131:9,10,11,19 132:6,
18 133:8,12 135:4,25
136:10 137:19

**knowledge**
10:14,16 26:2

**known**
73:10,12 88:14

**Kozycz**
5:19

-----

**L**

-----

**labeled**

39:12

**laid**
35:18

**language**
9:13

**large**
40:14 61:23 127:24
131:15

**law**
68:13

**lead**
18:20

**learned**
67:14

**leaving**
41:9 67:13,25

**led**
30:13

**left**
23:19 24:19,20 37:4
38:15

**legal**
41:5 88:1 113:5,18

**let's**
29:17,18 35:2,15 36:19
37:2 38:22 53:5 58:14
62:15 69:7 71:12 94:20
100:7 102:8 120:14
121:22 129:5 131:6
137:5

**level**
8:16 37:16,17 47:15,20,
21 48:2,3,7,8,23,24
49:4,6,8,11,22,23
50:11,12,18,23 51:3,5,
6,16 52:21 53:2,3,24
54:2,13 55:1,4,9,25
57:24 58:5,8,9,20,21
61:20,21 64:7,17
104:13 105:2,23,25
110:22

**levels**
46:21 49:11 50:19
54:25 55:2

**liability**
34:24 35:1,3 70:5 92:18
93:8,9

**likelihood**
64:6,8,12,15

**limited**
68:19 128:1

**line**
27:17 97:4 98:11,15
99:1,3,5,7,17,21,22,24
100:1,7,11 103:20
110:1 111:19,20 112:1,
18

**link**
112:22

**linked**
114:6

**list**
55:14,16

**listen**
72:14 112:7 119:21
130:18

**literature**
133:11 136:3

**litigation**
12:5,6 14:18 25:15
34:14 80:20 83:21 84:9

**litigation-related**
15:12

**litigations**
14:1

**little**
10:10 17:23,24 18:5
19:24 34:12 56:21 67:9
70:2 119:13 124:7
133:16 134:4

**LLC**
12:19

**long**
8:8,11,14,19 71:11
139:18

**look**
7:3 17:13 25:8 28:17
36:19 38:7,22 39:7
41:10,22 43:10 46:17
47:4 48:15,17,18,21
53:6 58:18,22 59:6,8
62:2 63:24 66:10 75:12
78:18,19,24 79:8,20,21
80:17 86:6 87:10 88:3
89:19 94:6 98:1,13

101:21 103:7 105:10,17
110:5,7 119:8 122:11
123:25 124:4 134:19
135:4,21

**looked**
30:15,16,24 31:3,5,8,
12,19,24 37:15 48:23,
24 50:4,19 86:3 91:22
93:20 103:6 126:1
127:12,14 134:14

**looking**
12:1 13:11 31:1,5,18
32:5 37:22 47:22 48:25
56:17 57:1,17,19,20
58:15,23,25 59:1 60:19
61:23 70:7 73:3 77:3
84:18 92:13 105:7,8
109:4 110:22 119:14
122:19 137:8

**looks**
56:19 102:5

**loss**
16:20,22,24 43:1,2,9
71:16,17,18 78:9 79:19
80:25 81:1,2,10,11,12,
20 84:23 107:22
112:12,15,25 113:1,10,
14,17 114:3,5 117:3
120:9

**losses**
113:2,3,10

**lot**
10:1 12:6 42:16 70:6
76:2,3 78:22,25 87:24
106:19 110:6 113:6
117:18 138:6 139:5,6

**Lots**
5:7 26:18 27:18 30:12,
13 45:25 53:10,15
54:13 55:9 56:2 120:23
121:2 131:23 132:17
133:23,24,25 134:7,11,
12,13,14,21,24 135:9,
22,25 136:3,9 138:10

**love**
91:6

**low**
49:24 64:13

**lower**
48:10,11

Confidential
BJORN STEINHOLT - 07/21/2016                              i15

**Lucas**
5:25

**luncheon**
95:4

**M**

**magnitude**
47:18 127:20,23
128:18,23 129:14

**maintain**
101:23 121:14

**maintained**
102:1,20,23,25 103:13,
24 119:10 124:16 126:5

**maintaining**
121:19 122:13,22
124:14,21,24 125:12

**maintenance**
124:8

**major**
20:6

**majority**
10:23

**making**
60:12

**manner**
97:12

**March**
44:6,7,12 74:14 93:9
120:17,21 121:1 123:14

**Marek**
13:2

**mark**
7:8 102:12

**marked**
6:19,23 97:25 98:4

**market**
20:18 21:2,5,9,22 22:4,
9,22 23:6 26:17 27:9,
18,20,24 28:3,6,7 29:1,
5,9,17 30:1,8,14,22,25
31:13,16 32:18 33:19
38:9,13,25 39:10,16,25
40:11 42:1 43:14 53:14
59:6 60:5,7 61:5,8,9,15
62:14,19 63:19 71:20

76:17 102:10 107:14
108:14,20 109:14 110:8
126:13,17 128:12,21
129:19,25 130:2,11,13,
21 131:14,16,18,22
132:1,2,17,20 133:13,
14 136:16,18,20,21,25
137:9,25 138:11,13,21
139:5,13,19,24

**market already**
30:5

**market's**
29:12,15

**market-specific**
56:3

**markets**
12:18 13:8,15,18,19
60:13

**massive**
126:6

**master**
8:16 9:5,9

**material**
27:22,25 28:4,7 29:7,
10,19,20,23,25 30:4,7
31:16 32:2 39:18 59:23
60:6 61:11 76:19 77:8,
17,21 78:19,23 79:2,3
80:3 110:10 126:16
128:3 138:20

**materiality**
79:6

**materials**
15:3

**Matt**
5:17

**matter**
5:6 15:12 28:9 29:14
41:11 44:23 47:8 48:6
56:1 68:13 70:14 100:4
111:23 125:21 136:15,
23,24

**mattered**
136:18

**matters**
14:18 136:19

**MBA**
9:10

**Mckiernan**
11:23

**mean**
8:10 9:24 11:5,9 17:20
21:20,21 22:10,11
23:17 24:6,18 28:2,5,13
32:23 33:7 35:5,22,23
36:2 40:14 41:22 48:6
52:24 55:11 60:18
63:13 65:24 67:1 69:1
74:13 77:1 87:7 100:6
102:19 103:18,23 110:5
113:6 116:2 117:25
118:20 119:24 120:10
122:21 126:6 127:22
128:24 129:2,9,21,22
130:2,12 134:9 136:12

