# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ALAN WILLIS, Individually and on Behalf of
All Others Similarly Situated,

                                        Plaintiff,

v.

BIG LOTS, Inc., et al.,

                                        Defendants.

Case No. 2:12-cv-00604-MHW-NMK

District Judge Michael H. Watson

Magistrate Judge Norah McCann King

## <u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND TO APPOINT CLASS REPRESENTATIVES AND CLASS COUNSEL</u>

William D. Kloss, Jr., Trial Attorney (0040854)
John J. Kulewicz (0008376)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box. 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .............................................................................................2

    A.    The Alleged Misstatements ............................................................................2

    B.    The Alleged Corrective Disclosures ..............................................................4

    C.    The Proposed Class Representatives................................................................5

        1.    The Proposed Representatives' Involvement in This Litigation................5

        2.    The Proposed Representatives' Investment Decisions.............................6

        3.    The Proposed Representatives' Purchases and Sales of Big Lots Stock.....8

ARGUMENT ...............................................................................................................9

I.     PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3).......................................................................................................9

    A.    Plaintiffs Have Failed To Articulate a Classwide Damages Methodology That Is Consistent With Their Theory of Liability, as Is Required Under *Comcast*.........10

    B.    Plaintiffs Are Not Entitled to a Classwide Presumption of Reliance. ..................15

        1.    Plaintiffs Have Failed To Demonstrate That the Market for Big Lots Stock Was Efficient During the Class Period....................................................15

        2.    Plaintiffs Cannot Invoke the *Affiliated Ute* Presumption of Reliance.......20

        3.    Defendants Have Rebutted Any Presumption of Reliance Because the Alleged Misstatements Had No Price Impact..........................................22

II.    PLAINTIFFS CANNOT ESTABLISH TYPICALITY BECAUSE THE PRESUMPTION OF RELIANCE HAS BEEN REBUTTED AS TO EACH PROPOSED CLASS REPRESENTATIVE.................................................................................................26

III.   PLAINTIFFS CANNOT ESTABLISH THE ADEQUACY REQUIREMENT OF RULE 23(A)(4). ...............................................................................................................30

    A.    The Representative Plaintiffs Do Not Control the Litigation and Are Inadequate Class Representatives.....................................................................................30

    B.    Teamsters Is Also Inadequate Because Scrutiny of Mr. Goldberg's Changing of His Deposition Testimony After Conferring With Counsel Will Detract from the Prosecution of the Litigation. ...........................................................................33

    C.    Pontiac Cannot Represent Purchasers That Bought Stock After April 23, 2012. .34

CONCLUSION............................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States,*
406 U.S. 128 (1972) ............................................................................ 1, 10, 20, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
133 S. Ct. 1184 (2013) ................................................................................. 16, 30

*Austin v. Loftsgaarden,*
675 F.2d 168 (8th Cir. 1982) ..............................................................................20

*Baffa v. Donaldson,*
222 F. 3d 52 (2d Cir. 2000) ................................................................................26

*Ballan v. Upjohn Co.,*
159 F.R.D. 473 (W.D. Mich. 1994) ....................................................................34

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ....................................................................................passim

*Bentley v. Honeywell Int'l, Inc.,*
223 F.R.D. 471 (S.D. Ohio 2004) .......................................................................26

*Berger v. Compaq Comput. Corp.,*
257 F.3d 475 (5th Cir. 2001) ........................................................................ 30, 31

*Binder v. Gillespie,*
184 F.3d 1059 (9th Cir. 1999) ............................................................................20

*Blank v. Jacobs,*
No. 03-CV-2111 (JS)(MLO), 2009 WL 3233037 (E.D.N.Y. Sept. 30, 2009) ................ 26, 27

*Cammer v. Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) .................................................................. 16, 17

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.,*
844 F. Supp. 2d 498 (S.D.N.Y. 2012) .................................................................32

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.,*
Civ. A. No. 12-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) .................................. 16, 23

*Clayton, Jr. v. Heartland Res., Inc.,*
No. 1:08CV-94-JHM, 2010 WL 4778787 (W.D. Ky. Nov. 16, 2010) ...................................20

*Clayton v. Heartland Res., Inc.*,
754 F. Supp. 2d 884 (W.D. Ky. 2010) ............................................................................20

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ..................................................................................passim

*Cox v. Collins*,
7 F.3d 394 (4th Cir. 1993) ..............................................................................20

*Dean v. China Argritech*,
No. CV 11-01331-RGK, 2012 WL 1835708 (C.D. Cal. May 3, 2012) ................................17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................................................................................34

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ......................................................................15

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ......................................................................16, 17

*GAMCO Investors, Inc. v. Vivendi, S.A.*,
927 F. Supp. 2d 88 (S.D.N.Y. 2013) ....................................................26, 27, 28, 29

*George v. China Auto. Sys., Inc.*,
No. 11 Civ. 7533(KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013) ................................17

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
134 S. Ct. 2398 (2014) ..................................................................................passim

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ..................................................................23, 24, 25, 26

*In re BP p.l.c. Sec. Litig.*,
No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...........................................13

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
No. C 03-2522 MHP, 2006 WL 1180267 (N.D. Cal. May 3, 2006) ......................................35

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
250 F.R.D. 137 (S.D.N.Y. 2008) ....................................................................21, 26

*In re Enron Corp. Sec.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ..............................................................30, 31

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ....................................................................17, 19

iv

*In re Harcourt Brace Jovanovich, Inc. Sec. Litig.*,
    838 F. Supp. 109 (S.D.N.Y. 1993) ...................................................................26

*In re Interbank Funding Corp. Sec. Litig.*,
    668 F. Supp. 2d 44 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010) ............................20

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) ............................................................... 31, 32

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    MDL No. 1658 (SRC), 2009 WL 331426 (D.N.J. Feb. 10, 2009) .......................................33

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ............................................................... 21, 24

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006)..............................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) ................................................................... 10, 11

*In re Vivendi Universal, S.A. Sec. Litig.*,
    123 F. Supp. 3d 424 (S.D.N.Y. 2015) ..............................................................27

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ....................................................................10

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*,
    616 F. Supp. 2d 461 (S.D.N.Y. 2009) ..............................................................32

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ................................................................... 20, 21

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000)...................................................................21

*Kline v. Wolf*,
    88 F.R.D. 696 (S.D.N.Y. 1981) ..................................................................34

*Loritz v. Exide Techs.*,
    No. 2:13-CV-02607-SVW-E, 2015 WL 6790247 (C.D. Cal. July 21, 2015) .......................15

*Molecular Tech. Corp. v. Valentine*,
    925 F.2d 910 (6th Cir. 1991) ....................................................................20

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ................................................................32

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns,*
    967 F. Supp. 2d 1143 (N.D. Ohio 2013) ............................................................ 17

*Rikos v. Procter & Gamble Co.,*
    799 F.3d 497 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493 (2016) .................................. 9, 10

*Rocco v. Nam Tai Elecs., Inc.,*
    245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................................ 34

*Shiring v. Tier Techs., Inc.,*
    244 F.R.D. 307 (E.D. Va. 2007) ................................................................... 30, 31

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ........................................................................................ 9

## Statutes & Rules

Fed. R. Civ. P. 23(a) ........................................................................................ passim

Fed. R. Civ. P. 23(b) ................................................................................... 1, 9

## Other Authorities

Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure*
    *Damages in Fraud on the Market Cases,* 37 UCLA Law Rev. 883 (1990) ........................... 14

## CITATION CONVENTIONS

<u>Deposition Transcripts</u>

"Benton Tr.":  30(b)(6) Deposition Transcript of Robert A. Benton on Behalf of Paradigm Capital Management, Inc. (Investment Advisor to Proposed Class Representative Teamsters Local 237 Additional Security Benefit Fund), dated July 20, 2016 (attached as Exhibit H to the Herman Declaration).

"Cain Tr.":  30(b)(6) Deposition Transcript of Randell A. Cain, Jr. on Behalf of Herndon Capital Management (Investment Advisor to Proposed Class Representative Teamsters Local 237 Additional Security Benefit Fund), dated July 22, 2016 (attached as Exhibit M to the Herman Declaration).

"Goldberg Tr.":  30(b)(6) Deposition Transcript of Mitchell R. Goldberg (for Proposed Class Representative Teamsters Local 237 Additional Security Benefit Fund), dated July 15, 2016 (attached as Exhibit G to the Herman Declaration).

"Moore Tr.":  30(b)(6) Deposition Transcript of Walter L. Moore (for Proposed Class Representative City of Pontiac General Employees' Retirement System), dated July 13, 2016 (attached as Exhibit D to the Herman Declaration).

"Mushock Tr.":  30(b)(6) Deposition Transcript of Ronald M. Mushock on Behalf of Systematic Financial Management, L.P. (Investment Advisor to Proposed Class Representative City of Pontiac General Employees' Retirement System), dated July 21, 2016 (attached as Exhibit I to the Herman Declaration).

"Sampson Tr.":  30(b)(6) Deposition Transcript of Janna L. Sampson on Behalf of OakBrook Investments, LLC (Investment Advisor to Proposed Class Representative City of Pontiac General Employees' Retirement System), dated July 14, 2016 (attached as Exhibit N to the Herman Declaration).

"Steinholt Tr.":  Deposition Transcript of Plaintiffs' Expert, Bjorn Steinholt, dated July 21, 2016 (attached as Exhibit O to the Herman Declaration).

<u>Parties</u>

"Big Lots" or the "Company":  Big Lots, Inc.