**meaning**
27:24 63:21

**means**
29:10 40:15 47:13,15
48:9 91:10 118:23
122:24,25 123:23 127:1
130:4 133:17

**measure**
40:9 42:9 48:4 83:10,15
98:16 102:18 110:2

**measuring**
99:2

**mechanism**
138:19

**media**
36:24

**mediate**
81:22 83:23

**mediation**
81:16 83:20

**mediations**
87:5

**meet**
87:25 102:18

**meets**
113:10

**members**
28:25

**members'**
97:19

**membership**
11:11

**mention**
134:7,10

**mentioned**
101:4 134:20

**mentioning**
134:17

**merge**
13:15

**met**
49:25

**method**
77:10,12,14

**methodologies**
41:6

**methodology**
26:22 27:13 33:10,14,
15 35:13,19 41:7 71:22
77:25 78:7 84:1 87:2,3
92:20,21 93:22 94:2,17,
20 95:14,25 100:24
118:7,16,17 120:11
123:17

**Michael**
5:17 45:5

**middle**
7:18 98:14 101:4
114:13,14

**Mike**
13:2,20

**million**
64:9 126:9

**mind**
14:24 16:8,15,16
137:19

**mine**
9:17

**minus**
39:25 40:5

**minutes**
88:18 98:9

**misleading**
44:1 68:24

**mispricing**
133:17,19

**misrepresentation**
38:8 41:23 71:24,25
89:17 102:9 103:24
104:4 105:8,19 106:5
114:18 119:23 122:20
125:16

**misrepresentations**
32:21 44:18,21,22 72:8
74:23,24 87:24,25
101:22 110:17 114:8
117:5 119:9,10,15,22
124:13

**misstatements**
114:17,22 115:3,5,10,
12,17,19 116:12,16

**Mitchell**
5:22 16:6 19:4 22:23
24:17 34:25 41:20
42:11 43:8,20 44:15
45:6 46:22 47:12 49:15
50:10 51:7 52:16 54:15
59:21 61:4 66:16 68:25
71:10 74:12 76:12
78:17 80:23 81:9 82:14
83:17 84:10 86:2,23
88:16 89:6 90:3,14
91:1,12 92:6 93:3,16
95:17 96:3,7,23 102:22
103:15 107:3,12 112:20
114:24 115:18 116:7,19
117:14 118:10 120:6
121:4,17 124:15 130:17
132:3,13,21 135:11
136:5 137:5 140:14,21,
25

**mix**
62:12

**model**
29:21 67:10 70:7 85:25
89:3 90:2 91:25 92:4,8,
12 94:13 96:22 129:23
130:1,5

**modeling**
9:3 130:11

**models**
9:1 80:14

**modified**
85:17

**modifying**
73:4

**money**
23:17

**Monica**
5:19

**monitor**
5:11

**month**
76:2

**months**
34:18

**Morel**
5:21

**Morgan**
96:8,11,15 97:2 98:2,
10,13 117:11

**Morgan's**
97:13

**morning**
5:4 6:14,15 60:3 89:18
100:13

**motion**
6:25 67:19 68:2,20
70:21 71:2 73:18 83:13
87:18 89:1,25 90:12
113:24

**mouth**
135:18

**move**
12:11,21 13:8 60:9

**moved**
12:8 13:3,24

**movement**
37:8,14 47:11 51:20
59:9 60:14,21,23 62:3,4
102:18 103:11 105:8
122:11

**movements**
59:25 61:2,13 64:2,24
65:2,5,11 107:11 128:5

**moves**
36:2

**moving**
13:11

**multiply**
25:9

**mutual**
133:12

_____

**N**

**name**
135:24

**narrow**
19:24

**national**
22:12,21

**nature**
16:17 88:23

**necessarily**
62:18 122:12,24

**need**
10:18,20 34:3,8,11,22
43:6 44:11 70:12 73:4
74:20 111:9 118:7
119:4,5

**negative**
39:21 40:8,20 42:8
47:5,23 51:24 52:19
55:15 56:18,24 57:3,17
58:25 59:10,16 120:22
121:12

**neglected**
137:10

**net**
53:13

**Netter**
95:17 96:3,7,23

**never**
81:25

**new**
22:21,24 23:5 27:22,25
28:4,6 29:7,10,23,24
30:4,7 31:7,16 32:2
36:11 39:18 40:16
59:22 60:6 61:10 102:9
119:17 122:25 126:16
128:3 137:14 138:3,20
139:14

**news**
62:18 132:17

**non-fraud-related**
110:7

**nonactionable**
68:13

**Norway**
8:9

**Norwegian**
8:15,19

**notion**
133:8

**notwithstanding**
60:11 83:7 120:25

**nuances**
88:25

**number**
5:5,9 31:21 40:21,22
45:13 47:5 55:15 63:9
64:11 77:15 87:15 95:6

**numbers**
17:7 47:4 50:4 56:10
58:12 106:16 107:1
111:25

**numerous**
32:8 85:15

_____

**O**

**O'brien**
5:20

**Object**
117:14 136:5

**objection**
16:6 22:23 24:17 34:25
41:20 42:11 43:8,20
44:15 46:22 47:12
49:15 50:10 51:7 52:16
54:15 59:21 61:4 66:16
68:25 71:10 74:12
76:12 78:17 80:23 81:9
82:14 83:17 84:10 86:2,
23 89:6 90:3,14 91:1,12
92:6 93:3,16 102:22
103:15 107:3,12 109:4
112:20 114:24 115:18
116:7,19 118:10 120:6
121:4,17 124:15 130:17
132:3,13,21 135:11

**objective**
85:4 100:9

**obligation**

Confidential
BJORN STEINHOLT - 07/21/2016                    i17

**69:25**

**observable**
126:18 128:4

**observed**
139:16

**obvious**
21:9

**obviously**
21:8 35:4 36:11 125:18

**occasions**
15:14 22:2,3,6,14
130:12

**occur**
64:8 65:6 124:20

**occurred**
40:15 44:4,6 65:3 86:7
101:18 103:9

**occurring**
48:14

**office**
11:24

**Oh**
127:20

**Ohio**
5:8

**Okay**
7:3,7,15,19 8:6,18,24
9:5,19 11:2,21 12:17,25
13:3,14,21,25 14:8,10
15:16,19,24 16:17 17:5,
15,17 18:12,14,25 20:8,
15,22 21:11 22:16
23:12,21,25 24:8,11,22
25:12 26:13 32:15
33:13 34:21 38:21
39:20 40:19 41:4,9
42:5,21 43:16 45:20
46:5,12,15 48:2,20
49:10 50:3,16 51:4,13
52:4 53:5,7,8,18,21
54:19 55:2,21 56:6
57:8,23 62:1,23 63:8
64:5,14 65:1,9,18 66:2,
7,20 67:4,8,13,25 73:17
75:20,24 76:5,23,25
77:5 80:19 81:4 83:5
84:4 85:13 87:14 89:13,
23 90:10,22 91:8,21
92:24 93:11 94:20,25