"Defendants":  Big Lots, Inc., Steven S. Fishman, Joe R. Cooper, Charles W. Haubiel II and Timothy A. Johnson.

"Plaintiffs":  City of Pontiac General Employees' Retirement System and Teamsters Local 237 Additional Security Benefit Fund.

Pleadings, Decisions & Court Submissions

"App. A":  Appendix A to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel.

"Compl." or "Complaint":  Amended Complaint for Violations of the Federal Securities Laws, dated April 4, 2013 (Dkt. No. 18).

"Ex. [ ]":  Exhibit to the Declaration of David A. Herman in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel.

"Gompers Rpt.":  Expert Report of Paul D. Gompers, dated July 28, 2016 (attached as Exhibit P to the Herman Declaration).

"Herman Decl.":  Declaration of David A. Herman in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel.

"Mot.":  Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel, dated May 27, 2016 (Dkt. No. 60).

"MTD Op.":  Opinion of the Honorable Michael H. Watson Regarding Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws, dated January 21, 2016 (Dkt. No. 49).

"Steinholt Rpt.":  Report of Plaintiffs' Expert, Bjorn I. Steinholt, dated May 27, 2016 (Dkt. No. 60-3).

## PRELIMINARY STATEMENT

Plaintiffs' motion for class certification should be denied because they have not met their burden of proving that this case and the proposed class representatives satisfy the requirements of Rules 23(a) and 23(b)(3).

*First*, Plaintiffs have failed to articulate a classwide damages methodology that is consistent with their theory of liability, as is required under the Supreme Court's decision in *Comcast v. Behrend*. Plaintiffs' expert merely opines that an "event study framework" ordinarily works to calculate damages in a securities case and states, with no supporting analysis, that he will be able to create a classwide damages methodology in the future. That does not meet Plaintiffs' burden. Rather, Plaintiffs must show that they can construct a classwide damages methodology tailored to *this* case that tracks Plaintiffs' theory of liability. Plaintiffs and their proffered expert have not done that, and their nonspecific and empty assurances do not withstand scrutiny under *Comcast*.

*Second*, Plaintiffs have failed to establish that the market for Big Lots stock was efficient during the putative class period. Their expert's analysis lacks scientific rigor and is insufficient to demonstrate that Big Lots' stock price quickly and fully reflected all material publicly available information during the proposed class period. Such a cause-and-effect relationship is the most important and direct test of market efficiency, and without it Plaintiffs cannot invoke the *Basic v. Levinson* "fraud on the market" presumption of reliance. Nor are Plaintiffs entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, because the gravamen of the Complaint is based on alleged misrepresentations, not omissions.

*Third*, even if Plaintiffs were able to demonstrate market efficiency—and they have not—Defendants have rebutted the fraud on the market presumption of reliance under the Supreme Court's 2014 holding in *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),

1

by showing that the alleged misstatements at issue did not have a statistically significant impact on the price of Big Lots' stock.

   *Fourth*, Plaintiffs cannot satisfy the typicality requirement of Rule 23(a) because each of the proposed class representatives is subject to an individualized reliance defense. ████

████████████████████████████████████████████████████████████

████████████████████████ ██ ████████████████████████

████████████████ Thus, any presumption of reliance is rebutted as to the proposed plaintiff representatives, making their claims atypical.

   *Fifth*, Plaintiffs are not adequate class representatives because they are not in control of the litigation and have demonstrated almost no understanding of the case.

## STATEMENT OF FACTS

   Plaintiffs allege that the Defendants made misrepresentations regarding Big Lots' performance and prospects from February 2, 2012 through August 23, 2012.  According to Plaintiffs, those misrepresentations artificially inflated the price of Big Lots stock.  (Compl. ¶ 172.)  Plaintiffs allege that the stock price fell when the "truth" ultimately came out, causing Plaintiffs to suffer a loss.  (*Id.* ¶ 2.)

### A.  The Alleged Misstatements

   On February 2, 2012, Big Lots issued a press release reporting its preliminary financial results for the fourth quarter of fiscal year 2011.  (*Id.* ¶ 61.)  Big Lots reported that its U.S. sales were 7.7% higher than in the fourth quarter of 2010 and that "comparable store sales" had increased 3.4%, exceeding the Company's guidance.  (Ex. A.)  Plaintiffs allege that the "February 2, 2012 statements regarding the Company's 4Q11 financial results were each materially false and misleading when made," (Compl. ¶ 62), and that the statements "had a direct effect on Big Lots' stock price driving it up to $42.82 per share, a one-day increase of nearly

8%." (*Id.* ¶ 63.)  However, this Court granted Defendants' motion to dismiss as to the alleged misstatements on February 2 (*see* MTD Op. at 31), which forced Plaintiffs to shorten the proposed class period, moving the start date to March 2, 2012.  (*See* Mot. at 1.)

On March 2, 2012, Big Lots issued a press release detailing its financial results for the fourth quarter of fiscal year 2011 and for the fiscal year 2011 as a whole.  (*See* Ex. B.) The press release also projected that FY 2012 earnings per share ("EPS") would "be in the range of $3.40 to $3.50" and same store sales would increase "2% to 3%."  (*Id.*)  Once again, Plaintiffs allege that the March 2, 2012 "statements regarding the Company' [sic] sales performance and EPS numbers for 1Q12 and FY 2012 were each materially false and misleading when made," and that "Defendants' false and misleading statements artificially inflated the price of Big Lots stock."  (Compl. ¶¶ 77, 81.)

This Court, however, dismissed all claims concerning the March 2 press release. With respect to the statements concerning FY 2011, the Court held that "[a]s with the February 2nd statements, there are no allegations in the Amended Complaint that Big Lots did not actually achieve the results reported for 2011."  (MTD Op. at 31-32.)  With respect to the statements concerning the Company's projected FY 2012 performance, the Court ruled they were forward-looking and thus "protected under the PSLRA's safe harbor."  (*Id.* at 34.)

Later on March 2, 2012, Big Lots held an investor conference call.  (*See* Ex. C.) Plaintiffs allege that Big Lots made false statements during that call (Compl. ¶¶ 69-74, 77) and that each of those statements "artificially inflated the price of Big Lots stock."  (*Id.* ¶ 81.)  This Court ruled, however, that over half of the alleged misstatements on the conference call are not actionable.  (MTD Op. at 34-43.)  In addition, despite plaintiffs' claim of price inflation,

plaintiffs' expert found that the price of Big Lots stock experienced a statistically significant *decrease* on March 2, 2012. (*See* Steinholt Rpt. Ex. E.)

Plaintiffs allege that, on eight additional dates from March 7 to June 6, 2012, Big Lots made material false statements that resulted in its stock trading at inflated prices throughout the class period. This Court ruled, however, that many of those statements are not actionable because Plaintiffs had failed to allege that they were false, because they were protected by the PSLRA safe harbor, or because they were immaterial, non-specific puffery. A list of the alleged misstatements that this Court permitted to survive Defendants' motion to dismiss is attached hereto as Appendix A. (*See generally* MTD Op. at 34-64.)

As discussed further below, despite Plaintiffs' claim of "price inflation," the economic analysis presented by their own expert demonstrates that on *none* of the alleged misstatement dates was there a statistically significant increase in the price of Big Lots stock that can be separated from overall market and industry effects. (*See* Steinholt Rpt. Ex. E.)

## B. The Alleged Corrective Disclosures

Plaintiffs allege that the Company made "corrective disclosures" of the alleged misstatements on two dates: April 23, 2012 and August 23, 2012. (Compl. ¶¶ 102, 128.) On April 23, the Company issued a press release revising downward its projection of comparable store sales for the first quarter of FY 2012 based on sales trends that had weakened through the month of April. (*Id.* ¶ 102.) On August 23, the Company disclosed that comparable store sales had decreased for the second quarter of FY 2012 and that the Company was revising downward its 2012 full year guidance. (*Id.* ¶¶ 128, 179.)

C.      The Proposed Class Representatives

Two parties have sought to be designated as class representatives: City of Pontiac General Employees' Retirement System ("Pontiac") and Teamsters Local 237 Additional Security Benefit Fund ("Teamsters").

1.      The Proposed Representatives' Involvement in This Litigation

Pontiac became involved in this litigation in 2012 after Robbins Geller brought the case to the attention of Pontiac's local attorneys. (Moore Tr. 73:7-11.) At his deposition, the chairman of Pontiac's Board of Trustees, Walter Moore, could not identify any steps Pontiac took to determine whether the allegations in the Complaint were true. (*Id.* at 94:14-22, 102:21-103:7.) Nor could he point to anything Pontiac relied on for its understanding of Big Lots' alleged misconduct other than the information provided by counsel. (*Id.*)

████████████████████████████████████████████████████

████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  ████████████

Indeed, Teamsters, ████████████████████████████████████

████████████████ was not asked to become involved in this case until over three years after Pontiac. (Goldberg Tr. 33:2-5.) The Director of Teamsters, Mitchell Goldberg, testified that he did not know how Teamsters became aware of the litigation (*id.* at 72:8-15), but he admitted that Teamsters had not reviewed any documents, spoken to counsel, or conducted any investigation about the allegations in the Complaint prior to May 27, 2016, the date on which Plaintiffs filed their motion for class certification, wherein Teamsters was identified as a proposed class

representative.[1] (*Id.* at 161:9-162:25.) In addition, Mr. Goldberg admitted that Teamsters' basis for asserting that Big Lots committed fraud is derived simply from reading the Complaint and that Teamsters has not attempted to verify any of its allegations. (*Id.* at 88:2-14.) Mr. Goldberg testified that Robbins Geller is in charge of making decisions about the case. (*Id.* at 83:12-22.)