95:13 96:20 97:1,7,24
98:8,25 99:9,16 100:3
102:14 104:6,17,23
105:13,21 106:2,7
108:3,15,19 109:22
111:7,14 112:2,17
115:8,15 116:24 117:10
119:3 120:20 121:8,10
127:14 128:11,17 131:4
132:16 133:21 134:5,16
135:7 138:4,9

**Olts**
5:25

**omissions**
114:17

**Once**
98:15

**one-tailed**
52:1 56:14 57:4 58:10,
11 105:2,11 106:1
110:25

**one-year**
63:2

**ones**
20:21 28:23

**open**
27:19

**opened**
11:24

**operation**
13:17,24

**operator**
5:4,11 6:4 19:18,21
45:9,12 95:2,5 140:6,9,
17

**opine**
26:17 132:5

**opined**
100:22

**opinion**
16:8,9 17:9 21:2 22:8
27:9,13,17 29:5 32:10
68:20 70:22 71:3 72:13
87:22 92:24 93:1,14
94:12,19 114:3 131:25
132:4

**opinions**
20:18 27:4

**opportunities**
12:1,2 133:18

**opportunity**
134:4

**opposed**
124:25

**optimistic**
139:8,10

**oral**
15:25

**order**
10:21 11:7 31:12 34:5
43:5 44:9 63:20 74:21
75:2 77:25 78:7 84:1
88:3 89:8,9,11,13 90:4,
5,7,13 94:20 97:5 108:7
110:1 111:7 113:20
118:8 120:12 123:18
124:5 128:10

**outlines**
111:11

**outperform**
131:14,16,18 133:13,14

**outside**
25:20 38:12

**over-**
59:6

**overall**
20:25 77:24

**overlapping**
137:4

**overly**
129:13 139:8,9,10

**overpaid**
97:17

**overturned**
16:9,23

**overview**
26:7 27:3

**ownership**
31:5

_____

**P**

_____

**p.m.**
95:3,8 140:7,10,18

**page**
6:23 7:24 11:14 26:4,6
27:5,6 85:9,11 95:11
98:14 100:8 111:24
114:13,14

**pages**
54:23 55:6

**paid**
24:24

**paper**
99:6,25 100:1,3

**paragraph**
26:4,9 27:5,8,12,16
28:2 32:6 49:20 51:10,
11 85:8,13,18 95:11
97:14 98:25 114:14
124:6,7,19 126:12

**parking**
76:2,3

**part**
8:10 11:5 14:22 24:3
33:25 35:12,13 42:24
43:9 45:3 66:1 69:2
77:2 78:14,18 88:21
89:17,20 106:14 107:18
134:12,13

**partial**
101:12,13,14

**partially**
117:6

**participants**
30:25

**particular**
23:2,3 30:22 33:18,21
37:9,14 38:13,18,20
40:17 49:22 51:9 57:16
58:16,24 63:23,25
69:15 82:4 84:13,25
85:2 86:3,11 87:8,9,22
99:6 104:4 106:19
107:23 113:11 117:19,
22,24 118:15,18,24
122:4 129:20 130:19
133:6 137:13 139:11

**particularly**
12:2 13:12 80:9 118:25
131:5

**Paskin**
5:17 6:13,21 16:12

19:5,17,23 23:7 24:21
42:4,20 43:23 45:7,16
47:1 48:1 50:2,15 51:12
53:4 54:18 60:10 64:4
66:19 70:13 74:16
76:22 78:2 81:3 83:4
84:3 88:19 89:12 90:9,
21 91:7 92:11 93:24
94:25 95:9 98:7 103:2
104:5 107:5 108:2
113:22 115:1,22
116:10,23 118:3 119:2
120:13 121:7 123:7
124:17 131:3 132:8,15
133:20 135:14 136:7
137:6,23 140:4,11,22

**pattern**
117:11,23,25 118:14

**pay**
23:17 24:9 25:21

**peer**
39:12

**people**
11:3 80:9 133:15

**percent**
37:16,17 39:21 40:1,5,
21 42:8 46:21 47:15,16,
19,20 48:2,7,8,23,24
49:4,6,12,22 50:18,23
51:2,3,6,16 52:9,15,21
53:2,3,11,16,24 54:2,
13,25 55:4,9,25 57:12,
24 58:5,8,9,20,21
61:20,21 62:1 63:11
64:7,17 104:12 105:2,
23,25 110:22 136:11

**percentage**
19:10 37:6 41:3,11,15
100:13,17,24 101:2,6

**perform**
37:12 43:6 72:22 85:24
86:9 91:11 94:4,5
108:19 109:18 129:19

**performed**
20:15 30:11 32:4 33:18
36:7 43:2 46:6 49:17
69:1 78:9 81:1,11 83:14
84:20 85:1 91:5,10
94:15 106:6,9 107:20,
21 108:13,17,21,25
109:7,13 111:12 112:15

117:3 120:9 123:16
133:3,4,7

**performing**
87:19

**period**
17:13 26:18 27:19
30:13 31:25 35:11 36:5
40:24 41:17,24 42:10,
14 43:12,13,18 44:2,5,
11,25 63:2,5,17,22
69:13,17,18 70:3 72:19,
20,25 73:11,13 83:11,
16 86:19 88:15 97:17
100:18 101:7,19 109:9,
11,16 110:18,19 118:9
120:16 122:12,15
125:10 131:24 138:11

**permissive**
50:18

**personally**
25:18 138:17 139:3

**perspective**
139:18

**pessimistic**
139:9,10

**Ph.d.**
10:6,9

**physical**
7:8

**pick**
53:5 63:16

**picked**
60:24,25 65:9

**piece**
108:6 127:3 130:13

**Pierrick**
5:21

**pigeonholed**
84:19

**pink-sheets**
22:13

**place**
5:13 75:17 123:20

**plaintiff**
82:19

**Plaintiffs**

5:23 6:1,3 21:5 32:22,
25 34:16 35:17,22 39:1
43:12,25 44:4,13 50:17
65:21 66:21 67:6 68:4,8
69:3,10 70:20 73:10,17
81:18 82:3,5,8,16 87:23
88:13 98:18 102:16
103:8 104:8 111:21
114:21 115:2 120:16