### 2.    The Proposed Representatives' Investment Decisions

Neither Pontiac nor Teamsters made any of its own investment decisions regarding Big Lots stock during the putative class period. (Moore Tr. 148:11-149:17, 159:8-19; Goldberg Tr. 112:3-5, 113:2-14.) Rather, Plaintiffs delegated those decisions to professional investment advisors. (Moore Tr. 159:8-19; Goldberg Tr. 118:8-11.) In turn, each of the advisors employed investment methodologies premised on exploiting inefficiencies in the way the market translated publicly-available information into stock prices. (*See, e.g.*, Benton Tr. 37:3-38:5 (discussing strategy of "Exploiting Market Inefficiency Through Fundamental Research").)

Three of the advisors developed their own proprietary methods to identify stocks that they believed were underpriced by the market in relation to what the advisor itself believed was their intrinsic value.

- Pontiac advisor Systematic Financial Management ("Systematic") used a quantitative model, together with qualitative research into a company's "fundamentals," to develop "its own view as to the value of a security." (Mushock Tr. 102:20-103:4.) In determining whether to invest in a security, Systematic would "look at the market price of a security relative to financial metrics" that Systematic analyzed in order "to determine whether a security was undervalued" by the market. (*Id.* at 106:24-107:9.) Systematic believed that "[i]nvestors routinely under-react to changes in company fundamentals" (Ex. J) and tried to "exploit" those under-reactions "through the application of [Systematic's] process" (Mushock Tr. 110:14-113:4. In light of Systematic's practice to form its own view of the value of a security, Systematic's

---

[1] As discussed in Part III.B., *infra*, after conferring with Robbins Geller on a break during the deposition, Mr. Goldberg recanted this testimony in response to leading questions by his own counsel.

representative agreed that "a reduction in the market price of a stock would make a stock more attractively valued to Systematic." (*Id.* at 129:24-130:7.)

- Teamsters advisor Paradigm Capital Management, Inc. ("Paradigm") believed that the "stock market is inefficient" and sought to invest in "companies selling at substantial discounts to [Paradigm's own] assessment of [the] intrinsic value" of those companies. (Ex. K at 8; *see also* Benton Tr. 37:13-38:24, 43:21-44:18.) Paradigm sought to invest where, "based upon Paradigm's fundamental research," "Paradigm believed the market had not appropriately valued a company's stock." (*Id.* at 42:25-43:6.)

- Teamsters' other advisor, Herndon Capital Management, LLC ("Herndon"), ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████ █████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████ █ █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

█████████████████ (Benton Tr. 66:20-67:3; Mushock Tr. 143:19-24; ██████████████████████████

████████████████████████████████████████████

████████████████████████████████ ██ ██████████████

████████████████████████████████████████

Pontiac's other investment advisor, OakBrook Investments, LLC ("OakBrook"),

employed a different approach that also was premised on the view that the market was not

efficient at translating information into stock prices. (Sampson Tr. 24:7-15.) ██████████████

████████████████████████████████████████████

█████████████████████████████████ █ ████████████████

### 3. The Proposed Representatives' Purchases and Sales of Big Lots Stock

Pontiac acquired Big Lots stock on various dates in March 2012 and then again on June 25, 2012. (Certif. of Named Pl., Sched. A (Dkt. No. 60-2).) Pontiac sold Big Lots stock on April 24 and May 15, 2012, and liquidated its entire position on August 16, 2012.[2] (*Id.*) Thus, as of the end of the class period and at the time of the second alleged corrective disclosure on August 23, 2012, Pontiac did not own any shares of Big Lots stock. Because it cannot have suffered a loss from the August 23 price decline, Pontiac can only seek to be a class representative for the period up to the first alleged corrective disclosure on April 23, 2012.

Teamsters acquired Big Lots stock on March 20, June 7 and August 17, 2012.[3] (Goldberg Decl. (Dkt. No. 60-6) at 7.) Teamsters sold less than a quarter of its holdings on August 23, 2012. (*Id.*) Through Herndon, Teamsters also purchased 1,787 shares on August 27, four days after the August 23 "corrective" disclosure, because Herndon believed that "the market

---

[2] Systematic purchased Big Lots stock for Pontiac on March 2, 2012; March 12, 2012; March 13, 2012; March 14, 2012; March 16, 2012; March 19, 2012; March 27, 2012; and March 29, 2012, and sold Big Lots stock on behalf of Pontiac on April 24, 2012. During the putative class period, OakBrook purchased Big Lots stock for Pontiac on June 25, 2012 and sold Big Lots stock on behalf of Pontiac on May 15, 2012 and August 16, 2012.

[3] Paradigm purchased Big Lots stock on Teamsters' behalf on March 20, 2012 and August 17, 2012, and sold Big Lots stock on August 23, 2012. Herndon bought Big Lots stock for Teamsters on June 7, 2012.

had overreacted to the August 23rd disclosure" and that "the market price decline [on that date] combined with Herndon's assessment of the fundamentals of the company made Big Lots' stock a more attractive investment opportunity at that point in time."  (Cain Tr. 131:7-20; 133:2-9.)

## ARGUMENT

Class actions are not certified as a matter of course.  Rather, to maintain a class action, a party "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Under Rule 23(a), the plaintiff must meet four "prerequisites":  (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation.  Fed. R. Civ. P. 23(a).  Under Rule 23(b), the proposed class must fit within one of three specified class types.  Plaintiffs here seek certification under Rule 23(b)(3), which requires they establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" (*i.e.*, "predominance"); and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (*i.e.*, "superiority").  Fed. R. Civ. P. 23(b)(3).

Courts must conduct a "rigorous analysis" to assess whether the requirements of Rule 23 are met, which necessarily "will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) (noting the "rigorous analysis" required), *cert. denied*, 136 S. Ct. 1493 (2016).

## I.    PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3).

Plaintiffs fail to satisfy the predominance requirement of Rule 23(b)(3) for two

independent reasons.

*First*, Plaintiffs' expert, Mr. Steinholt, has failed to put forward a methodology for calculating damages on a classwide basis in a manner that is consistent with Plaintiffs' theory of liability and this Court's earlier ruling on Defendants' motion to dismiss.  That failure is fatal under *Comcast*.  *See infra* Part I.A.

*Second*, Plaintiffs cannot show that the "reliance" element of their cause of action is susceptible to classwide proof.  Plaintiffs are not entitled to the "fraud on the market" presumption of reliance under *Basic v. Levinson* because they have not established that the market for Big Lots stock was efficient throughout the class period.  *See infra* Part I.B.1.  In addition, Plaintiffs are not entitled to the *Affiliated Ute* presumption of reliance because their case primarily alleges affirmative misstatements rather than omissions.  *See infra* Part I.B.2. Finally, even if plaintiffs could establish an entitlement to a presumption of reliance, defendants have rebutted that presumption in accordance with *Halliburton II*.  *See infra* Part I.B.3.

A.  **Plaintiffs Have Failed To Articulate a Classwide Damages Methodology That Is Consistent With Their Theory of Liability, as Is Required Under *Comcast*.**

In *Comcast*, the Supreme Court held that to satisfy the predominance requirement plaintiffs must articulate a methodology for calculating classwide damages that is consistent with their theory of liability.  133 S. Ct. at 1433; *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013).  District Courts must conduct a "rigorous analysis" of that methodology.  *Comcast*, 133 S. Ct. at 1433; *see also Rikos*, 799 F.3d at 523-24.  In the wake of *Comcast*, "[i]t is now indisputably the role of the district court to scrutinize the evidence" on plaintiffs' proposed damages methodology "before granting certification, even when doing so 'requires inquiry into the merits of the claim.'"  *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013).  "If

10

the damages model cannot withstand this scrutiny then, that is not just a merits issue.  [Plaintiffs' expert's] models are essential to the plaintiffs' claim they can offer common evidence of classwide injury.  No damages model, no predominance, no class certification."  *Id*. (internal citation omitted).

Plaintiffs have not even attempted to satisfy that burden.   Mr. Steinholt's report offers nothing more than generalizations about how damages ordinarily may be calculated in securities cases, with no explanation of how he would apply such a methodology in *this* case, as is required under *Comcast*.  He merely asserts that "an event study damages framework based on analyzing Big Lots' market prices can be used to calculate class-wide damages consistent with Plaintiff's theory of liability." (*See* Steinholt Rpt. ¶¶ 55-56.)  But when asked what analysis he had done to create a damages model that takes into account Plaintiffs' "allegations as they are set forth in the complaint and limited by the court's opinion on the motion to dismiss," Mr. Steinholt admitted:  "I have not performed a damage analysis as part of this engagement."  (Steinholt Tr. 68:18-69:2.)  When questioned concerning what case-specific economic analysis he performed to tie his proposed methodology to Plaintiffs' theory of liability, Mr. Steinholt was not able to identify anything other than to state that he reviewed the Complaint and this Court's motion to dismiss opinion (but conceded that he did no economic analysis to explain how a damages model would account for the detailed allegations in this case).  (*Id.* at 88:20-90:20; *see also id.* at 87:14-88:1.)  And although he admitted that his "job as an economist [is] to analyze and account for any confounding factors," to "quantify" the price impact of those factors, and to "exclude" that impact from any measure of damages, Mr. Steinholt admitted that he "did not undertake any additional analysis" to make such adjustments—not even to consider the potential

price impact of the statements that this Court held are protected under the PSLRA's safe harbor provision or otherwise are not actionable. (*Id.* at 75:20-78:11, 90:10-20.)