**Plaintiffs'**
6:25 32:24 35:15 42:7,
12,18,22 81:17 82:17
83:22 112:22 113:25
117:7 120:25

**Plaintiffs's**
36:3

**play**
75:9

**please**
5:15 19:17 137:7

**plug**
111:25

**point**
19:2 31:14 35:8,10
36:4,8 40:24 42:10,13
49:18 63:13 66:14
67:17 70:4,11 71:1,4
78:4 80:20 86:16,20
90:17 92:17 94:10
106:25 109:11 110:19
111:4,6 115:14 120:1
121:6,18,20 122:1,2,9,
15,16,23 123:1,5 125:9,
10,13

**pointing**
111:15

**points**
44:10

**portion**
46:3 76:9,10 104:3
106:21

**portions**
73:23,24 74:10

**portrayed**
37:19

**portraying**
36:21

**positive**
47:5,23 52:19 53:15,19

55:14 56:17,23 57:1,17
58:19,23 59:10,16
105:10

**pot**
25:1

**Power**
117:17 118:12

**practical**
129:17

**pre-announcement**
59:4

**pre-releases**
46:3

**predecessor**
17:2,12 20:1

**predict**
129:19

**predicted**
39:13,15,24 58:12

**predictive**
129:24

**predominantly**
62:21

**preference**
80:15

**preliminary**
84:12

**premature**
75:17

**premise**
60:18

**prepared**
15:7 51:14 102:15

**present**
5:19 30:22 52:6,13
77:20,22 79:9 80:6,18
82:16

**presented**
96:1

**press**
78:21

**Preston**
13:2

**Pretty**
88:19

Confidential
BJORN STEINHOLT - 07/21/2016

i19

**prevail**
32:25 33:1

**prevent**
90:8 91:25

**preventing**
124:10 125:1

**previously**
60:18 116:15

**price**
28:8,11,16 29:1,13
30:7,9 31:18 32:1 37:6,
8,13,23 38:4,6,10,18,19
39:5,9 40:23 41:18
47:11 51:20 52:25
53:11 57:20,21 58:17,
25 59:9,16,18,25 60:8,
14,21,23 61:2,10,12
64:2,24 65:2,5,11,20
66:23 68:22 70:8,9
71:15 76:8 77:4,19,24
79:11 86:6,10 92:14
98:17,20,21 99:10,13,
15 101:11,12,23,24
102:2,6,7,11,13,17,21,
23,24 103:11,18,23
104:11,20 105:1,7,9,19,
22 106:10 107:10
110:13 114:4,6 119:11,
14,16 121:2,12,16
122:4,8,11,21 123:5,10,
13,20,21,22,23 124:4,7,
10,14,22,25 125:1,2,6,
7,12,16,18 126:3,5,7,
11,18,20 127:10,17
128:4,13,16 129:4,6,9,
10,24 130:2 131:6,18
132:1,17,23 133:9
136:10,16,23,25 137:2,
16,17,20 138:15,17,25
139:1,2,3,5,15,19,20,23

**prices**
27:21,24 29:6 32:18
61:22 132:20

**Princeton**
11:17,24 12:11,13

**principals**
12:24,25

**prior**
33:5 41:18 62:8 63:3
66:14 121:20 127:10
134:15,25

**private**
95:25

**probability**
48:12

**probably**
13:10 14:9 17:3,14,24
20:6,24 66:5 105:17

**problem**
14:4 94:24 126:25
130:6

**proceed**
68:16 73:15,23

**proceeds**
14:21

**process**
66:1,3 77:9

**processed**
139:13

**processes**
28:4

**proffered**
15:20 18:3

**program**
8:11 10:1,11,13,24 11:3

**projects**
13:19,20

**proper**
99:14

**proportion**
11:11

**propose**
97:21

**proposed**
30:12 44:5 120:15
131:23

**proposing**
129:16

**prove**
33:1 34:17 35:17,23
45:2 69:10 82:3,6,9,18,
24 86:17 88:13

**proven**
34:23 75:19 130:10

**provide**
17:2,19

**provided**
15:3,12 17:9 18:3,18
20:3 21:13

**provides**
85:25 96:8 97:4

**providing**
23:10

**public**
81:7 117:16 118:11

**publicly-traded**
32:19

**purchase**
98:18,21

**purchases**
97:19

**purely**
113:4,17

**purpose**
15:4 108:13,23 109:5
133:6

**purposes**
15:8 22:20 40:20 41:7
57:5,13 71:3 100:22
108:17,20,22,24 109:3,
7,12,13,18,21 128:11,
21,23

**put**
45:20,23 97:24 107:6
135:17

**putting**
6:22

**Q**

**quantification**
33:21 71:21 75:18
88:11 119:7 123:16
138:16

**quantifications**
33:24

**quantified**
33:10 41:8 78:8 83:15
85:5 92:9 93:17,21
99:18 107:21 120:8

**quantify**
33:11,15 43:5 71:22
72:15 75:2 76:14 78:8,

10 83:21 84:1 88:3
90:19 92:8,9 93:6 94:2
97:11,16 108:25 120:12
124:5 128:22 129:14

**quantifying**
75:16 77:11 84:5 92:15
93:22 108:18,23 109:3,
8,21,24

**quantity**
88:24

**quarter**
19:13 32:14 92:21

**question**
21:16 28:12 44:24
61:14 71:11 74:18
78:22 82:8 86:15 88:21
91:21 94:9 106:8
116:17 118:4 121:10
134:10 135:2,15,19
139:12