That is woefully inadequate under *Comcast*. Plaintiffs must show that they can construct a damages model tailored to *this* case and use it to calculate alleged price inflation in *this* case in a manner that is consistent with their theory of liability. Instead, Mr. Steinholt simply assumes that any decline in the stock price following the April 23 and August 23 "corrective" disclosures will be fully recoverable as damages for all class members who bought stock prior to those dates. That assumption is plainly inappropriate here, where Plaintiffs allege numerous false statements throughout the class period; Mr. Steinholt's "analysis" provides that none of those statements makes the slightest bit of difference in measuring the degree to which the stock price was inflated by fraud (and thus how damages would be quantified) at different times throughout the class period. What is more, Mr. Steinholt's approach renders virtually meaningless the meticulous and well-reasoned analysis performed by this Court in deciding Defendants' motion to dismiss (save for the fact that the Court's decision forced Plaintiffs to change the start date of the proposed class period from February 2 to March 2). While the Court dismissed significant portions of Plaintiffs' claims relating to allegedly false statements made on ten different dates from March 2 through June 6, 2012, Mr. Steinholt's analysis presented to date provides that those extensive rulings by the Court are to be ignored for the purpose of measuring damages.

Perhaps even more remarkably, Mr. Steinholt confirmed that he could have done such an analysis, indeed that experts routinely do so in the early stages of securities litigation "for mediation." (*Id.* at 81:4-22.) But he has attempted no such work in this case, because Plaintiffs' counsel has not "asked" him to perform a damages analysis. (*Id.* at 83:7-25.)

As one court recently explained in denying class certification, "[s]imply invoking the event study methodology", as Mr. Steinholt has here, "does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified." *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). Rather, "[w]ithout a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment." *Id.*

As Professor Gompers explains, while Mr. Steinholt asserts that he could have performed a more sophisticated damages analysis had he been asked to do so (Steinholt Tr. 83:7-25), there are significant obstacles to employing an "event study framework" for classwide damages here, which Mr. Steinholt does not even begin to address.

*First*, Mr. Steinholt has not shown that it is appropriate to use a "constant inflation" model—where it is assumed that the negative residual returns on the corrective disclosure dates represent a fixed level of prior inflation (whether in dollar or percentage terms) on each day of the class period. (Gompers Rpt. ¶ 35.) As Professor Gompers explains, such a model can be appropriate only in cases where Plaintiffs allege that Defendants should have disclosed all of the information contained in the corrective disclosures on the first day of the class period. (*Id.* ¶ 37.) Here, Plaintiffs allege multiple misstatements, made on different dates throughout the class period and interlaced with protected forward looking statements and other confounding information, which means that a constant inflation model cannot be used to adequately calculate damages. (*Id.* ¶ 44.) Indeed, the scholarly article that Mr. Steinholt relies

13

upon, which he claims "provides a structure" that "every expert uses" to calculate damages, makes clear that a case such as this one presents a difficult problem for calculating damages. (Steinholt Tr. 96:14-97:12; *see* Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA Law Rev. 883, 892 (1990) (damages "analysis is further complicated if there is a series of exaggerations, misstatements, and omissions, rather than one isolated misrepresentation followed by a series of revelations").) Yet, Mr. Steinholt makes no attempt to disentangle those issues and admitted at his deposition that his proposed methodology is designed to calculate damages in cases where "there are no fraud-related events," including "alleged fraudulent disclosures," during the course of the class period.  (Steinholt Tr. 100:18-101:24.)  Further, such a model cannot remove the impact of confounding information and protected statements or apportion inflation among the various alleged misstatements.  (Gompers Rpt. ¶¶ 49-52.)

   *Second*, Mr. Steinholt has failed to propose any other, more appropriate methodology.  (*Id.* ¶ 60.)  To do so, Mr. Steinholt would need to explain, *inter alia*, how his model will be constructed, how it will establish a "but for" baseline to compare to the real world stock price, how it will calculate a "value line" tailored to this specific case, how it will track the specific alleged misstatements that comprise Plaintiffs' theory of liability, how it will account for those statements that already were dismissed by this Court, and how it later can be adjusted to reflect this Court's or a jury's determinations regarding the various alleged misstatements. (*Id*. ¶¶ 53-60.)  Mr. Steinholt has failed to suggest even how those issues might be addressed in general, let alone how he would apply any proposed methodology to this specific case.  His only response, the nonspecific invocation of an "event study framework," provides no information about what methodologies would actually be employed to conduct such an event study approach,

or how he would perform the necessary calculation of the amount by which Big Lots' stock was allegedly inflated during the various parts of the class period.

As courts have held, vague assurances that it is possible to calculate damages on a classwide basis are insufficient, especially where (as here) a plaintiff's allegations suggest that such calculations would be complex if not impossible. *See Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [Plaintiff's expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."). In *Loritz v. Exide Technologies*, the court similarly addressed "multiple alleged misrepresentations unfolding simultaneously—some of which may have been materially misleading and some of which may not have been" and "multiple alleged corrective disclosures issued at different times within the class period." No. 2:13-CV-02607-SVW-E, 2015 WL 6790247, at *24 (C.D. Cal. July 21, 2015). The plaintiffs' burden, the court ruled, included addressing how the complexities introduced by those allegations would be taken into account by plaintiffs' damages model, and determined that the plaintiffs' expert had not met that burden merely by "recounting various techniques that may generally be used to account for these considerations." *Id.* Rather, in order to "present a classwide damages model tied to their theory of liability," plaintiffs must explain how they would "tie [their proposed] techniques together into one model." *Id.* Accordingly, the *Exide* plaintiffs "fail[ed] to show that damages 'could feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Id.*

### B.    Plaintiffs Are Not Entitled to a Classwide Presumption of Reliance.

#### 1.    Plaintiffs Have Failed To Demonstrate That the Market for Big Lots Stock Was Efficient During the Class Period.

Traditionally, a plaintiff alleging fraud must demonstrate that he or she engaged

in a transaction based on actual awareness of a specific false or misleading representation made by the defendant. *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013). However, such "direct proof" of reliance is often "rendered difficult," and it is particularly ill-suited to classwide proof. *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988).

Thus, in *Basic*, the Supreme Court held that a class action plaintiff may invoke a rebuttable "presumption" of reliance based on the "fraud on the market" theory, which holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246-47. To invoke the presumption, however, a plaintiff must establish that the market for the relevant stock was *efficient* throughout the class period. *See Halliburton II*, 134 S. Ct. at 2408; *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990) ("The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets."). "Because market efficiency is so crucial to the invocation of the *Basic* presumption . . . a district court should conduct a rigorous market efficiency analysis." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, Civ. A. No. 12-5275, 2015 WL 5097883, at *5 (D.N.J. Aug. 31, 2015).

To determine whether a security is traded in an efficient market, the Sixth Circuit considers five factors first articulated by the District of New Jersey in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). *See Freeman*, 915 F.2d at 199. The first four factors concern general characteristics of the Company and its stock: "(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; [and] (4) the eligibility of the company to file an S-3 Registration Statement." *Id.* Those "indirect" factors have been

considered insufficient to establish market efficiency. *See, e.g.*, *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278 (D. Mass. 2006); *Dean v. China Argritech*, No. CV 11-01331-RGK (PJWx), 2012 WL 1835708, at *6-7 (C.D. Cal. May 3, 2012). As Professor Gompers explains, while the first four factors may show the prerequisites for efficiency, they do not prove that a stock *in fact* traded efficiently. (Gompers Rpt. ¶ 62.)

The fifth *Cammer* factor, by contrast, consists of direct evidence of market efficiency—whether there is "a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *Freeman*, 915 F.2d at 199 (citing *Cammer*, 711 F. Supp. at 1286-87). This factor has been viewed by courts as the most important and the most reliable economic evidence of market efficiency. *See Cammer*, 711 F. Supp. at 1287 (cause-and-effect relationship "is the essence of an efficient market and the foundation for the fraud on the market theory"); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1154 (N.D. Ohio 2013) ("[T]he most important *Cammer* factor is the cause-and-effect relationship between new, unexpected information and [stock] prices."). Showing a cause-and-effect relationship "is the critical factor—the *sine qua non* of efficiency." *Freddie Mac*, 281 F.R.D. at 182 (noting that even if the "less important *Cammer* and *Krogman* factors support an inference of efficiency, these factors cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price"). In *George v. China Automotive Systems, Inc.*, for example, the lack of adequate direct evidence of an efficient market meant that plaintiffs had "failed to carry their burden of proof on the issue of market efficiency and therefore [Rule 23(b)(3)] predominance." No. 11 Civ. 7533(KBF), 2013 WL 3357170, at *13 (S.D.N.Y. July 3, 2013). Even though the first four *Cammer* factors were uncontested, the court

17

explained that "the first four factors are structural factors: they set up or are reflective of a market in which shares *can* be traded efficiently.  The final factor demonstrates whether the market *is in fact* efficient through showing cause and effect."  *Id.* at *9 (emphasis added) (internal citation omitted).