**questions**
140:12

**quickest**
28:23

**quickly**
27:21,24 28:7 32:1

**quite**
64:3

**quote**
95:16,20 96:2,3,8,18
97:15 98:15,25 114:15

**quotes**
95:23

**R**

**random**
47:11 62:3,4

**randomly**
40:11 47:16,17 48:14
64:8

**rate**
25:9

**rationale**
140:1

**raw**
125:5

Confidential
BJORN STEINHOLT - 07/21/2016
i20

**reach**
22:4 85:23 89:5 90:24
94:1 115:23 116:18

**reached**
90:16 139:23

**reaching**
88:16 116:5 128:11
131:22

**react**
61:10

**reacting**
61:23

**reaction**
61:16 127:2,4 130:13

**reactions**
61:23 129:19 132:17

**reacts**
61:17

**read**
10:14 66:3,5,14 67:22
94:21 116:3,20 140:15

**reading**
26:14 65:19 66:20
90:23 91:23 92:25

**ready**
45:6

**real**
126:9

**really**
13:10 14:6 22:10 48:14
109:3 128:9 130:2,9,25

**reason**
21:9 71:18 85:18
109:10 126:4

**reasonable**
83:1

**reasonably**
132:4,10,18

**reasoning**
107:10

**reasons**
21:23 52:11 57:13 60:1
90:20 133:1

**rebuttal**
94:21

**received**
9:5

**Recess**
45:11 95:4 140:8

**recollection**
117:20

**record**
19:16,18,21 45:9,13
95:2,5 140:6,10,17

**recoverable**
112:24

**reduce**
101:15

**reduced**
69:17

**refer**
96:6,7 133:10 134:22

**reference**
7:7 85:10 99:25 135:24

**referenced**
51:10 98:2,8

**referring**
14:6 32:12 134:6

**refers**
136:2

**refining**
83:9

**reflect**
27:21,25 99:15 129:4

**reflected**
28:16 46:8 107:1 108:5
139:15,20

**reflecting**
123:24

**reflection**
41:17 132:1

**reflects**
38:20 55:7 129:9,11
130:21

**regarding**
74:4

**regardless**
59:12,14 131:12

**regression**
37:11 106:14,15,20

108:11,17,19 109:2,23

**regular**
28:17,24,25 131:19

**reject**
82:11

**relate**
43:13 70:9 79:22,23
103:25 104:2 107:15
112:9 115:20 116:12,16

**related**
7:17 9:22 13:10 19:11
20:10,12,14,17 42:24
52:17 76:21 115:9
117:2 127:23

**relates**
10:16,17 22:11 46:2,4
47:21 48:25 49:16,19
56:12 76:9,10 90:15
102:25 106:4,11 107:14
128:18

**relating**
31:22 35:9

**relationship**
25:19,20 26:1 79:24

**release**
59:15 60:4,12,15 62:9,
10 65:24,25 66:23
78:21 109:10

**released**
45:25 59:8 126:2

**releases**
31:18,20,23 46:4,24
52:18 59:17,19,22
60:20 62:5,15,22,24
63:1,4,10,18,25 64:16,
19 65:15 66:10 67:2,3,4
109:15 126:2

**relevance**
43:16

**relevant**
131:6 134:14

**reliance**
131:1,2

**relied**
133:5

**rely**
82:24 96:14

**relying**
29:1

**remain**
88:1

**remaining**
38:19 62:25 120:15

**remember**
64:11 125:20

**repeat**
118:11 120:10

**repeating**
123:15

**replicate**
94:16

**report**
6:16,24 7:5,9,12,20,25
14:1,5,25 15:25 16:14
17:19 18:3,17,20,24
20:2,10 21:6,7,15,18,
20,21 23:8,16,23 26:3
29:24 30:2,19 32:5
35:20 36:20 38:22
45:18 48:22 49:11
51:15 52:7 55:4 57:14
64:5 67:21 85:9 86:25
95:11 97:14 98:3 99:20
103:7 111:14,17 118:7
120:14 122:6 124:6
126:12 129:2 139:12

**reported**
37:5 60:4 72:2 75:5,6,7
122:7 125:24

**reporter**
6:4,10 19:16 30:17
140:19,23

**reporting**
126:7

**reports**
14:9,10,12,15,16 15:6
17:21 19:8 21:25 29:22
30:3 31:2 36:25 88:6,7
121:22 137:16,17 140:1

**represent**
5:16 55:11,13 104:7

**representing**
50:17

**represents**
122:9 128:2

Confidential
BJORN STEINHOLT - 07/21/2016

i21

**require**
108:7

**required**
112:5,18

**requirement**
8:14 9:13 10:22 11:1

**requirements**
9:12

**Research**
5:21 11:17,25 12:12,14

**reserve**
140:15

**resigned**
12:13

**respect**
16:23 20:3 22:24 27:9,
13 29:12,15 34:22,24
35:1 36:15 37:10 44:12
46:6,8,16 52:23 54:6,20
72:17 73:20,23,24 74:5
75:10 77:12 87:17
88:25 92:18 94:13
95:20 108:3 109:15
111:20,21 113:25
114:1,4 115:5 127:23
131:1,19,23 133:12
134:3 136:8

**respond**
29:6 91:19 94:23

**responded**
27:21,25

**response**
127:18

**rest**
50:8

**restate**
103:3

**result**
30:6 48:13 59:12,24
60:20,22 61:1 63:21
74:9 100:16

**resulted**
21:14

**results**
49:5 95:21 96:21
109:20 126:5

**retain**
25:7

**retained**
17:1,11 18:4,19 22:19

**retirement**
13:11

**return**
38:19 39:11,13,14,15,
16,21,24 40:4,10,18,21
41:13 42:9,23 46:18,20
47:9 53:14,15,23 54:12
56:1,4 57:2,3,18 120:22
121:13

**returns**
28:19 29:3 55:8 58:1,12
59:19 64:16 134:4

**revealed**
71:7 94:9

**revelation**
117:20

**revelations**
114:19,23

**revenue**
24:4

**reversed**
113:16

**review**
94:15 107:24 116:1
140:16

**reviewed**
33:7 89:7 90:4 115:25

**reviewing**
137:24

**revising**
137:16

**rid**
35:4

**right**
9:7 11:14 12:9 13:5
25:18 27:10,14 35:21,
22 36:7 37:23 39:7,22
40:1,5,7 44:7 48:5
50:17,20 51:4 55:17,19
58:17 60:24 62:8 64:10
66:11 67:11,12 68:1,9,
13 73:25 75:22 76:6
78:15 82:9,13 95:15

96:4 98:11 103:4 105:4,
23 106:23 109:9
111:10,25 112:6,11,13,
14,21,23 114:2 117:16
118:4 120:5 121:3
124:11,23 127:6,8
128:8,14,23,24 130:16
137:2 138:5 139:18
140:15