Plaintiffs here, and their expert, similarly have failed to demonstrate that Big Lots' stock price quickly and fully reacted to all publicly available information.  (*See* Gompers Rpt. ¶¶ 70-81.)  Mr. Steinholt analyzed just four days with potential value-relevant information out of 122 trading days in the putative class period (*see* Steinholt Rpt. ¶¶ 33-34), despite creating a voluminous exhibit of press releases and reports related to Big Lots throughout the relevant time period that he could have used to analyze other trading days (*see* Steinholt Ex. C.).

The scant analysis that Mr. Steinholt did conduct is unreliable.  *First*, for four of the six days Mr. Steinholt analyzed, he did not develop an ex-ante hypothesis concerning the price movement based on the content of the news released that day.  (*See* Gompers Rpt. ¶ 64.) As Professor Gompers explains, in order to conduct a proper scientific analysis, Mr. Steinholt should have developed an ex-ante hypothesis for the dates that he tested and should have declined to test dates for which he could not develop an adequate hypothesis.  (*Id.* ¶¶ 70-81.) Indeed, at his deposition, Mr. Steinholt admitted that "what the experts frequently . . . will do is to analyze the information disclosed and determine whether or not it would be expected to be positive or negative."  (Steinholt Tr. 56:19-24.)  Having failed to do that, however, Mr. Steinholt cannot say whether the stock price movement on the four analyzed days was consistent with economic expectations based on the informational content of the news released on those dates. (Gompers Rpt. ¶ 71.)  This problem is well illustrated by Mr. Steinholt's analysis for March 2, 2012, the first day of the putative class period.  Plaintiffs contend the statements made by Big

18

Lots on that day "artificially inflated the price of the stock," so an ex-ante hypothesis consistent with Plaintiffs' allegations presumably would have predicted some degree of price increase. However, as Mr. Steinholt's analysis shows, Big Lots stock *declined* by a statistically significant amount on that date. (Steinholt Rpt. Ex. E.) Yet Mr. Steinholt somehow concluded that was statistically significant evidence of market efficiency. Such a result does not make economic sense. (*See* Gompers Rpt. ¶¶ 70-74.)

       *Second*, Mr. Steinholt's use of the alleged corrective disclosure dates in his event study biases the results. (*See* Gompers Rpt. ¶¶ 82-85.) As Professor Gompers explains, because the behavior of Big Lots stock on those dates forms the basis for Plaintiffs' claims (and therefore Mr. Steinholt knew at the outset that those dates were likely associated with large price declines), any tested hypothesis concerning those dates is likely to be biased. (*Id*.) The bias is compounded by Mr. Steinholt's selection, in the first instance, of dates associated with financial releases, which he admits are "more likely to result in a statistically significant price movement." (Steinholt Tr. 59:12-60:23.) Simply put, he stacked the deck in favor of his desired result.

       "Without evidence of the prompt effect of unexpected news on [the] market price, the market cannot be called efficient. . . . Because [Plaintiff] has not shown by a preponderance of the credible evidence that the market . . . was efficient, the fraud on the market presumption of collective reliance does not apply." *Freddie Mac*, 281 F.R.D. at 182.[4]

---

[4] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

*See* Benton Tr. 44:2-9 ("the stock market being inefficient is a tenet of Paradigm's investment approach"); ██████████████████████████████████████████████████████████
████████████████████████████████████ Mushock Tr. 112:8-113:12 (Systematic "trie[d] to exploit" its belief that "[a]ll investors" "routinely under-react to changes in company fundamentals"); ██████████████████████████████████████████████
████████████████████████████████████████████████████████

19

### 2.    Plaintiffs Cannot Invoke the *Affiliated Ute* Presumption of Reliance.

In *Affiliated Ute*, 406 U.S. 128 (1972), the Supreme Court recognized a presumption of reliance in Rule 10b-5 cases "involving primarily a *failure* to disclose." *Id.* at 153 (emphasis added); *see also Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 917, 918 (6th Cir. 1991). The rationale underlying that presumption is that, in cases premised on omissions, "reliance on a negative would be practically impossible to prove." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001). The *Affiliated Ute* presumption does not arise, however, in cases where the allegations are based "primarily" on affirmative misrepresentations, where plaintiffs may instead seek to invoke the *Basic* presumption. *Id.* at 192; *see also In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 51 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010); *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 895 (W.D. Ky. 2010).

Even in cases involving a combination of alleged misstatements and omissions, "the court must engage in a context-specific determination of whether the offenses alleged are characterized as omissions or affirmative representations, in order to determine a *unitary burden of proof* on the reliance issue." *See Clayton, Jr. v. Heartland Res., Inc.*, No. 1:08CV-94-JHM, 2010 WL 4778787, at *3 (W.D. Ky. Nov. 16, 2010) (emphasis added). The *Affiliated Ute* presumption is available only in cases that "primarily" allege omissions. *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993); *Austin v. Loftsgaarden*, 675 F.2d 168, 178 n. 21 (8th Cir. 1982).

This is not such a case. Plaintiffs contend that "defendants issued false and misleading *statements* regarding the Company's business and financial results in order to artificially inflate the price of Big Lots stock." (Compl. ¶ 2 (emphasis added).) Indeed, the Complaint catalogs dozens of specific statements that plaintiffs allege were materially false or misleading. (*See, e.g.*, Compl. ¶¶ 61-62, 67-77, 83-93, 96-99, 107, 113-118, 120-125, 129-130.)

20

Plaintiffs repeatedly allege that those affirmative "*statements* had a direct effect on Big Lots' stock price." (*See, e.g.*, Compl. ¶¶ 63, 78, 94, 100, 126.) Indeed, this Court noted in its motion to dismiss opinion that the "Complaint identifies thirteen distinct sources of allegedly fraudulent *statements* made by Defendants during the class period," (MTD Op. at 30 (emphasis added)), and then analyzed each statement individually to determine whether Plaintiffs stated a claim. *See id.* at 31-63. Similarly, Mr. Steinholt describes the allegations as "relat[ing] to false and misleading *statements*." (Steinholt Rpt. ¶ 54 (emphasis added).)

Plaintiffs seek to avail themselves of *Affiliated Ute* (while simultaneously claiming the *Basic* presumption) by asserting that this Court upheld "*statements* Lead Plaintiff had alleged 'were fraudulent for *omitting* and/or concealing information concerning the true state of Big Lots' performance and merchandising operations.'" (Mot. at 17 (emphasis added).) But courts have uniformly rejected that sort of wordplay, holding that a claim alleging misstatements "should not be transformed into an omission [claim] simply because the defendants failed to disclose that the allegedly misleading fact was untrue." *Johnston*, 265 F.3d at 193. Such an approach "would allow the presumption to swallow the reliance requirement almost completely." *Id.*; *see also Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) (cautioning against "artfully-pleaded complaint[s]" that "recharacterize as an omission conduct which more closely resembles a misrepresentation"). Similarly, "where a [p]laintiff's principal objection . . . is that the omissions exacerbated the misleading nature of the affirmative statements, *Ute* will not apply." *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 143 (S.D.N.Y. 2008) (internal quotations omitted); *accord In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011). Accordingly, Plaintiffs are not entitled to the *Affiliated Ute* presumption.

**3.  Defendants Have Rebutted Any Presumption of Reliance Because the Alleged Misstatements Had No Price Impact.**

Defendants have rebutted the fraud on the market presumption of reliance through economic evidence—the report of Plaintiffs' own expert—that the alleged misrepresentations at issue had no statistically significant positive impact on the price of Big Lots' stock.

In *Halliburton II*, the Supreme Court held that defendants may rebut the *Basic* presumption at the class certification stage with evidence of a lack of "price impact." 134 S. Ct. 2398, 2417 (2014). The Court explained that "[p]rice impact is . . . an essential precondition for any Rule 10b-5 class action" and that "[w]hile *Basic* allows plaintiffs to establish that precondition indirectly, it does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Id.* at 2416. Accordingly, "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance because the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* at 2415-16 (internal quotations omitted).

Under *Halliburton II*, defendants can rebut the presumption by showing either that the alleged misrepresentations did not cause the stock price to increase (*i.e.*, lack of "front-end" price impact) *or* that the alleged corrective disclosures did not cause the stock price to decrease (*i.e.*, lack of "back-end" price impact). 134 S. Ct. at 2414. As the Supreme Court highlighted, "*Basic* itself 'made clear that the presumption . . . could be rebutted by appropriate

evidence,' including evidence that *the asserted misrepresentation (or its correction) did not affect the market price* of the defendant's stock." *Id.* (emphasis added).[5]

Applying *Halliburton II*, the Eighth Circuit recently held that a defendant had successfully rebutted the presumption at the class certification stage by showing that the alleged misstatements did not have any impact on the company's stock price at the time they were made—*i.e.*, that there was no front-end price impact. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016). The court explained that the "*Basic* presumption addresses whether the plaintiff investor relied on defendant's publicly known misrepresentations '*at the time of the relevant [initial] transaction*,'" whereas the separate element of "loss causation," which is not an issue for class certification, involves proof that the misrepresentation "*also caused a subsequent economic loss.*" *Id.* at 780 (emphasis added); *see also City of Sterling Heights*, 2015 WL 5097883, at *11 ("[W]hether the alleged misrepresentations affected the market price in the first place—i.e., whether there was price impact—is a different inquiry than whether those same representations also caused a subsequent economic loss. This is particularly important at class certification because evidence of loss causation is irrelevant at that stage, while evidence of price impact, or lack thereof, is highly relevant. Whether the initial misrepresentations affected the stock price is price impact. Whether the final disclosure later caused the stock price to drop is loss causation.") (internal citations and quotations omitted).