**rigid**
36:9

**rigorous**
90:24 91:2,4,16,20

**Robbins**
5:13,22,25 6:2 17:1,11,
18 18:4,19 19:25 20:9,
23,24 21:12,19 22:1,7,
18 23:1,4 25:6,10,16,19
26:1,11

**rough**
19:10 32:3 107:17
140:19

**roughly**
17:8,15 19:9 20:22
136:13

**routinely**
129:19

**Rudman**
5:23

**run**
129:24

**running**
106:16 109:21

---

**S**

**sale**
98:22

**sales**
97:19

**sample**
62:7 63:12 65:9,12

**San**
5:1,14 9:6,21 11:24
12:1 13:17,23

**satisfied**
139:22

**satisfy**
8:14

**saw**
55:14

**saying**
24:13 34:5 51:4 65:1
66:2 75:3 85:18 93:20
99:9 120:7 134:5

**says**
6:23 8:3 26:7 40:9 76:1,
2 79:2 85:11 131:9

**scenario**
36:3 42:19 73:13

**school**
80:12

**schools**
9:15

**science**
8:23 9:2

**sciences**
80:10

**second**
7:24 9:12 10:5 11:14
14:14 27:17 66:25

**section**
8:3 26:6,9 85:10 95:13
107:23 126:13

**securities**
10:19 11:7 20:11,12,14,
17,19 21:3 22:5,8,11,13
32:8,11,19 33:5,12
60:13 74:24 79:7 80:12,
15,16 85:15,20 86:5
98:19 100:4

**security**
22:20 32:13

**see**
8:3 26:6 30:8,20 31:8,
16,20,25 37:2 39:10
41:24 49:4,5 63:4,14,25
87:4,11 89:10 90:7
94:22,24 95:18 96:12
98:14,23 100:7 101:22
103:6,9 107:1 110:11
114:25 117:15,23
118:14 124:6,9 129:25
135:5

**seen**

Confidential
BJORN STEINHOLT - 07/21/2016

i22

69:5 92:22

**select**
67:2,3

**selected**
62:23

**selection**
66:1,3

**selling**
129:12

**send**
25:10,11

**sense**
32:17 34:16 49:23
90:22 107:17 136:24

**sentence**
27:23 87:6 95:16 128:1

**separate**
76:8

**separated**
56:3

**series**
44:1 114:16,18,22
115:3,4,9,12,17,19
116:12,15 117:4

**services**
12:9,12,15 21:14

**set**
36:10 68:19 82:17
136:25

**setting**
15:13

**settled**
14:20

**settlement**
14:21

**settles**
129:10

**share**
30:2,3 60:5,6 72:3 88:7
121:23 122:6,7

**short**
140:4

**Shorthand**
6:10

**shouldn't**
63:18

**show**
64:16 106:21

**showed**
65:3

**shows**
50:8 121:11

**side**
7:8 79:2

**sides**
130:19

**significance**
37:8,13 48:4 49:14
52:9,14,20 57:12
102:19 128:7

**significant**
31:9,21 37:16 46:20
47:14 50:7,22 53:2,24
54:12,17 55:8 57:18,20,
21 58:1,5,7,9 59:9,18,
25 60:14,21,22 61:2,12
64:2,3,7,16 65:10
103:10 104:11,20
105:1,7,25 110:24,25
120:22 121:12 127:25
128:9,16

**significantly**
65:20 66:23 130:14

**similar**
8:16 32:9,11,16,17 33:5
85:20 97:12 99:9
108:11,12 118:5,15

**simple**
50:13 73:14 121:21
135:19

**simplifying**
122:19

**simply**
37:21 39:14 40:15
47:11 97:3 98:16 125:5
126:5 139:25

**sit**
81:21 82:2 134:22
135:7

**sitting**
45:18 136:1

**situation**
114:20 125:3 137:14

**situations**
15:1,2

**six**
45:21,22,23 46:6,16
53:22 55:3 57:10,25
60:19,24 62:23 63:7
64:6,15,18,22 65:13

**skills**
10:18

**slightly**
109:17

**smart**
133:15

**so-called**
99:10 101:19 137:10

**social**
80:10

**sold**
98:18

**somebody**
15:20 94:4

**soon**
88:19

**sophisticated**
28:22 31:4 138:4,6,22

**sort**
10:6 15:8,21 17:9 19:7
24:3 27:3 40:3 41:11
100:3 102:18 105:3
108:11 112:4 114:20
125:5 127:14 130:15

**sorts**
69:21 111:9 129:20
137:18

**Southern**
5:8

**speak**
25:3

**speaking**
17:15

**specific**
11:8 25:23 30:11 31:12,
24 33:19,23 49:16,20
53:15 56:2 85:22 89:8,

13 117:15 120:5 126:16
133:23 134:17

**specifically**
33:24 43:24 49:2,6
51:19 52:24 70:18 82:5
88:23 95:24 107:6
108:13 109:14 111:18
134:6,20,23 135:8
136:2

**specifics**
22:3 90:11

**spent**
24:1

**spot**
88:17

**staff**
23:22

**stage**
20:17 72:21 79:12
81:24 83:14 84:8 92:4

**standard**
16:21,22,24 113:11,15,
17 133:3

**Stark**
5:12

**start**
7:9 42:14 86:18,19 93:9
109:10

**started**
25:17 37:1 111:5

**starting**
11:16 12:23 27:16 35:8,
9 36:4 70:11 74:13
86:16 93:8 94:10 120:1
121:5,18 122:1,2,9,15,
16 123:4 125:9,10

**starts**
37:1 70:5 72:24 74:14
92:18 104:3 109:8
111:4,23

**state**
5:16 8:8,11,13 23:8
46:19 52:24 64:5 67:21

**stated**
52:12 57:14 74:4 83:19
90:20 115:24 116:11
133:2 139:12

Confidential
BJORN STEINHOLT - 07/21/2016                    i23

**statement**
75:3 88:3,5 102:17,20
103:9,13 104:9 107:8
124:21

**statements**
44:2 68:4,8,12,15,24
70:19 71:9 72:8 73:7,
21,24 74:4 80:22 84:6
87:16,18 88:24 89:1
102:1 104:18 112:5
114:1 116:24,25 120:17

**States**
5:7

**statistical**
37:8,13 40:9 46:5,7,10
47:8,10 48:4 49:13
52:8,14,20 57:12
102:19 106:14 120:20
123:11 128:7

**statistically**
31:21 37:16,17 46:20
47:14 50:7,22 53:1,24
54:12,16 55:8 57:18,19,
21 58:1,4,7,8 59:8,24
60:21,22 61:2,12 65:10
103:10 104:11,19
105:1,7,25 110:23,25
120:22 127:24 128:7,16
132:22