Applying those principles, the Eighth Circuit reversed class certification based on evidence that the stock price did not increase as a result of the actionable misstatements. *Best*

_____

[5] *Halliburton II* consistently endorses a defendant's ability to show lack of price impact at the front end. *See* 134 S. Ct. at 2414 ("[D]efendants should at least be allowed to defeat the presumption at the class certification stage through evidence that *the misrepresentation* did not in fact affect the stock price.") (emphasis added); 2408 ("[I]f a defendant could show that *the alleged misrepresentation* did not, for whatever reason, actually affect the market price . . . then the presumption of reliance would not apply.") (emphasis added).

*Buy*, 818 F.3d at 783.  The court held that the defendants had "rebutted the *Basic* presumption by submitting direct evidence (the opinions of both parties' experts) that severed any link between the alleged conference call misrepresentations and the stock price at which plaintiffs purchased." *Id.*; *see also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("Defendants have successfully rebutted the . . . presumption" by demonstrating "that there is no date on which any alleged misrepresentation caused a statistically significant increase in the [stock] price.").

Here, the analysis performed by Plaintiffs' own expert (who was also the plaintiff's expert in *Best Buy*) makes clear that the statements that survived Defendants' motion to dismiss did not result in a statistically significant increase in Big Lots' stock price.  (*See* Gompers Rpt. ¶¶ 86-88.)  Exhibit E to Mr. Steinholt's report presents the results of a regression analysis of market and retail-industry returns, calculating a predicted company-specific "abnormal" return for Big Lots' stock for each day.  Mr. Steinholt then calculated a "t-statistic" for each day based on the magnitude of the "abnormal return."  Mr. Steinholt explains that when the t-statistic has an absolute value greater than 1.96, that represents (at a 5% level) a statistically significant, company-specific stock price movement.  (Steinholt Rpt. ¶ 35 n.36.)

Mr. Steinholt's calculations for each of the nine dates on which Plaintiffs allege that the Company made false statements shows that that *none* of the alleged misrepresentations was associated with a statistically significant increase in the stock price.[6]  (*See* Gompers Rpt. ¶ 87.)  Indeed, the only alleged misstatement dates correlated with statistically significant price

---

[6] During his deposition, Mr. Steinholt asserted that the increase in Big Lots' stock price on May 23, 2012 would be statistically significant at the 5% level if a "one tailed test" were applied. (Steinholt Tr. 104:17-106:6.)  But that is not how Mr. Steinholt measured Big Lots' stock price movements in his report for purposes of testing market efficiency, which applied a "two tailed test."  Nevertheless, even if such a test were applied and resulted in a statistically significant increase (and ignoring the other reasons class certification must be denied), that result would only support the certification of a class based on the alleged misrepresentations on May 23, 2012.

movements are March 2 and April 23, 2012, dates associated with statistically significant *declines* in the stock price. (*See id.*) If, as Mr. Steinholt argues, a statistically significant price movement on the day that a company releases news tends to show a causal relationship between that news and the price of the company's stock, it follows that a *lack* of any statistically significant price change tends to show that there was *no* causal relationship between that news and an increase in the stock price. Accordingly, there was no link between the alleged misstatements and the price of Big Lots stock, and any presumption of reliance is rebutted. (*See* Gompers Rpt. ¶ 87 ("According to the regression analysis presented in Exhibit E of Mr. Steinholt's expert report, there is no evidence of a positive and statistically significant stock price increase that could be associated with the alleged misstatements.").)

Plaintiffs' speculative invocation of the "price maintenance" theory does not allow them to escape their own expert's straightforward evidence of no price impact. In his report, Mr. Steinholt asserts:

> "In cases that relate to false and misleading statements that concealed adverse facts that were known by Defendants, but concealed from investors, the alleged misrepresentations would have been expected to maintain investors' expectations (by concealing the alleged truth), and thereby also preventing the stock price from declining. Under this theory, the misrepresentations would have maintained the stock price, causing it to trade at a higher level than it otherwise would have traded had Defendants been truthful." (Steinholt Rpt. ¶ 54.)

Mr. Steinholt has done no analysis, however, to support the conclusion that this generality is applicable here. Plaintiffs' speculative and conclusory argument should be rejected, just as the Eighth Circuit rejected it in *Best Buy*. There, the court found that the plaintiffs' theory that the statements maintained an inflated stock price, as allegedly evidenced by the price drop after the corrective disclosure, "provided no evidence that refuted defendants' overwhelming evidence of no price impact." *Best Buy*, 818 F.3d at 783. The court thus rejected the theory that the

statements "*could have* further inflated the price, prolonged the inflation of the price, or slowed the rate of fall." *Id.* at 782 (emphasis added); *see also In re Credit Suisse*, 250 F.R.D. at 145 (plaintiffs' "price maintenance theory is patently deficient," given that "Rule 23 determinations must be based on 'relevant *facts*'"). Here, where Plaintiffs' price maintenance theory is "based not on facts but on speculation," the uncontroverted economic evidence of a lack of statistically significant price increase caused by any of the alleged misstatements is sufficient to rebut the *Basic* presumption. *In re Credit Suisse*, 250 F.R.D. at 145.

## II. PLAINTIFFS CANNOT ESTABLISH TYPICALITY BECAUSE THE PRESUMPTION OF RELIANCE HAS BEEN REBUTTED AS TO EACH PROPOSED CLASS REPRESENTATIVE.

Class certification must be denied for lack of typicality "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson*, 222 F. 3d 52, 59 (2d Cir. 2000); *see also Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) ("[A]bsent class members will suffer if their representative is preoccupied with defenses unique to it."). Relevant here, a proposed representative in a securities case is "atypical of the class" where the representative individually is "subject to an arguable defense of non-reliance on the market." *In re Harcourt Brace Jovanovich, Inc. Sec. Litig.*, 838 F. Supp. 109, 113 (S.D.N.Y. 1993); *see also Blank v. Jacobs*, No. 03-CV-2111 (JS)(MLO), 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30, 2009) ("[A] unique defense could arise if the plaintiff was relying not on the market, but on his own assessment of the value of the stock.") (internal quotations omitted).

Two recent cases illustrate that Plaintiffs cannot satisfy typicality here because they are subject to the individualized defense that they did not rely upon the market price as an accurate representation of the value of Big Lots stock. In *GAMCO Investors, Inc. v. Vivendi, S.A.*, the plaintiffs were "value-based investors who utilized a [proprietary] metric . . . to evaluate

the intrinsic value of . . . securities."  927 F. Supp. 2d 88, 95, 97 (S.D.N.Y. 2013).  The investors purchased stocks that they believed were "selling at substantial discounts to their intrinsic [value]," and the market price of the stocks "factored into [p]laintiffs' investment decision only as a comparator with" their own assessments of the stocks' true value.  *Id.* at 94, 97.  The court held that the defendants had successfully rebutted the presumption of reliance as to those plaintiffs by demonstrating that "Plaintiffs did not 'rely on the market price of [the defendants'] securities as an accurate measure of their intrinsic value.'"  *Id.* at 102.

Similarly, in *In re Vivendi Universal, S.A. Securities Litigation*, the plaintiff was a "value investor" that sought to "'achieve superior long-term performance' by buying stocks undervalued by the market."  123 F. Supp. 3d 424, 426-27 (S.D.N.Y. 2015).  The plaintiff's "ultimate decision to invest in a stock depend[ed] heavily on its proprietary valuations" of the stock's "intrinsic value" as compared to its market price.  *Id.* at 427.  The court found that because plaintiff did not purchase based on the integrity of the market price, the presumption of reliance had been rebutted.  *Id.* at 438; *see also Blank v. Jacobs*, 2009 WL 3233037, at *5 ("[T]he plaintiff was relying not on the market, but on his own assessment of the value of the stock. . . . [A] named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3).") (internal quotations omitted).

The facts here are virtually identical to those of *GAMCO* and *Vivendi*.  The evidence is uncontroverted that the advisors making investment decisions for Pontiac and Teamsters "did not 'rely on the market price of [Big Lots] securities as an accurate measure of their intrinsic value.'"  *GAMCO*, 927 F. Supp. 2d at 102.  Rather, advisors Systematic, Paradigm and ████████████████████████████████████████████████████████████

████████████████████████ (Benton Tr. 64:21-65:7; Mushock Tr. 102:20-103:4; ████████

████████) As in *GAMCO*, the market price of Big Lots stock "factored into [their] investment

decision only as a comparator with" their own assessments of the stock's value; *i.e.* to determine

whether a stock was undervalued by the market and thus presented an investment opportunity.

927 F. Supp. 2d at 95, 97; *see* Mushock Tr. 106:24-107:9 ("Systematic would look at the market

price of a security relative to financial metrics to determine whether a security was

undervalued"); Benton Tr. 118:2-4 (Paradigm would "consider the current market price versus

their fundamental analysis and valuation of the company")██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

Indeed, as described more fully above (*see* Statement of Facts Part C.2, *supra*),

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Its other advisor, Systematic, "tr[ied] to

exploit" the fact that, in its view, "[a]ll investors" "routinely under-react to changes in company

fundamentals" (Mushock Tr. 112:8-113:12), and sought to invest in companies it believed were

"undervalued" by the market (*id.* at 106:24-107:9). Teamsters' advisor Paradigm "looked for

stocks where the market price did not accurately measure the fundamental value of the company



---

[7] During the class period, OakBrook was responsible only for Pontiac's June 25, 2012
purchase of Big Lots stock.

as determined by Paradigm." (Benton Tr. 64:21-65:7; *see also* Ex. Q.)