**statistics**
11:8

**stay**
130:20

**stayed**
11:19 12:17

**Steinholt**
5:6 6:8,14,23 45:14,17
95:7,10 97:25 137:6
140:11

**step**
106:9

**steps**
108:7 110:4,6

**sticking**
39:20

**stock**
22:21,24 23:5 26:18
27:18 28:8,11,16 29:1,
6,13 30:6,9,12,13,23

**submit**
14:22 21:20,21,25

**submitted**
6:16 14:1,16 15:3 17:21
18:2,17 19:8 20:2,9
21:6,7,18

**substance**
26:15

**sufficiently**
29:2

**suggest**
54:10

**suit**
74:25

**Suite**
5:13

**suits**
96:2

**summarize**
26:13

**summarizes**
27:8,12

**summary**
32:3 67:15

**summer**
5:20

**superficial**
125:14

**Supply**
117:17 118:12

**support**
13:13 23:21 25:21

**supreme**
38:1 130:23

**sure**
8:6 10:15 18:7 20:13
26:14 38:21 43:22 56:8
63:6 84:24 106:24
131:21 134:12 140:21

**surprised**
85:1

**swear**
6:5

**sworn**
6:9

**stocks**
23:4 133:13 134:3,18
135:5,22 137:8,10,11

**stone**
36:10

**Stop**
137:6

**straightforward**
130:24

**structure**
97:5,7,10

**studied**
116:24 134:1

**studies**
111:16 134:6,19 135:5,
21

**study**
33:13,18 34:1,6 35:19
36:9 37:18,21 38:5
39:18 47:7 48:5 50:5
51:14 85:11,14 92:12,
13 96:9,22,24 97:15
100:9,25 101:1 102:4,5,
14 103:5 112:1 129:21
134:23 135:8

**stuff**
133:22

**subjective**
129:14 133:1

**System**
117:17 118:12

_____

                 T

**t-stat**
48:3,20 50:8 52:9,14
53:18 55:22,23

**t-statistic**
40:8,14 46:18,19 47:4
50:4 105:24

**t-statistics**
37:7

**t-stats**
55:14 58:12,14

**tabs**
7:8

**tail**
58:18,19 105:10

**tailor**
34:22 67:10 82:4 111:7

**take**
7:3 28:18,20 29:18
35:15,18 36:19 40:20,
22 41:12 45:7 49:17
51:19 57:15 69:14
75:12 83:2,3 87:10 91:8
94:25 98:1 101:5,6
110:16 113:19 127:11
133:18 140:4

**taken**
94:1 110:12

**talk**
28:5 32:9 37:18,24
95:14 96:24 124:7

**talked**
22:7 54:20 60:2 100:12
113:13 119:13 132:24

**talking**
43:22 56:12 60:3 61:22
65:7,12 67:9 70:18
71:23 75:8 78:6 91:14,
15,16 93:18 94:24
116:9 117:16 122:18
124:9,24 125:5,6
126:13 128:19 137:6
139:5

**talks**

Confidential
BJORN STEINHOLT - 07/21/2016                                    i24

66:9 100:4 134:23

**tapering**
12:3

**target**
137:16

**team**
13:16 25:21

**tell**
18:1 22:10 72:2 82:25

**telling**
22:2

**ten**
18:9 48:8 51:3 54:25
58:8 75:7 88:17 122:6
125:20

**tend**
23:5 59:18

**tenth**
120:7

**terms**
24:18 28:14 41:6 86:25
87:19 89:16,19 91:4
96:21 102:24 132:23
134:17 135:18,23
137:21 138:14

**test**
47:15,23 50:23 51:21,
25 52:1,22 56:14,16
57:4,11 58:6,10,11
59:11 93:25 105:2,3,5,
6,11 106:1 110:23,25
126:19 127:4 128:1

**tested**
10:15

**testified**
6:10

**testimony**
14:2 15:12,20,24,25
16:4,14 17:19 18:3,18,
21 20:3 23:16

**testing**
57:1,2 61:7 130:6

**text**
52:7

**Thank**
54:19 140:11,13

**themself**
72:8

**theoretical**
131:7

**theory**
35:16 127:2

**there's**
31:6 35:3 42:16 62:22
63:14 70:6 71:17 75:24
77:10 78:21 116:15
138:2

**thereto**
7:5

**they're**
82:13

**they've**
24:1 35:18

**thing**
20:5 30:15 46:25 49:3
50:14 75:12 109:8
115:14 119:25 133:10

**things**
14:3 17:22 24:25 26:16,
25 31:10,11,12 35:7
36:12 48:9,18 56:19
70:6,22 73:16,18 82:17
83:23 119:18,19 130:7
134:2

**think**
13:18,22 15:17 16:7
18:10 20:20 34:21
51:10 52:24 54:9 58:4
82:18 87:21,22 88:18,
20 89:8 90:4,6 91:3,5,9
97:9 103:3 104:14,16
106:23 108:9 109:19
115:2,8 118:24 120:7
124:24 125:20,22,24
126:9 129:6 130:23

**thinks**
129:8

**thorough**
90:5,12

**thought**
21:22 61:1 66:25 76:4
87:9 138:15

**three**
31:11 129:6

**threshold**
48:20 49:23,24 50:1
52:10,15 57:11 88:1
128:6

**thresholds**
62:2

**THURSDAY**
5:2

**tie**
113:1,2

**time**
5:10 7:14 19:19,22 24:1
45:1,10,14 47:16 49:17
63:5 67:17 68:22 73:7
78:13 86:7,20 87:5
95:3,7 98:20,21 104:3
109:11 111:4,6 113:7
120:7 121:6,20 122:24
123:2 125:22 130:7
134:2 140:7,10,18

**times**
15:11 18:6,10 19:14
20:23,24,25 21:13
119:23 132:5 133:9

**today**
5:10,11 6:5 69:23 80:20
84:21 118:5,7 134:22
135:7 136:1 140:12

**tomorrow**
140:24

**total**
20:6 24:3 55:5,18 63:11

**totality**
17:4

**trade**
22:9 23:4,5

**traded**
22:12,20 26:18 27:18
99:8 137:8,22 138:10,
24

**trades**
133:25 137:12

**trading**
20:18 29:6 30:12,14
31:7,8,9 129:12 134:7,
11,23 135:9 138:7

**transcript**
140:16

**translate**
40:21 96:21

**translated**
101:1

**translating**
95:21

**trial**
15:13 16:1 32:25 34:17
75:19 82:6,18 84:17
85:16

**tribunal**
15:4 16:2,5

**tribunals**
14:17

**Trondheim**
8:9,12

**true**
7:21 36:1 42:18 61:6
70:24 73:7 82:15
125:18 132:14 137:3

**truth**
32:20 37:24 38:3,8,16
41:23 44:19,23,24
69:11 70:10 72:5,7,9,
10,11,18 74:19 79:22
86:18 88:8,9,10 89:20,
21 94:9 99:15 104:1,2
110:15,16,17 112:9
114:9,12 115:6,13
117:5,20 119:17,18
121:23 122:25 123:24
124:1