Indeed, Herndon's representative testified that the market price decline following the August 23 disclosure made Big Lots a *more attractive* investment as a result of that decline, such that four days later Herndon bought 1,787 additional shares of Big Lots for Teamsters. *Compare* Cain Tr. 133:2-9 *with GAMCO*, 927 F. Supp. 2d at 101-02 ("[I]f Vivendi had fully disclosed its liquidity condition at all relevant times . . . because Plaintiffs' estimation of Vivendi's 'intrinsic value' . . . would be unchanged, and . . . the price of Vivendi ADS's would have been lower, Plaintiffs would have seen Vivendi as a *more* attractive investment. And they did: during the Corrective Disclosure Period, Plaintiffs doubled or tripled their holdings in Vivendi securities."); *see also* Mushock Tr. 129:24-130:7 ("[A] reduction in the market price of a stock would make a stock more attractively valued to Systematic".).

Finally, that certain of the investment advisors may have read the Defendants' allegedly misleading public statements or listened to the Company's analyst conference calls is of no consequence. The relevant inquiry is not whether or not the representative plaintiffs (or any individual class member) relied on Defendants' allegedly false statements, but rather whether their purported reliance was typical of the class as a whole and appropriate for classwide proof. Indeed, the genesis of the fraud on the market presumption of *indirect* reliance on the integrity of the stock price was that *direct* reliance on the public statements themselves is

virtually impossible to adjudicate on a common basis for all class members.  *See Basic*, 485 U.S. at 242; *see also Halliburton II*, 134 S. Ct. at 2407-08; *Amgen*, 133 S. Ct. at 1192-93. Accordingly, if one is to assume, *arguendo*, that the two proposed plaintiff representatives (through their investment advisors) *directly* relied on the allegedly false statements but *did not indirectly* rely on the statements based on the integrity of the stock price, their *individual claims* may proceed, but *class certification must be denied.  See Basic*, 485 U.S. at 229-30 ("[W]ithout the presumption it would be impractical to certify a class under [Rule] 23(b)(3).").

## III.   PLAINTIFFS CANNOT ESTABLISH THE ADEQUACY REQUIREMENT OF RULE 23(A)(4).

### A.   The Representative Plaintiffs Do Not Control the Litigation and Are Inadequate Class Representatives.

Pontiac and Teamsters are inadequate because their appointment will result in attorneys—rather than class members—controlling and directing the litigation.  As courts have held, putative class representatives are inadequate where (as here) their knowledge of the case is derived solely from counsel and where class counsel, rather than the class representative, is directing the litigation.  *See Berger v. Compaq Computer Corp*., 257 F.3d 475, 483 n.18 (5th Cir. 2001); *see also Shiring v. Tier Techs., Inc*., 244 F.R.D. 307, 315-16 (E.D. Va. 2007).

Pontiac's involvement in this case is driven entirely by Robbins Geller.  Pontiac's representative, Mr. Moore, testified that he could not identify anything Pontiac relied on in understanding the alleged wrongful conduct other than what Robbins Geller had told him. (Moore Tr. 73:7-11; 120:24-121:6.)  Similarly, he could not identify any document that Pontiac considered in connection with its decision to become a plaintiff in this case.  (*Id.* at 86:12-19.) When asked the basis for his allegations that Defendants had committed fraud, Mr. Moore simply stated that he depends on counsel to handle the particulars of the case.  (*Id.* at 118:15-19; 125:7-18.)  *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 676 (S.D. Tex. 2006) ("A class

representative . . . must have a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation.") (internal quotations omitted).

Similarly, Mr. Goldberg testified for Teamsters that all of his knowledge about Big Lots and the allegations in the case came from reading the Complaint, and that Teamsters had not conducted any independent investigation of the facts, nor had they in any way attempted to verify the allegations in the Complaint.  (Goldberg Tr. 88:2-14; 69:25-70:11.)  Mr. Goldberg did not even know how the case came to Teamsters' attention.  (*Id.* at 71:19-72:15.)  *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 146 (N.D. Tex. 2014) (in assessing adequacy, criticizing that representatives had "'nearly total if not complete reliance on class counsel . . . for investigation and prosecution of the case,' and further, had relied on the complaints—prepared solely by class counsel—as their source of information about the facts in the case") (*citing In re Enron*, 529 F. Supp. 2d at 732); *see also Berger*, 257 F.3d at 483 n.18 ("Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel."); *Shiring*, 244 F.R.D. at 316 ("[P]laintiff is an inadequate class representative . . . because plaintiff has not demonstrated that he, rather than his counsel, is in control of the litigation.").  Mr. Goldberg testified that, prior to seeking to be appointed a class representative in Plaintiffs' motion to this Court on May 27, 2016, Teamsters had not reviewed any documents about the case, had not spoken with Robbins Geller about the case, and had not done any investigation as to the allegations in the Complaint.[8] (Goldberg Tr. 161:9-162:25.)  "When it appears that the potential representatives are 'simply

---

[8] Mr. Goldberg later recanted his testimony on this subject, as discussed in Part III.B.

lending their names to a suit controlled entirely by the class attorney,' . . . courts may find them

to be inadequate."[9]  *Kosmos*, 299 F.R.D. at 145.

In addition to relying solely on Robbins Geller to conduct this litigation, both

Plaintiffs demonstrate almost no understanding of the facts.  Mr. Moore's testimony makes clear

that Pontiac does not understand the allegations in its Complaint and that its knowledge of the

case is limited to the idea that Pontiac somehow lost money.  (Moore Tr. 122:16-21; *see also id.*

at 103:8-18 ("The only thing I can tell you [about Big Lots] is . . . I think that there was a Big Lot

store located in the City of Pontiac.  And that's pretty much all I can tell you other than the fact

that now we are involved in a lawsuit").)  Mr. Goldberg could not identify any individual

defendant other than Steven Fishman and testified (incorrectly) that he believed Douglas Wurl

was a defendant.[10]  (Goldberg Tr. 105:2-11.)  In sum, both proposed representatives are

inadequate because they have virtually no factual knowledge about the case.  *See Ogden v.*

*AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) ("[The proposed class representative]

is unable to describe whole portions of her complaint.  She has no factual knowledge, beyond

---

[9] Indeed, both Plaintiffs became involved in this case through their "monitoring" agreements with Robbins Geller—in Pontiac's case, the very agreement that another court harshly criticized as fostering "abusive" lawyer-driven litigation.  *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 844 F. Supp. 2d 498, 500 (S.D.N.Y. 2012) (agreement "cast doubt on the adequacy of [Pontiac] to serve as lead plaintiff and/or . . . Robbins Geller to serve as lead counsel"); *see also Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) ("[T]his practice, on its face, creates a clear incentive for [the law firm] to discover 'fraud' in the investments it monitors . . . [and] fosters the very tendencies toward lawyer-drive[n] litigation that the PSLRA was designed to curtail.").  In *Lockheed Martin*, the court allowed Pontiac to be a class representative (with "reservations") after assessing that Pontiac's representative "demonstrated a far greater understanding of this action than the corresponding representative . . . in the *Iron Workers* case."  844 F. Supp. 2d at 502, 504.  Here, Pontiac demonstrates no such understanding.  Moreover, both Plaintiffs used as their investment manager an entity known as Gray & Company, which is also being represented in this litigation by Robbins Geller.  (*See* Ex. R.)

[10] As discussed further in Part III.B., Mr. Goldberg later changed his testimony on this point, after conferring with his counsel during a break.  (Goldberg Tr. 168:13-170:10.)

knowing that money was lost, to support the allegations in her complaint.  And it is apparent that counsel has provided the vast majority of the knowledge that she does possess."); *see also In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MDL No. 1658 (SRC), 2009 WL 331426, at *9 (D.N.J. Feb. 10, 2009) (class representative inadequate where his "deposition testimony . . . indicates substantial confusion and ignorance about basic facts of the case.").

    **B.**    **Teamsters Is Also Inadequate Because Scrutiny of Mr. Goldberg's Changing of His Deposition Testimony After Conferring With Counsel Will Detract from the Prosecution of the Litigation.**

After defense counsel finished questioning Mr. Goldberg, attorneys from Robbins Geller took an approximately ten minute recess during which they had a conversation with Mr. Goldberg about the substance of this case.  (Goldberg Tr. 170:20-171:9; 184:6-19.)  Upon returning, Robbins Geller asked the witness a series of leading questions about the same topics defense counsel had covered just prior to the break.  (*Id.* at 164:6-168:12.)  In response to those questions, Mr. Goldberg gave answers that directly contradicted his prior testimony.[11]  When defense counsel questioned the witness about his contradictory testimony, Robbins Geller instructed the witness not to answer.  (*Id.* at 180:15-181:16.)