**try**
17:23 18:5 68:21 71:4,
12 107:7 124:18
129:14,19 130:8

**trying**
49:10 52:5 125:13
133:16

**turn**
7:11,24 26:3 67:11 85:8
95:10

**two**
9:11 12:24 18:1 26:16,
25 31:11,24 32:1,2
37:20 41:1 44:21 45:13
46:2,23 48:7 50:19 53:1
54:25 55:2 65:18 69:4,
6,12,15,17 70:8 72:15

Confidential
BJORN STEINHOLT - 07/21/2016

i25

77:15 79:24 111:22
114:6 116:11 127:9
128:14 130:7

**two-tailed**
47:15,23 50:23 51:21,
25 52:22 56:14,16 57:4,
11 58:6 59:11 105:5,6
110:23

**type**
10:1,2 22:13 33:10,11
34:2 35:14 54:11 74:21
78:1 91:4,9 97:9 119:1
134:3

**types**
35:12

**typical**
33:11 89:2

**typically**
11:9 22:11 23:4 28:5,17
48:16 81:23 110:8
130:20

**U**

**U.S.**
38:1 134:1

**Uh-huh**
56:11

**ultimately**
18:20 34:23 75:20

**unable**
88:13 94:12

**unaware**
61:16

**under-reacted**
59:6

**understand**
6:24 10:15 21:16,24
26:15 28:11 38:21,24
43:24 70:25 73:21
123:22 131:21 133:5

**understanding**
42:12 73:9 75:18
116:22

**understood**
14:13 15:1 18:14 25:4,
18 138:23

**undertake**
90:18

**undisputed**
128:2

**unexpected**
102:10

**unintelligible**
137:4

**unique**
87:8,21 89:11

**United**
5:7

**universe**
134:13,18,21 135:21,24

**universes**
135:6

**university**
8:8,11,12,13 9:6,21
10:4

**unusual**
31:21

**unwise**
82:19

**use**
10:2 25:5 33:11,20
34:1,2 35:20 36:6 47:3,
18,19 49:6,7,11 50:11,
12 51:1,2,3,5,9,15 53:2
56:16 57:3,10 59:11
84:1 86:4,5 87:4 92:22
97:11 99:5 110:24
113:15 123:18

**uses**
97:9 99:6 133:6

**usually**
34:1,2

**utilized**
97:8

**utilizing**
53:21 90:11

**V**

**Valuation**
12:9,12,15

**value**

47:6 48:11,12,13,14
55:23 77:19,20,22 79:9
80:6,18 97:4 98:11,15,
17 99:1,3,5,7,17,21,22,
24 100:1,7,11 110:1
111:18,20 112:1,18
123:24

**value-relevant**
132:2,19

**various**
7:9 14:10 44:10 73:3,18
81:6 110:4

**vast**
10:22

**venture**
11:17,24 12:7,11,13

**verified**
117:8

**versus**
5:6 61:13

**video**
5:4,11,12 6:4 19:18,21
45:9,12 95:2,5 140:6,9,
17

**videotape**
5:5

**videotaped**
45:14 95:6

**view**
22:18 39:5 78:13 92:25

**views**
139:7

**virtually**
64:1

**voice**
5:15

**voices**
137:4

**volume**
31:8,9 37:5

**W**

**wait**
70:15

**walks**

11:13

**want**
18:16 26:14 33:23
34:17,19 36:12 63:14
69:22 84:16 88:8
100:10 104:7 135:16
140:19,23

**wanted**
30:20 113:15

**wants**
113:11

**Washington**
117:16 118:11

**wasn't**
54:16

**way**
14:16 41:14 55:10 73:3
74:23 77:17 79:6,7
87:18 89:14 90:7 93:1,
14,25 97:13 100:15,19,
22 111:18 117:18
126:15 131:25

**ways**
41:1 67:9 73:3

**We'll**
10:5 140:14

**we're**
106:24

**we've**
45:6 76:1 103:6

**well-developed**
27:20

**went**
12:18 55:13

**weren't**
8:24

**West**
5:13

**what's**
6:22 23:19 24:19 32:15
67:14 72:6 97:24

**Willis**
5:6

**withdrawn**
26:5 34:4 36:18 59:13
85:7 123:10 136:9

Confidential
BJORN STEINHOLT - 07/21/2016                    i26

**witness**
  6:6 15:21 17:2 140:13

**won't**
  18:25

**words**
  9:14 40:16 44:18 61:21
  86:9 101:1,8 104:1
  117:10 125:1 135:17
  137:11 138:19

**work**
  11:14,21 13:13 16:18
  17:2 18:18 19:11 22:1
  23:9,15 24:5 25:6,22
  49:21 67:13,23 71:4
  83:9 97:14 108:8 111:9

**worked**
  11:16 19:25 25:8 32:14
  33:5 85:21 87:12

**working**
  17:22 20:9 21:12

**world**
  99:10,13 131:7

**wouldn't**
  44:23 58:17 60:8 61:11
  66:25 81:12 83:2,3
  84:14 122:11 128:24,25
  129:13

**write**
  14:21 27:17 98:15

**written**
  100:5

**wrong**
  56:5 130:5

_____

            Y
_____

**yeah**
  17:13 18:15 19:15 24:6
  28:13 29:9 36:6 53:9
  64:20 74:7 86:13,25
  101:21 106:13 111:11
  119:23 121:9 125:3
  127:22 136:12,23

**year**
  18:11 62:8

**years**
  12:18 18:1 22:14 32:7
  34:18 85:21 125:20

**York**
  22:21,24 23:5

**you'd**
  36:13

**you'll**
  78:21

**you're**
  18:18 23:8,10 24:13
  25:12 27:4 33:23 36:21
  38:14 43:22 45:5 56:5,
  25 57:2,19,20 63:23
  65:7,12 66:8 67:2 71:16
  77:3 91:13,14,15,16
  94:22,24 104:13 105:7,
  8 109:12 110:22 112:2
  113:20 116:4,5 126:13
  129:16 130:6,10 132:22
  134:6 136:1 137:1,8
  139:22

**you've**
  17:8 18:2 19:8,25 20:8,
  9,22 26:15 33:5 34:6,21
  35:19 46:7,16 54:6
  55:24 56:1 67:22 70:25
  71:4 77:5 93:14 94:1
  106:25