Mr. Goldberg's shifting testimony following what appears to have been improper coaching by Robbins Geller will be the subject of discovery and cross-examination at trial by the Defendants.  Defendants' inquiry into Teamsters' (and Robbins Geller's) conduct will detract from the substantive allegations of the litigation and would unfairly prejudice absent class

---

[11] During defense counsel's examination, Mr. Goldberg testified that neither he nor Teamsters had reviewed any documents or spoken to Robbins Geller prior to the time Robbins Geller filed the motion for class certification that sought to have Teamsters appointed as a class representative on May 27, 2016.  (Goldberg Tr. 161:9-162:25.)  After conferring with Robbins Geller on a break, however, Mr. Goldberg changed his testimony and stated that Teamsters had reviewed documents and had discussions with counsel prior to May 27, 2016.  (*Id.* at 164:19-165:2.)

members. *See Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136-37 (S.D.N.Y. 2007) (denying motion for class certification when representative "failed to properly comply with discovery requests and document production in a timely fashion" because "[t]he unique defenses that would arise during trial from such accusations . . . would pose a problem to the rest of the class"); *see also Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) (because "successful protection of the class claims depends upon [the class representative's] integrity[,] . . . failure to comply with proper discovery inquiry may be considered on the issue as to whether a class representative lives up to his fiduciary obligation").

### C.    Pontiac Cannot Represent Purchasers That Bought Stock After April 23, 2012.

During the relevant period, Pontiac sold the last of its Big Lots shares on August 17, 2012. Therefore, Pontiac did not own any Big Lots stock as of the second alleged corrective disclosure on August 23, 2012 and does not have a claim for losses resulting from the stock price decline on that date.

In order to satisfy the adequacy requirement of Rule 23(a), "there must not be antagonism between the interests of the named plaintiff and the interests of the rest of the class." *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 482 (W.D. Mich. 1994). Pontiac cannot represent a class allegedly harmed by the August 23, 2012 disclosure because the stock price decline following that date "will not have led to any loss" for Pontiac. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Pontiac lacks any financial incentive to demonstrate inflation in the period between April 23, 2012 and August 23, 2012, and in fact is incentivized to show minimal inflation as of August 17, 2012 (its final sale date of Big Lots securities) in order to recover a greater amount of damages. *See Ballan*, 159 F.R.D. at 485 ("An individual who purchased at the beginning of the

class period, but sold prior to the time plaintiff purchased, would not share plaintiff's desire to show that the maximum price inflation continued throughout the class period.").

Pontiac and similar plaintiffs who sold their stock before August 23, 2012 "did not suffer any loss causally related to defendants' alleged misrepresentations" and the second allegedly corrective disclosure of such misrepresentations. *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, No. C 03-2522 MHP, 2006 WL 1180267, at *9 (N.D. Cal. May 3, 2006) (excluding from the definition of the class plaintiffs who sold their shares before any corrective disclosure occurred). Pontiac therefore is atypical of a class of investors covering the entire period from March 2 through August 23, 2012, and cannot independently represent a class covering that period. Standing alone, and notwithstanding the other adequacy and typicality issues that render it unable to serve as a representative plaintiff at all, Pontiac could only represent a putative class covering the time period from March 2, 2012 through April 23, 2012.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel should be denied in its entirety.

Dated: July 29, 2016

Respectfully submitted,

**VORYS, SATER, SEYMOUR AND PEASE LLP**

/s/ William D. Kloss, Jr.
Trial Attorney
William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Phone:  (614) 464-6360
Fax:  (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

**CRAVATH, SWAINE & MOORE LLP**
Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for Defendants*

**APPENDIX A**

| Source | ¶ of Complaint | Statement Number | Statement |
|---|---|---|---|
| March 2, 2012 Conference Call | ¶ 69 | 1 | "Our fourth quarter was a success as we executed our strategies extremely well over the holiday season, maybe better than we ever have before" |
| | ¶ 69 | 2 | "[Big Lots] significant improvements in [consumables] in 2011 with our merchandise, with planned events, and our team, and the changes have translated into meaningful sales growth" |
| | ¶ 69 | 3 | "[P]roduct presentation, and in-store execution . . . steadily improved as the year went along" |
| | ¶ 70 | 4 | "Electronics continues to be good" |
| | ¶ 70 | 5 | That the availability of closeout consumable inventory had "picked up" |
| | ¶ 71 | 6 | That February sales were "pretty consistent" with fourth quarter 2011 results |
| | ¶¶ 72-73 | 7 | "We have improving trends coming out of 2011 and a focused strategy to execute in 2012" |
| | ¶¶ 72-73 | 8 | "We have stronger, more aggressive plans" to address quarter-to-quarter consistency issues |
| | ¶¶ 72-73 | 9 | "We feel very, very good that we have very specific merchandising plans for our execution on a quarter-by-quarter [basis]." |
| | ¶¶ 72-73 | 10 | "I will tell you that [closeout availability] for some reason seems to have picked up to a more aggressive posture in the last two to three weeks in particular. It tends to be in the Consumables area, which to us is good because we just like -- the Consumables business is the largest closeout piece of our business as a percent to total. So if you were taking a look at it, where we always talk about, anywhere from a third to half of our business being closeout, Consumables is between 70% and 75%, almost 80% closeouts. So it's been pretty aggressive and pretty active. We continue to work on relationships with the people who we do business with, the branded ones in particular.<br><br>I can't speak to why it has picked up. I can only assume that they either have a lot of inventory or somebody is pushing back. That is the same thing that happens all the time, but that is really where it is happening in a pretty aggressive posture, particularly in food and in HBC" |

| Source | ¶ of Complaint | Statement Number | Statement |
|---|---|---|---|
| | ¶¶ 72-73 | 11 | "[W]e are really aggressively approaching [closeout opportunities], and we are out there in the market probably stronger than we have ever been before in addressing those opportunities and making sure those opportunities aren't getting by us" |
| | ¶ 74 | 12 | "what Doug [Wurl] has done and I really support it." |
| March 7, 2012 Form 8-K | ¶ 75 | - | Same statements as March 2, 2012 Conference Call. |
| March 26, 2012 Form 10-K | ¶ 85 | 13 | "Strategically, we anticipate that opportunities exist to continue to grow the basket through the same successful initiatives that benefited results over the last few years." |
| March 27, 2012 Conference Call | ¶ 89 | 14 | "[O]ur vendor base continues to grow every day." |
| | ¶ 90 | 15 | "The results were great. Q4 comps were up nearly 20%." |
| | ¶ 92 | 16 | "For fiscal 2012 we are expecting another solid year – a US comp store sales increase in the range of 2% to 3%, earnings per share of $3.40 to $3.50 per diluted share, a 14% to 17% increase over 2011, and $200 million of cash flow.<br><br>As I wrap up, we have a positive track record of success. Our prospects for the future are encouraging. We've delivered record earnings per share for a half a decade. We've generated strong returns for our shareholders. We've created meaningful employment opportunities for our associates. And we have strategies, teams and capital for continued success in the future." |
| April 10, 2012 2011 Annual Report | ¶ 96 | 17 | "As promised, we focused on [the Consumables] category in 2011 and made significant improvements which translated into meaningful sales growth." |
| | ¶ 96 | 18 | "We correctly anticipated a shift in consumer buying trends toward electronics, the toys of a new age." |
| | ¶ 96 | 19 | "In fact, with the exception of the planned decline in toys, all major categories generated comparable sales increases in the second half of the year." |

| Source | ¶ of Complaint | Statement Number | Statement |
|---|---|---|---|
| April 23, 2012 Press Release | ¶ 102 | 20 | "Based on retail sales results quarter-to-date and assumptions for the balance of the first quarter of fiscal 2012, we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%. *[U.S. comparable store sales were on plan through the first six weeks of the quarter; however, sales compared to plan began to slow in late March and trends have further softened as we moved through the month of April.]* From a merchandising perspective, furniture, hardlines, and seasonal, particularly lawn and garden, have been our best performing businesses; whereas, consumables and play n' wear, particularly electronics, are currently below expectations for the quarter." |
| May 23, 2012 Conference Call | ¶ 113 | 21 | "The two most challenging areas in merchandising were Consumables and Electronics. Consumables was down low singles and Electronics was slightly positive after a 20% comp in 04. The combination of the miss in Consumables and the slowdown in Electronics trends contributed to nearly 3 points of the comp miss to our original forecast, or said another way, was the large majority of our miss." |
| | ¶ 114 | 22 | "The challenges were isolated to our business, which were more closeout in nature . . ." |
| | ¶ 114 | 23 | ". . . I won't allow or acknowledge macro excuses for what I believe is a straightforward execution issue." |
| | ¶ 114 | 24 | "Our shortfall was either we bought the wrong brand or item, or we weren't broad enough in our selections . . ." |
| | ¶ 114 | 25 | "I believe execution came up short here as well. . . ." |
| | ¶ 114 | 26 | "I believe the slowdown from [quarter 4] into [quarter 1 of FY 2012] was the result of not keeping pace with technology." |
| | ¶ 114 | 27 | Fishman attributed the slowdown to "underestimate[ing] the end-of-life impact" of tablets and video games and the DVD selection "w[as] somewhat out of date." |
| | ¶ 116 | 28 | "I think the relationship-building that Doug has really initiated with his team and with some of the major manufacturers, the best manufacturers in the country, |

3

| Source | ¶ of Complaint | Statement Number | Statement |
|---|---|---|---|
| | | | that we probably didn't have as close a relationship with in the past few years is only going to continue to grow.<br><br>He is not only structuring the business or restructuring it around giving him some more talent in those businesses, but also infusing some relationship people that we have really never had before to continue to grow those things." |
| May 29, 2012 Form 8-K | ¶ 120 | - | Same statements as May 23, 2012 Conference Call. |
| June 5, 2012 Conference Call | ¶ 122 | 29 | "Our misstep in electronics was really isolated to a couple select areas." |

4

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing was filed

electronically through the Court's CM/ECF System this 3rd day of August, 2016.  Notice of this

filing will be sent via email to all parties by operation of the Court's electronic filing system.


/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854)